Katherine Barnekow, State Bar No. 336792
kbarnekow@law.harvard.edu
Harvard Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
(617) 998-2450 (o)/fax: 617-496-4863
(512) 868-7800 (c)
kbarnekow@law.harvard.edu

Katherine A. Meyer
(motion for admission *pro hac vice* forthcoming)
kmeyer@law.harvard.edu
Director, Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
(617) 998-2450 (o)/ fax: 617-496-4863
(202) 257-5145 (c)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JACK GESCHEIDT,<br>LAURA CHARITON,<br>SKYLER THOMAS,<br>and ANIMAL LEGAL DEFENSE FUND,<br><br>Plaintiffs,<br><br>v.<br><br>DEB HAALAND, Secretary of Interior,<br>SHAWN BENGE, Acting Director<br>National Park Service, and<br>CRAIG KENKEL, Superintendent,<br>Point Reyes National Seashore,<br><br>Defendants. | Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      Plaintiffs challenge the National Park Service's failure to revise the 1980 General Management Plan for the Tomales Point portion of the Point Reyes National Seashore, where approximately 293 Tule elk live confined behind an eight-foot-high fence that was erected decades ago to prevent the elk from competing for forage and water with the cattle that are permitted by the Park Service to graze on the park land outside the fence. For many years now, due to climate change and other factors, the drought conditions in this area have become extremely dire and, as a consequence, the elk—who were re-introduced in this area and are required by law to be protected—have been unable to obtain access to sufficient food and water to survive and are dying by the dozens of dehydration and/or starvation. **Last year, *approximately 152 more elk—more than a third of the total Tomales Point elk population of 445—died*.** During the previous drought, 183 elk died in 2013 and another 71 elk died in 2014.

2.      Plaintiffs also challenge the failure of the Park Service to update and revise the 1998 Tule Elk Management Plan, mandated by Congress in 1976 "for Tule elk restoration and conservation," 16 U.S.C. § 673g (2018), "to provide for the protection of the elk." 1998 Tule Elk Management Plan and Environmental Assessment.

3.      Plaintiffs further challenge recent decisions by the Park Service not to remove any portion of the Tomales Point fence that is preventing the elk from accessing adequate food and water, as well as the Park Service's decision not to provide the elk with any supplemental food, and its very recent decision to provide water to some, but not all, of the elk at Tomales Point—in other words, its decision to continue to allow this protected wildlife to die of starvation and dehydration.

4.      As a result of the Park Service's failure to revise these two relevant management documents, and its decisions not to undertake measures to ensure that the elk are provided adequate food and water, this precious natural resource, one that millions of visitors come to the Point Reyes National Seashore to observe and enjoy, is dying a slow and horrific death that could be prevented.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

5.      The Park Service's failure to revise these critical management plans violates the agency's statutory duties to do so and constitutes agency action unlawfully withheld and unreasonably delayed within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1) (2018). Its decision to deprive the elk of forage and water necessary to prevent the elk from dying of starvation and/or dehydration is also arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2) (2018).

6.      For all of these reasons, and because the Tule elk are continuing to die horrific and preventable deaths in Tomales Point, Plaintiffs seek declaratory and injunctive relief in the interests of protecting these magnificent animals and the public's interest in continuing to observe, enjoy, study, and photograph them for many generations to come.

## JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2201 (2018).

## PARTIES

### Plaintiffs

8.      Plaintiff Jack Gescheidt, a resident of California since 1996, has been visiting Tomales Point in the Point Reyes National Seashore on a regular basis for at least twenty years and would like to continue to do so. He hikes and runs in Tomales Park and goes there on trips with his friends. He very much enjoys viewing the wildlife, particularly the Tule elk, who live there. He also enjoys photographing the Tule elk at Tomales Point. He has strong recreational, aesthetic, and photographic interests in the Tule elk at Tomales Point, and in ensuring their protection and survival.

9.      The National Park Service's failure to revise the 1980 General Management Plan for this portion of the Seashore, its failure to update the 1998 Elk Management Plan, and its decisions to deny the elk access to adequate food and water injures Mr. Gescheidt's interests because the Park Service is failing to manage the elk in a way that ensures their protection and survival. Consequently, these animals are dying horrific, inhumane, and painful deaths. As a

-3-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

result of Defendants' unlawful actions, Mr. Gescheidt has personally seen an elk at Tomales Point who was dying of either starvation or dehydration—an experience that causes him great anguish and aesthetic injury. In an effort to aid the elk, Mr. Gescheidt has tried to bring them supplemental water so that they will not continue to die such horrific deaths, but the Park Service confiscated the water and refused to let him, and others, bring water to the elk.

10.     Defendants' unlawful actions as described herein are depriving Mr. Gescheidt of the ability to enjoy Tomales Point in the manner in which he has been accustomed to in the past, causing him much emotional and aesthetic injury. He is now faced with the untenable decision to either continue visiting this area and risk seeing dead or dying elk or refrain from visiting this part of the park that he so loves.

11.     Mr. Gescheidt's injuries will be redressed if Plaintiffs prevail in this action because it will mean that the Park Service will have to revise the 1980 General Management Plan with respect to Tomales Point and figure out how to manage the elk in a *humane* way that does not result in this wildlife continuing to die horrific and painful deaths from starvation and dehydration. Should Plaintiffs prevail in this action, Mr. Gescheidt will again be able to visit his beloved Tomales Point and the elk who live there without seeing them, or being confronted with the possibility of seeing them, in such inhumane conditions.

12.     Plaintiff Laura Chariton, also a resident of California, has been visiting the Point Reyes National Seashore since 1974 and would like to continue to do so. She uses Tomales Point for recreational, educational, and aesthetic enjoyment, and very much enjoys observing the Tule elk who live there. She so loves Tomales Point that she and her husband celebrate important events in their lives there, including her birthday, which she has celebrated in the park with friends for many years. She loves the Tule elk and loves observing them in their natural state. She is so enamored of the elk that for many years she served as a Tule elk docent on behalf of the National Park Service, teaching visitors about the biology, ecosystems, and lives of the Tomales Point elk. Unfortunately, because she loves this area and the elk who live there, Ms. Chariton has also recently personally observed elk who were emaciated and dying from a lack of food and water – a sight that haunts her every single day.

-4-

13.     The Park Service's failure to revise the 1980 General Management Plan for this portion of the Seashore, its failure to update the 1998 Elk Management Plan, and its decisions to deny the elk access to adequate food and water injures Ms. Chariton's aesthetic and recreational interests because the Park Service is failing to manage the elk in a way that ensures their protection and survival, and its decisions therefore mean that the elk will continue to suffer horrible deaths from starvation and dehydration. To avoid these injuries, Ms. Chariton is faced with the untenable decision to either forgo visiting her beloved Tomales Point or continue to go there and be subjected to the horrific scene of elk either dying or dead from a lack of food and water because they cannot get past the fence that the Park Service maintains on the southern border of their habitat.

14.     Ms. Chariton's injuries will be redressed if Plaintiffs prevail in this action because it will mean that the Park Service will have to revise the 1980 General Management Plan with respect to Tomales Point and devise measures for managing the Tule elk in a *humane* way that does not result in the elk continuing to die horrific and painful deaths from starvation and dehydration. Thus, Ms. Chariton will again be able to visit Tomales Point and the elk who live there without fear of seeing them in such inhumane conditions.

15.     Plaintiff Skyler Thomas is a resident of California. He is a wildlife photographer and videographer. He has been visiting the Point Reyes National Seashore, and specifically Tomales Point, on a regular basis since 2016, and would like to continue to do so. He enjoys hiking there and taking photographs and videos of the wildlife, particularly the Tule elk. He is spiritually inspired by Tomales Point and has fallen in love with this beautiful place and the elk who live there. Unfortunately, because he so frequently visits the area, he has also recently been confronted with the sight of elk dead from a lack of water and forage. Through no effort on his own to see such carnage, he has already personally seen as many as fifteen emaciated dead elk— an experience that horrifies him and a sight that he cannot get out of his mind. Because of this situation, he is now faced with the deplorable choice of either refraining from visiting this area that he loves so much to avoid again seeing dead or dying elk or continuing to go there only to be confronted with these horrible scenes.

16.     Mr. Thomas' aesthetic, recreational, and photographic injuries are being greatly impaired by the Park Service's unlawful actions as described herein because the Park Service is failing to manage Tomales Point and the elk who live there in a way that does not cause them such suffering.

17.     Mr. Thomas' injuries will be redressed if Plaintiffs prevail in this action because this will mean that the Park Service will have to revise the 1980 General Management Plan with respect to Tomales Point and figure out how to manage the Tule elk in a *humane* way that does not result in the elk continuing to die horrific and painful deaths from starvation and dehydration, and Mr. Thomas will again be able to visit Tomales Point and the elk who live there without the fear of seeing them in such inhumane conditions.

18.     Plaintiff Animal Legal Defense Fund ("ALDF") is a national nonprofit animal protection organization founded in 1979 and headquartered in Cotati, California. ALDF uses education, public outreach, legislation, and litigation to protect the lives and advance the interests of animals, including the Tule elk who live in Tomales Point at Point Reyes National Seashore. ALDF has more than 300,000 members and supporters nationwide, including members who reside in Marin County, California. Since 2018, ALDF has advocated for sound management of the Tule elk. The organization and its members and supporters have provided public comment on numerous issues related to captive elk within the Point Reyes National Seashore, and in 2020, ALDF members and supporters urged the National Park Service to provide food and water to the captive Tule elk at Tomales Point.

19.     ALDF members, supporters, and staff derive substantial recreational, aesthetic, and conservation benefits and enjoyment from visiting Tomales Point, and observing the Tule elk who live there, and would like to continue to engage in all of these activities. However, their aesthetic and recreational interests in enjoying this part of the National Seashore, and especially the Tule elk, are greatly impaired by Defendants' unlawful actions as described herein, because those actions are causing Tule elk at Tomales Point to live in inhumane conditions and to die of starvation and dehydration because they cannot obtain access to adequate food and water.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

20.     These injuries to ALDF members, staff, and supporters will be redressed if Plaintiffs prevail in this action because this will mean that the Park Service will have to revise the 1980 General Management Plan with respect to Tomales Point and take other measures to manage the Tule elk in a *humane* way that does not result in the elk continuing to die horrific and painful deaths from starvation and dehydration. This will allow ALDF's members, supporters, and staff to continue enjoying Tomales Point and the elk who live there without having to see, or contemplate seeing, elk dying or dead from a lack of water or food caused by their inability to get beyond the fence maintained by the Park Service on the southern border of their habitat.

**Defendants**

21.     Defendant Deb Haaland is the Secretary of the Interior. She has ultimate authority to administer the laws at issue in this case and is therefore responsible for the challenged actions.

22.     Defendant Shawn Benge is the Acting Director of the National Park Service. Accordingly, he is responsible for the administration of Point Reyes Seashore, and is therefore responsible for Defendants' unlawful actions that form the basis of Plaintiffs' claims.

23.     Defendant Craig Kenkel is the Superintendent of the Point Reyes National Seashore and responsible for ensuring that the Park Service's management of activities there complies with applicable laws. He is therefore also responsible for the violations of law cited herein.

## FACTUAL AND LEGAL BACKGROUND

A.      **The Park Service Organic Act**

24.     Congress established the National Park Service in 1916 to "promote and regulate the use of the Federal areas known as national parks, monuments, and reservations . . . by such means and measures as conform to the fundamental purpose . . . to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means *as will leave them unimpaired for the enjoyment of future generations*." National Park Service Organic Act, ch. 408, § 1, 39 Stat. 535 (1916) (current version at 54 U.S.C. § 100101(a) (2018)) (emphasis added).

-7-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

25.     As to its duty to leave the wildlife in national park units "unimpaired" for the enjoyment of future generations, the Park Service defines "impairment" as an impact that "would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." 2006 NPS Management Policies, § 1.4.5.

26.     Even where resources and values are not at risk of impairment, the Park Service must fulfill the "fundamental purpose" of the National Park System, which is "to conserve park resources and values" and provide "for the enjoyment of park resources and values by the people of the United States." 2006 NPS Management Policies § 1.4.3. When a conflict arises between "conserving resources and values and providing for enjoyment of them, conservation is to be predominant." *Id.*

**B.      Point Reyes National Seashore**

27.     In 1962, Congress enacted legislation to create the Point Reyes National Seashore as part of the National Park System "to save and preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped . . . ." Act of September 13, 1962, Pub. L. No. 87-657, 76 Stat. 538 (1962) (codified at 16 U.S.C. § 459c *et seq.* (2018)) (the "Point Reyes Seashore Act").

28.     The Point Reyes Seashore Act authorized the Secretary of the Interior to acquire the lands, waters, and other property within the bounds of Point Reyes Peninsula in Marin County, California. The statute further provided that "the property acquired by the Secretary . . . shall be administered by the Secretary without impairment of its natural values, in a manner which provides for such recreational, educational, historic preservation, interpretation, and scientific research opportunities as are consistent with, based upon, and supportive of the maximum protection, restoration, and preservation of the natural environment within the area." *Id.*

29.     On October 20, 1972, the Park Service officially established the Point Reyes Seashore. Point Reyes National Seashore, Calif., 37 Fed. Reg. 23,366 (Oct. 20, 1972).

30.     This National Seashore is located on a coastal peninsula in Marin County, California, encompassing approximately 71,000 acres and 80 miles of coastline. It is surrounded

-8-

1  by the Pacific Ocean on its north, west, and southwest sides, and Tomales Bay on a portion of its

2  east side, including Tomales Point. It contains stunning and diverse landscapes, including rolling

3  grasslands, forests, sandy and rocky beaches, and coastal cliffs. Its natural resources are among

4  the most geologically and ecologically diverse in the National Park System.

5          **C.    <u>Preservation of the Tule Elk</u>**

6          31.    Tule elk are majestic ungulates endemic to California. For centuries, they freely

7  roamed the Point Reyes Peninsula until they were extirpated from the area by the mid-nineteenth

8  century by uncontrolled hunting and removal from their natural habitat to accommodate private

9  livestock ranching.

10         32.    The elk are mixed grazers and browsers—i.e., they feed on both ground-level

11 herbs and grasses and on woody shrubs and trees. Their life expectancy is approximately 8-12

12 years, but they can live much longer, and they give birth to their young between April - June.

13         33.    In 1976, Congress declared that "the protection and maintenance of California's

14 tule elk in a free and wild state is of educational, scientific, and esthetic value to the people of the

15 United States," and therefore required the Secretary of the Interior to "develop a plan for the Tule

16 elk restoration and conservation, including habitat management," and to make land under the

17 jurisdiction of the Secretary "reasonably available for the preservation and grazing of Tule elk,"

18 16 U.S.C. §§ 673e, 673g (2018) ("the Tule Elk Statute"). Congress also designated more than

19 33,000 acres encompassing forests, grasslands, beaches, and coastlines as wilderness and

20 potential wilderness. *Id.*

21         34.    In furtherance of these objectives, in 1978, the California Department of Fish and

22 Wildlife took ten tule elk from an existing heard in the San Luis National Wildlife refuge and

23 placed them in a small, 2600 acre preserve at the northern end of the Seashore called Tomales

24 Point.

25         35.    Although initially the reintroduced population of elk failed to thrive, the elk

26 population increased dramatically after the existing cattle were removed from Tomales Point, and

27 the comeback of the elk was heralded by the Park Service as a stunning wildlife reintroduction

28 success.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

36.     Those elk dispersed, and today, there are four herds of fenced-in Tule elk at Tomales Point (the North Herd, Plateau Herd, White Gulch Herd, and South Herd). The Park Service manages two additional free-roaming herds in the Limantour and Drakes Beach areas at the Seashore.

### D.     The 1980 General Management Plan

37.     In 1978, Congress also enacted legislation requiring the National Park Service to prepare and revise general management plans for the preservation and use of all national parks and other lands within its jurisdiction. National Parks and Recreation Act of 1978, Pub. L. 95-625, § 604(3), 92 Stat. 3518. Congress has since affirmed that such "[g]eneral management plans for the preservation and use of each System unit . . . shall be prepared and revised *in a timely manner* by the Director." 54 U.S.C. § 100502 (2018) (emphasis added).

38.     The statutory requirement that the Park Service revise all General Management Plans applies to all portions of the Point Reyes National Seashore.

39.     A General Management Plan ("GMP") "shall include," inter alia, "measures for the preservation of the area's resources."

40.     Park Service Management Policies explain that to comply with Congress's directive that such plans be revised "in a timely manner," such plans will be prepared and revised "to keep them current," and that, accordingly, the Park Service will review a GMP "every 10 to 15 years" or "sooner if conditions change significantly." 2006 NPS Management Policies § 2.3.1.12.

41.     In 1980, the Park Service issued a GMP for the National Seashore that established general management objectives and strategies for future management of the Seashore. The 1980 GMP states that "[r]estoration of historical natural conditions (such as reestablishment of Tule elk) will continue to be implemented when such actions will not seriously diminish scenic and recreational values."

42.     In 1980, pursuant to a Memorandum of Agreement with the California Department of Fish and Game, the Park Service erected a three-mile long, eight-foot high woven-wire fence

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    along the southern border of Tomales Point to separate the elk from 18,000 acres of Seashore

2    lands south of the fence where the Park Service permitted livestock ranchers to graze their cattle.

3              **E.      The 1998 Elk Management Plan**

4              43.      In 1982, the Park Service issued an Interim Tule Elk Management Plan, pending

5    completion of the final Management Plan required by the Tule Elk statute. The Interim Plan

6    stated that the Park Service planned to "[r]e-establish a healthy, tule elk population on a range

7    which has returned to a natural successional regime as if elk were always present."

8              44.      In 1998, the Park Service issued its final Tule Elk Management Plan. The purpose

9    of the Plan was to "guide management, monitoring, and research of the tule elk." The Park

10   Service explained that the Plan was needed "to provide for the protection of the elk that is

11   consistent with scientifically sound principles, takes into account the interests of the public, and

12   meets the objectives for which the Seashore was established."

13             45.      In the 1998 Elk Management Plan, the Park Service observed that elk help reduce

14   fires by eating grass and shrubs and have a positive impact on vegetation.

15             46.      The Park Service further explained that because "Tule elk play an important role in

16   the function of the Seashore ecosystem[,]" the Plan's principal "mission" was to "[a]daptively

17   manage elk as a natural component of the dynamic ecosystem of Point Reyes." Toward that goal,

18   a second "mission" of the Service was "[m]aintenance of the remaining genetic diversity . . . as an

19   important objective for elk preservation."

20             47.      The Service's stated management "goals" therefore included maintaining "viable

21   populations of tule elk at Point Reyes," noting that "[a] healthy herd is one that does not suffer

22   disease or mortality due to artificially induced or human caused impacts."

23             48.      The Service stated that another goal was to "[m]anage tule elk using minimal

24   intrusion to regulate population size, where possible, as part of natural ecosystem processes."

25             49.      The Service explained that if the Tule elk at Tomales Point "are to remain as part

26   of the Seashore's fauna and ecological processes, they should eventually become free-ranging

27   throughout most of the Seashore's natural zones where conditions allow," and hence another

28   stated goal of the 1998 Management Plan was to "[p]rovide for a free-ranging elk herd by 2005."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

50.     When the 1998 Plan was issued by the Park Service, there were approximately 465 elk in the Tomales Point herd. However, the Park Service was already concerned about the genetic viability of the Tule elk population at Tomales Point, explaining that it already had the "lowest level of genetic variation" of all the tule elk herds in the state. The agency acknowledged that if the population were reduced too much this could further impair genetic diversity and lead to inbreeding. To address this concern, the Park Service recommended the addition of 2-3 female elk every elk generation to maintain genetic variation within the population, and further recommended that the first addition of new elk "should be made as soon as possible."

51.     On information and belief, the Park Service has never brought in any new elk to Tomales Point since 1978.

52.     The 1998 Plan explained that NPS "policy" is to "maintain wild populations [of elk] within natural habitats," and that "maintaining captive herds for the enjoyment of visitors" was anathema to this policy.

53.     Noting that the total elk population at Point Reyes could grow to 1000 before carrying capacity was reached, the Service proposed an interim population of 350-450 elk at Tomales Point and stated that the agency would consider using immunocontraception to control the population should it begin to exceed that number. Indeed, the Park Service explained that the public was very much opposed to reducing the population by killing the elk by public hunting or agency sharpshooters, and that "[t]he preferred technique to limit growth is immunocontraception, which allows treated individuals to breed after contraception is stopped."

54.     In the 1998 Plan, the Park Service also acknowledged that removing or opening the fence at Tomales Point would allow the existing elk herd to disperse, and that any impairment to the elk habitat from cows could be reduced by installing elk gates or fence openings designed to allow passage of elk, but not cattle.

55.     In the 1998 Plan, the Park Service also considered relocating the existing fence further south to provide more useable habitat for the elk at Tomales Point.

56.     The Park Service further acknowledged that it could reduce or eliminate ranching permits under its existing authorities and observed that removal of the fence that restricted the

-12-

1    movement of the elk would be considered if the Service eliminated ranching on the adjacent

2    lands.

3        57.     When the 1998 Elk Management Plan was issued, the Park Service stated that it

4    had decided to "maintain the elk fence at Tomales Point and continue to separate tule elk from

5    cattle." The Park Service further stated that it will "continue monitoring tule elk and their

6    environment to analyze trends and better understand tule elk population dynamics and ecology at

7    Point Reyes," and that "[t]he control of the Tomales Point elk population will be attempted

8    through management techniques of contraception and relocation."

9        58.     On information and belief, the Park Service has not managed the Tomales Point

10   elk population with contraception and/or relocation.

11       59.     The Park Service has never updated or revised the Tule Elk Management Plan.

12       **F.      Additional Facts Giving Rise to Plaintiffs' Claims**

13       60.     The National Seashore is the only National Park System unit where Tule elk can

14   be seen, and their presence at the National Seashore is treasured by visitors, photographers,

15   naturalists, and locals alike. Their image has been expressed in the local folk art, as well as

16   numerous local and nationally published photographs.

17       61.     However, the Tomales Point fence prevents the Tule elk who live on the north side

18   of the fence from roaming to other areas of the National Seashore to find food/forage and water.

19       62.     During a drought in 2013-2015, roughly half of the Tomales Point Tule herd—

20   approximately 257 of the 540 elk—died from the lack of adequate forage and water and the elks'

21   inability to get past traverse the fence on the southern border of their range, yet not one dairy cow

22   on the other side of the fence was reported to have died from lack of water or forage. At the time,

23   the Park Service denied to the public that the elk fence and lack of water played any role in this

24   massive die-off of elk.

25       63.      In 2016, a coalition of environmental organizations brought a lawsuit challenging

26   the Park Service's failure to issue a new or revised General Management Plan for the Point Reyes

27   Seashore. *Res. Renewal Inst. et al. v. Nat'l Park Serv. et al.*, No. C 16-0688 SBA, 2016 WL

28   11673179 (N.D. Cal. July 15, 2016). The parties settled that lawsuit with the Park Service

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

agreeing to issue an amendment to the 1980 General Management Plan that addressed and analyzed the environmental impacts of continuing to allow livestock grazing at the Seashore. The settlement agreement does not specifically address the Tule elk who live at Tomales Point.

64.     Meanwhile, during the summer of 2020, the public became extremely concerned that drought conditions were once again causing the Tule elk at Tomales Point to die from lack of forage and water because, again, the elk cannot obtain access to forage and water on the other side of the eight-foot-high fence on the southern boundary of Tomales Point. Members of the public, including Plaintiffs, began to see emaciated and dying elk at Tomales Point, and urged the Park Service to take emergency measures to ensure that the elk were provided access to water.

65.     Again, as during the 2013-2015 drought, the Park Service denied to the public that the elk were dying from a lack of water and insisted that there were adequate sources of water on the north side of the fence.

66.     However, members of the public knew this was not true, because they had evidence that many of those water sources had gone dry. Therefore, some individuals, including some of the Plaintiffs, began a concerted effort to bring water to the elk on their own by carrying troughs and large containers of bottled water to several locations on Tomales Point. However, the Park Service prohibited the public from doing so by confiscating and removing these sources of water and continued to insist to the public and the media that the elk at Tomales Point had adequate access to water.

67.     On August 31, 2020, an environmental group sent a letter to the Park Service, requesting that it take all necessary actions to carry out its legal and moral responsibilities to ensure that the elk who live on the Tomales Point peninsula have access to sufficient water to prevent them from dying. It explained that if the Park Service refused to do so it would be in contravention of its statutory duties to "conserve" this legally protected wildlife as required by the NPS Organic Act.

68.     The four elk herds at Tomales Point depend on particular stock ponds located there to survive. The August 31, 2020, letter to the Park Service included evidence from people

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  monitoring the area, including photographs taken at the time, demonstrating that these ponds were

2  seriously depleted as follows:

3      **The North Herd**:    As to the two ponds normally available to the Elk, North Pond I

4      was completely dry; North Pond II has some water but was way below capacity.

5      **The Plateau Herd**:    As to the two ponds normally available to this herd, Central Pond I

6      was completely dry, and Central Pond II was very close to dry.

7      **The White Gulch Herd**:    There do not appear to be any ponds available to this herd,

8      and whether the seep normally used by this herd (that drains toward the Tomales Bay) was

9      running was not ascertainable.

10      **The South Herd:**    The two ponds normally used by this herd—South Pond I and

11      South Pond II—were completely dry and had been for a while.

12      69.    There is essentially no movement of individual elk from one herd crossing into

13  the adjacent herd's home range. Cobb, McCrea, *Spatial Ecology and Population Dynamics of*

14  *tule elk (Cervus elaphus nannodes) at Point Reyes National Seashore, California*,

15  https://escholarship.org/uc/item/2wt3h3rc.

16      70.    In September 2020, pursuant to the settlement reached in the prior case, the Park

17  Service issued an Amendment to the 1980 GMP for the National Seashore. However, the Park

18  Service asserted that "[t]he fenced elk population on Tomales Point is outside the planning area"

19  for that Amendment. In other words, the new Amendment to the GMP, scheduled to become

20  effective on or before July 14, 2021, does not address the Tomales elk and the fact that they are

21  dying of starvation and dehydration from a lack of forage and/or water.

22      71.    The Park Service states on its website that the Tule elk at Tomales Point are not

23  considered as part of its Amendment to the General Management Plan.

24      72.    Meanwhile, in the spring of 2021, the Park Service acknowledged that

25  approximately 152 more Tule elk died during 2020 due to the fact that the elk cannot go beyond

26  the artificial fence for sustenance.

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

73.     The only necropsies of elk that the Park Service have released to the public pursuant to the Freedom of Information Act demonstrate that in fact the elk died of starvation and/or dehydration. The necropsies show that the elk were completely emaciated when they died.

74.     Although the Park Service never sent a formal response to the letter it received in August 2020 about this matter, the agency recently announced on its website that in response to requests by the public to do something about this situation it has decided that it will not remove any portion of the fence at Tomales Point to allow the elk access to more food and water.

75.     The Park Service also recently announced that it will not provide the elk at Tomales Point any supplemental forage.

76.     Because there is currently a drought in this area of California, and there is expected to be less rain in 2021 than there was in 2020, more elk are dying and will continue to do so from a lack of forage and water.

77.     In light of the fact that more elk will die this year, coupled with the fact that 152 elk died last year, and 257 died during 2013-2015, there are serious concerns about whether the Park Service can maintain the genetic diversity of this elk population—identified as "an important objective for elk preservation" in the 1998 Elk Management Plan.

78.     The Park Service recently admitted for the first time that the Tule elk at Tomales Point do not have sufficient access to water. Although the Park Service has begun to provide supplemental water to some of the elk, it has not provided water that can be accessed by all four herds of elk who live there, and, again, it is not providing *any* of the elk any supplemental forage, despite the fact that the Park Service has informed the public that the reason so many elk died last year is that they lack access to adequate forage.

79.     Over the last year and continuing to the present, members of the public, including some of the Plaintiffs, have seen dying and dead elk at Tomales Point, due to the lack of water and forage.

80.     The fence at Tomales Point was artificially erected and is maintained by the Park Service—i.e., it is not a *natural* boundary, and hence is not a natural barrier to food and water for the elk.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

81.     The fence at Tomales Point is not mandated by statute, regulation, or any other law.

82.     The Park Service has not issued a new or revised General Management Plan with respect to Tomales Point since 1980.

83.     The Park Service has not issued a new or revised Elk Management Plan for the Tule elk at Tomales Point since 1998.

84.     The Park Service has not carried out its plan to use immunocontraception to restrict the growth of the Tule elk at Tomales Point.

85.     Death by starvation and/or lack of water is extremely painful and causes much suffering to the animal.

86.     Allowing wildlife to die of starvation or dehydration because of a human-erected barrier to forage and water is inhumane.

**PLAINTIFFS' CLAIMS FOR RELIEF**

**First Claim:  Failure to Revise the 1980 General Management Plan**

**for Tomales Point.**

87.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 as though fully alleged herein.

88.     By failing to revise the 1980 General Management Plan for the Point Reyes National Seashore with respect to Tomales Point and the Tule elk who live there in a timely manner as required by the NPS Act, 54 U.S.C. § 100502, Defendants have violated that mandatory duty and unreasonably delayed carrying it out in violation of the Administrative Procedure Act, 5 U.S.C. § 706(1).

89.     The Park Service's failure to revise the General Management Plan with respect to Tomales Point and the Tule elk who live there has resulted in its failure to address the elk's dire need for access to the food and water they need to maintain a healthy population; therefore, the agency's delay in dealing with this issue is particularly unreasonable in light of the agency's overarching obligation under its Organic Act to "conserve" this wildlife "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations," and the

-17-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   agency's specific obligation under the Point Reyes Seashore Act to administer this land "without
2   impairment of its natural values."

3        90.    The Park Service's failure to revise the General Management Plan with respect to
4   Tomales Point and the Tule elk who live there has also resulted in its failure to address the
5   continued genetic viability of the herd. Therefore, the agency's delay is particularly unreasonable
6   in light of its overarching obligation to "conserve" this wildlife "in such manner and by such
7   means as will leave them unimpaired for the enjoyment of future generations," and the agency's
8   specific obligation under the Point Reyes Seashore Act to administer this land "without
9   impairment of its natural values."

10        91.    The Park Service's violations of law injure Plaintiffs in the manner described in ¶¶
11   8-20 herein.

12        **Second Claim: Failure to Revise the Tule Elk Management Plan**

13        92.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 as though
14   fully alleged herein.

15        93.    By failing to update the 1998 Elk Management Plan for the Tule Elk at Tomales
16   Point, and instead allowing the Tule elk to die of starvation and/or dehydration in contravention
17   of the 1998 Plan, Defendants have also violated their statutory duty to develop a plan "for Tule
18   elk restoration and *conservation*" as required by 16 U.S.C. § 673g, and unlawfully withheld and
19   unreasonably delayed agency action required by law in violation of the Administrative Procedure
20   Act, 5 U.S.C. § 706(1).

21        94.    The Park Service's violations of law injure Plaintiffs in the manner described in ¶¶
22   8-20 herein.

23        **Third Claim: The Park Service's Decisions to Forego Measures to Ensure that the**
24        **Tomales Point Elk Have Access to Sufficient Water and Forage**

25        95.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 as though
26   fully alleged herein.

27        96.    The Park Service's recently announced decisions not to undertake measures to
28   ensure that the elk at Tomales Point have access to adequate forage and water constitutes final

-18-

1   agency action that is arbitrary and capricious, an abuse of discretion and in violation of the Park

2   Service's statutory obligations to both "conserve" this wildlife, and to "provide for the

3   enjoyment" of this wildlife "in such a manner and by such means as will leave them unimpaired

4   for the enjoyment of future generations," 54 U.S.C. § 100101(a), and the agency's specific

5   obligation under the Point Reyes Seashore Act to administer this land "without impairment of its

6   natural values." 16 U.S.C. § 459c-6(a). Accordingly, those decisions also violate the

7   Administrative Procedure Act, 5 U.S.C. § 706(2).

8         97.    The Park Service's violations of law injure Plaintiffs in the manner described in ¶¶

9   8-20 herein.

10   **WHEREFORE**, Plaintiffs respectfully request that this Court:

11         1.    Declare that Defendants' failure to revise the 1980 General Management Plan with

12   respect to Tomales Point and the Tule elk who live there constitutes agency action unlawfully

13   withheld and unreasonably delayed in violation of the Administrative Procedure Act, 5 U.S.C. §

14   706(1);

15         2.    Declare that Defendants' failure to revise the 1998 Elk Management Plan with

16   respect to the Tule elk at Tomales Point constitutes agency action unlawfully withheld and

17   unreasonably delayed in violation of the Administrative Procedure Act, 5 U.S.C. § 706(1);

18         3.    Declare that Defendants' decisions not to undertake measures to ensure that the

19   Tule elk at Tomales Point have access to adequate food and water is arbitrary and capricious, an

20   abuse of discretion, and otherwise not in accordance with law within the meaning of the

21   Administrative Procedure Act, 5 U.S.C. § 706(2);

22         4.    Order Defendants to take immediate measures to comply with their statutory duties

23   to revise the 1980 General Management Plan and 1998 Elk Management Plan with respect to the

24   Tule elk who live in Tomales Point at the Point Reyes National Seashore;

25         5.    Preliminarily and permanently enjoin Defendants from continuing to deprive the

26   Tule elk at Tomales Point of adequate food and water;

27         6.    Award Plaintiffs their costs and attorneys' fees; and

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1       7.     Award Plaintiffs such other and further relief as the Court may deem just and proper.

Respectfully submitted,

_____
Katherine Barnekow, State Bar No. 336792
kbarnekow@law.harvard.edu
Harvard Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: (617) 496-4863
Cell: (512) 868-7800

_____
Katherine A. Meyer
(motion for admission *pro hac vice* forthcoming)
kmeyer@law.harvard.edu
Director, Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: (617) 496-4863
Cell: (202) 257-5145

Attorneys for Plaintiffs

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF