STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
DAVID M. DEVITO (CABN 243695)
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7332
Facsimile: (415) 436-6748
david.devito@usdoj.gov

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environmental and Natural Resources Division
United States Department of Justice

MATTHEW P. RAND (NYBN 4937157)
Trial Attorney
Natural Resources Section
Environmental and Natural Resources Division
United States Department of Justice
150 M St. NE, Room 3.128
Washington, D.C. 20002
Telephone: (202) 305-0874
Facsimile: (202) 305-0506
matthew.rand@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JACK GESCHEIDT, *et al.*, | Case No. 4:21-cv-04734-HSG |
| Plaintiffs, | |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DEB HAALAND, Secretary of the Interior, *et al.*, | |
| Defendants. | |

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES .................................................................................................. ii

3

I.      INTRODUCTION ..................................................................................................... 1

4

II.     ISSUE PRESENTED ................................................................................................ 2

5

III.    FACTUAL BACKGROUND .................................................................................... 2

6

       A.     History of Point Reyes National Seashore and the Tule Elk. .......................... 2

7

       B.     NPS's Management of the Tule Elk. ............................................................... 4

8

       C.     Changes in the Elk Population Over Time ....................................................... 5

9

       D.     Current Conditions at Point Reyes................................................................... 6

10

       E.     Plaintiffs' Complaint and Motion for Preliminary Injunction. ........................ 8

11

IV.     STANDARD OF REVIEW ....................................................................................... 8

12

       A.     Standard for Obtaining an Emergency Mandatory Injunction.......................... 8

13

       B.     Review of Agency Action under the APA ........................................................ 9

14

V.      ARGUMENT ........................................................................................................... 10

15

       A.     Plaintiffs Fail to Demonstrate Likely Success on the Merits.......................... 10

16

       B.     Plaintiffs Fail to Demonstrate that Irreparable Harm Is Likely in the Absence

17
                 of an Injunction. ........................................................................................... 22

18

       C.     Injunctive Relief Is Contrary to the Balance of the Equities and the Public
                 Interest. ......................................................................................................... 23

19

       D.     Plaintiffs' Proposed Preliminary Injunction Is Impermissibly Vague. ........... 24

20

VI.     CONCLUSION........................................................................................................ 25

21

22

23

24

25

26

27

28

1

2

# TABLE OF AUTHORITIES

**Cases**

3

*Air Cal. v. U.S. Dep't of Transp.*,
 654 F.2d 616 (9th Cir. 1981) ................................................................. 15

4

*Al Otro Lado, Inc. v. Nielsen*,
 327 F. Supp. 3d 1284 (S.D. Cal. 2018) ................................................. 13

5

6

*All. for the Wild Rockies v. Bradford*,
 979 F. Supp. 2d 1139 (D. Mont. 2013) ................................................. 23

7

*Bennett v. Spear*,
 520 U.S. 154 (1997) ...................................................................... 13, 14

8

9

*Bicycle Trails Council of Marin v. Babbitt*,
 82 F.3d 1445 (9th Cir. 1996) ............................................................... 17

10

11

*Borenstein v. Lead Animal Shelter Animal Found.*,
 810 F. App'x 573 (9th Cir. 2020) ........................................................ 12

12

*Brown v. U.S. Forest Serv.*,
 465 F. Supp. 3d 1119 (D. Or. 2020) ....................................................... 9

13

14

*California v. Azar*,
 950 F.3d 1067 (9th Cir. 2020) ............................................................. 17

15

*City of W. Sacramento v. R & L Bus. Mgmt.*, No. 2:18-CV-00900-WBS_EFB,
 2020 WL 7360583 (E.D. Cal. Dec. 15, 2020) ...................................... 11

16

17

*Columbia Pictures Indus., Inc. v. Fung*,
 710 F.3d 1020 (9th Cir. 2013) ........................................................ 24-25

18

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
 833 F.3d 1136 (9th Cir. 2016) ............................................................. 17

19

20

*Ctr. for Food Safety v. Jewell*,
 83 F. Supp. 3d 126 (D.D.C. 2015) .................................................. 11, 12

21

*Defs. of Wildlife v. Salazar*,
 651 F.3d 112 (D.C. Cir. 2011) ............................................................. 20

22

23

*Defs. of Wildlife v. Salazar*,
 812 F. Supp. 2d 1205 (D. Mont. 2009) ................................................ 22

24

*Dep't of Fish & Game v. Fed. Subsistence Bd.*,
 501 F. Supp. 3d 671 (D. Alaska 2020) ................................................. 11

25

26

*DISH Network Corp. v. FCC*,
 653 F.3d 771 (9th Cir. 2011) ................................................................. 9

27

*Earth Island Inst. v. Carlton*,
 626 F.3d 462 (9th Cir. 2010) ............................................................... 16

28

*Ecology Ctr., Inc. v. U.S. Forest Serv.*,
  192 F.3d 922 (9th Cir. 1999) .................................................................................. 15

*Friends of Mt. Hood v. U.S. Forest Serv.*, No. 97-CV-1787 KI,
  2000 WL 1844731 (D. Or. Dec. 15, 2000) ............................................................ 15

*Gallo Cattle Co. v. U.S. Dep't of Agric.*,
  159 F.3d 1194 (9th Cir. 1998) .............................................................................. 10

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) (en banc) ............................................ 1, 9, 12, 16, 22

*Greater Yellowstone Coal. v. Babbitt*,
  952 F. Supp. 1435 (D. Mont. 1996) ...................................................................... 17

*Greenpeace Action v. Franklin*,
  982 F.2d 1342 (9th Cir. 1992) .............................................................................. 20

*Gros Ventre Tribe v. United States*,
  469 F.3d 801 (9th Cir. 2006) ................................................................................ 10

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
  593 F.3d 923 (9th Cir. 2010) .......................................................................... 10, 13

*Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*,
  664 F.3d 940 (D.C. Cir. 2012) .......................................................................... 14-15

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*,
  156 F. Supp. 3d 1252 (W.D. Wash. 2015) ............................................................ 22

*Inland Empire Pub. Lands Council v. Schultz*,
  992 F.2d 977 (9th Cir. 1993) ................................................................................ 20

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) (en banc) ................................................................ 23

*League of Wilderness Defs. v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) ................................................................................ 24

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .......................................................................................... 9, 15

*Marsh v. Ore. Nat. Res. Council*,
  490 U.S. 360 (1989) ........................................................................................ 17, 20

*Mayo v. Reynolds*,
  875 F.3d 11 (D.C. Cir. 2017) ........................................................................... 19-20

*Mont. Wilderness Ass'n, Inc. v. U.S. Forest Serv.*,
  314 F.3d 1146 (9th Cir. 2003) .............................................................................. 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................ 16

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................................................ 8-9

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................................................ 23

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) .............................................................................................. 10, 12, 13, 14

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) .................................................................................................. 10

*Perfect 10, Inc. v. Google, Inc.*,
    653 F.3d 976 (9th Cir. 2011) .............................................................................................. 22, 23

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
    499 F.3d 1108 (9th Cir. 2007) ................................................................................................ 17

*Rattlesnake Coal. v. U.S. EPA*,
    509 F.3d 1095 (9th Cir. 2007) ................................................................................................ 16

*Shasta Res. Council v. U.S. Dep't of Interior*,
    629 F. Supp. 2d 1045 (E.D. Cal. 2009) .................................................................................. 16

*Trout Unlimited v Lohn*,
    559 F.3d 946 (9th Cir. 2009) .................................................................................................. 17

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    438 F.3d 937 (9th Cir. 2006) ............................................................................................ 11, 16

*Wild Fish Conservancy v. Jewell*,
    730 F.3d 791 (9th Cir. 2013) .......................................................................................... 13, 14, 15

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................................... 9, 22

**Statutes**

5 U.S.C. § 551 .................................................................................................................... 13, 14

5 U.S.C. § 702 ............................................................................................................................ 10

5 U.S.C. § 704 .................................................................................................................... 10, 16

5 U.S.C. § 706 ................................................................................................. 8, 9, 10, 11, 13, 16

16 U.S.C. § 1 ............................................................................................................................. 17

16 U.S.C. § 673g .......................................................................................................................... 8

16 U.S.C. § 459c .......................................................................................................................... 2

28 U.S.C. § 1651 ....................................................................................................................... 10

28 U.S.C. § 2401 .................................................................................................................. 11, 16

54 U.S.C. § 100101 ..................................................................................................... 8, 17

54 U.S.C. § 100502 ..................................................................................................... 8, 11

**Rules**

Fed. R. Civ. P. 65 ...................................................................................................... 24, 25

**Other Authorities**

H. Rep. No. 87-1628 (1962) ............................................................................................. 2

H. R. Conf. Rep. No. 116-9 (2019) ................................................................................. 21

Act of Sept. 13, 1962, Pub. L. 87-657, 76 Stat. 538 ...................................................... 2

Act of October 18, 1976, Pub. L. 94-544, 90 Stat. 2515 ................................................ 2

Act of October 20, 1976, Pub. L. 94-567, 90 Stat. 2692 ................................................ 2

Joint Resolution of August 14, 1976, Pub. L. 94-389, 90 Stat. 1189 ............................ 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**I.    INTRODUCTION**

This year, facing an extreme and potentially unprecedented drought, the National Park Service ("NPS") ramped up its already vigilant monitoring of conditions affecting the tule elk at Point Reyes National Seashore ("Point Reyes" or "Park"), including the elk in the Tomales Point reserve.  Based on these efforts, and marshalling the expertise of its wildlife management experts, NPS recently installed systems to provide supplemental water to the elk.  NPS continues to closely track conditions and stands ready to act if needed to safeguard the viability of the Tomales Point elk population.

Dissatisfied with NPS's management practices, Plaintiffs—three individuals and an animal protection organization—move for a preliminary injunction that would substitute Plaintiffs' preferred actions for NPS's informed judgments.  Claiming that elk are dying "every day" due to starvation and/or dehydration, Plaintiffs seek a mandatory injunction directing NPS to commence artificially feeding the elk and provide additional supplemental water.  Plaintiffs cannot—and in many respects, do not even attempt to—make the "doubly demanding" showing necessary to obtain the "particularly disfavored" mandatory remedy they seek.[1]

The defects in Plaintiffs' request are myriad.  Plaintiffs base their motion on the First Claim in their complaint, which seeks to compel NPS to revise the 1980 General Management Plan for Point Reyes.  But Plaintiffs could not obtain the sought-after injunction if they were to prevail on that claim because they cannot show that a revised plan would mandate supplemental food and water for the elk. Plaintiffs' Third Claim directly challenges NPS's refusal to undertake Plaintiffs' preferred course of supplemental feeding and watering, but Plaintiffs do not cite that claim as the basis for a preliminary injunction. Plaintiffs are not likely to succeed on that claim, in any event, because they have not alleged a reviewable final agency action and, moreover, cannot surmount the deferential arbitrary and capricious standard of review that applies.  The evidence demonstrates that there is no threat to the viability of the elk population.  The vast majority of the elk are in good to excellent body condition and show no signs of dehydration or starvation, and NPS has sound scientific reasons for not engaging in supplemental feeding, which is well known to cause severe problems that outweigh any potential benefits.  And with

---

[1] *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

the additional water NPS has already provided, the elk have access to adequate water.

In short, NPS's management actions are reasonable and should not be disturbed.  Plaintiffs fail to meet the exacting burden for a preliminary injunction and their motion should be denied.

## II.     ISSUE PRESENTED

Have Plaintiffs met the "doubly demanding" standard that the law and facts "clearly compel" the extraordinary and "particularly disfavored" remedy of a mandatory preliminary injunction directing NPS to provide supplemental food and water to the tule elk at Tomales Point and/or remove the Tomales Point fence, when no legal authority specifically mandates that NPS take those actions, Plaintiffs fail to identify a reviewable final agency action, and, in any event, NPS acted reasonably?

## III.    FACTUAL BACKGROUND

### A.      History of Point Reyes National Seashore and the Tule Elk.

Point Reyes operates as a unit of the National Park System, administered by NPS.[2]  Congress established the Park on September 13, 1962, for the purpose of preserving "a portion of the diminishing seashore of the United States that remains undeveloped."  Pub. L. 87-657, 76 Stat. 538 (codified, as amended, at 16 U.S.C. §§ 459c through 459c-7).  Today, Point Reyes encompasses more than 71,000 acres, including the almost 33,000-acre Phillip Burton Wilderness Area (Public Laws 94-544 and 94-567), as well as approximately 18,000 acres under agricultural production within the "pastoral zone" designated by Congress at the time of the park's establishment.  H. Rep. No. 87-1628, at 8.  When Point Reyes was created in 1962, no tule elk were present.  Press Decl. ¶ 4.

Tule elk (*Cervus elaphus nannodes*) are a distinct subspecies of elk endemic to California.  ECF No. 8-3 at p. 1, 4.  Once present in abundance, by the mid-1800s tule elk had been eliminated from the Point Reyes area.  *Id*. at p.4.  In all of California, by 1870, only 5 to 10 individuals remained on a single ranch.  *Id*.  After numerous attempts to establish new herds, two herds eventually thrived and, by the 1940s, the population had increased to several hundred animals. *Id*. at p.5.  In the 1970s, the State of California started a conservation program with the goal of relocating and establishing new elk herds

---

[2] In their complaint, Plaintiffs name as defendants Deb Haaland, Secretary of the Interior, Shawn Benge, Acting Director of NPS, and Craig Kenkel, Superintendent of Point Reyes, each in their official capacities.  Defendants are referred to herein collectively as "NPS."

around the state. *Id*. An interagency task force was created to aid this effort, of which NPS was a member. *Id*.; Press Decl. ¶ 5. In its 1971 report, the task force identified Point Reyes as a suitable site for reintroduction of the tule elk, provided that five stipulations were met, including a "mandatory" fence to keep elk out of private lands and grazing areas. *See* Press Decl. ¶ 5 & Ex. 1 at p.9 ("An elk fence is mandatory, to the extent they cannot move to adjacent private lands and cause depredation problems or to adjacent service lands where dairy cattle are grazing."). In 1976, Congress directed the Secretary of the Interior, in coordination with relevant federal, state, and local officials, to "develop a plan for Tule elk restoration and conservation, including habitat management." Pub. L. 94-389.

Tomales Point, at the northern end of Point Reyes, was eventually selected as the location for reintroduction. Press Decl. ¶¶ 7-9 & Exs. 2-4. Tule elk were reintroduced in the Park in 1978, with the transfer of 10 individuals into the Tomales Point reserve ("Reserve"). This initial herd struggled to take hold. *Id*. ¶ 12. Within a year of their release into the Reserve, the herd's health had declined. *Id*. ¶ 13. Relevant here, state wildlife biologists discovered that the elk were suffering from mineral deficiencies, specifically copper. *Id*. The herd eventually stabilized and, by the late 1980s, NPS grew concerned about overpopulation and damage to sensitive resources. *Id*. ¶ 15. A study from this period estimated the carrying capacity for tule elk at Tomales Point at 350 animals, with an optimum carrying capacity at 140. *Id*.

NPS began a planning effort in 1992 aimed at controlling the growth of the elk herd. *Id*. ¶ 16. This planning effort resulted in a recommendation that excess elk be removed on a yearly basis via lethal removal (culling), though a draft environmental assessment was eventually withdrawn due to public opposition to culling. *Id*. NPS convened a scientific panel in 1993 to provide alternative recommendations for managing the elk herd. *Id*. ¶ 17. That panel's guidance was eventually incorporated into another elk planning effort, which led, in 1998, to the issuance of the Tule Elk Plan and Environmental Assessment (the "1998 EA"). *Id*. ¶ 19. The 1998 EA analyzed four different approaches to elk management. *Id*. NPS selected the preferred alternative, "Alternative A," as the management approach for tule elk in a Finding of No Significant Impact, dated July 17, 1998 ("FONSI"). *Id*. ¶ 20 & Ex. 7. (Alternative A set forth on pages 43 to 50 of the EA and as adopted in the FONSI, collectively, is hereinafter referred to as the "1998 Elk Plan.")

**B.     NPS's Management of the Tule Elk.**

The 1998 Elk Plan continues to guide elk management at Tomales Point up to the present day. Its three mission statements are to: (1) "Adaptively manage elk as a natural component of the dynamic ecosystem of Point Reyes;" (2) "Assist in the preservation of the tule elk as a subspecies and the genetic diversity it contains;" and (3) "Manage tule elk consistent with other management objectives, including agriculture, public visitation, and the protection of natural, cultural, and recreational resources."  ECF No. 8-3 at pp. 37-38.  The plan expresses several goals, including to "[m]aintain viable populations of tule elk at Point Reyes," "[m]anage tule elk using minimal intrusion to regulate population size, where possible, as part of natural ecosystem processes," and "research and monitor the habitat and elk population over time."  *Id*. at pp. 39-41.

Key management actions adopted in the 1998 Elk Plan include: "[m]aintain the elk fence on Tomales Point;" "continue monitoring tule elk and their environment to analyze trends and better understand tule elk population dynamics and ecology at Point Reyes;" and set an interim population range for the "Point Reyes tule elk population at 600-800 animals, with Tomales Point set at 350-450 and Limantour set at 250-350."[3]  *Id*. at pp. 43-44.

The 1998 Elk Plan specifically states that NPS "will maintain the elk fence on Tomales Point and continue to separate tule elk from cattle."  *Id*. at p. 44.  It also reiterates that NPS's approach "intends to manage the tule elk population over time with as little population manipulation as possible."  *Id*.  The 1998 Elk Plan discusses and rejects the concept of supplemental forage for the elk, specifying that "[n]o effort will be made to cultivate food crops specifically to improve the range's ability to support elk. Such strategies are known to be self-defeating as artificially provided food leads to ever-increasing herd sizes that overwhelm the ability of the range to support them."  *Id*.  In this regard, the plan noted the "history of failed elk management approaches … seen at Yellowstone National Park, where elk were fed supplementary winter food that resulted in chronic overpopulation problems," and also that supplemental feeding "run[s] counter to ecosystem management objectives for managing diverse and natural systems."[4]  *Id*.

---

[3] In December 1998, as directed in the 1998 Elk Plan, NPS relocated 45 elk to an area near Limantour Beach in order to establish a free-ranging elk herd within the Park.  Press Decl. ¶ 25.

[4] Although the 1998 Elk Plan adopted a non-interventionist approach, it discussed certain

In conformance with the 1998 Elk Plan, NPS's management of elk has been and continues to be informed by the knowledge and expertise of the Park's wildlife biologists, wildlife health experts and veterinarians in the NPS Biological Resources Division (BRD) in Ft. Collins, Colorado, and wildlife management experts at the California Department of Fish and Wildlife.  Kenkel Decl. ¶ 3.

### C.    Changes in the Elk Population Over Time

The elk population in the Reserve has undergone four distinct periods of expansion and contraction since the 1998 Elk Plan.  Press Decl. ¶ 27 & Ex. 8.  First, between 1998 and 2004, the population fell from the mid-500s to just under 350 animals.  *Id.*  Declines during that time period can be attributed to immunocontraception trials, as well as the relocation of 45 elk to Limantour in 1998.  *Id.*  Second, the elk population in the Reserve spiked to 585 animals in 2007, and then fell to the mid-400s in 2009.  *Id.*  Third, it rose again to 540 animals by 2012, then fell coincident with the drought that began in the winter of 2012-13 and continued to 2015, dropping below 300 animals.  *Id.* ¶ 28.  Fourth, after that drought ended, the population rebounded to 445 animals by 2019, when another drought began in the winter of 2019-20.  *Id.* ¶ 32.  The 2020 census count, which was reported publicly in March 2021, showed a decline from 445 to 293 elk.  *Id.* ¶¶ 40-41.

During the fall/winter of 2020, at NPS's request, necropsies were conducted of seven elk that were found dead or euthanized due to poor body condition or abnormal behavior.  *Id.* ¶ 38; Powers Decl. ¶¶ 5-6.  Five of the seven lived in the Reserve.[5]  Powers Decl. ¶ 6.  NPS experts concluded that the underlying cause of death for all seven elk—irrespective of whether they lived within or outside of the Reserve—was attributable to significant nutrient deficiencies, though NPS could not determine whether these deficiencies were caused by simple lack of forage or more complex interactions with lacking micronutrients, namely copper and selenium.  *Id.* ¶ 7.  NPS further concluded that these animals' primary cause of death was not due to a lack of water.  *Id.*  The consistency of the necropsy findings

---

"unacceptable situations that would require the Seashore to intervene," which include "large numbers of starving elk."  ECF No. 8-3 at p. 46.  This discussion, however, contemplated starvation resulting from massive overpopulation, with the possibility of intervention referring, in this context, to population control methods such as contraception and relocation being preferred over lethal removal.  *Id.*

[5] Plaintiffs incorrectly assume all of the necropsies involved animals from the Reserve.  *See* Powers Decl. ¶ 8.  Plaintiffs also incorrectly refer to eight necropsies, when only seven animals were necropsied.  One of the animals was necropsied in the field and had its tissues examined in the lab, and thus is mentioned in two reports.  *Id.*

across animals from both the Tomales Point and Drakes Beach herds suggest that elk both outside and within the Reserve are exposed to similar nutritional conditions.  *Id*. ¶¶ 9-10.

### D.    Current Conditions at Point Reyes.

Based on the drought that began in winter 2019-20, NPS anticipated the need to closely monitor water availability for the elk.  Press Decl. ¶ 32.  Park staff began checking water sources in July 2020, and performed a more thorough survey on August 6.  *Id*. ¶ 33.  That survey showed that, although the stock ponds were dry, the natural seeps, springs, and drainages still held water, all showing evidence of elk use.  *Id*.  In late August 2020, NPS posted information to the Park's website indicating that water remained available to the elk in seeps and springs in the southern portion of the Reserve, but noted that if monitoring efforts showed that those sources dried up, NPS would provide supplemental water by placing a trough in a location where the elk were already accustomed to finding water.  *Id*. ¶ 34.

Thereafter, in September 2020, NPS staff comprehensively surveyed and mapped the water sources in the southern, middle, and northern areas of the Reserve.  *Id*. ¶¶ 35-36 & Ex. 13.  Results from that effort, including a detailed water source map and 65 photos, were posted to the NPS website, along with a note explaining:

> Elk sign, including tracks and trails, were observed at each of these water sources.  At many of these locations, elk were seen during the surveys either using the water sources or bedded down nearby.  In addition, a heavy marine fog layer has blanketed the coastline in recent weeks bringing significant fog drip and precipitation to the Tomales Point elk reserve.

*Id*. ¶ 36.  Based on its continued monitoring throughout the fall until the beginning of the rainy season, NPS determined that, although water levels were low, it was unnecessary to provide supplemental water.  *Id*. ¶¶ 37, 39.

This past winter of 2020-21 offered another period of poor rainfall, this time significantly worse than the year before.  *Id*. ¶ 42.  Anticipating worsening drought conditions, Park staff began closely monitoring water sources in early spring.  *Id*. ¶ 43.  The Marin County Board of Supervisors declared a Drought Emergency on May 18, 2021.  *Id*. ¶ 42 & Ex. 15.  A check of water sources by Park staff on May 28, 2021 showed continued flow through McClure's Creek (one of the main water sources frequented by the elk), but also revealed that several higher elevation springs within the same watershed were dry, which had not been observed in any prior year.  *Id*. ¶ 44.  This loss of water in the upper-level

seeps and springs was the trigger point for adding supplemental water that NPS identified the prior year but did not reach. *Id*. Accordingly, NPS moved forward with plans for water supplementation. Kenkel Decl. ¶¶ 6-7.

On June 2, 2021, the Park Superintendent approved plans to place supplemental water in the southern part of Tomales Point. *Id*. ¶ 7; Press Decl. ¶ 45. Guided by its observations of elk movement patterns, NPS decided to install three water systems in the south, selecting locations for the troughs based on known areas frequently used by elk. Press Decl. ¶ 45 & Ex. 16. Consistent with its obligations under the Wilderness Act, NPS carefully identified areas for placing the troughs outside of designated wilderness. *Id*. ¶ 45. Installation of these water systems was completed on June 11, 2021 and they remain functional. *Id*.¶¶ 45, 53.

As of this filing, the state of the natural water sources is mixed. While some ponds and other water sources are dry, several seeps and spring still have water. *Id*. ¶ 52 & Exs. 30-33. The largest pond in the Reserve, in the northern end, still has water, although the level is lower than previously seen. *Id*. ¶ 52. Similarly, McClure's Creek is still flowing, but water levels now are lower than they were at the end of the 2020 dry season. *Id*. As of July 8, 2021, there was a fair amount of water in the bottom of White's Gulch, in the middle of the Reserve. *Id*. & Ex. 13. Elk or fresh sign of elk were recently observed at all of these water sources. *Id.*

The vast majority of elk observed to date by Park staff, including the Park's wildlife ecologists, and reviewed by the Park's veterinarian, appear in good to excellent condition with no signs of starvation or dehydration. *Id*. ¶ 47 & Exs. 17-26; Powers Decl. ¶ 11. On July 8, 2021, Park staff explored much of the Reserve (from the elk fence at the very southern end to Avalis Beach in the far north) and observed at least 140 elk, including three new calves born this spring. Press Decl. ¶ 47. Three of the elk observed appeared in fair condition, showing reduced fat reserves. *Id*. All the others were in excellent body condition, showing no signs of starvation or dehydration. *Id*. Staff have not seen signs of elk congregating at the Tomales Point fence, this year or ever in the past. *Id*. ¶ 48. The elk more or less frequent the same places year after year regardless of drought conditions. *Id*.

Forage conditions appear fair to good. *Id*. ¶ 50. In particular, the valley bottoms and areas around the seeps and springs continue to provide good forage. *Id*. Given current population numbers,

1    NPS believes there will be sufficient forage for the elk this year.  *Id*. ¶¶ 50-51.  NPS plans to continue

2    regularly monitoring the available water sources and forage conditions.  Kenkel Decl. ¶ 8.

3        **E.    Plaintiffs' Complaint and Motion for Preliminary Injunction.**

4        Plaintiffs filed the operative complaint on June 22, 2021.  ECF No. 1.  Contrary to the findings

5    and observations of NPS staff and experts, Plaintiffs allege that the tule elk living north of the Tomales

6    Point fence "have been unable to obtain access to sufficient food and water to survive and are dying by

7    the dozens of dehydration and/or starvation."  *Id*. ¶ 1.  Plaintiffs bring three claims for relief under the

8    APA.  Plaintiffs' First Claim asserts that a federal statute, 54 U.S.C. § 100502, compels NPS to revise

9    the Park's 1980 General Management Plan ("GMP") specifically "with respect to Tomales Point and the

10   Tule elk who live there in a timely manner," and that NPS has unreasonably delayed in doing so in

11   violation of 5 U.S.C. § 706(1).  *Id*. ¶ 88.  Plaintiffs' Second Claim alleges that NPS has failed to fulfill

12   its duty "develop a plan for Tule elk restoration and conservation" under 16 U.S.C. § 673g by "failing to

13   update" the 1998 Elk Plan, and that this failure constitutes agency action unreasonably delayed, also in

14   violation of § 706(1).  *Id*. ¶ 93.  Plaintiffs' Third Claim contends that NPS's "recently announced

15   decisions not to undertake measures to ensure that the elk at Tomales Point have access to adequate

16   water and forage and water" contravene its general conservation and non-impairment obligations under

17   54 U.S.C. § 100101(a) and constitute final agency action that is arbitrary and capricious, in violation of

18   5 U.S.C. § 706(2).  *Id*. ¶ 96.

19       On June 24, 2021, Plaintiffs filed their combined Motion for Temporary Restraining Order and

20   Preliminary Injunction.  ECF No. 8.  They seek an order requiring NPS to, within one week of issuance,

21   "take immediate measures to ensure that the Tule elk who live on Tomales Point in Point Reyes

22   National Seashore are provided access to sufficient food and water to ensure that these animals do not

23   continue to die of starvation and/or dehydration."  ECF No. 8-13.  Plaintiffs are no longer pursuing a

24   Temporary Restraining Order pending a ruling on their request for a preliminary injunction.

25   **IV.    STANDARD OF REVIEW**

26       **A.    Standard for Obtaining an Emergency Mandatory Injunction.**

27       "A preliminary injunction is an 'extraordinary and drastic remedy'"—"never awarded as of

28   right"—that may issue only upon "a clear showing that the plaintiff is entitled to such relief."  *Munaf v.*

*Geren*, 553 U.S. 674, 689-90 (2008).  To obtain a preliminary injunction, a plaintiff must establish that (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22-23 (2008).  As the movant, Plaintiffs bear the burden of demonstrating all four elements.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011).

Here, Plaintiffs seek a "mandatory injunction," which "orders a responsible party to take action" and is "particularly disfavored."  *Garcia*, 786 F.3d at 740 (quotations and citations omitted).  The preliminary injunction Plaintiffs seek would command NPS to "take immediate measures to ensure that the Tule elk who live on Tomales Point…are provided access to sufficient food and water…."  ECF No. 8-13.  This is not a prohibitory injunction or status quo order, as it would not restrain NPS, but instead would direct it to take affirmative actions demanded by Plaintiffs.  Thus, *Winter*'s already high standard rises to a "doubly demanding" level, which requires Plaintiffs to "establish that the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed."  *Garcia*, 786 F.3d at 740 (emphasis original).  Plaintiffs' reliance on the Ninth Circuit's "sliding scale" test is misplaced.  *See* ECF No. 8-1 at 11.  The sliding scale test does not apply to requests for mandatory injunctions, which demand a clear demonstration of likely success on the merits, *Garcia*, 786 F.3d at 740, not merely a showing of "serious questions."  *See Brown v. U.S. Forest Serv.*, 465 F. Supp. 3d 1119, 1128 n.3 (D. Or. 2020) (stating that the "'serious questions' standard is not consistent with the higher burden for mandatory injunctions.").  Rather, in mandatory injunction cases, likely success on the merits is a "threshold inquiry," and "when 'a plaintiff has failed to show the likelihood of success on the merits, [the court] 'need not consider the remaining three [*Winter* elements].'"  *Garcia*, 786 F.3d at 740 (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)).

### B.    Review of Agency Action under the APA

Because none of the statutes cited in the complaint provide a private right of action or waiver of sovereign immunity, all of Plaintiffs' claims depend on the judicial review provisions in the APA.  5 U.S.C. § 706; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (unless the statute challenged provides for review of agency action, judicial review is obtained pursuant to the APA).

For their first and second claims, Plaintiffs seek review under § 706(1) (Compl. ¶¶ 88 & 93). Section 706(1) grants a court the power to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), in limited situations "where an agency has ignored a *specific legislative command*." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010) (emphasis added).  "In this regard, the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through the use of the so-called prerogative writs—principally writs of mandamus under the All Writs Act, now codified at 28 U.S.C. § 1651(a)," which "was normally limited to enforcement of 'a specific, unequivocal command,' the ordering of a 'precise, definite act…about which an official had no discretion whatever.'"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (internal citations omitted, alteration omitted).

Plaintiffs bring their third claim under § 706(2) (Compl. ¶ 96).  Section 706(2) grants a court the power to "hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2), (2)(A).  Both provisions are limited to "agency action," 5 U.S.C. § 704, which the Ninth Circuit has held is incorporated into the APA's limited waiver of sovereign immunity in 5 U.S.C. § 702.  *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198-99 (9th Cir. 1998).  Thus, this Court has jurisdiction to review Plaintiffs' claims under the APA only if those claims fall within the terms of the APA's limited waiver of sovereign immunity.  *Gros Ventre Tribe v. United States*, 469 F.3d 801, 808, 815 (9th Cir. 2006).

## V.     ARGUMENT

### A.     Plaintiffs Fail to Demonstrate Likely Success on the Merits.

#### 1.     The First and Second Claims Pled in Plaintiffs' Complaint Are Incompatible with, and Cannot Support, the Preliminary Relief Sought.

"A preliminary injunction is appropriate when it grants relief of the same nature as that to be finally granted."  *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)).  "Because injunctive relief 'must be narrowly tailored to remedy the specific harm shown,' the precise nature and extent of injunctive relief to which plaintiffs are entitled will depend on which, if any, of those claims are

1    successful." *City of W. Sacramento v. R & L Bus. Mgmt.*, No. 2:18-CV-00900-WBS_EFB, 2020 WL

2    7360583, at *3 (E.D. Cal. Dec. 15, 2020) (quoting *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1244

3    (9th Cir. 2018)) (footnote omitted).  Thus, to obtain the requested mandatory injunction, Plaintiffs must

4    demonstrate likely success not just on any claim, but on a claim which, were they ultimately to prevail

5    on the merits, would entitle them to the relief they now seek preliminarily.  *See Dep't of Fish & Game v.*

6    *Fed. Subsistence Bd.*, 501 F. Supp. 3d 671, 688-89 (D. Alaska 2020) (denying preliminary injunction

7    despite finding plaintiff was likely to succeed on the merits because the relief sought—invalidation of

8    agency action—did not match the appropriate remedy for the violation).  In other words, Plaintiffs must

9    show they are likely to succeed on the underlying claim giving rise to the injunction.

10          Here, Plaintiffs make no effort to establish a likelihood of success on any claim that could afford

11   them the relief they seek via preliminary injunction.  Plaintiffs' brief focuses exclusively on their First

12   Claim, which challenges only NPS's alleged failure to revise the 1980 GMP.  ECF No. 8-1 at 11-15.

13   The remedy available to Plaintiffs on that claim, however, even if successful, would be to compel the

14   "agency action unlawfully withheld," 5 U.S.C. § 706(1), *i.e.*, an order directing NPS to revise the 1980

15   GMP.  The same goes for Plaintiffs' Second Claim, which challenges NPS's alleged failure to revise the

16   1998 Elk Plan.[6]  Success on the merits of that claim would likewise translate, at most, into an order

17   compelling the unlawfully withheld plan update.  Plaintiffs' proposed preliminary injunction, however,

18   says nothing about revising either the 1980 GMP or the 1998 Elk Plan.

19          Thus, "even assuming that there had been an unreasonable delay with respect to the revision" of

20   the plans at issue, "the remedy Plaintiffs seek is not viable" because it demands specific directives that

21   go far beyond merely ordering the agency to revise those plans.  *Ctr. for Food Safety v. Jewell*, 83 F.

22   Supp. 3d 126, 144 (D.D.C. 2015).  Moreover, as in *Center for Food Safety*, "Plaintiffs have not

23

24          [6] Plaintiffs' Second Claim differs materially from their First Claim in that, unlike the language of
     54 U.S.C. § 100502, which states that general management plans should be revised "in a timely
25   manner," there is no statute that requires updates to elk-management plans, or the Park's elk-
     management plan in particular, and any direct challenge to the 1998 Elk Plan under the APA has long
26   been time-barred.  *See* 28 U.S.C. § 2401(a); *Turtle Island Restoration Network v. U.S. Dep't of Com.*,
     438 F.3d 937, 942-43 (9th Cir. 2006) ("Although the APA itself contains no specific statute of
27   limitation, a general six-year civil action statute of limitations applies to challenges under the APA.").
     NPS anticipates filing a motion to dismiss the Second Claim (and, for the reasons discussed below, the
28   Third Claim) at the appropriate juncture.

identified any authority to support using a claim of unreasonable delay to require the agency to take actions not directly linked to the delayed action or to otherwise punish the agency for the delay." *Id.* at 145. As the court held in that case, "[i]t would be purely speculative for the Court to conclude" that any revised plan would necessarily result in the specific redress sought by the plaintiffs—there, elimination of "farming or farm-related pesticide use" at the Cypress Creek National Wildlife Refuge. *Id.* at 144. Here, it would be equally speculative for this Court to conclude that any revision to the 1980 GMP or 1998 Elk Plan would necessarily obligate NPS to provide supplemental forage and water or remove the Tomales Point fence. Kenkel Decl. ¶ 10; *see Norton*, 542 U.S. at 65 ("[W]hen an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."). Accordingly, Plaintiffs' motion should be denied because they have not demonstrated (indeed, have not even attempted to demonstrate) that the requested mandatory injunction is supported by a likelihood of success on any underlying claim that could support it. *See Borenstein v. Lead Animal Shelter Animal Found.*, 810 F. App'x 573, 573-74 (9th Cir. 2020) (affirming denial of mandatory preliminary injunction where the remedy sought was not authorized by the statute under which the plaintiff sued).

**2.  Plaintiffs Demonstrate No Likelihood of Success on Their Third Claim, Which Is Their Only Claim that Even Purports to Challenge the Specific Actions the Proposed Preliminary Injunction Would Address.**

Although Plaintiffs' Third Claim purports to challenge NPS's decisions relating to supplemental feeding and water, which Plaintiffs seek to redress in the preliminary injunction, Plaintiffs' motion offers no analysis of the merits of that claim. Plaintiffs do not even argue that they are likely to succeed on their Third Claim. By failing to address, much less demonstrate, their likelihood of prevailing on the merits of the sole claim that could potentially encompass their request for preliminary injunctive relief, Plaintiffs effectively concede they cannot do so. Plaintiffs' silence on the subject is fatal to their motion, particularly in light of the "doubly demanding" burden they face to show that "the law and facts clearly favor" their position to obtain the "particularly disfavored" mandatory injunction they seek. *Garcia*, 786 F.3d at 740. In any event, Plaintiffs cannot succeed on their Third Claim, for several reasons.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(i)**  **Plaintiffs' Third Claim Is Really a "Failure to Act" Claim under APA § 706(1) in Disguise, Which Lacks Merit Because NPS Has Not Ignored any Specific Legislative Command.**

While a failure to act can qualify as an agency action under the APA, *see* 5 U.S.C. § 551(13), in order to state a claim, the plaintiff must "assert[ ] that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64 (emphasis in original).  Plaintiffs make no such claim.  Plaintiffs challenge what they characterize as "decisions not to undertake" certain "measures." Compl. ¶ 96.  This is an allegation of agency *inaction*, not affirmative agency action, and "[a] challenge to an agency's alleged failure to act is more appropriately channeled through Section 706(1)."  *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1309 (S.D. Cal. 2018).  Here, however, Plaintiffs chose not to plead their Third Claim under § 706(1)—and they cannot.  Federal courts' authority under § 706(1) "is carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon*, 593 F.3d at 932.  No source of authority "specific[ally] . . . command[s]" NPS to undertake the requested measures, *i.e.*, to provide supplemental forage, additional supplemental water, or remove the Tomales Point fence.  *Id.*

**(ii)**  **Plaintiffs' Third Claim Fails Because They Are Not Challenging Final Agency Action.**

Plaintiffs' Third Claim also fails under § 706(2).  "To bring a claim under 5 U.S.C. § 706(2), plaintiffs must identify a final agency action upon which the claim is based." *Hells Canyon*, 593 F.3d at 930.  The APA defines reviewable "agency action" to include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). This definition "is not so all-encompassing as to authorize … judicial review over everything done by an administrative agency." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800-01 (9th Cir. 2013) (quoting *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)).  To qualify as "final," the action challenged (1) must "mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

Plaintiffs do not identify any specific "agency action" that is challenged in their Third Claim, and the preliminary injunction motion makes no mention of the subject because it does not address the Third

Claim at all.  To the extent Plaintiffs mean to challenge NPS's "recently announced decisions"  as arbitrary and capricious, their complaint references only: (1) an announcement (which is not cited or attached) "that [NPS] will not provide the elk at Tomales Point any supplemental forage," Compl. ¶ 75; (2) a decision, apparently implicit in the fact that "the Park Service has begun to provide supplemental water to some of the elk" on Tomales Point, not to "provide[] water that can be accessed by all four herds of elk who live there," *id.* ¶ 78; and (3) a statement by NPS "on its website that in response to requests by the public to do something about this situation it has decided that it will not remove any portion of the fence at Tomales Point to allow the elk access to more food and water," *id.* ¶ 74.  The "decisions" referenced by Plaintiffs appear to relate to statements on the "Frequently Asked Questions" ("FAQ") page of NPS's website.[7] None of these statements qualifies as reviewable final agency action.

NPS's statements on an FAQ website do not meet the definition of a "rule," "order," "license," "sanction," or "relief" necessary to qualify as "agency action."  *See* 5 U.S.C. §§ 551(4), (6), (8), (10), (11) & (13).  The Supreme Court has been clear that each category of agency action is "circumscribed" and "discrete."  *Norton*, 542 U.S. at 62.  Plaintiffs do not explain how the challenged "recently announced decisions" fit under any of the definitional categories, and it is evident that they do not.  *See Wild Fish Conservancy*, 730 F.3d at 801 (finding plaintiff's allegation that the federal government "operate[d] dams 2 and 5 in a manner that obstructs fish passage through Icicle Creek during some or all of the year" did not challenge final agency action even though "the act of closing the gates at structure 2 has immediate physical consequences," because "such action is not fairly analogous to a 'rule, order, license, sanction, [or] relief.'").

Further, the first two FAQ answers—about providing supplemental forage and water—do not bear the two hallmarks of finality identified in *Bennett*.  These FAQ answers express NPS's present views about its ongoing management of the tule elk population on Tomales Point in light of the current drought conditions.  As such, these statements (and the "recently announced decisions" they allegedly represent) do not "mark the consummation of the agency's decisionmaking process" or conclusively determine any legal rights.  *See Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d

---

[7] *See* https://www.nps.gov/pore/learn/nature/tule_elk_tomales_point_faq.htm

940, 945-46 (D.C. Cir. 2012) (finding that neither FDA advisory letters sent to manufacturers of ear candles, nor statement on the FDA's website that it would never approve ear candles, qualified as final agency action because the agency was not bound or otherwise obligated or committed to the views expressed); *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 925 (9th Cir. 1999) (affirming district court's ruling that it lacked jurisdiction over plaintiff's challenge to Forest Service's legally mandated monitoring efforts as allegedly inadequate because "monitoring does not 'consummate' any agency process," and "legal consequences do not flow from that duty, nor do rights or obligations arise from it"); *Air Cal. v. U.S. Dep't of Transp.*, 654 F.2d 616, 620-21 (9th Cir. 1981) (agency letter that was "informal [in] nature" and "was neither a definitive statement of the agency's position nor a document with the status of law" was not final agency action).

Instead, the FAQ answers merely explain the agency's current thinking on matters of discretionary wildlife management in light of present conditions, namely the possibility of providing supplemental food and water, a possibility which is subject to constant monitoring and may change as those conditions warrant.  As such, there is no final agency action subject to judicial review.  *See Lujan*, 497 U.S. at 890, 899 (courts do not review day-to-day operations of an agency under the APA); *Wild Fish Conservancy*, 730 F.3d at 801-02 (rejecting claim seeking review of agency's closing of certain dam gates "because they constitute day-to-day operations that merely implement operations plans for the Hatchery"); *Mont. Wilderness Ass'n, Inc. v. U.S. Forest Serv.*, 314 F.3d 1146, 1150 (9th Cir. 2003), *vacated on other grounds sub nom. Blue Ribbon Coal. Inc. v. Mont. Wilderness Ass'n, Inc.*, 542 U.S. 917 (2004) (agency's "routine maintenance work" on federal lands not subject to review because those activities "implement [the agency's] travel management and forest plans" for the lands at issue); *Friends of Mt. Hood v. U.S. Forest Serv.*, No. 97-CV-1787 KI, 2000 WL 1844731, at *5 (D. Or. Dec. 15, 2000) (challenge to day-to-day management of Mt. Hood Meadows ski area was "not final agency action for APA review under *Lujan*").

In challenging the FAQ statement pertaining to the Tomales Point fence, Plaintiffs conflate final agency action with statements about a decision made years ago.  The challenged statement merely provides information to the public about a topic on which NPS receives frequent inquiry.  The substantive answer that appears on the website informs readers that NPS is not considering removing the

fence, consistent with the outcome of a lengthy public planning process that was consummated in 1998—namely, because "[t]he 1998 Tule Elk Management Plan …specifically directs the National Park Service to maintain the elk fence at Tomales Point." Plaintiffs do not challenge this action because they cannot: it is barred by the six-year statute of limitations on APA claims. *See* 28 U.S.C. § 2401(a); *Turtle Island Restoration Network*, 438 F.3d at 942-43; *see also Shasta Res. Council v. U.S. Dep't of Interior*, 629 F. Supp. 2d 1045, 1054 (E.D. Cal. 2009) ("Plaintiffs did not formally challenge the 1993 RMP when it was issued fifteen years ago…and any new challenge to its provisions would be untimely under the APA's six-year statute of limitations."). Plaintiffs attempt to plead around this problem by characterizing NPS's FAQ as a "recently announced decision," but they have not alleged that the FAQ answer is anything more than a public statement about a decision that was made decades ago.

Because Plaintiffs' Third Claim does not challenge any final agency action, this Court lacks subject matter jurisdiction to review that claim under the APA. 5 U.S.C. § 704; *Rattlesnake Coal. v. U.S. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007) (federal courts lack subject matter jurisdiction to hear claim if plaintiff does not identify final agency action).

### (iii) Plaintiffs Cannot Show that NPS Acted in an Arbitrary and Capricious Manner.

Even if Plaintiffs' Third Claim properly identified final agency action subject to review under APA § 706(2), Plaintiffs would still bear the burden of establishing that NPS's actions were arbitrary and capricious, which they cannot meet. That section permits a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). In the context of Plaintiffs' motion for a preliminary injunction, arbitrary and capricious review under the APA presents yet another high hurdle, layered here on top of the already "difficult task" of proving entitlement to this "extraordinary remedy," *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010), made "doubly demanding" by virtue of the "mandatory" nature of Plaintiffs' requested injunctive relief. *Garcia*, 786 F.3d at 740.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The standard is "highly deferential, presuming the agency action to be

valid and affirming the agency action if a reasonable basis exists for its decision." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir. 2016) (quotation omitted).  To meet it, the plaintiff must show that the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quotation omitted).

Moreover, because the challenged actions concern NPS's wildlife management actions regarding the Tomales Point elk in light of current and anticipated climate conditions—matters within NPS's core areas of expertise—the agency's decisions deserve particular deference.  *See Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (finding that where agency's analysis "'requires a high level of technical expertise,' we must defer to the 'informed discretion of the responsible federal agencies'" (citation omitted)).  The National Park Service Organic Act's "statutory purpose language [in 16 U.S.C. § 1] obviously gives park managers broad discretion in determining how best to conserve wildlife and to leave them unimpaired for future generations."[8]  *Greater Yellowstone Coal. v. Babbitt*, 952 F. Supp. 1435, 1441 (D. Mont. 1996); *see also Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1454 (9th Cir. 1996) (noting NPS's "broad discretion" in the realm of park management).  "It is well established that an agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review, so long as they are reasonable." *California v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020) (quotation and citation omitted); *see Trout Unlimited v Lohn*, 559 F.3d 946, 959 (9th Cir. 2009) (affirming agency's "downlisting" of Upper Columbia River steelhead, explaining that "[a]ssessing a species' likelihood of extinction involves a great deal of predictive judgment.  Such judgments are entitled to particularly deferential review.").

### (a)   NPS's Decisions Regarding Supplemental Water and Forage Are Reasonable.

Plaintiffs cannot meet their burden because NPS has at all times acted, and continues to act,

---

[8] 16 U.S.C. § 1 was amended and replaced in 2014 and now appears at 54 U.S.C. § 100101(a).

1  reasonably.  The challenged actions involve agency management decisions that take into account

2  information about past, present, and expected future conditions.  The evidence before NPS—like the

3  challenged agency "decisions" themselves—reflects NPS's constant and ongoing monitoring of the

4  Tomales Point elk, including the water and forage available to them.  Press Decl. ¶¶ 33, 35, 37, 43-44,

5  47-50, 52.  NPS's monitoring includes areas within the parts of the Reserve inhabited by the elk that

6  members of the public do not frequent.  *Id.*  NPS continues to survey the water sources throughout the

7  Park to evaluate whether they remain adequate.  Kenkel Decl. ¶ 8.

8           Indeed, NPS's recent provision of supplemental water—which Plaintiffs apparently challenge

9  because they do not believe it went far enough—illustrates NPS's exercise of its reasoned

10  decisionmaking in response to current information.  Based on frequent observation of available water

11  sources, comparisons of water levels to historical precedents, and predictions about the anticipated depth

12  of this year's drought conditions, among other things, NPS determined that the water sources available

13  to the elk in the southern portion of the Reserve were likely to become inadequate in the short term.  *Id.*

14  ¶ 7; Press Decl. ¶¶ 41-45.  Accordingly, NPS reacted to this situation by adding supplemental water in

15  specific locations, which were selected for specific reasons.  *Id.*  To date, these same monitoring and

16  evaluative efforts have led NPS to conclude that water sources elsewhere in the Park remain adequate at

17  this time.  Press Decl. ¶¶ 47-48, 52-53 & Exs. 30-33.  NPS continues to monitor water conditions, and

18  may resort to providing additional supplemental water if, in its expert judgment, that becomes necessary.

19  Kenkel Decl. ¶ 9.

20           Similarly, NPS's continued approach to the issue of artificially supplementing food for the elk is

21  the product of reasoned agency judgment as discussed in the 1998 Elk Plan.  To begin with, the evidence

22  shows that adequate forage currently exists on Tomales Point to support the existing elk population.

23  Press Decl. ¶ 50 & Exs. 27-28.  Park staff have surveyed the available forage and NPS continues to

24  believe the supply is sufficient and will remain so for the foreseeable future.  *Id.* ¶¶ 50-51.  Park staff

25  also frequently observe the elk, including their eating habits.  Contrary to Plaintiffs' assertions, the vast

26  majority of the elk appear to be in good to excellent body condition, are not emaciated, and exhibit no

27  indication that they lack enough to eat.  *Id.* ¶ 47 & Exs. 17-26.  Although the Tomales Point fence has

28  become a symbolic flashpoint in the present controversy surrounding the management of elk in Point

Reyes, the evidence does not support Plaintiffs' claims that the elk are dying of starvation in large numbers while unsuccessfully attempting to escape the fence to obtain access to additional forage. *Id.* ¶¶ 48-49.

While Plaintiffs may firmly attribute the elk deaths of the past year to alleged starvation, the reality, in NPS's view, is significantly more complicated. The seven necropsies conducted over the past year show that the ultimate cause of death for those animals, both within and outside the Reserve, was attributable to nutrient deficiencies. Powers Decl. ¶ 7. The cause of those deficiencies, however, is unclear. *Id.* NPS's experts do not know whether they stem from insufficient forage, as Plaintiffs simply assert, or from complex interactions with lacking micronutrients, which are also lacking throughout the Park. *Id.* The necropsy results suggest that animals both within and outside the Reserve are exposed to similar nutritional conditions. *Id.* ¶¶ 9-10.

In determining how to manage the elk going forward, NPS draws on the expertise of its staff in weighing the uncertainties surrounding the root causes of last year's population decline in combination with several other important factors, all of which Plaintiffs ignore. Unlike last year, which began with a population above the carrying capacity, the population in the Reserve is now at a level the area has capably sustained in the past even during drought. Press Decl. ¶¶ 27-29, 32 & Ex. 8. The current population now numbers around 300, which is not far below the area's carrying capacity of approximately 350 animals. *Id.* ¶¶ 17, 40. The vast majority of the elk now appear to be in good to excellent body condition, showing no signs of dehydration or starvation. *Id.* ¶ 47. It is well-established that providing food to wildlife, as Plaintiffs ask the Court to order, is fraught with negative consequences. Powers Decl. ¶¶ 13-14. Though artificial feeding could conceivably improve short-term survival rates, it is known to cause a host of negative side-effects, including increased disease transmission, increased parasite loads, and habituation. *Id.* The resulting population increases would also harm the existing vegetation in the Reserve, further compounding the problems. *Id.* NPS has specific experience with feeding elk elsewhere in the system, and that well-publicized experience displayed all of the problems discussed above, which have proven persistent and difficult to reverse. *See*, *e.g.*, *Mayo v. Reynolds*, 875 F.3d 11, 17 (D.C. Cir. 2017) (noting that "[s]upplemental feeding artificially increases the size and density of the elk herd, and it has also contributed to the spread of

disease among the elk and erosion of their habitat"); *Defs. of Wildlife v. Salazar*, 651 F.3d 112, 113-14 (D.C. Cir. 2011) (describing the long history of "significant problems" caused by supplemental feeding and affirming agency's approach to ending the practice).

Moreover, not providing supplemental forage is consistent with the minimally intrusive management approach selected from the 1998 Elk Plan, as well as with specific provisions in the plan, which explains:

> No effort will be made to cultivate food crops specifically to improve the range's ability to support elk. Such strategies are known to be self-defeating as artificially provided food leads to ever increasing herd sizes that overwhelm the ability of the range to support them.

ECF No. 8-3 at p. 44. The plan expressly anticipates that population declines will occur coincident with "natural ecosystem processes." *Id.* at p. 39.

In short, NPS holds the well-reasoned view that providing supplemental forage is not a viable long-term solution and, given the extreme difficulty and likely negative consequences of attempting the practice, is to be avoided if at all possible even as a short-term measure. Powers Decl. ¶¶ 13-14; Kenkel Decl. ¶ 5. The current population of the Tomales Point elk numbers nearly 300, which is not far below the area's carrying capacity of approximately 350 animals. Press Decl. ¶¶ 17, 40. While NPS is mindful of genetic viability concerns and continues to closely monitor the population numbers, it does not believe viability is in jeopardy at this time, such that artificially feeding the elk is warranted. Powers Decl. ¶ 12; Kenkel Decl. ¶ 5. In all events, the decision remains one for NPS, not Plaintiffs, as it is bedrock administrative law that "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378; *Greenpeace Action v. Franklin*, 982 F.2d 1342, 1350 (9th Cir. 1992) (same); *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993) ("We are in no position to resolve this dispute because we would have to decide that the views of [the plaintiffs'] experts have more 'merit than those of the Forest Service's experts.'" (citation and alteration omitted)).

### (b) Defendants' Decision Not to Remove the Tomales Point Fence Is Reasonable.

The discussion above focuses on the issues of supplemental water and forage, as those are the

actions Plaintiffs demand in their proposed mandatory injunction.  For their part, Plaintiffs state that they "are by no means suggesting that at this juncture the Court dictate precisely which measures the Park Service undertake to ensure that the Tule elk at Tomales Point do not continue to die from a lack of food and water." ECF No. 8-1 at 20.  Nevertheless, although Plaintiffs' proposed preliminary injunction would not mandate it, because Plaintiffs repeatedly reference the Tomales Point fence and suggest its removal, Defendants briefly address here why the "decision" not to remove the fence—even if any challenge to the fence's continued maintenance were not time barred—could not be disturbed on arbitrary and capricious review.  The reasons are manifold.

The 1998 Elk Plan, which was adopted after a public comment process under the National Environmental Policy Act ("NEPA"), affirmed the continued maintenance of the fence.  The fence's continued maintenance is listed as a specific action among the management actions identified in the 1998 Elk Plan, which continues to guide NPS's management practices.  ECF No. 8-3 at p. 44. (NPS "will maintain the elk fence on Tomales Point and continue to separate tule elk from cattle.").  The 1998 Elk Plan further explains that "[r]emoving the fence at Tomales Point will be considered if and when ranching ceases on the adjacent lands." *Id.* at p. 49.  Ranching has not ceased and, consistent with the legislation establishing Point Reyes and steady Congressional and Executive branch support, cessation is unlikely in the foreseeable future. *See* H.R. Conf. Rep. No. 116-9, at 149 (Feb. 13, 2019) (noting that "multi-generational ranching and dairying is important both ecologically and economically for the Point Reyes National Seashore and the surrounding community," and that "[t]hese historic activities are also fully consistent with Congress's intent for the management of Point Reyes National Seashore"); Kenkel Decl., Ex. 1, Memo. of Sec'y of Interior Ken Salazar, Nov. 29, 2012 (noting that "the Department of the Interior and the NPS support the continued presence of dairy and beef ranching operations in Point Reyes' pastoral zone").  Thus, NPS cannot remove the fence without first engaging in the planning process under NEPA.  And even if those obstacles could be ignored (which they cannot), the present forage conditions would hardly mandate removal of the fence as a measure to benefit the elk.  Indeed, removal or alteration of the fence offers no solution because the same forage quality issues exist on both sides of the fence.  Powers Decl. ¶¶ 8-9.  Moreover, because the elk have never been observed moving generally toward the fence, and tend to inhabit the same areas year after year regardless of drought,

fence removal would be unlikely to lead to migration of the elk out of the Reserve.  Press Decl. ¶ 48.

Thus, Plaintiffs cannot show that removing the fence would improve conditions for the elk herd.

**B.      Plaintiffs Fail to Demonstrate that Irreparable Harm Is Likely in the Absence of an Injunction.**

Plaintiffs' failure to show a likelihood of success on the merits provides the Court with an

adequate basis to deny their motion.  *Garcia*, 786 F.3d at 740.  Should the Court proceed to consider

irreparable harm, Plaintiffs also fail to meet their burden.  To make the requisite showing, a plaintiff

must establish that the harm "is likely in the absence of the injunction."  *Winter*, 555 U.S. at 22.  This

also requires a "sufficient causal connection" between the alleged harm and the activity to be enjoined,

which is satisfied by demonstrating that "the requested injunction would forestall" the irreparable harm.

*Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011).  Here, Plaintiffs fail to show harm

to the elk at the population level or that the proposed injunction would remedy the alleged harm.

NPS takes its wildlife management responsibilities very seriously and is proactively monitoring

the situation to ensure that the Reserve's elk population remains viable.  The elk, however, are not a

threatened or endangered species.  Even in the context of more imperiled species, "courts require a

showing that the identified harm to the species is significant vis-à-vis the overall population, and not just

that individual animals are likely to be injured."  *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156

F. Supp. 3d 1252, 1262 (W.D. Wash. 2015) (citing *Pac. Coast Fed'n of Fisherman's Ass'ns v.*

*Gutierrez*, 606 F. Supp. 2d 1195, 1210 n.12 (E.D. Cal. 2008)) (internal quotation marks omitted); *Defs.*

*of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009).  Individual animals perish on a

regular basis in the ordinary course over time.  Consistent with the 1998 Elk Plan's non-interventionist

management approach, the elk population in the Reserve has gone through cycles, during which it grows

beyond the area's carrying capacity and then recedes.  The deaths that occur during the down years

result from a host of factors and are not unexpected; indeed, in some measure they are necessary to

prevent the population from growing to an unsustainable level.  The significant population reduction

reported at the last census thus predictably coincided with the drought that began last year.  As the

drought has persisted (indeed, worsened to levels not experienced since tule elk were reintroduced to

Point Reyes in 1978), additional deaths are likely.  But NPS—which has been closely monitoring the

situation for decades and is now monitoring even more vigilantly—does not perceive any present threat to the population's viability.  Although Plaintiffs argue that "there is a serious concern that this entire population of elk may lose its genetic viability," ECF No. 8-1 at 17, the evidence does not bear out their contention.  The current population stands at nearly 300 animals, not far below the area's carrying capacity.  The record does not support a conclusion that any population loss that occurs as a result of the drought would be significant for the species as a whole.

Moreover, even if Plaintiffs could establish a significant threat to the overall elk population (which they cannot), they remain unable to demonstrate that the proposed injunction would prevent the alleged harm to their personal interests.  The evidence shows that the elk have access to sufficient water and forage, and therefore additional supplemental water and supplemental forage are neither necessary nor advisable at this time.  Were NPS to commence artificial feeding, elk would nevertheless continue to die, from nutritional deficiencies or other causes.  Plaintiffs have not shown that their requested preliminary injunction would change their personal experiences and observations in the event they visit the Park, which would differ little from those of the recent past.  Most importantly, artificial feeding would expose the elk population to its many documented perils, including increased disease, parasite problems, and habituation.  The elk would be no better off in the short-term, and almost certainly much worse off in the long-term. *See All. for the Wild Rockies v. Bradford*, 979 F. Supp. 2d 1139, 1141-42 (D. Mont. 2013) (declining to enjoin on appeal a project because "enjoining the project is more likely to irreparably harm the grizzly bear than allowing the project to proceed").  Accordingly, Plaintiffs cannot make the necessary showing that the "requested injunction would forestall" the alleged harm. *Perfect 10*, 653 F.3d at 981.  Indeed, it could very well do the opposite, causing severe harm while preventing none.

### C.   Injunctive Relief Is Contrary to the Balance of the Equities and the Public Interest.

The third and fourth preliminary injunction factors, "harm to the opposing party and weighing the public interest," "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Injunctive relief turns on the public interest writ large, not the plaintiffs' particular preferences, even when their concerns are expressed in environmental terms. *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Winter*, 555 U.S.

1    "The public interest inquiry primarily addresses [the] impact on non-parties rather than parties." *League*

2    *of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (quotation omitted).

3           The federal government and the public it represents have a strong interest in competent

4    management of the national parks, consistent with applicable law.  NPS has a broad mission that serves

5    a wide array of interests and constituencies.  Seeing to the welfare of the tule elk, important though it is,

6    is just one aspect of NPS's overall responsibility.  NPS is tasked with balancing the myriad interests

7    involved and, within that sphere, has been entrusted by the public with significant discretion in how it

8    does so.  That is particularly true in areas such as wildlife management that reside within the core of

9    NPS's expertise.  Here, Plaintiffs have failed to identify any specific legal command that NPS has not

10   followed; rather, focusing exclusively on their personal feelings about the short-term survival of the elk,

11   Plaintiffs express disagreement with NPS's well-reasoned decisions.  In putting their own preferences

12   first, Plaintiffs wholly ignore the many competing concerns and priorities NPS must balance, including

13   but by no means limited to those associated with multigenerational ranching operations in the Park,

14   which Plaintiffs readily admit they would prefer be eliminated wholesale, but which are consistent with

15   the legislative purposes of the Park.  With their singular, short-term focus, Plaintiffs also ignore the

16   public's strong interest in avoiding repetition of the adverse scenarios that have unfolded where efforts

17   have been made to artificially feed wildlife, especially elk.  Overriding NPS's decisions by mandating

18   that NPS artificially feed and water the elk, or even remove the Tomales Point fence without engaging in

19   the necessary planning processes, would be contrary to the public interest.  Under these circumstances,

20   the public interest factor weighs against Plaintiffs and in favor of allowing NPS to continue to manage

21   the elk specifically, and the Park in general, in the manner consistent with its obligations and expertise.

22           **D.     Plaintiffs' Proposed Preliminary Injunction Is Impermissibly Vague.**

23           Even if Plaintiffs could establish entitlement to relief, the proposed injunction fails to comply

24   with Rule 65's requirements.  "Every order granting an injunction must state its terms specifically," and

25   "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts

26   restrained or required."  Fed. R. Civ. P. 65(d)(1)(B) & (C).  "[O]ne basic principle built into Rule 65 is

27   that those against whom an injunction is issued should receive fair and precisely drawn notice of what

28   the injunction actually prohibits." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047-48 (9th

1   Cir. 2013) (quotation omitted).

2          Plaintiffs' proposed order would obligate NPS to "take immediate measures to ensure that the

3   Tule elk who live on Tomales Point in Point Reyes National Seashore are provided access to sufficient

4   food and water to ensure that these animals do not continue to die of starvation and/or dehydration."

5   ECF No. 8-13.  Plaintiffs concede the vagueness of this command; they admit it is intentional,

6   recognizing the impropriety of having "the Court dictate precisely which measures the Park Service

7   undertake to ensure that the Tule elk at Tomales Point do not continue to die from a lack of food and

8   water."  ECF No. 8-1 at 13.  This acknowledgment further exposes the flaws in Plaintiffs' request,

9   underscoring the absence of any legal authority to support a request for relief that might be sufficiently

10  specific to satisfy Rule 65.  Leaving the order purposefully vague does not and cannot, however,

11  substitute for compliance with the rule.

12         As phrased, Plaintiffs' proposed injunction fails to inform NPS what amount of food and water

13  would be "sufficient" to comply, where to place it within the Reserve, or how to ensure that the elk

14  consume it.  Even more problematically, the injunction would apparently gauge compliance by virtue of

15  whether elk "continue to die of starvation and/or dehydration."  It is beyond dispute that animals die

16  within the park in the normal course on a regular basis, more often than not without anyone from NPS or

17  the public learning of the death for a long time (and in many cases, ever).  The elk perish from a variety

18  of causes, most of which are not readily apparent from mere observation.  Plaintiffs apparently

19  contemplate conducting a necropsy upon every discovery of a death (which is neither possible, nor, even

20  if it were possible, remotely feasible) to determine whether the cause of death was "starvation and/or

21  dehydration."  Of course, necropsies can only be performed when the carcass is extremely fresh.  They

22  are also expensive, time consuming, and logistically challenging.  Even when performed, necropsy

23  results are often inconclusive regarding cause of death, and even when they reach conclusions in that

24  regard, regularly identify multiple causes.  These problems render Plaintiffs' proposed injunction

25  impossible to administer or comply with.  Rule 65's specificity requirements exist to prevent entry of

26  such unworkable injunctions.

27  **VI.    CONCLUSION**

28         For the foregoing reasons, the Court should deny Plaintiffs' request for injunctive relief.

DATED: July 14, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney


 /s/ *David M. DeVito*
DAVID M. DEVITO
Assistant United States Attorney

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment & Natural Resources Division

 /s/ *Matthew P. Rand*
Matthew P. Rand
Trial Attorney

Attorneys for Defendants

## **ATTESTATION PURSUANT TO LOCAL CIVIL RULE 5-1(i)(3)**

I, David M. DeVito, attest that any signatories indicated by a conformed signature (/s/) within this e-filed document have approved, and concur in, this filing.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


 /s/ *David M. DeVito*
DAVID M. DEVITO