Katherine Barnekow, State Bar No. 336792
kbarnekow@law.harvard.edu
Harvard Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: 617-496-4863
Cell: (202) 257-5145

Katherine A. Meyer
(appearance *pro hac vice*)
kmeyer@law.harvard.edu
Director, Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: 617-496-4863
Cell: (202) 257-5145

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| JACK GESCHEIDT, et al.,<br><br>            Plaintiffs,<br><br>   v.<br><br>DEB HAALAND,<br>Secretary of Interior, et al.,<br><br>            Defendants. | Case No. 21-4734-HSG<br><br>PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT .............................................................................................................................. 1

   I.   THE COURT SHOULD NEITHER ACCEPT DEFENDANTS' FACTUAL ASSERTIONS NOR DEFER TO THE AGENCY'S "EXPERTISE" IN MANAGING THE TOMALES ELK ........................................................................................ 1

      A.  The Park Service Keeps Revising Pertinent Facts to Suit its Needs ................................. 1

      B.  Because the Park Service Has Failed to Revise the General Management Plan for the Tomales Elk, There Is No Reason for Court to Defer to its Management "Expertise" in this Case ............................................................................................................................... 5

   II.  PLAINTIFFS HAVE A STRONG CASE ON THE MERITS ........................................... 7

   III.  THE COURT CAN GRANT THE REQUESTED EMERGENCY RELIEF ..................... 8

      A.  The Court Has Equitable Authority to Grant the Requested Relief ................................... 8

      B.  The Requested Emergency Relief is Directly Related to Plaintiff's Claim ...................... 10

   IV.  THE EQUITIES WEIGH IN FAVOR OF GRANTING THE INJUNCTION .................................................................................................................12

   V.  THERE IS NOTHING VAGUE ABOUT PLAINTIFFS' REQUESTED RELIEF ........................................................................................................ 15

CONCLUSION ........................................................................................................................ 15

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Borenstein v. Lead Animal Shelter Animal Found.*,
  810 F. App'x 573 (9th Cir. 2020) .......................................................................................... 11

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ................................................................................................................ 6

*Center for Food Safety v. Jewell*,
  83 F. Supp. 3d 126 (D.D.C. 2015) ........................................................................................ 10

*Defs. of Wildlife v. Salazar*,
  651 F.3d 112 (D.C. Cir. 2011) .............................................................................................. 12

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) (en banc) .................................................................................. 9

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ................................................................................................................ 9

*Humane Soc'y of the United States. v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) ................................................................................................ 5

*Mayo v. Reynolds*,
  875 F.3d 11 (D.C. Cir. 2017) ................................................................................................ 12

*Nat'l Wildlife Fed'n. v. Nat'l Marine Fisheries Serv.*,
  886 F.3d 803 (9th Cir. 2018) ................................................................................................ 13

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946) ................................................................................................................ 9

*Red Wolf Coal. v. United States Fish & Wildlife Serv.*,
  No. 2:20-CV-75-BO, 2021 WL 230202 (E.D.N.C. Jan. 22, 2021) ......................................... 9

*Res. Renewal Inst. v. Nat'l Park Serv.*,
  No. C 16-0688 SBA, 2016 WL 11673179 (N.D. Cal. July 15, 2016) .................................... 7

*Washington Toxics Coal. v. Envt. Prot. Agency*,
  413 F.3d 1024 (9th Cir. 2005) .............................................................................................. 11

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) .................................................................................................................. 12

**STATUTES**

5 U.S.C. § 706(1) ........................................................................................................................ 7, 10

7 U.S.C. § 2143 ............................................................................................................................... 15

16 U.S.C. § 459c ......................................................................................................................... 9, 13

54 U.S.C. § 100101(a) ........................................................................................................ 9, 12, 13

54 U.S.C. § 100502 .................................................................................................................. 10

-iii-

# INTRODUCTION

The only question presented by the instant motion is whether, given the strength of Plaintiffs' unreasonable delay claim, and all of the equities involved, this Court should enter preliminary relief to ensure that the wildlife at issue does not continue to die from dehydration and/or starvation before this case can be decided. As Plaintiffs demonstrated in their opening brief, and further demonstrate below, the Court clearly has the authority to do so, and the facts of this case cry out for such temporary emergency relief.

# ARGUMENT

## I. THE COURT SHOULD NEITHER ACCEPT DEFENDANTS' FACTUAL ASSERTIONS NOR DEFER TO THE AGENCY'S "EXPERTISE" IN MANAGING THE TOMALES ELK.

### A. The Park Service Keeps Revising Pertinent Facts to Suit its Needs.

In light of the many inconsistencies the Park Service has put forward in the last few years about this matter, the Court should be extremely wary of accepting its latest presentation of the pertinent facts. For example, we know there is a fence maintained by the Park Service along the entire southern border of the Tomales Point elk habitat, and that, as a result, the Tule elk who live there are unable to reach water and forage on the other side of the fence. *See, e.g.*, Declaration of Dr. Howell, Pl. Ex. G, ECF No. 8-9, ¶¶ 4, 7–8. We also know that the reason the fence was installed over 43 years ago was to keep the elk on Tomales Point from competing for water and forage used by cattle south of the fence. *See* 1998 Management Plan, Pl. Ex. A, ECF No. 8-3, at 8 ("The erection of a three-mile fence across the peninsula from the Pacific Ocean to Tomales Bay *isolated the herd from adjacent dairy farms*") (emphasis added).

Now—for the first time—in an effort to defeat Plaintiffs' request for emergency relief, the Park Service would have this Court believe that the fence has nothing to do with keeping the elk from habitat used by the ranches because the Tomales elk have no interest in traveling south of the fence. *See, e.g.,* Defendants' Memorandum ("Def. Brf.") at 21–22 (asserting that "because the elk have never been observed moving generally toward the fence, and tend to inhabit the same areas year after year regardless of drought, *fence removal would be unlikely to lead to migration*

-1-

*of the elk out of the Reserve*") (emphasis added); *id.* ("Plaintiffs cannot show that removing the fence *would improve conditions for the elk herd*") (emphasis added).

But if, in fact, the existence of the fence is so meaningless here—i.e., it neither deprives the Tomales elk of any food or water, nor is it needed to protect the cattle ranches from competition from the elk—what possible purpose does this fence serve at this point in time, and why is the Park Service so bent on keeping it in place? This glaring inconsistency in the Park Service's narrative, alone, should make this Court wary of uncritically accepting the agency's many self-serving factual statements. **But there is much more.**

When 257 Tomales elk died during the 2013-2015 drought, the Park Service vehemently denied that the animals died from a lack of water. *See* National Park Service, Point Reyes National Seashore, *Tule Elk at Tomales Point FAQ*, https://www.nps.gov/pore/learn/nature/tule_elk_tomales_point_faq.htm (last updated July 1, 2021) ("[T]here is no evidence that the 2013–2015 herd decline was due to dehydration and a lack of water."). Then, during the summer of 2020, when Plaintiffs and others personally witnessed dead and emaciated elk at Tomales Point and implored the Park Service to remove the fence so that the elk could have access to water, the Service denied that a large die-off was even occurring or that the elk had insufficient access to water. *See, e.g., id.* (informing the public that NPS did not supply any supplemental water during 2020 because "[r]egular monitoring of the available water sources for the elk determined that water was in sufficient supply and that there was *no need to provide supplemental water for the elk*.") (emphasis added).

But then, in March 2021, the Park Service finally admitted the horrific truth that Plaintiffs had known all along: that ***in fact 152 of a total of 445—or one-third of the total population of Tomales elk—died during 2020-2021***. *See Tule Elk at Tomales Point FAQ*, *supra*. However, the agency still insisted that this massive die-off was unrelated to a lack of water, telling the public that the real problem was "poor forage quality." *Id.*

-2-

Then, following a huge public outcry—including relentless media coverage critical of the Park Service for allowing these animals to die such inhumane deaths[1]—the agency announced that things had suddenly changed and that it had decided to provide the Tomales elk with some supplemental water—despite recently telling the public that the problem was *not* a lack of water, but instead a *lack of adequate forage*. *See* Will Houston, *Drought: Point Reyes supplies emergency water for tule elk*, MARIN INDEPENDENT JOURNAL (June 11, 2021, 5:00PM), https://www.marinij.com/2021/06/11/drought-point-reyes-supplies-emergency-water-for-%20tule-elk/. The agency has not, however, made any effort to provide these animals with any supplemental *food,* and in fact now argues against this temporary remedy that would address what it claims was the reason for the most recent massive die-off. *See also* Declaration of James Coda,

---

[1] *See*, *e.g.*, Asher Elbein, *Home on the Range*, BIOGRAPHIC (March 23, 2021), https://www.biographic.com/home-on-the-range/; Will Houston, *Point Reyes elk dying as dry period persists*, MARIN INDEPENDENT JOURNAL (March 31, 2021, 6:50PM), https://www.marinij.com/2021/03/31/point-reyes-elk-dying-as-dry-period-persists/; Andrew Chamings, *Tule elk in Marin are dying off, as the park service and activists feud over the reason why*, SF GATE (April 5, 2021, 9:16AM), https://www.sfgate.com/california-parks/article/tule-elk-marin-bay-area-feud-activists-park-fence-16078340.php; Anna Guth, *True to boom and bust, fenced herd shrinks in drought*, POINT REYES LIGHT (April 7, 2021), https://www.ptreyeslight.com/article/true-boom-and-bust-fenced-herd-shrinks-drought; Susan C. Schena, *Rally Against Mass Killing Of Tule Elk 2021: Pt. Reyes*, PATCH (April 10, 2021, 11:00AM) https://patch.com/california/sanrafael/calendar/event/20210410/1028869/rally-against-mass-killing-of-tule-elk-2021-pt-reyes; Gayle Ong, *Rare elk population declining due to drought conditions*, KRON4 (April 11, 2021, 9:24AM), https://www.kron4.com/news/bay-area/rare-elk-population-declining-due-to-drought-conditions/; ABC7 News, *Protesters demand removal of fence after 100+ tule elk die in Point Reyes* (April 11, 2021), https://abc7news.com/tule-elk-deaths-protest-point-reyes-national-seashore/10506617/; Gustaf Kilander, *Dozens of rare elk die in California due to climate crisis*, THE INDEPENDENT (April 12, 2021, 8:35PM), https://www.independent.co.uk/climate-change/elk-california-drought-b1830264.html; Jeff Miller, *Center for Biological Diversity Lambasts Rep. Jared Huffman in Scathing Rebuke over Tule Elk Comments in Letter to the Editors*, ENVIRO NEWS (April 12, 2021), https://www.environews.tv/041221-center-for-biological-diversity-lambasts-rep-jared-huffman-over-tule-elk-comments-in-letter-to-the-editors/; Susanne Rust, *Scores of tule elk died at Point Reyes seashore in 2020. Are their days numbered?*, LOS ANGELES TIMES (April 14, 2021, 6:00PM), https://www.latimes.com/california/story/2021-04-14/scores-of-tule-elk-died-at-point-reyes-national-seashore; Gabrielle Strum, *California's Native Elk Need Your Help: An Environmentalist's Perspective on the Decimation of Biodiversity in the State*, THE LUMBERJACK (May 9, 2021), https://thelumberjack.org/2021/05/09/californias-native-elk-need-your-help/; George Wuerthner, *Fed Plan to Extend Point Reyes Ranch Leases, Kill Tule Elk, Moves Forward*, EARTH ISLAND JOURNAL (May 10, 2021), https://www.earthisland.org/journal/index.php/articles/entry/fed-plan-extend-point-reyes-ranch-leases-kill-tule-elk/.

Pl. Ex. I, ECF No. 8-11, ¶¶ 10–12 (the supplemental water provided is only available to one of the four Tomales Point herds).

Now that Plaintiffs have filed this lawsuit and moved for a preliminary injunction in an effort to ensure that these animals do not continue to die from a lack of forage and water while this case is pending—as a result of what the Park Service itself admits are *worsening drought conditions*, Def. Brf. at 22—the Park Service would also have this Court believe that the elk are doing just fine, and, lo and behold, the problem is neither a lack of adequate water nor forage, but instead a lack of certain nutrients that exists throughout the National Seashore. Def. Brf. at 5 (stating that the cause of death for elk—"irrespective of whether they lived within or outside of the Reserve—was attributable to *significant nutrient deficiencies*, although NPS could not determine whether these deficiencies were caused by simple lack of forage or more complex interactions with lacking micronutrients, such as copper and selenium").

But, of course, a lack of certain nutrients *is* a forage problem that could be solved if the Tomales elk could obtain access to habitat south of the fence. As recently explained to Defendant Haaland by five wildlife biologists who have assisted the Park Service in the reintroduction, monitoring, and/or research on Tule elk since their release at Tomales Point in 1978, both the 2015 and most recent population crash "were *the result of the inability of the confined elk to disperse from the Reserve to find more favorable forage*." Letter to Secretary Haaland (June 24, 2021), Pl. Ex. K ("Scientist Letter") at 3 (emphasis added).

Moreover, if, as Defendants suggest, this problem exists throughout Point Reyes, the other elk herds at Point Reyes—who are free ranging south of the Tomales fence—would also be dying in large numbers. But, according to the Park Service's own population numbers, that is not the case. Rather, in 2020, the Limantour herd declined only from 164 to 155 animals, and the Drakes Beach herd actually *increased by one. See Tule Elk at Tomales Point FAQ, supra.*

Defendants' self-serving assertions that they have not "seen" elk congregating at the fence and that the majority of elk "observed to date by Park staff" appear "in good to excellent condition with no signs of starvation or dehydration," Def. Brf. at 7, does not negate what Plaintiffs know to be true: that more than 150 elk have already died because they are prevented

-4-

from reaching adequate food and water and that, as drought conditions worsen, these animals will continue to die if they cannot access adequate food and water. And, as demonstrated by the Supplemental Declaration of Plaintiff Jack Gescheidt, who surveyed Tomales Point on July 16, 2021, in fact the elk are *not* doing fine, and any remaining water sources are miniscule at best. *See* Supplemental Gescheidt Decl., Pl. Ex. L, (describing the carcasses and skeletons of many elk, including animals found at the bottom of a dry ravine, and reporting that water sources are scarce.); *see also* Photographs attached to Mr. Gescheidt's Supplemental Declaration; *see also* Scientist Letter, Pl. Ex. K, at 5 ("[r]emoving/opening the high fence across Tomales Point would allow the confined tule elk to disperse away from areas of inadequate forage and water"); Supplemental Kline Decl., Pl. Ex. M (Photographs taken of Tomales elk at the fence).

In light of these many factual inconsistencies—as well as the Park Service's propensity to shift its position on what has occurred and what is needed to rectify the situation—this Court should be extremely wary of accepting the agency's latest factual assertions made for the sole purpose of defeating Plaintiffs' motion for emergency relief. *See*, *e.g.*, *Humane Soc'y of the United States v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010) (noting that "[divergent factual findings" by an agency as to the cause of death of wildlife "raise questions as to *whether the agency is fulfilling its statutory mandates impartially and competently*") (emphasis added).

**B.   Because the Park Service Has Failed to Revise the General Management Plan for the Tomales Elk, There Is No Reason for Court to Defer to its Management "Expertise" in this Case.**

There also is no reason for this Court to defer to the agency's "expertise" in this matter, as urged by Defendants. Def. Brf. at 16–23. The whole point of Plaintiffs' underlying claim is that the Park Service has unreasonably delayed revising its management approach for the Tomales elk as required by the agency's governing statute, based on events and circumstances that have occurred **over the last 41 years**. *See* Plaintiffs' Memorandum ("Pl. Brf.") at 11–15. Thus, this Court cannot defer to the agency's "expert" management decision, as there has been no such agency action to review—as Defendants themselves vehemently stress. Def. Brf. at 13–16.

There also is no basis for this Court to defer to such ad hoc, public relations driven, management "decisions" upon which the Park Service so heavily relies throughout its brief.

-5-

Indeed, because these inconsistent management pronouncements are not tethered to any final agency action, they are *worse* than the kind of post hoc rationalizations to which courts must *never* defer. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

In this regard, it is also important to reject any notion that these large die-offs of the Tule elk are simply the result of "natural ecosystem processes" as asserted by Defendants. Def. Brf. at 20. There is nothing *natural* about an eight-foot wire fence. As the Park Service itself explained in its 1998 Tule Elk Management Plan, although "[n]atural ecosystem processes will result in disease, predation, loss of fitness and eventually mortality . . . a healthy herd is one that does not suffer disease or mortality *due to artificially induced or human caused impacts*." Pl. Ex. A, at 39 (emphasis added). The three-mile-long wire woven fence that the Park Service maintains to restrict the elk's access to habitat south of the fence is both "artificially induced" and "human caused." *See id.* (observing that such "human caused influences" includes "*the fencing of elk on the peninsula of Tomales Point*") (emphasis added); *see also* Howell Decl., Pl. Ex. G, ECF No. 8-9, ¶ 4 ("The fence located at Tomales Point creates a closed system, with no emigration or immigration in population, essential elements for natural population dynamics . . . *The fence is not a natural barrier and prevents the elk from reaching food and water that are part of the natural environment.*") (emphasis added).

In fact, recent Marin County maps dramatically demonstrate there are many more water sources available on the fence's southern side compared to its northern side. *See* Attachment 1 (aerial maps showing water sources north and south of the Tomales Point fence). The photographs attached to the government's brief do not show otherwise. Indeed, those photographs, one of which is included as Attachment 2 to this brief (Def. Ex. 32, ECF No. 16-32), show that what the Park Service is calling an adequate water supply north of the fence for *hundreds of animals each requiring about four gallons of water a day*[2] is actually nothing more

---

[2] *See* Konrad Hafen, *How Often Do Elk Need Water and How Much Do They Drink?*, PUBLIC LANDS JOURNAL, https://publiclandsjournal.com/how-often-do-elk-need-water-and-how-much-do-they-drink/#:~:text=Water%20is%20an%20essential%20element,the%20elk%20are%20hanging%20out (last visited July 20, 2021).

-6-

than a tiny puddle. *See id*; *see also* Supplemental Gescheidt Decl., Pl. Ex. L; *see also* Photographs attached to Mr. Gescheidt's Supplemental Declaration.

As to available habitat for the elk south of the fence, the Park Service admits that "*grazing resources are not currently a limiting factor*" for the two free-ranging herds. *See* Environmental Impact Statement (Sept. 2020), Pl. Ex. N, at 187 (emphasis added); *see also* McCrea A. Cobb, Spatial Ecology and Population Dynamics of Tule Elk (*Cervus elaphus nannodes*) at Point Reyes National Seashore, California (Spring 2010), Pl. Ex. O, at 149–150 (explaining that "[u]nlike elk in the Tomales herds, elk in the D. Ranch and Limantour herds are not constrained by fences, and thus *have much more available high quality habitat surrounding their current ranges*") (emphasis added).

## II.     PLAINTIFFS HAVE A STRONG CASE ON THE MERITS.

Plaintiffs have made a strong showing that the Park Service's failure to revise the General Management Plan for this portion of the Park in a "timely manner," as required by the governing statute, violates that mandate and constitutes agency action unreasonably delayed within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(1)—a claim that Judge Armstrong has already ruled is justiciable. *See Res. Renewal Inst. v. Nat'l Park Serv.*, No. C 16-0688 SBA, 2016 WL 11673179 (N.D. Cal. July 15, 2016); Pl. Brf. at 11–12. Thus, Defendants' assertion that "Plaintiffs have failed to identify any specific legal command that NPS has not followed," Def. Brf. at 24, is demonstrably incorrect.

Moreover, although this was the sole claim upon which Plaintiffs based their request for temporary relief, Pl. Brf. at 11–15, Defendants chose not to address the merits of *this* argument, and instead spent the bulk of their opposition contending that Plaintiffs had failed to show a likelihood of success on a *different* claim that, again, simply was not the basis for the instant motion. *See* Def. Brf. at 12–22 (arguing that there is no basis for Plaintiffs' Third Claim under 5 U.S.C. § 706(2)).

It is not surprising the government chose not to respond to Plaintiffs' actual argument on the merits, in light of the extreme delay that has ensued since the agency issued the 1980 General Management Plan for the National Seashore, including Tomales Point. Indeed, experts have been

-7-
PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION
No. 4:21-cv-04734-HSG

warning the Park Service for *decades* that it needs to evaluate the environmental needs and conditions of the Tomales elk and to revise its management of this wildlife accordingly.

In 1993, the Park Service's own Scientific Advisory Panel reported that the increasing population of Tule elk at Tomales Point required the Park Service to consider various management actions before the elk started dying of starvation because they could not obtain access to adequate forage. McCullough, et al., "Report of the Scientific Advisory Panel on Control of Tule Elk on Point Reyes National Seashore" (October 18, 1993), Pl. Ex. P. The Panel warned that, with respect to the Park Service's continued hands-off approach toward these elk, "[w]e can reliably predict that if such a strategy is employed the tule elk will seasonably be malnourished and appear less 'healthy' and that *dead and dying animals will become more evident*." *Id.* at 4 (emphasis added). In 1998, the Park Service issued a Tule Elk Management Plan, which stressed that further action was needed "to provide for the protection of the elk that is consistent with scientifically sound principles, takes into account the interests of the public, and meets the objectives for which the Seashore was established." Pl. Ex. A, at 1.

In his 2010 dissertation on this subject, McCrea Cobb stated in no uncertain terms that "[g]iven the predicted future abundances of elk and close proximity to ranches—conflicts are likely to occur within the next 10 years at Point Reyes." Cobb, *supra,* Pl. Ex. O, at 150. He stressed that "NPS managers at Pt. Reyes are *strongly encouraged to develop a proactive plan to address this issue*." *Id.* (emphasis added). But, again, the Park Service failed to take necessary action. Therefore, in view of the agency's statutory mandate to revise its General Management Plans in a "timely manner" and the fact that it has known for *decades* that the population of elk at Tomales Point could reach population levels that could adversely affect their survival if they could not reach sufficient forage and water beyond the fence maintained by the Park Service, Plaintiffs' unreasonable delay claim is extremely compelling.

### III.  THE COURT CAN GRANT THE REQUESTED EMERGENCY RELIEF.

#### A.  The Court Has Equitable Authority to Grant the Requested Relief.

This Court clearly has the authority to issue the requested preliminary relief. To begin with, requiring the Park Service to undertake measures to ensure that more elk do not continue to

-8-

die of starvation from a lack of food and water would *maintain the status quo*—i.e., the continuation of this wildlife population which is supposed to be preserved "unimpaired" for the enjoyment of future generations. 54 U.S.C. § 100101(a); 16 U.S.C. § 459c.

But, even if the requested relief is viewed as a mandatory injunction, this Court has ample authority to issue such relief under the extremely exigent circumstances of this case. It is axiomatic that "[t]he essence of equity jurisdiction" is the power of the Court "to do equity and mould each degree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944). Indeed, "[where] the public interest is involved . . . those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

Here, where there is a strong public interest in preserving the Tomales elk and preventing more massive deaths of this wildlife by starvation and/or dehydration while this case is pending, this Court has ample equitable authority to direct the Park Service to initiate measures to ensure that these elk do not continue to die. *See*, *e.g.*, *Red Wolf Coal. v. United States Fish & Wildlife Serv.*, No. 2:20-CV-75-BO, 2021 WL 230202 (E.D.N.C. Jan. 22, 2021) (issuing mandatory injunction requiring the Fish and Wildlife Service to draft an immediate plan to release captive red wolves into the Red Recovery Area to prevent extinction of the species).

Moreover, the Court of Appeals for this Circuit has made clear that such relief is appropriate where "*the law and facts clearly favor*" the moving party. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Here, both the facts and the law clearly favor Plaintiffs' request for preliminary relief.

As to the law, Plaintiffs have made a strong showing that the Park Service's failure to revise the General Management Plan for this portion of the Park in a "timely manner," as required, violates that mandate and constitutes agency action unreasonably delayed within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(1). Pl. Brf. at 11–15, *supra*.

As to the facts, Plaintiffs also have a compelling case in light of what is now occurring, as predicted by the agency's own Scientific Advisory Panel over 28 years ago—i.e., **the elk, who**

*are supposed to be protected and conserved, are dying of starvation and/or dehydration because they cannot traverse the human-erected fence.*

### B. The Requested Emergency Relief is Directly Related to Plaintiffs' Claim.

The Park Service's assertion that the preliminary relief sought by Plaintiffs falls outside the scope of the ultimate relief they can obtain in this case, Def. Brf. at 11–12, is also incorrect. Plaintiffs seek to compel the Park Service to revise its General Management Plan with respect to Tomales Point and the elk who live there precisely so that the agency can address the current—and *long-standing*—management crisis, i.e., wild elk, who are supposed to be conserved for future generations, are dying horrific deaths because the animals cannot get past a fence that the Park Service erected more than 40 years ago and continues to maintain for the benefit of livestock ranchers who are permitted to use public lands south of the fence. Therefore, the relief Plaintiffs ultimately seek here should lead to management decisions *other than the current "management" by human-caused starvation*. In other words, Plaintiffs are asking the Court to order the Park Service to intervene to address a serious situation that *the agency itself created* by *failing to revise its General Management Plan for this portion of the Park "in a timely manner."* 54 U.S.C. § 100502.

The cases cited by Defendants do not help their cause. *Center for Food Safety v. Jewell*, 83 F. Supp. 3d 126 (D.D.C. 2015) did not involve a request for a preliminary injunction. Hence, the court had no occasion to decide whether emergency relief was appropriate in light of the underlying claim. Rather, that case simply held that plaintiffs challenging the Fish and Wildlife Service's (FWS) unreasonable delay in revising a conservation plan for certain refuges could not seek vacatur of cooperative farming agreements until the agency prepared the requisite plan. *Id.* at 143. Moreover, there the court stressed that the plaintiffs did not seek to compel the FWS to update the plan—the only ultimate relief that is permitted in an unreasonable delay claim. *Id.* Here, however, Plaintiffs have asked the Court to compel the Park Service to revise the General Management Plan for Tomales Point. Compl. at 19. Thus, the only question here is whether the Court may issue appropriate temporary relief to ensure that this wildlife—the very subject of this case—*does not continue to die while the case is pending*. As demonstrated above, the Court

-10-

clearly has such authority. *See also Washington Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005) (abrogated on other grounds) (holding that court can issue injunction against continued use of pesticides while the FWS complies with its procedural obligations under the Endangered Species Act).

Defendants' reliance on *Borenstein v. Lead Animal Shelter Animal Found.*, 810 F. App'x 573 (9th Cir. 2020), Def. Brf. at 12, is also misplaced. There, the Court simply held that the plaintiff had failed to demonstrate a likelihood of success on the merits because the relief sought—a mandatory injunction undoing an alleged past act of discrimination—was not authorized by the Americans with Disabilities Act. *Id.* Here, however, the preliminary relief sought by Plaintiffs—ordering Defendants to ensure that the Tomales elk have access to adequate food and water by either (1) removing the fence that restrains their movements, or (2) providing them supplemental food and water—are both permissible under the statute at issue here. The Park Service clearly has authority to remove the fence, as there is no binding law that requires it.[3]

The Park Service also has authority to provide supplemental food and water to the elk—as it has done in the past and is doing now with regard to some supplemental water. Def. Brf. at 1; *see also* 54 U.S.C. § 100101(a) (NPS "shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve . . . the wild life . . . ."). Therefore, the *Borenstein* case has no relevance here.

---

[3] The Park Service's reliance on a non-binding 1971 Task Force Report, Def. Brf. at 3, does not supply any such mandate, nor does the non-binding 1998 Elk Management Plan, *see id.*, which by its own terms *expired by 2008 at the latest*. *See* Pl. Ex. A at 1 (noting that the 1998 Elk Management Plan was intended to guide management of the elk "for the next five to ten years."). Nor does the 1974 Memorandum of Understanding between the Park Service and California Department of Fish and Game supply any such mandate. *See* Press Decl., ECF No. 16, ¶ 10. Not only is that agreement now 47 years old—and issued at a time when the ranching leases were only expected to be in effect for about 20 years—but it also states that the Park Service agrees to "[p]rotect the elk and maintain as vigorous a herd as possible," ECF No. 16-5, ¶ 6—something the Park Service has utterly failed to do. Moreover, at least since 2018, that state agency has *opposed* the fence's continued presence, stating that "*artificial conditions associated with [the elk's] confinement are undesirable in the long term.*" CALIFORNIA FISH & WILDLIFE, ELK CONSERVATION AND MANAGEMENT PLAN (2018), https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=162912&inline at 454–456.

-11-

Indeed, the Park Service is already providing supplemental water to *some,* just not all, of the elk, and the government admits that "artificial feeding could conceivably improve short-term survival rates." Def. Brf. at 19. Moreover, while Defendants raise concerns about potential adverse side-effects from *long-term* supplemental feeding, *id.*, **Plaintiffs are willing to have this case decided on an expedited summary judgment basis.** Accordingly, there is no legitimate concern that providing the Tomales elk with supplemental feed in the short-term would result in any such negative effects that have occurred in the extremely *long-term* supplemental feeding projects cited by the agency. *See id.* (citing *Mayo v. Reynolds*, 875 F.3d 11, 17 (D.C. Cir. 2017); *Defs. of Wildlife v. Salazar*, 651 F.3d 112, 113–14 (D.C. Cir. 2011) (review of environmental concerns from supplemental feeding of elk in Wyoming that has been going on since the *"turn of the last century*.") (emphasis added). In fact, the Park Service has already successfully used short-term supplemental feeding for the Tomales elk when the initial population had trouble surviving. *See* Press Declaration, ECF No. 16, ¶¶ 12–13 (explaining that the elk were provided supplemental food "from mid-September 1979 until the elk stopped taking [it] after about six months").

Accordingly, there is no sound reason why providing supplemental feed for these elk now, on a very short-term basis, would cause any countervailing adverse impacts. Indeed, the Park Service's own 1998 Tule Elk Management Plan explains that "*large numbers of starving elk*" at the Seashore was the very kind of circumstance that "would require the Seashore to intervene" with a management solution. Pl. Ex. A at 46 (emphasis added).

## IV.  THE EQUITIES WEIGH IN FAVOR OF GRANTING THE INJUNCTION.

As already demonstrated, Pl. Brf. at 16-18, Plaintiffs will continue to suffer irreparable harm in the absence of the requested temporary relief, and all of the equities weigh in their favor.

Defendants' argument that Plaintiffs cannot demonstrate that the entire population of Tomales elk is currently in jeopardy, Def. Brf. at 22–23, misses the mark on several fronts. First, in *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008), the Supreme Court made clear that the irreparable harm necessary to support emergency relief must be to the *plaintiffs*, not the wildlife at issue. Here, Plaintiffs have submitted sworn affidavits attesting to the fact that their ability to enjoy this part of the National Seashore is ruined, and will continue to be ruined,

-12-

because the elk they enjoy observing and photographing are dying of starvation and dehydration. Pl. Exs. B–D.  Because this situation will only persist as drought conditions *worsen,* this harm cannot be repaired unless the Park Service intervenes now to protect these elk by ensuring that they have adequate access to both food and water during the pendency of this case. *See*, *e.g.,* Def. Brf. at 22 (noting that drought conditions have "*worsened to levels not experienced since tule elk were reintroduced to Point Reyes in 1978*") (emphasis added).

Second, the Park Service misstates the relevant law on this issue. In fact, in *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818–19 (9th Cir. 2018), the Ninth Circuit held that the district court "did not err when it found irreparable harm *without finding an extinction-level threat to listed species*" because "[i]rreparable harm should be determined by reference to the purposes of the statute being enforced" and "[o]ne of the ESA's central purposes is to conserve species," not only to avoid their immediate extinction. (Emphasis added). Here, likewise, the central purpose of the NPS organic statute is to "*conserve* . . . the wildlife" within each national park unit "and to provide for the enjoyment of the same in such manner and by such means *as will leave them unimpaired for the enjoyment of future generations*." 54 U.S.C. § 100101(a) (emphases added); *see also* 16 U.S.C. § 459c (requiring the Park Service to administer the Point Reyes National Seashore "without impairment of its natural values."). Thus, because continuing to allow this wildlife to die in such a horrific manner neither "conserves" the animals, nor leaves them "unimpaired" for the enjoyment of the public, Plaintiffs will continue to suffer irreparable harm if the Park Service does not take immediate measures to ensure the survival of the remaining Tomales elk during the pendency of this case.

Third, Plaintiffs *have* shown that the genetic viability of the entire population *is* in jeopardy. Pl. Brf. at 17–18; Howell Decl., Pl. Ex. G, ECF No. 8-9, ¶ 12.  The agency's statement that "the evidence does not bear out" Plaintiffs' contention that "there is a serious concern that the entire population of elk may lose its genetic viability," Def. Brf. at 23, is completely unsupported. The only evidence provided by the Service can be found in the Declaration of Jenny Powers, who merely states that the Park Service does "not have direct evidence *confirming* or contradicting" evidence of "sufficient genetic variation" in the tule elk at Tomales Point. Powers Decl., ECF No.

-13-

17, ¶ 12 (emphasis added). Therefore, even if Plaintiffs were required to demonstrate that the entire Tomales Point elk population was at risk here—which is *not* their burden—they have done so.[4]

On the other hand, Defendants have not shown that *anyone* will be harmed if the requested injunction is granted. While Defendants generally refer to a need to "balance" the concerns of the "multigenerational ranching operations in the Park," Def. Brf. at 24, now that it insists that the Tomales elk neither want –nor need—to go below the fence in search of food and water, *see supra* at 1-2, this concern seems minimal at best and is greatly outweighed by the harm posed to Plaintiffs.[5]

Finally, as to the public interest, Plaintiffs wholeheartedly agree with Defendants that "[t]he federal government and the public it represents have a strong interest in *competent management* of the national parks, consistent with applicable laws." Def. Brf. at 24 (emphasis added). This gets to the nub of Plaintiffs' underlying claim in this case—i.e., the Park Service's decades-long failure to reconcile what it apparently believes are competing interests that the agency is required to protect and preserve. *See*, *e.g.*, NPS Management Policies, § 5.3.5, Pl. Ex. Q ("All cultural resource and natural resource values will be considered in defining specific treatment and management goals . . . *Conflicts will be considered and resolved through the planning process . . . .*") (emphasis added). Thus, the current situation is one of **the agency's own making—it has failed to manage the Tule elk at Tomales Point in a way that would have averted the present inhumane catastrophe, despite repeated warnings from its own scientists that it must do so to avoid such a crisis.** *See supra* at 5–7. The Park Service's chosen management practice—allowing this wildlife to suffer and die because they are unable to obtain

---

[4] Ms. Powers further explains that "a recent paper on tule elk herds in California, *but outside of the Park*, shows sufficient genetic variation . . . and no evidence of inbreeding in the study populations." Powers Decl., ECF No. 17, ¶ 12 (emphasis added).

[5] Moreover, according to a recent scientific study of the interaction between the Drakes Beach elk and cattle, "all grazed cattle pastures were *consistently avoided by elk*." Hughey, et al., "Effects of Human-Altered Landscapes on a Reintroduced Ungulate: Patterns of Habitat Selection at the Rangeland-Wildlife Interface," Biological Conservation 257 (2021) at 5, Pl. Ex. R (emphasis added); *see also id.* at 9 ("contrary to common assumptions, our results indicate that native elk minimize their interactions with cattle and thus, in this ecosystem, *grazing conflicts between wildlife and livestock may be limited*") (emphasis added).

-14-

access to sufficient food and/or water below the Park Service's fence—is certainly not "competent management" of this national park unit by any stretch of the imagination.

## V.     THERE IS NOTHING VAGUE ABOUT PLAINTIFFS' REQUESTED RELIEF.

Finally, there is nothing vague about the relief requested here. Plaintiffs request that the Court order the Park Service to either remove all or some of the fence so that the Tomales elk can obtain access to alternative habitat, or provide supplemental water and food to the elk until this case can be resolved. To make absolutely clear what Plaintiffs are requesting, they are filing with this Reply two revised alternative orders so that the Court can decide which is most appropriate in light of all of the circumstances of this case. *See* Proposed Orders.[6] As explained *supra,* the Park Service has ample authority to remove all or part of the fence and to provide the necessary supplemental water and feed to these animals. Indeed, the Park Service stresses throughout its brief that it "stands ready to act if needed to safeguard the viability of the Tomales Point elk population." Def. Brf. at 1. Thus, there is no question that, at an absolute minimum, the Park Service is capable of providing supplemental food and water to these animals while this case is pending.

However, what the agency should *not* be allowed to do is continue to "manage" this wildlife through starvation and dehydration caused by confinement behind a wire fence. Rather, if it is going to continue to maintain these elk in a captive state—like animals in a zoo—it must at least provide them adequate food and water to ensure that they do not continue to die horrific deaths by starvation and/or dehydration. *See, e.g.*, Animal Welfare Act, 7 U.S.C. § 2143 (mandating as "minimum" standards for zoo animals "feeding [and] watering").

## CONCLUSION

For all of the foregoing reasons, and those set forth in our opening brief, Plaintiffs' request for a preliminary injunction should be granted.

---

[6] Although not mentioned by the Park Service, Plaintiffs provided Defendants' counsel with a more specific revised proposed Order in advance of the June 28, 2021, case management conference.

-15-

Respectfully submitted,

_____
Katherine Barnekow, State Bar No. 336792
kbarnekow@law.harvard.edu
Harvard Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
(617) 998-2450 (o)/ fax: 617-496-4863
(512) 868-7800 (c)

_____
Katherine A. Meyer
(appearance *pro hac vice*)
kmeyer@law.harvard.edu
Director, Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
(617) 998-2450 (o)
(202) 257-5145 (c)

Attorneys for Plaintiffs

-16-

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION
No. 4:21-cv-04734-HSG