UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACK GESCHEIDT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DEB HAALAND, et al., <br><br> Defendants. | Case No. 21-cv-04734-HSG <br><br> **ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Re: Dkt. No. 8 |

Pending before the Court is a motion for preliminary injunction, filed by Plaintiffs Jack Gescheidt, Laura Chariton, Skyler Thomas, and the Animal Legal Defense Fund.[1] Dkt. No. 8 ("Mot."). The Court held a telephonic hearing on July 30, 2021. For the reasons detailed below, the Court **DENIES** the motion.

**I.   BACKGROUND**

Plaintiffs filed this action against the National Park Service ("Park Service" or "NPS")[2] on June 22, 2021. *See* Dkt. No. 1 ("Compl."). Plaintiffs challenge the Park Service's management practices related to the tule elk population that lives in the Tomales Point area of Point Reyes National Seashore. *Id.* Plaintiffs contend that recent drought conditions in the area have become "extremely dire," and the tule elk are dying from lack of adequate forage and water. *See, e.g.*, *id.* at ¶ 1. Plaintiffs allege that the death of tule elk could be avoided through the Park Service's prompt intervention, and that the agency's failure to timely revise its management plans and

---

[1] Although styled as a motion for a temporary restraining order and preliminary injunction, during the case management conference held on June 28, 2021, the parties agreed to move forward with Dkt. No. 8 as a motion for preliminary injunction. *See* Dkt. No. 12.
[2] Plaintiffs sue Deb Haaland, the Secretary of the Interior, Shawn Benge, Acting Director of the National Park Service, and Craig Kenkel, Superintendent of Point Reyes National Seashore, in their official capacities. *See* Compl. at ¶¶ 21–23.

provide the elk with supplemental food and water violate the Administrative Procedure Act ("APA").  *See id.* at ¶¶ 4–6.

### A. Factual Background

#### i. History of Point Reyes National Seashore and the Tule Elk

The Point Reyes National Seashore operates as a unit of the National Park System and is administered by the Park Service.  *See* Pub. L. No. 94–544, 90 Stat. 2515 (1976).  Congress initially established the National Seashore in September 1962 to "preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped."  *See* Pub. L. No. 87-657, 76 Stat. 538 (codified as amended at 16 U.S.C. §§ 459c *et seq.*).  The National Seashore currently includes 32,000 acres of wilderness, including the area of Tomales Point where the tule elk at issue in this case live.[3]  *See* Dkt. No. 8-3, Ex. A ("1998 Tule Elk Management Plan") at 4.

Tule elk (Cervus elaphus nannodes) are a distinct subspecies of elk endemic to California.  *See id.*  At the time the National Seashore was created, however, no tule elk were present there.  *See id.* at 8.  They were extirpated from much of California by the mid-1800s due to hunting and loss of habitat.  *Id.* at 4.  California began a conservation program in the 1970s to increase the population across the state.  *Id.* at 6.  Congress also directed federal agencies to "cooperate with the State of California in making the lands under their respective jurisdictions reasonably available for the preservation and grazing of Tule elk in such manner and to such extent as may be consistent with Federal law."  16 U.S.C. § 673e.  As part of this process, the California Department of Fish and Game provided 10 tule elk to the Park Service in 1978 for reintroduction at Tomales Point.  *See* 1998 Tule Elk Management Plan at 8.  The Park Service subsequently erected a three-mile-long fence along the southern border of Tomales Point to "isolate[] the herd from adjacent dairy ranches."[4]  *See id.*  This created a 2,600-acre enclosure for the elk at Tomales

---

[3] In total, the National Seashore encompasses over 70,000 acres.  *See* POINT REYES PARK STATISTICS, https://www.nps.gov/pore/learn/management/statistics.htm (last visited July 30, 2021).
[4] The parties appear to agree that the fence at issue separates the elk from *public* lands where the Park Service permits ranchers and dairy farmers to graze their cattle.  *See* Dkt. No. 15 ("Opp.") at 21 (citing H.R. Conf. Rep. 116-9 at 149 (Feb. 3, 2019)).  The Park Service is permitted to lease

2

Point, which still exists today. *Id.* Although the tule elk did not initially thrive, the population at Tomales Point eventually grew to over 100 by 1989. *See* Dkt. No. 16 ("Press Decl.") at ¶¶ 12–15.

### ii. The National Park Service's Management of the Tule Elk

In September 1980, the Park Service issued a General Management Plan for the National Seashore, which identified management objectives and strategies for management of the National Seashore (the "1980 General Management Plan").[5] According to the plan, the Park Service's management objectives included "identify[ing], protect[ing], and perpetuat[ing] the diversity of existing ecosystems which are found at Point Reyes National Seashore and are representative of the California seacoast," as well as "protect[ing] marine mammals, threatened and endangered species, and other sensitive natural resources found within the seashore."[6] The plan also stated that "[r]estoration of historical natural conditions (such as reestablishment of Tule elk) will continue to be implemented when such actions will not seriously diminish scenic and recreational values."[7]

Congress also specifically directed the Secretary of the Interior to "develop a plan for Tule elk restoration and conservation, including habitat management." 16 U.S.C. § 673g. In 1998, the Park Service issued a Tule Elk Management Plan. The purpose of the 1998 plan was "to guide the management, monitoring, and research of the tule elk . . . at Point Reyes National Seashore for the next five to ten years." *See* 1998 Tule Elk Management Plan at 1. The 1998 plan identified three "missions" related to the elk:

- Adaptively manage elk as a natural component of the dynamic ecosystem of Point Reyes.

- Assist in the preservation of tule elk as a subspecies and the genetic diversity it contains.

- Manage tule elk consistent with other management objectives, including agriculture, public visitation, and the protection of

---

land at the National Seashore. *See* 54 U.S.C. § 102102(a).
[5] *See* GENERAL MANAGEMENT PLAN FOR POINT REYES NATIONAL SEASHORE – SEPTEMBER 1980, https://www.nps.gov/pore/learn/management/upload/planning_gmp_1980.pdf (last visited July 30, 2021).
[6] *Id.* at 1–2.
[7] *Id.* at 13.

3

natural, cultural, and recreational resources.

*Id.* at 37–39.

As relevant to this case, the 1998 plan also adopted specific management actions, including that the Park Service would "[m]aintain the elk fence on Tomales Point and continue to separate tule elk from cattle"; "continue monitoring tule elk and their environment to analyze trends and better understand tule elk population dynamics and ecology at Point Reyes"; and set an interim population range for the "Point Reyes tule elk population at 600–800 animals, with Tomales Point set at 350–450 and Limantour set at 250–350." *See id.* at 43–45, 49–50. The 1998 plan stated that "[r]emoving the fence at Tomales Point will be considered if and when ranching ceases on the adjacent lands." *Id.* at 49. The plan also explicitly rejected the idea of providing supplemental forage for the tule elk, specifying that "[n]o effort will be made to cultivate food crops specifically to improve the range's ability to support elk." *Id.* at 44. The Park Service reasoned that "[s]uch strategies are known to be self-defeating as artificially provided food leads to ever-increasing herd sizes that overwhelm the ability of the range to support them." *Id.* The Park Service noted the failure of such elk management approaches elsewhere. *Id.*

In its opposition brief and during the hearing, the Park Service acknowledged that "[t]he 1998 Elk Plan continues to guide elk management at Tomales Point up to the present day." *See* Opp. at 4. Plaintiffs contend that the Park Service has unreasonably delayed reviewing and revising both the 1980 General Management Plan and the 1998 Tule Elk Management Plan.

### iii. Current Tomales Point Conditions and Tule Elk Population

There are now four herds of tule elk at Tomales Point, referred to as the North herd, the Plateau herd, the White Gulch herd, and the South herd. The Park Service also manages two other herds in different locations in the National Seashore, the Limantour and Drakes Beach herds. The elk population at Tomales Point has fluctuated over time. During the hearing on the motion, Plaintiffs agreed that the carrying capacity for the tule elk in Tomales Point—meaning the maximum population that can be sustained there given available resources—is 350. *Accord* Press Decl. at ¶ 15.

The Park Service counts the number of elk annually. *See id.* at ¶ 26. Between 1998 and

4

2004, the population fell from the mid-500s to under 350 tule elk. *Id.* at ¶ 8. The population rose to 585 elk in 2007, and then fell again to the mid-400s in 2009. *Id.* By 2012, the population rose to 540 elk, and then fell again during a drought from 2013–2015, dropping below 300 elk. *Id.* When the drought ended, the population rebounded to 445 elk by 2019, when yet another drought began. *Id.* at ¶ 32. According to the 2020 census, which was reported publicly in March 2021, the population has again declined to 293 elk. *Id.* at ¶¶ 40–41.

The parties disagree about the reason for the death of 152 tule elk since 2019 and the herd's current condition.

Plaintiffs contend that the elk are dying from starvation and dehydration due to the current drought because the elk cannot seek additional resources on the other side of the elk fence and the Park Service is not providing the herds with sufficient supplemental water or food. *See* Mot. at 8–10. Plaintiffs point to necropsies that the Park Service performed on several elk from the Tomales Point area in the fall and winter of 2020. Plaintiffs' experts state that these reports show that the elk "died of starvation, or starvation was a significant cause of their death." *See* Dkt. No. 8-8, Ex. F ("Allen Decl.") at ¶¶ 4–6; *see also* Dkt. No. 8-9, Ex. G ("Howell Decl.") at ¶ 5. Plaintiffs' experts further note that the reports indicate that there was evidence of poisonous plants in several of the elk's digestive tracts, which they assert "is an indication that there was not nutritious forage available." *See* Allen Decl. at ¶ 6; *see also* Howell Decl. at ¶ 5. Plaintiffs also include declarations from named Plaintiffs and other observers who have seen dead tule elk during their visits to the National Seashore since 2020. *See, e.g.*, Dkt. No. 8-4, Ex. B ("Skyler Decl.").[8] They anticipate more elk will die from a lack of forage and water unless the Park Service intervenes. *See* Allen Decl. at ¶ 10.

---

[8] On July 29, 2021, the day before the hearing and nine days after briefing on the motion was complete, Plaintiffs filed additional declarations without seeking or obtaining leave of court. Dkt. Nos. 22, 23, 24. The government objects that the filing of these exhibits violated this district's civil local rules, Dkt. No. 25, and the Court agrees. *See* Civil L-R 7-3(d) ("Once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval," subject to exceptions not applicable here). In the interest of having a complete record, the Court will not strike the declarations, and finds that they do not significantly alter the relevant facts here in any event. However, Plaintiffs' counsel are directed to review and comply with all applicable local rules in the future, and further noncompliance may be a basis for sanctions, including the exclusion of evidence or monetary sanctions.

The Park Service, for its part, suggests that the situation is more nuanced, and that its staff is actively monitoring the condition of the elk in light of the current drought. *See* Opp. at 5–8. The Park Service states that its management practices are informed by the National Seashore's wildlife biologists; wildlife health experts and veterinarians; and wildlife management experts. *See* Dkt. No. 18 ("Kenkel Decl.") at ¶ 3. It asserts that consistent with its management obligations, its staff began checking water sources in July 2020, and continued to do so into the fall of 2020, but concluded that it was unnecessary to provide supplemental water at that time. Press Decl. at ¶¶ 33–37, 39; Dkt. No. 16-13, Ex. 13. They halted the water source monitoring after the first significant rain event in November. *See* Press Decl. at ¶ 37.

The Park Service then coordinated the necropsies of seven elk in the fall of 2020. *See* Dkt. No. 17 ("Powers Decl.") at ¶¶ 5–7. The Park Service states that—contrary to Plaintiffs' conclusions—their own experts determined that the underlying cause of death for the necropsied elk "was attributable to significant nutrient deficiencies." *See id.* at ¶ 7. The Park Service has not, however, determined whether "these deficiencies were caused by simple lack of forage or more complex interactions with lacking micronutrients, namely copper and selenium." Opp. at 5. The Park Service's experts also noted that although two of the necropsied elk showed signs of dehydration, this appeared "due to an inability to stand and move to water." Powers Decl. at ¶ 7.

Because the 2020–21 winter season also offered poor rainfall, the Park Service states that it began monitoring water sources again in May 2021.[9] *See id.* at ¶¶ 42–44. Based on this survey, the Park Service moved forward with plans to place supplemental water in the southern part of Tomales Point. *See id.* at ¶ 45; *see also* Kenkel Decl. at ¶¶ 6–7. The Park Service states that these water systems were installed on June 11, 2021, and that they remain functional. Press Decl. at ¶¶ 45, 53. The Park Service describes the current state of the natural water sources at Tomales Point as "mixed." *See* Opp. at 7. But according to the Park Service, "[t]he vast majority of elk observed to date by Park staff, including the Park's wildlife ecologists, and reviewed by the Park's veterinarian, appear in good to excellent condition with no signs of starvation or dehydration." *Id.*

---

[9] The Marin County Board of Supervisors declared a Drought Emergency in the area on May 18, 2021. *See* Dkt. No. 16-15, Ex. 15.

(citing Press Decl. at ¶ 47; Powers Decl. at ¶ 11). However, it has stated that it would consider taking further action if needed "to ensure that the Park is able to maintain a viable population of tule elk in the Tomales Point elk reserve." *See* Kenkel Decl. at ¶ 9. Plaintiffs assert that these measures are insufficient, and that the supplemental water is only available to one of the four Tomales Point herds. *See* Mot. at 10–11.

### B. Procedural Background

Based on these facts, Plaintiffs bring three claims for relief under the APA. *First*, Plaintiffs challenge the Park Service's failure to revise the 1980 General Management Plan with regard to Tomales Point and the tule elk in a timely manner, as they say is required under 54 U.S.C. § 100502. *See* Compl. at ¶¶ 1, 88. Plaintiffs contend that by waiting over forty years, the Park Service has unreasonably delayed revising the 1980 plan, in violation of 5 U.S.C. § 706(1). *Id.* at ¶¶ 88–90. *Second*, Plaintiffs allege that the Park Service has unreasonably delayed updating and revising the 1998 Tule Elk Management Plan in contravention of its conservation obligations under 16 U.S.C. § 673g, also in violation of 5 U.S.C. § 706(1). *See id.* at ¶¶ 2, 93. *Third*, Plaintiffs contend that "[t]he Park Service's recently announced decisions not to undertake measures to ensure that the elk at Tomales Point have access to adequate water and forage and water" contravene its conservation obligations and constitute final agency action that is arbitrary and capricious, in violation of 5 U.S.C. § 706(2). *Id.* ¶¶ 5, 96.

In the instant motion, Plaintiffs now seek a preliminary injunction to compel Defendant to take immediate measures to ensure that the tule elk at Tomales Point Reserve are provided adequate forage and water, either by removing the fence or providing supplemental food and water.

### II. LEGAL STANDARD

A plaintiff seeking preliminary relief must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. A

7

1  court must find that "a certain threshold showing" is made on each of the four required
2  elements. *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).  Under the Ninth Circuit's
3  sliding scale approach, a preliminary injunction may issue if there are "serious questions going to
4  the merits" if "a hardship balance [also] tips sharply towards the [movant]," and "so long as the
5  [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the
6  public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

7  Where a plaintiff seeks mandatory injunctive relief instead of prohibitory injunctive relief
8  to maintain the status quo, a plaintiff's burden is "doubly demanding." *Garcia v. Google, Inc.*,
9  786 F.3d 733, 740 (9th Cir. 2015).  Such a plaintiff "must establish that the law and facts clearly
10 favor her position, not simply that she is likely to succeed." *Id.*  And the Ninth Circuit often
11 cautions that a mandatory injunction "goes well beyond simply maintaining the status quo
12 pendente lite [and] is particularly disfavored." *Id.* (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d
13 1313, 1320 (9th Cir. 1994)).  District courts therefore should deny such requests "unless the facts
14 and law clearly favor the moving party." *Stanley*, 13 F.3d at 1320 (quotation omitted).  Put
15 differently, mandatory injunctive relief should never issue in "doubtful cases." *Garcia*, 786 F.3d
16 at 740 (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160
17 (9th Cir. 2011)).

18 **III.  DISCUSSION**
19     **A.  Type of Injunction**
20 As an initial matter, the parties appear to dispute what type of injunction Plaintiffs are
21 seeking.  *Compare* Opp. at 8–9, *with* Dkt. No. 19 ("Reply") at 8–9.
22 A preliminary injunction "can take two forms," either a "prohibitory injunction" or a
23 "mandatory injunction." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d
24 873, 878–79 (9th Cir. 2009).  "Prohibitory injunction[s]" simply "preserve the status quo pending
25 a determination of the action on the merits," while "mandatory injunction[s]" "order[] a
26 responsible party to take action." *Id.* (quotation omitted).  "The relevant status quo is that between
27 the parties pending a resolution of a case on the merits." *Arizona Dream Act Coal. v. Brewer*, 757
28 F.3d 1053, 1061 (9th Cir. 2014) (quotation omitted); *see also Tanner Motor Livery, Ltd. v. Avis*,

*Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) ("The status quo is the last uncontested status which preceded the pending controversy." (quotation omitted)). As noted above, this distinction is significant because mandatory injunctions are "particularly disfavored," and a plaintiff's burden is "doubly demanding" when seeking one. *Garcia*, 786 F.3d at 740.

Plaintiffs have revised their requested relief during the course of the briefing on this motion. Initially, Plaintiffs sought a preliminary injunction ordering "the National Park Service [to] take immediate measures to ensure that the Tule elk who live on Tomales Point in Point Reyes National Seashore are provided access to sufficient food and water to ensure that these animals do not continue to die of starvation and/or dehydration." *See* Dkt. No. 8-3 ("Proposed Order"). Plaintiffs did not, however, specify the means by which the Park Service should do this. In reply, Plaintiffs proffer two alternative orders with more specificity. The first orders the Park Service to "provid[e] supplemental water and forage to all four of the elk herds that live in Tomales Point." *See* Dkt. No. 19-12 ("Proposed Order 1"). And the second orders the Park Service to "remov[e] the fence on the southern border of the Tule elk's habitat in Tomales Point." *See* Dkt. No. 19-13 ("Proposed Order 2"). Plaintiffs argue that all three proposed orders "would maintain the status quo." *See* Dkt. No. 19 at 9 (emphasis omitted). They define the status quo as "the continuation of this wildlife population which is supposed to be preserved 'unimpaired' for the enjoyment of future generations." *See id.* (citing 54 U.S.C. § 100101).

But under all three proposed orders, Plaintiffs are clearly seeking to change the status quo, rather than preserve it. *See Marlyn Nutraceuticals*, 571 F.3d at 878–79. Plaintiffs acknowledge that the fence separating the tule elk at Tomales Point from the adjacent public lands has existed since at least 1980. *See* Mot. at 5. And the 1998 Tule Elk Management Plan explicitly directed the Park Service to maintain that fence. *See* 1998 Tule Elk Management Plan at 44. As Plaintiffs acknowledge, the Park Service generally has not provided supplemental food or water to the tule elk. Mot. at 8–11. And the 1998 Tule Elk Management Plan raised concerns with providing supplemental food. *See* 1998 Tule Elk Management Plan at 44. Moreover, even as framed, Plaintiffs are asking that the Park Service either remove a fence or affirmatively provide food and water. They are therefore requesting an injunction that would require the Park Service to take

action. *See Marlyn Nutraceuticals*, 571 F.3d at 878–79. The Court thus analyzes the motion as one seeking mandatory injunctive relief.

### B. *Winter* Factors

Plaintiffs have confirmed that they are only seeking a preliminary injunction based on their first cause of action for unreasonable delay in amending the 1980 General Management Plan. *See, e.g.*, Reply at 1 ("The only question presented by the instant motion is whether, *given the strength of Plaintiffs' unreasonable delay claim*, . . . this Court should enter preliminary relief . . . .") (emphasis added). The Court therefore considers the *Winter* factors in light of this claim.

#### i. Likelihood of Success on the Merits

Under the "sliding scale" approach for a preliminary injunction, "a stronger showing of one element may offset a weaker showing of another." *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (citing *Cottrell*, 632 F.3d at 1131. "[A]t an irreducible minimum, though, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Id.* (quotation omitted). And because the Court finds that Plaintiffs are seeking a mandatory injunction, they must establish that the law and facts clearly favor their position. *See Garcia*, 786 F.3d at 740. The Court finds that Plaintiffs have not met this very high standard.

##### a. Unreasonable Delay – § 706(1)

Under § 706(1), a court may "compel agency action unlawfully withheld or unreasonably delayed." *See* 5 U.S.C. § 706(1). As explained above, Plaintiffs contend that under 54 U.S.C. § 100502, the Park Service must "prepare[] and revise[]" its general management plan "in a timely manner." *See* 54 U.S.C. § 100502. Forty years, they posit, is untimely under any definition. *See* Compl. at ¶¶ 1, 88.

The Park Service argues that there is a disconnect between Plaintiffs' "undue delay" claim and their requested relief. *See* Opp. at 10–12. The Park Service notes that even if Plaintiffs were to succeed on this claim, the Court could only compel the Park Service to revise the 1980 General Management Plan. *Id.* The Court could not, however, dictate *how* the Park Service should revise that plan. *Id.* The Park Service further contends that it is not clear that it would ultimately revise

10

the plan to remove the fence or provide supplemental food and water to the tule elk at Tomales Point as Plaintiffs desire. *Id.*

The Ninth Circuit has cautioned that "[a] court's equitable power lies only over the merits of the case or controversy before it." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015). "A preliminary injunction is appropriate when it grants relief of the same nature as that to be finally granted." *See id.* at 635–36 (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). "There must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint. This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself." *Id.* at 636. "The relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted finally.'" *Id.* (quoting *De Beers*, 325 U.S. at 220).

Plaintiffs, therefore, must establish that were they to succeed on their § 706(1) claim, they would be able to compel the Park Service to either remove the fence or provide additional food and water to the elk at Tomales Point. But as the Supreme Court has explained, "the only agency action that can be compelled under [§ 706(1) of] the APA is action legally *required*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (emphasis in original). "Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id.* at 65.

Plaintiffs nevertheless insist that the Court has broad equitable powers. *See* Reply at 9. Plaintiffs suggest that there is a nexus between their undue delay claim and their requested relief because had the Park Service revised its general plan as Plaintiffs contend it was required to do decades ago, the tule elk would not be experiencing such widespread die-off. *See id.* at 5–6. Instead, however, Plaintiffs assert that the Park Service has created the "the current and long-standing management crisis." *See id.* at 10 (emphasis omitted). They point out, for example, that there are significantly more water sources on the other side of the fence, which would be

11

accessible if the fence were removed. *See id.* at 6. And Plaintiffs note that the other tule elk herds in the National Seashore are not facing the same conditions or mortality rates. *See id.* at 6–7. Plaintiffs therefore suggest that any revision of the plans must include either (1) tearing down the fence; or (2) supplying water and forage to the tule elk stuck on the other side of the fence at Tomales Point.

The Court understands that Plaintiffs are passionate about the health and longevity of the tule elk, and that they believe these two measures are both feasible and imperative. But critically, Plaintiffs do not explain why such actions are legally required. Plaintiffs do not cite, and the Court is not aware of, any authorities which would allow Plaintiffs (or the Court) to dictate how the Park Service should revise its general management plan, or even what competing interests it should elevate over others in doing so.

Rather, Plaintiffs cite *Washington Toxics Coal. v. Env't Prot. Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005), *abrogated on other grounds as recognized in* C*ottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091–92 (9th Cir. 2015), to suggest that the Court may still issue an injunction to prevent the elk from dying while the case is pending. *See* Reply at 10–11.

The plaintiffs in *Washington Toxics Coalition* challenged the Environmental Protection Agency's ("EPA") approval of several pesticides without consulting the National Marine Fisheries Service. *Id.* at 1028. The plaintiffs alleged that there was evidence that the approved pesticides would affect 25 "endangered" or "threatened" species of salmon and steelheads in the Pacific Northwest. *Id.* at 1029. The plaintiffs brought suit against the EPA under § 7(a)(2) of the Endangered Species Act ("ESA"), which requires federal agencies to ensure "that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." *See* 16 U.S.C. § 1536(a)(2). The district court granted injunctive relief, preventing most uses of these pesticides, while the EPA completed the § 7(a)(2) consultation process. *Washington Toxics*, 413 F.3d at 1031. Intervenors argued that the district court could only order compliance with the ESA, and therefore had to permit the continuing use of the pesticides during the § 7(a)(2) consultation process. *Id.* at 1034.

As an initial matter, *Washington Toxics* did not involve the APA. Rather, the Ninth Circuit

specifically stated that the APA did not govern the plaintiffs' claims. *See id.* at 1034. This distinction is significant because in finding that the scope of the injunction was within the district court's discretion, the Ninth Circuit reasoned that based on "well-settled" law "the appropriate remedy for violations of the ESA consultation requirements is an injunction pending compliance with the ESA." *Id.* at 1035. Under this established case law, agency actions (such as the approval of pesticides) could only continue during the consultation process if the actions "are non-jeopardizing to the protected species and will not result in a substantive violation of the ESA." *Id.* at 1031, 1035. Plaintiffs have not provided any authority that there is a similar "well-established" principle that the Court may compel agency action while the Court determines if the agency has unduly delayed reviewing its general management plan.

Plaintiffs also cite *Red Wolf Coal. v. United States Fish & Wildlife Serv.*, No. 2:20-CV-75-BO, 2021 WL 230202 (E.D.N.C. Jan. 22, 2021), which raised claims under § 7(a)(1) of the ESA as well as § 706(2) of the APA. In *Red Wolf Coalition*, the plaintiffs alleged that the United States Fish and Wildlife Service ("USFWS") violated the ESA and APA by reversing its policy to release captive red wolves into the Red Wolf Recovery Area in North Carolina while it considered the viability of the program. *Id.* at *1–2. At the time the case was filed, there were only seven known red wolves in the wild. *Id.* at *2. Under the ESA, USFWS was required to "carry out conservation measures [for the red wolf] until conservation [is] no longer necessary." *Id.* at *4. The court held that the agency's decision to halt all but passive monitoring of the wolves, therefore, constituted "a failure to comply with its affirmative duty." *See id.* The court also reasoned that the change in policy was also arbitrary and capricious under § 706(2) of the APA because the USFWS failed to provide any reasoned explanation for the change. *Id.* at *5. The court therefore preliminary enjoined the USFWS from implementing its new policy. *Id.* at *6.

Preventing the implementation of a new policy, however, is distinct from requiring the Park Service to change its longstanding practices. And in *Red Wolf Coalition*, the claims against the USFWS were specifically targeted at the new policy, not the agency's *undue delay* in reviewing its policies. The Court therefore finds both *Washington Toxics* and *Red Wolf Coalition* inapposite. Had Plaintiffs in this case sought an injunction based on the Park Service's decision to

13

erect a fence[10] or deny the elk supplemental food or water, it might have been a closer question whether Plaintiffs' requested injunctive relief was properly tailored to their claims. But they did not do so here.

Certainly, as Plaintiffs note throughout their briefing, the Park Service is charged with caring for the elk in Tomales Point. And as discussed above, Congress directed the Secretary of the Interior to "develop a plan for Tule elk restoration and conservation, including habitat management." *See* 16 U.S.C. § 673g. Plaintiffs also note that under 54 U.S.C. § 100101(a), the Park Service is obligated to:

> [P]romote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101.

But nothing in these statutes dictates how the Park Service should ensure the protection and conservation of the National Seashore generally or the tule elk more specifically. As the 1998 Tule Elk Management Plan indicates, this is a complicated question involving many competing considerations. Were Plaintiffs to prevail on their undue delay claim, the Court could certainly compel the Park Service to revise the 1980 General Management Plan. Plaintiffs are asking the Court to go further by telling the Park Service what new policies it should adopt in the interim.

The Court finds this request particularly concerning where, as here, the parties cite competing evidence about how best to care for the National Seashore and the tule elk who live there. Indeed, they appear to disagree fundamentally about whether the tule elk in Tomales Point are in good health at the moment.

---

[10] As the Park Service notes in its opposition brief, any direct challenge to the construction of the fence or to the 1998 Tule Elk Management Plan's decision to maintain the fence is likely time-barred. *See* Opp. at 11, n.6; *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 438 F.3d 937, 942–43 (9th Cir. 2006) ("Although the APA itself contains no specific statute of limitation, a general six-year civil action statute of limitations applies to challenges under the APA.").

The Park Service says it is aware of the conditions at Tomales Point, and is actively monitoring the elk. *See, e.g.*, Kenkel Decl. at ¶ 9; Press Decl. at ¶¶ 33–53. They have already established a willingness to intervene and provide water when they determine it is necessary. The Park Service also notes that at 293 elk, the population at Tomales Point is around its carrying capacity, a level it believes can be sustained even through this drought. *See* Press Decl. at ¶¶ 17, 27–29, 32, 40. And it finds the majority of the elk still in good health. *See id.* at ¶ 47. In response to Plaintiffs' requested interventions, the Park Service also specifically identifies problems that could arise from them. For example, the Park Service describes possible "negative externalities" of providing supplemental forage for the elk in the long term because "artificial feeding of wildlife can increase disease transmission because infectious animals congregate closely with other animals to access the feed." *See* Powers Decl. at ¶ 13. The elk may also become dependent on this food, which would require the Park Service to continue to feed them "to prevent future population crashes." *Id*. at ¶ 14. Artificial feeding may also "allow the population to increase, which could negatively impact vegetation and range health within the Reserve." *Id.*

To the extent Plaintiffs ask the Court to credit their own experts over those of the Park Service, the Supreme Court has stated that "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989). Although the *Marsh* opinion arose in the context of whether agency action was arbitrary and capricious under § 706(2) of the APA, the Court sees no reason why this holding would not apply with equal force here. Regardless, even if the Court were to weigh the parties' opinions equally, Plaintiffs cannot establish that the law and facts clearly favor their position, as they must, if the evidence is essentially in equipoise. Given the evidence presented by both parties, "[i]t would be purely speculative" for the Court to conclude at this stage that a revised general management plan would eliminate the fence or provide Plaintiffs' specified resources to the tule elk in Tomales Point. *See Ctr. For Food Safety v. S.M.R. Jewell*, 83 F. Supp. 3d 126, 143–44 (D.D.C. 2015) (denying request to set aside all cooperative farming agreements in a wildlife refuge based on a § 706(1) undue delay claim where plaintiffs asserted

that defendants failed to revise their conservation plan as required under the National Wildlife Refuge Act).

\*   \*   \*

To be clear, the Court is not indifferent to the conditions facing the tule elk or to the importance of their survival at Tomales Point. But neither, it seems, is the Park Service. What is clear is that this case raises complex and nuanced questions of wildlife management. The Park Service has presented evidence that it is aware of the risks facing the tule elk due to the ongoing drought, and that it is therefore actively monitoring the health of the elk. In response to these measures, it has supplied some supplemental water, and has said it will do more if it is necessary. The Court understands that Plaintiffs question the adequacy of the Park Service's efforts. But in the face of competing evidence, Plaintiffs are asking the Court to elevate Plaintiffs' concerns over the Park Service's own core discretion and expert judgment. The record does not show that the facts or law clearly favor Plaintiffs.

Thus, at this stage, the Court finds that Plaintiffs have not met their extraordinarily high burden to warrant a mandatory preliminary injunction. Because the Court finds that Plaintiffs have not met their burden, the Court need not consider the remaining *Winter* factors.

## IV. CONCLUSION

Accordingly, the Court **DENIES** the motion for preliminary injunction. The Court further **SETS** a case management conference on August 17, 2021, at 2:00 p.m., in Courtroom 2 on the Fourth Floor, at 1301 Clay Street, Oakland, California. The joint case management statement is due August 10, 2021. The parties should be prepared to discuss how to move this case forward expeditiously, and they should include a proposed schedule for motions for summary judgment.

**IT IS SO ORDERED.**

Dated: 8/2/2021

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge