UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVCE

RECORD OF DECISION

FINAL NON-NATIVE DEER MANAGEMENT PLAN/
ENVIRONMENTAL IMPACT STATEMENT

**Point Reyes National Seashore**
**Marin County, California**

The Department of the Interior, National Park Service, has prepared this Record of Decision (ROD) on the *Non-Native Deer Management Plan/ Environmental Impact Statement* for Point Reyes National Seashore, California. This ROD includes a statement of the decision made, synopses of other alternatives considered, the basis for the decision, a description of the "environmentally preferred" alternative, a discussion of impairment of park resources or values, a listing of measures to minimize environmental harm, and an overview of public engagement and agency coordination in the environmental decision-making process.

## BACKGROUND OF THE PROJECT

The Non-Native Deer Management Plan/ Environmental Impact Statement analyzes options for the management of non-native axis and fallow deer at Point Reyes National Seashore (PRNS) and the PRNS-administered lands of Golden Gate National Recreation Area (GGNRA). Preparation of the Non-Native Deer Management Plan (NNDMP) was initiated in 20002 because PRNS had no management plan for non-native deer and because the deer were having detrimental impacts to park ecosystems.

Non-native axis deer (*Axis axis*) and fallow deer (*Dama dama*) were introduced to the Point Reyes area in the 1940s and 1950s, before establishment of Point Reyes National Seashore (PORE), by a local landowner who purchased them from the San Francisco Zoo for hunting purposes. Axis deer are native to India and fallow deer originate in the Mediterranean region and Asia Minor.

Although no management plan for the exotic deer has ever been developed, an informal plan for control of each species to 350 animals was recommended in 1976 by the Seashore's Citizen Advisory Committee. Active NPS control of deer occurred from 1976 to 1994, and during that time, over 2,000 axis and fallow deer were shot in the park. In 1995, control ceased because of public controversy and budget constraints and there has been essentially no active exotic deer management since then.

It is estimated that when control ceased, approximately 140 axis deer and an unknown number of fallow deer remained in PORE. Field observations and censuses conducted by NPS staff since 2000 indicate that approximately 250 axis deer continue to inhabit 1,500 acres of the pastoral area of the Seashore, where cattle ranching continues under lease. Fallow deer are clearly more numerous and their range has expanded since the end of culling

009267

to encompass 23,000 acres of wilderness and natural areas. The total number of fallow deer numbers was estimated to be 860 in 2003.

In the past 20 years, fallow deer have moved southeastwards into the Olema Valley portion of the Seashore and onto the Seashore-administered lands of Golden Gate National Recreational Area (GGNRA). Olema Valley straddles 3 towns and contains a 2,000-acre private inholding, owned by the Vedanta religious society. Fallow deer densities in Olema Valley approach 80 deer/km², higher than in many zoological parks.

Both species have the potential for rapid population growth with axis and fallow deer capable of doubling their numbers every 4 to 6 years, respectively. Currently, exotic deer are found only transiently outside of NPS boundaries and in small numbers. However, further expansion of their range to neighboring state and private lands in the next few years is likely. If management actions are not taken soon, sufficient numbers of fallow deer will be present outside the Seashore to recolonize the park in the event that PORE fallow deer populations are reduced or eradicated. California Department of Fish and Game, California State Parks and the Marin County Municipal Water District have all expressed concern that, if left uncontrolled, fallow deer will impact the lands under their jurisdictions. The agencies have voiced support for an exotic deer management plan that would result in eradication in the Seashore.

The legislation that established the Seashore requires that it be managed to ensure "maximum protection, restoration, and preservation of the natural environment within the area" (90 Stat. 2692; 16 U.S.C§). Restoration will not be possible until exotic deer are removed. The presence of non-native axis and fallow deer is both the result of human activities and disruptive to many elements of the natural ecosystem at PRNS. Some of the more serious effects these non-native deer have at the Seashore include competition with and displacement of native tule elk and black-tailed deer (particularly in high deer density or low forage conditions), the potential for transmitting disease to these native ungulates, heavy use of and resulting direct impacts to riparian and woodland habitats and indirect impacts to the native wildlife dependent on this habitat.

Fallow deer have been documented to cause denudation of significant areas of woodland and riparian areas during the breeding season (Fellers and Osbourn, 2006). They have also been shown to cause significant trailing, girdling of young trees and trampling of riparian vegetation. Loss of riparian habitat can affect a number of species at PRNS, including several special status species, such as California red-legged frog, Coho and Chinook salmon and steelhead trout.

The Seashore is home to two species of native ungulates, Columbian black-tailed deer (*Odocoileus hemionus columbianus)* and the rare tule elk (*Cervus elaphus nannodes*). Both axis and fallow deer browse shrubs when grasses are not available and consume the same plant species as native deer and elk (Fellers 2006, Fallon-McKnight, 2006).Non-native deer, at current numbers, consume upwards of 1.5 tons of forage in the Seashore per day. Exotic deer potentially compete for food with native deer, particularly during times of low forage availability (Elliott and Barrett 1985, Fellers 1983). Park scientists have determined, based

009268

on dietary overlap, for every two nonnative deer, the park is losing one native deer. At current exotic deer levels, scientists have indicated there is a 46% reduction in black-tailed deer population and that there are approximately 900 fewer native deer than there should be.

Additionally, the nonnative deer have been shown to cause diseases which are fatal for tule elk and black-tailed deer. A 1976 study found at least 8% of exotic deer studied were shedding the organism which causes Johne's disease, or paratuberculosis, an exotic diarrheal disease of wild and domestic livestock (Riemann et al. 1976). This fatal disease, if transmitted by exotic deer to tule elk, could endanger a newly founded free-ranging elk herd in the Limantour wilderness area of the park. Exotic deer also have been documented to carry exotic lice that are known to cause disease and death in native deer in other areas.

Exotic deer also cause demonstrable economic impacts to the 26 beef and dairy cattle operations which operate through lease arrangements within PORE. Fallow and axis deer affect Seashore ranchers by damaging fences and through depredation of livestock pastures and supplemental livestock feed.

The following goals have been developed for the Non-Native Deer Management Plan for PRNS and the Northern District lands of GGNRA. These goals were generated from internal staff meetings and public external scoping meetings and presentations, and from review of NPS Policies, Director's Orders, and other guidance documents listed below.

The objectives of the plan are:

1. To correct past and ongoing disturbances to Seashore wilderness ecosystems from introduced exotic deer and thereby to contribute substantially to the restoration of naturally functioning native ecosystems,
2. To minimize long-term costs, in terms of limited staff time and resources, incurred by continued monitoring and management of exotic deer,
3. To prevent spread of populations of both species of exotic deer beyond NPS boundaries,
4. To reduce impacts of exotic deer to agricultural permittees within pastoral areas.

The planning area for the NNDMP includes NPS lands located approximately 40 miles northwest of San Francisco in Marin County, California. These lands include the 70,046-acre Point Reyes National Seashore, comprised primarily of beaches, coastal headlands, extensive freshwater and estuarine wetlands, marine terraces, and forests, as well as 18,000 acres of the Northern District of GGNRA, primarily supporting annual grasslands, coastal scrub, and Douglas-fir and coast redwood forests.

The impacts of non-native deer on the native ecosystem in the park and regulatory policies indicate the reduction or elimination of these species is needed. The Final Environmental Impact Statement identifies and evaluates five alternatives, four action alternatives and a ''no action'' alternative, for a NNDMP for Point Reyes National Seashore-administered lands. Potential impacts and appropriate mitigation are assessed for each alternative. The alternatives analyzed in this EIS investigate the degree of deer removal required and the means to do so.

009269

**DECISION (SELECTED ACTION)**

Alternative E is the selected action, which was identified and analyzed as the Preferred Alternative in the final NNDMP/FEIS, and remains unchanged from the draft EIS. It was created by reviewing oral and written public comments (both initially during the scoping phase and in response to release of the DEIS), consulting with NPS personnel, biologists and researchers nationwide, and by reviewing relevant literature.

In Alternative E, all axis and fallow deer inhabiting the Seashore and the GGNRA lands administered by the Seashore would be removed by 2021 through lethal removal and fertility control. Culling would be conducted by NPS staff or NPS contactors specifically trained in wildlife sharpshooting. As in Alternative C, a percentage of fallow deer females would be treated with an experimental long-acting contraceptive, and both axis and fallow deer would be removed via shooting. The contraceptive program would incorporate the latest contraceptive technologies to safely prevent reproduction, for as long as possible, and with minimal treatments per animal. Because no long-acting "sterilant" has been registered for use in wildlife by the Environmental Protection Agency, studies on safe and efficacious use of a candidate drug would have to be conducted at PRNS. Should such contraceptive technology become available for axis deer, its practicality and effectiveness would be tested on females of this species as well.

Population modeling for fallow deer at PRNS suggests that, in this alternative, total numbers of both species of non-native deer removed by 2021 are projected to be at least 1,350 (800 axis and 550 fallow deer) while total numbers of fallow does treated by 2021 with a lifetime contraceptive, should one exist, could range from 100 to 150.

Where deer carcasses could be moved, they would be donated to charitable organizations as food for the needy or for endangered species recovery programs. In cases where carcasses could not be accessed, they would be left in place to recycle nutrients into the ecosystem. Monitoring activities would continue until all non-native deer are removed, by 2021.

**OTHER ALTERNATIVES CONSIDERED**

The final NNDMP/FEIS analyzes four other alternatives (essentially unchanged from what was presented in the DEIS).

Alternative A, the No Action Alternative, represents the current deer management program. No non-native deer control actions would be undertaken. Monitoring activities would continue for the life of the Plan.

In Alternative B, Control of Non-Native Deer at Pre-Determined Levels by Agency Removal, non-native deer populations would be controlled initially to a level of 350 for each species (700 total axis and fallow deer). Control of each non-native deer species to 350 animals would be accomplished with lethal removal by NPS staff or contractors specifically trained in wildlife sharpshooting. Efforts would be made to reach target levels in 15 years, to ensure continued presence of both species in the Seashore, and to reduce risks of range

009270

expansion beyond Seashore boundaries. This would entail removing between 150 and 250 deer per year for the first ten years with harvest numbers decreasing to 100-150 deer per year from 2016 on. The total number of deer that would require removal is unknown (infinite). Where axis and fallow deer carcasses could be moved, they would be donated to charitable organizations as food for the needy or for endangered species recovery programs. In cases where carcasses could not be accessed, they would be left in place to recycle nutrients into the ecosystem. Monitoring activities would continue for the life of the Plan.

In Alternative C, Control of Non-Native Deer at Pre-Determined Levels by Agency Removal and Fertility Control, non-native deer populations would be controlled initially to a level of 350 for each species (700 total axis and fallow deer) using both lethal removal and fertility control. Efforts would be made to reach target levels in 15 years. Population modeling for fallow deer at PRNS suggests that, in this alternative, total numbers of non-native deer removed by 2050 would be at least 3,000 (2,200 axis and 800 fallow deer). Fallow deer would be treated with an experimental long-acting contraceptive that shows promise for multi-year effectiveness in this species. No agents show the same promise for axis deer, but should such contraceptive technology become available, its practicality and effectiveness would be tested on axis deer as well. Total numbers of fallow does treated by 2050 with a lifetime contraceptive, should one exist, would vary depending on overall sex ratios and density dependent factors but could range from 200 to 300. Because the effectiveness of long-term contraceptives on axis deer is unknown, similar models have not been developed for this species. Because the goal of this alternative would be to control axis and fallow deer at a specified level and not to eradicate them from PRNS, annual culling and fertility control would continue indefinitely and total numbers of deer removed and treated with contraceptives is unknown (infinite). Monitoring activities would continue for the life of the Plan.

In Alternative D, Removal of All Non-Native Deer by Agency Personnel, all axis and fallow deer inhabiting the Seashore and the GGNRA lands administered by the Seashore would be removed by 2021 through lethal removal by NPS staff or NPS contactors specifically trained in wildlife sharpshooting. This would entail culling approximately 250 non-native deer per year. Total numbers of non-native deer removed could range from 1,400 to 2,200 depending on starting population size and structure, composition and type of deer removed early in the program, and herd growth rates. Where deer carcasses could be moved, they would be donated to charitable organizations as food for the needy or for endangered species recovery programs. In cases where carcasses could not be accessed, they would be left in place to recycle nutrients into the ecosystem. Monitoring activities would continue until all nonnative deer were removed, by 2021.

During the scoping phase, several alternatives were initially considered by the NPS or proposed by the public but rejected because they were beyond the document's scope, were found to be technically or economically infeasible, were outside laws, regulations and policies that govern the park or were unable to meet park objectives. These include:
• Managing native deer at PRNS
• Managing non-native deer outside of NPS boundaries
• Managing livestock at PRNS

009271

- Public hunting of non-native deer
- Yearly contraception
- Use of long-acting contraceptives ("sterilants") alone
- Surgical sterilization
- Relocation
- Restricting deer to a fenced area
- Trapping and euthanasia by lethal injection

## BASIS FOR DECISION

After careful consideration of the alternatives presented, their environmental impacts, planning goals, and public comments received throughout the planning process, including comments on the *Draft Non-Native Deer Management Plan/Environmental Impact Statement*, Alternative E has been selected for implementation. This alternative best accomplishes National Park Service management policy, the legislated purpose of PRNS and GGNRA, and the statutory mission of the National Park Service to provide long-term protection of park resources. The selected action also best accomplishes the stated purposes of the Non-Native Deer Management Plan (as described on page 2-3, in the Purpose and Need Chapter, of the *Final Non-Native Deer Management Plan/EIS*). An analysis of the selected alternative's relationship to these goals is presented below.

RANGE OF NNDMP ALTERNATIVES COMPARED BY STATED PLAN OBJECTIVES

| Goals | Alt. A | Alt. B | Alt. C | Alt. D | Alt. E |
|---|---|---|---|---|---|
| To correct past and ongoing disturbances to Seashore wilderness ecosystems from introduced exotic deer and thereby to contribute substantially to the restoration of naturally functioning native ecosystems. | 0 | 1 | 1 | 2 | 2 |
| To minimize long-term costs, in terms of limited staff time and resources, incurred by continued monitoring and management of exotic deer. | 1 | 0 | 0 | 2 | 2 |
| To prevent spread of populations of both species of exotic deer beyond NPS boundaries. | 0 | 1 | 1 | 2 | 2 |
| To reduce impacts of exotic deer to agricultural permittees within pastoral areas. | 0 | 1 | 1 | 2 | 2 |

0 – Does Not At All Contribute to Goal Achievement
1 - Partially Meets Goal
2 – Provides Highest Levels of Goal Achievement

009272

## ENVIROMENTALLY PREFERRED ALTERNATIVE

National Park Service policy regarding implementation of the National Environmental Policy Act (NEPA) requires that an environmentally preferred alternative be identified in all NEPA analysis documents. The environmentally preferred alternative is the alternative that best promotes the national environmental policy expressed in Section 101 of NEPA. This includes alternatives that would:

- fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
- assure for all visitors a safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
- attain the widest range of beneficial uses of the environment without degradation, risk of health or safety, or other undesirable and unintended consequences;
- preserve important historic, cultural and natural aspects of our national heritage and maintain, wherever possible, an environment which supports diversity and variety of individual choice;
- achieve a balance of population and resource use which would permit high standards of living and a wide sharing of life's amenities; and
- enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

Essentially, this means the environmentally preferred alternative is the one that causes the least damage to the biological and physical environment or most naturally perpetuates biological or physical process; it also means the alternative which is best suited to protect, preserve, and enhance historic, cultural and natural resources and process. After analyzing the alternatives and potential environmental consequences described in the Draft and Final EIS, the NPS has determined that both Alternative D and E are the environmentally preferred alternatives.

Alternatives A, B, and C would continue ongoing impacts to park natural and physical resources. These include trampling and browsing of riparian and woodland vegetation, with loss of soils, wildlife habitat and increased erosion and degraded water quality as a result. Large herds of fallow and axis deer would continue to return to certain pastures, riparian areas and forests, with locally severe losses of vegetation. Because the diets of fallow deer and axis deer overlap with native deer and fallow deer are thought to be more aggressive than native deer and elk, they would continue to compete for and occupy their habitat. Competition would result in reduced productivity and lower fawn survival in native black-tailed deer when forage is scarce. Fallow and axis deer would also serve as reservoirs of paratuberculosis, to which both black-tailed deer and tule elk are susceptible.

Non-native deer also eat the same food as several native PRNS small mammal and bird species, and would indirectly affect other wildlife through the loss of habitat from deer browsing or trampling of vegetation. Non-native deer compete for food with prey species of the federally threatened northern spotted owl. They are also known to occupy beach habitat used by western snowy plovers (federally threatened) as nesting habitat. In addition, fallow

009273

deer frequent riparian areas and trample, thrash and browse vegetation, resulting in the removal of habitat for threatened California red-legged frog, coho and Chinook salmon, steelhead trout, and the endangered California freshwater shrimp. Non-native deer may also browse plants used by the endangered Myrtle's silverspot butterfly for nectar or as larval hosts. Such impacts would continue with Alternatives A, B, and C.

Although they do not have special federal status, several rare or unique bird species in the park occupy habitat in brush or nest on the ground in areas where non-native deer browse or trample. Deer may eat or trample special status plant species as well. Monitoring and managing exotic deer by park staff is expensive, and non-native deer also cause damage to private property. All the above impacts would result from implementation of Alternatives A, B, and C. In contrast to Alternatives A,B, and C, either Alternative D or E would eliminate these impacts on natural and physical resources and either is considered environmentally preferred.

Although eliminating axis and fallow deer, as proposed in Alternatives D and E, would adversely affect some visitors, this adverse impact is not part of the natural or physical environment and so does not contribute to the environmental preferability of an alternative.

## FINDINGS ON IMPAIRMENT OF PARK RESOURCES AND VALUES

The NPS has determined that implementation of Alternative E from the *Non-Native Deer Management Plan/Environmental Impact Statement* will not constitute an impairment to park resources and values. This conclusion is based on a thorough analysis of the environmental impacts described in the *Final Non-Native Deer Management Plan/EIS*, the public comments received, relevant scientific studies, and the professional judgment of the decision-maker guided by the direction in Management Policy. While the plan has some negative impacts, in all cases these adverse impacts are the result of actions to preserve and restore park resources and values. Overall, the plan results in major benefits to park resources and values, and it does not result in their impairment. Alternatives B, C and D also do not result in impairment.

In contrast, Alternative A, the No Action Alternative, has the potential to impair wildlife resources. Data on current and past population growth of fallow and axis deer at PRNS indicate that this alternative would result in an increase in non-native deer numbers within the Seashore and throughout Marin County. Adverse impacts of No Action to native ungulates, particularly native black-tailed deer, would be major. Black-tailed deer are considered a "keystone" species in the native California coastal ecosystem because increases and decreases in their population numbers have repercussions throughout the park ecosystem. Alternative A therefore affects a resource that is key to the natural integrity of the park or to opportunities for enjoyment of a park and as such, has potential to result in impairment.

In determining whether impairment may occur, park managers consider the duration, severity, and magnitude of the impact; the resources and values affected; and direct, indirect, and cumulative effects of the action. According to NPS Policy, "an impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is necessary to fulfill specific purposes identified in the establishing legislation

009274

or proclamation of the park, or key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or identified in the park's general management plan or other relevant NPS planning documents as being of significance (NPS Management Policies 2006, Section 1.4.5).

The non-impairment policy does not prohibit impacts to park resources and values. The NPS has the discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impacts do not constitute impairment. Moreover, an impact is less likely to constitute impairment if it is an unavoidable result of an action necessary to preserve or restore the integrity of park resources or values.

This decision is made based on guidance contained in the NPS Management Policies (2006). The decision to implement Alternative E will result in a greater level of accomplishment of the goals of the Plan.

In conclusion, the NPS has determined that the implementation of Alternative E will not result in impairment of resources and values in PRNS and GGNRA North District. This conclusion is documented in the *Final Non-Native Deer Management Plan/EIS*.

## MEASURES TO MINIMIZE ENVIRONMENTAL HARM

The NPS has investigated all practical means to avoid or minimize environmental impacts that could result from implementation of the selected action. The measures have been incorporated into Alternative E, and are presented in detail in the *Final Non-Native Deer Management Plan/EIS*.

They include:

- To mitigate adverse impacts to native vegetation - off-road use of vehicles only when necessary for lethal removal, contraception or retrieval of animals,

- To mitigate scattering and emigration of deer - lethal removal of animals from the edges of the Seashore before culling animals deeper within the park,

- To mitigate adverse impacts to species of special concern - culling and capture would not take place in areas requiring special resource protection, such as northern spotted owl nesting areas, in streams, riparian areas and on beaches,

- To mitigate impacts to visitor experience - shooting would be limited to non-peak times in high visitation areas.

In order to ensure protection of native species and ecosystems and to assess success of the management program, continued monitoring for at least 15 years would be an integral part of implementation. Such monitoring would include:

009275

- Monitoring of native and non-native deer numbers through park-wide aerial and/or ground censusing, indirect indices (pellet group or spotlight counts) or area sampling, performed at intervals of 1–3 years. Any use of aircraft to monitor deer would comply with Office of Aircraft Safety regulations and policies for all NPS aerial operations (Director's Order 60).

- Monitoring of native and non-native deer population growth rates.

- Monitoring of non-native deer range year-round with special emphasis on identifying expansion of non-native deer range beyond Seashore boundaries and alteration of range as a reaction to management actions.

- Monitoring of the diets of native and non-native deer to assess dietary overlap given the new ranges occupied by exotic deer and new deer herd sizes since previous dietary studies.

- Surveillance for evidence of deer overgrazing in natural or wilderness areas in which non-native deer are found in high densities. This could include the erection of deer-proof exclosures, as experimental controls, in wilderness areas.

- Monitoring of disease in all non-native deer found in high densities within pastoral areas, and in direct contact with livestock, within Seashore boundaries.

- Monitoring of the costs of the management program, including staff time, training, administrative, legal, and public relations costs and the costs of monitoring as described above.

- Formal or informal surveys of visitor response to non-native deer management. Periodic monitoring of park visitation with special attention to changes in visitation during or after specific management actions.

Mitigation measures will also be applied to future actions that are guided by this plan. In addition, the National Park Service will prepare appropriate compliance reviews, i.e., National Environmental Policy Act, Wilderness Act, and other relevant legislation for future actions not analyzed in site-specific detail in this EIS, including any actions essential to undertake in designated Wilderness (and which require advance determination of the "minimum tool" required to complete the necessary project).

## PUBLIC AND INTERAGENCY INVOLVEMENT

During a series of scoping meetings, the NPS requested input from the public, from federal, state, and local agencies, and from park resource specialists on resource management concerns, the types of issues that should be addressed in the EIS, and the range of deer management alternative strategies that should be considered.

009276

On April 10, 2002, a "Notice of Scoping for Non-Native Deer Management Plan at Point Reyes National Seashore" was published in the Federal Register. On May 4, 2002, at a public meeting of the Point Reyes National Seashore Citizen Advisory Commission, a presentation was given announcing the scoping period for the plan.  Scoping comments were solicited from May 4, 2002 to July 5, 2002.

From February to July 2002, park staff gave presentations to local and state public groups on the Seashore's planning process and provided background information on non-native deer. Audiences ranged from local homeowners' and ranchers' associations to local branches of national environmental and animal rights groups. The following groups were addressed:

- Animal Protection Institute
- Environmental Action Committee of West Marin
- Inverness Association
- Marin Audubon
- Marin Conservation League
- Marin Humane Society
- Point Reyes Seashore Ranchers' Association
- Point Reyes Station Village Association
- Sierra Club, Marin Chapter

In addition, the following groups were contacted and given the opportunity to attend an informational presentation but were either unavailable or felt they were sufficiently informed on the topic:

- Defenders of Wildlife
- Federated Indians of Graton Rancheria
- In Defense of Animals
- Inverness Ridge Association
- Marin Agricultural Land Trust
- National Parks and Conservation Association
- Natural Resource Defense Council
- Wilderness Society

On December 5, 2001, representatives of public agencies were invited to attend an informational meeting at the Seashore, with the objective of updating those agencies on the development of a non-native deer management plan. Attending the meeting, in addition to NPS staff, were representatives from:

Marin County Parks and Open Space
Marin Municipal Water District
U.S. Geological Survey- Biological Resources Division
California Department of Fish and Game
California State Parks
U.S. Department of Agriculture (Animal Plant Health Inspection Service)

009277

Also invited but not attending was the U.S. Fish and Wildlife Service. NPS biologists informed attendees of the schedule for development of a management plan and EIS, and gave an update on known numbers and range of non-native deer within and outside of the Seashore.

Between August 2001 and September 2003, an interdisciplinary team of Seashore biologists, administrators, and specialists met nine times and supervised the preparation of the DEIS. In addition, personnel from Golden Gate National Recreation Area and the NPS Pacific West Regional office were instrumental in providing guidance.

The DEIS was made available for public review and comment for 63 days, from February 4, 2005 through April 8, 2005 when EPA filing notice occurred. A press release was sent to over 40 news agencies on February 3, 2005 including newspaper, radio and television. Over 275 letters were mailed to interested public agencies and individuals. Comments received through April 19, 2005 were considered for response. The Notice of Availability (NOA) was published on January 4, 2005. The draft EIS was placed on the park website during the comment period and notices of its availability were sent to over 200 interested parties including agencies and organizations. Fifteen copies of the draft EIS were sent to the State of California Clearinghouse for state agencies on February 4, 2005 for review. Copies were also distributed to all local libraries, the central Marin County Library and the San Francisco Public Library. Approximately 20 printed copies of the draft EIS were sent to interested parties. Midway through the public comment period, on March 3, 2005, an informational workshop was held in the Red Barn Classroom at Seashore Headquarters. Approximately 60 people attended the 3-hour meeting and posed questions to a panel of scientists and staff or expressed preference for project alternatives. Audience members were informed of a number of ways of submitting comments on the plan either that night at the meeting, or by mail/email before April 8, 2005.

During the comment period, the NPS received a total of 1,980 pieces of correspondence (including letters, emails, facsimiles, and hand-delivered comment forms), containing 4450 individual comments. Form letters constituted 57% of the emails comment letters received. Ninety-four percent of the comments were sent in by individual members of the public. Seventy-four percent of all correspondence originated from the U.S. with 35% of this originating in California.

All comments were reviewed and considered. Where warranted, the draft plan was revised to reflect edits recommended by commenters or to clarify text questioned by commenters. Responses were prepared for all substantive comments submitted by the public and agencies and are included at the end of Chapter 5, Consultation and Coordination, in the FEIS.

The Environmental Protection Agency reviewed the draft NNDMP/EIS and rated it LO— Lack of Objections and supported the NPS selection of Alternative E.

Documentation of NPS compliance with federal and state laws and regulations is incorporated into the text of the FEIS.  Compliance with the major federal laws and associated state regulations is summarized here.

009278

<u>Endangered Species Act</u> of 1973, as amended, PL 93-205, 87 Stat. 884, 16 USC §1531 et seq. The Act protects threatened and endangered species, as listed by the U.S. Fish and Wildlife Service (USFWS), from unauthorized take, and directs federal agencies to ensure that their actions do not jeopardize the continued existence of such species. Section 7 of the Act defines federal agency responsibilities for consultation with the USFWS and the National Marine Fisheries Service (NMFS) and requires preparation of a Biological Assessment to identify any threatened or endangered species that is likely to be affected by the proposed action. The National Park Service initiated the consultation process with USFWS and NMFS on March 26, 2003. Concurrence from both USFWS and NMFS that the plan would not adversely affect listed species was requested in letters sent to both agencies.

On March 10, 2005, in a letter to the USFWS, the NPS requested concurrence with its finding that the proposed plan would not be likely to adversely affect the proposed critical habitat for the California red-legged frog or adversely affect nine plant and animal species found in the planning area. In a memo dated April 7, 2005, the USFWS explained that their assessment of potential effect was based on the project constraints described in the consultation letter including: (1) no actions would take place in creeks, waterways or riparian areas, (2) culling would be conducted by specifically trained staff, (3) carcasses would be removed when possible, and where not possible, left to decay naturally, and (4) that if project work descriptions or time frames change from those provided in the consultation letter, those changes would be submitted to the USFWS for review. In the April 7, 2005 memo, the USFWS concurred with the NPS findings that measures in the proposed plan are sufficient to reduce any direct, indirect and cumulative effects to the nine listed species and proposed critical habitat to an insignificant or discountable level. With the issuance of the memo, the USFWS concluded its consultation process for the Non-native Deer Management Plan EIS.

On March 28, 2005, NPS transmitted a letter to NMFS regarding potential project effects on listed fish species and fish habitat during implementation of the plan. The NPS clarified that management actions would not take place in creeks, waterways, or riparian areas and therefore the proposed project is not likely to adversely effect Central California Coast Evolutionary Significant Unit coho salmon, Central California Coast Evolutionary Significant Unit steelhead, Central California Coast Evolutionary Significant Unit Chinook salmon, Designated Critical Habitat for Central California Coast Evolutionary Significant Unit coho salmon, and Essential Fish Habitat for coho salmon and Chinook salmon. NMFS concurred with NPS findings in a letter to the NPS on May 3, 2005, ending the informal consultation process.

<u>Archeological Resources Protection</u> Act of 1979, PL 96-95, 93 Stat. 712, 16 U.S.C. §470aa et seq. and 43 CFR 7, subparts A and B, 36 CFR. This act secures the protection of archeological resources on public or Indian lands and fosters increased cooperation and exchange of information between industry, government, and the professional community in order to facilitate the enforcement and education of present and future generations. It regulates excavation and collection on public and Indian lands. It requires notification of Indian tribes who may consider a site of religious or cultural importance prior to issuing a permit. The NPS would meet its obligations under this Act in all activities conducted in the Non-Native Deer Management Plan through the adoption of standard mitigation measures

009279

addressing standard procedures to follow in the event that cultural resources are unexpectedly encountered.

National Historic Preservation Act of 1966, as amended, PL 89-665, 80 Stat. 915, 16 U.S.C. §470 et seq. and 36 CFR 18, 60, 61, 63, 68, 79, 800. The National Historic Preservation Act requires agencies to take into account the effects of their actions on properties listed in or eligible for listing in the National Register of Historic Places. The Advisory Council on Historic Preservation has developed implementing regulations (36 CFR 800), which allow agencies to develop agreements for consideration of these historic properties. The NPS, in consultation with the Advisory Council, the California State Historic Preservation Officer, American Indian tribes and the public, has developed a Programmatic Agreement for operations and maintenance activities on historic structures. This Programmatic Agreement provides a process for compliance with National Historic Preservation Act, and includes stipulations for identification, evaluation, treatment, and mitigation of adverse effects for actions affecting historic properties. The NPS sent a scoping notice to the state historic preservation officer and the Advisory Council for Historic Preservation. The Draft EIS was sent to the state historic preservation officer (through the State Department of Parks and Recreation) and the State Native American Heritage Commission These agencies did not submit comments on the management plan during the scoping or the public comment periods. The Chief of Cultural Resources of PRNS concluded that as non-native deer are not part of the traditions or history of the Native American people of the region or the local ranching culture and as implementation of the management plan would not affect historic structures or districts, no further compliance with Section 106 is warranted (Gordon White, 10/6/03).

American Indian Religious Freedom Act, PL 95-341, 92 Stat. 469, 42 U.S.C. §1996. This act declares policy to protect and preserve the inherent and constitutional right of the American Indian, Eskimo, Aleut, and Native Hawaiian people to believe, express, and exercise their traditional religions. It provides that religious concerns should be accommodated or addressed under NEPA or other appropriate statutes. The National Park Service, as a matter of policy, is as nonrestrictive in permitting Native American access to and use of identified traditional sacred resources for traditional ceremonies.

**Comments Received Following Release of the Final EIS**

The Notice of Availability for the Final EIS was published in the Federal Register on August 18, 2006; EPA's Notice of Filing posted on August 18, 2006 formally initiated the No Action waiting period, which concluded on September 22, 2006. A press release was sent to over 40 news agencies on August 21, 2006 including newspaper, radio and television. The Final EIS was placed on the park website during the No Action period and announcements of availability were sent to over 200 interested parties including agencies and organizations. Copies of the Final EIS were requested by, and distributed to six interested individuals and groups. Twelve individual response letters were received; the respondents expressed either support for the Plan or general aversion to lethal removal of wildlife, but did not offer specific comments that could be addressed. In addition, the Seashore received a letter from EPA dated September 5, 2006 endorsing the adequacy of the environmental impact analysis

14

in the Final EIS. EPA posted its conclusion of satisfactory completion of the Final EIS in the Federal Register on September 19, 2006.

**CHANGES MADE FOR THE *FINAL NON-NATIVE DEER MANAGEMENT PLAN/ ENVIRONMENTAL IMPACT STATEMENT***

A number of minor changes were made in the *Final Non-Native Deer Management Plan/EIS*, based on public comment for the draft EIS. During the review of the draft EIS, 4,450 individual comments were received. A number of commenters questioned the information on wildlife contraception upon which impact analysis was based. Based on these letters, minor changes were made in the *Final Non-Native Deer Management Plan/EIS* as described on pages 22-26, further detailing the current information on deer contraception. Other commenters questioned the assessment of impacts to wilderness and minor changes detailing the analysis of these impacts were added to the Visitor Experience sections for each alternative in Chapter 4, Environmental Consequences. More information was added to the Cumulative Impacts sections of each alternative as well (Chapter 4). Finally, three appendices were added to the FEIS to provide additional information and background: Appendix B: Monitoring and Management Plan for Action Alternatives B,C,D and E; Appendix E: Section 7 Consultation, US Fish and Wildlife Service and National Oceanic and Atmospheric Administration; and Appendix F: Projects Considered in Cumulative Impacts Analysis.

No substantive changes were made to Alternative E, the selected course of action.

**CONCLUSION**

Alternative E provides the most comprehensive and effective method among the alternatives considered for meeting the National Park Service's purposes, goals, and criteria for managing non-native deer in Point Reyes National Seashore and the North District of GGNRA and for meeting national environmental and NPS management policy goals. The selection of Alternative E, as reflected by the *Final Non-Native Deer Management Plan/EIS,* would not result in the impairment of park resources and would allow the National Park Service to conserve park resources and provide for their enjoyment by visitors. Alternative E would also protect the overall long-term ecological health of the park's wilderness areas, assist NPS in the restoration of native ecosystems within the park, prevent spread of non-native deer into surrounding private and public lands, and address adverse impacts to agricultural permittees within the PRNS.

Approved: _____     _____

Jonathan B. Jarvis, Regional Director         Date

Pacific West Region, National Park Service

009281



National Park Service | Department of the Interior

## Accessibility Self-Evaluation and Transition Plan Overview

# POINT REYES

## NATIONAL SEASHORE | CALIFORNIA

### JANUARY 2016

009282

# Executive Summary

The goal of a Self-Evaluation and Transition Plan (SETP) is to design an effective plan to improve the park's accessibility by upgrading services, activities, and programs at park areas and to instill a culture around universal access by employing means to convey information to the widest population possible and by prioritizing ongoing staff training.

The plan for Point Reyes National Seashore includes major findings from the self-evaluation process, as well as a strategy for improving accessibility parkwide. The SETP resulted from the work of an NPS interdisciplinary design team, including planning, design, and construction professionals; and interpretive, resource, visitor safety, maintenance, and accessibility specialists. Site plans, photographs, and specific actions for accomplishing work in priority park areas were developed, and associated time frames and implementation strategies were established to assist NPS staff in scheduling and performing required actions and to document work as it is completed. Park policies, practices, communication, and training needs were also addressed.

Following are the key park experiences and associated priority park areas addressed in the transition plan:

- **Beach Access** – North Beach, Drakes Beach, and Drakes Estero

- **Wildlife Viewing** – Bear Valley Visitor Center, Limantour Beach, Clem Miller Environmental Education Center, Drakes Beach, Drakes Estero, North Beach, Lighthouse, Abbotts Lagoon Trailhead and Trail, Elephant Seal Overlook, Pierce Point Ranch (including Tule Elk Reserve and Tomales Point Trailhead), and Lifeboat Station (including Boathouse)

- **Bird Watching** – Bear Valley Visitor Center, Limantour Beach, Drakes Beach, Drakes Estero, Lighthouse, Abbotts Lagoon Trailhead and Trail, Elephant Seal Overlook, and Lifeboat Station (including Boathouse).

- **Ranching** – Pierce Point Ranch (including Tule Elk Reserve and Tomales Point Trailhead) and Five Brooks Trailhead

- **Visit Lighthouse** – the Lighthouse

- **Wilderness** – Bear Valley Visitor Center, Limantour Beach, Clem Miller Environmental Education Center, Abbotts Lagoon Trailhead and Trail, Bear Valley Trailhead and Trail, and Coast Camp and Trail

- **Camping** – Coast Camp and Trail and Clem Miller Environmental Education Center

- **Hiking** – Abbotts Lagoon Trailhead and Trail, Bear Valley Trailhead and Trail, Chimney Rock Trailhead and Trail, Elephant Seal Overlook, and Earthquake Trail

- **Environmental Education** – Bear Valley Visitor Center, Clem Miller Environmental Education Center, and Point Reyes Hostel

- **Geology** – Bear Valley Visitor Center, Earthquake Trail, Drake Beach, and Lighthouse

- **Human History** – Kule Loklo, RCA Point Reyes Receiving Station, Pierce Point Ranch (including Tule Elk Reserve and Tomales Point Trailhead), Lifeboat Station (including Boathouse), Lighthouse, Chimney Rock Trailhead and Trail, and Bear Valley Visitor Center

- **Wildflowers** – Bear Valley Visitor Center, Limantour Beach, Clem Miller Environmental Education Center, Drakes Beach, Lighthouse, Abbotts Lagoon Trailhead and Trail, Elephant Seal Overlook, Chimney Rock Trailhead and Trail, Bear Valley Trailhead and Trail, and Coast Camp and Trail

- **Views and Vistas** – Drakes Beach, Drakes Estero, North Beach, Limantour Beach, Abbotts Lagoon Trailhead and Trail, Chimney Rock Trailhead and Trail, Elephant Seal Overlook, Lighthouse, and Lifeboat Station (including Boathouse)

Overall, the same types of services, programs, and activities were found throughout park areas and assessment findings for these generally repeated from area to area, for both physical accessibility and program accessibility. More detailed accessibility improvements are recommended for each finding by area location.

## Physical Accessibility

Recurring findings were generally found for parking areas, accessible paths of travel, outdoor recreation access routes, hiking trails, and visitor information areas, such as kiosks, bulletin boards, interpretive panels and waysides. Some issues included surfaces that were not firm and stable and some slope measurements that exceeded maximums allowed. Some restroom features did not meet required measurements and mechanisms to open trash and recycling receptacles exceeded allowable poundage for

operation. Amenities offered for picnicking and camping, such as picnic tables, fire rings, and water spigots did not always meet appropriate access route and clearance measurements. Some signage was also either missing or had insufficient or misplaced information.

Other physical access issues where improvements are recommended include providing signed parking for oversize vehicles and horse trailer parking, improving concessioner facilities for parking and check-in, providing beach access accommodations, upgrading trailhead areas, and repairing bus/shuttle stop areas. Note that many of the shuttle stops were constructed in Spring 2014 and made accessible at that time. For trails not specifically identified in this report, a more thorough assessment will need to be conducted to guide additional implementation measures in the future. In addition, services that are provided at the various visitor centers, Environmental Education Center, Lifeboat Station Boathouse, Receiving Station, and Red Barn require repair or rehabilitation to make more accessible. These services include information desks, bookstores, meeting/community spaces, and areas that support overnight accommodations.

## Program Accessibility

Recurring findings related to program accessibility included individual elements of interpretive waysides, including font and contrast issues that require modifications to meet minimum size and readability standards. In general, interpretive panels, waysides, publications, videos, and self-guided tours did not have alternate formats available, such as materials in braille or large print, open captioning, or audio or electronic formats. Assistive listening devices were not available for people with hearing loss for guided tours or special events. Audio description for ranger-led interpretive tours and self-guided tours that describe visual elements to persons with low or no vision were also not available. Tactile exhibits were limited.

Specific program areas that would serve visitors with increased accessible formats at a larger scale include upgrades in educational and amphitheater programs at the Environmental Education Center; guided beach tours at Drakes Beach; and self-guided and guided tours of the Earthquake Trail, Pierce Point Ranch, and the Receiving Station. Upgrading museum and exhibits at Bear Valley, the Lighthouse, Drakes Beach, Kule Loklo Indian Village, and the Lifeboat Station Boathouse is also recommended.

# Parkwide Accessibility

During the self-evaluation and assessment process, some of the more noteworthy parkwide accessibility challenges that were discussed by the planning team included postings and publications, staff training and park protocols, audio and visual programs, visitor information and communication, tours, programs, specials events, concessions and partnerships.

It is suggested that the park employ trained consultants to assist in determining how to best address program accessibility improvements parkwide, and to ensure that design and implementation of alternate format programs best meets the intended audiences. When alternate formats are provided, signage should be placed at appropriate locations and communicated in park materials to inform visitors of availability.

Staff training is of primary importance, as creating parkwide accessibility requires staff awareness and understanding, as well as appropriate action to make or support accessible conditions. General training for all staff, and regular, specific training for maintenance and interpretive staffs to upkeep physical and programmatic access is strongly advised. Conducting the assessment process with the park team was a step forward as it brought higher awareness and field training to staff, and served to generate commitment towards embracing this ethic as a core value.

While improving accessibility across the board is important, park staff will need to consider which improvements in which park areas expand accessibility to the greatest numbers of park visitors with disabilities. In addition, suggested time frames for implementation and relative cost need to be factored into decisions related to accessibility investments.

Point Reyes National Seashore is striving to be inclusive and welcoming. The self-evaluation process identified a number of strengths. There is general awareness among park staff about accessibility and visitors are currently being accommodated through various means of communication. The commitment to accessibility is evident within the park in how facilities are retrofitted and how the construction and maintenance program continues to upgrade services and amenities. The interpretive branch is making strides in programmatic accessibility.

# Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    Physical Accessibility . . . . . . . . . . . . . . . . . . . . . . . . 3

    Program Accessibility . . . . . . . . . . . . . . . . . . . . . . . . 4

    Parkwide Accessibility . . . . . . . . . . . . . . . . . . . . . . . . 5

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

    Point Reyes National Seashore Description . . . . . . . . . . . . 12

    Point Reyes National Seashore Purpose and
Significance Statements . . . . . . . . . . . . . . . . . . . . . . 12

        Park Purpose . . . . . . . . . . . . . . . . . . . . . . . . . 12

        Park Significance . . . . . . . . . . . . . . . . . . . . . . . 13

    Accessibility Self-Evaluation and Transition Plan . . . . . . . . . . 14

    Implementation of the Plan . . . . . . . . . . . . . . . . . . . . . 15

**Accessibility Self-Evaluation and Transition Plan Process** . . . . . . . . . . . **16**

    Self-Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        Step 1: Identify Key Park Experiences . . . . . . . . . . . . 17

        Step 2: Identify All Park Areas Where Key
Park Experiences Occur . . . . . . . . . . . . . . 17

        Step 3: Prioritize Park Areas . . . . . . . . . . . . . . . . . 17

        Step 4: Identify Services, Activities, and
Programs in Each Park Area . . . . . . . . . . . . 18

        Step 5: Conduct Accessibility Assessment . . . . . . . . . . 18

    Transition Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        Step 6: Draft and Finalize Transition Plan . . . . . . . . . . 20

**Implementation Strategy for Point Reyes National Seashore** . . . . . . . . . . **21**

    Priority Park Areas . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Implementation Strategy for Priority Park Areas . . . . . . . . . . 23

    Abbotts Lagoon Trailhead and Trail . . . . . . . . . . . . . . . . 24

        Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        Implementation Strategy . . . . . . . . . . . . . . . . . . . 25

    Bear Valley Trailhead and Trail . . . . . . . . . . . . . . . . . . . 28

        Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        Implementation Strategy . . . . . . . . . . . . . . . . . . . 29

    Bear Valley Visitor Center . . . . . . . . . . . . . . . . . . . . . 32

        Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        Implementation Strategy . . . . . . . . . . . . . . . . . . . 33

Chimney Rock Trailhead and Trail and Elephant Seal Overlook . . . . 36
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    Implementation Strategy . . . . . . . . . . . . . . . . . . . . . 37
Clem Miller Environmental Education Center . . . . . . . . . . . . . 40
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Implementation Strategy . . . . . . . . . . . . . . . . . . . . . 41
Coast Camp and Trail . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Site Plan 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Implementation Strategy Site 1 . . . . . . . . . . . . . . . . . . 45
    Site Plan 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    Implementation Strategy Site 2 . . . . . . . . . . . . . . . . . . 49
Drakes Beach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    Implementation Strategy . . . . . . . . . . . . . . . . . . . . . 51
Drakes Estero . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    Implementation Strategy . . . . . . . . . . . . . . . . . . . . . 55
Earthquake Trail . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    Implementation Strategy . . . . . . . . . . . . . . . . . . . . . 59
Five Brooks Trailhead . . . . . . . . . . . . . . . . . . . . . . . . . 62
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
    Implementation Strategy . . . . . . . . . . . . . . . . . . . . . 63
Kule Loklo Indian Village . . . . . . . . . . . . . . . . . . . . . . . 66
    Site Plan 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
    Implementation Strategy Site 1 . . . . . . . . . . . . . . . . . . 67
    Site Plan 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
    Implementation Strategy Site 2 . . . . . . . . . . . . . . . . . . 69
    Site Plan 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
    Implementation Strategy Site 3 . . . . . . . . . . . . . . . . . . 71
Lifeboat Station Boathouse . . . . . . . . . . . . . . . . . . . . . . 74
    Orientation Map and Site Features . . . . . . . . . . . . . . . . 74
    Implementation Strategy . . . . . . . . . . . . . . . . . . . . . 75
Lighthouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    Orientation Map and Site Features . . . . . . . . . . . . . . . . 78
    Implementation Strategy . . . . . . . . . . . . . . . . . . . . . 79
Limantour Beach . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
    Implementation Strategy . . . . . . . . . . . . . . . . . . . . . 83

North Beach . . . . . . . . . . . . . . . . . . . . . . . . 86
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . 86
    Implementation Strategy . . . . . . . . . . . . . . . 87
Pierce Point Ranch (including Tule Elk Reserve, and
Tomales Point Trailhead) . . . . . . . . . . . . . . . . . 90
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . 90
    Implementation Strategy . . . . . . . . . . . . . . . 91
Point Reyes Hostel . . . . . . . . . . . . . . . . . . . . 94
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . 94
    Implementation Strategy . . . . . . . . . . . . . . . 95
RCA Point Reyes Receiving Station . . . . . . . . . . . . 96
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . 96
    Implementation Strategy . . . . . . . . . . . . . . . 97
Red Barn . . . . . . . . . . . . . . . . . . . . . . . . . 98
    Site Plan . . . . . . . . . . . . . . . . . . . . . . . 98
    Implementation Strategy . . . . . . . . . . . . . . . 99
Point Reyes National Seashore Policy, Practice,
Communication, and Training . . . . . . . . . . . . . . . 102
    Park Features . . . . . . . . . . . . . . . . . . . . . 102
    Postings and Publications . . . . . . . . . . . . . . 103
    Staff Training and Park Protocols . . . . . . . . . . 104
    Audio and Visual Programs . . . . . . . . . . . . . 106
    Visitor Information . . . . . . . . . . . . . . . . . . 107
    Tours, Programs, and Special Events . . . . . . . . . 109
    Concessions and Partnerships . . . . . . . . . . . . 110

**Appendix A: Accessibility Laws, Standards, Guidelines, and NPS Policies
Applicable to Point Reyes National Seashore** . . . . . . . . . . **112**

**Appendix B: Glossary Of Terms** . . . . . . . . . . . . . . . . . . . . . . . **115**

**Appendix C: Contributors** . . . . . . . . . . . . . . . . . . . . . . . . . . . **118**

This page intentionally left blank.



# Introduction

Since 1916, the National Park Service (NPS) has preserved, unimpaired, the natural and cultural resources and values of the national park system, while also providing for the enjoyment, education, and inspiration of this and future generations.

Many of our national parks were founded because of their stunning views, extreme and unique geography, challenging and sensitive natural environments, and historic, fragile structures. The many reasons this park, Point Reyes National Seashore, and other parks exist are due to their history and resources. The NPS mission balances protection of resources (both natural and cultural) along with visitation. To accommodate our visitors, facilities, services, activities, and programs were designed and built within parks to help them better understand each park purpose and significance.

Most facility installation preceded the passing of laws and policies that reflect the commitment of the National Park Service to provide access to the widest cross section of the public, and to ensure compliance with the Architectural Barriers Act of 1968, the Rehabilitation Act of 1973, the Equal Employment Opportunity Act of 1972, and the Americans with Disabilities Act of 1990 (42 USC 12207). The accessibility of commercial services within national parks is also governed by all applicable federal laws. Within its nearly 100 years of operation, the National Park Service has continued to work toward a more inclusive environment. Paralleling these efforts, laws and regulations have provided additional guidelines. The more than 400 park units that comprise the national park system today include not only the large western parks, for which the agency is well known, but also nationally significant urban parks, historic sites, monuments, parkways, battlefields, and a diversity of other park types across the country.

For nearly a century, the park service has been a leader in connecting people to both our natural and cultural heritage. Today's generation of visitors has different needs and expectations and the agency must adapt to meet these changing demands. Modern science and visitor trend analysis have provided new insight into the opportunities and challenges related to accessibility in the national park system. There are approximately 60 million people with disabilities in the United States today, with the number expected to rise to 71 million in upcoming years as the number of baby boomers (people 65 and older) rises. This information can help the service understand changing visitation patterns, the nexus between resource stewardship and accessibility, and the impacts of managing visitors, resources, and infrastructure with the threats of decreasing funding. Adequate planning can identify unique solutions to challenges and provide the service with a trajectory that is full of opportunity—for visitors now and for future generations. The National Park Service is committed to making all practicable efforts to make NPS facilities, programs, services, and employment opportunities accessible to and usable by all people, including those with disabilities.

# Point Reyes National Seashore Description

Point Reyes National Seashore is an extraordinary place, spectacularly rich in biological diversity and steeped in human history that remains vibrant to this day. Only an hour from seven million people, it is a world apart. Protected in this national park are 80 miles of stunning California coastline; thousands of years of human history chronicling the first people of Point Reyes; working ranches sustaining a storied agricultural tradition; world class wildlife and plant diversity; a designated wilderness unique to the Pacific Coast; one extraordinary lighthouse; and so much more.

# Point Reyes National Seashore Purpose and Significance Statements

Point Reyes National Seashore will complete a foundation document by 2016. Foundation documents provide basic guidance for planning and management decisions by identifying the park purpose, significance, and fundamental resources and values. The Point Reyes National Seashore foundation plan identifies special mandates and administrative commitments, and provides an assessment and prioritization of park planning and data needs. The park purpose and significance below will be updated during the foundation document process. Understanding these elements helps set the stage for appropriately integrating accessibility into the overall park priorities and plans.

## Park Purpose

Point Reyes National Seashore was established to preserve and protect wilderness, natural ecosystems, and cultural resources along the diminishing undeveloped coastline of the United States. Located just an hour's drive from a densely populated metropolitan area, the seashore is a sanctuary for countless plant and animal species and a haven for human inspiration, education, and recreation. The seashore is intended to serve as a model of effective and successful environmental stewardship—a coastal sanctuary where park staff, partners, and the public are actively involved in the common goals of maintaining, protecting, restoring, and preserving the natural and cultural integrity of the park.

## Park Significance

- Point Reyes National Seashore is located at a rich, complex convergence of land and sea, culture and nature, urban and rural. This is where continental and oceanic plates of Earth's crust collide, creating the unique geological formations of the San Andreas Fault. The seashore's dynamic geologic foundations produce extraordinary biodiversity, where the rivers of the coastal range meet the sea, and where marine, estuarine, freshwater, and terrestrial ecosystems overlap. Human communities overlap here too: this is where European voyagers and the indigenous peoples of America's Pacific Coast first encountered each other. Today visitors can view the distant modern cities of the San Francisco Bay Area from ranches established almost 150 years ago.

- The seashore lies within an area recognized locally, nationally, and globally as a center of biodiversity. The seashore hosts more than 800 native plants, more than 490 resident and migratory birds, rare and elusive amphibians, and a unique assemblage of mammals such as tule elk, elephant seal, mountain lion, harbor seal, bobcat, and Point Reyes mountain beaver. The seashore is one of the best spots on the West Coast to watch the migration of the Pacific gray whale and to observe other open ocean animals such as albatross, dolphins, and humpback whales.

- For more than 2,000 years humans have inhabited the Point Reyes Peninsula, employing its rich resources and modifying aspects of the landscape to meet their changing needs. More than 100 Coast Miwok archeological sites document a culture that was an integral part of the ecosystems that are called native today. It was a culture deeply tied to the land and water; Coast Miwok people managed native plant communities with selective cultivation and seasonal burning resulting in a landscape that European, Mexican, and American ranchers later found ideal for grazing beginning in the early 1800s. Ranching continues in the seashore in two large agricultural historic districts, managed cooperatively with ranching families to preserve historic structures and cultural landscapes.

- The unique geography of the Point Reyes Peninsula, stretching almost 10 miles into the Pacific Ocean from the adjacent coastline, encouraged local development of a rich maritime and radio communications history. The seashore preserves the site where the first European explorer, Sir Francis Drake, careened his Golden Hinde in 1579. Drakes Bay is also the site of the first shipwreck on the Pacific Coast of North America in 1595. Numerous shipwrecks on these treacherous coastal waters led to the establishment of the 1870 Point Reyes Lightstation and the 1926 Lifesaving Station. In 1914, the Marconi Company sent the first wireless communication across the Pacific from this site on the Point Reyes Peninsula.

## Accessibility Self-Evaluation and Transition Plan

The creation of a transition plan is mandated by regulations under the Rehabilitation Act of 1973, as they apply to the US Department of the Interior, which states that "No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal assistance." It specifically requires parks to document architectural barriers, solutions, and time frames for making improvements to increase accessibility.

This Accessibility Self-Evaluation and Transition Plan (SETP) has been prepared to provide Point Reyes National Seashore a tool for addressing overall needs associated with making the park accessible when viewed in its entirety. The plan is based on an understanding of key park experiences and establishes a methodical process that identifies, prioritizes, and outlines improvements to park accessibility. The plan proposes strategies for implementation over time and in a manner consistent with park requirements and protocols.

All key park experiences and all park areas were identified to ensure that the plan would consider all park programs. Park areas were then evaluated against measurable criteria to determine which would be considered priority park areas. Each priority park area was assessed to determine where barriers existed to participating in park programs, and the best manner in which access could be improved. In some situations it is not reasonably practicable to create physical or universal design solutions.

The general public, including people with disabilities and organizations representing people with disabilities, were invited to provide comments on the Draft Self-Evaluation and Transition Plan process and findings.

## Implementation of the Plan

One of the goals of the plan is to increase accessibility awareness and understanding among staff and volunteers of Point Reyes National Seashore. The park superintendent is responsible for implementing and integrating the plan, and the park-designated accessibility coordinator ensures adequate communication to park employees and works with the superintendent to follow up on the implementation and relevancy of the plan by documenting improvements and keeping the plan updated.





# Accessibility Self-Evaluation and Transition Plan Process

## Self-Evaluation

The following graphic illustrates the primary steps in the self-evaluation process. Each step is further described below.

### SELF-EVALUATION

**1** Identify Key Park Experiences

**2** Identify All Park Areas Where Key Park Experiences Occur

**3** Prioritize Park Areas

**4** Identify Services, Activities, and Programs in Each Park Area

**5** Conduct Accessibility Assessment

009297

## Step 1: Identify Key Park Experiences

Key park experiences are those park experiences that are iconic and important for visitors to understand the purpose and significance of the park unit. They are "musts" for park visitors. Key park experiences are grounded in park legislation and can be identified through a consideration of park purpose, significance, interpretive themes, and those programs or activities highlighted in park communications. Based on input from NPS staff, the following key park experiences were identified at Point Reyes National Seashore to ensure that planned improvements were prioritized to best increase overall access to the experiences available at Point Reyes National Seashore.

- Beach Access
- Wildlife Viewing
- Bird Watching
- Ranching
- Visit Lighthouse
- Wilderness
- Camping

- Hiking
- Environmental Education
- Geology
- Human History
- Wildflowers
- Views and Vistas

## Step 2: Identify All Park Areas Where Key Park Experiences Occur

After key park experiences were identified, the park areas where those experiences occur were determined. A park area is a location within a park regularly used by visitors and/or staff. The list of park areas within Point Reyes National Seashore was considered and then areas were prioritized per criteria in step 3.

## Step 3: Prioritize Park Areas

The criteria below were used to prioritize park areas for scheduling and completing assessments:

- Level of visitation
- Diversity of services, activities, and programs offered in area
- Geographic favorability (as a whole, the park areas selected reflected a broad distribution throughout the park)
- Other unique characteristics of the site

The areas selected for assessment provide the best and greatest opportunities for the visiting public to access the key park experiences. Each key park experience is represented within the identified priority areas so that all key park experiences will be accessible in some way. At the conclusion of this step, the list of priority park areas outlines which locations were assessed in steps 4 and 5. Other areas not assessed at this time will be improved as part of future facility alterations or as a component of a future planned construction project.

## Step 4: Identify Services, Activities, and Programs in Each Park Area

Step 4 is the identification of all services, activities, and programs within each priority park area. This process ensured that during step 5 all visitor amenities within a priority area would be assessed. Assessments include both physical and programmatic elements. The lists of services, activities, and programs were the basis for conducting the 19 assessments and documenting all elements as they pertain to providing improved accessibility.

## Step 5: Conduct Accessibility Assessment

During step 5, an interdisciplinary assessment team assessed physical and programmatic barriers within each priority area. Levels of access were identified to understand how usable the existing park program is for people with cognitive, mobility, vision, and hearing disabilities. The three general levels of access were defined by the team:

**Level 1:** a physical or programmatic barrier where program participation is usable by most participants with disabilities

**Level 2:** a physical or programmatic barrier where program participation is possible with assistance or modification

**Level 3:** a physical or programmatic barrier that prohibits participation in a program

Existing conditions and barriers to services, activities, and programs were discussed on-site by the assessment team to determine the current level of access. The assessment team then developed a reasonable range of recommended actions for consideration. Barrier-specific solutions, as well as alternative ways to improve access overall were addressed and included both physical changes and/or the addition of alternate format methods. In some cases, programmatic alternatives needed to be examined, as it was not always possible to eliminate all physical barriers due to limitations such as historic designations, environmental concerns, topography, or sensitive cultural and natural resources. Therefore, a full range of programmatic alternatives to provide access to the key experience for as many visitors as possible was considered.

All collected data, including findings, preliminary options, and conceptual plans, are organized by park area for the park and planning team to use in implementing the recommendations for the transition plan.

## Transition Plan

The following graphic illustrates the primary steps taken in developing the Point Reyes National Seashore transition plan. Public involvement occurred at the draft stage of the transition plan. Once the draft plan was developed, it was released to solicit input from the general public, including people with disabilities and organizations that represent people with disabilities, to provide comments and thoughts on whether the document represents a reasonable review of the park's barriers and a feasible and appropriate strategy for overcoming the barriers. Upon gathering all comments from the public, the park analyzed the comments to determine if any changes to the plan were necessary. Those changes were made before the implementation strategy was finalized. Once finalized, a notification was sent to the public to announce the plan's availability.

# TRANSITION PLAN



6 — Draft Transition Plan

Public Involvement

Final Transition Plan

## Step 6: Draft and Finalize Transition Plan

The final step of the process is drafting and finalizing the transition plan and the park implementation strategy. Developing an implementation strategy can be complex, because making accessibility improvements may present a large range of coordination efforts for scheduling work. It is necessary to schedule improvements strategically and consider the activities and requirements associated with park operations. The final plan will make specific recommendations to improve accessibility, identify time frames for completion of each improvement, and note the parties responsible for each project.

Time frames for implementation of recommended solutions are primarily based on the level of access of the barrier and the ability of the park to complete the work within normal scheduling of park operations and planned improvement projects. Time frames for making improvements are categorized as follows:

**Short-term (0–3 years):** If the improvement does not require supplemental NPS project funding, park staff will initiate the elimination of the barrier internally; or, if a project is currently scheduled for funding, the improvement will be incorporated into the project and the barrier eliminated.

short-term

**Mid-term (3–7 years):** The park will develop a proposal and submit it for those projects requiring supplemental NPS project funding in the next servicewide budget call (servicewide budget calls happen annually). For those projects requiring supplemental NPS project funding, the park will submit a request in the next budget call. Improvements will be scheduled dependent upon the year of receipt of funding. If the improvement does not require supplemental NPS project funding, park staff will continue the elimination of the barrier internally.

mid-term

**Long-term (>7 years):** The park will eliminate the barrier when other work is taking place as part of facility alterations or as a component of a future planned construction project.

long-term



# Implementation Strategy for Point Reyes National Seashore

## Priority Park Areas

Each key park experience at Point Reyes National Seashore is represented within the priority park areas when viewing the park as a whole. Park areas not included in the priority park area list will be upgraded to current code requirements when facility alteration and/or new construction is planned. The priority park areas identified earlier and listed below are those that were assessed and included in the transition plan implementation strategy (featured in alphabetical order). The priority park area locations can be found through the number key and associated map below:



| | | | |
|---|---|---|---|
| **1** | Abbotts Lagoon Trailhead and Trail | **11** | Five Brooks Trailhead |
| **2** | Bear Valley Trailhead and Trail | **12** | Kule Loklo Indian Village |
| **3** | Bear Valley Visitor Center | **13** | Lifeboat Station (including Boathouse) |
| **4** | Chimney Rock Trailhead and Trail | **14** | Lighthouse (including Visitor Center) |
| **5** | Clem Miller Environmental Education Center | **15** | Limantour Beach |
| **6** | Coast Camp and Trail | **16** | North Beach |
| **7** | Drakes Beach (including the Ken Patrick Visitor Center) | **17** | Pierce Point Ranch (including Tule Elk Reserve and Tomales Point Trailhead) |
| **8** | Drakes Estero | **18** | Point Reyes Hostel |
| **9** | Earthquake Trail and Picnic Area | **19** | RCA Point Reyes Receiving Station |
| **10** | Elephant Seal Overlook | **20** | Red Barn |

# Implementation Strategy for Priority Park Areas

The Architectural Barrier Act (ABA) of 1968 requires that any building or facility designed, constructed, altered, or leased with federal funds be accessible and usable by any individuals with disabilities. In 1984, the Uniform Federal Accessibility Standards (UFAS) were adopted for federal facilities. In 2006, the Architectural Barriers Act Accessibility Standards (ABAAS) were adopted for federal facilities. Subsequently in 2011, standards for recreational facilities were added to ABAAS as chapter 10.

Dependent upon the date of a building's construction or alteration, different design standards would apply (i.e., pre-1984, post-1984, post-2006, or post-2011). In conducting the transition plan facility assessments, the 2011 ABAAS standards were used for ease of using only one standard for on-site assessments. Although a barrier may be identified by the current assessment for improvement, facilities constructed pre-1984, or between 1984 and 2011, are only required to be in compliance with the standard in place at the time of construction and/or alteration, and may not be in violation of ABAAS. However, any renovation or upgrade of that building will be required to meet the most current standard at the time of work.

Recommended improvements for park policies, practices, communication, and training are included. Employee areas will be addressed as needed. In the event an employee with a disability is hired by Point Reyes National Seashore, the supervisor and employee will discuss accommodations that are needed by the employee. The supervisor will then determine what accommodations are reasonable within the given work environment. Implementation tables for selected employee areas are included for Point Reyes National Seashore.

Site plans illustrate existing conditions and recommended improvements for each priority park area in a conceptual format. During the implementation phase, reassessment of the project site conditions and consultation with the Architectural Barriers Act Accessibility Standard is strongly recommended to ensure that specific design and programmatic solutions are addressed correctly. Assistance is available at the Denver Service Center and through the Pacific West Region Accessibility Coordinator.

# Abbotts Lagoon Trailhead and Trail

## Site Plan



## Abbotts Lagoon Trailhead and Trail

## Implementation Strategy

Abbotts Lagoon Trail, a two-mile trail, offers an easy hike through open grasslands and coastal scrub, past a freshwater pond, to a bridge crossing over a brackish lagoon. Just beyond the lagoon is the Great Beach, which offers dramatic views of the open ocean from a sandy beach. This park area offers great opportunities to view spring wildflowers, while also being one of the best fall and winter birdwatching areas. Visitors can see shorebirds, waterfowl, sparrows, hawks, osprey, golden eagles, and peregrine falcons. Hiking on the trail offers wilderness experiences and a better understanding of ranching in the surrounding area. Improvements for accessibility to this resource and experience include:

**1** **Car Parking.** 1) Provide one signed and marked "van accessible" parking stall and one signed and marked accessible vehicle parking stall. Stalls should be maximum 2% running and cross slope, 5' marked access aisle and 11' wide van- accessible stall, and 8' wide for vehicle stall. 2) Provide access aisle on the passenger side of the van and driver side of the vehicle. 3) Provide sign for each accessible parking stall, including the van-accessible stall.

long-term

**2** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces.** 1) Provide a firm and stable surface (paved) along outdoor recreation access route from proposed accessible stalls to trailhead features (kiosk, trash and/or recycling, etc.) and smooth out any areas where there is a change in vertical level greater than 1/4".

long-term

**3** **Trash and Recycling.** 1) Provide firm and stable surface to receptacle with accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less. 2) Provide landing in front of trash and recycling receptacle with 2% cross and running slope.

long-term

**4**     **Unisex Restrooms.** 1) The left (northwest) side exceeds accessible grades, remove signage stating it is accessible and direct people to the unisex restroom on the right (southeast). 2) Provide tactile sign on latch side of right side door at 48"–60" high. 3) Remove timber in accessible route.

long-term

**5**     **Outdoor Seating.** 1) Provide a companion seating space with a firm and stable ground surface in front of and next to the bench (36" wide by 48" long).

long-term

**6**     **Trailhead Kiosk/Interpretive Wayside.** 1) Remove italicized text and increase contrast to be 70% or greater by reducing opacity of any background images and make text easy to read. 2) Provide a firm and stable surface (paved) up to trailhead kiosk and regrade to have 2% cross and running slopes.

long-term

**7**     **Hiking Trail.** 1) Regrade trail to have 2% or less cross slopes and a 36" wide minimum tread width. Slope and width improvements will make the first 2,300' of trail accessible. 2) At bridge crossings remove changes in vertical level greater than 1/2". 3) Provide companion seating (36" wide by 48" long) on firm and stable surface next to benches. 4) Ensure trail provides a firm and stable surface with compacted blue shale (maintenance will be needed on a regular basis). 5) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per ABAAS section 1017.10. 6) Develop and provide audio description tour that uses park's existing audio tour system.

long-term

This page intentionally left blank.

# Bear Valley Trailhead and Trail

## Site Plan



## Bear Valley Trailhead and Trail

## Implementation Strategy

Bear Valley Trailhead leads to two popular three-to-six hour hiking opportunities (Sky-Bear Valley Loop at 10.5 miles and Arch Rock via Bear Valley at 8.2 miles). Arch Rock via Bear Valley is the single most popular trail in the park and is a direct link between the Bear Valley Visitor Center and ocean. Both trails provide a hiking experience through Douglas-fir forest, meadows, chaparral, and open grass with coastal views. Visitors can also enjoy birdwatching and viewing wildflowers along the trail in a wilderness setting. At some points, visitors can even stroll along the Bear Valley Creek. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** Note: Provide a total of six accessible stalls split between the two priority park areas: Earthquake Trail and Picnic Area and Bear Valley Trailhead and Trail. 1) Provide two accessible parking stalls at Bear Valley Trailhead and Trail, with one of these being van accessible. Stalls should be maximum 2% running and cross slope, 5' marked access aisle, 8' wide car accessible stall, and 11' wide van accessible stall. Provide a firm and stable surface (paved) up to all elements at trailhead. 2) Place a sign with bottom of the sign at 60" at the front of each accessible parking stall, with the van accessible stall sign stating it is "van accessible."

mid-term

**2** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces.** 1) Provide a firm and stable surface (paved) from parking stall to all elements at the Bear Valley Trailhead (e.g. kiosk, seating, trash and recycling, etc.)

long-term

**3** **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle with accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less. Provide landing in front for trash and recycling receptacle with 2% cross and running slope.

long-term

**4** **Trailhead Kiosk/Interpretive Wayside.** 1) Increase font size to 24-point font and reduce transparency of images where there is a text overlay. Remove any italicized text on the kiosk panel. 2) Provide a firm and stable surface up to and at the kiosk from the designated parking stall.

long-term

**5** **Outdoor Seating.** 1) Provide a companion seating space (36" wide by 48" long) next to the bench. Provide firm and stable surface up to and next to the bench.

long-term

**6** **Compass Wayside.** 1) Provide a firm and stable surface up to and around the wayside with 36" minimum clear space around. 2) Use simple font and increase contrast between gray background and white lettering.

long-term

**7** **Hiking Trail.** 1) Make the hiking trail accessible in accordance with ABAAS section 1017 to the junction of Meadow Trail. The existing trail meets running slope requirements, but requires regrading on 15 different sections of trail where cross slopes exceed 5%. 2) The 0.9 miles of trail from Meadow Trail to Divide Meadows exceeds ABAAS requirements for both running and cross slope and cannot be rerouted due to topography and the adjacent creek. 3) Provide trailhead information signage including trail conditions (length, surface type, width, running slope, and cross slope per ABAAS section 1017.10.  Signage should denote that the first 0.8 miles is moderately accessible and the next 0.9 miles is not accessible per ABAAS requirements. 4) Regrade entry route to the Divide Meadows restroom at 5% and remove obstacles greater than 1/2".

long-term

This page intentionally left blank.

# Bear Valley Visitor Center

## Site Plan



MATCHLINE - SEE KULE LOKLO INDIAN VILLAGE (1) FOR MORE INFORMATION

Scale: 1" =50'

0   25   50   100   200'

## Bear Valley Visitor Center

## Implementation Strategy

Bear Valley Visitor Center is the primary visitor center for Point Reyes National Seashore. It provides an orientation of the park's visitor destinations, human, and natural history. The Bear Valley Visitor Center was designed to blend in with the historically significant ranching culture of this area and is located in the heart of the Olema Valley. The interior exhibit space provides a glimpse of the diverse ecosystems and cultural heritage of the park and includes a seismograph, touch table, auditorium, and book sales area. Audio-visual programs, shown in the auditorium, are available upon request. Permits for backcountry camping, as well as beach fire permits, may be obtained here. Visitors are also directed on the best locations within Point Reyes National Seashore to view wildlife, watch bird, see wildflowers, hike trails throughout the park including in wilderness, and visit the Lighthouse. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Provide four accessible parking stalls, with one of these being van accessible. Stalls should be maximum 2% running and cross slope, 5' marked access aisle, 8' wide car accessible stall, and 11' wide van accessible stall. Disperse stalls to have three near visitor center and one near the Kule Loklo Trailhead. 2) Place a sign with bottom of the sign at 60" at the front of each accessible parking stall, with the van accessible stall sign stating it is "van accessible."

long-term

**2** **Oversize Vehicle Parking.** 1) Provide one oversize accessible parking stall for vehicles with horse trailers. Stall should be maximum 2% running and cross slope, 5' marked access aisle, and 11' wide oversize vehicle stall. Provide a firm and stable surface (paved). 2) Place a sign to the side of the parking stall, still allowing for pull through with bottom of sign at 60".

mid-term

**3** **Bus Drop-off Area.** 1) Use paint striping to reroute drop off. Note: If bus drops off in new location all the way up to walkway edge, slopes meet requirements (see map).

long-term

**4** **Accessible Route and Walking Surfaces.** 1) From accessible parking, oversize vehicle accessible parking, and bus drop-off area to front door regrade walkway to meet maximum 5% running slope and 2% cross slope.

long-term

**5** **Accessible Route and Walking Surfaces.** 1) From bus shelter and drop off to front door, ensure steps provide firm and stable surface and consistent tread widths without openings in ground surface. 2) Replace individual hand railings with one continuous railing.

long-term

**6** **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle with a landing in front of trash and recycling receptacle at 2% cross and running slope. 2) Provide an accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less.

long-term

**7** **Public Telephone.** 1) Regrade surface to provide level area adjacent to telephone (2%). Note: Alternatively, public telephone could be moved to an existing level area.

long-term

**8** **Men's Restroom.** 1) Relocate toilet paper dispensers, urinal, mirrors and soap dispensers to appropriate heights. 2) Wrap sink piping. 3) Add tactile tape under hand dryers to alert cane users.

long-term

**9** **Women's Restroom.** 1) Relocate toilet paper dispensers.  2) Wrap sink piping. 3) Add tactile tape under hand dryers.

long-term

**⑩ Visitor Center.** 1) Lower counter to allow for parallel approach use (36" maximum height and 36" long minimum). 2) Adjust interior door pressures to five pounds or less. 3) Remove 4" projecting door opener between 34" and 80" to allow for required door width 32" minimum. 4) Regrade landing to be level (2% max). 5) Provide signage to notify public of wheelchair availability. 6) Train staff that captioning should always be turned on. 7) Provide signage for visitors so they understand available options. 8) Add feet to bottom of bench to raise height 1/2" to meet minimum bench height requirements (Range 17"-19"). 9) Provide assistive listening devices, educate staff on their use and provide signage on availability.

`long-term`

**⑪ Visitor Center Exhibits and Interpretive Panels.** 1) Replace underlayment on carpet to correct threshold and slopes on ramp to exhibits and panels. 2) Add tactile exhibits to interpret key messages throughout the gallery. 3) Add periscope to provide alternative telescope experience from lower level. 4) Reposition angled interpretive panels to remove barriers to route of travel. 5) Add braille information and audio description tour. 6) Provide signage indicating accessible alternatives, such as audio description, braille, large print, etc. 7) Replace panels with appropriate color contrast to allow better use by persons with low-vision. 8) Provide transcript and audio description for all multimedia presentations. 9) Ensure videos are open captioned. 10) Provide audio description and large print transcript for Science on a Sphere presentations.

`long-term`

**⑫ Theater.** 1) Provide two dispersed wheelchair spots (one in front and one in back) within moveable seating arrangement. Allow for 36" access aisle. 2) Develop a park standard operating procedure for chair dispersal / set up. 3) Provide tactile signage on latch side of doors at 48"-60" for wayfinding.

`short-term`

**⑬ Bookstore and Gift Shop.** 1) Reconfigure counter to allow for shorter reach range at 48" maximum with parallel approach.

`mid-term`

**⑭ Tactile Signage.** 1) Provide tactile signage on latch side of doors to permanent rooms at 48"-60" for wayfinding (e.g. theater, men's restroom, women's restroom, and bookstore).

`mid-term`

# Chimney Rock Trailhead and Trail and Elephant Seal Overlook

## Site Plan







# Chimney Rock Trailhead and Trail and Elephant Seal Overlook

## Implementation Strategy

Chimney Rock Trail is a two-mile partial loop on a Point Reyes National Seashore bluff overlooking the ocean. There are spectacular views of wildflowers along this trail in the spring, and opportunities for viewing seals, sea lions, whales, and birds. Chimney Rock Trail also offers opportunities to better understand the influence of human history in the area. Elephant Seal Overlook is also in the vicinity of the Chimney Rock Trailhead and is the best place in the park to view and observe elephant seals, especially from December to March. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Pave or otherwise stabilize the accessible parking and access aisle surface.

mid-term

**2** **Bus Drop Off.** 1) Allow accessible vehicles to drive themselves even during road closure. 2) Provide permanent bus signage in accessible formats (e.g. large print). Note: Alternatively, regrade alighting area and pave to provide a firm and stable surface. Connect bus shelter to drop off area or provide ramped access. Add tactile warning strips to shelter floor edges for cane detection.

mid-term

**3** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces to Chimney Rock Trailhead and Wayside.** 1) Pave or otherwise stabilize the route with cross slopes of 2% maximum. 2) Provide a firm and stable surface on route to interpretive waysides. Note: Alternatively, consider moving waysides to main trailhead.

mid-term

**4** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces to Elephant Seal Overlook.** 1) Regrade and repave to have a 5% or less cross and running slope from the edge of road to overlook. Note: Alternatively, consider providing full access to the overlook by constructing an accessible parking space at the beginning of trail.

mid-term

**5** **Unisex Restroom.** 1) Replace latches to be opened with a closed fist. 2) Add tactile signage on latch side of door at 48"–60" above floor.

mid-term

**6** **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle with landing in front for trash and recycling receptacle at 2% cross and running slope. 2) Provide accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less.

mid-term

**7** **Trailhead Kiosk.** 1) Provide large-print, accessible electronic document, braille, and audio description at visitors centers and on website about trailhead kiosk wayfinding and orientation information for increased visual access. Ensure information is provided in a clear and simple topic hierarchy. Use sans serif fonts. Make all font sizes 24-point or larger with a minimum 70% contrast between text and images or background color. Remove any unnecessary italicized or underlined fonts.

mid-term

**8** **Interpretive Wayside.** 1) Provide large print, accessible electronic document, braille, and audio description at visitors centers and on website about trailhead kiosk wayfinding and orientation information for increased visual access. Ensure information is provided in a clear and simple topic hierarchy. Use sans serif fonts. Make all font sizes 24-point or larger with a minimum 70% contrast between text and images or background color. Remove any unneccesary italicized or underlined fonts. Latin names of plants are in italics; this is an allowable exception to the code. 2) Pave or otherwise stabilize the landing surface.

mid-term

**9** **Chimney Rock Hiking Trail.** 1) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per ABAAS section 1017.10. 2) Develop and provide audio description tour that uses park's existing audio tour system.

mid-term

**❿ Elephant Seal Overlook Hiking Trail.** 1) In sections where geogrid is exposed, add more aggregate material and compact. 2) Provide a 4" high edge protection along section of trail that drops off. 3) Add a handrail at 34" in same locations. 4) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per ABAAS section 1017.10. 5) Develop and provide audio description tour that uses park's existing audio tour system.

long-term

**⓫ Outdoor Seating / Bench.** 1) Provide a 36" wide by 48" deep companion seating option next to the bench with a firm and stable surface. 2) Add a second bench option closer to the railing to allow seal viewing while seated.

long-term

# Clem Miller Environmental Education Center

## Site Plan



Scale: 1" = 50'

0   25   50   100   200'

## Clem Miller Environmental Education Center

## Implementation Strategy

Clem Miller Environmental Education Center is located in the valley of the Phillip Burton Wilderness. The center accommodates up to 86 overnight guests in five dormitory-style cabins. Facilities include a large cedar lodge with dining room, library science center, and commercial kitchen. The site also includes a bathhouse, large central meadow for picnicking and gatherings, a campfire center or amphitheater and immediate access to hiking trails. Guests can view birds and wildflowers within a wilderness setting, while also learning about how human history formed and impacted the area. The center is a model of ecological sustainability with composting and recyclying systems, solar-heated water, and photovoltaic modules providing electricity. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Provide one van-accessible stall at maximum 2% running and cross slope, 5' marked access aisle and 11' wide. 2) Provide "van accessible" signage with bottom of sign at 60" minimum.

long-term

**2** **Accessible Route and Walking Surfaces.** 1) Elongated openings not perpendicular to path of travel will remain as is. There are no gaps between boards. If gapping increases in the future, consider changing direction of boards. 2) Provide a firm and stable and 2% cross and running sloped landing at the bottom of the ramp (handrails will not need to be extended due to protrusion). 3) Remove any changes in vertical level 1/4" and greater. 4) Provide three sets of handrails on the stairs off the front porch—one set on each side and one in the middle extended 12" beyond bottom and top stair.

long-term

**3** **Clem Miller Education Center.** 1) Reduce pressure to open interior doors to five pounds or less. 2) Provide 36" accessible routes around moveable seating and integrated seating at tables. (Refer to park policies and practices, communication, and training implementation). 3) Move interpretive panels down to eye level and to accessible location with firm and stable surface up to and at panel. 4) Make all text 24-point font with simple fonts and reduce transparency of background image or move image to be separate and not behind text. 5) Move tactile and interactive exhibits (skulls, etc.) down to an accessible reach range (48" maximum).

short-term (3.1)

short-term (3.2)

long-term (3.3–3.5)

**4** **Tactile Signage.** 1) Move tactile signage to 48"–60" above finish floor on latch side of the door with an 18" by 18" clear floor space below the sign for all rooms that are permanent (e.g., classroom, kitchen, restrooms, infirmary, leader quarters, unisex restroom in Clem Miller, etc.).

mid-term

**5** **Unisex Restroom.** 1) Redesign space to be 60" wide minimum and 59" long minimum (Note: this may mean removing an adjoining storage closet or reducing the size of the office). 2) Move toilet paper dispenser to 7"–9" in front of toilet on wall. 3) Insulate pipes under sink.

short-term

**6** **Kitchen.** 1) Remove mats when there is a cook with a disability in kitchen.

short-term

**7** **Picnic Facilities on Deck.** 1) Provide a 36" wide accessible route between picnic tables and place at least two accessible picnic tables (20% of total) with integrated seating spot on ends or middle.

short-term

**8** **Picnic Facilities in Open Space.** 1) Provide a firm and stable 3" wide accessible route to two picnic tables and place at least two accessible picnic tables (20% of total) with integrated seating spot on ends or middle.

long-term

**9** **Drinking Fountain.** 1) Provide a firm and stable (paved) surface up to the drinking fountain. 2) Lower fountain so that spout is at 36" above the ground, with 27" clear knee space under the unit.

long-term

**10** **Men's Restroom and Showers.** 1) Rehabilitate restroom and shower interiors and doors, including toilet fixtures, shower, dispensers, toilet compartment, shower stalls, grab bars and accessory items to meet the requirements of ABAAS Chapter

2 Toilet and Bathing Facilities (subsections-F206.4, F213, and F216.8) and Chapter 6 Plumbing Elements and Facilities.

long-term

**⑪**   **Women's Restroom and Showers.** 1) Rehabilitate restroom and shower interiors and doors, including toilet fixtures, shower, dispensers, toilet compartment, shower stalls, grab bars and accessory items to meet the requirements of ABAAS Chapter 2 Toilet and Bathing Facilities (subsections-F206.4, F213, and F216.8) and Chapter 6 Plumbing Elements and Facilities.

long-term

**⑫**   **Leader Cabin Accessible Route, Restrooms, and Shower.** 1) Redesign route to provide a 36" wide minimum accessible pathway that is 5% or less from the education center to front door of the education center. 2) Redesign shower room for an accessible roll-in type shower. 3) Move trash can to be out of the path of travel. 4) Move back wall grab bar to 33"–36" maximum above finish floor. 5) Move toilet paper dispenser to 7"–9" in front of toilet. 6) Move mirror to 40" maximum above finish floor.

long-term

**⑬**   **Children's Cabin Acccessible Route and Living Quarters.** 1) Remove any changes in vertical level greater than 1/4" and make flush asphalt to boardwalk surfaces. Remove any 1/2" gaps between boards. 2) Move fire extinguisher to 48" maximum reach range. 3) Switch the bunk beds with a single bunk in the middle so there is an accessible route and transfer position.

long-term

**⑭**   **Amphitheater and Trail.** 1) Increase height of seating surface to 17"–19" above ground. 2) Provide a firm and stable compacted aggregate surface to the amphitheater; or in the meantime provide a beach wheelchair that can help get people to the amphitheater. (Note: this is a short-term solution until a firm and stable route can be provided). 3) Provide a 36" wide ramp with handrails to top of stage and barrier or handrail for front of stage. 4) Provide two integrated wheelchair seating spaces in amphitheater, one in the front and one in the back that is not in the path of travel.

long-term

# Coast Camp and Trail

## Site Plan 1



## Coast Camp and Trail

### Implementation Strategy Site 1

Coast Camp is a hike-to campground nestled within a small coastal grassy valley with easy access to the beach and tidepools. Coast Camp has 12 individual sites that can accommodate up to six people each and two group sites that can accommodate up to 25 people. The campground has a vault toilet and water faucet. Campsites are complete with a picnic table, food storage locker, and charcoal grill. Coast Trail is one of the trails that reaches Coast Camp and loops in with Laguna Trail. It is 2.7 miles long on coastal bluffs and riparian zones, and is open to bicycles. Coast Trail goes through Point Reyes National Seashore wilderness areas and provides views of the ocean, hawks, and shorebirds in the area. Visitors are offered views of the surrounding landscape and coast. Improvements to accessibility for this resource and experience include:

**1** **Coast Trail.** 1) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per ABAAS section 1017.10. 2) Develop and provide audio description tour that uses park's existing audio tour system. 2) Options for providing an accessible camping experience include: 2a) provide a reservation system to allow people with mobility impairments to access the campsite with their vehicles. Provide accessible parking stalls at accessible campsites, 2b) allow options for horse concessioner to carry in visitors, or 2c) provide beach wheelchair or other off-road independently operated wheelchair with storage for people to check out and use to access campsite.

long-term

**2** **Group Campsite.** 1) Provide one van-accessible stall at maximum 2% running and cross slope, 5' marked access aisle and 11' wide for group campsite. 2) Provide a firm and stable surface at accessible group campsite. 3) Provide accessible picnic table with 36" clear space and pedestal grill with 48" clear space around all sides. 4) At group campsite provide one firm and stable tent pad and one firm and stable platform (17" height) with 48" clear space. 5) Place a sign indicating group campsite is accessible.

long-term

**❸ Water Spigot.** 1) Provide a firm and stable surface via the outdoor recreation access route to the water spigots. There should be a 72" by 48" clear space with the long side of the space adjoining or overlapping the outdoor recreation access route. 2) Replace spigot with an accessible spigot that can be operated with a closed fist. Locate the spigot at 11" minimum and 12" maximum from the rear center of the long side of the space.

long-term

**❹ Accessible Route and Walking Surfaces.** 1) Provide an accessible route from proposed car parking stall to unisex restroom. Ensure ground surface leading up to the restroom is level (with no vertical changes in level greater than ¼", unless beveled then ½"). Provide an 18" clear space that is firm and stable on latch side of door. Route must be at least 60" wide minimum for turning space and 2% running and cross slope.

long-term

**❺ Unisex Restrooms.** 1) Provide one van- accessible stall at maximum 2% running and cross slope, 5' marked access aisle and 11' wide for unisex restroom. Relocate restroom along outdoor recreation access route to campsites. Move tactile signs to be on the latch side of each door at 48"–60" above finish floor.

long-term

**❻ Outdoor Recreation Access Route (ORAR) and Walking Surfaces**. 1) For primary outdoor recreation access route provide a firm and stable surface from campground entrance to and at accessible campsites (road and site). Note: Within route, keep accessible running grades in mind (maximum length 200' can only be 5%–8.33% and maximum length 30' can only be 8.33%–10% before a landing is required). Route must be at least 36" wide minimum and 2% cross slope.

long-term

This page intentionally left blank.

# Coast Camp and Trail

## Site Plan 2



Scale: 1" = 50'

0    25    50    100    200'

## Coast Camp and Trail

## Implementation Strategy Site 2

**3** **Water Spigot.** 1) Provide a firm and stable surface via the outdoor recreation access route to the water spigots. There should be a 72" by 48" clear space with the long side of the space adjoining or overlapping the outdoor recreation access route. 2) Replace spigot with an accessible spigot that can be operated with a closed fist. Locate the spigot at 11" minimum and 12" maximum from the rear center of the long side of the space.

long-term

**6** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces.** 1) For primary outdoor recreation access route provide a firm and stable surface from campground entrance to and at accessible campsites (road and site). Note: Within route, keep accessible running grades in mind (maximum length 200' can only be 5%–8.33% and maximum length 30' can only be 8.33%–10% before a landing is required). Route must be at least 36" wide minimum and 2% cross slope.

long-term

**7** **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle with a landing in front of trash and recycling receptacle with 2% cross and running slope. 2) Provide an accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less.

long-term

**8** **Individual Campsite.** 1) Provide one van-accessible stall at maximum 2% running and cross slope, 5' marked access aisle and 11' wide for individual campsite. 2) Provide one accessible campsite for individuals at site 12. Provide a firm and stable surface. 3) Provide accessible picnic table with 36" clear space. 4) Provide a pedestal grill with 48" clear space. 5) At individual campsite provide one firm and stable tent pad. 6) Place a sign indicating individual campsite is accessible.

long-term

# Drakes Beach

## Site Plan



009331

## Drakes Beach

## Implementation Strategy

Drakes Beach is a wide stretch of beach backed by dramatic white sandstone cliffs. This park area includes a small cafe and the Ken C. Patrick Visitor Center, which includes exhibits that focus on 16th century maritime exploration, human history, ranching, marine fossils, and marine environments. A minke whale skeleton is suspended from the ceiling and the bookstore offers books on history, as well as cards and posters. Visitors can enjoy birdwatching from the beach. Drakes Beach offers an Annual Sand Sculpture Contest on Labor Day. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Provide a total of eight accessible parking stalls with two van-accessible parking stalls and four accessible vehicle parking stalls closest to ocean, provide curb cut at end of each access aisle. Provide one van-accessible parking stall by each accessible picnic site. 2) Provide sign for each accessible parking stall, with bottom of sign at 60" above ground.

short-term

**2** **Oversize Vehicle Parking.** 1) Provide two signed and marked oversize vehicle parking stalls across from bus shelter at 2% cross and running slope. Stall should be 11' wide minimum with a 5' access aisle on passenger side of vehicle. 2) Provide one sign for both stalls on island or to the side for oversize vehicle accessible parking stalls to pull through, with bottom of sign at 60" above ground.

short-term

**3** **Outdoor Seating on Planter Box.** 1) Repair or replace seating to be 17"–19" above ground surface. 2) Cut out four sections for companion seating within the circle for two wheelchairs.

long-term

**4** **Walking Surfaces and Accessible Route.** 1) Remove any changes in vertical level greater than ¼" and any spaces between boards with ½" spacing between them.

long-term

**5** **Picnic Facility by Visitor Center.** 1) Provide one accessible picnic table with integrated seating and 36" clear space around the tables on the deck at the visitor center.

short-term

009332

**6** **Concessions.** 1) Install accessible doors within interior to require five pounds or less in force to open. 2) When design and construction takes place, make sure all elements are accessible (routes, eating and dining surfaces, check out counter, kitchen, etc.) 3) Provide tactile signage at 48"–60" on latch side of door for (future) permanent concessions space.

`short-term`

**7** **Courtyard Outdoor Seating and Gathering Space, Water Fountain,Telephone, Trash and Recycling, and Interpretive Panels.** 1) Provide some seating with backs and armrests and make sure all are at a 17"–19" height. 2) Provide locations for companion seating with cuts in the current benches. 3) Remove the bottom shelf on the public telephone and move the book to the side of the unit. 4) Move public telephone unit down to an accessible reach range still leaving knee clearance. 5) Adjust pressure on water fountain or replace with new water fountain with lever or button that requires only five pounds of pressure. 6) Provide a firm and stable surface at trash and recycling at 2% cross and running slope. 7) Replace with accessible trash and recycling receptacle that is operable with a closed fist. 8) Provide 24-point font on interpretive panels with at least 70% contrast between text and images or background colors. Remove all italic text.

`mid-term`

**8** **Men's Restroom.** 1) Provide tactile signage at 48"–60" on latch side of door. 2) Lower baby changing station so that top of lip is at 34" height. 3) Provide door pulls on both sides of the accessible bathroom stall.

`short-term`

**9** **Women's Restroom.** 1) Provide tactile signage at 48"–60" on latch side of door. 2) Lower coat hanger to 48" maximum. 3) Provide tactile signage to restroom on latch side of the door at 48"–60". 4) Provide door pulls on both sides of the accessible bathroom stall.

`short-term`

**10** **Visitor Center.** 1) Provide a variety of book options at different shelf levels within reach range. 2) Provide tactile signage at 48"–60" on latch side of doors for any permanent rooms inside the visitor center. 3) Remove desk wall on end closest to the room wall to have knee clearance for visitors at information desk and service counter.

`short-term` (10.1–10.2)     `mid-term` (10.3)

⓫ **Visitor Center Exhibits and Interpretive Waysides.** 1) Move tactile models on the floor to another location out of the 36" wide circulatory paths. 2) Identify specific objects that are meant to be touched and not touched. 3) Bring items out of cases that are replicas, and leave items in cases that are fragile or not replicas and interpret through signage for people who are blind or low vision. 4) Improve interpretive waysides to have high contrast, simple 24-point lettering, and 70% contrast between text and images or background color. 5) Provide large print transcript and audio description tour of interpretive exhibits and waysides.

| short-term | (11.1–11.2) | mid-term | (11.3) |

| long-term | (11.4–11.5) |

⓬ **Viewing Area.** 1) Provide turning space at viewing area with firm and stable surface and no drop-offs on the edge.

| long-term |

⓭ **Beach Access.** 1) Provide accessible beach access route closest to the visitor center with a combination of boardwalk and temporary roll-out mat with a firm and stable surface that meets accessibility requirements with passing and resting spaces up to the high water mark.

| long-term |

⓮ **Peter Behr Hiking Trail.** Trail experience is provided at Earthquake Trail, no accessibility improvements will be made beyond the trailhead due to steep grades (ABAAS section 1019 "Conditions for Exception - Hiking Trail" 1017.1 Exception 1). 1) Clear ice plant for a clear path of 36" wide with 60" by 60" passing spaces and resting intervals. 2) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per ABAAS section 1017.10. 3) Develop and provide audio description tour that uses park's existing audio tour system.

| short-term |

⓯ **Picnic Facility around Parking Lot.** 1) Provide two accessible picnic sites (located near each individual accessible parking stall) with curb cuts from designated accessible parking stall to picnic site with firm and stable surface, clear space. 2) Provide an accessible picnic table with integrated seating space on ends or middle.

| long-term |

# Drakes Estero

## Site Plan



## Drakes Estero

### Implementation Strategy

Drakes Estero is one of the last pristine estuaries on the California coast. This park area is a kayaking destination with views of eelgrass, oyster beds, bat rays, leopard sharks, harbor seals, and water fowl, such as white pelicans. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Provide one signed and marked "van accessible" parking stall and one signed and marked accessible vehicle parking stall. Stalls should be maximum 2% running and cross slope, 5' marked access aisle and 11' wide van-accessible stall, and 8' wide for vehicle stall. Provide access aisle on the passenger side of the van and driver side of the vehicle. 2) Provide "van accessible" signage with bottom of sign at 60" minimum and another accessible sign at vehicle stall.

short-term

**2** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces.** 1) Provide firm and stable surface (paved) from parking stall to all elements at the Drakes Estero Kayak Launch (e.g., kiosk, restroom, trash and recycling, and kayak launch, etc.). Remove changes in vertical level greater than ¼" on route to restroom from parking stall.

short-term

**3** **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle and provide a landing in front for trash and recycling receptacle with 2% cross and running slope. 2) Replace with an accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less.

short-term

**4** **Unisex Restrooms.** 1) Move tactile signage to 48"–60" above finish floor on latch side of the door with an 18" by 18" clear floor space below the sign.

short-term

**5** **Information Kiosk.** 1) Increase font size to 24-point and change fonts to a legible sans serif font. 2) Replace kiosk material and remove glass so that there is no clouding. 3) Provide a firm and stable surface up to and at the kiosk from the designated accessible parking stall.

short-term

**⑥** **Beach Access and/or Kayak Launch.** 1) On determined beach access route provide temporary roll-out mat for a firm and stable surface, make sure cross slopes are at 2% grade if use temporary roll-out mat . Ensure running slopes meet the following requirements (for 50' the slope stays between 5% and 8.33%, and for 30' the slope stays between 8.33% and 10%).

short-term

This page intentionally left blank.

# Earthquake Trail

## Site Plan



Scale: 1" = 50'

0    25    50    100    200'

## Earthquake Trail

## Implementation Strategy

Earthquake Trail, a 0.6-mile trail, is a short paved loop beginning near the Bear Valley Visitor Center. It explores the San Andreas Fault Zone and has interpretive signs which describe the geology and human history of the park area. Visitors can view wildlife from the trail. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Provide four accessible stalls, with one of those being van accessible, near the Earthquake Trailhead. Stalls should be maximum 2% running and cross slope, 5' marked access aisle, 8' wide car accessible stall, and 11' wide van-accessible stall. Provide firm and stable surface (paved) up to all elements at trailhead. 2) Provide signage with bottom of sign at 60" above the ground, designating the stall "van accessible."

mid-term

**2** **Outdoor Seating / Bench.** 1) Cut out section (36" wide) of bench for companion seating at restroom.

long-term

**3** **Water Fountain.** 1) Provide firm and stable surface extended 36" around all sides of the water fountain.

long-term

**4** **Men's Restroom.** 1) Rehabilitate restroom interiors and doors, including toilet fixtures, dispensers, toilet compartment, grab bars and accessory items to meet the requirements of ABAAS Chapter 2 Toilet and Bathing Facilities (subsections-F206.4, F213, and F216.8) and Chapter 6 Plumbing Elements and Facilities.

long-term

**5** **Women's Restroom.** 1) Rehabilitate restroom interiors and doors, including toilet fixtures, dispensers, toilet compartment, grab bars and accessory items to meet the requirements of ABAAS Chapter 2 Toilet and Bathing Facilities (subsections-F206.4, F213, and F216.8) and Chapter 6 Plumbing Elements and Facilities.

long-term

**6**    **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle with a landing in front for trash and recycling receptacle at 2% cross and running slope. 2) Provide an accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less.

mid-term

**7**    **Individual Picnic Site.** 1) Provide one individual accessible picnic site, within a 36" clear space between picnic tables with a firm and stable surface up to and around the accessible picnic site from the primary outdoor recreation accessible route or Earthquake trail, whichever is the closet point of connection. 2) Provide accessible picnic tables at sites with integrated wheelchair spot in the middle or ends of the table.

long-term

**8**    **Group Picnic Site.** 1) Provide one accessible group site, with a 36" clear space between picnic tables with a firm and stable surface up to and around the accessible picnic site from the primary outdoor recreation accessible route or Earthquake trail, whichever is the closest point of connection. 2) Provide accessible picnic tables at sites with integrated wheelchair spot in the middle or ends of the table.

long-term

**9**    **Trailhead Kiosk.** 1) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per ABAAS section 1017.10.2) Ensure there are no italics, increase font size on captions, and reduce transparency of images where there is a text overlay. 3) Provide a firm and stable surface up to trailhead kiosk.

long-term

**10**    **Outdoor Seating / Bench.** 1) Replace benches along trail with 17"–19" seating surface. 2) Provide a firm and stable surface for companion seating and approaching the bench.

long-term

⓫ **Interpretive Waysides.** 1) Remove all italics, increase font size on captions, and reduce transparency of images where there is a text overlay. 2) Provide a firm and stable surface up to and at all interpretive waysides.

long-term

⓬ **Hiking Trail.** 1) Regrade and resurface trail to have a maximum 2% cross slope and running slopes that meet ABAAS section 1017. 2) Reduce spacing between boardwalk boards to less than ½" and smooth out vertical transition from asphalt to boardwalks to be ¼" or less. Patch cracks and depressions found along the trail. 3) Develop and provide audio description tour that uses park's existing audio tour system. 4) Provide alternative formats for cell phone tour—large-print signage with large-print map of stops. 5) Provide GPS activated audio for individuals participating in the program.

long-term

# Five Brooks Trailhead

## Site Plan



Scale: 1" = 50'

0   25   50   100   200'

## Five Brooks Trailhead

## Implementation Strategy

The Five Brooks Trailhead offers easy access and miles of trails to visitors, but is primarily used by equestrians. One of the primary trails that heads out from Five Brooks Trailhead is the Olema Valley Trail, an 11-mile trail, that traces the rift zone of the San Andreas Fault through Olema Valley. A biologically rich landscape can be seen with a mosaic of Douglas-fir, oak, bay, laurel, fern, bramble, birds, and some wildflowers. The trail weaves throughout wilderness and ranching landscapes. The park area also provides a full service riding stable with guided trail rides to enjoy the scenery. Equestrian trail rides include nearly 120 miles of trails that take visitors to forested mountain tops, grassy meadows, coastal scrub, and miles of white sand beaches. Improvements to accessibility for this resource and experience include:

**❶ Car Parking.** 1) Provide one signed and marked van-accessible parking stall and one accessible vehicle parking stall. Stalls should be maximum 2% running and cross slope, 5' marked access aisle and 11' wide van-accessible stall, and 8' wide for vehicle stall. Provide access aisle on the passenger side of the van and driver side of the vehicle. 2) Provide "van accessible" signage with bottom of sign at 60" minimum and another accessible sign at vehicle stall.

long-term

**❷ Oversize Vehicle / Horse Trailer Parking.** 1) Provide one signed and marked oversize vehicle accessible parking stall. Stall should be maximum 2% running and cross slope, 5' marked access aisle and 11' wide accessible stall. Provide firm and stable surface (paved) at stall and up to restrooms, trailhead kiosk, picnicking area, etc. 2) Provide "oversize vehicle accessible" signage to the side with bottom of sign at 60" minimum.

long-term

**❸ Outdoor Recreation Access Route (ORAR) and Walking Surfaces.** 1) Provide a firm and stable surface (paved) from parking stall to all elements at the Five Brooks Trailhead (e.g., trailhead kiosk, picnic tables, trash and recycling, vault toilets, etc.).

long-term

**4** **Unisex Restroom.** 1) Move tactile signage to 48"–60" above finish floor on latch side of the door with an 18" by 18" clear floor space below the sign for the restroom. 2) Move side wall grab bar forward so that it is 42" in length and 12" in front of back wall.

long-term

**5** **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle and provide a landing in front for trash and recycling receptacle with 2% cross and running slope. 2) Provide an accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less.

long-term

**6** **Trailhead Kiosk.** 1) Increase font size to 24-point and reduce transparency of images where there is a text overlay. Remove any italicized text on the kiosk panel. 2) Provide a firm and stable surface up to and at the kiosk from the designated parking stall. 3) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per ABAAS section 1017.10.

long-term

**7** **Picnic Facility.** 1) Relocate picnic area to field north of fencing. Provide a 36" wide route and clear space around picnic tables and an accessible outdoor recreation access route from trailhead to accessible picnic locations. 2) Provide at least two accessible picnic tables (20% of total) with integrated seating spot on ends or middle.

long-term

**8** **Concessioner Customer Parking and Outdoor Recreation Access Route (ORAR) and Walking Surfaces.** 1) Provide one van-accessible parking stall. Stall should be maximum 2% running and cross slope, with a 5' marked access aisle and 11' wide. Provide firm and stable surface (paved) at stall and up to facility services. Provide a firm and stable surface (paved) from the proposed van-accessible stall to check-in-desk/picnic table. 2) Provide "van accessible" signage with bottom of sign at 60" minimum.

long-term

**9** **Horseback Riding Concession Services.** 1) Provide map with 24-point text of important information (e.g., horse trail routes and names). Keep simple and easy to read. 2) Provide an accessible ramp to transfer onto horse.

mid-term (9.1)

long-term (9.2)

**10** **Concessioner Check-in Desk.** 1) Provide a firm and stable surface (paved) up to and around an accessible picnic table (36" clear space around) at 2% or less cross and running slope. 2) Provide an accessible picnic table with integrated wheelchair space on ends or in middle

long-term

**11** **Concessioner Picnic Facility.** 1) Provide a firm and stable (paved) 36" wide accessible route between picnic tables. 2) Place at least two accessible tables (20% of total) with integrated seating spot on ends or middle.

long-term

# Kule Loklo Indian Village

## Site Plan 1



MATCHLINE - SEE 2 FOR MORE INFORMATION

Scale: 1" = 100'

0   50   100   200   400'

MATCHLINE - SEE BEAR VALLEY VISITOR CENTER FOR MORE INFORMATION

009347

## Kule Loklo Indian Village

## Implementation Strategy Site 1

An exhibit of a recreated Coast Miwok Village, Kule Loklo illustrates traditional building techniques and village life before the arrival of European cultures. Every year, some 45,000 visitors explore Coast Miwok history and culture through ranger-led programs, self-guided walks, Junior Ranger exercises, and formal education programs at Kule Loklo. A self-guided 0.3-mile trail with wayside exhibits leads visitors to the site from the Bear Valley Visitor Center. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Provide one signed and marked "van accessible" parking stall and two signed and marked accessible vehicle parking stall. Stalls should be maximum 2% running and cross slope, 5' marked access aisle and 11' wide van-accessible stall, and 8' wide for vehicle stall. Provide access aisle on the passenger side of the van and driver side of the vehicle. Stalls are dispersed between the Bear Valley Visitor Center parking lot and Kule Loklo Indian Village. 2) Provide sign for each accessible parking stall, including one at the van-accessible stall with bottom of the sign at 60" above the ground.

long-term

**2** **Trailhead Kiosk.** 1) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per ABASS section 1017.10. 2) Provide a firm and stable surface up to trailhead kiosk with a 2% cross and running slope. 2) Ensure there are no italics and underlines, font size is 24-point, and contrast is 70% minimum.

long-term

**3** **Trail from Bear Valley Visitor Center.** 1) Reconstruct 1,800' of trail to Outdoor Recreation Access Route standards (ORAR) from Bear Valley Visitor Center to Village, which would require realignment of first 500' of trail, plus installing firm and stable trail tread for full length of trail. 2) When replacing wayside exhibits, provide a landing at 2% cross and running slope at each wayside. Ensure there is 70% contrast and fonts are 24-point sans serif. 3) Install sign at trail entry notifying visitors of alternate access route and accessible parking stalls. Provide trailhead information signage on trail conditions (length, slopes, and services found along the trail). 4) Develop and provide audio description tour that uses park's existing audio tour system.

long-term

# Kule Loklo Indian Village

## Site Plan 2



MATCHLINE - SEE 3 FOR MORE INFORMATION

3

Scale: 1" = 100'

0   50   100        200                400'

MATCHLINE - SEE 1 FOR MORE INFORMATION

Kule Loklo Indian Village

Implementation Strategy Site 2

**③** **Trail from Bear Valley Visitor Center.** See Kule Loklo Indian Village Site 1.

long-term

009350

Kule Loklo Indian Village

Site Plan 3



MACHLINE - SEE 3 FOR MORE INFORMATION

Scale: 1" = 100'

0    50    100    200    400'

009351

Kule Loklo Indian Village

Implementation Strategy Site 3

**1** **Car Parking.** 1) Provide one signed and marked "van accessible" parking stall and two signed and marked accessible vehicle parking stall. Stalls should be maximum 2% running and cross slope, 5' marked access aisle and 11' wide van-accessible stall, and 8' wide for vehicle stall. Provide access aisle on the passenger side of the van and driver side of the vehicle. Stalls are dispersed between the Bear Valley Visitor Center parking lot and Kule Loklo Indian Village. 2) Provide sign for each accessible parking stall, including one at the van-accessible stall with bottom of the sign at 60" above the ground. 3) Provide controlled road access from Limantour Road, establish procedures for visitors to enter on gravel road access behind locked gate on Limantour Road.

long-term

**2** **Trailhead Kiosk.** 1) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per Architectural Barriers Act Accessibility Standards Section 1017.10. 2) Provide a firm and stable surface up to trailhead kiosk with a 2% cross and running slope. 2) Ensure there are no italics and underlines, font size is 24-point, and contrast is 70% minimum.

long-term

**3** **Trail from Bear Valley Visitor Center.** See Kule Loklo Indian Village (1).

long-term

**4** **Trash and Recycling Receptacles.** 1) Replace trash receptacles with handles that are operable with a closed fist and five pounds or less in pressure. 2) Provide a firm and stable landing in front of trash and recycling receptacles at 2% cross and running slope.

long-term

009352

**⑤** **Unisex Restrooms.** 1) Install higher toilet seat at 17"–19" on both sides of unisex restroom. 2) Install tactile signage at each door on latch side at 48"–60" above the floor. 3) Construct new 200' accessible trail connecting to the proposed Village Loop trail. 5) Install barrier or tactile warning at fountain. 6) Construct firm and stable surface in front of fountain area. 7) Regularly maintain and clean forest litter on trail surface from eucalyptus trees.

long-term

**⑥** **Village Loop Trail.** 1) Construct approximately 1,300' of accessible trail that meets outdoor recreation access route standards: keep accessible running grades in mind (maximum length 200' can only be 5%–8.33% and maximum length 30' can only be 8.33%–10% before a landing is required). Route must be at least 36" wide minimum and 2% cross slope. In the village connect major exhibit features, parking, picnic area, and restrooms. Major exhibit features include the village entry signage, sweat house (exterior only), kotchas (minimum one accessible unit), ceremonial dance area, and roundhouse. 2) Develop and provide audio description tour that uses park's existing audio tour system.

long-term

**⑦** **Picnic Area.** 1) Reconstruct the picnic area to provide firm and stable surfaces at 2% cross and running slopes and 36" around all edge of table. 2) Provide an accessible picnic table with integrated seating spots on ends and edges.

long-term

This page intentionally left blank.

# Lifeboat Station Boathouse

## Orientation Map and Site Features



## Lifeboat Station Boathouse

## Implementation Strategy

The Point Reyes Lifeboat Station is a National Historic Landmark. It is the last remaining example of a rail launched boathouse that was common on the Pacific coast. Located on Drakes Bay at Chimney Rock, the Lifeboat Station was built in 1927 by the US Coast Guard and contained the crew's quarters, a large boat bay, and a marine railway system for launching a 36-foot lifeboat. The Lifeboat Station also offers weekend classes through the Field Institute where participants get the opportunity to spend the night and conduct classes in the historic structure. The area around the Lifeboat Station Boathouse is used by the Marine Mammal Center as a release site for rehabilitated wildlife. While staying here some classes are unexpectedly treated to the release of an otter or harbor seal. Visitors can view wildlife and birds in the area while having expansive ocean views and vistas. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Regrade the parking stall to have a 2% maximum cross slope and running slope. 2) Add sign identifying it as van accessible; bottom of sign should be 60" high.

long-term

**2** **Accessible Route and Walking Surfaces.** 1) Regrade exterior walk from parking to deck ramp so that cross slopes and running slope are 2% or less. 2) Adjust deck boards to be flush with one another so that there are no changes in vertical level greater than ¼" and no spaces between boards greater than ½".

long-term

**3** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces.** 1) Provide a firm and stable surface outdoor recreation access route (paved) from parking stall to picnic area, trash, and other elements outside the Lifeboat Station (including Boathouse).

long-term

**4** **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle with a landing in front for trash and recycling receptacle at 2% cross and running slope. 2) Provide an accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less.

long-term

**⑤**    **Interpretive Wayside.** 1) Provide large-print, accessible electronic document, braille, and audio description at visitors centers and on website about interpretive wayside information for increased visual access. Ensure information is provided in a clear and simple topic hierarchy. Use sans serif fonts. Make all font sizes 24-point or larger with a minimum 70% contrast between text and images or background color. remove any unnecessary italicized or underlined fonts. 2) Pave or otherwise stabilize the landing surface. When interpretive panels are replaced, assure high contrast of at least 70%.

long-term

**⑥**    **Picnic Facility.** 1) Provide a 36" wide route and clear space around picnic tables and an accessible outdoor recreation access route from trailhead to accessible picnic locations. 2) Provide accessible picnic tables with integrated seating spot on ends or middle.

long-term

**⑦**    **Museum Tactile Exhibits and Interpretive Waysides.** 1) Raise tactile objects up to have a 36" high surface with 27" knee clearance below (if possible). 2) Identify via large-print signage objects are not meant to be touched. 3) Arrange these with interpretive panels to be on an accessible route through the space. 4) Rearrange interpretive panels and all exhibits in museum. Interpretive panels should be turned 90 degrees to slope of floor to allow safer landing space while viewing. (The building is historic and changing the floor gradient will not allow ongoing use for boat storage. Therefore, slope of floor will never completely meet accessible code, but can be improved with these changes).

long-term

**⑧**    **Lifeboat Station.** Historic structure status prevents addition of an accessible route to the second floor, as it would degrade the integrity (ABAAS section 1019 Conditions for Exception). Accessible gathering area, kitchen, lodging and restrooms are provided on first floor. 1) Widen door frame to provide a 29 ½" clear space through doorway. 2) Provide a ramped entrance through doorway to remove the 3" threshold. Reduce interior door pressure down to five pounds or less and replace handle with lever that does not require pinching and twisting. 3) Move tactile signage to 48"–60" above finish floor on latch side of the door with an 18" by 18" clear floor space below the sign. 4) Replace heater control with an accessible device that does not require pinching and twisting to operate. 5) Provide a 36" wide by 48" deep companion seating space within the seating area for front/rear approach. This could be easily accomplished by changing the (moveable) furniture currently in the room. 6) Remove built in bench that currently blocks the clear floor space in front of the public telephone.

long-term

**9** **Accessible Restroom (First Floor).** 1) Insulate sink pipes. 2) Move toilet paper dispenser to be 7"–9" in front of toilet. 3) Replace back wall grab bar with 36" bar with 1" to one side and 24" to other side.

long-term

**10** **Kitchen.** 1) Provide a handle to allow opening refrigerator with a closed fist.

long-term

**11** **Accessible Bedroom.** 1) Remove top bunk and replace with a single bed for easy transfer.

long-term

**12** **Men's Restroom (Upstairs).** 1) Place tactile signage to 48"–60" above finish floor on latch side of the door with an 18" by 18" clear floor space below the sign.

long-term

**13** **Women's Restroom (Upstairs).** 1) Place tactile signage to 48"–60" above finish floor on latch side of the door with an 18" by 18" clear floor space below the sign.

long-term

**14** **Boathouse (Upstairs).** 1) Place tactile signage to 48"–60" above finish floor on latch side of the door with an 18" by 18" clear floor space below the sign. 2) Provide emergency evacuation maps in building that are large print, easy to ready, and high contrast. 3) Provide large print transcripts, audio description, and braille about historic photos in upstairs hallway. 4) Additionally, photo enlargements can be placed on main floor.

long-term

# Lighthouse

## Orientation Map and Site Features



* Lighthouse
* Visitor Center
* Upper Parking Lot, Park Offices, and Restroom
* Park Housing and Parking Lot
* Middle Parking Lot
* Shuttle Stop
* Lower Parking Lot

## Lighthouse

## Implementation Strategy

The Lighthouse is located on the western-most point of the Point Reyes Headlands. The historic Point Reyes Lighthouse warned mariners of danger for more than a hundred years. The Point Reyes Lighthouse, built in 1870, was retired from service in 1975 when the US Coast Guard installed an automated light. Visitors can see historic photographs of shipwrecks and lighthouse-keepers and handle items on the touch table, including whale baleen. A display of local birds will introduce visitors to the birds seen just off the cliffs. A small bookstore offers books, maps, and other educational products. From the Lighthouse, visitors can view wildlife, birds, wildflowers and geologic features. Improvements to accessibility for this resource and experience include:

**①** **Car Parking.** 1) Pave lower parking lot accessible space (asphalt or concrete) and correct striping size. 2) Pave parking space (asphalt or concrete) and add correct striping size for van accessible parking (11' wide with a 5' wide access aisle) at middle parking lot. 3) Raise signage height to 60" minimum above grade for both parking lots. 4) In the interim, provide an accessible parking area at the upper lot adjacent to the bathrooms for reasonable accommodation.

short-term

**②** **Shuttle and Shuttle Stop.** 1) Pave and re-size drop off surface and grade to 2% maximum slopes. 2) Add detectable warning strips to bus shelter drop-off edge. 3) Provide clear signage in large print at gate and on bus stop sign.

short-term

**③** **Accessible Route and Walking Surfaces.** 1) From middle accessible parking lot provide an alternative route at employee housing along an improved sidewalk in front of housing. Repave walk/patio area with less than 2% cross slope and a firm and stable surface.

short-term

**❹ Interpretive Waysides.** 1) Short term solution to provide description on website. 2) Move waysides farther up the hill to an alternative location along employee road to allow access with view. 3) Provide braille and or tactile options on signage. 4) There is potential for (quick response) QR codes. Note: No options are completely viable.



| short-term | (4.1) | mid-term | (4.2) |

long-term (4.3–4.4)

**❺ Trash and Recycling.** 1) Replace and reconfigure during construction of new National Oceanic and Atmospheric Administration facility to meet accessibility codes.

short-term

**❻ Picnic Facility.** 1) Replace picnic table to provide accessible companion seating. 2) Repave surrounding surface.

short-term

**❼ Public Telephone.** 1) Replace and reconfigure during construction of new National Oceanic and Atmospheric Administration facility to meet accessibility codes.

short-term

**❽ Visitor Center.** 1) Adjust interior door pressures to five pounds or less. 2) Provide a level landing (2% cross and running slope) at door.

short-term

**❾ Visitor Center Exhibits and Interpretive Panels.** 1) Scale of room doesn't justify audio tour. Train staff to offer audio descriptions of photographs and text. 2) Build tactile models of the seal cutouts. 3) Place graphics behind existing tactile models to allow appropriate reach range (48").

short-term

**⑩**   **Bookstore and Information Counter.** 1) Lower front section of counter height to be 36" high and 36" wide. 2) For forward approach remove section below counter for a 27" knee clearance.

short-term

**⑪**   **Unisex Restrooms.** 1) In parking lot restrooms make wall thicker to reduce distance from wall to centerline of toilet at 16"–18". 2) Reduce door pressure to five pounds or less. 3) Add tactile identification signage on latch side of door at 48"–60" above floor. 4) Replace sidewall grab bar with 42" long minimum bar located 12" from corner (or set in corner and extending 54" total).

short-term

# Limantour Beach

## Site Plan



Muddy Hollow Trail

Scale: 1" = 50'

0    25    50         100              200'

## Limantour Beach

## Implementation Strategy

Limantour Beach, a long, narrow spit of sand, bound between Drakes Bay and an estuary, is a bountiful wildlife area within a wilderness setting. Scores of shorebirds feed in the wetlands and along the beaches during the fall. Ducks abound in winter at old, freshwater stock ponds created during the peninsula's ranching era. Harbor seals are often seen bobbing offshore in the gentle waves or basking in the sun's warmth. Mother gray whales guide their calves along the shoreline during the spring. The Limantour Spit Trail, a 2-mile trail that starts near Limantour Beach, provides opportunities to view birds on the mudflats of Limantour Estero and the sandy beach of Drakes Bay. Muddy Hollow Trail, a 4-mile trail, is an easy hike with opportunities to see diverse bird life,  tule elk, and wildflowers. The path follows a riparian habitat and arrives at Estero de Limantour and Limantour Beach. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Mark and sign five accessible parking stalls, with one of those being van-accessible stalls and four-car accessible parking stalls. The van-accessible stall should be 11' wide with adjoining 5' wide access aisle on passenger side. The other four car parking stalls should be 8' wide with an adjoining 5' wide access aisle. Two of the car accessible parking stalls will need to be provided on the east side of the lower parking lot. 2) Van-accessible stall should be designated as "van accessible" with bottom of sign at 60" above the ground; other stalls should also be signed appropriately. Provide curb cuts to sidewalk in front of vehicles with landing up and ramps on path.

long-term

**2** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces.** 1) Provide a firm and stable surface (paved) from parking stall to all elements at the Limantour Beach Trailhead (e.g., kiosk, seating, trash and recycling, vault toilets, etc.).

long-term

**3** **Men's and Women's Restroom.** 1) Provide firm and stable surface from parking stall to concrete pad of restrooms; ensure change in vertical level at threshold is ¼" or less. 2) Provide a 42" side wall grab bar that is positioned 12" in front of the back wall. 3) Move tactile signage to 48"–60" above finish floor on latch side of the door with an 18" by 18" clear floor space below the sign.

long-term

009364

**④ Trash and Recycling.** 1) Provide a firm and stable surface up to receptacle or move trash and recycling receptacle to be right off the trail. 2) Provide an accessible trash and recycling receptacle that is operable with a closed fist.

long-term

**⑤ Outdoor Seating / Bench.** 1) Provide a firm and stable surface up to benches and a companion seating space  (36" wide by 48" deep) next to bench.

long-term

**⑥ Picnic Facilities.** 1) Provide one accessible picnic site. Provide 36" clear space around the picnic table that is firm and stable from the primary outdoor recreation accessible route. 2) Provide an accessible picnic table with an integrated wheelchair spot in the middle or ends of the table.

long-term

**⑦ Trailhead Kiosk.** 1) Increase font size to 24-point font and reduce transparency of images where there is a text overlay. Remove any italicized text on the kiosk panel. 2) Provide a firm and stable surface up to and at the kiosk from the designated accessible parking stalls.

long-term

**⑧ Interpretive Wayside.** 1) Provide a firm and stable surface up to interpretive wayside with a 2% cross and running slope. 2) Remove all italics, increase font size on captions, and reduce transparency of images where there is a text overlay. 3) Relocate interpretive wayside from upper parking lot to lower parking lot area.

long-term

**9** **Muddy Hollow Hiking Trail and Limantour Beach Trail.** A beach experience is provided at Drakes Beach, no accessibility improvements will be made beyond the Limantour Beach and Muddy Hollow trailheads (ABAAS section 1019 "Conditions for Exception – Hiking Trails" 1017.1 exception 1). 1) Provide trailhead information signage on trail conditions (length of the trail or trail segment, surface type, typical and maximum tread width, typical and maximum running slope, and typical and maximum cross slope) per ABAAS section 1017.10. 2) Develop and provide audio description tour that uses park's existing audio tour system.

long-term

**10** **Beach Shower.** 1) Remove platform and provide a firm and stable surface up to and at the beach shower at a size of 60" by 60" with the shower head centered on one end. 2) Lower shower handle to 48" maximum. 3) Change out lever to require five pounds or less pressure to operate.

long-term

**11** **Beach Access Route.** No change due to change in elevation (ABAAS section 1019 "Conditions for Exception – Beach Access Routes" 1018.1 exception 1), the beach experience is being provided elsewhere at Drakes Beach.

long-term

# North Beach

## Site Plan



## North Beach

## Implementation Strategy

North Beach is an access point of the Great Beach (also known as Point Reyes Beach). It is a total of 11 miles long with undeveloped ocean beach that visitors are welcome to explore. If a visitor is looking for the drama of heavy surf this is the place to be. Drive-up access and parking lots are provided at North Beach. During the winter months, elephant seals are present. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Provide four accessible parking stalls, one of which is van accessible. Two stalls should be placed facing the restroom and two facing the ocean. The van-accessible stall should be 11' wide with adjoining 5' wide access aisle on passenger side. The other three car accessible parking stalls should be 8' wide with an adjoining 5' wide access aisle. 2) Provide curb cuts to sidewalk in front of vehicles with landing up and ramps on path. 3) Provide signs at parking stall with bottom edge of sign at 60" above the ground. The van-accessible stall should be signed as "van accessible."

long-term

**2** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces.** 1) Regularly remove sand on pathway in front of cars to keep it firm and stable.

short-term

**3** **Accessible Route and Walking Surfaces to Restrooms.** 1) Level asphalt to boardwalk transition to a maximum vertical change in level of ¼" or less. 2) Provide 4" edge protection on boardwalk to restrooms. Path to restrooms will be addressed in another design and reroute project already proposed. 3) Keep access aisle at 2% running and cross slope and provide a curb cut to have landing on pathway and ramp up on both sides with 60" wide pathway.

long-term

**4** **Trash and Recycling.** 1) Regularly remove sand on pathway in front of cars to keep it firm and stable.

long-term

009368

**5** **Men's Restroom.** 1) In accessible stall, provide a 42" long minimum grab bar that is placed 12" forward of the back wall. 2) Replace toilet paper dispenser to be 7"–9" in front of toilet centerline. 3) Insulate pipes under sink. 4) Remove section of partition that comes into 60" wide by 59" long accessible stall. 5) Switch out faucet to five pounds or less pressure to turn on. 6) Move tactile signage down to 48"–60" above finish floor, keeping it on the latch side of the door to the restrooms.

long-term

**6** **Women's Restroom.** 1) In accessible stall, provide a 42" long minimum grab bar that is placed 12" forward of the back wall. 2) Replace toilet paper dispenser to be 7"–9" in front of toilet centerline. 3) Insulate pipes under sink. 4) Switch out faucet to five pounds or less pressure to turn on. 5) Move tactile signage down to 48"–60" above finish floor, keeping it on the latch side of the door to the restrooms.

long-term

**7** **Water Fountain.** 1) Replace or fix water fountain to reduce pressure to turn on to five pounds or less.

long-term

**8** **Interpretive Wayside and Other Signage or Postings.** 1) Provide information in 24-point font, with 70% contrast, and remove any italicized text. 2) Relocate sign with firm and stable surface up to the sign at the bottom of the hill to meet 2% running and cross slope, yet still positioned to view dune vegetation. 3) Provide accessible information for acquiring a permit (telephone, reservation system, etc.).

short-term

**9** **Beach Access Route / Viewing Area.** 1) Provide a viewing platform from north end of parking lot that loops around the wooden fence and extends just below the fence.

long-term

This page intentionally left blank.

# Pierce Point Ranch (including Tule Elk Reserve, and Tomales Point Trailhead)

## Site Plan



Scale: 1" = 50'

0   25   50   100   200'

## Pierce Point Ranch (including Tule Elk Reserve, and Tomales Point Trailhead)

## Implementation Strategy

Pierce Point Ranch, established in 1858, is one of the oldest ranches on the Point Reyes Peninsula and was one of the most successful dairy ranches of its time. The farm ceased operations in 1973 and three years later, Congress authorized creation of the wilderness area incorporating that ranch as habitat for the reintroduction of tule elk. In 1980, the National Park Service invested in the rehabilitation of the ranch core, citing it as the best example of the 19th century west Marin dairy ranch. Pierce Point Ranch was added to the National Register of Historic Places in 1985, and subsequently opened to the public as an interpretive site. A short, self-guided path guides visitors through this historic and picturesque ranch complex. Pierce Point Ranch is also the entrance to the Tomales Point Trail and Tule Elk Preserve, where a long stretch of coastal bluff offers spectacular views of both Tomales Bay, the Pacific Ocean, and birds. Hikers can observe the herd of the Tule Elk that roam this point as their home range. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Provide one signed and marked "van accessible" parking stall and one signed and marked accessible vehicle parking stall. Stalls should be maximum 2% running and cross slope, 5' marked access aisle and 11' wide van-accessible stall, and 8' wide for vehicle stall. Provide access aisle on the passenger side of the van and driver side of the vehicle. Provide (paved) firm and stable surface at stall. 2) Provide "van accessible" signage with bottom of sign at 60" minimum and another accessible sign at vehicle stall.

long-term

**2** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces on Interpretive Tour.** 1) Provide firm and stable surface from parking stall to trailhead kiosk and public telephone. 2) Stabilize landing surfaces (2% cross and running slope) at wayside along interpretive tour of ranch. Regrade route to meet outdoor recreation access routes (ORAR) grades.

long-term

**3** **Outdoor Recreation Access Route (ORAR) and Walking Surfaces at Tomales Trailhead.** 1) At Tomales Point Trailhead, realign and relocate signage to avoid tree roots. 2) Provide a 36" wide minimum ORAR with passing spaces (60" by 60") every 1000'. Remove any vertical obstacles along route that are ½" or greater and regrade to have a 2% or less cross slope and to meet running slope requirements.

long-term

**4** **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle with landing (2% cross and running slope) in front of trash and recycling receptacle. 2) Provide accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less.

long-term

**5** **Public Telephone.** 1) Provide firm and stable surface up to and in front of the telephone from parking space. 2) Ensure coin slot is no higher than 48" reach range.

long-term

**6** **Trailhead Kiosk & Interpretive Waysides.** 1) Remove italicized text, increase contrast to be 70% or greater by reducing opacity of any background images and make text easy to read. 2) Provide a firm and stable surface (paved) up to trailhead kiosk and regrade to have 2% cross and running slopes.

long-term

**7** **Picnic Facility.** 1) Provide one accessible picnic site. Provide 36" clear space between picnic tables with a firm and stable surface up to and around the accessible picnic site from the primary accessible route. 2) Provide accessible picnic tables with integrated wheelchair spot in the middle or ends of the table.

long-term

This page intentionally left blank.

# Point Reyes Hostel

## Site Plan



Scale: 1" = 50'

0    25    50    100    200'

## Point Reyes Hostel

## Implementation Strategy

The Point Reyes Hostel provides the only overnight lodging in the park as a park concession and is part of Hostelling International USA. About 11,000 park visitors use the lodging for overnight accommodations, which is nearby a network of park trails and Limantour Beach. The recently constructed LEED Certified building provides four accessible sleeping units with adjacent accessible bathrooms, kitchen, community area, and parking.  The new accessible units are separate from the older hostel and office complex. The hostel provides a total of 54 beds for overnight accommodation and the new accessible units provide 20 beds. Improvements to accessibility for this resource and experience include:

**1** **Office.** The older hostel and office complex is difficult to access from the new accessible lodging units due to grade issues. 1) Develop standard operating procedures for Hostel Manager to provide guests of accessible units with access to the registration desk, including provisions for advanced check-in procedures.

short-term

**2** **Public Telephone.** 1) Install new public telephone in the kitchen/dining area of the accessible lodging. Include a direct phone access line to the main hostel registration desk to provide equal access to support services as offered.

short-term

**3** **Outdoor Community Space at Hostel/Office Complex.** If community group activities are to occur in the main hostel outdoor area, 1) develop standard operating procedures to accommodate temporary ramp access to the patio, or for moving activity to an accessible location.

long-term

**4** **Picnic Area.** 1) Construct new firm and stable picnic area with accessible walkways to all accessible provisions. 2) Install two accessible picnic tables with integrated seating space on ends or sides (20% of total).

mid-term

**5** **LEED Building.** The dormitory building is older construction and not accessible. The accessible sleeping experience is provided at the LEED Building and provides equal provisions.

# RCA Point Reyes Receiving Station

## Site Plan



Scale: 1" = 50'

0    25    50         100              200'

## RCA Point Reyes Receiving Station

## Implementation Strategy

This RCA Point Reyes Receiving Station is recognized for being a critical link in the first Trans-Pacific radio communications. The Art Deco style building was built in 1929 and still houses some World War II era equipment, much of it still operable. Volunteers provide informal tours of the facilities on Saturday afternoons, host occasional special events, and use the equipment to communicate around the world once a year. Visitors can also bird watch and hike around RCA Point Reyes Receiving Station. Improvements to accessibility for this resource and experience include:

**❶** **Car Parking.** 1) Provide one signed and marked "van accessible" parking stall. Stall should be maximum 2% running and cross slope, 5' marked access aisle and 11' wide van-accessible stall. Provide access aisle on the passenger side of the van. 2) Provide sign at the van-accessible stall with bottom of sign at 60" above the ground.

long-term

**❷** **Accessible Route and Walking Surfaces.** 1) Construct a ramp to access the building that is 32" wide minimum. 2) Provide handrails on stairs that are between 34"–38" above the steps and extend 12" beyond and top and bottom of the staircase. 3) Provide new door hardware that can be opened with a closed fist with access to the front side door. 3) Provide wayfinding signage that shows accessible route for all visitors.

long-term

**❸** **RCA Receiving Station.** 1) Improve visitor access within building interior. 2) Rehabilitate restroom interiors and doors, including toilet fixtures, dispensers, toilet compartment, grab bars and accessory items to meet the requirements of ABAAS Chapter 2 Toilet and Bathing Facilities (subsections-F206.4, F213, and F216.8) and Chapter 6 Plumbing Elements and Facilities.

long-term

**❹** **RCA Receiving Station Interpretive Waysides and Tour.** 1) When the interpretive program becomes formalized, ensure interpretive waysides meet Harpers Ferry Center Programmatic Guidelines. Provide large-print, accessible electronic document, braille, and audio description on website and at visitor centers about interpretive wayside information for increased visual access. Ensure information is provided in a clear and simple topic hierarchy. Use sans serif fonts. Make all font sizes 24-point or larger with a minimum 70% contrast between text and images or background color. Remove any unnecessary italicized or underlined fonts.

long-term

009378

# Red Barn

## Site Plan



Scale: 1" = 25'

0    12.5    25    50    100'

## Red Barn

## Implementation Strategy

The Red Barn is used by the National Park Service and Point Reyes National Seashore Association for various educational programs and art exhibits (painting, photography, and educational exhibits). Themes of the shows typically reflect the natural or cultural aspects of the seashore and surrounding area. The building also contains a modern library and museum collection facility, a meeting room/classroom for park projects and for Field Institute classes, and environmental education programs for schools. The Red Barn was a hay barn in the late 1800s, and partially open to the public in 1975 as an auditorium. In 2002 it was remodeled as the Red Barn Classroom and is open to the public. Visitors can also better understand how geology impacted the Red Barn over time. Improvements to accessibility for this resource and experience include:

**1** **Car Parking.** 1) Provide two accessible parking stalls, one of which is van accessible (11' minimum wide with a 5' minimum wide access aisle). The other accessible parking stall (8' minimum wide with a 5' minimum wide access aisle). The two stalls can share an access aisle. Provide firm and stable surface (paved) for each stall at 2% running and cross slope. 2) Sign as "van accessible" with bottom of sign at 60" above ground.

long-term

**2** **Accessible Route and Walking Surfaces.** 1) Provide a firm and stable surface (paved) from parking stall to ramp or front door along accessible route; remove any changes in vertical level greater than ¼". 2) Replace handrails on ramps to restrooms and NOAA offices to steel with 1½" clearance between rail and wood boards. Ensure a 36" wide accessible route on ramp.

long-term

**3** **Trash and Recycling.** 1) Provide firm and stable surface up to receptacle with landing in front of trash and recycling receptacle with 2% cross and running slope. 2) Provide an accessible trash and recycling receptacle that can be opened with a closed fist and force of five pounds or less.

long-term

**4)** **Picnic Facilities.** 1) Provide two accessible picnic sites (one in shade and one in sun). Provide 36" clear space between picnic tables and a firm and stable surface up to and around the accessible picnic site from the primary accessible route. 2) Provide accessible picnic tables at sites with integrated wheelchair spot in the middle or ends of the table.

long-term

**5)** **Men's Restroom.** 1) Provide tactile signage on latch side of door at 48"–60" above floor. 2) Lower latch and soap dispenser 48" maximum above finish floor. 3) Provide door pull on inside of accessible stall door. 4) Remove door knobs that require pinching and twisting and replace with level door handles. 5) Reduce pressure to open doors to five pounds or less.

long-term

**6)** **Women's Restroom.** 1) Provide tactile signage on latch side of door at 48"–60" above floor. 2) Remove door knobs that require pinching and twisting and replace with level door handles. 3) Lower latch and soap dispenser 48" maximum above finish floor. 4) Provide door pull on inside of accessible stall door, and provide side wall grab bar that is 42" long positioned 12" front back wall. 5) Reduce pressure to open doors to five pounds or less.

long-term

**7)** **Red Barn Meeting Space.** 1) Provide large-print transcripts describing the artwork for each piece. 2) Remove door knobs that require pinching and twisting and replace with level door handles. 3) Reduce interior door pressures to five pounds or less.

mid-term   (7.1)

long-term   (7.2–7.3)

This page intentionally left blank.

# Point Reyes National Seashore Policy, Practice, Communication, and Training

## Park Features



## Point Reyes National Seashore Policy, Practice, Communication, and Training

Park policies and practices are specific to the park unit, and provide guidance for reaching desired outcomes. Park policies are defined courses of action adopted by the park, while park practices are those habitual and/or customary performances or operations that the park employs.

### Postings and Publications

**1** **Architectural Barriers Act (ABA) Flyers in Common Areas.** 1) Post a flyer in all common areas stating that Point Reyes National Seashore strives to meet all accessibility requirements of the Architectural Barriers Act of 1968, what the Architectural Barriers Act is, and how to request accommodations.

mid-term

**2** **Junior Ranger Booklet.** 1) Provide a large print and braille version of the Junior Ranger Program booklet.

short-term

**3** **Publications.** 1) Provide braille brochures and tactile wayfinding maps. Market and partner with outreach organizations to determine content. 2) Provide audio described brochures. Market and partner with outreach organizations to determine content. 3) Provide large print brochures. Market and partner with outreach organizations to determine content. All publications should be in a readable type face at 18 point font. Alignment should be flush left and rag right with hyphens avoided. Black or white type color should be used and red text avoided. Italicized and underlined text should be avoided. Graphics should have at least 70% contrast. Alternative formats (audio and braille and/or large print) should also be provided. 4) Add accessibility information in all publications, providing service, activity, or program information.



short-term  (3.1–3.2)        mid-term  (3.3)

long-term  3.4

**4** **Publicly Shared Documents.** 1) Ensure publicly shared documents have no language that is discriminatory to people with disabilities.

mid-term

## Staff Training and Park Protocols

**5** **Accessibility Awareness Training.** 1) Require yearly accessibility awareness training for all staff, including permanent and non-permanent employees, starting with the training list provided on the Pacific West Region Accessibility Self-Evaluation and Transition Plan SharePoint site.

short-term

**6** **Accessible Facilities and Maintenance Training.** 1) Require yearly training for maintenance staff on maintaining accessible facilities, including restrooms, walks and trails, door pressure requirements, assistive devices, accessible routes that are clear of obstructions, and universal design principles.

short-term

**7** **Accessibility for Project Managers Training.** 1) Require yearly training for project managers on entering information into PMIS and other forms about accessibility, universal design principles, and quality control of projects and design.

short-term

**8** **Accessible Interpretive Training.** 1) Provide training for the interpretation and education division about accessibility issues, people first language, major disability categories, how to assess programs and make them more accessible, which websites offer more information, service animals, what technologies are available, universal design principles, visitor services and communication in accessibility Also, require yearly visitor information and interpretive staff training in use of assistive technology—assistive listening devices, audio description, how to interpret tactile models and maps.

short-term

**9** **Communication with Law Enforcement.** 1) Provide a standard operation procedure for law enforcement to communicate with a person with a disability.

mid-term

**10** **Moveable Seating.** 1) Develop and distribute standard operating procedures for moveable cubicles and conference rooms, so there is clear space and accessible routes to all elements in a room or building. 2) Develop and distribute standard operating procedures for moveable seating arrangements and moving things to create an accessible route and maintain integrated accessible seating.

long-term

**11** **Other Powered Mobility Devices.** 1) Provide guidance outlining where other powered mobility devices are or are not allowed within the park.

mid-term

**12** **Service Animals.** 1) Provide guidance outlining policy regarding service animals within the park. The park should include training for staff to understand what they may ask concerning service animals and what, if any, restrictions on service animals are present.

mid-term

**13** **Beach Wheelchairs.** 1) Consider purchase of beach wheelchairs. If purchased, inform visitors and program participants that they are available. Add information to all publications providing program information that wheelchairs and beach wheelchairs are available. 2) Provide a standard operating procedure or guidance for checking out and returning beach wheelchairs. 3) Provide a standard operating procedure or guidance describing protocol for pre-and post-inspecting, cleaning, and maintenance of beach wheelchairs. Note: This may include hiring a trained professional to periodically inspect wheelchair maintenance to ensure it meets specifications of regular use. 4) Develop and distribute standard operating procedures or guidance for using beach wheelchairs for visitors to participate and get to services, activities, and programs. Train staff on use, cleaning, and maintenance of beach wheelchairs. 5) Provide signage stating availability of beach wheelchairs. Inform visitors and program participants of the availability. Add information to all publications providing service, activity, and program information that wheelchairs and beach wheelchairs are available.

mid-term

**14** **Emergency Preparedness.** 1) Develop, distribute, and practice standard operating procedures for assisting people with disabilities in the case of an emergency.

short-term

## Audio and Visual Programs

**⓯** **Assistive Listening Devices.** 1) Purchase assistive listening transmitters and devices or install site perimeter induction loops. Provide assistive listening at visitor centers, educational programs, and guided tours that have an audio component. 2) Provide a standard operating procedure or guidance for checking out and returning assistive listening devices. 3) Provide a standard operating procedure or guidance describing protocol for pre -and post-inspection of assistive listening devices. Procedure should address cleaning and maintenance of all devices. 4) Develop and distribute standard operating procedures or guidance for using assistive technology for ranger programs and information services. Train staff on use, cleaning, and maintenance of assistive listening devices. 5) Provide signs stating device availability. Inform visitors and program participants that auxiliary aids are available. Add information to all publications stating that assistive listening devices are available.

mid-term

**⓰** **Live Audio Description.** 1) Provide live audio descriptions on guided interpretive tours. 2) Provide training for interpretation and education division on live audio description for guided tours at the park unit.

mid-term

**⓱** **Open Captioning and Audio Description.** 1) Provide open captioning on video and indicate its availability on the website. Also, provide audio description of all images being shown on the video.

long-term

**⓲** **T-Coil Hearing Loops or Neck Loops.** 1) Purchase T-coil hearing loops and neck loops. Inform visitors and program participants that auxiliary aids are available. Add information to all publications providing program information that T-coil hearing loops and neck loops are available. 2) Provide a standard operating procedure or guidance for checking out and returning T-coil hearing loops and neck loops. 3) Provide a standard operating procedure or guidance describing protocol for pre-and post-inspection of T-coil hearing loops and neck loops. Procedure should address cleaning and maintenance of all devices. 4) Develop and distribute standard operating procedures or guidance for using T-coil hearing loops and neck loops for ranger programs and information services. Train staff on use, cleaning, and maintenance of T-coil hearing loops and neck loops. 5) Provide signs stating device availability. Inform visitors and program participants that auxiliary aids are available. Add information to all publications providing program information that T-coil hearing loops and neck loops are available.

mid-term

**19** **Text Telephone (TTY) Machines.** 1) Provide a TTY machine at all locations there is a public telephone. 2) On publications and website where the park contact information or phone number is provided, include a TTY number. 3) Provide a standard operating procedure or guidance describing protocol for pre-and post-inspection of TTY machines. Procedure should address cleaning and maintenance of all devices. 4) Develop and distribute standard operating procedures or guidance for using TTY machines for communication. Train staff on use, cleaning, and maintenance of TTY machines.

mid-term

**20** **Presentations.** 1) Develop and distribute standard operating procedure to provide guidance for presentations provided by outside groups regarding accessibility, providing assistive listening devices, etc.

mid-term

## Visitor Information

**21** **Communication.** 1) Provide park e-mail address and telephone number on website and in publications for questions: John_a_Dell'Osso@nps.gov. 2) Develop a standard operating procedure ensuring that there is an accessible e-mail and phone that people with disabilities can contact a minimum of five days per week [Monday– Friday, 8am– 5pm].

short-term   (21.1)        mid-term   (21.2)

**22** **Marketing.** 1) Market via social media (Pinterest, Facebook, Snapchat, Twitter, etc.) that accessible programs, services, and activities are available at the park. 2) Market via hard media and other advertising methods that accessible programs, services, and activities are available at the park. 3) Contact groups with disabilities directly to inform them about the accessible programs, services, and activities that have become available at the park, as solutions are implemented. 4) Contact and reach out to groups with disabilities to get more involvement in park accessibility improvement projects as they occur (case-by-case basis).

mid-term

**㉓** **Reservations.** 1) On the website, identify the following numbers to call: Federal Relay Service (telephone number), Voice (telephone number), Voice Carry Over (telephone number), Speech-to-Speech (telephone number), TeleBraille (telephone number). Provide online reservation system built into content management system. Also, provide information on website reservation systems about services that are accessible for each park area that requires a reservation. 2) Provide accessible formats of making reservations through Federal Relay Service, Text Telephone (TTY), Video Phone, etc. Provide information on the website regarding the accessibility of facilities.

mid-term

**㉔** **Signage.** 1) Provide signage at visitor center that accessible alternative formats are available.

mid-term

**㉕** **Website.** 1) Provide information on website that accessible programs, services, and activities are available, including, but not limited to, audio description, assistive listening devices, braille/tactile features, accessible tours, open captioning, trails, etc. 2) All websites should have a manual switch to change size of fonts. Alignment should be flush left and rag right. Hyphens should be avoided. Black or white type color should be used. The use of red or green text should be avoided. Italicized and underlined text should be avoided. Do not use all caps or italics within the information. Graphics should have at least 70% contrast. Provide Word documents as an alternative to PDFs.

short-term   (25.1)          mid-term   (25.2)

## Tours, Programs, and Special Events

**26** **Guided Tours, Educational Programs, and Special Events.** 1) Provide alternative formats such as trail information in large print, as well as audio description of what to expect to see on a guided tour, education program, or special event (provided at visitor center in a publication and on a website) for people with disabilities that request it. 2) Provide conditions of the guided tour, education program, or special event environment (e.g., number of steps, slopes, other barriers that exist, etc.) in a publication and/or on a website. 3) Provide designated stopping points or resting areas for the guided tour, education program, or special event at 2% maximum cross and running slope with a firm and stable surface and 30" by 48" clear space.

mid-term

**27** **Self-Guided Tours.** 1) Provide alternative formats such as trail information in large print, as well as audio description of what to expect and see on a self-guided tour (provided at visitor center in publication and on the website) for people with disabilities that request it. 2) Provide conditions of the self-guided tour environment (e.g., number of steps, slopes, other barriers that exist, etc.) in a publication and/or website. 3) Provide designated stopping points or resting areas for the self-guided tour at 2% maximum cross and running slope with a firm and stable surface and 30" by 48" clear space.

mid-term

**28** **Sign Language Interpreters.** 1) Develop the process for requesting sign language interpreters. Provide sign language interpreters within five days of request being made. 2) Develop and distribute standard operating procedures for contacting and scheduling sign language interpreters.

mid-term

**29** **Special Events.** 1) Provide a system for people to call in and request a sign language interpreter within five days of service. Provide assistive listening devices and a T-coil or neck loop system with signage indicating they are available for special events. Provide large print of any handouts or waivers being provided. 2) Provide information on how people can contact the park for accommodations for special events and release announcements in a variety of accessible methods (e.g., large print flyers, electronic accessible PDFs, etc.) 3) Develop and distribute standard operating procedure for including accessibility information on event announcements.

mid-term

## Concessions and Partnerships

 **Park Partner, Leasee, and Concessionaire Services, Activities, and Programs.**
1) Prepare a standard operating procedure for leasees and park partners about providing accessible programs, services, and activities within the park unit. 2) Develop and distribute a standard operating procedure, regarding accessibility, providing assistive listening devices, etc., which provide guidance for presentations provided by outside groups. 3) Architectural Barriers Act for Accessibility Standards does not apply to state partner lands, however the Americans with Disabilities Act does. State requirements take precedence in these cases. Communication will take place between state partners and the federal government to ensure an assessment will take place and accessibility solutions will be implemented in the future. 4) Architectural Barriers Act for Accessibility Standards applies to all lands funded by the federal government. Communication will take place between park partner concessionaires and the federal government to ensure accessibility of services, activities, and programs. The National Park Service will conduct an assessment and develop a transition plan at park partner concessionaire services, if they have been identified as a priority park area.

mid-term

This page intentionally left blank.

# Appendix A: Accessibility Laws, Standards, Guidelines, and NPS Policies Applicable to Point Reyes National Seashore

As a national park, Point Reyes National Seashore is required to comply with specific federal laws that mandate that discriminatory barriers be removed to provide equal opportunities to persons with disabilities. The following laws, design guidelines, and Director's Orders specifically pertain to Point Reyes National Seashore.

### LAWS AND STANDARDS

A law is a principle and regulation established in a community by some authority and applicable to its people, whether in the form of legislation or of custom and policies recognized and enforced by judicial decision. A standard is something considered by an authority or by general consent as a basis of comparison; an approved model. It is a specific low-level mandatory control that helps enforce and support a law.

### Architectural Barriers Act of 1968

http://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-aba-standards/guide-to-the-aba-standards

### Section 504 of the Rehabilitation Act of 1973

http://www.law.cornell.edu/cfr/text/43/17.550

### Section 508 of the Rehabilitation Act of 1973

http://www.section508.gov/

### Accessibility Standards for Outdoor Developed Areas

http://www.access-board.gov/guidelines-and-standards/recreation-facilities/outdoor-developed-areas/final-guidelines-for-outdoor-developed-areas

**Accessibility Standards for Shared Use Paths**

http://www.access-board.gov/guidelines-and-standards/streets-sidewalks/shared-use-paths

**Draft Accessibility Standards for Public Rights-of-Way**

http://www.access-board.gov/guidelines-and-standards/streets-sidewalks/public-rights-of-way

**Effective Communication**

http://www.ada.gov/effective-comm.htm

**Reasonable Accommodations**

http://www.opm.gov/policy-data-oversight/disability-employment/reasonable-accommodations/http://www.opm.gov/policy-data-oversight/disability-employment/reasonable-accommodations/

**Other Powered Mobility Devices**

http://www.ada.gov/regs2010/ADAregs2010.htm

**Service Animals**

http://www.nps.gov/goga/planyourvisit/service-animals.htm

**Section 17.549 Program Accessibility: Discrimination Prohibited**

http://www.law.cornell.edu/cfr/text/43/17.549

**Section 17.550 Program Accessibility: Existing Facilities**

http://www.law.cornell.edu/cfr/text/43/17.550

**Section 17.551 Program Accessibility: New Construction and Alterations**

http://www.law.cornell.edu/cfr/text/43/17.551

## NATIONAL PARK SERVICE DIRECTOR'S ORDERS AND MANAGEMENT POLICIES

A policy is a definite course of action adopted and pursed by a government, ruler, or political party. It is an action or procedure conforming to or considered with reference to prudence or expediency.

### Director's Order 16A

http://www.nps.gov/policy/DOrders/DOrder16a.html

### Director's Order 42

http://www.nps.gov/policy/DOrders/DOrder42.html

### National Park Service Management Policies: Section 1.9.3 – Accessibility for Persons with Disabilities

http://www.nps.gov/policy/mp/policies.html

### GUIDELINES

A guideline is an indication of a future course of action. It consists of recommended, nonmandatory controls that help support standards or serve as a reference when no applicable standard is in place.

### Programmatic Accessibility Guidelines for National Park Service Interpretive Media

http://www.nps.gov/hfc/accessibility/

# Appendix B: Glossary Of Terms

**Accessibility assessment:** A process in which physical and programmatic barriers to accessibility are identified at a park unit.

**Accessibility assessment team:** This group is a subgroup of the Interdisciplinary Design Team (see definition below) and includes an accessibility specialist and/or technician, coordinators, a regional representative, the primary facilitator for the process, architect, engineer and/or landscape architect, and typically the chiefs of interpretation, resources management, and facilities management.

**Accessibility Self-Evaluation and Transition Plan:** A tool that establishes a methodical process for identifying and improving park wide access and proposes strategies for implementing the plan over time, in a manner consistent with park requirements and protocols.

**Architectural Barriers Act Accessibility Standard (ABAAS):** Standards issued under the Architectural Barriers Act apply to facilities designed, built, altered, or leased with certain federal funds. Passed in 1968, the Architectural Barriers Act is one of the first laws to address access to the built environment. The law applies to federal buildings, including post offices, social security offices, federal courthouses and prisons, and national parks.

**Barrier:** Architectural and programmatic obstacles to accessibility that make it difficult, and sometimes impossible, for people with disabilities to maneuver, understand, or experience.

**Best Practices:** A method or technique that has consistently shown results superior to those achieved with other means, and that is used as a benchmark for meeting accessibility requirements.

**Consultation:** A formal or informal process for discussing an action or process for implementing a solution, such as section 106 (cultural resource compliance), or design for an Accessibility Self-Evaluation and Transition Plan.

**Facility Management Software System (FMSS) Work Order:** The process for documenting work needs and collecting information to aid the work scheduling and assignment process within the Facility Management Software System. Information collected should include labor, equipment and material costs, hours, types, and quantities.

**Guidelines:** A guideline is an indication of a future course of action. It consists of recommended, nonmandatory controls that help support standards or serve as a reference when no applicable standard is in place.

009396

**Interdisciplinary Design Team:** This team is composed of all the people involved in the workshop at the park unit, potentially including planning, design, and construction professionals; and interpretive, resource (natural and cultural), visitor safety, maintenance and accessibility specialists.

**Key park experiences:** For the purpose of the SETP, key park experiences are those that are iconic and important for visitors to understand the purpose and significance of a given park unit. They are those experiences that are "musts" for all park visitors. Key park experiences can be identified through a consideration of park purpose, significance, interpretive themes, and those programs or activities highlighted in park communications.

**Laws:** A law is a principle and regulation established in a community by some authority and applicable to its people, whether in the form of legislation or of custom and policies recognized and enforced by judicial decision.

**Level of access:** For the purpose of the SETP the team assessed the general degree of accessibility for programs, while considering each experience, disability, and physical and programmatic access. It also assists in identifying the accessibility level for participating in a park experience and where it falls in priority for action.

**National Environmental Policy Act (NEPA) Requirements:** NEPA defines a process that federal agencies must follow when proposing to take actions that have environmental impacts. NEPA requires federal agencies to fully consider the impacts of proposals that would affect the human environment prior to deciding to take an action. NEPA also requires federal agencies to involve the interested and affected public in the decision-making process.

**Park areas:** A park area is the geographic location that is home to a single or multiple key park experience(s).

**Park Asset Management Plan-Optimizer Banding (PAMP-OB):** Provides a 5-year asset management strategy for park units, allowing for annual updates that coincide with the budget and planning processes already occurring in park units. As this approach includes life cycle total cost of ownership, analysis, processing, and calculations, it also helps park units and the service as a whole to manage the gap between what should be spent on facilities and what is actually being spent.

**Park Policy:** A defined course of action adopted for reaching a desired outcome; they are specific to the park unit and not defined by the Washington Service Office or the region.

**Park Practices:** Those habitual and/or customary performances or operations for reaching a desired outcome; they are specific to the park unit and not defined by Washington Service Office or the region.

**Responsible Person:** The person/position responsible for seeing that the elimination of a barrier is completed.

**Policy:** A policy is a definite course of action adopted and pursed by a government, ruler, or political party. It is an action or procedure conforming to or considered with reference to prudence or expediency.

**Project Management Information System (PMIS) Facility:** A separate and individual building, structure, or other constructed real property improvement.

**Project Management Information System (PMIS) Nonfacility:** A project that includes anything not covered by the definition for PMIS facility

**Project Management Information System (PMIS) # (number):** A unique Project ID Number that is automatically generated when adding a new project into the Project Management Information System

**Project planning team:** This group is a subgroup of the Interdisciplinary design team and includes DSC planners and a regional liaison. This team collects baseline data, facilitates calls, develops the participant guide, plans for and facilitates the workshop, and produces the draft and final documents.

**Readily Achievable:** Easily accomplished and able to be carried out without much difficulty or expense.

**Service, activity, and program:** A service, activity, or program has a single purpose and is an activity undertaken by a department that affords benefits, information, opportunities, and activities to one or more members of the public.

**Solution:** The action to eliminate the barrier that has been identified.

**Standards:** A standard is something considered by an authority or by general consent as a basis of comparison; an approved model. It is a specific low level mandatory control that helps enforce and support a law.

**Time frame:** Time frames for implementation of a recommended solution are primarily based on level of access of the barrier. They describe when staff will eliminate the barrier. Recommendations are divided into three time frames including: short-term, mid-term, and long-term.

# Appendix C: Contributors

## Point Reyes National Seashore

David Brouillette, Chief of Facilities Management

Gregory Crawford, Buildings and Utilities Supervisor

John Dell'Osso, Chief of Interpretation

John Golda, Interpretive Operations Supervisor

Shawn Maloney,Trails Supervisor

Kevin McKay, Special Park uses / Concession Specialist

Cicely Muldoon, Superintendent

Debra Olson-Suarez, Program Analyst

Gordon White, Chief of Resource Management


## Golden Gate National Recreation Area

Richard De La O, Accessibility Program Manager

Michael Faw, Accessibility and Media Specialist

Kelly Wyrsch, Accessibility Specialist


## Pacific West Regional Office

Patricia Brouillette, Project Manager/Landscape Architect

Dave Kruse, Regional Chief of Facility Management

Trung-Son Nguyen, Regional Accessibility Coordinator

Jack Williams, Regional Liaison


## Denver Service Center

Megan Braunschweig, Landscape Architect

Tamara Delaplane, Landscape Architect

Brenda Todd, Project Manager

Cynthia Nelson, Branch Chief

# POINT REYES NATIONAL SEASHORE
## Accessibility Self-Evaluation and Transition Plan Overview
January 2016

This Accessibility Self-Evaluation and Transition Plan Overview has been prepared as a collaborative effort between Point Reyes National Seashore, Pacific West Regional staff, and the Denver Service Center and is recommended for approval by the superintendent.

_____          11 JANUARY 2016
**APPROVED**
Superintendent, Point Reyes National Seashore                    Date

 

As the nation's principal conservation agency, the Department of the Interior has responsibility for most of our nationally owned public lands and natural resources. This includes fostering sound use of our land and water resources; protecting our fish, wildlife, and biological diversity; preserving the environmental and cultural values of our national parks and historic places; and providing for the enjoyment of life through outdoor recreation. The department assesses our energy and mineral resources and works to ensure that their development is in the best interests of all our people by encouraging stewardship and citizen participation in their care. The department also has a major responsibility for American Indian reservation communities and for people who live in island territories under U.S. administration.

PORE 612/131046
January 2016



Experience Your America

Accessibility Self-Evaluation and Transition Plan Overview

# POINT REYES
NATIONAL SEASHORE | CALIFORNIA

NATIONAL PARK SERVICE  •  U.S. DEPARTMENT OF THE INTERIOR



# Foundation Document
## Point Reyes National Seashore
**California**                                      **April 2020**

009402

PACIFIC OCEAN
POINT REYES NATIONAL SEASHORE
GOLDEN GATE NATIONAL RECREATION AREA
BOLINAS RIDGE
INVERNESS RIDGE
POINT REYES BEACH
Tomales Bay
Drakes Bay
Bolinas Bay
Drakes Estero
Bolinas Lagoon
Dillon Beach
Tomales
Petaluma
Marshall
Inverness
Point Reyes Station
Olema
Nicasio
Lagunitas
Forest Knolls
San Geronimo
Woodacre
Bolinas
Stinson Beach
Tule Elk Reserve
Historic Pierce Point Ranch
McClures Beach
Kehoe Beach
Marshall Beach
Hearts Desire Beach
Tomales Bay State Park
Marconi Conference Center State Historic Park
Golden Gate National Recreation Area
Abbotts Lagoon
Historic RCA Coast Station KPH and Cypress Tree Tunnel
Point Reyes Beach North
Point Reyes Beach South
Estero
Giacomini Wetlands
Bear Valley Visitor Center
Park Headquarters
(See detail map, separate PDF file)
Cross Marin Trailhead
Samuel P. Taylor State Park
Clem Miller Environmental Education Center
Point Reyes Hostel
Limantour Beach
No lifeguard on duty
Kenneth C. Patrick Visitor Center
(hours vary)
Drakes Beach
No lifeguard on duty
Lighthouse Visitor Center
(closed Tue-Thu)
Point Reyes Lighthouse
Sea Lion Overlook
Elephant Seal Overlook
Historic Lifeboat Station
Chimney Rock
Five Brooks
Divide Meadow
Glen
Wildcat
Coast
Sky
Palomarin
Point Blue Conservation Science (field station)
Audubon Canyon Ranch
Mt. Tamalpais State Park
Agate Beach County Park
Duxbury Point
Steep Cliffs
The cliffs of Tomales Point are likely to crumble and slide. Climbing on them or walking near the edge invites catastrophe. Because of falling rocks, walking below cliffs is dangerous. Keep away!
High Tide
Check tide tables before walking on beaches. Rising water can trap you against a cliff with no possibility of escape.
Heavy Surf
The pounding surf, rip currents, and severe undertow are treacherous, especially at McClures Beach, Kehoe Beach, and Point Reyes Beaches North and South. Stay away from the water.
Park boundary extends ¼ mile from shore
Steep Cliffs
The cliffs of the Point Reyes and Chimney Rock Headlands are likely to crumble and slide. Climbing on them or walking near the edge invites catastrophe. Because of falling rocks, walking below cliffs is dangerous. Keep away!
Steep Cliffs
The cliffs above Wildcat Beach and in the Alamere Falls area are likely to crumble and slide. Climbing on them or walking near the edge invites catastrophe. Because of falling rocks, walking immediately below cliffs is dangerous. Keep away!
Sir Francis Drake Boulevard
Point Reyes-Petaluma Road
Marshall-Petaluma Road
Tomales-Petaluma Road
Chileno Valley Rd
Nicasio Valley Road
Lucas Valley Road
Novato Boulevard
Bolinas-Fairfax Road
Limantour Road
Pierce Point Road
Mount Vision Rd
Bear Valley Rd
Ranger station
Trailhead
Kayaking
Restrooms
Picnic area
Bookstore
Telephone
Pets on leash
Horse facilities
Primitive campground
Paved road
Hiking only trail
Hiking/biking trail
Phillip Burton Wilderness (land)
Phillip Burton Wilderness (water)
Unpaved road
Hiking/biking trail (no e-bikes)
0 1.5 3 Kilometers
0 1.5 3 Miles
North

# Contents

**Mission of the National Park Service** . . . . . . . . . . . . . . . . . . . . . 1

**Introduction.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Part 1: Core Components** . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Brief Description of the Park. . . . . . . . . . . . . . . . . . . . . . . . 3

    Park Purpose  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Park Significance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Fundamental Resources and Values . . . . . . . . . . . . . . . . . . . 7

    Interpretive Themes . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Appendixes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

    Appendix A: Current Enabling Legislation for
        Point Reyes National Seashore from U.S. Code . . . . . . . .  10

    Appendix B: Historic Legislative Acts for
        Point Reyes National Seashore . . . . . . . . . . . . . . . .  14

    Appendix C: Selected Federal and State Legislation and Directives . . . . .  33

A special thank-you to the photographers who have generously provided permission for use of their work of Point Reyes National Seashore.

Front cover, ii, 3, 7, 9 (bottom), back cover © Kevin Haney. Used by permission.

Page 8 © Susan Van Der Wal. Used by permission.

Page 48 © Ryan Johns. Used by permission.

Foundation Document



009405

Point Reyes National Seashore

# Mission of the National Park Service

The National Park Service (NPS) preserves unimpaired the natural and cultural resources and values of the national park system for the enjoyment, education, and inspiration of this and future generations. The National Park Service cooperates with partners to extend the benefits of natural and cultural resource conservation and outdoor recreation throughout this country and the world.

The NPS core values are a framework in which the National Park Service accomplishes its mission. They express the manner in which, both individually and collectively, the National Park Service pursues its mission. The NPS core values are:

- **Shared stewardship:** We share a commitment to resource stewardship with the global preservation community.

- **Excellence:** We strive continually to learn and improve so that we may achieve the highest ideals of public service.

- **Integrity:** We deal honestly and fairly with the public and one another.

- **Tradition:** We are proud of it; we learn from it; we are not bound by it.

- **Respect:** We embrace each other's differences so that we may enrich the well-being of everyone.

The National Park Service is a bureau within the Department of the Interior. While numerous national park system units were created prior to 1916, it was not until August 25, 1916, that President Woodrow Wilson signed the National Park Service Organic Act formally establishing the National Park Service.

The national park system continues to grow and comprises more than 400 park units covering more than 84 million acres in every state, the District of Columbia, American Samoa, Guam, Puerto Rico, and the Virgin Islands. These units include, but are not limited to, national parks, monuments, battlefields, military parks, historical parks, historic sites, lakeshores, seashores, recreation areas, scenic rivers and trails, and the White House. The variety and diversity of park units throughout the nation require a strong commitment to resource stewardship and management to ensure both the protection and enjoyment of these resources for future generations.



*The arrowhead was authorized as the official National Park Service emblem by the Secretary of the Interior on July 20, 1951. The sequoia tree and bison represent vegetation and wildlife, the mountains and water represent scenic and recreational values, and the arrowhead represents historical and archeological values.*

Foundation Document

## Introduction

Every unit of the national park system will have a foundational document to provide basic guidance for planning and management decisions—a foundation for planning and management. The core components of a foundation document include a brief description of the park as well as the park's purpose, significance, fundamental resources and values, and interpretive themes. The foundation document also includes special mandates and administrative commitments, an assessment of planning and data needs that identifies planning issues, planning products to be developed, and the associated studies and data required for park planning. Along with the core components, the assessment provides a focus for park planning activities and establishes a baseline from which planning documents are developed.

A primary benefit of developing a foundation document is the opportunity to integrate and coordinate all kinds and levels of planning from a single, shared understanding of what is most important about the park. The process of developing a foundation document begins with gathering and integrating information about the park. Next, this information is refined and focused to determine what the most important attributes of the park are. The process of preparing a foundation document aids park managers, staff, and the public in identifying and clearly stating in one document the essential information that is necessary for park management to consider when determining future planning efforts, outlining key planning issues, and protecting resources and values that are integral to park purpose and identity.

While not included in this document, a park atlas is also part of a foundation project. The atlas is a series of maps compiled from available geographic information system (GIS) data on natural and cultural resources, visitor use patterns, facilities, and other topics. It serves as a GIS-based support tool for planning and park operations. The atlas is published as a (hard copy) paper product and as geospatial data for use in a web mapping environment. The park atlas for Point Reyes National Seashore can be accessed online at: http://insideparkatlas.nps.gov/.



009407

# Part 1: Core Components

The core components of a foundation document include a brief description of the park, park purpose, significance statements, fundamental resources and values, and interpretive themes. These components are core because they typically do not change over time. Core components are expected to be used in future planning and management efforts.

## Brief Description of the Park

Legislation authorizing the establishment of Point Reyes National Seashore was enacted on September 13, 1962 (Public Law 87-657) for the purpose of preserving "a portion of the diminishing seashore of the United States that remains undeveloped." Today, this geologically unique peninsula encompasses more than 71,000 acres of beaches, coastal cliffs and headlands, marine terraces, coastal uplands, and forests and includes all tide and submerged lands to 0.25 miles offshore. The park administers an additional 15,000 acres of the North District of Golden Gate National Recreation Area, including all NPS lands north of Bolinas-Fairfax Road, under a regional directive for management. The lands currently under NPS management have been acquired tract by tract over time. Within the park boundary are two no-take state marine reserves, three special closure areas, and three state marine conservation areas. Marine boundaries are shared with the Greater Farallones National Marine Sanctuary, and Cordell Bank National Marine Sanctuary is situated further offshore.

The park manages a diversity of land uses ranging from the almost 33,000-acre Phillip Burton Wilderness (Public Laws 94-544 and 94-567), which includes one of only two marine wilderness areas in the national park system and is one of the most accessible areas in the national wilderness preservation system, to active beef cattle and dairy ranching operations. Approximately 18,000 acres of Point Reyes National Seashore is currently under agricultural production within the pastoral zone. In the North District of Golden Gate National Recreation Area an additional 10,000 acres is currently used for grazing.



Foundation Document



Located near the San Francisco Bay metropolitan area's population of more than 8 million people, the park hosts approximately 2.5 million visitors annually. Abundant recreational opportunities include more than 80 miles of undeveloped coastline, 147 miles of hiking trails, backcountry campgrounds, and many beautiful beaches. Twenty-eight threatened and endangered species are present within the park's boundary. The park supports more than 900 plant species, about 17% of the California flora, and more than 490 species of birds have been recorded in the park, representing 52% of the species of avian fauna of North America.

More than 120 archeological sites representing Coast Miwok history and culture have been identified within the park and have yielded some of the most significant information on American Indian history in the San Francisco Bay region. The park has about 400 historic structures including the historic Point Reyes Lighthouse built in 1870 and two national historic landmarks— the Point Reyes Lifeboat Station and the Drakes Bay Historic and Archaeological District. The park's museum collection contains more than 490,000 artifacts and documents.

The human history of the Point Reyes peninsula extends to more than 5,000 years ago and includes the long history of the Coast Miwok people who call this place home. The sheltered harbor of Drakes Bay served as the scene of one of the earliest instances of European contact and interaction with native peoples on the west coast of the United States that is recognized in the Drakes Bay Historic and Archaeological District National Historic Landmark.

The park also includes two ranching historic districts, listed in the National Register – the Olema Valley Dairy Ranches Historic District and the Point Reyes Peninsula Dairy Ranches Historic District. The ranches in these historic districts helped catapult Marin County to the forefront of butter and cheese production by the 1870s. The ranches in these historic districts convey a century of change in the California dairy industry, representing the evolution of dairy farming from the original wood frame milking barns to the concrete Grade A sanitary barns of the 1940s.

The unique geography of the Point Reyes peninsula, which extends more than 10 miles into the Pacific Ocean, also made it strategic for the placement of the Point Reyes Lighthouse and the primary wireless communication station in the Pacific. In 1906, Point Reyes again became the focus of wonder as the land shifted almost 20 feet along the San Andreas Fault. Although the earthquake devastated communities in the Bay Area, it also spawned new areas of geologic and scientific inquiry that have provided dramatic evidence for the theory of plate tectonics and the study of seismology. The trace of this event can be viewed today within Point Reyes National Seashore.

Saved from development by their inclusion in the national park system, the lands managed by Point Reyes National Seashore are unique not only in their assemblages of natural and cultural features, but also in the protection of wilderness in close proximity to a major urban population. This juxtaposition makes the park's resources and recreational opportunities readily accessible to a large number of people and enhances the importance of the special qualities for which it was set aside.

009409

# Park Purpose

The purpose statement identifies the specific reason(s) for establishment of a particular park. The purpose statement for Point Reyes National Seashore was drafted through a careful analysis of its enabling legislation and the legislative history that influenced its development. Legislation authorizing the establishment of Point Reyes National Seashore was enacted on September 13, 1962 (see appendix A for enabling legislation and legislative acts). The purpose statement lays the foundation for understanding what is most important about the park.

> *Established for public benefit, recreation, and inspiration, POINT REYES NATIONAL SEASHORE preserves a rugged and wild coastal peninsula and surrounding waters, connecting native ecosystems, enduring human history, and interpretive, scientific, and educational opportunities.*

The park administers an additional 15,000 acres of the North District of Golden Gate National Recreation Area, including all NPS lands north of Bolinas-Fairfax Road, under a regional directive for management. The purpose statement for Golden Gate National Recreation Area was also developed through an analysis of its enabling legislation and legislative history (see the 2017 *Foundation Document, Golden Gate National Recreation Area, California*).

> *The purpose of GOLDEN GATE NATIONAL RECREATION AREA is to offer national park experiences to all, including a large and diverse urban population, while preserving and interpreting the outstanding natural, historic, scenic, and recreational values of the park lands.*

# Park Significance

Significance statements express why a park's resources and values are important enough to merit designation as a unit of the national park system. These statements are linked to the purpose of Point Reyes National Seashore, and are supported by data, research, and consensus. Statements of significance describe the distinctive nature of the park and why an area is important within a global, national, regional, and systemwide context. They focus on the most important resources and values that will assist in park planning and management.

The following significance statements have been identified for Point Reyes National Seashore. (Please note that the sequence of the statements does not reflect the level of significance.) Additional significance statements relating to lands of Golden Gate National Recreation Area managed by Point Reyes National Seashore can be found in the *Foundation Document, Golden Gate National Recreation Area, California* (2017).

- The Phillip Burton Wilderness at Point Reyes National Seashore, although immediately accessible to a large urban community, offers an extraordinary opportunity for solitude and unconfined recreation in untrammeled terrestrial and marine environments.

- Point Reyes National Seashore supports internationally recognized biodiversity due to its dynamic geology, mosaic of terrestrial and marine environments, and location at one of the four major coastal upwelling zones in the world. The park protects thousands of plant and animal species, many of which are threatened or endangered.

- The productive coastal grassland ecosystem supported by the fog-driven climate of the Point Reyes Peninsula was the basis for development of the area's historic dairy and beef ranch tradition.

- Representing more than 5,000 years of human history, Point Reyes National Seashore contains one of the most intact and well preserved landscapes of American Indian history and a material record of one of the earliest instances of cultural contact between American Indians and European explorers on the west coast of the United States. The Coast Miwok, federally recognized as the Federated Indians of Graton Rancheria, maintain cultural ties to the Point Reyes Peninsula.

- The geography of the Point Reyes Peninsula, which extends almost 10 miles into the Pacific Ocean, both necessitated and facilitated the development of innovative maritime and radio communications technologies that influenced the history of the region and the nation.

- The geology of the Point Reyes Peninsula inspires both visitors and scientists. The coastal bluffs expose an intersection of sedimentary deposits rich in paleontological history, whereas vistas of Tomales Bay and the Olema Valley, shaped by the San Andreas Fault, provide an exceptional opportunity to visualize and study plate tectonics. Studies here have helped geologists refine our understanding of Earth's history.

- With its proximity to the San Francisco Bay metropolitan area, the undeveloped scenic coastal landscapes and rich biodiversity of Point Reyes National Seashore offer opportunities to visitors from around the world for inspiration, recreation, education, and research.

# Fundamental Resources and Values

Fundamental resources and values (FRVs) are those features, systems, processes, experiences, stories, scenes, sounds, smells, or other attributes determined to warrant primary consideration during planning and management processes because they are essential to achieving the purpose of the park and maintaining its significance. Fundamental resources and values are closely related to a park's legislative purpose and are more specific than significance statements.

Fundamental resources and values help focus planning and management efforts on what is truly significant about the park. One of the most important responsibilities of NPS managers is to ensure the conservation and public enjoyment of those qualities that are essential (fundamental) to achieving the purpose of the park and maintaining its significance. If fundamental resources and values are allowed to deteriorate, the park purpose and/or significance could be jeopardized.

The following fundamental resources and values have been identified for Point Reyes National Seashore. Additional FRV statements relating to lands of Golden Gate National Recreation Area managed by Point Reyes National Seashore can be found in the 2017 *Foundation Document, Golden Gate National Recreation Area, California.*

- **Wilderness.** The Phillip Burton Wilderness comprises almost 33,000 acres of land and water, roughly one-third of the lands administered by the Point Reyes National Seashore. It is the only federally designated wilderness in the San Francisco Bay Area and includes one of only two marine wilderness areas in the national park system. The Phillip Burton Wilderness provides access to outstanding opportunities for solitude and inspired recreation adjacent to a large urban area.

- **Scenic Coastal Landscapes.** Shaped by ongoing geologic processes, the Point Reyes Peninsula juts 10 miles into the Pacific Ocean and encompasses more than 80 miles of wild beaches, dramatic cliffs, coastal grasslands, and detached coastal formations. Point Reyes National Seashore offers opportunities to observe and understand the interaction of land and sea from many perspectives, including geology, ecological disturbance, and climate change.



- **Marine, Estuarine, and Freshwater Environments.** Natural interactions and connections between freshwater, estuarine, and marine systems are indicators of ecosystem health and examples of resilience. Protection of these environments and the interactions between them is important for the ecological health of intertidal invertebrates and fishes, pinnipeds, seabirds, shorebirds, and dune plants, among other species, which are threatened by rising sea levels, changes in nutrient and temperature regimes, oil spills, and other pressures.

- **Diversity of Habitats and Native Species.** In Point Reyes National Seashore the convergence of ecological regions at the continental margin creates a complexity of terrestrial and marine habitats that sustain exceptional and internationally recognized native biodiversity, including a wide range of rare and endemic species.

- **Maritime Cultural Landscapes.** Point Reyes National Seashore preserves nationally significant maritime sites including the Lifeboat Station and iconic Point Reyes Lighthouse and Marconi/Radio Corporation of America (RCA) radio stations. Together with dozens of shipwrecks offshore, these sites illustrate important stories of heroism and innovation in lifesaving, navigation, and communication technologies, including the first wireless communication across the Pacific Ocean in 1914.

- **Continuum of Human Use.** Point Reyes National Seashore preserves a landscape representing more than 5,000 years of American Indian history that is of outstanding archeological and cultural significance to the Federated Indians of Graton Rancheria and records early culture contacts between Coast Miwok and European explorers. The park preserves two districts (Olema Valley Dairy Ranches Historic District and Point Reyes Peninsula Dairy Ranches Historic District) that recognize more than 150 years of ranching on the Point Reyes Peninsula.

- **Opportunities for Inspiration and Recreation.** A system of trails, beaches, and waterways in Point Reyes National Seashore provides a wide variety of year-round activities and coastal access just an hour's drive from the San Francisco Bay Area. Activities include whale watching, hiking, kayaking, beach recreation, bird watching, horseback riding, backpacking, and wilderness experiences.

- **Science and Learning.** Science and restoration efforts throughout Point Reyes National Seashore lay the groundwork for educating visitors, informing management, and fostering stewardship. The park's proximity to San Francisco Bay Area institutes, colleges, and universities enables numerous learning laboratory and research opportunities.



009413

# Interpretive Themes

Interpretive themes are often described as the key stories or concepts that visitors should understand after visiting a park—they define the most important ideas or concepts communicated to visitors about a park unit. Themes are derived from, and should reflect, park purpose, significance, resources, and values. The set of interpretive themes is complete when it provides the structure necessary for park staff to develop opportunities for visitors to explore and relate to all park significance statements and fundamental resources and values.

Interpretive themes are an organizational tool that reveal and clarify meaning, concepts, contexts, and values represented by park resources. Sound themes are accurate and reflect current scholarship and science. They encourage exploration of the context in which events or natural processes occurred and the effects of those events and processes. Interpretive themes go beyond a mere description of the event or process to foster multiple opportunities to experience and consider the park and its resources. These themes help explain why a park story is relevant to people who may otherwise be unaware of connections they have to an event, time, or place associated with the park.

The following interpretive themes have been identified for Point Reyes National Seashore:



- Point Reyes National Seashore and surrounding national marine sanctuaries and national wildlife refuges support an abundance and diversity of species and their essential habitats in a relatively wild, natural state. These resources provide a benchmark for monitoring environmental change.

- Point Reyes has attracted and supported people for thousands of years, creating a tapestry of stories, interactions, and experiences.

- Point Reyes National Seashore provides an outdoor classroom and laboratory for the study of geological and ecological processes that will foster greater understanding, restoration, and caring for native ecosystems.

- Dynamic geologic processes and broad changes occurring in part as a result of climate change are continually defining and shaping the landscape of Point Reyes National Seashore, creating new challenges in its preservation, and offering new research and interpretive opportunities.



- The land and waters of the Phillip Burton Wilderness, an hour's drive from downtown San Francisco, are a sanctuary for nature and the human spirit that supports recreation, exploration, inspiration, and solitude and serves as a reminder of the human connections with this area.

Additional interpretive subthemes would be developed through future interpretive planning.

# Appendixes

## Appendix A: Current Enabling Legislation for Point Reyes National Seashore from U.S. Code

in, and incidental costs relating thereto, in accordance with the provisions of such sections.

(Pub. L. 87–126, §9, Aug. 7, 1961, 75 Stat. 293; Pub. L. 91–252, May 14, 1970, 84 Stat. 216; Pub. L. 98–141, §3, Oct. 31, 1983, 97 Stat. 909.)

#### AMENDMENTS

1983—Pub. L. 98–141 substituted "$42,917,575" for "$33,500,000".

1970—Pub. L. 91–252 substituted "$33,500,000" for "$16,000,000".

#### § 459c. Point Reyes National Seashore; purposes; authorization for establishment

In order to save and preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped, the Secretary of the Interior (hereinafter referred to as the "Secretary") is authorized to take appropriate action in the public interest toward the establishment of the national seashore set forth in section 459c–1 of this title.

(Pub. L. 87–657, §1, Sept. 13, 1962, 76 Stat. 538.)

#### § 459c–1. Description of area

**(a) Boundary map; availability; publication in Federal Register**

The Point Reyes National Seashore shall consist of the lands, waters, and submerged lands generally depicted on the map entitled "Boundary Map, Point Reyes National Seashore", numbered 612–80,008–E and dated May 1978, plus those areas depicted on the map entitled "Point Reyes and GGNRA Amendments, dated October 25, 1979".

The map referred to in this section shall be on file and available for public inspection in the Offices of the National Park Service, Department of the Interior, Washington, District of Columbia. After advising the Committee on Natural Resources of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate in writing, the Secretary may make minor revisions of the boundaries of the Point Reyes National Seashore when necessary by publication of a revised drawing or other boundary description in the Federal Register.

**(b) Bear Valley Ranch right-of-way**

The area referred to in subsection (a) shall also include a right-of-way to the aforesaid tract in the general vicinity of the northwesterly portion of the property known as "Bear Valley Ranch", to be selected by the Secretary, of not more than four hundred feet in width, together with such adjoining lands as would be deprived of access by reason of the acquisition of such right-of-way.

(Pub. L. 87–657, §2, Sept. 13, 1962, 76 Stat. 538; Pub. L. 89–666, §1(a), Oct. 15, 1966, 80 Stat. 919; Pub. L. 93–550, title II, §201, Dec. 26, 1974, 88 Stat. 1744; Pub. L. 95–625, title III, §318(a), Nov. 10, 1978, 92 Stat. 3486; Pub. L. 96–199, title I, §101(a)(1), Mar. 5, 1980, 94 Stat. 67; Pub. L. 103–437, §6(d)(16), Nov. 2, 1994, 108 Stat. 4584.)

#### AMENDMENTS

1994—Subsec. (a). Pub. L. 103–437 substituted "Natural Resources" for "Interior and Insular Affairs" after "Committee on".

1980—Subsec. (a). Pub. L. 96–199 inserted ", plus those areas depicted on the map entitled 'Point Reyes and GGNRA Amendments, dated October 25, 1979'" after "dated May 1978".

1978—Subsec. (a). Pub. L. 95–625 substituted as a description of the area the lands generally depicted on Boundary Map numbered 612–80,008–E and dated May 1978 for prior such depiction on Boundary Map numbered 612–80,008–B, and dated August 1974; included submerged lands in the description; made the map specifically available in the Washington, District of Columbia, Office; and authorized minor revisions of boundaries and publication thereof in the Federal Register after advising Congressional committees.

1974—Subsec. (a). Pub. L. 93–550 substituted as a boundary description Boundary Map No. 612–80,008–B, and dated August 1974, on file in the office of the National Park Service, Department of the Interior, for a boundary map designated NS–PR–7001, dated June 1, 1960, on file with the Director of the National Park Service, Washington, D.C., and all measurements relating thereto.

1966—Subsec. (b). Pub. L. 89–666 inserted "to the aforesaid tract in the general vicinity of the northwesterly portion of the property known as 'Bear Valley Ranch'" after "right-of-way", struck out "from the intersection of Sir Francis Drake Boulevard and Haggerty Gulch" after "aforesaid tract" and included such adjoining lands as would be deprived of access by reason of the right-of-way.

#### § 459c–2. Acquisition of property

**(a) Authority of Secretary; manner and place; concurrence of State owner; transfer from Federal agency to administrative jurisdiction of Secretary; liability of United States under contracts contingent on appropriations**

The Secretary is authorized to acquire, and it is the intent of Congress that he shall acquire as rapidly as appropriated funds become available for this purpose or as such acquisition can be accomplished by donation or with donated funds or by transfer, exchange, or otherwise the lands, waters, and other property, and improvements thereon and any interest therein, within the areas described in section 459c–1 of this title or which lie within the boundaries of the seashore as established under section 459c–4 of this title (hereinafter referred to as "such area"). Any property, or interest therein, owned by a State or political subdivision thereof may be acquired only with the concurrence of such owner. Notwithstanding any other provision of law, any Federal property located within such area may, with the concurrence of the agency having custody thereof, be transferred without consideration to the administrative jurisdiction of the Secretary for use by him in carrying out the provisions of sections 459c to 459c–7 of this title. In exercising his authority to acquire property in accordance with the provisions of this subsection, the Secretary may enter into contracts requiring the expenditure, when appropriated, of funds authorized by section 459c–7 of this title, but the liability of the United States under any such contract shall be contingent on the appropriation of funds sufficient to fulfill the obligations thereby incurred.

**(b) Payment for acquisition; fair market value**

The Secretary is authorized to pay for any acquisitions which he makes by purchase under sections 459c to 459c–7 of this title their fair market value, as determined by the Secretary,

who may in his discretion base his determination on an independent appraisal obtained by him.

**(c) Exchange of property; cash equalization payments**

In exercising his authority to acquire property by exchange, the Secretary may accept title to any non-Federal property located within such area and convey to the grantor of such property any federally owned property under the jurisdiction of the Secretary within California and adjacent States, notwithstanding any other provision of law. The properties so exchanged shall be approximately equal in fair market value, provided that the Secretary may accept cash from or pay cash to the grantor in such an exchange in order to equalize the values of the properties exchanged.

(Pub. L. 87–657, § 3, Sept. 13, 1962, 76 Stat. 539; Pub. L. 91–223, § 2(a), Apr. 3, 1970, 84 Stat. 90.)

Amendments

1970—Subsec. (a). Pub. L. 91–223 substituted introductory "The" for "Except as provided in section 459c–3 of this title, the".

**§ 459c–3. Repealed. Pub. L. 91–223, § 2(b), Apr. 3, 1970, 84 Stat. 90**

Section, Pub. L. 87–657, § 4, Sept. 13, 1962, 76 Stat. 540, provided conditions for exercise of eminent domain within pastoral zone and defined "ranching and dairying purposes".

**§ 459c–4. Point Reyes National Seashore**

**(a) Establishment; notice in Federal Register**

As soon as practicable after September 13, 1962, and following the acquisition by the Secretary of an acreage in the area described in section 459c–1 of this title, that is in the opinion of the Secretary efficiently administrable to carry out the purposes of sections 459c to 459c–7 of this title, the Secretary shall establish Point Reyes National Seashore by the publication of notice thereof in the Federal Register.

**(b) Distribution of notice and map**

Such notice referred to in subsection (a) of this section shall contain a detailed description of the boundaries of the seashore which shall encompass an area as nearly as practicable identical to the area described in section 459c–1 of this title. The Secretary shall forthwith after the date of publication of such notice in the Federal Register (1) send a copy of such notice, together with a map showing such boundaries, by registered or certified mail to the Governor of the State and to the governing body of each of the political subdivisions involved; (2) cause a copy of such notice and map to be published in one or more newspapers which circulate in each of the localities; and (3) cause a certified copy of such notice, a copy of such map, and a copy of sections 459c to 459c–7 of this title to be recorded at the registry of deeds for the county involved.

(Pub. L. 87–657, § 4, formerly § 5, Sept. 13, 1962, 76 Stat. 540; renumbered § 4, Pub. L. 91–223, § 2(c), Apr. 3, 1970, 84 Stat. 90.)

Amended Description of Boundaries of Point Reyes National Seashore; Publication in Federal Register

Pub. L. 93–550, title II, § 202, Dec. 26, 1974, 88 Stat. 1744, provided that: "The Secretary of the Interior shall, as soon as practicable after the date of enactment of this title [Dec. 26, 1974], publish an amended description of the boundaries of the Point Reyes National Seashore in the Federal Register, and thereafter he shall take such action with regard to such amended description and the map referred to in section 201 of this title [amending section 459c–1 of this title] as is required in the second sentence of subsection (b) of section 4 of the act of September 13, 1962, as amended [subsec. (b) of this section]."

**§ 459c–5. Owner's reservation of right of use and occupancy for fixed term of years or life**

**(a) Election of term; fair market value; termination; notification; lease of Federal lands; restrictive covenants, offer to prior owner or leaseholder**

Except for property which the Secretary specifically determines is needed for interpretive or resources management purposes of the seashore, the owner of improved property or of agricultural property on the date of its acquisition by the Secretary under sections 459c to 459c–7 of this title may, as a condition of such acquisition, retain for himself and his or her heirs and assigns a right of use and occupancy for a definite term of not more than twenty-five years, or, in lieu thereof, for a term ending at the death of the owner or the death of his or her spouse, whichever is later. The owner shall elect the term to be reserved. Unless the property is wholly or partly donated to the United States, the Secretary shall pay to the owner the fair market value of the property on the date of acquisition minus the fair market value on that date of the right retained by the owner. A right retained pursuant to this section shall be subject to termination by the Secretary upon his or her determination that it is being exercised in a manner inconsistent with the purposes of sections 459c to 459c–7 of this title, and it shall terminate by operation of law upon the Secretary's notifying the holder of the right of such determination and tendering to him or her an amount equal to the fair market value of that portion of the right which remains unexpired. Where appropriate in the discretion of the Secretary, he or she may lease federally owned land (or any interest therein) which has been acquired by the Secretary under sections 459c to 459c–7 of this title, and which was agricultural land prior to its acquisition. Such lease shall be subject to such restrictive covenants as may be necessary to carry out the purposes of sections 459c to 459c–7 of this title. Any land to be leased by the Secretary under this section shall be offered first for such lease to the person who owned such land or was a leaseholder thereon immediately before its acquisition by the United States.

**(b) "Improved and agricultural property" defined**

As used in sections 459c to 459c–7 of this title, the term "improved property" shall mean a pri-

vate noncommercial dwelling, including the land on which it is situated, whose construction was begun before September 1, 1959, or, in the case of areas added by action of the Ninety-fifth Congress, May 1, 1978 or, in the case of areas added by action of the Ninety-sixth Congress, May 1, 1979, and structures accessory thereto (hereinafter in this subsection referred to as "dwelling"), together with such amount and focus of the property adjoining and in the same ownership as such dwelling as the Secretary designates to be reasonably necessary for the enjoyment of such dwelling for the sole purpose of noncommercial residential use and occupancy. In making such designation the Secretary shall take into account the manner of noncommercial residential use and occupancy in which the dwelling and such adjoining property has usually been enjoyed by its owner or occupant. The term "agricultural property" as used in sections 459c to 459c–7 of this title means lands which were in regular use for, or were being converted to agricultural, ranching, or dairying purposes as of May 1, 1978 or, in the case of areas added by action of the Ninety-sixth Congress, May 1, 1979, together with residential and other structures related to the above uses of the property that were in existence or under construction as of May 1, 1978.

**(c) Payment deferral; scheduling; interest rate**

In acquiring those lands authorized by the Ninety-fifth Congress for the purposes of sections 459c to 459c–7 of this title, the Secretary may, when agreed upon by the landowner involved, defer payment or schedule payments over a period of ten years and pay interest on the unpaid balance at a rate not exceeding that paid by the Treasury of the United States for borrowing purposes.

**(d) Lands donated by State of California**

The Secretary is authorized to accept and manage in accordance with sections 459c to 459c–7 of this title, any lands and improvements within or adjacent to the seashore which are donated by the State of California or its political subdivisions. He is directed to accept any such lands offered for donation which comprise the Tomales Bay State Park, or lie between said park and Fish Hatchery Creek. The boundaries of the seashore shall be changed to include any such donated lands.

**(e) Fee or admission charge prohibited**

Notwithstanding any other provision of law, no fee or admission charge may be levied for admission of the general public to the seashore.

(Pub. L. 87–657, § 5, formerly § 6, Sept. 13, 1962, 76 Stat. 541; renumbered § 5, Pub. L. 91–223, § 2(c), Apr. 3, 1970, 84 Stat. 90; amended Pub. L. 95–625, title III, § 318(b)–(d), Nov. 10, 1978, 92 Stat. 3487; Pub. L. 96–199, title I, § 101(a)(2)–(4), Mar. 5, 1980, 94 Stat. 67.)

<center>AMENDMENTS</center>

1980—Subsec. (a). Pub. L. 96–199, § 101(a)(2), substituted "Except for property which the Secretary specifically determines is needed for interpretive or resources management purposes of the seashore, the" for "The" in first sentence.

Subsec. (b). Pub. L. 96–199, § 101(a)(3), inserted "or, in the case of areas inserted by action of the Ninety-sixth

Congress, May 1, 1979," after "May 1, 1978" and "that were in existence or under construction as of May 1, 1978" after "related to the above uses of the property".

Subsecs. (d), (e). Pub. L. 96–199, § 101(a)(4), added subsecs. (d) and (e).

1978—Subsec. (a). Pub. L. 95–625, § 318(b), extended provision to agricultural property; provided for: retention rights of heirs and assigns, retention rights for term of twenty-five years or for term ending with death of owner or spouse, whichever was later, as elected by owner, which provision previously authorized retention for term of fifty years, termination of right of retention and notice thereof, and for lease of federally owned lands, subject to restrictive covenants, with first offer to prior owner or leaseholder; and included clause relating to donation of property to the United States.

Subsec. (b). Pub. L. 95–625, § 318(c), defined "improved property" to include private dwelling, the construction of which was begun, in the case of areas added by action of the Ninety-fifth Congress, October 1, 1978, and included definition of "agricultural property".

Subsec. (c). Pub. L. 95–625, § 318(d), added subsec. (c).

### § 459c–6. Administration of property

**(a) Protection, restoration, and preservation of natural environment**

Except as otherwise provided in sections 459c to 459c–7 of this title, the property acquired by the Secretary under such sections shall be administered by the Secretary without impairment of its natural values, in a manner which provides for such recreational, educational, historic preservation, interpretation, and scientific research opportunities as are consistent with, based upon, and supportive of the maximum protection, restoration, and preservation of the natural environment within the area, subject to the provisions of the Act entitled "An Act to establish a National Park Service, and for other purposes", approved August 25, 1916 (39 Stat. 535),[1] as amended and supplemented, and in accordance with other laws of general application relating to the national park system as defined by the Act of August 8, 1953 (67 Stat. 496),[1] except that authority otherwise available to the Secretary for the conservation and management of natural resources may be utilized to the extent he finds such authority will further the purposes of sections 459c to 459c–7 of this title.

**(b) Hunting and fishing regulations**

The Secretary may permit hunting and fishing on lands and waters under his jurisdiction within the seashore in such areas and under such regulations as he may prescribe during open seasons prescribed by applicable local, State, and Federal law. The Secretary shall consult with officials of the State of California and any political subdivision thereof who have jurisdiction of hunting and fishing prior to the issuance of any such regulations, and the Secretary is authorized to enter into cooperative agreements with such officials regarding such hunting and fishing as he may deem desirable.

(Pub. L. 87–657, § 6, formerly § 7, Sept. 13, 1962, 76 Stat. 541; renumbered § 6, Pub. L. 91–223, § 2(c), Apr. 3, 1970, 84 Stat. 90; amended Pub. L. 94–544, § 4(a), Oct. 18, 1976, 90 Stat. 2515; Pub. L. 94–567, § 7(a), Oct. 20, 1976, 90 Stat. 2695.)

<center>REFERENCES IN TEXT</center>

The Act entitled "An Act to establish a National Park Service, and for other purposes", approved August

---

[1] See References in Text note below.

25, 1916 (39 Stat. 535), referred to in subsec. (a), is act Aug. 25, 1916, ch. 408, 39 Stat. 535, known as the National Park Service Organic Act, which enacted sections 1, 2, 3, and 4 of this title and provisions set out as a note under section 100101 of Title 54, National Park Service and Related Programs. Sections 1 to 4 of the Act were repealed and restated as section 1865(a) of Title 18, Crimes and Criminal Procedure, and section 100101(a), chapter 1003, and sections 100751(a), 100752, 100753, and 102101 of Title 54 by Pub. L. 113–287, §§3, 4(a)(1), 7, Dec. 19, 2014, 128 Stat. 3094, 3260, 3272. For complete classification of this Act to the Code, see Tables. For disposition of former sections of this title, see Disposition Table preceding section 100101 of Title 54.

The Act of August 8, 1953 (67 Stat. 496), referred to in subsec. (a), is act Aug. 8, 1953, ch. 384, 67 Stat. 496, which enacted sections 1b to 1d of this title. The Act, except for section 1(3), was repealed and restated in sections 100501, 100755, 100901, 101901, 102711, and 103102 of Title 54, National Park Service and Related Programs, by Pub. L. 113–287, §§3, 7, Dec. 19, 2014, 128 Stat. 3094, 3272. Section 1(3) of the Act was transferred and is set out as a note under section 407a of this title. For complete classification of this Act to the Code, see Tables. For disposition of former sections of this title, see Disposition Table preceding section 100101 of Title 54.

AMENDMENTS

1976—Subsec. (a). Pub. L. 94–544 and Pub. L. 94–567 made substantially identical amendments by inserting provision which directed the Secretary to administer the property acquired in such a manner so as to provide recreational, educational, historic preservation, interpretation, and scientific research opportunities consistent with the maximum protection, restoration, and preservation of the environment.

## § 459c–6a. The Clem Miller Environmental Education Center; designation

The Secretary shall designate the principal environmental education center within the seashore as ''The Clem Miller Environmental Education Center'', in commemoration of the vision and leadership which the late Representative Clem Miller gave to the creation and protection of Point Reyes National Seashore.

(Pub. L. 87–657, §7, as added Pub. L. 94–544, §4(b), Oct. 18, 1976, 90 Stat. 2515, and Pub. L. 94–567, §7(b), Oct. 20, 1976, 90 Stat. 2695.)

CODIFICATION

Section 4(b) of Pub. L. 94–544 and section 7(b) of Pub. L. 94–567 enacted identical sections.

## § 459c–6b. Cooperation with utilities district; land use and occupancy; terms and conditions

The Secretary shall cooperate with the Bolinas Public Utilities District to protect and enhance the watershed values within the seashore. The Secretary may, at his or her discretion, permit the use and occupancy of lands added to the seashore by action of the Ninety-fifth Congress by the utilities district for water supply purposes, subject to such terms and conditions as the Secretary deems are consistent with the purposes of sections 459c to 459c–7 of this title.

(Pub. L. 87–657, §8, as added Pub. L. 95–625, title III, §318(e), Nov. 10, 1978, 92 Stat. 3487.)

## § 459c–7. Authorization of appropriations; restriction on use of land

There are authorized to be appropriated such sums as may be necessary to carry out the provisions of sections 459c to 459c–7 of this title, except that no more than $57,500,000 shall be appropriated for the acquisition of land and waters and improvements thereon, and interests therein, and incidental costs relating thereto, in accordance with the provisions of such sections: *Provided*, That no freehold, leasehold, or lesser interest in any lands hereafter acquired within the boundaries of the Point Reyes National Seashore shall be conveyed for residential or commercial purposes except for public accommodations, facilities, and services provided pursuant to the Act of October 9, 1965 (Public Law 89–249; 79 Stat. 969).[1] In addition to the sums heretofore authorized by this section, there is further authorized to be appropriated $5,000,000 for the acquisition of lands or interests therein.

(Pub. L. 87–657, §9, formerly §8, Sept. 13, 1962, 76 Stat. 541; Pub. L. 89–666, §1(b), Oct. 15, 1966, 80 Stat. 919; renumbered §7 and amended Pub. L. 91–223, §§1, 2(c), Apr. 3, 1970, 84 Stat. 90; renumbered §8, Pub. L. 94–544, §4(b), Oct. 18, 1976, 90 Stat. 2515; renumbered §8, Pub. L. 94–567, §7(b), Oct. 20, 1976, 90 Stat. 2695; renumbered §9, Pub. L. 95–625, title III, §318(e), Nov. 10, 1978, 92 Stat. 3487; amended Pub. L. 95–625, title III, §318(f), as added Pub. L. 96–199, title I, §101(a)(5), Mar. 5, 1980, 94 Stat. 67.)

REFERENCES IN TEXT

The Act of October 9, 1965, referred to in text, is Pub. L. 89–249, Oct. 9, 1965, 79 Stat. 969, known as the National Park System Concessions Policy Act, which enacted subchapter IV (§20 et seq.) of this chapter and amended section 462 of this title, prior to being repealed by Pub. L. 105–391, title IV, §415(a), Nov. 13, 1998, 112 Stat. 3515.

Sums ''heretofore'' authorized by this section, referred to in text, means sums authorized by this section prior to the enactment on Mar. 5, 1980, of Pub. L. 96–199, which added the authorization for a $5,000,000 appropriation for the acquisition of lands or interest in lands.

CODIFICATION

Section 4(b) of Pub. L. 94–544 and section 7(b) of Pub. L. 94–567 identically renumbered this section as section 8 of Pub. L. 87–657.

AMENDMENTS

1980—Pub. L. 96–199 inserted provisions authorizing an appropriation of $5,000,000 for the acquisition of lands or interests therein.

1970—Pub. L. 91–223, §1, substituted ''$57,500,000'' for ''$19,135,000'', restricted conveyances of any interest in any lands acquired after April 3, 1970, only for public accommodations, facilities, and services under provisions for concessions in areas administered by National Park Service.

1966—Pub. L. 89–666 substituted ''$19,135,000'' for ''$14,000,000''.

## § 459d. Padre Island National Seashore; description of land and waters

In order to save and preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the

---

[1] See References in Text note below.

Foundation Document

# Appendix B: Historic Legislative Acts for Point Reyes National Seashore

538                                    PUBLIC LAW 87-657—SEPT. 13, 1962                    [76 STAT.

Public Law 87-657

September 13, 1962
[S. 476]

AN ACT

To establish the Point Reyes National Seashore in the State of California, and for other purposes.

California.
Point Reyes National Seashore.
Establishment.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in order to save and preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped, the Secretary of the Interior (hereinafter referred to as the "Secretary") is hereby authorized to take appropriate action in the public interest toward the establishment of the national seashore set forth in section 2 of this Act.

SEC. 2. (a) The area comprising that portion of the land and waters located on Point Reyes Peninsula, Marin County, California, which shall be known as the Point Reyes National Seashore, is described as follows by reference to that certain boundary map, designated NS-PR-7001, dated June 1, 1960, on file with the Director, National Park Service, Washington, District of Columbia.

Beginning at a point, not monumented, where the boundary line common to Rancho Punta de los Reyes (Sobrante) and Rancho Las Baulines meets the average high tide line of the Pacific Ocean as shown on said boundary map;

Thence southwesterly from said point 1,320 feet offshore on a prolongation of said boundary line common to Rancho Punta de los Reyes (Sobrante) and Rancho Las Baulines;

Thence in a northerly and westerly direction paralleling the average high tide line of the shore of the Pacific Ocean; along Drakes Bay, and around Point Reyes;

Thence generally northerly and around Tomales Point, offshore a distance of 1,320 feet from average high tide line;

Thence southeasterly along a line 1,320 feet offshore and parallel to the average high tide line along the west shore of Bodega Bay and Tomales Bay to the intersection of this line with a prolongation of the most northerly tangent of the boundary of Tomales Bay State Park;

Thence south 54 degrees 32 minutes west 1,320 feet along the prolongation of said tangent of Tomales Bay State Park boundary to the average high tide line on the shore of Tomales Bay;

Thence following the boundary of Tomales Bay State Park in a southerly direction to a point lying 105.4 feet north 41 degrees east of an unimproved road heading westerly and northerly from Pierce Point Road;

Thence south 41 degrees west 105.4 feet to a point on the north right-of-way of said unimproved road;

Thence southeasterly along the north right-of-way of said unimproved road and Pierce Point Road to a point at the southwest corner of Tomales Bay State Park at the junction of the Pierce Point Road and Sir Francis Drake Boulevard;

Thence due south to a point on the south right-of-way of said Sir Francis Drake Boulevard;

Thence southeasterly along said south right-of-way approximately 3,100 feet to a point;

Thence approximately south 19 degrees west approximately 300 feet;

Thence south approximately 400 feet;

Thence southwest to the most northerly corner of the Inverness watershed area;

Thence southerly and easterly along the west property line of the Inverness watershed area approximately 9,040 feet to a point near the

intersection of this property line with an unimproved road as shown on said boundary map;

Thence southerly along existing property lines that roughly follow said unimproved road to its intersection with Drakes Summit Road and to a point on the north right-of-way of Drakes Summit Road;

Thence easterly approximately 1,000 feet along the north right-of-way of said Drakes Summit Road to a point which is a property line corner at the intersection with an unimproved road to the south;

Thence southerly and easterly and then northerly, as shown approximately on said boundary map, along existing property lines to a point on the south right-of-way of the Bear Valley Road, approximately 1,500 feet southeast of its intersection with Sir Francis Drake Boulevard;

Thence easterly and southerly along said south right-of-way of Bear Valley Road to a point on a property line approximately 1,000 feet west of the intersection of Bear Valley Road and Sir Francis Drake Boulevard in the village of Olema;

Thence south approximately 1,700 feet to the northwest corner of property now owned by Helen U. and Mary S. Shafter;

Thence southwest and southeast along the west boundary of said Shafter property to the southwest corner of said Shafter property;

Thence approximately south 30 degrees east on a course approximately 1,700 feet to a point;

Thence approximately south 10 degrees east on a course to the centerline of Olema Creek;

Thence generally southeasterly up the centerline of Olema Creek to a point on the west right-of-way line of State Route Numbered 1;

Thence southeasterly along westerly right-of-way line to State Highway Numbered 1 to a point where a prolongation of the boundary line common to Rancho Punta de los Reyes (Sobrante) and Rancho Las Baulines would intersect right-of-way line of State Highway Numbered 1;

Thence southwesterly to and along said south boundary line of Rancho Punta de los Reyes (Sobrante) approximately 2,900 feet to a property corner;

Thence approximately south 38 degrees east approximately 1,500 feet to the centerline of Pine Gulch Creek;

Thence down the centerline of Pine Gulch Creek approximately 400 feet to the intersection with a side creek flowing from the west;

Thence up said side creek to its intersection with said south boundary line of Rancho Punta de los Reyes (Sobrante);

Thence southwest along said south boundary line of Rancho Punta de los Reyes to the point of beginning, containing approximately 53,-000 acres. Notwithstanding the foregoing description, the Secretary is authorized to include within the Point Reyes National Seashore the entire tract of land owned by the Vedanta Society of Northern California west of the centerline of Olema Creek, in order to avoid a severance of said tract.

(b) The area referred to in subsection (a) shall include also a right-of-way, to be selected by the Secretary, of not more than 400 feet in width to the aforesaid tract from the intersection of Sir Francis Drake Boulevard and Haggerty Gulch.

Sec. 3. (a) Except as provided in section 4, the Secretary is authorized to acquire, and it is the intent of Congress that he shall acquire as rapidly as appropriated funds become available for this purpose or as such acquisition can be accomplished by donation or with donated funds or by transfer, exchange, or otherwise the lands, waters, and other property, and improvements thereon and any interest therein, within the areas described in section 2 of this Act or which lie within

540    PUBLIC LAW 87-657–SEPT. 13, 1962    [76 Stat.

the boundaries of the seashore as established under section 5 of this Act (hereinafter referred to as "such area"). Any property, or interest therein, owned by a State or political subdivision thereof may be acquired only with the concurrence of such owner. Notwithstanding any other provision of law, any Federal property located within such area may, with the concurrence of the agency having custody thereof, be transferred without consideration to the administrative jurisdiction of the Secretary for use by him in carrying out the provisions of this Act. In exercising his authority to acquire property in accordance with the provisions of this subsection, the Secretary may enter into contracts requiring the expenditure, when appropriated, of funds authorized by section 8 of this Act, but the liability of the United States under any such contract shall be contingent on the appropriation of funds sufficient to fulfill the obligations thereby incurred.

(b) The Secretary is authorized to pay for any acquisitions which he makes by purchase under this Act their fair market value, as determined by the Secretary, who may in his discretion base his determination on an independent appraisal obtained by him.

(c) In exercising his authority to acquire property by exchange, the Secretary may accept title to any non-Federal property located within such area and convey to the grantor of such property any federally owned property under the jurisdiction of the Secretary within California and adjacent States, notwithstanding any other provision of law. The properties so exchanged shall be approximately equal in fair market value, provided that the Secretary may accept cash from or pay cash to the grantor in such an exchange in order to equalize the values of the properties exchanged.

SEC. 4. No parcel of more than five hundred acres within the zone of approximately twenty-six thousand acres depicted on map numbered NS–PR–7002, dated August 15, 1961, on file with the director, National Park Service, Washington, District of Columbia, exclusive of that land required to provide access for purposes of the national seashore, shall be acquired without the consent of the owner so long as it remains in its natural state, or is used exclusively for ranching and dairying purposes including housing directly incident thereto. The term "ranching and dairying purposes", as used herein, means such ranching and dairying, primarily for the production of food, as is presently practiced in the area.

"Ranching and dairying purposes."

In acquiring access roads within the pastoral zone, the Secretary shall give due consideration to existing ranching and dairying uses and shall not unnecessarily interfere with or damage such use.

Publication in F. R.

SEC. 5. (a) As soon as practicable after the date of enactment of this Act and following the acquisition by the Secretary of an acreage in the area described in section 2 of this Act, that is in the opinion of the Secretary efficiently administrable to carry out the purposes of this Act, the Secretary shall establish Point Reyes National Seashore by the publication of notice thereof in the Federal Register.

Notification of Governor, etc.

(b) Such notice referred to in subsection (a) of this section shall contain a detailed description of the boundaries of the seashore which shall encompass an area as nearly as practicable identical to the area described in section 2 of this Act. The Secretary shall forthwith after the date of publication of such notice in the Federal Register (1) send a copy of such notice, together with a map showing such boundaries, by registered or certified mail to the Governor of the State and to the governing body of each of the political subdivisions involved; (2) cause a copy of such notice and map to be published in one or more newspapers which circulate in each of the localities; and (3) cause a certified copy of such notice, a copy of such map, and a copy of this Act to be recorded at the registry of deeds for the county involved.

009421

76 Stat. ]        PUBLIC LAW 87-658~SEPT. 14, 1962                    541

Sec. 6. (a) Any owner or owners (hereinafter in this subsection referred to as "owner") of improved property on the date of its acquisition by the Secretary may, as a condition to such acquisition, retain the right of use and occupancy of the improved property for noncommercial residential purposes for a term of fifty years. The Secretary shall pay to the owner the fair market value of the property on the date of such acquisition less the fair market value on such date of the right retained by the owner.

(b) As used in this Act, the term "improved property" shall mean a private noncommercial dwelling, including the land on which it is situated, whose construction was begun before September 1, 1959, and structures accessory thereto (hereinafter in this subsection referred to as "dwelling"), together with such amount and locus of the property adjoining and in the same ownership as such dwelling as the Secretary designates to be reasonably necessary for the enjoyment of such dwelling for the sole purpose of noncommercial residential use and occupancy. In making such designation the Secretary shall take into account the manner of noncommercial residential use and occupancy in which the dwelling and such adjoining property has usually been enjoyed by its owner or occupant.

"Improved property."

Sec. 7. (a) Except as otherwise provided in this Act, the property acquired by the Secretary under this Act shall be administered by the Secretary, subject to the provisions of the Act entitled "An Act to establish a National Park Service, and for other purposes", approved August 25, 1916 (39 Stat. 535), as amended and supplemented, and in accordance with other laws of general application relating to the national park system as defined by the Act of August 8, 1953 (67 Stat. 496), except that authority otherwise available to the Secretary for the conservation and management of natural resources may be utilized to the extent he finds such authority will further the purposes of this Act.

16 USC 1.

16 USC 1a.

(b) The Secretary may permit hunting and fishing on lands and waters under his jurisdiction within the seashore in such areas and under such regulations as he may prescribe during open seasons prescribed by applicable local, State, and Federal law. The Secretary shall consult with officials of the State of California and any political subdivision thereof who have jurisdiction of hunting and fishing prior to the issuance of any such regulations, and the Secretary is authorized to enter into cooperative agreements with such officials regarding such hunting and fishing as he may deem desirable.

Sec. 8. There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this Act, except that no more than $14,000,000 shall be appropriated for the acquisition of land and waters and improvements thereon, and interests therein, and incidental costs relating thereto, in accordance with the provisions of this Act.

Appropriation.

Approved September 13, 1962.

Foundation Document

Public Law 91-223

April 3, 1970
[H. R. 3786]

AN ACT

To authorize the appropriation of additional funds necessary for acquisition of land at the Point Reyes National Seashore in California.

Point Reyes
National Sea-
shore, Calif.
Appropriation.
80 Stat. 919.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 8 of the Act of September 13, 1962 (76 Stat. 538), as amended (16 U.S.C. 459c–7), is amended (a) by deleting "$19,135,000" and inserting "$57,500,000", and (b) by changing the period at the end of the section to a colon and adding: "*Provided,* That no freehold, leasehold, or lesser interest in any lands hereafter acquired within the boundaries of the Point Reyes National Seashore shall be conveyed for residential or commercial purposes except for public accommodations, facilities, and services provided pursuant to the Act of October 9, 1965 (Public Law 89–249; 79 Stat. 969).".

16 USC 20.

16 USC 459c-2.

SEC. 2. (a) Section 3(a) of the Act of September 13, 1962 (76 Stat. 538), is amended by striking out the words "Except as provided in section 4, the," in the first sentence and inserting the word "The" in lieu thereof.

Repeal.
16 USC 459c-3.

(b) Section 4 is hereby repealed.

(c) The remaining sections of the Act of September 13, 1962 (76 Stat. 538), are renumbered accordingly.

Approved April 3, 1970.

18

009423

86 Stat. ]       PUBLIC LAW 92-589–OCT. 27, 1972

Public Law 92-589

AN ACT

To establish the Golden Gate National Recreation Area in the State of California, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### ESTABLISHMENT

Section 1. In order to preserve for public use and enjoyment certain areas of Marin and San Francisco Counties, California, possessing outstanding natural, historic, scenic, and recreational values, and in order to provide for the maintenance of needed recreational open space necessary to urban environment and planning, the Golden Gate National Recreation Area (hereinafter referred to as the "recreation area") is hereby established. In the management of the recreation area, the Secretary of the Interior (hereinafter referred to as the "Secretary") shall utilize the resources in a manner which will provide for recreation and educational opportunities consistent with sound principles of land use planning and management. In carrying out the provisions of this Act, the Secretary shall preserve the recreation area, as far as possible, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area.

### COMPOSITION AND BOUNDARIES

Sec. 2. (a) The recreation area shall comprise the lands, waters, and submerged lands generally depicted on the map entitled "Boundary Map, Golden Gate National Recreation Area", numbered NRA-GG-80,003A, sheets 1 through 3, and dated July, 1972.

(b) The map referred to in this section shall be on file and available for public inspection in the Offices of the National Park Service, Department of the Interior, Washington, District of Columbia. After advising the Committees on Interior and Insular Affairs of the United States House of Representatives and the United States Senate (hereinafter referred to as the "committees") in writing, the Secretary may make minor revisions of the boundaries of the recreation area when necessary by publication of a revised drawing or other boundary description in the Federal Register.

### ACQUISITION POLICY

Sec. 3. (a) Within the boundaries of the recreation area, the Secretary may acquire lands, improvements, waters, or interests therein, by donation, purchase, exchange or transfer. Any lands, or interests therein, owned by the State of California or any political subdivision thereof, may be acquired only by donation. When any tract of land is only partly within such boundaries, the Secretary may acquire all or any portion of the land outside of such boundaries in order to minimize the payment of severance costs. Land so acquired outside of the boundaries may be exchanged by the Secretary for non-Federal lands within the boundaries. Any portion of land acquired outside the boundaries and not utilized for exchange shall be reported to the General Services Administration for disposal under the Federal Property and Administrative Services Act of 1949 (63 Stat. 377), as amended: *Provided,* That no disposal shall be for less than fair market value. Except as hereinafter provided, Federal property within

Foundation Document

the boundaries of the recreation area is hereby transferred without consideration to the administrative jurisdiction of the Secretary for the purposes of this Act, subject to the continuation of such existing uses as may be agreed upon between the Secretary and the head of the agency formerly having jurisdiction over the property. Notwithstanding any other provision of law, the Secretary may develop and administer for the purposes of this Act structures or other improvements and facilities on lands for which he receives a permit of use and occupancy from the Secretary of the Army.

(b) Fort Cronkhite, Fort Barry, and the westerly one-half of Fort Baker, in Marin County, California, as depicted on the map entitled "Golden Gate Military Properties" numbered NRAGG–20,002 and dated January 1972, which shall be on file and available for public inspection in the offices of the National Park Service, are hereby transferred to the jurisdiction of the Secretary for purposes of this Act, subject to continued use and occupancy by the Secretary of the Army of those lands needed for existing air defense missions, reserve activities and family housing, until he determines that such requirements no longer exist. The Coast Guard Radio Receiver Station, shall remain under the jurisdiction of the Secretary of the Department in which the Coast Guard is operating. When this station is determined to be excess to the needs of the Coast Guard, it shall be transferred to the jurisdiction of the Secretary for purposes of this Act.

(c) The easterly one-half of Fort Baker in Marin County, California, shall remain under the jurisdiction of the Department of the Army. When this property is determined by the Department of Defense to be excess to its needs, it shall be transferred to the jurisdiction of the Secretary for purposes of this Act. The Secretary of the Army shall grant to the Secretary reasonable public access through such property to Horseshoe Bay, together with the right to construct and maintain such public service facilities as are necessary for the purposes of this Act. The precise facilities and location thereof shall be determined between the Secretary and the Secretary of the Army.

(d) Upon enactment, the Secretary of the Army shall grant to the Secretary the irrevocable use and occupancy of one hundred acres of the Baker Beach area of the Presidio of San Francisco, as depicted on the map referred to in subsection (b).

(e) The Secretary of the Army shall grant to the Secretary within a reasonable time, the irrevocable use and occupancy of forty-five acres of the Crissy Army Airfield of the Presidio, as depicted on the map referred to in subsection (b).

(f) When all or any substantial portion of the remainder of the Presidio is determined by the Department of Defense to be excess to its needs, such lands shall be transferred to the jurisdiction of the Secretary for purposes of this Act. The Secretary shall grant a permit for continued use and occupancy for that portion of said Fort Point Coast Guard Station necessary for activities of the Coast Guard.

(g) Point Bonita, Point Diablo, and Lime Point shall remain under the jurisdiction of the Secretary of the Department in which the Coast Guard is operating. When this property is determined to be excess to the needs of the Coast Guard, it shall be transferred to the jurisdiction of the Secretary for purposes of this Act. The Coast Guard may continue to maintain and operate existing navigational aids: *Provided,* That access to such navigational aids and the installation of necessary new navigational aids within the recreation area shall be undertaken in accordance with plans which are mutually acceptable to the Secretary and the Secretary of the Department in which the Coast Guard is operating and which are consistent with both the purposes of this Act and the purpose of existing

statutes dealing with establishment, maintenance, and operation of navigational aids.

(h) That portion of Fort Miley comprising approximately one and seven-tenths acres of land presently used and required by the Secretary of the Navy for its inshore, undersea warfare installations shall remain under the administrative jurisdiction of the Department of the Navy until such time as all or any portion thereof is determined by the Department of Defense to be excess to its needs, at which time such excess portion shall be transferred to the administrative jurisdiction of the Secretary for purposes of this Act.

(i) New construction and development within the recreation area on property remaining under the administrative jurisdiction of the Department of the Army and not subject to the provisions of subsection (d) or (e) hereof shall be limited to that which is required to accommodate facilities being relocated from property being transferred under this Act to the administrative jurisdiction of the Secretary or which is directly related to the essential missions of the Sixth United States Army: *Provided, however*, That any construction on presently undeveloped open space may be undertaken only after prior consultation with the Secretary. The foregoing limitation on construction and development shall not apply to expansion of those facilities known as Letterman General Hospital or the Western Medical Institute of Research.

(j) The owner of improved property on the date of its acquisition by the Secretary under this Act may, as a condition of such acquisition, retain for himself and his heirs and assigns a right of use and occupancy of the improved property for noncommercial residential purposes for a definite term of not more than twenty-five years, or, in lieu thereof, for a term ending at the death of the owner or the death of his spouse, whichever is later. The owner shall elect the term to be reserved. Unless the property is wholly or partially donated to the United States, the Secretary shall pay to the owner the fair market value of the property on the date of acquisition minus the fair market value on that date of the right retained by the owner. A right retained pursuant to this section shall be subject to termination by the Secretary upon his determination that it is being exercised in a manner inconsistent with the purpose of this Act, and it shall terminate by operation of law upon the Secretary's notifying the holder of the right of such determination and tendering to him an amount equal to the fair market value of that portion of the right which remains unexpired.

(k) The term "improved property", as used in subsection (j), means a detached, noncommercial residential dwelling, the construction of which was begun before June 1, 1971, together with so much of the land on which the dwelling is situated, the said land being in the same ownership as the dwelling, as the Secretary shall designate to be reasonably necessary for the enjoyment of the dwelling for the sole purpose of noncommercial residential use, together with any structures accessory to the dwelling which are situated on the land so designated.

(l) Whenever an owner of property elects to retain a right of use and occupancy as provided for in the Act, such owner shall be deemed to have waived any benefits or rights accruing under sections 203, 204, 205, and 206 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (84 Stat. 1894), and for the purposes of those sections such owner shall not be considered a displaced person as defined in section 101(6) of that Act.

(m) Notwithstanding any other provision of law, the Secretary shall have the same authority with respect to contracts for the acquisition of land and interests in land for the purposes of this Act as was

given the Secretary of the Treasury for other land acquisitions by section 34 of the Act of May 30, 1908, relating to purchase of sites for public buildings (35 Stat. 545), and the Secretary and the owner of land to be acquired under this Act may agree that the purchase price will be paid in periodic installments over a period that does not exceed ten years, with interest on the unpaid balance thereof at a rate which is not in excess of the current average market yield on outstanding marketable obligations of the United States with remaining periods to maturity comparable to the average maturities on the installments. Judgments against the United States for amounts in excess of the deposit in court made in condemnation actions shall be subject to the provisions of the Act of July 27, 1956 (70 Stat. 624) and sections 2414 and 2517 of title 28, United States Code.

### ADMINISTRATION

Sec. 4. (a) The Secretary shall administer the lands, waters and interests therein acquired for the recreation area in accordance with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1, 2–4), as amended and supplemented, and the Secretary may utilize such statutory authority available to him for the conservation and management of wildlife and natural resources as he deems appropriate to carry out the purposes of this Act. Notwithstanding their inclusion within the boundaries of the recreation area, the Muir Woods National Monument and Fort Point National Historic Site shall continue to be administered as distinct and identifiable units of the national park system in accordance with the laws applicable to such monument and historic site.

(b) The Secretary may enter into cooperative agreements with any Federal agency, the State of California, or any political subdivision thereof, for the rendering, on a reimbursable basis, of rescue, firefighting, and law enforcement and fire preventive assistance.

(c) The authority of the Army to undertake or contribute to water resource developments, including shore erosion control, beach protection, and navigation improvements on land and/or waters within the recreation area shall be exercised in accordance with plans which are mutually acceptable to the Secretary and the Secretary of the Army and which are consistent with both the purpose of this Act and the purpose of existing statutes dealing with water and related resource development.

(d) The Secretary, in cooperation with the State of California and affected political subdivisions thereof, local and regional transit agencies, and the Secretaries of Transportation and of the Army, shall make a study for a coordinated public and private transportation system to and within the recreation area and other units of the national park system in Marin and San Francisco Counties.

### ADVISORY COMMISSION

Sec. 5. (a) There is hereby established the Golden Gate National Recreation Area Advisory Commission (hereinafter referred to as the "Commission").

(b) The Commission shall be composed of fifteen members appointed by the Secretary for terms of three years each.

(c) Any vacancy in the Commission shall be filled in the same manner in which the original appointment was made.

(d) Members of the Commission shall serve without compensation, as such, but the Secretary may pay, upon vouchers signed by the Chairman, the expenses reasonably incurred by the Commission and its members in carrying out their responsibilities under this Act.

009427

(e) The Secretary, or his designee, shall from time to time, but at least annually, meet and consult with the Commission on general policies and specific matters related to planning, administration and development affecting the recreation area and other units of the national park system in Marin and San Francisco Counties.

(f) The Commission shall act and advise by affirmative vote of a majority of the members thereof.

(g) The Commission shall cease to exist ten years after the enactment of this Act.

### APPROPRIATION LIMITATION

SEC. 6. There are hereby authorized to be appropriated such sums as may be necessary to carry out the provisions of this Act, but not more than $61,610,000 shall be appropriated for the acquisition of lands and interests in lands. There are authorized to be appropriated not more than $58,000,000 (May 1971 prices) for the development of the recreation area, plus or minus such amounts, if any, as may be justified by reason of ordinary fluctuations in construction costs as indicated by engineering cost indices applicable to the type of construction involved herein.

Approved October 27, 1972.

PUBLIC LAW 94–544—OCT. 18, 1976          90 STAT. 2515

Public Law 94–544
94th Congress

An Act

To designate certain lands in the Point Reyes National Seashore, California, as wilderness, amending the Act of September 13, 1962 (76 Stat. 538), as amended (16 U.S.C. 459c–6a), and for other purposes.

*Oct. 18, 1976*
*[H.R. 8002]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, in furtherance of the purposes of the Point Reyes National Seashore Act (76 Stat. 538; 16 U.S.C. 459c), and of the Wilderness Act (78 Stat. 890; 16 U.S.C. 1131–36), and in accordance with section 3(c) of the Wilderness Act, the following lands within the Point Reyes National Seashore are hereby designated as wilderness, and shall be administered by the Secretary of the Interior in accordance with the applicable provisions of the Wilderness Act: those lands comprising twenty-five thousand three hundred and seventy acres, and potential wilderness additions comprising eight thousand and three acres, depicted on a map entitled "Wilderness Plan, Point Reyes National Seashore", numbered 612–90,000–B and dated September 1976, to be known as the Point Reyes Wilderness.

Point Reyes National Seashore, Calif. Certain lands designated as wilderness areas.
16 USC 1132 note.
16 USC 1132.
16 USC 1131 note.

SEC. 2. As soon as practicable after this Act takes effect, the Secretary of the Interior shall file a map of the wilderness area and a description of its boundaries with the Interior and Insular Affairs Committees of the United States Senate and House of Representatives, and such map and descriptions shall have the same force and effect as if included in this Act: *Provided, however,* That correction of clerical and typographical errors in such map and descriptions may be made.

Map and description, filing with congressional committees.

SEC. 3. The area designated by this Act as wilderness shall be administered by the Secretary of the Interior in accordance with the applicable provisions of the Wilderness Act governing areas designated by that Act as wilderness areas, except that any reference in such provisions to the effective date of this Act, and, where appropriate, any reference to the Secretary of Agriculture, shall be deemed to be a reference to the Secretary of the Interior.

Administration.

SEC. 4. (a) Amend the Act of September 13, 1962 (76 Stat. 538), as amended (16 U.S.C. 459c–6a), as follows:

16 USC 459c–6.

In section 6(a) insert immediately after the words "shall be administered by the Secretary," the words "without impairment of its natural values, in a manner which provides for such recreational, educational, historic preservation, interpretation, and scientific research opportunities as are consistent with, based upon, and supportive of the maximum protection, restoration, and preservation of the natural environment within the area,".

(b) Add the following new section 7 and redesignate the existing section 7 as section 8:

16 USC 459c–7.

"SEC. 7. The Secretary shall designate the principal environmental education center within the seashore as 'The Clem Miller Environmental Education Center', in commemoration of the vision and leadership which the late Representative Clem Miller gave to the creation and protection of Point Reyes National Seashore.".

The Clem Miller Environmental Education Center, designation.
16 USC 459c–6a.

Approved October 18, 1976.

009429

90 STAT. 2692          PUBLIC LAW 94–567—OCT. 20, 1976

## Public Law 94–567
## 94th Congress

### An Act

Oct. 20, 1976
[H.R. 13160]

To designate certain lands within units of the National Park System as wilderness; to revise the boundaries of certain of those units; and for other purposes.

Wilderness areas.
Designation.
16 USC 1132
note.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in accordance with section 3(c) of the Wilderness Act (78 Stat. 890; 16 U.S.C. 1132(c)), the following lands are hereby designated as wilderness, and shall be administered by the Secretary of the Interior in accordance with the applicable provisions of the Wilderness Act:

PUBLIC LAW 94–567—OCT. 20, 1976          90 STAT. 2693

(k) Point Reyes National Seashore, California, wilderness comprising twenty-five thousand three hundred and seventy acres, and potential wilderness additions comprising eight thousand and three acres, depicted on a map entitled "Wilderness Plan, Point Reyes National Seashore", numbered 612–90,000–B and dated September 1976, to be known as the Point Reyes Wilderness.

SEC. 3. All lands which represent potential wilderness additions, upon publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act have ceased, shall thereby be designated wilderness.

"SEC. 7. The Secretary shall designate the principal environmental education center within the Seashore as 'The Clem Miller Environmental Education Center,' in commemoration of the vision and leadership which the late Representative Clem Miller gave to the creation and protection of Point Reyes National Seashore.".

PUBLIC LAW 95–372 [S. 9];  Sept. 18, 1978

## OUTER CONTINENTAL SHELF LANDS ACT AMENDMENT OF 1978

*For Legislative History of Act, see p. 1450*

An Act to establish a policy for the management of oil and natural gas in the Outer Continental Shelf; to protect the marine and coastal environment; to amend the Outer Continental Shelf Lands Act; and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Outer Continental Shelf Lands Act Amendments of 1978".

Outer Continental Shelf Lands Act Amendments of 1978.

43 USC 1801 note.

### TABLE OF CONTENTS

TITLE I—FINDINGS AND PURPOSES WITH RESPECT TO MANAGING THE RESOURCES OF THE OUTER CONTINENTAL SHELF

Sec. 101.  Findings.
Sec. 102.  Purposes.

TITLE II—AMENDMENTS TO THE OUTER CONTINENTAL SHELF LANDS ACT

Sec. 201.  Definitions.
Sec. 202.  National policy for the Outer Continental Shelf.
Sec. 203.  Laws applicable to the Outer Continental Shelf.
Sec. 204.  Outer Continental Shelf exploration and development administration.
Sec. 205.  Revision of bidding and lease administration.
Sec. 206.  Outer Continental Shelf oil and gas exploration.
Sec. 207.  Annual report.
Sec. 208.  New sections of the Outer Continental Shelf Lands Act.
    "Sec. 18.  Outer Continental Shelf leasing program.
    "Sec. 19.  Coordination and consultation with affected States and local governments.
    "Sec. 20.  Environmental studies.
    "Sec. 21.  Safety regulations.
    "Sec. 22.  Enforcement.
    "Sec. 23.  Citizen suits, court jurisdiction, and judicial review.
    "Sec. 24.  Remedies and penalties.
    "Sec. 25.  Oil and gas development and production.
    "Sec. 26.  Outer Continental Shelf oil and gas information program.
    "Sec. 27.  Federal purchase and disposition of oil and gas.
    "Sec. 28.  Limitation on export.
    "Sec. 29.  Restrictions on employment.
    "Sec. 30.  Documentation, registry, and manning requirements.".

TITLE III—OFFSHORE OIL SPILL POLLUTION FUND

Sec. 301.  Definitions.
Sec. 302.  Fund establishment, administration, and financing.
Sec. 303.  Damages and claimants.
Sec. 304.  Liability.
Sec. 305.  Financial responsibility.
Sec. 306.  Notification, designation, and advertisement.
Sec. 307.  Claims settlement.
Sec. 308.  Subrogation.
Sec. 309.  Jurisdiction and venue.
Sec. 310.  Relationship to other law.
Sec. 311.  Prohibition.
Sec. 312.  Penalties.
Sec. 313.  Authorization of appropriation.
Sec. 314.  Annual report.
Sec. 315.  Effective dates.

Sept. 18      CONTINENTAL SHELF LANDS ACT                    P.L. 95–372

OUTER CONTINENTAL SHELF OIL AND GAS EXPLORATION

Sec. 206. Section 11 of the Outer Continental Shelf Lands Act (43 U.S.C. 1340) is amended—

(1) by inserting "(a) (1)" immediately before "Any"; and

(2) by adding at the end thereof the following:

"(2) The provisions of paragraph (1) of this subsection shall not apply to any person conducting explorations pursuant to an approved exploration plan on any area under lease to such person pursuant to the provisions of this Act.

"(b) Except as provided in subsection (f) of this section, beginning ninety days after the date of enactment of this subsection, no exploration pursuant to any oil and gas lease issued or maintained under this Act may be undertaken by the holder of such lease, except in accordance with the provisions of this section.

"(c) (1) Except as otherwise provided in the Act, prior to commencing exploration pursuant to any oil and gas lease issued or maintained under this Act, the holder thereof shall submit an exploration plan to the Secretary for approval. Such plan may apply to more than' one lease held by a lessee in any one region of the outer Continental Shelf, or by a group of lessees acting under a unitization, pooling, or drilling agreement, and shall be approved by the Secretary if he finds that such plan is consistent with the provisions of this Act, regulations prescribed under this Act, including regulations prescribed by the Secretary pursuant to paragraph (8) of section 5(a) of this Act, and the provisions of such lease. The Secretary shall require such modifications of such plan as are necessary to achieve such consistency. The Secretary shall approve such plan, as submitted or modified, within thirty days of its submission, except that the Secretary shall disapprove such plan if he determines that (A) any proposed activity under such plan would result in any condition described in section 5(a)(2)(A)(i) of this Act, and (B) such proposed activity cannot be modified to avoid such condition. If the Secretary disapproves a plan under the preceding sentence, he may, subject to section 5(a)(2)(B) of this Act, cancel such lease and the lessee shall be entitled to compensation in accordance with the regulations prescribed under section 5(a)(2)(C) (i) or (ii) of this Act.

"(2) The Secretary shall not grant any license or permit for any activity described in detail in an exploration plan and affecting any land use or water use in the coastal zone of a State with a coastal zone management program approved pursuant to section 306 of the Coastal Zone Management Act of 1972 (16 U.S.C. 1455), unless the State concurs or is conclusively presumed to concur with the consistency certification accompanying such plan pursuant to section 307(c) (3)(B) (i) or (ii) of such Act, or the Secretary of Commerce makes the finding authorized by section 307(c)(3)(B)(iii) of such Act.

"(3) An exploration plan submitted under this subsection shall include, in the degree of detail which the Secretary may by regulation require—

"(A) a schedule of anticipated exploration activities to be undertaken;

"(B) a description of equipment to be used for such activities;

"(C) the general location of each well to be drilled; and

"(D) such other information deemed pertinent by the Secretary.

*Exploration plan.*

*43 USC 1334.*

*16 USC 1456.*

*Regulations.*

92 STAT. 647

Foundation Document

Regulations.

"(4) The Secretary may, by regulation, require that such plan be accompanied by a general statement of development and production intentions which shall be for planning purposes only and which shall not be binding on any party.

"(d) The Secretary may, by regulation, require any lessee operating under an approved exploration plan to obtain a permit prior to drilling any well in accordance with such plan.

"(e)(1) If a significant revision of an exploration plan approved under this subsection is submitted to the Secretary, the process to be used for the approval of such revision shall be the same as set forth in subsection (c) of this section.

"(2) All exploration activities pursuant to any lease shall be conducted in accordance with an approved exploration plan or an approved revision of such plan.

"(f)(1) Exploration activities pursuant to any lease for which a drilling permit has been issued or for which an exploration plan has been approved, prior to ninety days after the date of enactment of this subsection, shall be considered in compliance with this section, except that the Secretary may, in accordance with section 5(a)(1)(B)

43 USC 1334.   of this Act, order a suspension or temporary prohibition of any exploration activities and require a revised exploration plan.

"(2) The Secretary may require the holder of a lease described in paragraph (1) of this subsection to supply a general statement in accordance with subsection (c)(4) of this section, or to submit other information.

"(3) Nothing in this subsection shall be construed to amend the terms of any permit or plan to which this subsection applies.

Regulations.   "(g) Any permit for geological explorations authorized by this section shall be issued only if the Secretary determines, in accordance with regulations issued by the Secretary, that—

"(1) the applicant for such permit is qualified;

"(2) the exploration will not interfere with or endanger operations under any lease issued or maintained pursuant to this Act; and

"(3) such exploration will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance.

"(h) The Secretary shall not issue a lease or permit for, or otherwise allow, exploration, development, or production activities within fifteen miles of the boundaries of the Point Reyes Wilderness as depicted on a map entitled 'Wilderness Plan, Point Reyes National Seashore', numbered 612–90,000–B and dated September 1976, unless the State of California issues a lease or permit for, or otherwise allows, exploration, development, or production activities on lands beneath navigable waters (as such term is defined in section 2 of the Sub-

43 USC 1301.   merged Lands Act) of such State which are adjacent to such Wilderness.".

28                                                                      009433

92 STAT. 3486        PUBLIC LAW 95–625—NOV. 10, 1978

POINT REYES NATIONAL SEASHORE

SEC. 318. (a) Section 2(a) of the Act of September 13, 1962 (76 Stat. 538) as amended (16 U.S.C. 459) is further amended as follows:

"SEC. 2. (a) The Point Reyes National Seashore shall consist of the lands, waters, and submerged lands generally depicted on the map entitled 'Boundary Map, Point Reyes National Seashore', numbered 612–80,008–E and dated May 1978.

"The map referred to in this section shall be on file and available for public inspection in the Offices of the National Park Service, Department of the Interior, Washington, District of Columbia. After advising the Committee on Interior and Insular Affairs of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate in writing, the Secretary may make minor revisions of the boundaries of the Point Reyes National Seashore when necessary by publication of a revised drawing or other boundary description in the Federal Register.".

(b) Section 5(a) of such Act is amended to read as follows:

Use and occupancy rights, retention. 16 USC 459c–5.

"SEC. 5. (a) The owner of improved property or of agricultural property on the date of its acquisition by the Secretary under this Act may, as a condition of such acquisition, retain for himself and his or her heirs and assigns a right of use and occupancy for a definite term of not more than twenty-five years, or, in lieu thereof, for a term ending at the death of the owner or the death of his or her spouse, whichever is later. The owner shall elect the term to be reserved. Unless the property is wholly or partly donated to the United States, the Secretary shall pay to the owner the fair market value of the property on the date of acquisition minus the fair market value on that date of the right retained by the owner. A right retained pursuant to this section shall be subject to termination by the Secretary upon his or her determination that it is being exercised in a manner inconsistent with the purposes of this Act, and it shall terminate by operation of law upon the Secretary's notifying the holder of the right of such determination and tendering to him or her an amount equal to the fair market value of that portion of the right which remains unexpired. Where appropriate in the discretion of the Secretary, he or she may lease federally owned land (or any interest therein) which has been acquired by the Secretary under this Act, and which was agricultural land prior to its acquisition. Such lease shall be subject to such restrictive covenants as may be necessary to carry out the purposes of this Act. Any land to be leased by the Secretary under this section shall be offered first for such lease to the person who owned such land or was a leaseholder thereon immediately before its acquisition by the United States.".

Payment.

Termination and notification.

Federally-owned lands, lease.

(c) In subsection 5(b) of such Act, following "September 1, 1959," insert "or, in the case of areas added by action of the Ninety-fifth Congress, May 1, 1978,"; and at the end of the subsection, add the following new sentence: "The term 'agricultural property' as used in this Act means lands which were in regular use for, or were being converted to agricultural, ranching, or dairying purposes as of May 1, 1978, together with residential and other structures related to the above uses of the property.".

"Agricultural property."

(d) Section 5 of such Act is amended by adding the following new subsection (c) to read as follows:

"(c) In acquiring those lands authorized by the Ninety-fifth Congress for the purposes of this Act, the Secretary may, when agreed upon by the landowner involved, defer payment or schedule payments over a period of ten years and pay interest on the unpaid balance at a rate not exceeding that paid by the Treasury of the United States for borrowing purposes.".

Payment deferral, scheduling, and interest rate.

(e) Section 8 of such Act is renumbered section 9 and the following new section is inserted after section 7:

16 USC 459c–7.

"SEC. 8. The Secretary shall cooperate with the Bolinas Public Utilities District to protect and enhance the watershed values within the seashore. The Secretary may, at his or her discretion, permit the use and occupancy of lands added to the seashore by action of the Ninety-fifth Congress by the utilities district for water supply purposes, subject to such terms and conditions as the Secretary deems are consistent with the purposes of this Act.".

Cooperation. 16 USC 459c–6b. Land use and occupancy, terms and conditions.

PUBLIC LAW 96-199—MAR. 5, 1980                    94 STAT. 67

Public Law 96-199
96th Congress

An Act

To establish the Channel Islands National Park, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

TITLE I

SEC. 101. The National Parks and Recreation Act of 1978, approved November 10, 1978 (92 Stat. 3467), is amended as follows:

(a) Section 318, re: Point Reyes National Seashore is amended by:

(1) in subsection (a), change the period following "May 1978" to a comma and insert "plus those areas depicted on the map entitled 'Point Reyes and GGNRA Amendments, dated October 25, 1979'.";

(2) in subsection (b), changing the word "The" at the beginning of section 5(a) to "Except for property which the Secretary specifically determines is needed for interpretive or resources management purposes of the seashore, the";

(3) in subsection (c), after "May 1, 1978", inserting "or, in the case of areas added by action of the Ninety-sixth Congress, May 1, 1979", and at the end of the subsection, following the word "property", inserting "that were in existence or under construction as of May 1, 1978";

(4) in subsection (d), changing the phrase "subsection (c)" to read "subsections (c), (d), and (e)" and adding the following at the end thereof:

"(d) The Secretary is authorized to accept and manage in accordance with this Act, any lands and improvements within or adjacent to the seashore which are donated by the State of California or its political subdivisions. He is directed to accept any such lands offered for donation which comprise the Tomales Bay State Park, or lie between said park and Fish Hatchery Creek. The boundaries of the seashore shall be changed to include any such donated lands.

"(e) Notwithstanding any other provision of law, no fee or admission charge may be levied for admission of the general public to the seashore.";

(5) adding a new subsection (f) as follows:

"(f) Section 9 of such Act is amended by adding at the end thereof: 'In addition to the sums heretofore authorized by this section, there is further authorized to be appropriated $5,000,000 for the acquisition of lands or interests therein.'.".

(b) Section 551, re: the National Trails System Act is amended by:

(1) in paragraph (9), add the following at the end thereof:

"(8) The North Country National Scenic Trail, a trail of approximately thirty-two hundred miles, extending from eastern New York State to the vicinity of Lake Sakakawea in North Dakota, following the approximate route depicted on the map identified as 'Proposed North Country Trail-Vicinity Map' in the Department of the Interior 'North Country Trail Report', dated June 1975. The map shall be on

*Margin notes:*

Mar. 5, 1980
[H.R. 3757]

National Parks and Recreation Act of 1978, amendment.

16 USC 1 note.
Point Reyes National Seashore, area description.
16 USC 459c-1.

16 USC 459c-5.

Lands and improvements, acceptance and management.

Appropriation authorization.
16 USC 459c-7.

North Country National Scenic Trail.
16 USC 1244.

94 STAT. 68          PUBLIC LAW 96–199—MAR. 5, 1980

Administration.

16 USC 1244.

16 USC 1249.
Appropriation
authorization.

16 USC 410y–1a.

16 USC 1276.

Revised
boundary
map.
16 USC 460bb.
16 USC 460bb–1.

16 USC 460bb–5.

Report and
annual list-
ing.
16 USC 1a–5.

file and available for public inspection in the office of the Director, National Park Service, Washington, District of Columbia. The trail shall be administered by the Secretary of the Interior.";

(2) in paragraph (15), subsection (e), delete the "," after Continental Divide National Scenic Trail, and insert "and the North Country National Scenic Trail,";

(3) in paragraph (15), subsection (f), after the phrase "Continental Divide National Scenic Trail", insert "or the North Country National Scenic Trail";

(4) in paragraph (23), revise subsection (c) to read as follows:
"(c) There is hereby authorized to be appropriated such sums as may be necessary to implement the provisions of this Act relating to the trails designated by paragraphs 5(a) (3), (4), (5), (6), (7), and (8): *Provided,* That no such funds are authorized to be appropriated prior to October 1, 1978: *And provided further,* That notwithstanding any other provisions of this Act or any other provisions of law, no funds may be expended by Federal agencies for the acquisition of lands or interests in lands outside the exterior boundaries of existing Federal areas for the Continental Divide National Scenic Trail, the North Country National Scenic Trail, the Oregon National Historic Trail, the Mormon Pioneer National Historic Trail, the Lewis and Clark National Historic Trail, and the Iditarod National Historic Trail.".

(c) Section 320, re: Chesapeake and Ohio Canal National Historical Park, is amended by changing the colon following the word "acres" to a period, and by deleting the proviso in its entirety.

Sec. 102. The Wild and Scenic Rivers Act of 1968 (82 Stat. 906), as amended (16 U.S.C. 1271), is further amended—

(a) in section 5(a) by adding the following new clause at the end thereof:
"(76) Birch, West Virginia: The main stem from the Cora Brown Bridge in Nicholas County to the confluence of the river with the Elk River in Braxton County.".

(b) in section 5(b) by deleting "(75)" and inserting "(76)".

Sec. 103. The Act of October 27, 1972 (86 Stat. 1299), as amended (16 U.S.C. 459), is further amended as follows:

(a) In subsection 2(a), change the period following "October 1978" to a comma, and insert "plus those areas depicted on the map entitled 'Point Reyes and GGNRA Amendments and dated October 25, 1979.'".

(b) In section 6, after "$61,610,000" insert "plus $15,500,000", after "herein", insert "said total development ceiling to be reduced by $10,000,000".

Sec. 104. The Act of August 18, 1970 (84 Stat. 825), as amended, is further amended as follows:

(a) In section 8 near the end thereof, delete the sentence "Each report and annual listing shall be printed as a House document.", and insert in lieu the following: "Each report and annual listing shall be printed as a House document: *Provided,* That should adequate supplies of previously printed identical reports remain available, newly submitted identical reports shall be omitted from printing upon the receipt by the Speaker of the United States House of Representatives of a joint letter from the chairman of the Committee on Interior and Insular Affairs of the United States House of Representatives and the chairman of the Committee on Energy and Natural Resources of the United States Senate indicating such to be the case."; and

(b) Insert "(a)" after "Sec. 8." and add a new subsection (b) as follows:

Foundation Document

99 STAT. 166                    PUBLIC LAW 99-68—JULY 19, 1985

Public Law 99-68
99th Congress

An Act

July 19, 1985     To designate the wilderness in the Point Reyes National Seashore in California as the
[H.R. 1373]                              Phillip Burton Wilderness.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,*

SECTION 1. PHILLIP BURTON WILDERNESS.

16 USC 1132     (a) In recognition of Congressman Phillip Burton's dedication to
note.           the protection of the Nation's outstanding natural, scenic, and
                cultural resources and his leadership in establishing units of the
                National Park System and preserving their integrity against threats
                to those resources and specifically his tireless efforts which led to
98 Stat. 1619.  the enactment of the California Wilderness Act of 1984, the des-
                ignated wilderness area of Point Reyes National Seashore, Califor-
                nia as established pursuant to law, shall henceforth be known as the
                "Phillip Burton Wilderness".
                   (b) In order to carry out the provisions of this Act, the Secretary of
                the Interior is authorized and directed to provide such identification
                by signs, including, but not limited to changes in existing signs,
                materials, maps, markers, interpretive programs or other means as
                will adequately inform the public of the designation of the wilder-
                ness and the reasons therefor.
                   (c) REFERENCES.—Nothing in this Act shall affect the management
                of (or the application of any rule, regulation, or provision of law to)
                any area within the Point Reyes National Seashore, except that all
                references to the "Point Reyes Wilderness" or to "the wilderness in
                the Point Reyes National Seashore" which appear in any rule,
                regulation, provision of law or other official document shall here-
                after be deemed to be references to the Phillip Burton Wilderness
                Area.
Appropriation      (d) There are authorized to be appropriated such sums as may be
authorization.  necessary to carry out the provisions of this Act.

                Approved July 19, 1985.

32                                                                                    009437

# Appendix C: Selected Federal and State Legislation and Directives



THE SECRETARY OF THE INTERIOR
WASHINGTON

NOV 29 2012

To:          Director, National Park Service

Through:     Principal Deputy Assistant Secretary for Fish and Wildlife and Parks

From:        Secretary   Ken Salazar

Subject:     Point Reyes National Seashore – Drakes Bay Oyster Company

After giving due consideration to the request of the Drakes Bay Oyster Company ("DBOC") to conduct commercial operations within Point Reyes National Seashore in the State of California ("Point Reyes"), I have directed the National Park Service (NPS) to allow the permit to expire at the end of its current term. This decision is based on matters of law and policy including:

1) The explicit terms of the 1972 conveyance from the Johnson Oyster Company to the United States of America. The Johnson Oyster Company received $79,200 for the property.  The Johnson Oyster Company also reserved a 40 year right of use and occupancy expiring November 30, 2012.  Under these terms and consideration paid, the United States purchased all the fee interest that housed the oyster operation.  In 2004, DBOC acquired the business from Johnson Oyster Company, including the remaining term of the reservation of use and occupancy and was explicitly informed "no new permit will be issued" after the 2012 expiration date.

2) The continuation of the DBOC operation would violate the policies of NPS concerning commercial use within a unit of the National Park System and nonconforming uses within potential or designated wilderness, as well as specific wilderness legislation for Point Reyes National Seashore.

The area within Point Reyes that Congress identified as potential wilderness includes a biologically rich estuary known as Drakes Estero, consisting of several tidal inlets tributary to Drakes Bay, on the southern side of the Point Reyes peninsula. Drakes Estero encompasses approximately 2,500 acres of tidelands and submerged lands and is home to one of the largest harbor seal populations in California.  In 1999 the eastern portion of Drakes Estero, known as the Estero de Limantour, was converted from potential to designated wilderness, becoming the first (and still the only) marine wilderness on the Pacific coast of the United States outside of Alaska. DBOC's commercial mariculture operation is the only use in the remaining portion of Drakes Estero preventing its conversion from potential to designated wilderness.

Therefore, I direct you to:

1) Notify DBOC that both the Reservation of Use and Occupancy ("RUO") and the Special Use Permit ("SUP") held by DBOC expire according to their terms on November 30, 2012.

2

2) Allow DBOC a period of 90 days after November 30, 2012, to remove its personal property, including shellfish and racks, from the lands and waters covered by the RUO and SUP in order for DBOC to minimize the loss of its personal property and to meet its obligations to vacate and restore all areas covered by the RUO and SUP. No commercial activities may take place in the waters of Drakes Estero after November 30, 2012. During this 90 day period, DBOC may conduct limited commercial activities onshore to the extent authorized in writing by NPS.

3) Effectuate the conversion of Drakes Estero from potential to designated wilderness.

Because of the importance of sustainable agriculture on the pastoral lands within Point Reyes, I direct that you pursue extending permits for the ranchers within those pastoral lands to 20-year terms.

Finally, I direct you to use all existing legal authorizations at your disposal to help DBOC workers who might be affected by this decision, including assisting with relocation, employment opportunities, and training.

I have taken this matter very seriously. I have personally traveled to Point Reyes National Seashore, visited DBOC, met with a wide variety of interested parties on all sides of this issue, and considered many letters, scientific reports, and other documents. The purpose of this memorandum is to document the reasons for my decision and to direct you to take all necessary and appropriate steps to implement it.

I. Factual and Legal Background

A. Point Reyes National Seashore

Congress authorized the establishment of Point Reyes National Seashore in the Act of September 13, 1962, Pub. L. No. 87-657, 76 Stat. 538, codified as amended at 16 U.S.C. §§ 459c through 459c-7 (2012). The NPS subsequently began to acquire privately owned lands within Point Reyes's legislated boundaries. In 1965 the State of California granted the United States all of the State's right, title, and interest to the tide and submerged lands within the national seashore except for certain mineral rights. On October 20, 1972, the national seashore was formally established by publication of the required notice in the Federal Register. 37 Fed. Reg. 23,366 (1972). The legislation does authorize the Secretary of the Interior to lease agricultural ranch and dairy lands within Point Reyes' pastoral zone in keeping with the historic use of that land. The enabling legislation does not authorize mariculture.

Point Reyes comprises approximately 71,067 acres, of which approximately 65,090 are federally owned. The National Seashore, located about an hour's drive north of San Francisco, currently attracts more than two million visitors per year. In 1976, Congress designated 25,370 acres of land within Point Reyes as wilderness and identified an additional 8,003 acres of land and water as potential wilderness. Act of October 18, 1976, Pub. L. No. 95-544, 90 Stat. 2515, and § 1(k)

009439

3

of the Act of October 20, 1976, Pub. L. No. 94-567, 90 Stat. 2692, 2693.[1]  With respect to the area identified as potential wilderness, Congress provided, "All lands which represent potential wilderness additions, upon publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act have ceased, shall thereby be designated wilderness." *Id.* § 3.[2]  The House of Representatives committee report accompanying the October 18, 1976, act states, "As is well established, it is the intention that those lands and waters designated as potential wilderness additions will be essentially managed as wilderness, to the extent possible, with efforts to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status." H.R. REP. NO. 94-1680 at 3 (1976).[3]  Sections 4(c) and 4(d)(5) of the Wilderness Act prohibit commercial activities such as mariculture in designated wilderness. 16 U.S.C. §§ 1133(c) and 1133(d)(5).

B. Commercial Mariculture Operations within Point Reyes National Seashore

Since the 1930s commercial oyster operations have been conducted on lands and waters now included within Point Reyes.  In 1958 Charles W. Johnson assumed control over state-issued water-bottom leases in Drakes Estero, and in 1961 he purchased five acres of uplands near the estero and expanded an existing oyster processing facility on it. In 1972 Mr. Johnson, dba Johnson Oyster Company (JOC), conveyed fee title to his property to the United States, reserving in the deed a 40-year right to use and occupy 1.5 acres of land, including the processing facility, "for the purpose of processing and selling wholesale and retail oysters, seafood and complimentary [*sic*; probably should read "complementary"] food items, the interpretation of oyster cultivation to the visiting public, and residential purposes reasonably incident thereto." The reservation indicated that possibility of a new permit after the RUO's expiration but in no way suggested that one would definitely be issued. The United States paid JOC fair market value for the interest the United States acquired, taking into consideration the value of the 40-year reserved use and occupancy. The deed of conveyance refers to the reservation as "a terminable right to use and occupy."

In 2004 DBOC purchased the assets of Johnson's Oyster Company, including the remaining term of the RUO, with full knowledge that the reserved use and occupancy would expire in 2012.

On March 28, 2005, then Superintendent of Point Reyes, Don Neubacher, sent a letter to DBOC "to ensure clarity and avoid any misunderstanding….[r]egarding the 2012 expiration date and the potential wilderness designation, based on our legal review, no new permits will be issued after that date."

---

[1] The official map referenced in both pieces of legislation indicated that Congress actually designated approximately 24,200 acres of land as wilderness and identified approximately 8,530 acres of additional land as potential wilderness.

[2] It is worth noting that under the statute's clear terms the conversion from potential to designated wilderness occurs automatically by operation of law when the required Federal Register notice is published.

[3] In 1999 approximately 1,752 acres of uplands, tidelands, and submerged lands within Point Reyes were converted from potential to designated wilderness. 64 Fed. Reg. 63,057 (1999).

4

The DBOC subsequently applied for, and was issued, an NPS special use permit authorizing it to use approximately 1,050 acres offshore and 3.1 additional acres onshore for its operations. Both authorizations—the RUO and the SUP—expire by their own terms on November 30, 2012.

C. SEC. 124

In 2009 Congress enacted SEC. 124 of the Act of October 30, 2009, Pub. L. No. 111-88, 123 Stat. 2932, which provides in its entirety as follows:

> SEC. 124. Prior to the expiration on November 30, 2012, of the Drakes Bay Oyster Company's Reservation of Use and Occupancy and associated special use permit ("existing authorization") within Drake's (sic) Estero at Point Reyes National Seashore, notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization, except as provided herein, for a period of 10 years from November 30, 2012: Provided, That such extended authorization is subject to annual payments to the United States based on the fair market value of the use of the Federal property for the duration of such renewal. The Secretary shall take into consideration recommendations of the National Academy of Sciences Report pertaining to shellfish mariculture in Point Reyes National Seashore before modifying any terms and conditions of the extended authorization. Nothing in this section shall be construed to have any application to any location other than Point Reyes National Seashore; nor shall anything in this section be cited as precedent for management of any potential wilderness outside the Seashore.

D. Preparation of Draft and Final Environmental Impact Statements

After SEC. 124 was enacted in 2009, the NPS initiated the process of preparing a draft environmental impact statement (DEIS) to analyze the environmental impacts associated with various alternatives related to a decision to permit or not to permit DBOC's continued commercial operations in Drakes Estero and to obtain robust public input into this matter. The NPS issued a scoping notice, hosted public scoping meetings, produced and released to the public a thousand-page-long DEIS, and invited and accepted public comments on the DEIS. As a result of that public process, the NPS prepared a final environmental impact statement (FEIS), which includes responses to public comments on the DEIS. The NPS released the FEIS to the public earlier this month.

SEC. 124 does not require me (or the NPS) to prepare a DEIS or an FEIS or otherwise to comply with the National Environmental Policy Act of 1969 (NEPA) or any other law. The "notwithstanding any other provision of law" language in SEC. 124 expressly exempts my decision from any substantive or procedural legal requirements. Nothing in the DEIS or FEIS that the NPS released to the public suggests otherwise. As the FEIS explained:

> Although the Secretary's authority under Section 124 is 'notwithstanding any other provision of law,' the Department has determined that it is helpful to

generally follow the procedures of NEPA. The EIS provides decision-makers with sufficient information on potential environmental impacts, within the context of law and policy, to make an informed decision on whether or not to issue a new SUP. In addition, the EIS process provides the public with an opportunity to provide input to the decision-makers on the topics covered by this document.

FEIS at 2. The FEIS also stated, "The NEPA process will be used to inform the decision of whether a new [special use permit] should be issued to DBOC for a period of 10 years." *Id.* at 5. The NEPA process, like SEC. 124 itself, does not dictate a result or constrain my discretion in this matter.

II. Discussion

I understand and appreciate that the scientific methodology employed by the NPS in preparing the DEIS and FEIS and the scientific conclusions contained in those documents have generated much controversy and have been the subject of several reports. Collectively, those reports indicate that there is a level of debate with respect to the scientific analyses of the impacts of DBOC's commercial mariculture operations on the natural environment within Drakes Estero.

Although there is scientific uncertainty and a lack of consensus in the record regarding the precise nature and scope of the impacts that DBOC's operations have on wilderness resources, visitor experience and recreation, socioeconomic resources and NPS operations, the DEIS and FEIS support the proposition that the removal of DBOC's commercial operations in the estero would result in long-term beneficial impacts to the estero's natural environment.[4] Thus while the DEIS and FEIS do not resolve all the uncertainty surrounding the impacts of the mariculture operations on Drakes Estero, and while they are not material to the legal and policy factors that provide the central basis for my decision, they have informed me with respect to the complexities, subtleties, and uncertainties of this matter and have been helpful to me in making my decision.[5]

SEC. 124 grants me the authority and discretion to issue DBOC a new special use permit, but it does not direct me to do so. SEC. 124 also does not prescribe the factors on which I must base my decision. In addition to considering the documents described above, I gave great weight to matters of public policy, particularly the public policy inherent in the 1976 act of Congress that identified Drakes Estero as potential wilderness.

In enacting that provision, Congress clearly expressed its view that, but for the nonconforming uses, the estero possessed wilderness characteristics and was worthy of wilderness designation.

---

[4] While NEPA review was not legally required, NEPA as a general matter does not require absolute scientific certainty or the full resolution of any uncertainty regarding the impacts of the federal action. *See League of Wilderness Defenders-Blue Mountain Biodiversity Project v. U.S. Forest Service*, 689 F.3d 1060 (9th Cir. 2012) and *Lands Council v. McNair*, 537 F.3d 981,988 (9th Cir 2008) (en banc) (overruled in part on other grounds by *Winter v. Natural Res. Def. Council,*, 555 U.S. 7 (2008).

[5] In a letter to me dated November 27, 2012, counsel for DBOC has asserted that the FEIS is "fatally flawed" and I should avoid any consideration "of the FEIS in its entirety." My decision today is based on the incompatibility of commercial activities in wilderness and not on the data that was asserted to be flawed.

6

Congress also clearly expressed its intention that the estero become designated wilderness by operation of law when "all uses thereon prohibited by the Wilderness Act have ceased." The DBOC's commercial operations currently are the only use of the estero prohibited by the Wilderness Act. Therefore, DBOC's commercial operations are the only use preventing the conversion of Drakes Estero to designated wilderness. Since the RUO and SUP allowing DBOC's commercial operations in the estero will expire by their own terms, after November 30, 2012, DBOC no longer will have legal authorization to conduct those operations, and approximately 1,363 acres can become designated wilderness.

Although Sec. 124 grants me the authority to issue a new SUP and provides that such a decision would not be considered to establish any national precedent with respect to wilderness, it in no way overrides the intent of Congress as expressed in the 1976 act to establish wilderness at the estero. With that in mind, my decision effectuates that Congressional intent.

III. Implementation

Based on the foregoing, I hereby direct that you expeditiously take all necessary and appropriate steps to implement my decision. My decision means that, after November 30, 2012, DBOC no longer will be legally authorized to conduct commercial operations within Point Reyes. Accordingly, I direct that the NPS publish in the Federal Register the notice announcing the conversion of Drakes Estero from potential to designated wilderness. I direct that the NPS allow DBOC a period of 90 days after November 30, 2012, to remove its personal property, including shellfish and racks, from the lands and waters covered by the RUO and SUP in order for DBOC to minimize the loss of its personal property and to meet its obligations to vacate and restore all areas covered by the RUO and SUP. No commercial activities may take place in the waters of Drakes Estero after November 30, 2012. During this 90 day period, DBOC may conduct limited commercial activities onshore to the extent authorized in writing by NPS.

I am aware that allowing DBOC's existing authorizations to expire by their terms will result in dislocation of DBOC's business and may result in the loss of jobs for the approximately 30 people currently employed by DBOC. I therefore direct that you use existing legal authorities to ameliorate to the extent possible the economic and other impacts on DBOC's employees, including providing information and other assistance to those employees to the full extent authorized under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, codified as amended at 42 U.S.C. §§ 4601-4655. Additionally, I direct you to develop a plan for training and to work with the local community to identify job opportunities for DBOC employees.

Finally, the Department of the Interior and the NPS support the continued presence of dairy and beef ranching operations in Point Reyes' pastoral zone. I recognize that ranching has a long and important history on the Point Reyes peninsula, which began after centuries old Coast Miwok traditions were replaced by Spanish mission culture at the beginning of the 19th century. Long-term preservation of ranching was a central concern of local interests and members of Congress as they considered legislation to establish the Point Reyes National Seashore in the late 1950s and early 1960s. In establishing the pastoral zone (Point Reyes enabling legislation PL 87-657, Section 4) Congress limited the Government's power of eminent domain and recognized "the

7

value to the Government and the public of continuation of ranching activities, as presently practiced, in preserving the beauty of the area." (House Report No. 1628 at pages 2503-04). Congress amended the Point Reyes enabling legislation in 1978 to authorize the NPS to lease agricultural property that had been used for ranching or dairying purposes. (Section 318, Public Law 95-625, 92 Stat. 3487, 1978). The House Report explained that the "use of agricultural lease-backs is encouraged to maintain this compatible activity, and the Secretary is encouraged to utilize this authority to the fullest extent possible." (House Report 95-1165, page 344).

Accordingly, I direct that the Superintendent work with the operators of the cattle and dairy ranches within the pastoral zone to reaffirm my intention that, consistent with applicable laws and planning processes, recognition of the role of ranching be maintained and to pursue extending permits to 20-year terms for the dairy and cattle ranches within that pastoral zone. In addition, the values of multi-generational ranching and farming at Point Reyes should be fully considered in future planning efforts. These working ranches are a vibrant and compatible part of Point Reyes National Seashore, and both now and in the future represent an important contribution to the Point Reyes' superlative natural and cultural resources.

IV. Conclusion

My decision honors Congress's direction to "steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status" and thus ensures that these precious resources are preserved for the enjoyment of future generations of the American public, for whom Point Reyes National Seashore was created. As President Lyndon Johnson said on signing the Wilderness Act in 1964, "If future generations are to remember us with gratitude rather than contempt, we must leave them something more than the miracles of technology. We must leave them a glimpse of the world as it was in the beginning, not just after we got through with it."


cc:  Regional Director, Pacific West Region, NPS
     Superintendent, Point Reyes National Seashore

Foundation Document

Assembly Bill No. 1024

CHAPTER 983

*An act to convey certain tide and submerged lands to the United States in furtherance of the Point Reyes National Seashore.*

[Approved by Governor July 9, 1965. Filed with
Secretary of State July 9, 1965.]

*The people of the State of California do enact as follows:*

SECTION 1.   There is hereby granted to the United States, subject to the limitations which are described in Section 2 of this act, all of the right, title, and interest of the State of California, held by the state by virtue of its sovereignty in and to all of the tide and submerged lands or other lands beneath navigable waters situated within the boundaries of the Point Reyes National Seashore which the Secretary of the Interior is authorized to establish by authority of Public Law 87-657, 76 Stat. 538, and as such boundaries exist on the effective date of this act.

SEC. 2.   There is hereby excepted and reserved to the State all deposits of minerals, including oil and gas, in the lands, and to the state, or persons authorized by the state, the right to prospect for, mine, and remove such deposits from the lands; provided, that no well or drilling operations of any kind shall be conducted upon the surface of such lands.

SEC. 3.   There is hereby reserved to the people of the state the right to fish in the waters underlying the lands described in Section 1.

SEC. 4.   If the United States ceases to use the lands for public purposes, all right, title and interest of the United States in and to such lands shall cease and the lands shall revert and rest in the state.

SEC. 5.   The United States shall survey and monument the granted lands and record a description and plat thereof in the office of the County Recorder of Marin County.

40

009445

PUBLIC LAW 94–389 [H.J.Res. 738];  Aug. 14, 1976

# PRESERVATION OF TULE ELK POPULATION— CALIFORNIA

*For Legislative History of Act, see p. 3252*

Joint Resolution providing for Federal participation in preserving the Tule elk population in California.

Whereas, although Tule elk once roamed the central valleys of California in vast numbers, the species became nearly extinct during the latter part of the last century as a result of its native habitat being developed for agricultural purposes and urban growth; and

Whereas, although around 1870 the Tule elk population reached a low of approximately thirty animals, through the dedicated efforts of various citizen groups and individual cattlemen, the population has slowly recovered to a total of approximately six hundred animals, the majority of which may be found in free-roaming herds in the Owens Valley, at Cache Creek in Colusa County, California, a small number which are captive in the Tupman Refuge in Vern County, California; and

Whereas in 1971 the California Legislature, recognizing the threat to the Tule elk as a species, amended section 332 and enacted section 3951 of the Fish and Game Code which provide for the encouragement of a statewide population of Tule elk of not less than two thousand, if suitable areas can be found in California to accommodate such population in a healthy environment, and further fixed the population of the Tule elk in the Owens Valley at four hundred and ninety animals, or such greater number as might thereafter be determined by the California Department of Fish and Game, in accordance with game management principles, to be the Owens Valley holding capacity; and

Whereas the Tule elk is considered by the Department of the Interior to be a rare, though not endangered, species by reason of the steps taken by the State of California; and

Whereas the protection and maintenance of California's Tule elk in a free and wild state is of educational, scientific, and esthetic value to the people of the United States; and

Whereas there are Federal lands in the State of California (including, but not limited to, the San Luis National Wildlife Refuge, the Point Reyes National Seashore, various national forests and national parks, and Bureau of Land Management lands located in central California, as well as lands under the jurisdiction of the Secretary of Defense such as Camp Pendleton, Camp Roberts, and Camp Hunter Liggett) which, together with adjacent lands in public and private ownership, offer a potential for increasing the Tule elk population in California to the two thousand level envisioned by the California Legislature: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That it is the sense of Congress that the restoration and conservation of a Tule elk population in California of at least two thousand, except that the number of Tule elk in the Owens River Watershed area shall at no time exceed four hundred and ninety or such greater number which is determined by the State of California to be the maximum holding capacity of such area, is an appropriate national goal.

California. Tule elk population, preservation. 16 USC 673d.

009446   41

P.L. 94–389        LAWS OF 94th CONG.—2nd SESS.        Aug. 14

**Cooperation.**
**16 USC 673e.**

SEC. 2. The Secretary of the Interior, the Secretary of Agriculture, and the Secretary of Defense shall cooperate with the State of California in making the lands under their respective jurisdictions reasonably available for the preservation and grazing of Tule elk in such manner and to such extent as may be consistent with Federal law.

**Report to**
**Congress.**
**16 USC 673f.**

SEC. 3. The Secretary of the Interior shall submit, on or before the first of March of each year, a report to the Congress as to the estimated size and condition of the various Tule elk herds in California and the nature and condition of their respective habitats. The Secretary shall include in such report his determination as to whether or not the preservation of the Tule elk herd at its then-existing level is, or may be, endangered or threatened by actual or proposed changes in land use or land management practices on lands owned by any Federal, State, or local agency, together with his recommendations as to what Federal actions, if any, should be taken in order to preserve the Tule elk herds at the then-existing level or such other level as may be determined from time to time by the State of California.

**Tule elk**
**restoration and**
**conservation**
**plan.**
**16 USC 673g.**

SEC. 4. The Secretary of the Interior, in coordination with all Federal, State, and other officers having jurisdiction over lands on which Tule elk herds are located or lands which would provide suitable Tule elk habitat, shall develop a plan for Tule elk restoration and conservation, including habitat management, which shall be integrated with the comparable plans of State and local authorities in California. The Secretary's annual report to Congress shall describe the development and implementation of such plan.

Approved August 14, 1976.

LEGISLATIVE HISTORY:

HOUSE REPORT No. 94–895 (Comm. on Merchant Marine and Fisheries).
SENATE REPORT No. 94–1120 (Comm. on Commerce).
CONGRESSIONAL RECORD, Vol. 122 (1976):
     Mar. 15, considered and passed House.
     Aug. 6, considered and passed Senate.

# HEARINGS

BEFORE THE

## SUBCOMMITTEE ON FISHERIES AND WILDLIFE CONSERVATION AND THE ENVIRONMENT

OF THE

## COMMITTEE ON MERCHANT MARINE AND FISHERIES HOUSE OF REPRESENTATIVES

NINETY-THIRD CONGRESS

FIRST SESSION

ON

H.J. RES. 203, H.J. RES. 204, H.J. RES. 270, H.J. RES. 297, H.J. RES. 336, H.J. RES. 309, H.J. RES. 376, H.J. RES. 413, H.J. RES. 436, H.J. RES. 449, H.J. RES. 507

### RESOLUTIONS TO ESTABLISH THE TULE ELK NATIONAL WILDLIFE REFUGE

SEPTEMBER 24, 25, 1973

## Serial No. 93–22



Printed for the use of the Committee on Merchant Marine and Fisheries

U.S. GOVERNMENT PRINTING OFFICE

26-390          WASHINGTON : 1974

Foundation Document

Bob Conover
Marine Resources Br
Calif. Dept. of Fish & G

# CALIFORNIA FISH AND GAME

"CONSERVATION OF WILD LIFE THROUGH EDUCATION"

## CONTENTS.

| | PAGE |
|---|---|
| AN ATTEMPT TO SAVE CALIFORNIA ELK...*Barton Warren Evermann* | 85 |
| CALIFORNIA'S FUR-BEARING MAMMALS...........*Harold C. Bryant* | 96 |
| WARDENS AND WARDEN WORK............................*T. S. Palmer* | 108 |
| THE TENNESSEE POSSUM HAS ARRIVED IN CALIFORNIA......... | |
| ...............................................*Joseph Grinnell* | 114 |
| THE HALIBUT FISHERY OF THE PACIFIC COAST...*Edward P. Rankin* | 116 |
| PUBLIC FISHING VS. PRIVATE HUNTING...............*F. M. Newbert* | 119 |
| EDITORIAL .................................................... | 123 |
| HATCHERY AND FISHERY NOTES.................................. | 127 |
| CONSERVATION IN OTHER STATES................................ | 131 |
| LIFE HISTORY NOTES.......................................... | 132 |
| WILD LIFE IN RELATION TO AGRICULTURE....................... | 136 |
| REPORTS— | |
| SEIZURES AND SEARCHES.................................. | 130 |
| VIOLATIONS OF THE FISH AND GAME LAWS.................. | 138 |
| FINANCIAL REPORT...................................... | 140 |

## AN ATTEMPT TO SAVE CALIFORNIA ELK.

By BARTON WARREN EVERMANN,

Director of the Museum, California Academy of Sciences.

The complete extermination of any species of animal or plant in any part of its habitat is always a matter of regret. Even if the species be a noxious one, we nevertheless dislike to see it entirely wiped out in any locality in which it was naturally found. If it be a useful species, well known to the laity as well as to naturalists, its extermination is deplored; and when the species becomes extinct, when not a single individual is left anywhere upon the face of the earth, it is regarded as most regrettable. The world will never cease to regret the practical extermination of the buffalo. It will never cease to deplore the actual extinction of the great auk and the passenger pigeon. We all know the fate of those three interesting species; and when we see other species of interesting animals threatened with extermination, we are naturally filled with alarm. We have learned how thoughtless many people are; how disposed they are to destroy things; how strong the inclination is with many to toss a stone at the frog or turtle resting on a rock or log in the pond; to kill every snake they see. "What a fine morning this is! Let's go out and kill something." That spirit is all too prevalent.

1—15680

009449



## United States Department of the Interior

NATIONAL PARK SERVICE
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:

JAN 3 1 2013

Memorandum

To:          Regional Director, Pacific West Region

From:        Director *Jonathan B Jarvis*

Subject:     Delegation of Authority for Point Reyes National Seashore Agricultural Leases
             and Directions to Implement the Secretary's Memorandum of November 29, 2012

In accordance with 200 D.M. § 2.2 and 245 D.M. 1.1.A., I hereby delegate to you the park-specific authority provided by 16 U.S.C. §§ 459 c-5 and 460bb-2(j) in order to issue agricultural leases/special use permits ("lease/permits") as provided herein. This authority may not be re-delegated.

This delegation authorizes the issuance of lease/permits for the purpose of grazing cattle and operating beef and dairy ranches, along with associated residential uses by the lessees and their immediate families and their employees, and their employees' immediate families, within the pastoral zone of Point Reyes National Seashore and the northern District of Golden Gate National Recreation Area administered by Point Reyes National Seashore. Under this delegation, you may issue lease/permits with terms of up to twenty years. These long-term lease/permits will provide greater certainty for the ranches operating within the national park's pastoral zone and demonstrate the support of the National Park Service (NPS) and the Department of the Interior for the continued presence of dairy and beef ranching operations.

This delegation supersedes and replaces the delegation of authority issued by the Acting Director on February 23, 2009, and it supersedes any general provision of D.O. 53 or R.M. 53 which would otherwise limit the authority of a Regional Director to issue special use permits for terms of up to twenty years. The Solicitor's Office has also advised that the issuance of such lease/permits under the cited provisions of the park's enabling legislation is not subject to the requirements set forth under the general NPS leasing authority found at 16 U.S.C. 1a-2(k) nor the implementing regulations at 36 C.F.R. Part 18.

In his November 29, 2012, memorandum announcing his decision on the Drakes Bay Oyster Company, the Secretary of the Interior observed that ranching operations have "a long and important history on the Point Reyes peninsula. . . . These working ranches are a vibrant and compatible part of Point Reyes National Seashore, and both now and in the future represent an important contribution to the Point Reyes' superlative natural and cultural resources."

Preservation of cultural and natural resources within the pastoral zone is an important responsibility shared by the NPS and the park ranchers.

This delegation of authority is supportive of multi-generational ranching and dairying within the pastoral zone and is consistent with the above-referenced provisions of the park's enabling legislation. In his November 29, 2012, memorandum, the Secretary directed the NPS to "pursue extending permits for the ranchers within [the] pastoral lands to 20-year terms." This delegation of authority is intended as an initial step to implement the Secretary's directive in a timely and efficient manner.

In order to assure clarity and consistency for all permits, to clarify expectations and commitments, and to allow for operational flexibility inherent to the long-term beef and dairy operations, I direct the park superintendent to review the permit structure to assure that it reflects and protects the interests of ranch operators while meeting NPS responsibilities to protect natural and cultural resources. In the interim, I further direct the park superintendent and her staff to work with the ranchers to assure that current authorizations are continued while the new permit structure is developed and implemented.

Point Reyes National Seashore

Foundation Document



009453

# National Park Service
# Interior Regions 8, 9, 10 and 12 Foundation Document Recommendation
# Point Reyes National Seashore

**December 2019**

**This Foundation Document has been prepared as a collaborative effort between park and regional staff and is recommended for approval by the Regional Director.**

19 DECEMBER 2019

**RECOMMENDED**
**Cicely Muldoon, Superintendent, Point Reyes National Seashore** — Date

2/20/20

**APPROVED**
**Stan Austin, Regional Director, National Park Service Interior Regions 8, 9, 10 and 12** — Date

 

As the nation's principal conservation agency, the Department of the Interior has responsibility for most of our nationally owned public lands and natural resources. This includes fostering sound use of our land and water resources; protecting our fish, wildlife, and biological diversity; preserving the environmental and cultural values of our national parks and historic places; and providing for the enjoyment of life through outdoor recreation. The department assesses our energy and mineral resources and works to ensure that their development is in the best interests of all our people by encouraging stewardship and citizen participation in their care. The department also has a major responsibility for American Indian reservation communities and for people who live in island territories under U.S. administration.

PORE 612/166963
February 2020

**Foundation Document  •  Point Reyes National Seashore**



NATIONAL PARK SERVICE  •  U.S. DEPARTMENT OF THE INTERIOR

009455

# Management Policies 2006

Abraham Lincoln Birthplace  Acadia  Adams  African Burial Ground  Agate Fossil Beds  Algnak River  Alibates Flint Quarries  Allegheny Portage Railroad  Amistad  Andersonville  Andrew Johnson  Aniakchak  Antietam  Apostle Islands Appalachian Trail  Appomattox Court House  Arches  Arkansas Post  Arlington House  Assateague Island  Aztec Ruins Badlands  Bandelier  Bent's Old Fort  Bering Land Bridge  Big Bend  Big Cypress  Big Hole  Big South Fork River  Big Thicket Bighorn Canyon  Biscayne  Black Canyon of the Gunnison  Blue Ridge Parkway  Bluestone River  Booker T. Washington Boston  Boston African American  Boston Harbor Islands  Brices Cross Roads  Brown v. Board of Education  Bryce Canyon Buck Island Reef  Buffalo River  Cabrillo  Canaveral  Cane River Creole  Canyon de Chelly  Canyonlands  Cape Cod  Cape Hatteras  Cape Krusenstern  Cape Lookout  Capitol Reef  Capulin Volcano  Carl Sandburg Home  Carlsbad Caverns Carter G. Woodson Home  Casa Grande Ruins  Castillo de San Marcos  Castle Clinton  Catoctin Mountain  Cedar Breaks Cedar Creek & Belle Grove  Chaco Culture  Chamizal  Channel Islands  Charles Pinckney  Chattahoochee River  Chesapeake & Ohio Canal  Chickamauga & Chattanooga  Chic_____  _____  Christiansted  City of Rocks  Clara Barton  Colonial Colorado  Congaree  Constitution Gardens  Co_____  Lake  Craters of the Moon  Cumberland Gap Cumberland Island  Curecanti  Cuyahoga Valley_____  _____ritage  De Soto  Death Valley  Delaware River Delaware Water Gap  Denali  Devils_____  _____tugas  Ebey's Landing  Edgar Allan Poe Edison  Effigy Mounds  Eisenhower_____  _____gene O'Neill  Everglades  Federal Hall Fire Island  First Ladies  Flight 93  Flo_____  _____owie  Fort Caroline  Fort Davis  Fort Donelson  Fort Frederica  Fort Laramie_____  Fort Necessity  Fort Point  Fort Pulaski Fort Raleigh  Fort Scott  Fort Smith_____  _____t Union Trading Post  Fort Vancouver Fort Washington  Fossil Butte  Frankl_____  _____ck Douglass  Frederick Law Olmsted Fredericksburg & Spotsylvania County Ba_____  _____tes of the Arctic  Gateway  Gauley River General Grant  George Rogers Clark  Ge_____  _____Washington Carver  George Washington Memorial Parkway  Gettysburg  Gila Cl_____  _____len Canyon  Golden Gate  Golden Spike Governors Island  Grand Canyon  Grand_____  _____s Ranch  Great Basin  Great Egg Harbor River  Great Sand Dunes  Great Smoky Mo_____  _____untains  Guilford Courthouse  Gulf Islands Hagerman Fossil Beds  Haleakalā  Hamilto_____  _____Ferry  Harry S Truman  Hawai'i Volcanoes Herbert Hoover  Hohokam Pima  Home o_____  _____omestead NM of America  Hopewell Culture Hopewell Furnace  Horseshoe Bend  Hot Spr_____  _____ll Trading Post  Independence  Indiana Dunes Isle Royale  James A. Garfield  Jean Lafitte  Nh_____  _____n National Expansion  Jewel Cave  Jimmy Carter John D. Rockefeller Jr. Memorial Parkway  John _____  _____Fitzgerald Kennedy  John Muir  Johnstown Flood Joshua Tree  Kalaupapa  Kaloko-Honokohau  Katm_____  _____Kennesaw Mountain  Keweenaw  Kings Canyon Kings Mountain  Klondike Gold Rush  Knife River Indian_____  _____buk Valley  Korean War Veterans  Lake Clark  Lake Mead Lake Meredith  Lake Roosevelt  Lassen Volcanic  Lava B_____  _____wis & Clark  Lewis & Clark Trail  Lincoln Boyhood  Lincoln Home  Lincoln Memorial  Little Bighorn Battlefield  Little River Canyon  Little Rock Central High School  Longfellow Lowell  Lyndon B. Johnson  Lyndon Baines Johnson Memorial Grove  Maggie L. Walker  Mammoth Cave  Manassas Manzanar  Marsh Billings-Rockefeller  Martin Luther King, Jr.  Martin Van Buren  Mary McLeod Bethune Council House Mesa Verde  Minidoka Internment  Minute Man  Minuteman Missile  Mississippi River  Missouri River  Mojave  Monocacy Montezuma Castle  Moores Creek  Morristown  Mount Rainier  Mount Rushmore  Muir Woods  Natchez  Natchez Trace Parkway  Natchez Trace Trail  National Capital Parks  National Mall  NP of American Samoa  Natural Bridges  Navajo New Bedford Whaling  New Orleans Jazz  New River Gorge  Nez Perce  Nicodemus  Ninety Six  Niobrara River  Noatak North Cascades  Obed River  Ocmulgee  Olympic  Oregon Caves  Organ Pipe Cactus  Ozark Riverways  Padre Island Palo Alto Battlefield  Pea Ridge  Pecos  Pennsylvania Avenue  Perry's Victory  Petersburg  Petrified Forest  Petroglyph Pictured Rocks  Pinnacles  Pipe Spring  Pipestone  Piscataway  Point Reyes  Potomac Heritage Trail  Poverty Point  Prince William Forest  Pu'uhonua o Hōnaunau  Puukoholā Heiau  Rainbow Bridge  Redwood  Richmond  Rio Grande River Rock Creek  Rocky Mountain  Roger Williams  Rosie the Riveter/World War II Home Front  Ross Lake  Russell Cave Sagamore Hill  Saguaro  Saint Croix Island  Saint Croix Riverway  Saint Gaudens  Saint Paul's Church  Salem Maritime Salinas Pueblo Missions  Salt River Bay  San Antonio Missions  San Francisco Maritime  San Juan  San Juan Island  Santa Monica Mountains  Saratoga  Saugus Iron Works  Scotts Bluff  Sequoia  Shenandoah  Shiloh  Sitka  Sleeping Bear Dunes Springfield Armory  Statue of Liberty  Steamtown  Stones River  Sunset Crater Volcano  Tallgrass Prairie  Thaddeus Kosciuszko  Theodore Roosevelt  Theodore Roosevelt Birthplace  Theodore Roosevelt Inaugural  Theodore Roosevelt Island  Thomas Jefferson Memorial  Thomas Stone  Timpanogos Cave  Timucuan  Tonto  Tumacácori  Tupelo  Tuskegee Airmen  Tuskegee Institute  Tuzigoot  Ulysses S. Grant  Upper Delaware River  USS Arizona Memorial  Valley Forge Vanderbilt Mansion  Vicksburg  Vietnam Veterans Memorial  Virgin Islands  Virgin Islands Coral Reef  Voyageurs  Walnut Canyon  War in the Pacific  Washington Monument  Washita Battlefield  Weir Farm  Whiskeytown Unit  White House White Sands  Whitman Mission  William Howard Taft  Wilson's Creek  Wind Cave  Wolf Trap  Women's Rights  World War II Memorial  Wrangell-St. Elias  Wright Brothers  Wupatki  Yellowstone  Yosemite  Yucca House  Yukon Charley Rivers  Zion

009456

## Management of National Park Service Programs

This volume of *Management Policies* focuses exclusively on management of the national park system. Beyond managing the national park system, the National Park Service administers a broad range of programs that serve the conservation and recreation needs of the nation and the world. Examples include the following:

◆ National Register of Historic Places

◆ National Historic Landmarks Program

◆ National Natural Landmarks Program

◆ Land and Water Conservation Fund Grants Program

◆ Historic American Buildings Survey

◆ Historic American Engineering Record

◆ Historic American Landscapes Survey

◆ American Battlefield Protection Program

◆ National Maritime Heritage Grants Program

◆ Rivers, Trails and Conservation Assistance Program

◆ Tribal Heritage Preservation Grants Program

◆ Preserve America Grants Program

◆ National Heritage Areas Program

Although these programs operate mainly outside the national parks, they form a vital part of the National Park Service mission. Information about the policies and procedures that govern these programs may be obtained from the appropriate NPS program managers (who are generally located in Washington, D.C.), or by visiting the NPS web site at ***www.nps.gov***.



## U.S. Department of the Interior

The Department of the Interior protects and manages the nation's natural resources and cultural heritage; provides scientific and other information about those resources; and honors its special responsibilities to American Indians, Alaska Natives, and affiliated Island Communities.



## National Park Service

The National Park Service preserves unimpaired the natural and cultural resources and values of the national park system for the enjoyment, education, and inspiration of this and future generations. The National Park Service cooperates with partners to extend the benefits of natural and cultural resource conservation and outdoor recreation throughout this country and the world.

# Management Policies 2006



U.S. Department of the Interior │ National Park Service

## U.S. GOVERNMENT OFFICIAL EDITION NOTICE





**Use of ISBN Prefix.** This is the Official U.S. Government edition of this publication and is herein identified to certify its authenticity. Use of the 0-16-076874-8 ISBN is for U.S. Government Printing Office Official Editions only. The Superintendent of Documents of the U.S. Government Printing Office requests that any reprinted edition clearly be labeled as a copy of the authentic work with a new ISBN.

**Legal Status and Use of Seals and Logos.** The Arrowhead symbol of the National Park Service authenticates *Management Policies 2006* as the National Park Service's official guide to managing national parks. The National Park Service symbol is protected under 18 USC 701, 15 USC 1051 et seq, and regulations published in 36 CFR Part II. The use of the National Park Service Arrowhead symbol on any republication of this material without the express, written permission of the Director of the National Park Service is prohibited. Any person using the National Park Service symbol in a manner inconsistent with the provisions of 36 CFR Part II is subject to the penalties specified in 18 USC 701.

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800; DC area (202) 512-1800
Fax: (202) 512-2104   Mail: Stop IDCC, Washington, DC 20402-0001

ISBN 0-16-076874-8

009459

# Table of Contents

**Management Policies**   **1**
The Guide to Managing the
National Park System   1
  Underlying Principles   2

**Introduction**   **3**
Law, Policy, and Other Guidance   3
  Hierarchy of Authorities   4
  Policy Development   4
  Compliance, Accountability,
  and Enforceability   4
  The Directives System   4
  Other Sources of Guidance   5
  NPS Program Policies   5

**1 The Foundation**   **7**
  **1.1 The National Park Idea**   **8**
  1.2   The National Park System   8
  1.3   Criteria for Inclusion   8
  1.3.1   National Significance   8
  1.3.2   Suitability   9
  1.3.3   Feasibility   9
  1.3.4   Direct NPS Management   9

  **1.4 Park Management**   **10**
  1.4.1   The Laws Generally Governing
     Park Management   10
  1.4.2   "Impairment" and "Derogation":
     One Standard   10
  1.4.3   The NPS Obligation to Conserve
     and Provide for Enjoyment of
     Park Resources and Values   10
  1.4.3.1   Park Purposes and Legislatively
     Authorized Uses   11
  1.4.4   The Prohibition on Impairment
     of Park Resources and Values   11
  1.4.5   What Constitutes Impairment
     of Park Resources and Values   11
  1.4.6   What Constitutes Park
     Resources and Values   11
  1.4.7   Decision-making Requirements to
     Identify and Avoid Impairments   12
  1.4.7.1   Unacceptable Impacts   12
  1.4.7.2   Improving Resource Conditions
     within the Parks   12

  **1.5 Appropriate Use of the Parks**   **13**
  **1.6 Cooperative Conservation
     Beyond Park Boundaries**   **13**
  **1.7 Civic Engagement**   **14**
  **1.8 Environmental Leadership**   **14**
  **1.9 Management Excellence**   **14**
  1.9.1   Human Resources   15
  1.9.1.1   Career Development, Training,
     and Management   15
  1.9.1.2   Succession Planning   15
  1.9.1.3   Workforce Planning   15
  1.9.1.4   Employee Safety and Health   15
  1.9.1.5   Workforce Diversity   15
  1.9.1.6   Volunteers in the Parks   15

  1.9.2   Managing Information   16
  1.9.2.1   Information Sharing   16
  1.9.2.2   Proprietary Information   16
  1.9.2.3   Information Confidentiality   16
  1.9.3   Accessibility for Persons with Disabilities
     17
  1.9.4   Public Information and Media Relations   17
  1.9.5   Management Accountability   17
  1.9.5.1   Financial Sustainability   17
  1.9.5.2   Facilities   18
  1.9.5.3   Budget Performance and
     Accountability Programs   18

  **1.10 Partnerships**   **18**
  **1.11 Relationship with
     American Indian Tribes**   **19**
  1.11.1   Government-to-Government
     Relationship   19
  1.11.2   Consultation   19
  1.11.3   Trust Resources   19

  **1.12 Native Hawaiians, Pacific Islanders,
     and Caribbean Islanders**   **20**
  **1.13 An Enduring Message**   **20**

**2 Park System Planning**   **21**
  **2.1 General Principles**   **22**
  2.1.1   Decision-making   22
  2.1.2   Scientific, Technical,
     and Scholarly Analysis   22
  2.1.3   Public Participation   22
  2.1.4   Goal Orientation   22

  **2.2 Major Elements of Park Planning
     and Decision-making**   **22**

  **2.3 Levels of Park Planning**   **23**
  2.3.1   General Management Planning   23
  2.3.1.1   Statutory Requirements   24
  2.3.1.2   Management Zoning   24
  2.3.1.3   Planning Team   24
  2.3.1.4   Science and Scholarship   24
  2.3.1.5   Public Involvement   24
  2.3.1.6   Alternative Futures   25
  2.3.1.7   Environmental Analysis   25
  2.3.1.8   Cooperative Planning   25
  2.3.1.9   Wild and Scenic Rivers   25
  2.3.1.10   Wilderness   25
  2.3.1.11   Alaska Park Units   26
  2.3.1.12   Periodic Review of
     General Management Plans   26
  2.3.2   Program Management Planning   26
  2.3.3   Strategic Planning   26
  2.3.3.1   Relationship between the Strategic Plan
     and the General Management Plan   27
  2.3.4   Implementation Planning   27
  2.3.4.1   Environmental Analysis   27
  2.3.5   Park Annual Performance
     Planning and Reporting   27

**3 Land Protection**   **29**
  **3.1 General**   **30**
  **3.2 Land Protection Methods**   **30**
  **3.3 Land Protection Plans**   **30**

IV

MANAGEMENT POLICIES 2006

3.4 Cooperative Conservation — 31
3.5 Boundary Adjustments — 31
3.6 Land Acquisition Authority — 32
3.7 Land Acquisition Funding — 32
3.8 Condemnation — 33

**4 Natural Resource Management — 35**
Introduction — 36
4.1 General Management Concepts — 36
4.1.1 Planning for Natural Resource Management — 37
4.1.2 Natural Resource Information — 38
4.1.3 Evaluating Impacts on Natural Resources — 38
4.1.4 Partnerships — 38
4.1.5 Restoration of Natural Systems — 39
4.1.6 Compensation for Injuries to Natural Resources — 39

4.2 Studies and Collections — 39
4.2.1 NPS-conducted or -sponsored Inventory, Monitoring, and Research Studies — 40
4.2.2 Independent Studies — 40
4.2.3 Natural Resource Collections — 41
4.2.4 Collection Associated with the Development of Commercial Products — 41

4.3 Special Designations — 41
4.3.1 Research Natural Areas — 41
4.3.2 Experimental Research Areas — 41
4.3.3 Wilderness Areas — 41
4.3.4 National Wild and Scenic Rivers System — 41
4.3.5 National Natural Landmarks — 42
4.3.6 Biosphere Reserves — 42
4.3.7 World Heritage List — 42

4.4 Biological Resource Management — 42
4.4.1 General Principles for Managing Biological Resources — 42
4.4.1.1 Plant and Animal Population Management Principles — 43
4.4.1.2 Genetic Resource Management Principles — 43
4.4.1.3 Definition of Native and Exotic Species — 43
4.4.2 Management of Native Plants and Animals — 44
4.4.2.1 NPS Actions That Remove Native Plants and Animals — 44
4.4.2.2 Restoration of Native Plant and Animal Species — 45
4.4.2.3 Management of Threatened or Endangered Plants and Animals — 45
4.4.2.4 Management of Natural Landscapes — 46
4.4.2.5 Maintenance of Altered Plant Communities — 46
4.4.3 Harvest of Plants and Animals by the Public — 46
4.4.4 Management of Exotic Species — 47
4.4.4.1 Introduction or Maintenance of Exotic Species — 47
4.4.4.2 Removal of Exotic Species Already Present — 48
4.4.5 Pest Management — 48
4.4.5.1 Pests — 48
4.4.5.2 Integrated Pest Management Program — 48
4.4.5.3 Pesticide Use — 49
4.4.5.4 Biological Control Agents and Bioengineered Products — 49
4.4.5.5 Pesticide Purchase and Storage — 49

4.5 Fire Management — 49
4.6 Water Resource Management — 50
4.6.1 Protection of Surface Waters and Groundwaters — 50
4.6.2 Water Rights — 50
4.6.3 Water Quality — 51
4.6.4 Floodplains — 51
4.6.5 Wetlands — 51
4.6.6 Watershed and Stream Processes — 52

4.7 Air Resource Management — 52
4.7.1 Air Quality — 52
4.7.2 Weather and Climate — 53
4.8 Geologic Resource Management — 53
4.8.1 Protection of Geologic Processes — 53
4.8.1.1 Shorelines and Barrier Islands — 54
4.8.1.2 Karst — 54
4.8.1.3 Geologic Hazards — 54
4.8.2 Management of Geologic Features — 54
4.8.2.1 Paleontological Resources and Their Contexts — 54
4.8.2.2 Caves — 55
4.8.2.3 Geothermal and Hydrothermal Resources — 55
4.8.2.4 Soil Resource Management — 56
4.9 Soundscape Management — 56
4.10 Lightscape Management — 57
4.11 Chemical Information and Odors — 57

**5 Cultural Resource Management — 59**

Introduction — 60
5.1 Research — 60
5.1.1 NPS Research — 60
5.1.2 Independent Research — 61
5.1.3 Identification and Evaluation of Resources — 61
5.1.3.1 Inventories — 61
5.1.3.2 Evaluation and Categorization — 62
5.1.3.2.1 National Register Nomination — 62
5.1.3.2.2 National Historic Landmark Designation — 62
5.1.3.2.3 Nominations for World Heritage List Designation — 62

5.2 Planning — 63
5.2.1 Consultation — 63
5.2.2 Agreements — 64
5.2.3 Confidentiality — 64

5.3 Stewardship — 65
5.3.1 Protection and Preservation of Cultural Resources — 65
5.3.1.1 Emergency Management — 65
5.3.1.2 Fire Detection, Suppression, and Post-fire Rehabilitation and Protection — 65
5.3.1.3 Compensation for Injuries to Cultural Resources — 65
5.3.1.4 Environmental Monitoring and Control — 66
5.3.1.5 Pest Management — 66
5.3.1.6 Visitor Carrying Capacity — 66
5.3.1.7 Cultural Soundscape Management — 66
5.3.2 Physical Access for Persons with Disabilities — 66
5.3.3 Historic Property Leases and Cooperative Agreements — 66
5.3.4 Stewardship of Human Remains and Burials — 67
5.3.5 Treatment of Cultural Resources — 67
5.3.5.1 Archeological Resources — 68
5.3.5.1.1 Preservation — 68
5.3.5.1.2 Stabilization — 68
5.3.5.1.3 Rehabilitation, Restoration, and Reconstruction — 68
5.3.5.1.4 Protection — 68
5.3.5.1.5 Archeological Data Recovery — 68
5.3.5.1.6 Earthworks — 68
5.3.5.1.7 Submerged Cultural Resources — 69
5.3.5.2 Cultural Landscapes — 69
5.3.5.2.1 Preservation — 69
5.3.5.2.2 Rehabilitation — 69
5.3.5.2.3 Restoration — 69
5.3.5.2.4 Reconstruction of Obliterated Landscapes — 69
5.3.5.2.5 Biotic Cultural Resources — 69
5.3.5.2.6 Land Use and Ethnographic Value — 70
5.3.5.2.7 New Construction — 70
5.3.5.3 Ethnographic Resources — 70
5.3.5.3.1 Resource Access and Use — 71

5.3.5.3.2 Sacred Sites 71
5.3.5.3.3 Research 72
5.3.5.4 Historic and Prehistoric Structures 72
5.3.5.4.1 Preservation 72
5.3.5.4.2 Rehabilitation 72
5.3.5.4.3 Restoration 72
5.3.5.4.4 Reconstruction of Missing Structures 72
5.3.5.4.5 Movement of Historic Structures 72
5.3.5.4.6 New Construction 73
5.3.5.4.7 Use of Historic Structures 73
5.3.5.4.8 Park Structures Owned or Managed by Others 73
5.3.5.4.9 Damaged or Destroyed Historic Structures 73
5.3.5.4.10 Historic and Prehistoric Ruins 73
5.3.5.5 Museum Collections 74
5.3.5.5.1 Preservation 74
5.3.5.5.2 Restoration 74
5.3.5.5.3 Reproduction 74
5.3.5.5.4 Acquisition, Management, Disposition, and Use 74
5.3.5.5.5 Historic Furnishings 75
5.3.5.5.6 Archives and Manuscripts 75

6 Wilderness Preservation and Management 77

6.1 General Statement 78
6.2 Identification and Designation of the Wilderness Resource 78
6.2.1 Assessment of Wilderness Eligibility or Ineligibility 78
6.2.1.1 Primary Eligibility Criteria 78
6.2.1.2 Additional Considerations in Determining Eligibility 78
6.2.1.3 The Assessment Process 79
6.2.2 Wilderness Studies 79
6.2.2.1 Potential Wilderness 79
6.2.2.2 Proposed Wilderness 79
6.2.3 Recommended Wilderness 79
6.2.4 Designated Wilderness 80

6.3 Wilderness Resource Management 80
6.3.1 General Policy 80
6.3.2 Responsibility 80
6.3.3 Consistency 81
6.3.4 Wilderness-related Planning and Environmental Compliance 81
6.3.4.1 Zoning for Wilderness 81
6.3.4.2 Wilderness Management Planning 81
6.3.4.3 Environmental Compliance 81
6.3.5 Minimum Requirement 81
6.3.6 Scientific Activities in Wilderness 82
6.3.6.1 General Policy 82
6.3.6.2 Monitoring Wilderness Resources 83
6.3.7 Natural Resources Management 83
6.3.8 Cultural Resources 83
6.3.9 Fire Management 84
6.3.10 Management Facilities 84
6.3.10.1 Administrative Facilities 84
6.3.10.2 Trails in Wilderness 84
6.3.10.3 Shelters and Campsites 85
6.3.10.4 Signs 85
6.3.11 Wilderness Boundaries 85
6.3.11.1 Legal Descriptions and Boundary Maps 85
6.3.11.2 Caves 85
6.3.11.3 Waters in Wilderness 85
6.3.12 American Indian Access and Associated Sites 85

6.4 Wilderness Use Management 86
6.4.1 General Policy 86
6.4.2 Wilderness Interpretation and Education 86
6.4.3 Recreational Use Management in Wilderness 86
6.4.3.1 Recreation Use Evaluation 86
6.4.3.2 Outdoor Skills and Ethics 87
6.4.3.3 Use of Motorized Equipment 87
6.4.4 Commercial Services 87
6.4.5 Special Events 87
6.4.6 Existing Private Rights 87
6.4.7 Grazing and Livestock Driveways 87
6.4.8 Rights-of-Way 88
6.4.9 Mineral Development 88
6.4.10 Accessibility for Persons with Disabilities 88

7 Interpretation and Education 89
Introduction 90
7.1 Interpretive and Educational Programs 90
7.2 Interpretive Planning 91
7.3 Personal and Nonpersonal Services 91
7.3.1 Personal Services 91
7.3.1.1 Curriculum-based Education Programs 91
7.3.2 Nonpersonal Services 91
7.3.2.1 Park Brochures 92
7.3.3 Technology and Interpretation 92
7.3.4 Interpretive and Educational Services Beyond Park Boundaries 92
7.4 Interpretive Competencies and Skills 92
7.5 Requirements for All Interpretive and Educational Services 93
7.5.1 Interpretation and 21st Century Relevancy 93
7.5.2 Access to Interpretive and Educational Opportunities 93
7.5.3 Resource Issue Interpretation and Education 93
7.5.4 Research and Scholarship 93
7.5.5 Evaluation of Interpretation and Education Effectiveness 93
7.5.6 Consultation 94
7.5.7 Cultural Demonstrators 94
7.5.8 Historic Weapons 94
7.5.9 Reenactments 94
7.6 Interpretive and Educational Partnerships 95
7.6.1 Volunteers in Parks (VIPs) 95
7.6.2 Cooperating Associations 95

8 Use of the Parks 97
8.1 General 98
8.1.1 Appropriate Use 98
8.1.2 Process for Determining Appropriate Uses 98
8.2 Visitor Use 99
8.2.1 Visitor Carrying Capacity 100
8.2.2 Recreational Activities 101
8.2.2.1 Management of Recreational Use 101
8.2.2.2 Commercial Visitor Services 102
8.2.2.3 River Use 102
8.2.2.4 Backcountry Use 102
8.2.2.5 Fishing 102
8.2.2.6 Hunting and Trapping 103
8.2.2.7 Parachuting 103
8.2.2.8 Recreational Pack and Saddle Stock Use 103
8.2.3 Use of Motorized Equipment 103
8.2.3.1 Motorized Off-road Vehicle Use 104
8.2.3.2 Snowmobiles 104
8.2.3.3 Personal Watercraft Use 104
8.2.4 Accessibility for Persons with Disabilities 104
8.2.5 Visitor Safety and Emergency Response 105
8.2.5.1 Visitor Safety 105
8.2.5.2 Emergency Preparedness and Emergency Operations 105
8.2.5.3 Search and Rescue 106
8.2.5.4 Dive Operations 106
8.2.5.5 Public Health Program 106
8.2.5.6 Emergency Medical Services 106
8.2.6 Recreation Fees and Reservations 106

| | | |
|---|---|---|
| 8.2.6.1 | Recreation Fees | 107 |
| 8.2.6.2 | National Recreation Reservation Service | 107 |
| 8.2.7 | Tourism | 107 |

**8.3  Law Enforcement Program** 108

| | | |
|---|---|---|
| 8.3.1 | General | 108 |
| 8.3.2 | The Context for Law Enforcement | 108 |
| 8.3.3 | Shared Responsibilities | 108 |
| 8.3.4 | Enforcement Authority | 108 |
| 8.3.5 | Jurisdiction | 109 |
| 8.3.6 | Use of Force | 109 |
| 8.3.7 | Law Enforcement Public Information and Media Relations | 109 |
| 8.3.8 | Homeland Security | 109 |
| 8.4 | Overflights and Aviation Uses | 109 |
| 8.4.1 | Alaska and Remote Areas | 110 |
| 8.4.2 | Education | 110 |
| 8.4.3 | General Aviation | 110 |
| 8.4.4 | Administrative Use | 110 |
| 8.4.5 | Military Aviation | 110 |
| 8.4.6 | Commercial Air Tour Management | 110 |
| 8.4.7 | Permitted Overflights | 110 |
| 8.4.8 | Airports and Landing Sites | 110 |
| 8.5 | Use by American Indians and Other Traditionally Associated Groups | 111 |

**8.6  Special Park Uses** 112

| | | |
|---|---|---|
| 8.6.1 | General | 112 |
| 8.6.1.1 | Requests for Permits | 112 |
| 8.6.1.2 | Fees | 112 |
| 8.6.2 | Special Events | 112 |
| 8.6.2.1 | General | 112 |
| 8.6.2.2 | Helium-filled Balloons | 113 |
| 8.6.2.3 | Fireworks Displays | 113 |
| 8.6.2.4 | Sale of Food or Merchandise | 113 |
| 8.6.3 | First Amendment Activities | 113 |
| 8.6.4 | Rights-of-Way for Utilities and Roads | 113 |
| 8.6.4.1 | General | 113 |
| 8.6.4.2 | Utilities | 114 |
| 8.6.4.3 | Telecommunication Sites | 114 |
| 8.6.4.4 | Roads and Highways and Petroleum-based Pipelines | 115 |
| 8.6.5 | Access to Private Property | 115 |
| 8.6.6 | Filming and Photography | 115 |
| 8.6.6.1 | General | 115 |
| 8.6.6.2 | Permits and Fees | 115 |
| 8.6.6.3 | NPS Participation | 115 |
| 8.6.7 | Agricultural Uses | 116 |
| 8.6.8 | Domestic and Feral Livestock | 116 |
| 8.6.8.1 | General | 116 |
| 8.6.8.2 | Managing Agricultural Grazing | 116 |
| 8.6.8.2.1 | Permitting Agricultural Grazing | 117 |
| 8.6.8.2.2 | Structures for Agricultural Grazing | 117 |
| 8.6.8.3 | Trespass and Feral Livestock | 117 |
| 8.6.9 | Military Operations | 117 |
| 8.6.10 | Cemeteries and Burials | 117 |
| 8.6.10.1 | National Cemeteries | 117 |
| 8.6.10.2 | Family Cemeteries | 117 |
| 8.6.10.3 | Other Burials and the Scattering of Ashes | 117 |
| 8.6.11 | Other Special Park Uses | 118 |

**8.7  Mineral Exploration and Development** 118

| | | |
|---|---|---|
| 8.7.1 | Mining Claims | 118 |
| 8.7.2 | Federal Mineral Leases | 118 |
| 8.7.3 | Nonfederally Owned Minerals | 119 |

**8.8  Collecting Natural Products** 119

**8.9  Consumptive Uses** 119

**8.10 Natural and Cultural Studies, Research, and Collection Activities** 120

**8.11 Social Science Studies** 120

| | | |
|---|---|---|
| 8.11.1 | General | 120 |
| 8.11.2 | NPS-supported Studies | 120 |
| 8.11.3 | Independent and Commercial Studies | 121 |
| 8.11.4 | Management and Conduct of Studies | 121 |

**8.12 Leases** 121

| | | |
|---|---|---|
| 8.12.1 | Additional Criteria | 122 |
| 8.12.2 | Prior Approval | 122 |
| 8.12.3 | Noncompetitive Awards | 122 |
| 8.12.4 | Historic Properties | 122 |

**9   Park Facilities** 123

**9.1  General** 124

| | | |
|---|---|---|
| 9.1.1 | Facility Planning and Design | 124 |
| 9.1.1.1 | Life-cycle Costs | 124 |
| 9.1.1.2 | Integration of Facilities into the Park Environment | 125 |
| 9.1.1.3 | Protection of Cultural Values | 125 |
| 9.1.1.4 | Adaptive Use | 125 |
| 9.1.1.5 | Siting Facilities to Avoid Natural Hazards | 126 |
| 9.1.1.6 | Sustainable Energy Design | 126 |
| 9.1.2 | Accessibility for Persons with Disabilities | 126 |
| 9.1.3 | Construction | 127 |
| 9.1.3.1 | Construction Sites | 127 |
| 9.1.3.2 | Revegetation and Landscaping | 127 |
| 9.1.3.3 | Borrow Pits and Spoil Areas | 127 |
| 9.1.4 | Maintenance | 128 |
| 9.1.4.1 | General | 128 |
| 9.1.4.2 | Acquisition of Environmentally Preferable and Energy-Efficient Products | 128 |
| 9.1.5 | Utilities | 128 |
| 9.1.5.1 | Water Supply Systems | 129 |
| 9.1.5.2 | Wastewater Treatment Systems | 129 |
| 9.1.5.3 | Utility Lines | 129 |
| 9.1.5.4 | Historic Utilities | 129 |
| 9.1.6 | Waste Management and Contaminant Issues | 129 |
| 9.1.6.1 | Waste Management | 129 |
| 9.1.6.2 | NPS Response to Contaminants | 130 |
| 9.1.7 | Energy Management | 131 |
| 9.1.8 | Structural Fire Protection and Suppression | 131 |

**9.2  Transportation Systems and Alternative Transportation** 131

| | | |
|---|---|---|
| 9.2.1 | Road Systems | 132 |
| 9.2.1.1 | Park Roads | 132 |
| 9.2.1.2 | Non-NPS Roads | 132 |
| 9.2.1.2.1 | Existing Commercial and Other Through-Traffic | 133 |
| 9.2.1.2.2 | Construction and Expansion Proposals | 133 |
| 9.2.2 | Trails and Walks | 133 |
| 9.2.2.1 | Cooperative Trail Planning | 133 |
| 9.2.2.2 | Hiking Trails | 134 |
| 9.2.2.3 | Equestrian Trails | 134 |
| 9.2.2.4 | Bicycle Trails | 134 |
| 9.2.2.5 | Water Trails | 134 |
| 9.2.2.6 | Interpretive Trails | 134 |
| 9.2.2.7 | National Trails | 134 |
| 9.2.2.8 | Trailheads | 134 |
| 9.2.2.9 | Trail Bridges | 134 |
| 9.2.3 | Traffic Signs and Markings | 135 |
| 9.2.4 | Parking Areas | 135 |
| 9.2.5 | Navigation Aids | 135 |

**9.3  Visitor Facilities** 135

| | | |
|---|---|---|
| 9.3.1 | Informational and Interpretive Facilities | 135 |
| 9.3.1.1 | Signs | 135 |
| 9.3.1.2 | Entrance Stations | 135 |
| 9.3.1.3 | Visitor Centers | 136 |
| 9.3.1.4 | Amphitheaters | 136 |
| 9.3.1.5 | Wayside Exhibits | 136 |
| 9.3.1.6 | Viewing Devices | 136 |
| 9.3.1.7 | Facilities for Arts and Culture | 136 |
| 9.3.2 | Overnight Accommodations and Food Services | 136 |
| 9.3.2.1 | Campgrounds | 136 |
| 9.3.2.2 | Backcountry Campsites | 137 |

| 9.3.2.3 | Hostels and Shelters | 137 |
| 9.3.3 | Comfort Stations | 137 |
| 9.3.4 | Other Visitor Facilities | 137 |
| 9.3.4.1 | Picnic and Other Day Use Areas | 137 |
| 9.3.4.2 | Facilities for Water Recreation | 138 |
| 9.3.4.3 | Skiing Facilities | 138 |
| 9.3.5 | Advertising | 138 |

**9.4   Management Facilities   138**

| 9.4.1 | Administrative Offices | 138 |
| 9.4.2 | Museum Collections Management Facilities | 139 |
| 9.4.3 | Employee Housing | 139 |
| 9.4.3.1 | Housing Management Plan | 139 |
| 9.4.3.2 | Eligible Residents | 139 |
| 9.4.3.3 | Historic Structures | 139 |
| 9.4.3.4 | Design and Construction | 139 |
| 9.4.4 | Maintenance Structures | 139 |
| 9.4.5 | Miscellaneous Management Facilities | 139 |

**9.5   Dams and Reservoirs   140**

**9.6   Commemorative Works and Plaques   140**

| 9.6.1 | General | 140 |
| 9.6.2 | Interpretive Works That Commemorate | 140 |
| 9.6.3 | Approval of Commemorative Works | 141 |
| 9.6.4 | Preexisting Commemorative Works | 141 |
| 9.6.5 | Donated Commemorative Works | 141 |
| 9.6.6 | Commemorative Works in National Cemeteries | 141 |

**10   Commercial Visitor Services   143**

**10.1 General   144**

| 10.1.1 | Leasing | 144 |

**10.2 Concessions   144**

| 10.2.1 | Concession Policies | 144 |
| 10.2.2 | Commercial Visitor Services Planning | 144 |
| 10.2.3 | Concession Contracting | 144 |
| 10.2.3.1 | Terms and Conditions of Contracts | 144 |
| 10.2.3.2 | Modifications/Amendments | 144 |
| 10.2.3.3 | Extension | 144 |
| 10.2.3.4 | Competition | 144 |
| 10.2.3.5 | Third-party Agreements and Subconcessions | 145 |
| 10.2.3.6 | Multipark Contracts | 145 |
| 10.2.3.7 | Termination | 145 |
| 10.2.4 | Concession Operations | 145 |
| 10.2.4.1 | Operating Plans | 145 |
| 10.2.4.2 | Service Type and Quality | 145 |
| 10.2.4.3 | Evaluation of Concession Operations | 145 |
| 10.2.4.4 | Interpretation by Concessioners | 145 |
| 10.2.4.5 | Merchandise | 145 |
| 10.2.4.6 | Artifacts and Specimens | 146 |
| 10.2.4.7 | Rates | 146 |

| 10.2.4.8 | Risk Management Program | 146 |
| 10.2.4.9 | Natural and Cultural Resource Management Requirements | 146 |
| 10.2.4.10 | Environmental Program Requirements | 146 |
| 10.2.4.11 | Insurance | 147 |
| 10.2.4.12 | Food Service Sanitation Inspections | 147 |
| 10.2.4.13 | Smoking | 147 |
| 10.2.4.14 | Wireless Local Area Networks | 147 |
| 10.2.5 | Concessions Financial Management | 147 |
| 10.2.5.1 | Franchise Fees | 147 |
| 10.2.5.2 | Franchise Fee Special Account | 147 |
| 10.2.5.3 | Record-keeping System | 147 |
| 10.2.5.4 | Annual Financial Reports | 147 |
| 10.2.5.5 | Donations to the National Park Service | 148 |
| 10.2.6 | Concession Facilities | 148 |
| 10.2.6.1 | Design | 148 |
| 10.2.6.2 | Accessibility of Commercial Services | 148 |
| 10.2.6.3 | Maintenance | 148 |
| 10.2.6.4 | Utilities and Services | 148 |
| 10.2.6.5 | Closure of Commercial Operations during Government Shutdown | 148 |
| 10.2.7 | Concessioner Employees and Employment Conditions | 149 |
| 10.2.7.1 | Nondiscrimination | 149 |
| 10.2.7.2 | Substance Abuse | 149 |
| 10.2.8 | NPS Employees | 149 |
| 10.2.8.1 | Accepting Gifts and Reduced Rates from Concessioners | 149 |
| 10.2.8.2 | Employment of NPS Personnel or Family Members by Concessioners | 149 |
| 10.2.8.3 | NPS Employee Ownership or Investment in Concession Businesses | 149 |
| 10.2.8.4 | Concession Management Personnel Qualifications | 149 |

**10.3 Commercial Use Authorizations   149**

| 10.3.1 | General | 150 |
| 10.3.2 | Requirements | 150 |
| 10.3.3 | Limitations | 150 |
| 10.3.4 | Construction Prohibition | 150 |
| 10.3.5 | Duration | 150 |
| 10.3.6 | Other Contracts | 150 |

**Appendix A   151**

Laws Cited in Text   151

**Appendix B   155**

Executive Orders and Memoranda Cited in Text   155

**Appendix C   157**

Director's Orders   157

**Glossary   161**

**Index   167**

009465

# Management Policies

## The Guide to Managing the National Park System



*The national park system was created to conserve unimpaired many of the world's most magnificent landscapes, places that enshrine our nation's enduring principles, and places that remind us of the tremendous sacrifices Americans have made on behalf of those principles. They are the most remarkable collection of places in America for recreation and learning. Visitors can immerse themselves in places where events actually happened and enjoy some of the most significant natural and historic places in America. These are places that offer renewal for the body, the spirit and the mind. As required by the 1916 Organic Act, these special places must be managed in a special way—a way that allows them to be enjoyed not just by those who are here today, but also by generations that follow. Enjoyment by present and future generations can be assured only if these special places are passed on to them in an unimpaired condition. And that is the challenge that faces all the employees of the National Park Service. It is a challenge eagerly embraced, but employees must have the tools required to perform the job successfully. The policies contained in these pages represent one of the most important tools available. Through their judicious and consistent application, these policies will set a firm foundation for stewardship that will continue to earn the trust and confidence of the American people.*



## Underlying Principles

The National Park Service adhered to a number of principles in preparing this 2006 edition of *Management Policies*. The key principles were that the policies must:

◆ comply with current laws, regulations and executive orders;

◆ prevent impairment of park resources and values;

◆ ensure that conservation will be predominant when there is a conflict between the protection of resources and their use;

◆ maintain NPS responsibility for making decisions and for exercising key authorities;

◆ emphasize consultation and cooperation with local/state/tribal/federal entities;

◆ support pursuit of the best contemporary business practices and sustainability;

◆ encourage consistency across the system —"one national park system";

◆ reflect NPS goals and a commitment to cooperative conservation and civic engagement;

◆ employ a tone that leaves no room for misunderstanding the National Park Service's commitment to the public's appropriate use and enjoyment, including education and interpretation, of park resources, while preventing unacceptable impacts;

◆ pass on to future generations natural, cultural, and physical resources that meet desired conditions better than they do today, along with improved opportunities for enjoyment.



# Introduction

## Law, Policy, and Other Guidance

*This volume is the basic Service-wide policy document of the National Park Service. Adherence to policy is mandatory unless specifically waived or modified by the Secretary, the Assistant Secretary, or the Director.*

**4**

In carrying out their responsibilities under the 1916 National Park Service[1] Organic Act and other pertinent statutes, all NPS officials and employees must be knowledgeable about the laws, regulations, and policies that pertain to their work. The property clause of the U.S. Constitution, which is the supreme law of the United States, gives Congress the authority to develop laws governing the management of the national park system. The property clause specifically directs that "The Congress will have the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States" (article IV, section 3). Once laws are enacted, authority for interpreting and implementing them is delegated to appropriate levels of government. In carrying out this function, the National Park Service, like other federal agencies, develops policy to interpret the ambiguities of the law and to fill in the details left unaddressed by Congress in the statutes.

## Hierarchy of Authorities

The management of the national park system and NPS programs is guided by the Constitution, public laws, treaties, proclamations, executive orders, regulations, and directives of the Secretary of the Interior and the Assistant Secretary for Fish and Wildlife and Parks. NPS policy must be consistent with these higher authorities and with appropriate delegations of authority. Many of the public laws and other guidance affecting the various facets of NPS administration and management are cited for reference purposes throughout these *Management Policies*. Other laws, regulations, and policies related to the administration of federal programs, although not cited, may also apply. For example, many, but not all, of the legislative requirements of the Alaska National Interest Lands Conservation Act (ANILCA) are cited at different places throughout these *Management Policies*. The additional legislative requirements of ANILCA, although not cited, must also be considered in the interpretation and application of these policies, as must all other applicable legislative requirements. It is especially important that superintendents and other park staff review their park's enabling legislation to determine whether it contains explicit guidance that would prevail over Service-wide policy.

## Policy Development

Policy sets the framework and provides direction for all management decisions. This direction may be general or specific; it may prescribe the process through which decisions are made, how an action is to be accomplished, or the results to be achieved. Policy initiatives may originate as a sudden, urgent response to an unanticipated problem or issue, or through a slow, evolutionary process as the Park Service gains increased experience or insight regarding a problem or issue. Sometimes the initiative does not originate within the Park Service, but rather with persons or organizations outside the Park Service who have a strong interest in how the Service manages the parks. However, NPS policy is usually developed through a concerted workgroup and consensus-building team effort involving extensive field review, consultation with NPS senior managers, and review and comment by affected parties and the general public.

All policy must be articulated in writing and must be approved by an NPS official who has been delegated authority to issue the policy. Policy must be published or otherwise made available to the public—particularly those whom it affects—and those who must implement it in the Washington office, regional offices, and parks. Unwritten or informal "policy," and various understandings of NPS traditional practices, will not be recognized as official policy.

## Compliance, Accountability, and Enforceability

Service-wide policy is articulated by the Director of the National Park Service. NPS employees must follow these policies unless specifically waived or modified in writing by the Secretary, the Assistant Secretary, or the Director. Waivers and modifications will be considered on a case-by-case basis, and previous waivers or modifications will not necessarily be regarded as precedents for future waivers or modifications. A request for a waiver or modification of policy must include a written justification and be submitted to the Director through the Office of Policy, which will coordinate with appropriate program offices.

The policies contained within this document are intended only to improve the internal management of the National Park Service; they are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person. Park superintendents will be held accountable for their and their staff's, adherence to Service-wide policy.

## The Directives System

This volume of NPS *Management Policies* is the basic Service-wide policy document of the National Park Service, superseding the 2001 edition. It is the highest of three levels of guidance documents in the NPS Directives System. The Directives System is designed to provide NPS management and staff with clear and continuously updated information on NPS policy and required and/or recommended actions, as well as any other information that will help them manage parks and programs effectively.

The *Management Policies* will be revised at appropriate intervals to consolidate Service-wide policy decisions, or to respond to new laws and technologies, new understandings of park resources and the factors that affect them, or changes in American society. Interim updates or amendments may be accomplished through director's orders (the second level of the Directives System), which also serve as a vehicle to clarify or supplement the

---

[1]   The terms "National Park Service," "Park Service," "Service," and "NPS" are used interchangeably in this document.

*Management Policies* to meet the needs of NPS managers. Any previously dated statement of policy not consistent with these *Management Policies*, or with a director's order that updates, amends, or clarifies policy, is to be disregarded.

Under the Directives System, the most detailed and comprehensive guidance on implementing Service-wide policy is found in "level 3" documents, which are usually in the form of handbooks or reference manuals issued by associate directors. These documents provide NPS field employees with compilations of legal references, operating policies, standards, procedures, general information, recommendations, and examples to assist them in carrying out *Management Policies* and director's orders. Level 3 documents may not impose any new Service-wide requirements unless the Director has specifically authorized them to do so, but they may reiterate or compile requirements (for example, laws, regulations, and policies) that have been imposed by higher authorities.

This document is intended to be read in its entirety. While certain chapters or sections provide important guidance by themselves, that guidance must be supplemented by the overriding principles listed below, which provide insight into the reading of this document. In addition there is an interrelationship among the chapters that provides for clarity and continuity for the management of the national park system. Also, the glossary contains important terms that apply throughout the document and should be incorporated into the reading of the document.

Whenever *Management Policies* are revised in the future they should

◆ comply with current laws, regulations, and executive orders;

◆ prevent impairment of park resources and values;

◆ ensure that conservation will be predominant when there is a conflict between the protection of resources and their use;

◆ maintain NPS responsibility for making decisions and for exercising key authorities;

◆ emphasize consultation and cooperation with local/state/tribal/federal entities;

◆ support pursuit of the best contemporary business practices and sustainability;

◆ encourage consistency across the system — "one national park system";

◆ reflect NPS goals and a commitment to cooperative conservation and civic engagement;

◆ employ a tone that leaves no room for misunderstanding the Park Service's commitment to the public's appropriate use and enjoyment, including education and interpretation, of park resources, while preventing unacceptable impacts;

◆ pass on to future generations natural, cultural and physical resources that meet desired conditions better than they do today, along with improved opportunities for enjoyment.

## Other Sources of Guidance

Instructions, guidance, and directives of regional or otherwise-limited application supplementary to and in conformance with Service-wide policies may be issued by regional directors or associate directors within formal delegations of authority. Superintendents may issue, within formal delegations of authority, park-specific instructions, procedures, directives, and other supplementary guidance (such as hours of operation or dates for seasonal openings), provided that the guidance does not conflict with Service-wide policy.

## NPS Program Policies

This volume addresses only those policies applicable to management of the national park system. It does not address policies applicable to NPS-administered programs that serve the conservation and recreation needs of the nation, but are not directly related to the national park system. Examples include the National Register of Historic Places; the National Historic Landmarks Program; the National Natural Landmarks Program; the Land and Water Conservation Fund Grants Program; the Historic American Buildings Survey; the Historic American Engineering Record; the Historic American Landscapes Survey; the American Battlefield Protection Program; the National Maritime Heritage Grants Program; the Rivers, Trails and Conservation Assistance Program; the Tribal Heritage Preservation Grants Program; the Preserve America Grants Program; and the National Heritage Areas Program.

009471

# The Foundation

*Beginning with Yellowstone, the idea of a national park was an American invention of historic consequences. The areas that now make up the national park system, and those that will be added in years to come, are cumulative expressions of a single national heritage. The National Park Service must manage park resources and values in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.*



1

The idea of a national park was an American invention of historic consequences, marking the beginning of a worldwide movement that has subsequently spread to more than one hundred countries.

**8**

## 1.1    The National Park Idea

The world's first national park—Yellowstone—was created in 1872, at which time Congress set aside more than one million acres as "a public park or pleasuring ground for the benefit and enjoyment of the people." The legislation assigned control of the new park to the Secretary of the Interior, who would be responsible for issuing regulations to provide for the "preservation, from injury or spoliation, of all timber, mineral deposits, natural curiosities, or wonders, within the park, and their retention in their natural condition." Other park management functions were to include the development of visitor accommodations, the construction of roads and bridle trails, the removal of trespassers, and protection "against the wanton destruction of the fish and game found within the park" (16 United States Code 21-22).

This idea of a national park was an American invention of historic consequences, marking the beginning of a worldwide movement that has subsequently spread to more than 100 countries. However, when Yellowstone National Park was created, no concept or plan existed upon which to build a system of such parks. The concept now described as the national park system, which embraces, nationwide, a wide variety of natural and cultural resources, evolved slowly over the years—often through the consolidation of federal land management responsibilities.

As interest grew in preserving the great scenic wonders of the West, efforts were also underway to protect the sites and structures associated with early Native American culture, particularly in the Southwest. The Antiquities Act of 1906 authorized the President "to declare by public proclamation [as national monuments] historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled" by the U.S. government (16 USC 431).

In 1916 Congress created the National Park Service in the Department of the Interior to promote and regulate the use of the federal areas known as national parks, monuments, and reservations (16 USC 1). (As noted in the Introduction, the terms "National Park Service," "Park Service," "Service," and "NPS" are used interchangeably in this document.)

## 1.2    The National Park System

The number and diversity of parks within the national park system grew as a result of a government reorganization in 1933, another following World War II, and yet another during the 1960s. Today there are nearly 400 units in the national park system. These units are variously designated as national parks, monuments, preserves, lakeshores, seashores, wild and scenic rivers, trails, historic sites, military parks, battlefields, historical parks, recreation areas, memorials, and parkways. Regardless of the many names and official designations of the park units that make up the national park system, all represent some nationally significant aspect of our natural or cultural heritage. They are the physical remnants of our past—great scenic and natural places that continue to evolve, repositories of outstanding recreational opportunities, classrooms of our heritage, and the legacy we leave to future generations— and they warrant the highest standard of protection.

It should be noted that, in accordance with provisions of the Wild and Scenic Rivers Act, any component of the National Wild and Scenic Rivers System that is administered by the Park Service is automatically a part of the national park system. Although there is no analogous provision in the National Trails System Act, several national trails managed by the Service have been included in the national park system. These national rivers and trails that are part of the national park system are subject to the policies contained herein, as well as to any other requirements specified in the Wild and Scenic Rivers Act or the National Trails System Act.

## 1.3    Criteria for Inclusion

Congress declared in the National Park System General Authorities Act of 1970 that areas comprising the national park system are cumulative expressions of a single national heritage. Potential additions to the national park system should therefore contribute in their own special way to a system that fully represents the broad spectrum of natural and cultural resources that characterize our nation. The National Park Service is responsible for conducting professional studies of potential additions to the national park system when specifically authorized by an act of Congress, and for making recommendations to the Secretary of the Interior, the President, and Congress. Several laws outline criteria for units of the national park system and for additions to the National Wild and Scenic Rivers System and the National Trails System.

To receive a favorable recommendation from the Service, a proposed addition to the national park system must (1) possess nationally significant natural or cultural resources, (2) be a suitable addition to the system, (3) be a feasible addition to the system, and (4) require direct NPS management instead of protection by other public agencies or the private sector. These criteria are designed to ensure that the national park system includes only the most outstanding examples of the nation's natural and cultural resources. These criteria also recognize that there are other management alternatives for preserving the nation's outstanding resources.

### 1.3.1    National Significance

NPS professionals, in consultation with subject-matter experts, scholars, and scientists, will determine whether a resource is nationally significant. An area will be considered nationally significant if it meets all of the following criteria:

◆    It is an outstanding example of a particular type of resource.

◆    It possesses exceptional value or quality in illustrating or interpreting the natural or cultural themes of our nation's heritage.

◆ It offers superlative opportunities for public enjoyment or for scientific study.

◆ It retains a high degree of integrity as a true, accurate, and relatively unspoiled example of a resource.

National significance for cultural resources will be evaluated by applying the National Historic Landmarks criteria contained in 36 CFR Part 65 (*Code of Federal Regulations*).

### 1.3.2    Suitability

An area is considered suitable for addition to the national park system if it represents a natural or cultural resource type that is not already adequately represented in the national park system, or is not comparably represented and protected for public enjoyment by other federal agencies; tribal, state, or local governments; or the private sector.

Adequacy of representation is determined on a case-by-case basis by comparing the potential addition to other comparably managed areas representing the same resource type, while considering differences or similarities in the character, quality, quantity, or combination of resource values. The comparative analysis also addresses rarity of the resources, interpretive and educational potential, and similar resources already protected in the national park system or in other public or private ownership. The comparison results in a determination of whether the proposed new area would expand, enhance, or duplicate resource protection or visitor use opportunities found in other comparably managed areas.

### 1.3.3    Feasibility

To be feasible as a new unit of the national park system, an area must be (1) of sufficient size and appropriate configuration to ensure sustainable resource protection and visitor enjoyment (taking into account current and potential impacts from sources beyond proposed park boundaries), and (2) capable of efficient administration by the Service at a reasonable cost.

In evaluating feasibility, the Service considers a variety of factors for a study area, such as the following:

◆ size

◆ boundary configurations

◆ current and potential uses of the study area and surrounding lands

◆ landownership patterns

◆ public enjoyment potential

◆ costs associated with acquisition, development, restoration, and operation

◆ access

◆ current and potential threats to the resources

◆ existing degradation of resources

◆ staffing requirements

◆ local planning and zoning

◆ the level of local and general public support (including landowners)

◆ the economic/socioeconomic impacts of designation as a unit of the national park system

The feasibility evaluation also considers the ability of the National Park Service to undertake new management responsibilities in light of current and projected availability of funding and personnel.

An overall evaluation of feasibility will be made after taking into account all of the above factors. However, evaluations may sometimes identify concerns or conditions, rather than simply reach a yes or no conclusion. For example, some new areas may be feasible additions to the national park system only if landowners are willing to sell, or the boundary encompasses specific areas necessary for visitor access, or state or local governments will provide appropriate assurances that adjacent land uses will remain compatible with the study area's resources and values.

### 1.3.4    Direct NPS Management

There are many excellent examples of the successful management of important natural and cultural resources by other public agencies, private conservation organizations, and individuals. The National Park Service applauds these accomplishments and actively encourages the expansion of conservation activities by state, local, and private entities and by other federal agencies. Unless direct NPS management of a studied area is identified as the clearly superior alternative, the Service will recommend that one or more of these other entities assume a lead management role, and that the area not receive national park system status.

Studies will evaluate an appropriate range of management alternatives and will identify which alternative or combination of alternatives would, in the professional judgment of the Director, be most effective and efficient in protecting significant resources and providing opportunities for appropriate public enjoyment. Alternatives for NPS management will not be developed for study areas that fail to meet any one of the four criteria for inclusion listed in section 1.3.

In cases where a study area's resources meet criteria for national significance but do not meet other criteria for inclusion in the national park system, the Service may instead recommend an alternative status, such as "affiliated area." To be eligible for affiliated area status, the area's resources must (1) meet the same standards for significance and suitability that apply to units of the national park system; (2) require some special recognition or technical assistance beyond what is available through existing NPS programs; (3) be managed in accordance with the policies and standards that apply to units of the national park system; and (4) be assured of sustained resource protection, as documented in a formal agreement between the Service and the nonfederal management entity. Designation as a "heritage area" is another option that may be recommended. Heritage areas have a nationally important, distinctive assemblage of resources that is best managed for

conservation, recreation, education, and continued use through partnerships among public and private entities at the local or regional level. Either of these two alternatives (and others as well) would recognize an area's importance to the nation without requiring or implying management by the National Park Service.

*(See National Significance 1.3.1; Suitability 1.3.2)*

## 1.4   Park Management

### 1.4.1   The Laws Generally Governing Park Management

The most important statutory directive for the National Park Service is provided by interrelated provisions of the NPS Organic Act of 1916 and the NPS General Authorities Act of 1970, including amendments to the latter law enacted in 1978.

The key management-related provision of the Organic Act is as follows:

> [The National Park Service] shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified… by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations. (16 USC 1)

Congress supplemented and clarified these provisions through enactment of the General Authorities Act in 1970, and again through enactment of a 1978 amendment to that act (the "Redwood amendment," contained in a bill expanding Redwood National Park), which added the last two sentences in the following provision. The key part of that act, as amended, is as follows:

> Congress declares that the national park system, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region of the United States, its territories and island possessions; that these areas, though distinct in character, are united through their inter-related purposes and resources into one national park system as cumulative expressions of a single national heritage; that, individually and collectively, these areas derive increased national dignity and recognition of their superlative environmental quality through their inclusion jointly with each other in one national park system preserved and managed for the benefit and inspiration of all the people of the United States; and that it is the purpose of this Act to include all such areas in the System and to clarify the authorities applicable to the system. Congress further reaffirms, declares, and directs that the promotion and regulation of the various areas of the National Park System, as defined in section 1c of this title, shall be consistent with and

founded in the purpose established by section 1 of this title [the Organic Act provision quoted above], to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress. (16 USC 1a-1)

This section 1.4 of *Management Policies* represents the agency's interpretation of these key statutory provisions.

### 1.4.2   "Impairment" and "Derogation": One Standard

Congress intended the language of the Redwood amendment to the General Authorities Act to reiterate the provisions of the Organic Act, not create a substantively different management standard. The House committee report described the Redwood amendment as a "declaration by Congress" that the promotion and regulation of the national park system is to be consistent with the Organic Act. The Senate committee report stated that under the Redwood amendment, "The Secretary has an absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 Act to take whatever actions and seek whatever relief as will safeguard the units of the national park system." So, although the Organic Act and the General Authorities Act, as amended by the Redwood amendment, use different wording ("unimpaired" and "derogation") to describe what the National Park Service must avoid, they define a single standard for the management of the national park system— not two different standards. For simplicity, *Management Policies* uses "impairment" (or a variation thereof), not both statutory phrases, to refer to that single standard.

### 1.4.3   The NPS Obligation to Conserve and Provide for Enjoyment of Park Resources and Values

The fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values. This mandate is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired. NPS managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values. However, the laws do give the Service management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values.

The fundamental purpose of all parks also includes providing for the enjoyment of park resources and values by the people of the United States. The enjoyment that is contemplated by the statute is broad; it is the enjoyment of all the people of the United States and includes enjoyment both by people who visit parks and by those who appreciate

them from afar. It also includes deriving benefit (including scientific knowledge) and inspiration from parks, as well as other forms of enjoyment and inspiration. Congress, recognizing that the enjoyment by future generations of the national parks can be ensured only if the superb quality of park resources and values is left unimpaired, has provided that when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant. This is how courts have consistently interpreted the Organic Act.

### 1.4.3.1    Park Purposes and Legislatively Authorized Uses

Park purposes are found in the general laws pertaining to the national park system, as well as the enabling legislation or proclamation establishing each unit. In addition to park purposes, in many cases the enabling legislation or proclamation for a park unit may also identify uses that are either mandated or authorized. In the administration of mandated uses, park managers must allow the use; however, they do have the authority to and must manage and regulate the use to ensure, to the extent possible, that impacts on park resources from that use are acceptable. In the administration of authorized uses, park managers have the discretionary authority to allow and manage the use, provided that the use will not cause impairment or unacceptable impacts. In determining whether or how to allow the use, park managers must consider the congressional or presidential interest, as expressed in the enabling legislation or proclamation, that the use or uses continue. Where there is strong public interest in a particular use, opportunities for civic engagement and cooperative conservation should be factored into the decision-making process.

*(See Unacceptable Impacts 1.4.7.1; Civic Engagement 1.7; Major Elements of NPS Park Planning and Decision-making 2.2; General 8.1)*

### 1.4.4    The Prohibition on Impairment of Park Resources and Values

While Congress has given the Service the management discretion to allow impacts within parks, that discretion is limited by the statutory requirement (generally enforceable by the federal courts) that the Park Service must leave park resources and values unimpaired unless a particular law directly and specifically provides otherwise. This, the cornerstone of the Organic Act, establishes the primary responsibility of the National Park Service. It ensures that park resources and values will continue to exist in a condition that will allow the American people to have present and future opportunities for enjoyment of them.

The impairment of park resources and values may not be allowed by the Service unless directly and specifically provided for by legislation or by the proclamation establishing the park. The relevant legislation or proclamation must provide explicitly (not by implication or inference) for the activity, in terms that keep the Service from having the authority to manage the activity so as to avoid the impairment.

### 1.4.5    What Constitutes Impairment of Park Resources and Values

The impairment that is prohibited by the Organic Act and the General Authorities Act is an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Whether an impact meets this definition depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts.

An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is

◆   necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or

◆   key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or

◆   identified in the park's general management plan or other relevant NPS planning documents as being of significance.

An impact would be less likely to constitute an impairment if it is an unavoidable result of an action necessary to preserve or restore the integrity of park resources or values and it cannot be further mitigated.

An impact that may, but would not necessarily, lead to impairment may result from visitor activities; NPS administrative activities; or activities undertaken by concessioners, contractors, and others operating in the park. Impairment may also result from sources or activities outside the park. This will be addressed consistent with sections 1.6 and 1.7 on Cooperative Conservation and Civic Engagement.

*(See Unacceptable Impacts 1.4.7.1)*

### 1.4.6    What Constitutes Park Resources and Values

The "park resources and values" that are subject to the no-impairment standard include

◆   the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;

◆   appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;

◆ the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and

◆ any additional attributes encompassed by the specific values and purposes for which the park was established.

*(See introduction to chapter 4)*

### 1.4.7 Decision-making Requirements to Identify and Avoid Impairments

Before approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values. If there would be an impairment, the action must not be approved.

In making a determination of whether there would be an impairment, an NPS decision-maker must use his or her professional judgment. This means that the decision-maker must consider any environmental assessments or environmental impact statements required by the National Environmental Policy Act of 1969 (NEPA); consultations required under section 106 of the National Historic Preservation Act (NHPA), relevant scientific and scholarly studies; advice or insights offered by subject matter experts and others who have relevant knowledge or experience; and the results of civic engagement and public involvement activities relating to the decision. The same application of professional judgment applies when reaching conclusions about "unacceptable impacts."

When an NPS decision-maker becomes aware that an ongoing activity might have led or might be leading to an impairment of park resources or values, he or she must investigate and determine if there is or will be an impairment. This investigation and determination may be made independent of, or as part of, a park planning process undertaken for other purposes. If it is determined that there is, or will be, an impairment, the decision-maker must take appropriate action, to the extent possible within the Service's authorities and available resources, to eliminate the impairment. The action must eliminate the impairment as soon as reasonably possible, taking into consideration the nature, duration, magnitude, and other characteristics of the impacts on park resources and values, as well as the requirements of the National Environmental Policy Act, National Historic Preservation Act, the Administrative Procedure Act, and other applicable laws.

*(See Levels of Park Planning 2.3; Evaluating Impacts on Natural Resources 4.1.3; Planning 5.2; General 8.1; Visitor Use 8.2; General 9.1; Glossary definition of Professional Judgment. Also see Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

#### 1.4.7.1 Unacceptable Impacts

The impact threshold at which impairment occurs is not always readily apparent. Therefore, the Service will apply a standard that offers greater assurance that impairment will not occur. The Service will do this by avoiding impacts that it determines to be unacceptable. These are impacts that fall short of impairment, but are still not acceptable within a particular park's environment. Park managers must not allow uses that would cause unacceptable impacts; they must evaluate existing or proposed uses and determine whether the associated impacts on park resources and values are acceptable.

Virtually every form of human activity that takes place within a park has some degree of effect on park resources or values, but that does not mean the impact is unacceptable or that a particular use must be disallowed. Therefore, for the purposes of these policies, unacceptable impacts are impacts that, individually or cumulatively, would

◆ be inconsistent with a park's purposes or values, or

◆ impede the attainment of a park's desired future conditions for natural and cultural resources as identified through the park's planning process, or

◆ create an unsafe or unhealthful environment for visitors or employees, or

◆ diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values, or

◆ unreasonably interfere with

◇ park programs or activities, or

◇ an appropriate use, or

◇ the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park.

◇ NPS concessioner or contractor operations or services.

*The following graphic illustrates the relationship between appropriate use, unacceptable impacts and impairment.*

## Managing for Resource Conservation



*(See Appropriate Use of the Parks 1.5; General 8.1)*

#### 1.4.7.2 Improving Resource Conditions within the Parks

The Service will also strive to ensure that park resources and values are passed on to future generations in a condition that is as good as, or better than, the conditions that exist today. In particular, the Service will strive to restore the integrity of park resources that have been damaged or

compromised in the past. Restoration activities will be guided by the natural and cultural resource-specific policies identified in chapters 4 and 5 of these *Management Policies.*

*(See Planning for Natural Resource Management 4.1.1; Restoration of Natural Systems 4.1.5; Compensation for Injuries to Natural Resources 4.1.6; Restoration of Native Plant and Animal Species 4.4.2.2; Restoration (of Cultural Landscapes) 5.3.5.2.3; Restoration (of Historic and Prehistoric Structures) 5.3.5.4.3; Restoration (of Museum Collections) 5.3.5.5.2. Also see Director's Order #12 and Handbook.)*

## 1.5   Appropriate Use of the Parks

The National Park Service embraces appropriate use of the parks because these uses are key to the enjoyment of the parks and the appreciation and inspiration derived from the resources. Park resources have profound effects on those who experience them through appropriate park uses. An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary from one park to another and from one location to another within a park.

In its role as steward of park resources, the National Park Service must ensure that park uses that are allowed would not cause impairment of, or unacceptable impacts on, park resources and values. When proposed park uses and the protection of park resources and values come into conflict, the protection of resources and values must be predominant. A new form of park use may be allowed within a park only after a determination has been made in the professional judgment of the superintendent that it will not result in unacceptable impacts. The National Park Service will always consider allowing activities that are appropriate to the parks, although conditions may preclude certain activities or require that limitations be placed on them. Park superintendents must continually monitor all park uses to prevent unanticipated and unacceptable impacts. If unanticipated and unacceptable impacts emerge, the superintendent must engage in a thoughtful, deliberate process to further manage or constrain the use, or discontinue it.

Appropriate visitor enjoyment is often associated with the inspirational qualities of the parks. As a general matter, preferred forms of enjoyment are those that are uniquely suited to the superlative natural and cultural resources found in the parks and that (1) foster an understanding of and appreciation for park resources and values, or (2) promote enjoyment through a direct association with, interaction with, or relation to park resources.

These preferred forms of use contribute to the personal growth and well-being of visitors by taking advantage of the inherent educational value of parks. Equally important, many appropriate uses also contribute to the health and personal fitness of park visitors. These are the types of uses that the Service will actively promote, in accordance with

the Organic Act. Other forms of park uses may be allowed within a park in accordance with the policies found in chapter 8.

*(See Park Purposes and Legislatively Authorized Uses 1.4.3.1; Chapter 2, Park System Planning; Process for Determining New Appropriate Uses 8.1.2. Also see Director's Order #17: National Park Service Tourism; 36 CFR 1.5)*

## 1.6   Cooperative Conservation Beyond Park Boundaries

Cooperative conservation beyond park boundaries is necessary as the National Park Service strives to fulfill its mandate to preserve the natural and cultural resources of parks unimpaired for future generations. Ecological processes cross park boundaries, and park boundaries may not incorporate all of the natural resources, cultural sites, and scenic vistas that relate to park resources or the quality of the visitor experience. Therefore, activities proposed for adjacent lands may significantly affect park programs, resources, and values. Conversely, NPS activities may have impacts outside park boundaries. Recognizing that parks are integral parts of larger regional environments, and to support its primary concern of protecting park resources and values, the Service will work cooperatively with others to

◆   anticipate, avoid, and resolve potential conflicts;

◆   protect park resources and values;

◆   provide for visitor enjoyment; and

◆   address mutual interests in the quality of life of community residents, including matters such as compatible economic development and resource and environmental protection.

Such local and regional cooperation may involve other federal agencies; tribal, state, and local governments; neighboring landowners; nongovernmental and private sector organizations; and all other concerned parties. The Service will do these things because cooperative conservation activities are a vital element in establishing relationships that will benefit the parks and in fostering decisions that are sustainable.

The Service will use all available tools to protect park resources and values from unacceptable impacts. The Service will also seek to advance opportunities for conservation partnerships. Superintendents will monitor land use proposals, changes to adjacent lands, and external activities for their potential impacts on park resources and values. It is appropriate for superintendents to engage constructively with the broader community in the same way that any good neighbor would. Superintendents will encourage compatible adjacent land uses and seek to avoid and mitigate potential adverse impacts on park resources and values by actively participating in the planning and regulatory processes of other federal agencies and tribal, state, and local governments having jurisdiction over property affecting, or affected by, the park. If a decision is

made or is imminent that will result in unacceptable impacts on park resources, superintendents must take appropriate action, to the extent possible within the Service's authorities and available resources, to manage or constrain the use to minimize impacts. When engaged in these activities, superintendents should fully apply the principles of civic engagement to promote better understanding and communication by (1) documenting the park's concerns and sharing them with all who are interested, and (2) listening to the concerns of those who are affected by the park's actions.

The Service will also cooperate with federal, state, local, and tribal governments, as well as individuals and organizations, to advance the goal of creating seamless networks of parks. These partnership activities are intended to establish corridors that link together, both physically and with a common sense of purpose, open spaces such as those found in parks, other protected areas, and compatibly managed private lands. The Service's goals in participating in a park network will be to increase protection and enhancement of biodiversity and to create a greater array of educational and appropriate recreational opportunities. When participating in a park network, the Service will not relinquish any of its authority to manage areas under its jurisdiction, nor will it expect other partners to relinquish theirs.

*(See Civic Engagement 1.7; Cooperative Planning 2.3.1.8; Cooperative Conservation 3.4; Chapter 4, Natural Resource Management. Also see Director's Order #17: National Park Service Tourism; Director's Order #75A: Civic Engagement and Public Involvement)*

## 1.7   Civic Engagement

The Service will embrace civic engagement as a fundamental discipline and practice. The Service's commitment to civic engagement is founded on the central principle that preservation of the nation's heritage resources relies on continued collaborative relationships between the Service and American society. Civic engagement will be viewed as a commitment to building and sustaining relationships with neighbors and other communities of interest—both near and far. This will require that the Service communicate by both talking and listening. Through its practice of civic engagement, the Service will actively encourage a two-way, continuous, and dynamic conversation with the public.

Civic engagement will take place on many levels to strengthen understanding of the full meaning and contemporary relevance of park resources and values. The goal of civic engagement will be to reinforce the Service's and the public's commitment to the preservation and stewardship of cultural and natural heritage resources.

The Service will welcome people to enjoy their parks in appropriate, sustainable ways. This practice will promote civic responsibility by building long-term, collaborative relationships with a broad range of communities, which in turn will foster a widespread investment in stewardship of the nation's resources. Park and program managers will seek opportunities to work in partnership with

all interested parties to jointly sponsor, develop, and promote public involvement activities and thereby improve mutual understanding, decisions, and work products. Through these efforts the Service will also learn from the communities it serves, including gateway communities.

A better understanding of the changing demographics of our nation is critical to the future of the National Park Service. The Park Service must actively seek to understand the values and connections our changing population has or does not have for natural and cultural heritage if it is to remain responsive and relevant to public needs and desires. This includes understanding why people do or do not visit—or care—about national parks. It is vital that the Service help those who do not visit to understand and support their national park system.

*(See Relationship with American Indian Tribes 1.11. Also see Director's Order #75A: Civic Engagement and Public Involvement)*

## 1.8   Environmental Leadership

Given the scope of its responsibility for the resources and values entrusted to its care, the Service has an obligation to demonstrate and work with others to promote leadership in environmental stewardship. The Park Service must set an example not only for visitors, other governmental agencies, the private sector, and the public at large, but also for a worldwide audience. Touching so many lives, the Service's management of the parks presents a unique opportunity to awaken the potential of each individual to play a proactive role in protecting the environment.

Environmental leadership will be demonstrated in all aspects of NPS activities, including policy development; park planning; all aspects of park operations; land protection; natural and cultural resource management; wilderness management; interpretation and education; facilities design, construction, and management; and commercial visitor services. In demonstrating environmental leadership, the Service will (1) fully comply with the letter and the spirit of the National Environmental Policy Act and the National Historic Preservation Act, and (2) continually assess the impact its operations have on natural and cultural resources so that it may identify areas for improvement. The Service will institute a Service-wide environmental auditing program that will evaluate a broad array of NPS activities to ensure that they meet the highest standards for environmental protection and compliance. The program will also screen for opportunities to implement sustainable practices and tangibly demonstrate the highest levels of environmental ethic.

*(See Facility Planning and Design 9.1.1)*

## 1.9   Management Excellence

Successful and sustained accomplishment of the Service's mission requires sound professional judgment and attentive employment of the most effective and efficient business

principles and practices. Opportunities to protect resources and provide opportunities for public enjoyment will be severely limited unless park managers can demonstrate their responsibility to and accountability for concepts ranging from competent management of information technology and finances to the successful management and development of human resources.

*(See Introduction—Compliance, Accountability and Enforceability)*

### 1.9.1 Human Resources

The Service will pursue a human resources program that is comprehensive, that is based on competency, and that encompasses the entire workforce, including employees, volunteers, contractors, concession employees, interns, and partners.

#### 1.9.1.1 Career Development, Training, and Management

Employee development helps organizations achieve greater success. The goals of the Park Service's employee development activities are to help employees strengthen their skills, knowledge, and experiences, as well as to promote broader employee engagement in the NPS mission. Employee development planning and strategies will be directly linked to core competencies and ensure the highest return on investment for the organization. Employees will also have opportunities to broaden their experiences and to progress in their careers through continuing education, undergraduate and graduate level courses, seminars, training, teaching, attendance at professional workshops and conferences, and other programs sponsored by scholarly institutions. In accordance with section 102 of the National Parks Omnibus Management Act of 1998 (16 USC 5912), the Park Service will implement a comprehensive training program for employees in all professional careers and a goal of ensuring that the workforce has the best, up-to-date knowledge, skills, and abilities with which to manage, interpret, and protect the resources of the national park system.

#### 1.9.1.2 Succession Planning

The Service will develop the capacity to supply future leadership through a strategic and conscious effort to develop a diverse workforce with the potential to take on leadership positions. This process will include a collaborative effort among all possible interests (including pre-employment/educational institutions) to prepare employees to meet the needs for leadership talent over time. The Service will cultivate talent for the short term and the long term to ensure the availability of a sufficient number of people who reflect the diversity of America.

In accordance with section 103 of the National Parks Omnibus Management Act of 1998 (16 USC 5913), the Service will implement a management training and development plan whereby career, professional NPS employees from any appropriate academic field may obtain sufficient training, experience, and advancement opportunity to enable those qualified to move into park

management positions, including the position of park superintendent. Similar efforts will be made for central office positions.

#### 1.9.1.3 Workforce Planning

The Service will implement a process to

- evaluate the workforce;
- identify the competencies needed by the workforce in each of the career fields;
- evaluate present and future trends;
- develop strategies to address competency gaps;
- benchmark best practices; and
- develop a plan that will allow the Service to meet mission and strategic goals.

In concert with employee development and succession planning, workforce planning will ensure that all elements of the workforce are provided the orientation and training necessary to support the NPS mission.

#### 1.9.1.4 Employee Safety and Health

The safety and health of employees, contractors, volunteers, and the public are core Service values. In making decisions on matters concerning employee safety and health, NPS managers must exercise good judgment and discretion and, above all, keep in mind that the safeguarding of human life must not be compromised. The Service must ensure that all employees are trained and informed on how to do their jobs safely, and that they have the necessary clothing, materials, and equipment to perform their duties with minimal personal risk.

*(See Visitor Safety and Emergency Response 8.2.5)*

#### 1.9.1.5 Workforce Diversity

The Park Service will continue to seek ways to achieve its workforce diversity goals and to recognize workforce diversity as a sound business practice. Success in achieving workforce diversity will also enhance the Service's ability to more successfully connect with park visitors who represent America's diverse population. Continuing efforts will be made to increase public awareness of employment opportunities and to develop partnerships with diverse populations and organizations for the purpose of improving workforce diversity.

#### 1.9.1.6 Volunteers in the Parks

Increasingly, American citizens who are not employed by the Service make important contributions by supplementing the efforts of the NPS workforce. The Service welcomes their efforts and will continue to use its authority under the Volunteers in the Parks Act of 1969 to

- protect park resources and values;
- improve its service to the public;
- foster stronger ties with the pubic; and
- provide opportunities for the public to learn about and experience the parks.

Pursuant to this statute, volunteers may be recruited without regard to civil service regulations; are covered for tort liability and work-injury compensation; and may be reimbursed for out-of-pocket expenses while participating in the program. However, volunteers cannot be used for law enforcement work or in policymaking processes, or to displace NPS employees. Volunteers may perform hazardous duties only if they possess the necessary skills to perform the duties assigned to them. Volunteers will be accepted without regard to race, creed, religion, age, sex, color, national origin, disability, or sexual orientation. NPS housing may be used for volunteers.

*(See Volunteers in Parks 7.6.1. Also see Director's Order #7: Volunteers in Parks, and associated Reference Manual 7)*

## 1.9.2  Managing Information

The future of individual parks and of the Service as an accountable organization depends heavily on (1) the availability, management, and dissemination of comprehensive information, and (2) the Service's success in the long-term preservation of, management of, and access to that information. NPS information resources exist in a variety of different media, including paper records, electronic documents, maps, databases, photographs, videos, and audio recordings. The Service will implement professional quality programs to preserve, manage, and integrate these resources and make them accessible. The Service will also use tools and technologies that will enhance

◆　information capture in permanent and durable forms;

◆　information management that is required by NPS policy and by legal and professional standards, including information security;

◆　management of electronic, textual, and audiovisual information resources, including still images, for continuous accessibility by NPS staff and the public;

◆　Internet and World Wide Web capabilities, while maintaining information security;

◆　geographic information systems (GIS);

◆　the understanding and management of the nation's natural and cultural resources; and

◆　the accessibility and availability of information to persons with disabilities.

### 1.9.2.1  Information Sharing

The Service is committed to the widest possible availability and sharing of knowledge and to fostering discussion about the national park system, America's natural and cultural heritage that is found in national parks, and the national experiences and values they represent. Most information shared with the public is presumed to be in the public domain, and therefore available to anyone who is interested. The only exceptions to information sharing are where disclosure could jeopardize specific park resources or donor agreements or violate legal or confidentiality requirements.

### 1.9.2.2  Proprietary Information

When producing or acquiring new works (such as images, graphic designs, logos, writing, Web sites, or other proprietary information) through acquisition by donation, contracting, partnerships, or other means, the Service will acquire the appropriate copyrights and any necessary releases whenever there is a current or anticipated need for unrestricted access to those works. The Service will respect the rights of owners of copyrights to control how their works are used and comply with fair use standards when information or works are not licensed for dissemination.

*(Also see Director's Order #67: Copyright and Trademarks)*

### 1.9.2.3  Information Confidentiality

Although it is the general NPS policy to share information widely, the Service also realizes that providing information about the location of park resources may sometimes place those resources at risk of harm, theft, or destruction. This can occur, for example, with regard to caves, archeological sites, tribal information, and rare plant and animal species. Some types of personnel, financial, and law enforcement matters are other examples of information that may be inappropriate for release to the public. Therefore, information will be withheld when the Service foresees that disclosure would be harmful to an interest protected by an exemption under the Freedom of Information Act (FOIA).

Information will also be withheld when the Park Service has entered into a written agreement (e.g., deed of gift, interview release, or similar written contract) to withhold data for a fixed period of time at the time of acquisition of the information. Such information will not be provided unless required by the Freedom of Information Act or other applicable law, a subpoena, a court order, or a federal audit.

NPS managers will use these exemptions sparingly, and only to the extent allowed by law. In general, if information is withheld from one requesting party, it must be withheld from anyone else who requests it, and if information is provided to one requesting party, it must be provided to anyone else who requests it. Procedures contained in Director's Order #66: FOIA and Protected Resource Information will be followed to document any decisions to release information or to withhold information from the public. Director's Order #66 also provides more detailed information regarding the four specific statutes and an executive order that exempt park resource information from FOIA disclosure.

*(See Natural Resource Information 4.1.2; Studies and Collections 4.2; Caves 4.8.2.2; Research 5.1; Confidentiality 5.2.3; Access to Interpretive and Educational Opportunities 7.5.2. Also see Director's Orders #5: Paper and Electronic Communications; #19: Records Management; #84: Library Management; and #11C: Web Publishing. Also see Reference Manual 53, chapter 5)*

### 1.9.3    Accessibility for Persons with Disabilities

All practicable efforts will be made to make NPS facilities, programs, services, employment, and meaningful work opportunities accessible and usable by all people, including those with disabilities. This policy reflects the commitment to provide access to the widest cross section of the public and ensure compliance with the Architectural Barriers Act of 1968, the Rehabilitation Act of 1973, the Equal Employment Opportunity Act of 1972, and the Americans with Disabilities Act of 1990. Specific guidance for implementing these laws is found in the Secretary of the Interior's regulations regarding enforcement of nondiscrimination on the basis of disability in Department of the Interior programs (43 CFR Part 17, Subpart E), and the General Services Administration's regulations adopting accessibility standards for the Architectural Barriers Act (41 CFR Part 102-76, Subpart C).

A primary principle of accessibility is that, to the highest degree practicable, people with disabilities should be able to participate in the same programs, activities, and employment opportunities available to everyone else. In choosing among methods of providing accessibility, higher priority will be given to methods that offer programs and activities in the most integrated setting appropriate. Special, separate, or alternative facilities, programs, or services will be provided only when existing ones cannot reasonably be made accessible. The determination of what is practicable will be made only after careful consultation with persons with disabilities or their representatives. Any decision that would result in less than equal opportunity is subject to the filing of an official disability rights complaint under the departmental regulations cited above.

*(See Physical Access for Persons with Disabilities 5.3.2; Accessibility for Persons with Disabilities 8.2.4; Accessibility of Commercial Services 10.2.6.2. Also see Americans with Disabilities Act and Architectural Barriers Act Accessibility Standards)*

### 1.9.4    Public Information and Media Relations

The Park Service will provide timely and accurate information to the public and news media in accordance with applicable laws, departmental policy, and director's orders. Park managers should identify appropriate opportunities to inform and educate the public about park resources and values and ways to enjoy them. Every effort should be made to provide early notification of changes in park management practices and conduct active civic engagement pursuant to Directors Order #75A. Park managers should keep the public informed of ongoing events in parks, especially as they may affect visitors and gateway communities. In some instances, certain information about individuals or events may need to be withheld for privacy, security, or other reasons, consistent with the Freedom of Information Act and the Privacy Act of 1974.

*(Also see Director's Order #66: FOIA and Protected Resource Information)*

### 1.9.5    Management Accountability

Managers are responsible for the quality and timeliness of program performance, increasing productivity, controlling costs, mitigating the adverse aspects of agency operations, and ensuring that programs are managed with integrity and in compliance with applicable law. Management accountability systems will be designed and implemented to add value and contribute to the efficiency and effectiveness of NPS programs.

The National Park Service will comply with OMB (Office of Management and Budget) Circular A-123, the Federal Managers' Financial Integrity Act of 1982 (31 USC 3512), and the Government Performance and Results Act of 1993 (31 USC 1115), which require that all federal agencies and individual managers take systematic and proactive measures to (1) develop and implement appropriate, cost-effective management controls for results-oriented management, (2) assess the adequacy of management controls in federal programs and operations, (3) identify needed improvements, (4) take corresponding corrective action, and (5) report annually on management controls.

The concept of management accountability will be applied to all strategies, plans, guidance, and procedures that govern programs and operations throughout the Park Service, including those at the park level, the program center level, and the Service-wide level. The Service will, through its organization, policies, and procedures, implement systems of controls to reasonably ensure that

◆    programs achieve their intended results;

◆    resources are used consistently with the NPS mission;

◆    programs and resources are managed to prevent waste, fraud, abuse, and mismanagement;

◆    laws and regulations are followed; and

◆    reliable and timely information is obtained, maintained, reported, and used for decision making.

*(See Strategic Planning 2.3.3, and Director's Order #54: Management Accountability)*

### 1.9.5.1    Financial Sustainability

The Park Service will strive to be an effective and efficient steward of appropriated and nonappropriated funds and services. These include revenues from recreation, concessions, and other fees, as well as financial and in-kind support from cooperating associations, friends' groups, other partnership entities, and volunteers. The Park Service will attempt to meet management goals consistently through strategic planning that anticipates budget requirements, changing conditions, and reasonably foreseeable trends and events.

The Service will continually implement best management practices to achieve financial sustainability, including

◆    analyzing and revising work processes to achieve greater efficiency;

◆ making full use of information technology;

◆ anticipating and addressing funding availability through accepted business practices;

◆ ensuring that the out-year budget implications of decision-making are carefully considered in planning and other processes;

◆ ensuring that both short- and long-term costs of facility development and operation are factored into the project formulation and selection process;

◆ using value-based decision-making processes such as value analysis, capital asset planning, benefit-cost analysis, life-cycle cost estimating, risk analysis, and total cost of ownership analysis;

◆ linking performance management elements to achieving and maintaining financial sustainability;

◆ embracing preventative maintenance and management that prevents the degradation of park resources and facilities, thereby avoiding costly restoration or rehabilitation efforts; and

◆ using best financial management practices to ensure transparent information and public accountability consistent with proven financial accounting standards.

The Service will continually seek improvement and innovation in the areas covered by the following subsections.

### 1.9.5.2   Facilities

The National Park Service will provide visitor and administrative facilities that are necessary, appropriate, and consistent with the conservation of park resources and values. Facilities will be harmonious with park resources, compatible with natural processes, esthetically pleasing, functional, energy- and water-efficient, cost-effective, universally designed, and as welcoming as possible to all segments of the population. Park facilities and operations of all sizes will demonstrate environmental leadership by incorporating sustainable practices to the maximum extent practicable in planning, design, siting, construction, and maintenance.

### 1.9.5.3   Budget Performance and Accountability Programs

The Park Service will also continue to improve the budget formulation and accounting and financial reporting processes, particularly related to park specifics and assets, including heritage assets, by making them more transparent. The goal of these efforts will be to ensure that

◆ funds are spent in support of a park's purpose or NPS mission;

◆ funds are spent in an efficient, transparent, and effective manner;

◆ a park's request for funding is credible; and

◆ there are adequate funds and staff to conserve and protect the resources for which parks are responsible and provide for the enjoyment of the same.

## 1.10   Partnerships

The Service recognizes the benefits of cooperative conservation (in accordance with Executive Order 13352, Facilitation of Cooperative Conservation), as well as the significant role partners play in achieving conservation goals and funding conservation initiatives on behalf of the national park system. The Service has had many successful partnerships with individuals; organizations; tribal, state, and local governments; and other federal agencies that have helped fulfill the NPS mission. Through these partnerships, the Service has received valuable assistance in the form of educational programs, visitor services, living history demonstrations, search-and-rescue operations, fund-raising campaigns, habitat restoration, scientific and scholarly research, ecosystem management, and a host of other activities. These partnerships, both formal and informal, have produced countless benefits for the Service and for the national park system.

Benefits often extend into the future, because many people who participate as partners connect more strongly with the parks and commit themselves to long-term stewardship. The Service will continue to welcome and actively seek partnership activities with individuals, organizations, and others who share the Service's commitment to protecting park resources and values and providing for their enjoyment. The Service will embrace partnership opportunities that will help accomplish the NPS mission provided that personnel and funding requirements do not make it impractical for the Service to participate and that the partnership activity would not (1) violate legal or ethical standards, (2) otherwise reflect adversely on the NPS mission and image, or (3) imply or indicate an unwillingness by the Service to perform an inherently governmental function.

In the spirit of partnership, the Service will also seek opportunities for cooperative management agreements with state or local agencies that will allow for more effective and efficient management of the parks, as authorized by section 802(a) of the National Parks Omnibus Management Act of 1998 (16 USC 1a-2(l)).

Whenever groups are created, controlled, or managed for the purpose of providing advice or recommendations to the Service, the Service will first consult with the Office of the Solicitor to determine whether the Federal Advisory Committee Act requires the chartering of an advisory committee. Consultation with the Office of the Solicitor will not be necessary when the Service meets with individuals, groups, or organizations simply to exchange views and information or to solicit individual advice on proposed actions. This act does not apply to intergovernmental meetings held exclusively between federal officials and elected officers of state, local and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities, when (1) the meetings relate to intergovernmental responsibilities or administration, and (2) the purpose of the committee is

solely to exchange views, information, or advice relating to the management or implementation of federal programs established pursuant to statute that explicitly or inherently share intergovernmental responsibilities or administration.

*(See Public Involvement 2.3.1.5; Partnerships 4.1.4; Studies and Collections 4.2; Independent Research 5.1.2; Agreements 5.2.2; Interpretive and Educational Partnerships 7.6; Volunteers in Parks 7.6.1; Cooperating Associations 7.6.2; Enforcement Authority 8.3.4; Commercial Visitor Services Chapter 10. Also see Director's Orders #7: Volunteers in Parks;#17: National Park Service Tourism; #20: Agreements, #21: Donations and Fundraising; #27: Challenge Cost-share Program; #32: Cooperating Associations; #75A: Civic Engagement and Public Involvement; NPS Guide to the Federal Advisory Committee Act; Executive Order 13352 (Facilitation of Cooperative Conservation)*

## 1.11   Relationship with American Indian Tribes

The National Park Service has a unique relationship with American Indian tribes, which is founded in law and strengthened by a shared commitment to stewardship of the land and resources. The Service will honor its legal responsibilities to American Indian tribes as required by the Constitution of the United States, treaties, statutes, and court decisions. For the purposes of these policies, "American Indian tribe" means any band, nation, or other organized group or community of Indians, including any Alaska Native Village, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

The formal legal rationale for the relationship between the National Park Service and tribes is augmented by the historical, cultural, and spiritual relationships that American Indian tribes have with park lands and resources. As the ancestral homelands of many American Indian tribes, parks protect resources, sites, and vistas that are highly significant for the tribes. Therefore, the Service will pursue an open, collaborative relationship with American Indian tribes to help tribes maintain their cultural and spiritual practices and enhance the Park Service's understanding of the history and significance of sites and resources in the parks. Within the constraints of legal authority and its duty to protect park resources, the Service will work with tribal governments to provide access to park resources and places that are essential for the continuation of traditional American Indian cultural or religious practices.

### 1.11.1   Government-to-Government Relationship

In accordance with the Presidential Memorandum of April 29, 1994, and Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments), the Service will maintain a government-to-government relationship with federally recognized tribal governments. This means that NPS officials will work directly with appropriate tribal government officials whenever plans or activities may directly or indirectly affect tribal interests, practices, and/or traditional use areas such as sacred sites.

### 1.11.2   Consultation

Consultations, whether initiated by a tribe or the Park Service, will be respectful of tribal sovereignty. The Federal Advisory Committee Act does not apply to consultation meetings held exclusively between federal officials and elected officers of tribal governments or their designees.

Tribal needs for privacy and confidentiality of certain kinds of information will be respected. Such information will be deemed confidential when authorized by law, regulation, or policy. Before beginning government-to-government consultations, park managers will consider what information is necessary to record. Culturally sensitive information will be collected and recorded only to the extent necessary to support sound management decisions and only in consultation with tribal representatives.

Mutually acceptable consultation protocols to guide government-to-government relationships will be developed at the park and program levels with assistance from regional and support offices as needed. The protocols will be developed with an understanding of special circumstances present at individual parks. These protocols and the actual consultation itself will be informed by national, regional, and park-based subject matter experts.

NPS managers will be open and candid with tribal governments during consultations so that the affected tribes may fully evaluate the potential impact of the proposal and the Service may fully consider tribal views in its decision-making processes. This means that government-to-government consultation should begin at the earliest possible stages of planning.

*(See Consultation 5.2.1; Ethnographic Resources 5.3.5.3. Also see Director's Order #66: FOIA and Protected Resource Information)*

### 1.11.3   Trust Resources

Activities carried out on park lands may sometimes affect tribal trust resources. Trust resources are those natural resources reserved by or for Indian tribes through treaties, statutes, judicial decisions, and executive orders, which are protected by a fiduciary obligation on the part of the United States. In accordance with the government-to-government relationship and mutually established protocols, the Service will interact directly with tribal governments regarding the potential impacts of proposed NPS activities on Indian tribes and trust resources.

In considering a proposed program, project, or action, the Service will ensure that effects on trust resources are explicitly identified and evaluated in consultation with potentially concerned tribes and that they are addressed in planning, decision, and operational documents. With regard to activities that may impact Indian trust resources or tribal health and safety, the Service will consult with the Bureau of Indian Affairs, the Office of the Solicitor, and other offices and agencies, as appropriate.

*(Also see Secretarial Order 3206, June 5, 1997)*

### 1.12   Native Hawaiians, Pacific Islanders, and Caribbean Islanders

The National Park Service administers parks in Hawaii, Guam, the Commonwealth of the Northern Mariana Islands, American Samoa, Puerto Rico, and the Virgin Islands. The Service will maintain open, collaborative relationships with native peoples for whom these islands are their ancestral homes. The Service will also meet any responsibilities that may have been defined in the enabling legislation of these island parks and to Native Hawaiians in the administration of the Native American Graves Protection and Repatriation Act and the National Historic Preservation Act.

### 1.13   An Enduring Message

The need for *Management Policies* in the National Park Service was first articulated by Secretary of the Interior Franklin K. Lane in a letter to the first Director of the National Park Service, Stephen T. Mather, on May 13, 1918.

Secretary Lane stated that administrative policy should adhere to three broad principles based on the 1916 Organic Act:

> First, that the national parks must be maintained in absolutely unimpaired form for the use of future generations as well as those of our own time; second, that they are set apart for the use, observation, health, and pleasure of the people; and third, that the national interest must dictate all decisions affecting public or private enterprise in the parks.

Today's national parks have become important to our nation in more ways than Secretary Lane could possibly have imagined. Parks are a true reflection of our nation's collective history, heritage, and ideals. They can be models of healthy, natural, sustainable ecosystems. To remain relevant now and into the future, parks must be welcoming in order that visitors may understand and appreciate these special places that have been set aside for their enjoyment. As America's story continues to evolve, new park units will be added in the future, and they will carry equally compelling reasons for their inclusion in the national park system.

Secretary Lane's guiding principles remain fundamentally valid, and they serve as a useful reminder of the need for a sustained commitment to park resource protection so that they are left unimpaired for the enjoyment of future generations. The Service's commitment to protecting the national parks and ensuring public enjoyment for present and future generations is embodied in this 2006 edition of *Management Policies*.

# 2

# Park System Planning



**Public participation in planning and decision-making will ensure that the Park Service fully understands and considers the public's interests in the parks.**

*Park planning helps define the set of resource conditions, visitor experiences, and management actions that, taken as a whole, will best achieve the mandate to preserve resources unimpaired for the enjoyment of present and future generations. NPS planning processes will flow from broad-scale general management planning through progressively more specific strategic planning, implementation planning, and annual performance planning and reporting, all of which will be grounded in foundation statements.*

## 2.1   General Principles

### 2.1.1   Decision-making

The National Park Service will use planning to bring logic, analysis, public involvement, and accountability into the decision-making process. Park planning and decision-making will be conducted as a continuous, dynamic cycle, from broad visions shared with the public to individual, annual work assignments and evaluations. Each park will be able to demonstrate to decision-makers, staff, and the public how decisions relate to one another in terms of a comprehensive, logical, and trackable rationale.

### 2.1.2   Scientific, Technical, and Scholarly Analysis

Decision-makers and planners will use the best available scientific and technical information and scholarly analysis to identify appropriate management actions for protection and use of park resources. Analysis will be interdisciplinary and tiered. Tiering is a staged approach to environmental analysis that addresses broad programs and issues in initial or systems-level analyses. Site-specific proposals and impacts are analyzed in subsequent studies. The tiered process supports decision-making on issues that are ripe for decision and provides a means to sustain those decisions. The focus of analysis starts with the park as a whole (including its global, national, and regional contexts) and then moves to site-specific details. At key points of planning and decision-making, the Park Service will identify reasonable alternatives and analyze and compare their differences with respect to

◆   consistency with the park's purpose,

◆   the quality of visitor experiences,

◆   the impacts on park resources,

◆   short- and long-term costs, and

◆   environmental consequences that may extend beyond park boundaries.

### 2.1.3   Public Participation

Public participation in planning and decision-making will ensure that the Service fully understands and considers the public's interests in the parks, which are part of the public's national heritage, cultural traditions, and community surroundings. The Service will actively seek out and consult with existing and potential visitors, neighbors, American Indians, other people with traditional cultural ties to park lands, scientists and scholars, concessioners, cooperating associations, gateway communities, other partners, and government agencies. The Service will work cooperatively with others to improve the condition of parks; to enhance public service; and to integrate parks into sustainable ecological, cultural, and socioeconomic systems.

*(See Cooperative Conservation Beyond Park Boundaries 1.6; Civic Engagement 1.7; Public Involvement 2.3.1.5; Consultation 5.2.1. Also see Director's Order #75A: Civic Engagement and Public Involvement)*

### 2.1.4   Goal Orientation

Managers will be held accountable for identifying and accomplishing measurable long-term goals and annual goals that are incremental steps to carrying out the park mission. Such planning is a critical and essential part of the NPS performance management system that is designed to improve the Park Service's performance and results. Park staff will monitor resource conditions and visitor experiences and plan, track, and report performance. If goals are not being met, managers will seek to understand why and take appropriate action. The goals will be periodically reassessed, taking into account new knowledge or previously unforeseen circumstances, and then the planning cycle will be reinitiated at the appropriate point.

*(See Park Management 1.4)*

## 2.2   Major Elements of Park Planning and Decision-making

A documented, comprehensive, logical, trackable rationale for decisions will be created through several levels of planning that are complementary and become increasingly detailed. The process begins with determining why the park was established and what resource conditions and visitor experiences should exist there; the process will become increasingly focused on how resource conditions and visitor experiences should be achieved.

The following planning elements are part of an interrelated framework that will inform NPS decision-making:

◆   **Foundation Statement** — The planning process begins with the development of a foundation statement that is based on the park's enabling legislation or presidential proclamation and that documents the park purpose, significance, fundamental resources and values and primary interpretive themes. It also includes any relevant laws and executive orders that apply to the national park system or to the individual park unit. The foundation statement is generally developed (or reviewed and expanded or revised, if appropriate) early as part of the public and agency scoping and data collection for the general management plan (GMP). Once a park has developed a complete foundation statement, it should remain relatively stable from one GMP cycle to the next, although new scientific and scholarly information may require expansion and revision to reflect the most current knowledge about what is most important about the park. General management planning is the most appropriate context for developing or reviewing a foundation statement because of the comprehensive public involvement and NEPA analysis that occurs during general management planning. The foundation statement may be vetted within the agency and with the public, then formally adopted as part of the final general management plan, or may be produced as a stand-alone foundation document for the park unit.

◆   **General Management Plan** — This is a broad umbrella document that sets the long-term goals for the park based on the foundation statement. The general management plan (1) clearly defines the desired natural

and cultural resource conditions to be achieved and maintained over time; (2) clearly defines the necessary conditions for visitors to understand, enjoy, and appreciate the park's significant resources, and (3) identifies the kinds and levels of management activities, visitor use, and development that are appropriate for maintaining the desired conditions; and (4) identifies indicators and standards for maintaining the desired conditions. For wild and scenic rivers and national trails, the analogous documents are a comprehensive river management plan and comprehensive management plan, respectively. Each of these plans has requirements very similar to a general management plan, so units usually refer to these plans as GMPs. Additional requirements for river and trail studies are covered in the Wild and Scenic Rivers Act and the National Trails System Act.

◆ **Program Management Plans** — These more detailed documents follow the general management plan and provide program-specific information on strategies to achieve and maintain the desired resource conditions and visitor experiences, including identification of appropriate visitor use where applicable (for example, resource stewardship strategy and comprehensive interpretation plan).

◆ **Strategic Plans** — These plans provide 1- to 5-year direction and objective, measurable, long-term goals. The long-term goals will define the resource conditions and visitor experiences to be achieved in the near future, for which the superintendent will be held accountable. Results on progress towards these goals will be reported annually. These goals are based on the park's foundation statement; an assessment of the park's natural and cultural resources; park visitors' experiences; and the park's performance capability given available personnel, funding, and external factors.

◆ **Implementation Plans** — These plans provide project-specific details needed to implement an action in an area of a park and explain how the action(s) helps achieve long-term goals.

◆ **Annual Performance Plans** —Annual goals and an annual work plan that will guide park efforts for a fiscal year are in annual performance plans.

◆ **Annual Performance Reports** — These reports contain an accounting of annual results in relation to annual goals.

Park managers and regional directors are responsible for ensuring that planning is properly conducted within this planning framework and making management decisions that are supported by public involvement, the best available information, and analysis. However, many parks may initially lack one or more of these planning elements. In the interim, management will be guided by the park's foundation statement, strategic plan, and other current approved plans. No major new development or other major commitment of park land or natural or cultural resources will be authorized without an approved general management plan.

*(See Visitor Use 8.2)*

## 2.3    Levels of Park Planning

The order of plan development will generally flow from broad general management plans to progressively more specific implementation plans.

When determining a plan's scope, it will be important to distinguish which issues can most appropriately be addressed by general management planning, and which can be most appropriately addressed by more detailed strategic or implementation planning. Each level of planning has a distinct function, and all levels are designed to interrelate with a minimum of duplication and confusion. At each level, plans will be written to make the links and relationships among the planning levels apparent to readers.

Environmental analysis of alternatives and public involvement required under section 102(2)(C) of the National Environmental Policy Act (NEPA) (42 USC 4332(2)(C)) will be conducted at any level of planning in which the decisions to be made constitute a major federal action significantly affecting the quality of the human environment. Normally, NEPA analysis and public participation will be done at the general management planning level, when the overall direction for the park's future is decided, and again at the implementation planning level before funding and resources are committed to carry out specific actions (see 2.3.1 and 2.3.4, below). In keeping with the Council on Environmental Quality guidelines for NEPA compliance, environmental analysis for more specific programs or actions will follow, or flow from, earlier NEPA documents for the broader general management plan.

*(See Civic Engagement 1.7. Also see Director's Orders #2: Park Planning, and #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

### 2.3.1    General Management Planning

The Park Service will maintain a general management plan for each unit of the national park system. The purpose of each general management plan, which will begin with the development of a foundation statement for the park unit, will be to ensure that the park has a clearly defined direction for resource preservation and visitor use. This basic foundation for decision-making will be developed by an interdisciplinary team, in consultation with relevant NPS offices, other federal and state agencies, local and tribal governments, other interested parties, and the general public. The management plans will be based on full and proper use of scientific and scholarly information related to existing and potential resource conditions, visitor experiences, environmental impacts, and relative costs of alternative courses of action.

The approved plan will create a realistic vision for the future, setting a direction for the park that takes into consideration the environmental and financial impact of proposed facilities and programs and ensures that the final plan is achievable and sustainable. The plan will take the long view, which may project many years into the future, when dealing with the time frames of natural and cultural

processes. The first phase of general management planning will be the development of the foundation statement. The plan will consider the park in its full ecological, scenic, and cultural contexts as a unit of the national park system and as part of a surrounding region. The general management plan will also establish a common management direction for all park divisions and districts. This integration will help avoid inadvertently creating new problems in one area while attempting to solve problems in another.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Visitor Use 8.2)*

### 2.3.1.1    Statutory Requirements

General management plans will meet all statutory requirements contained in 16 USC 1a-7(b) and will include

◆ the types of management actions required for the preservation of park resources;

◆ the types and general intensities of development (including visitor circulation and transportation patterns, systems, and modes) associated with public enjoyment and use of the area, including general locations, timing of implementation, and anticipated costs;

◆ visitor carrying capacities and implementation commitments for all areas of the park; and

◆ potential modifications to the external boundaries of the park—if any—and the reasons for the proposed changes.

For NPS-administered components of the National Wild and Scenic Rivers System and the National Trails System, comprehensive management plans will meet all the statutory requirements of 16 USC 1271-1287 or 16 USC 1244.

*(See Visitor Carrying Capacity 8.2.1)*

### 2.3.1.2    Management Zoning

Each park's approved general management plan will include a map that delineates management zones or districts that correspond to a description of the desired resource and visitor experience conditions for each area of the park. Management zoning will outline the criteria for (or describe the kind of) appropriate uses and facilities necessary to support these desired conditions. For example, highly sensitive natural areas might tolerate little, if any, visitor use, while other areas might accommodate much higher levels of use. Even in historic structures, one floor might be most appropriate for exhibits, while another could accommodate offices or administrative uses. Some desired conditions may apply parkwide, but the delineation of management zones will illustrate where there are differences in intended resource conditions, visitor experiences, and management activities.

### 2.3.1.3    Planning Team

Interdisciplinary teams, including park managers and technical experts, will prepare general management plans. Planning teams will work with the park superintendent and regional directors and consult with other park staff, NPS leadership, other agencies with jurisdiction by virtue of law or expertise, other knowledgeable persons, and the public concerning future management of park resources. The superintendent will be involved with all phases of the plan's development. The superintendent and regional director have ultimate responsibility for the contents of the plan, ensuring that there is consistency in direction and decisions between parks with similar resources and values. The regional director is the official responsible for approving general management plans.

### 2.3.1.4    Science and Scholarship

Decisions documented in general management plans and other planning products, including environmental analyses and documentation, will be based on current scientific and scholarly understanding of park ecosystems and cultural contexts and the socioeconomic environment both internal and external to the park. The collection and analysis of information about park resources will be a continuous process that will help ensure that decisions are consistent with park purposes.

*(See Decision-making Requirements to Avoid Impairments 1.4.7; Planning for Natural Resource Management 4.1.1; Planning 5.2)*

### 2.3.1.5    Public Involvement

Members of the public—including existing and potential visitors, park neighbors, American Indians, other people with traditional cultural ties to lands within the park, concessioners, cooperating associations, other partners, scientists and scholars, and other government agencies—will be encouraged to participate during the preparation of a general management plan and the associated environmental analysis. Public involvement strategies, practices, and activities will be developed and conducted within the framework of civic engagement. (Whereas civic engagement is the philosophy of welcoming people into the parks and building relationships around a shared stewardship mission, public involvement—also called public participation—is the specific, active involvement of the public in NPS planning and other decision-making processes.) Public involvement will meet NEPA and other federal requirements for

◆ identifying the scope of issues,

◆ developing the range of alternatives considered in planning,

◆ reviewing the analysis of potential impacts, and

◆ disclosing the rationale for decisions about the park's future.

The Park Service will use the public involvement process to

◆ share information about legal and policy mandates, the planning process, issues, and proposed management directions,

◆ learn about the values placed by other people and groups on the same resources and visitor experiences, and

◆ build support for implementing the plan among local interests, visitors, Congress, and others at the regional and national levels.

Whenever groups are created, controlled, or managed for the purpose of providing advice or recommendations to the Service, the Service will first consult with the Office of the Solicitor to determine whether the Federal Advisory Committee Act requires the chartering of an advisory committee. Consultation with the Office of the Solicitor will not be necessary when the Service meets with individuals, groups, or organizations simply to exchange views and information, or to solicit individual advice on proposed actions. This act does not apply to intergovernmental meetings held exclusively between federal officials and elected officers of state, local and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities, when the meetings relate to intergovernmental responsibilities or administration.

*(See Civic Engagement 1.7; Consultation 5.2.1. Also see NPS Guide to the Federal Advisory Committee Act. Also see Director's Order #75A: Civic Engagement and Public Involvement)*

### 2.3.1.6    Alternative Futures

Alternative futures for the park will be explored and assessed during general management planning and environmental analysis. Within the broad parameters of the park mission and mission goals, various approaches to park resource preservation, use, and development may be possible, some of which may represent competing demands for the same resource base. The general management plan will be the principal tool for resolving such issues. The range of alternatives will examine different combinations of management zoning, within the limits of laws, regulations, and policies governing national parks.

### 2.3.1.7    Environmental Analysis

The analysis of alternatives will meet the program standards for NPS implementation of the National Environmental Policy Act and related legislation, including the National Historic Preservation Act. In most cases, an environmental impact statement (EIS) will be prepared for general management plans. In a few cases, the regional director, in consultation with the NPS Environmental Quality Division, through the Associate Director for Natural Resource Stewardship and Science, may approve an exception to this general rule if

◆ completion of scoping demonstrates that there is no public controversy concerning potential environmental effects, and

◆ the initial analysis of alternatives clearly indicates there is no potential for significant impact by any alternative.

Where the National Environmental Policy Act and sections 106 and 110 of the National Historic Preservation Act (16 USC 470f and 470h-2, respectively) both apply,

NEPA procedures will be used to inform the public about undertakings having the potential to affect properties listed on, or eligible for listing on, the National Register of Historic Places, consistent with the Advisory Council on Historic Preservation's regulatory provisions governing coordination with the National Environmental Policy Act and the NPS nationwide programmatic agreement on section 106 compliance (36 CFR Part 800). The tiered approach to environmental analysis will be used as often as possible, in accordance with 40 CFR 1502.20.

*(See Evaluating Environmental Impacts 4.1.3; Planning 5.2. Also see Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

### 2.3.1.8    Cooperative Planning

General management planning will be conducted as part of cooperative regional planning and ecosystem planning whenever possible. NPS participation in cooperative regional planning will be undertaken with the hope of better coordinating and focusing the independent efforts of multiple parties. NPS participation in such planning efforts will acknowledge the rights and interests of other landowners. While being consistent with NPS *Management Policies* and park goals, plans will identify and consider potential effects outside and inside park boundaries, and plans will identify ways to enhance beneficial effects and mitigate adverse effects.

### 2.3.1.9    Wild and Scenic Rivers

Potential national wild and scenic rivers will be considered in planning for the use and development of a park's water and related land resources. The Park Service will compile a complete listing of all rivers and river segments in the national park system that it considers eligible for the National Wild and Scenic Rivers System. General management plans and other plans potentially affecting river resources will propose no actions that could adversely affect the values that qualify a river for the National Wild and Scenic Rivers System. After a determination of eligibility is made, a decision concerning whether or not to seek legislation to designate a river or river segment may be made only through a general management plan, an amendment to a general management plan, or the legislative review process.

### 2.3.1.10    Wilderness

The Wilderness Act directs agencies responsible for managing wilderness to study wilderness resources and values. The Park Service will develop wilderness studies and plans as part of the comprehensive planning framework for each park. Managers are encouraged to incorporate these studies and plans within general management plans when possible. To preserve Congress's prerogative to designate wilderness, general management plans and other plans potentially affecting eligible wilderness resources will propose no actions that could adversely affect the wilderness characteristics and values that make them eligible for consideration for inclusion in the National Wilderness Preservation System.

Lands and waters found to possess the characteristics and values of wilderness, as defined in the Wilderness Act, can be studied to develop a recommendation to Congress for wilderness designation in a general management plan/wilderness study. Where designated wilderness exists, park mangers have a responsibility to develop and maintain a wilderness management plan or equivalent planning document to guide the preservation, management, and use of these resources. A comprehensive management plan for wilderness is appropriately done in tandem with a general management plan, and wilderness should be taken into consideration in subsequent program management and implementation plans.

When wilderness eligibility and suitability are evaluated as a part of the GMP process, a determination of eligibility or suitability will not necessarily mean that the Service will seek designation. After the determination is made, a decision concerning whether to seek legislation to designate wilderness may be made only through a general management plan, an amendment to a general management plan, or the legislative review process.

*(See Wilderness Review Process 6.2)*

### 2.3.1.11   Alaska Park Units

General management plans for park system units in Alaska that were established or expanded by the Alaska National Interest Lands Conservation Act will address the provisions for conservation and management planning specified in section 1301 of that act (16 USC 3191).

### 2.3.1.12   Periodic Review of General Management Plans

As necessary, general management plans will be reviewed and amended or revised, or a new plan will be prepared, to keep them current. GMP reviews may be needed every 10 to 15 years, but may be needed sooner if conditions change significantly. If conditions remain substantially unchanged, a longer period between reviews would be acceptable. Even in parks with strong traditions and established patterns of use and development, managers will be responsible for assessing whether resources are threatened with impairment, the visitor experience has been degraded, or the park's built environment is difficult to sustain. Periodically reassessing the general management plan will give everyone with a major stake in the park an opportunity to revalidate the park's role in the nation and in the region and reevaluate whether the kinds of resource conditions and visitor experiences being pursued are the best possible mix for the future. An approved management plan may be amended or revised, rather than a new plan prepared, if conditions and management prescriptions governing most of the area covered by the plan remain essentially unchanged from those present when the plan was originally approved. Amendments or revisions to a general management plan will be accompanied by a supplemental environmental impact statement or other suitable NEPA analysis and public involvement.

*(See Chapter 1: The Foundation; Chapter 3: Land Protection; Chapter 4: Natural Resource Management; Chapter 5: Cultural Resource Management; Chapter 6: Wilderness Preservation and Management; Chapter 8: Use of the Parks; Chapter 9: Park Facilities; Chapter 10: Commercial Visitor Services. Also see Director's Orders #2: Park Planning; and #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

### 2.3.2   Program Management Planning

Program management planning for a park provides a bridge between the broad direction provided in the general management plan and specific actions taken to achieve goals. These plans provide a comprehensive approach for a single park program area across most or all of the park. Program management planning may include special emphasis plans, such as a park resource stewardship strategy, a comprehensive interpretive plan, a land protection plan, a visitor use plan, a fire management plan, an asset management plan, or a management stewardship plan. Integrated, interdisciplinary approaches to program planning are encouraged. Program management plans will provide comprehensive recommendations about specific actions needed to achieve and maintain the desired resource conditions and visitor experiences.

### 2.3.3   Strategic Planning

The Service is committed to performance management and accountability. Managers are responsible for the quality and timeliness of program performance, increasing productivity, controlling costs, mitigating the adverse aspects of agency operations, and ensuring that programs are managed with integrity and in compliance with applicable laws. Strategic planning will be conducted for the National Park Service as a whole, and every park, program, and central office will be covered by a strategic plan. Strategic plans will address both Service-wide and local outcomes. Park-related strategic plans will be recommended by the superintendent, approved by the regional director, and consistent with the department's overall strategic plan. Strategic plans will contain

◆  mission statement and purpose from the foundation document

◆  long-term performance goals (with performance targets)

◆  a short description of the strategies chosen to accomplish the goals

◆  a description of how the annual goals will relate to the long-term goals

◆  a description of the analysis used to establish or revise goals

◆  a section that identifies the civic engagement strategy used to involve stakeholders and communities in the development of the strategic plan

◆  an identification of the key external factors that could significantly affect achievement of the goals

◆  a list of those who developed the plan

Information in park strategic plans is used to compile Service-wide achievements; therefore, these plans must contain similar information.

*(See Management Accountability 1.9.5)*

### 2.3.3.1   Relationship between the Strategic Plan and the General Management Plan

The park's strategic plan will be consistent with the Department of the Interior's strategic plan and the park's general management plan, and it will build from the foundation statement. Parks that lack a current general management plan will work from their existing plans or an updated foundation document. A strategic plan will focus on a shorter time frame than a general management plan, target measurable results; and not require the comprehensive resource analysis, consultation, and compliance required for a general management plan.

Should a park decide, through its strategic planning process, that a major shift in direction or emphasis is needed, the strategic plan will identify the need for a new general management plan or a GMP amendment. Strategic plans may also identify the need for more detailed program management or implementation plans.

### 2.3.4   Implementation Planning

Implementation planning will focus on how to implement activities and projects needed to achieve the desired conditions identified in the general management plan, strategic plan, and program management planning documents. Implementation plans may deal with complex, technical, and sometimes controversial issues that often require a level of detail and thorough analysis beyond that appropriate for other planning documents.

Implementation plans may concentrate on individual projects or components of the general management plan, and they may specify the techniques, disciplines, equipment, infrastructure, schedule, and funding necessary to accomplish outcomes.

Implementation plan details may vary widely and may direct a finite project (such as reintroducing an extirpated species or developing a trail) or a continuous activity (such as maintaining a historic structure). Examples of implementation plan details include management plans for specific species and habitats, site designs, off-road-vehicle management plans, and interpretive media plans. Details will generally be deferred until the activity or project under consideration has attained sufficient priority to indicate that action will be taken within the next two to five years and will be included in an annual work plan. This will help ensure that decisions about how to best achieve a certain goal are relevant, timely, and based on current data. As a means for providing flexibility in the face of changing natural conditions, park managers are encouraged to use an adaptive management approach when appropriate (see glossary for definition of adaptive management).

Technical specialty teams under the direction of the program leader in the park (usually a division chief) or in the regional office will develop implementation plans, and the plans will be approved by the superintendent (or at a higher level when appropriate).

Development of an implementation plan may overlap other planning efforts if this is appropriate for the purposes of planning efficiency or public involvement. However, the decisions made for the general management plan will precede—and direct—more detailed decisions regarding projects and activities. Major new development or rehabilitation and major actions or commitments aimed at changing resource conditions or visitor use in a park must be consistent with an approved general management plan.

### 2.3.4.1   Environmental Analysis

Many actions taken by the National Park Service, unless categorically excluded from further NEPA analysis, require public involvement and analysis of alternatives. They also require compliance with the National Historic Preservation Act and related legislation. Although general management planning addresses key environmental quality and cultural resource issues at the programmatic level over the long term, resolution of resource issues must continue during implementation planning. This will generally be accomplished through the appropriate NEPA and NHPA section 106 compliance processes and the application of the tiered approach to environmental analysis.

*(See Park Management 1.4; Chapter 3: Land Protection; Chapter 4: Natural Resource Management; Chapter 5: Cultural Resource Management; Chapter 6: Wilderness Preservation and Management; Chapter 8: Use of the Parks; Chapter 9: Park Facilities; Chapter 10: Commercial Visitor Services. Also see Director's Orders #2: Park Planning; Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making (and the related Environmental Screening Form); Executive Order 12898 (Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations))*

### 2.3.5   Park Annual Performance Planning and Reporting

Each park will prepare annual performance plans (articulating annual goals for each fiscal year) and annual performance reports (describing the progress made in meeting the annual goals). The development of the annual performance plan and report will be synchronized with NPS budget development.

009493



**3**

# Land Protection

*The National Park Service will use all available authorities to protect lands and resources within units of the national park system, and the Park Service will seek to acquire nonfederal lands and interests in land that have been identified for acquisition as promptly as possible. For lands not in federal ownership, both those that have been identified for acquisition and other nonfederally owned lands within a park unit's authorized boundaries, the Service will cooperate with federal agencies; tribal, state, and local governments; nonprofit organizations; and property owners to provide appropriate protection measures. Cooperation with these entities will also be pursued, and other available land protection tools will be employed when threats to resources originate outside boundaries.*

Appropriate land protection methods must be applied to protect park resources and values from incompatible land uses.

**30**

## 3.1   General

The National Park Service is required by the 1916 Organic Act to protect and preserve unimpaired the resources and values of the national park system while providing for public use and enjoyment. A number of park units have nonfederally owned lands within their authorized boundaries. When nonfederal lands exist within park boundaries, acquisition of those lands and/or interests in those lands may be the best way to protect and manage natural and cultural resources or provide for visitor enjoyment. When acquisition is necessary and appropriate, the Park Service will acquire those lands and/or interests as promptly as possible, consistent with departmental land transaction and appraisal policies. Practical, cost-effective alternatives will be considered and pursued by the Service to advance protection and management goals.

The boundaries of most park units are not based strictly on ecological processes or other resource protection principles, and park units are increasingly subject to impacts from external sources. Examples include air pollution, water pollution, and the loss of scenic vistas, natural quiet, and wildlife habitat. To fulfill NPS protection responsibilities, strategies and actions beyond park boundaries may be employed. External threats may be addressed by using available tools—such as gateway community planning and partnership arrangements; NPS educational programs; and participation in the planning processes of federal agencies and tribal, state, and local governments. Strong fulfillment of Service responsibilities is required by the National Environmental Policy Act, the National Historic Preservation Act, and other applicable laws to minimize impacts on park resources and values.

## 3.2   Land Protection Methods

The Park Service may employ a variety of different methods, as appropriate, for protecting park resources. These methods will be considered in the land protection planning process for each unit. Examples include

◆   acquisition of fee-simple real property interest, possibly with arrangements for some rights to be reserved;

◆   acquisition of less-than-fee real property interests, such as easements or rights-of-way; and

◆   cooperative approaches, such as cooperative agreements, participation in regional consortiums, local planning and zoning processes, or other measures that do not involve federal acquisition of any interest in real property.

Federal fee-simple ownership (all of the rights associated with real property) provides the Service with the greatest ability to protect and manage resources and provide for public use and enjoyment. Less-than-fee interests (some of the rights associated with real property) require a federal commitment to monitor and enforce the Service's interest in the affected property. Acquisition of less-than-fee interests may be appropriate in instances in which the Service needs only a specific interest in land, or in which it needs to modify uses of the land to protect resources or values but full fee ownership is not required or possible.

Acquisition of fee-simple interests is a critically important and effective land protection method for lands within park unit boundaries. The Service may employ, as appropriate, a broad strategy to protect land and resources, including innovative techniques; partnerships; participation in the planning and decision-making processes of other federal agencies; and vigilance at the regional and local levels of government where nonfederal land use decisions are generally made.

Some park units created by Congress have been specifically authorized to continue historical or traditional activities such as farming, ranching, or low-density residential uses. Congress may also restrict the method of acquisition or prohibit acquisition without owner consent. In all cases, the Park Service will acquire the lands and/or interests in land only by the method or methods authorized.

When nonfederal land is identified for acquisition, the Service will make every reasonable effort to reach an agreement with the owner on the purchase price, in accordance with the uniform appraisal standards for departmental land transaction policies. If an agreement cannot be reached, the Service will take further steps in accordance with authorities and congressional directions that apply to the unit in question. NPS policy is to acquire lands and interests in lands from willing sellers, and condemnation is generally considered only as a last resort. However, acquisition by condemnation is sometimes necessary to establish just compensation, to clear a title, or to prevent imminent damage or unacceptable threats to park resources and values.

*(See Condemnation 3.8)*

## 3.3   Land Protection Plans

Planning for the protection of park lands will be integrated into the planning process for park management. Land protection plans (LPPs) should be prepared to determine and publicly document what lands or interests in land need to be in public ownership and what means of protection are available to achieve the purposes for which the unit was created. These plans will be prepared for each unit of the national park system containing nonfederal land or interests in land within its authorized boundary. A thorough review of a park's authorizing statutes and complete legislative history will be conducted as part of the land protection planning process.

Land acquisition priorities will be guided by a park unit's land protection plan. Superintendents will ensure that land protection plans are developed, and periodically reviewed and updated to identify what land or interests in land would facilitate achieving park purposes. These purposes and the desired conditions for resources and visitor

experiences are normally defined in the park's general management plan. Strategic plans define what results can be accomplished in the foreseeable future—usually a five-year period. Land protection plans will be coordinated with general management plans, strategic plans, and other plans for resource management and visitor use. Decisions about acquisition within park boundaries will consider the relationship between the park and its adjacent lands. Superintendents have the responsibility to be aware of uses or activities that are planned for lands around the park that may have impacts on park resources and opportunities for visitor enjoyment.

A land protection plan should be simple and concise and document (1) what lands or interests in land would advance park purposes through public ownership, (2) what means of protection are available to achieve park purposes as established by Congress, (3) the protection methods and funds that will be sought or applied to protect resources and to provide for visitor use and park facility development, and (4) acquisition priorities. Historic structures and objects on the land under consideration within the land protection plan will be evaluated for their relevance to the park mission and the scope of the park museum collection. The land protection plan will specify those structures and objects that benefit the public through public ownership and identify the appropriate source of funding. Personal property not identified for acquisition should be removed by the property owner. For acquisition of water rights, see chapter 4, section 4.6.2.

When appropriate, the land protection plan may serve as a vehicle for addressing land protection issues external to a park's boundaries. When external impacts or opportunities are addressed, plans will clearly distinguish between the authorities related to land acquisition and the authorities for the Service to cooperate with other entities beyond the park boundary.

## 3.4   Cooperative Conservation

Superintendents will be aware of and monitor state government programs for managing state-owned submerged lands and resources within NPS units. When there is potential for such programs to adversely impact park resources or values, superintendents will make their concerns known to appropriate state government officials and encourage compatible land uses that avoid or mitigate potential adverse impacts. When federal acquisition of state-owned submerged lands and resources within NPS units is not feasible, the Park Service will seek to enter into cooperative agreements with state governments to ensure the adequate protection of park resources and values.

External threats may originate with proposed uses outside a park that may adversely impact park resources or values. Superintendents will therefore be aware of and monitor land use proposals and changes to adjacent lands and their potential impacts. They will also seek to encourage compatible adjacent land uses to avoid or to mitigate

potential adverse effects. Superintendents will make their concerns known and, when appropriate, actively participate in the planning and regulatory processes of neighboring jurisdictions, including other federal agencies and tribal, state, and local governments.

In working cooperatively with surrounding landowners and managers a superintendent might, for example, comment on potential zoning changes for proposed development projects, or brief the public and officials about park resources and related studies that are relevant to proposed zoning or other changes. Superintendents should, whenever possible, work cooperatively and communicate their concerns as early as possible in the process to minimize potential conflict. Superintendents should seek advice from the appropriate NPS program managers and the Solicitor's Office when dealing with complicated external land protection issues and threats, especially those with potential for Service-wide controversy or consequences.

In some cases—such as air or water pollution—the source of a significant threat may be far removed from the park's boundaries. In such cases the Park Service will coordinate at the regional or national level in making its concerns known and in seeking a remedy to the problem. Threats to parks from external sources should be identified and addressed in the general management plan or in other planning documents. The result will be enhanced public awareness of the far-reaching impacts of these threats and an increased likelihood of remedial actions by those who are responsible.

*(See Cooperative Conservation Beyond Park Boundaries 1.6; Evaluating Impacts on Natural Resources 4.1.3; Partnerships 4.1.4; Biological Resource Management 4.4; Removal of Exotic Species Already Present 4.4.4.2; Water Resource Management 4.6; Air Resource Management 4.7; Geologic Resource Management 4.8; Soundscape Management 4.9; Lightscape Management 4.10; Stewardship 5.3. Also see Director's Order #25: Land Protection, and Reference Manual 25); Director's Order #75A: Civic Engagement and Public Involvement)*

## 3.5   Boundary Adjustments

The boundary of a national park may be modified only as authorized by law. For many parks, such statutory authority is included in the enabling legislation or subsequent legislation that specifically authorizes a boundary revision. Where park-specific authority is not available, the Land and Water Conservation Fund Act of 1965, as amended, provides an additional but limited authority to adjust boundaries.

The act provides for boundary adjustments that essentially fall into three distinct categories: (1) technical revisions; (2) minor revisions based upon statutorily defined criteria; and (3) revisions to include adjacent real property acquired by donation, purchased with donated funds, transferred from any other federal agency, or obtained by exchange. Adjacent real property is considered to be land located contiguous to but outside the boundary of a national park system unit.

**32**

As part of the planning process, the Park Service will identify and evaluate boundary adjustments that may be necessary or desirable for carrying out the purposes of the park unit. Boundary adjustments may be recommended to

◆ protect significant resources and values, or to enhance opportunities for public enjoyment related to park purposes;

◆ address operational and management issues, such as the need for access or the need for boundaries to correspond to logical boundary delineations such as topographic or other natural features or roads; or

◆ otherwise protect park resources that are critical to fulfilling park purposes.

If the acquisition will be made using appropriated funds, and it is not merely a technical boundary revision, the criteria set forth by Congress at 16 USC 460l-9(c) (2) must be met. All recommendations for boundary changes must meet the following two criteria:

◆ The added lands will be feasible to administer considering their size, configuration, and ownership; costs; the views of and impacts on local communities and surrounding jurisdictions; and other factors such as the presence of hazardous substances or exotic species.

◆ Other alternatives for management and resource protection are not adequate.

These criteria apply conversely to recommendations for the deletion of lands from the authorized boundaries of a park unit. For example, before recommending the deletion of land from a park boundary, a finding would have to be made that the land did not include a significant resource, value, or opportunity for public enjoyment related to the purposes of the park. Full consideration should be given to current and future park needs before a recommendation is made to delete lands from the authorized boundaries of a park unit. Actions consisting solely of deletions of land from existing park boundaries would require an act of Congress.

### 3.6    Land Acquisition Authority

The National Park Service acquires lands or interests in land within parks when authorized to do so by an act of Congress or by presidential proclamation. Although acquisition outside authorized boundaries is generally prohibited, certain statutes provide limited systemwide authority for minor boundary changes and the acceptance of donated lands adjacent to a park's boundaries. There is no single statute authorizing land acquisition. There are, however, several laws that provide limited acquisition authority that is applicable systemwide. For most parks, acquisition authority is provided by statutes specific to the park. The Park Service land acquisition process and land protection

planning process will comply with all applicable legislation, congressional guidelines, executive orders, and Department of the Interior policies. For delegations of authority for land acquisition, see Director's Order #25: Land Protection.

### 3.7    Land Acquisition Funding

When the acquisition of lands and/or interests in land within a park boundary is necessary, the Park Service will consider acquisition by

◆ purchase with appropriated or donated funds;

◆ exchange;

◆ donation;

◆ bargain sale;

◆ transfer or withdrawal from public domain; or

◆ condemnation, as a last resort.

Funding for land acquisition within the national park system is derived primarily from the Land and Water Conservation Fund. LWCF monies are restricted to uses associated with the acquisition of land and/or interests in land within the authorized boundaries of NPS units. As outlined in Department of the Interior policy, the federal portion of the fund will be used to acquire the lands, waters, and interests therein necessary to achieve the Service's natural, cultural, wildlife, and recreation management objectives. To implement this policy, the fund will be used in accordance with management objectives for each park unit based on the NPS mission and congressional mandates and in accordance with an analysis of long-range goals for resource protection, safe public access, and park management. As further required by departmental policy, the Service will, to the extent consistent with statutory authorities,

◆ prioritize acquisition of lands or interests in land within unit boundaries to achieve park purposes consistent with management objectives;

◆ use to the maximum extent practical, cost-effective alternatives to the direct federal purchase of privately owned lands, and, when acquisition is necessary, acquire or retain only the minimum interests determined by park officials to be necessary to meet management objectives;

◆ cooperate with landowners; other federal agencies; tribal, state, and local governments; and the private sector to manage land for public use or protect it for resource conservation; and

◆ formulate, or revise as necessary, plans for land acquisition and resource use or protection to ensure that sociocultural impacts are considered and that the most outstanding areas are adequately managed.

## 3.8   Condemnation

As a general policy and in accordance with congressional direction, condemnation is the acquisition method of last resort for the Park Service when acquiring lands or interests in lands.

It is the Service's goal to acquire lands or interests in lands through a cooperative negotiation process with a willing seller. Under certain circumstances, however, condemnation may be necessary. Friendly condemnations with willing sellers may be appropriate to ensure that the United States acquires clear title to the property in question, or to enable a court to determine the fair market value to be paid for the property. If there is no willing seller, the Service may pursue condemnation proceedings if

◆   it is first determined that other acquisition means will not be successful;

◆   the acquisition would be consistent with any restrictions applicable to that park unit; and

◆   approval has been obtained from the Director and any other required sources (e.g., by the Department of the Interior or Congress).

In Alaska, consideration of a land exchange is required before acquisition through condemnation.

009499

4

# Natural Resource Management

*The National Park Service will preserve and protect the natural resources, processes, systems, and values of units of the national park system in an unimpaired condition to perpetuate their inherent integrity and to provide present and future generations with the opportunity to enjoy them.*



Natural resource studies contribute to a better understanding of park resources, and help managers make better decisions.

**36**     **Introduction**

The National Park Service will strive to understand, maintain, restore, and protect the inherent integrity of the natural resources, processes, systems, and values of the parks while providing meaningful and appropriate opportunities to enjoy them. The Service recognizes that natural processes and species are evolving, and the Service will allow this evolution to continue—minimally influenced by human actions. The natural resources, processes, systems, and values that the Service preserves are described generally in the 1916 NPS Organic Act and in the enabling legislation or presidential proclamation establishing each park. They are described in greater detail in management plans specific to each park. Natural resources, processes, systems, and values found in parks include

◆ physical resources such as water, air, soils, topographic features, geologic features, paleontological resources, and natural soundscapes and clear skies, both during the day and at night

◆ physical processes such as weather, erosion, cave formation, and wildland fire

◆ biological resources such as native plants, animals, and communities

◆ biological processes such as photosynthesis, succession, and evolution

◆ ecosystems

◆ highly valued associated characteristics such as scenic views

In this chapter, natural resources, processes, systems, and values are all included in the term "natural resources." The term "natural condition" is used here to describe the condition of resources that would occur in the absence of human dominance over the landscape.

The Service manages the natural resources of parks to maintain them in an unimpaired condition for present and future generations in accordance with NPS-specific statutes, including the NPS Organic Act and the National Parks Omnibus Management Act of 1998; general environmental laws such as the Clean Air Act, the Clean Water Act, the Endangered Species Act of 1973, the National Environmental Policy Act, and the Wilderness Act; executive orders; and applicable regulations.

Activities that take place outside park boundaries and that are not managed by the Service can profoundly affect the Service's ability to protect natural resources inside the parks. The Service will act to protect natural resources from impacts caused by external activities by working cooperatively with federal, state, and local agencies; tribal authorities; user groups; adjacent landowners; and others to identify and achieve broad natural resource goals. By working cooperatively through both formal and informal lines of communication and consultation, the Service will better achieve park management objectives and the protection of parks' natural resources.

*(See Park Management 1.4; Cooperative Conservation Beyond Park Boundaries 1.6; Partnerships 4.1.4)*

## 4.1   General Management Concepts

As explained in chapter 1 of these *Management Policies*, preserving park resources and values unimpaired is the core or primary responsibility of NPS managers. The Service cannot conduct or allow activities in parks that would impact park resources and values to a level that would constitute impairment. To comply with this mandate, park managers must determine in writing whether proposed activities in parks would impair natural resources. Park managers must also take action to ensure that ongoing NPS activities do not cause the impairment of park natural resources. In cases of uncertainty as to the impacts of activities on park natural resources, the protection of natural resources will predominate. The Service will reduce such uncertainty by facilitating and building a science-based understanding of park resources and the nature and extent of the impacts involved.

Natural resources will be managed to preserve fundamental physical and biological processes, as well as individual species, features, and plant and animal communities. The Service will not attempt to solely preserve individual species (except threatened or endangered species) or individual natural processes; rather, it will try to maintain all the components and processes of naturally evolving park ecosystems, including the natural abundance, diversity, and genetic and ecological integrity of the plant and animal species native to those ecosystems. Just as all components of a natural system will be recognized as important, natural change will also be recognized as an integral part of the functioning of natural systems. By preserving these components and processes in their natural condition, the Service will prevent resource degradation and therefore avoid any subsequent need for resource restoration. In managing parks to preserve naturally evolving ecosystems, and in accordance with requirements of the National Parks Omnibus Management Act of 1998, the Service will use the findings of science and the analyses of scientifically trained resource specialists in decision-making.

Park units with significant natural resources range in size from just a few acres to millions of acres and from urban to remote and wilderness settings. As integral parts of a national park system, these park units individually and cumulatively contribute to America's natural heritage and provide the places where that heritage can be better understood and enjoyed.

Science has demonstrated that few if any park units can fully realize or maintain their physical and biological integrity if managed as biogeographic islands. Instead, park units must be managed in the context of their larger ecosystems. The ecosystem context for some species and processes may be relatively small, while for others this context is vast. In any case, superintendents face the challenge of placing each of the resources they protect in their appropriate ecosystem

context and then working with all involved and affected parties to advance their shared conservation goals and avoid adverse impacts on these resources.

Superintendents must be mindful of the setting in which they undertake the protection of park resources. The practicability of achieving a natural soundscape may be quite reasonable at a park unit in a remote setting, but the same may not be true at a popular roadside viewpoint in the same park unit, or at a park unit in a more urban locale. Similarly, the restoration and maintenance of natural fire regimes can advance more rapidly and on a larger landscape scale in wilderness areas where considerations for public safety and the protection of private property and physical developments can usually be readily addressed. However, the restoration and maintenance of natural fire regimes in more developed and highly visited locations with the same considerations can be extremely complicated. The goal of protecting natural resources and values while providing for their enjoyment remains the same in all cases except to the extent that Congress has directly and specifically provided otherwise. The degree to which a park can adequately restore and maintain its natural resources to a desired condition will depend on a variety of factors—such as size, past management events, surrounding land uses, and the availability of resources. Through its planning processes, the Park Service will determine the desired future conditions for each park unit and identify a strategy to achieve them. This strategy should include working cooperatively with adjacent land and resource managers, as appropriate.

The Service will not intervene in natural biological or physical processes, except

◆   when directed by Congress;

◆   in emergencies in which human life and property are at stake;

◆   to restore natural ecosystem functioning that has been disrupted by past or ongoing human activities; or

◆   when a park plan has identified the intervention as necessary to protect other park resources, human health and safety, or facilities.

Any such intervention will be kept to the minimum necessary to achieve the stated management objectives.

Natural systems in the national park system, and the human influences upon them, will be monitored to detect change. The Service will evaluate possible causes and effects of changes that might cause impacts on park resources and values. The Service will use the results of monitoring and research to understand the detected change and to develop appropriate management actions.

Biological or physical processes altered in the past by human activities may need to be actively managed to restore them to a natural condition or to maintain the closest approximation of the natural condition when a truly natural

system is no longer attainable. Prescribed burning and the control of ungulates when predators have been extirpated are two examples. Decisions about the extent and degree of management actions taken to protect or restore park ecosystems or their components will be based on clearly articulated, well-supported management objectives and the best scientific information available.

There may be situations in which an area may be closed to visitor use to protect the natural resources (for example, during an animal breeding season) or for reasons of public safety (for example, during a wildland fire). Such closures may be accomplished under the superintendent's discretionary authority and will comply with applicable regulations (36 CFR 1.5 and 1.7).

*(See The Prohibition on Impairment of Park Resources and Values 1.4.4; Environmental Leadership 1.8; General Management Planning 2.3.1; Facility Planning and Design 9.1.1. Also see Director's Order #11B: Ensuring Quality of Information Disseminated by the NPS; Director's Order #75A: Civic Engagement and Public Involvement)*

### 4.1.1   Planning for Natural Resource Management

Each park with a significant natural resource base (as exemplified by participation in the Vital Signs component of the Natural Resource Challenge) will prepare and periodically update a long-range (looking at least one to two decades ahead) comprehensive strategy for natural resource management. This long-range strategy will describe the comprehensive program of activities needed to achieve the desired future conditions for the park's natural resources. It will integrate the best available science and prescribe activities such as inventories, research, monitoring, restoration, mitigation, protection, education, and management of resource uses. The strategy will also describe the natural-resource-related activities needed to achieve desired future conditions for cultural resources (such as historic landscapes) and visitor enjoyment.

Similarly, planning for park operations, development, and management activities that might affect natural resources will be guided by high-quality, scientifically acceptable information, data, and impact assessment. Where existing information is inadequate, the collection of new information and data may be required before decision-making. Long-term research or monitoring may also be necessary to correctly understand the effects of management actions on natural resources whose function and significance are not clearly understood.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; General Management Planning 2.3.1; Land Protection Plans 3.3; NPS-conducted or -sponsored Inventory, Monitoring, and Research Studies 4.2.1; Cultural Landscapes 5.3.5.2; Chapter 8: Use of the Parks; Chapter 9: Park Facilities. Also see 516 DM 4.16—Adaptive Management)*

### 4.1.2   Natural Resource Information

Information about natural resources that is collected and developed will be maintained for as long as it is possible to do so. All forms of information collected through inventorying, monitoring, research, assessment, traditional knowledge, and management actions will be managed to professional NPS archival and library standards.

Most information about park natural resources will be made broadly available to park employees, the scientific community, and the public. Pursuant to provisions of the National Parks Omnibus Management Act, the Service will withhold information about the nature and specific location of sensitive park natural resources—specifically caves and mineral, paleontological, endangered, threatened, rare, or commercially valuable resources— unless the Service determines, in writing, that disclosure of the information would further the purposes of the park; would not create an unreasonable risk of harm, theft, or destruction of resources; and would be consistent with other applicable laws.

Under the Freedom of Information Act, the Park Service may be able to withhold sensitive natural resource data and information that is used in ongoing law enforcement investigations or subject to national security clearance classification. The Service may be able to withhold data provided through interim project reporting, pending the completion of relevant projects and the receipt of final project reports, as specified in approved scientific research and collecting permits and associated research proposals if the release of information will cause foreseeable harm to the NPS interests. Information that is made available to the public (that is, not withheld under the Freedom of Information Act or other laws) will remain searchable and accessible under the professional and NPS archival and library standards.

*(See Information Confidentiality 1.9.2.3; Confidentiality 5.2.3; Interpretive and Educational Programs 7.1. Also see Director's Order #66: FOIA and Protected Resource Information; Museum Handbook 24-Part II)*

### 4.1.3   Evaluating Impacts on Natural Resources

Planning, environmental evaluation, and civic engagement regarding management actions that may affect the natural resources of the national park system are essential for carrying out the Service's responsibilities to present and future generations. The Service will ensure that the environmental costs and benefits of proposed operations, development, and resource management are fully and openly evaluated before taking actions that may impact the natural resources of parks. This evaluation must include appropriate participation by the public; the application of scholarly, scientific, and technical information in the planning, evaluation, and decision-making processes; the use of NPS knowledge and expertise through interdisciplinary teams and processes; and the full incorporation of mitigation measures, pollution prevention techniques, and other principles of sustainable park management.

Every environmental assessment and environmental impact statement produced by the Service will include an analysis of whether the impacts of a proposed activity constitute impairment of park natural resources and values. Every finding of no significant impact, record of decision, and National Historic Preservation Act Section 106 memorandum of agreement signed by the Park Service will contain a discrete certification that the impacts of the proposed activity will not impair park natural resources and values.

*(See Park Management 1.4; Implementation Planning 2.3.4; NPS-conducted or -sponsored Inventory, Monitoring, and Research Studies 4.2.1. Also see Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

### 4.1.4   Partnerships

The Service will pursue opportunities to improve natural resource management within parks and across administrative boundaries by pursuing cooperative conservation with public agencies, appropriate representatives of American Indian tribes and other traditionally associated peoples, and private landowners in accordance with Executive Order 13352 (Facilitation of Cooperative Conservation). The Service recognizes that cooperation with other land and resource managers can accomplish ecosystem stability and other resource management objectives when the best efforts of a single manager might fail. Therefore, the Service will develop agreements with federal, tribal, state, and local governments and organizations; foreign governments and organizations; and private landowners, when appropriate, to coordinate plant, animal, water, and other natural resource management activities in ways that maintain and protect park resources and values. Such cooperation may include park restoration activities, research on park natural resources, and the management of species harvested in parks. Cooperation also may involve coordinating management activities in two or more separate areas, integrating management practices to reduce conflicts, coordinating research, sharing data and expertise, exchanging native biological resources for species management or ecosystem restoration purposes, establishing native wildlife corridors, and providing essential habitats adjacent to or across park boundaries.

In addition, the Service will seek the cooperation of others in minimizing the impacts of influences originating outside parks by controlling noise and artificial lighting, maintaining water quality and quantity, eliminating toxic substances, preserving scenic views, improving air quality, preserving wetlands, protecting threatened or endangered species, eliminating exotic species, managing the use of pesticides, protecting shoreline processes, managing fires, managing boundary influences, and using other means of preserving and protecting natural resources.

*(See Cooperative Conservation Beyond Park Boundaries 1.6; Partnerships 1.10; Cooperative Conservation 3.4; Agreements 5.2.2)*

### 4.1.5    Restoration of Natural Systems

The Service will reestablish natural functions and processes in parks unless otherwise directed by Congress. Landscapes disturbed by natural phenomena, such as landslides, earthquakes, floods, hurricanes, tornadoes, and fires, will be allowed to recover naturally unless manipulation is necessary to protect other park resources, developments, or employee and public safety. Impacts on natural systems resulting from human disturbances include the introduction of exotic species; the contamination of air, water, and soil; changes to hydrologic patterns and sediment transport; the acceleration of erosion and sedimentation; and the disruption of natural processes. The Service will seek to return such disturbed areas to the natural conditions and processes characteristic of the ecological zone in which the damaged resources are situated. The Service will use the best available technology, within available resources, to restore the biological and physical components of these systems, accelerating both their recovery and the recovery of landscape and biological community structure and function. Efforts may include, for example

◆    removal of exotic species

◆    removal of contaminants and nonhistoric structures or facilities

◆    restoration of abandoned mineral lands, abandoned or unauthorized roads, areas overgrazed by domestic animals, or disrupted natural waterways and/or shoreline processes

◆    restoration of areas disturbed by NPS administrative, management, or development activities (such as hazard tree removal, construction, or sand and gravel extraction) or by public use

◆    restoration of natural soundscapes

◆    restoration of native plants and animals

◆    restoration of natural visibility

When park development/facilities are damaged or destroyed and replacement is necessary, the development will be replaced or relocated to promote the restoration of natural resources and processes.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Restoration of Native Plant and Animal Species 4.4.2.2; Management of Natural Landscapes 4.4.2.4; Siting Facilities to Avoid Natural Hazards 9.1.1.5. Also see Director's Order #18: Wildland Fire Management)*

### 4.1.6    Compensation for Injuries to Natural Resources

The Service will use all legal authorities that are available to protect and restore natural resources and the environmental benefits they provide when actions of another party cause the destruction or loss of, or injury to, park resources or values. As a first step, damage assessments provide the basis for determining the restoration and compensation needs that address the public's loss and are a key milestone toward the ultimate goal, which is restoration, replacement, and/or reclamation of resources for the American public.

Pursuant to applicable provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Oil Pollution Act of 1990; the Federal Water Pollution Control Act (as amended by the Clean Water Act of 1977); and the National Park System Resource Protection Act, the Service will

◆    determine the injury caused to natural resources, assess all appropriate damages, and monitor damages;

◆    seek to recover all appropriate costs associated with responses to such actions and the costs of assessing resource damages, including the direct and indirect costs of response, restoration, and monitoring activities; and

◆    use all sums recovered in compensation for resource injuries to restore, replace, or acquire the equivalent of the resources that were the subject of the action.

*(See Compensation for Injuries to Cultural Resources 5.3.1.3. Also see Director's Order #14: Resource Damage Assessment and Restoration)*

## 4.2    Studies and Collections

The Service will encourage appropriately reviewed natural resource studies whenever such studies are consistent with applicable laws and policies. These studies support the NPS mission by providing the Service, the scientific community, and the public with an understanding of park resources, processes, values, and uses that will be cumulative and constantly refined. This approach will provide a scientific and scholarly basis for park planning, development, operations, management, education, and interpretive activities.

As used here, the term studies means short- or long-term scientific or scholarly investigations or educational activities that may involve natural resource surveys, inventories, monitoring, and research, including data and specimen collection. Studies include projects conducted by researchers and scholars in universities, foundations and other institutions; tribal colleges and organizations; other federal, tribal, and state agencies; and NPS staff. The data and information acquired through studies conducted in parks will be made publicly available, consistent with section 4.1.2, and will be obtained and disseminated in accordance with the standards found in Director's Order #11B: Ensuring Quality of Information Disseminated by the NPS.

The Service will promote cooperative relationships with educational and scientific institutions and qualified individuals when that relationship can assist the Service in obtaining information and when the opportunity for research and study in the parks offers the cooperators a significant benefit to their programs. NPS facilities and assistance may be made available to qualified cooperators who are conducting NPS-authorized studies.

Studies in parks will be preceded by (1) an approved scope of work, proposal, or other detailed written description

of the work to be performed; and (2) a written statement of environmental and cultural resource compliance appropriate to the proposed methodology and study site. All studies in parks will employ nondestructive methods to the maximum extent feasible with respect to resource protection, research methodology, and the scientific and management value of the information and collections to be obtained. Although studies involving physical impacts to park resources or the removal of objects or specimens may be permitted, studies and collecting activities that will lead to the impairment of park resources and values are prohibited.

Scientific natural resource collecting activities are governed by 36 CFR 2.5. A very limited number of other types of natural resource collecting are governed by 36 CFR 2.1. In most cases, only small quantities may be collected. The repeated collection of materials to ensure a continuing source of supply for research or propagation is prohibited unless the proposed activity clearly requires repeated collection, as might be the case with a monitoring or park restoration program.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Managing Information 1.9.2; Research 5.1; Resource Access and Use 5.3.5.3.1; Collecting Natural Products 8.8; Consumptive Uses 8.9; Social Science Studies 8.11. Also see Director's Order #28B: Ethnography Program; Director's Order #74: Studies and Collecting; Director's Order #78: Social Science)*

### 4.2.1 NPS-conducted or -sponsored Inventory, Monitoring, and Research Studies

The Service will

◆ identify, acquire, and interpret needed inventory, monitoring, and research, including applicable traditional knowledge, to obtain information and data that will help park managers accomplish park management objectives provided for in law and planning documents;

◆ define, assemble, and synthesize comprehensive baseline inventory data describing the natural resources under NPS stewardship, and identify the processes that influence those resources;

◆ use qualitative and quantitative techniques to monitor key aspects of resources and processes at regular intervals;

◆ analyze the resulting information to detect or predict changes (including interrelationships with visitor carrying capacities) that may require management intervention and provide reference points for comparison with other environments and time frames; and

◆ use the resulting information to maintain—and where necessary restore—the integrity of natural systems.

The Service may support studies to (among other things)

◆ ensure a systematic, current, and fully adequate park information base;

◆ provide a sound basis for policy, guidelines, and management actions;

◆ develop effective strategies, methods, and technologies to (1) restore disturbed resources, and (2) predict, avoid, or minimize adverse impacts on natural and cultural resources and on visitors and related activities;

◆ ensure that plans and actions reflect contemporary knowledge about the natural and cultural context of special natural areas, cultural landscapes, and natural resources having traditional cultural meaning and value to associated human groups;

◆ determine the causes of natural resource management problems and identify alternative strategies for potentially resolving them;

◆ understand the ceremonial and traditional resource management practices of Native Americans, subsistence uses by rural Alaska residents, and traditional uses by groups with demonstrated ties to particular natural resources of parks;

◆ further understand park ecosystems and related human social systems, including visitors and gateway communities, and document their components, condition, and significance; and

◆ ensure that the interpretation of the parks' natural resources and issues reflects current standards of scholarship relating to the history, science, and condition of the resources.

Superintendents may authorize NPS staff to carry out routine inventory, monitoring, study, and related duties without requiring an NPS scientific research and collecting permit. With or without an NPS permit, staff will comply appropriately with professional standards and with general and park-specific research and collecting permit conditions. All research and data and specimen collection conducted by NPS employees will be appropriately documented and carried out in accordance with all laws, regulations, policies, and professional standards pertaining to survey, inventory, monitoring, and research. NPS staff will be expected to make their findings available to the public, such as by publication in professional journals or presentation in interpretive programs.

Park inventory, monitoring, and research needs and specific research objectives will be identified in the appropriate management plans for each park, or in park, regional, or Service-wide program plans.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Natural Resource Information 4.1.2; Restoration of Natural Systems 4.1.5; Weather and Climate 4.7.2; Miscellaneous Management Facilities 9.4.5)*

### 4.2.2 Independent Studies

Non-NPS studies conducted in parks are not required to address specifically identified NPS management issues or information needs. However, these studies, including data and specimen collection, require an NPS scientific research and collecting permit. The studies must conform to NPS policies and guidelines regarding the collection

and publication of data, the conduct of studies, wilderness restrictions, and park-specific requirements identified in the terms and conditions of the permit. Projects will be administered and conducted only by fully qualified personnel and conform to current standards of scholarship. NPS scientific research and collecting permits may include requirements that permittees provide for parks, within agreed-upon time frames, copies of appropriate field notes, cataloging, and other data; information about the data; progress reports; interim and final reports; and publications derived from the permitted activities.

*(See Independent Research 5.1.2)*

### 4.2.3   Natural Resource Collections

Natural resource collections include non-living and living specimens. Guidance for collecting and managing specimens and associated field records can be found in the Code of Federal Regulations (36 CFR 2.5) and NPS guidance documents, including the museum handbook. Nonliving specimens and their associated field records are managed as museum collections. Living collections will be managed in accordance with the provisions of a park's general management plan, the Animal Welfare Act, and other appropriate requirements.

Field data, objects, specimens, and features obtained for preservation during inventory, monitoring, research, and study projects, together with associated records and reports, will be managed over the long term within the museum collection. Specimens that are not authorized for consumptive analysis remain federal property and will be labeled and cataloged into the NPS cataloging system (ANCS+, or its successor) in accordance with applicable regulations (36 CFR 2.5).

*(See Paleontological Resources and Their Contexts 4.8.2.1; Collecting Natural Products 8.8; Consumptive Uses 8.9; Natural and Cultural Studies, Research, and Collection Activities 8.10; Social Science Studies 8.11. Also see Director's Order #24: NPS Museum Collections Management)*

### 4.2.4   Collection Associated with the Development of Commercial Products

Extractive use of park resources for commercial purposes is prohibited except when specifically authorized by law or in the exercise of valid existing rights.

The results of research conducted on any material originating as a research specimen collected under an NPS scientific research and collecting permit (including progeny, replicates, or derivatives) may be used only for scientific purposes and not for commercial purposes without supplemental written authorization from the Park Service. The sale of collected research specimens from the permitted collector to third parties is prohibited; these research specimens remain federal property. Specimens and any material originating as a specimen may be loaned for scientific purposes related to commercial use in accordance with the terms of applicable written authorization from the Park Service.

Similarly, the results of other research conducted under an NPS scientific research and collecting permit that does not involve the collection of specimens may be used for scientific purposes only and may not be used for commercial purposes without supplemental written authorization.

*(Also see Director's Order #74: Studies and Collecting)*

### 4.3   Special Designations

The Park Service recognizes that special designations apply to parts or all of some parks to highlight the additional management considerations that those designated areas warrant. These designations include research natural area, experimental research area, wilderness area, national wild and scenic river, national natural landmark, biosphere reserve, and world heritage listing. These designations do not reduce the Service's authority for managing the parks, although in some cases they may create additional management requirements or considerations.

### 4.3.1   Research Natural Areas

Research natural areas contain prime examples of natural resources and processes, including significant genetic resources that have value for long-term observational studies or as control areas for manipulative research taking place outside the parks. Superintendents recommend areas of parks to their regional director, who is authorized to designate them as research natural areas. Superintendents cooperate with other federal land managers in identifying park sites for designation and planning research and educational activities for this interagency program.

Activities in research natural areas generally will be restricted to nonmanipulative research, education, and other activities that will not detract from an area's research values.

### 4.3.2   Experimental Research Areas

Experimental research areas are specific tracts that are set aside and managed for approved manipulative research. Manipulative research is defined as research in which conscious alteration of existing conditions is part of the experiment. The limited situations that may warrant establishment of experimental research areas are identified in *Natural Resources Reference Manual 77*. Superintendents may recommend areas of the park to their regional director, who is authorized to designate them as experimental research areas.

### 4.3.3   Wilderness Areas

See chapter 6.

### 4.3.4   National Wild and Scenic Rivers System

Parks containing one or more river segments listed in the NPS National Rivers Inventory, or that have characteristics that might make them eligible for the National Wild and Scenic Rivers System, will comply with section 5(d)(1) of the Wild and Scenic Rivers Act (16 USC 1276(d)(1)), which instructs each federal agency to assess whether those rivers are suitable for inclusion in the system. The assessments,

and any resulting management requirements, may be incorporated into a park's general management plan or other management plan. No management actions may be taken that could adversely affect the values that qualify a river for inclusion in the National Wild and Scenic Rivers System.

*(See Wild and Scenic Rivers 2.3.1.9. Also see Director's Order #46A: Wild and Scenic Rivers within the National Park System; Wild and Scenic Rivers Act)*

### 4.3.5    National Natural Landmarks
Park sites that are among the best examples of a type of biotic community or geological feature in a park's physiographic province may be nominated to the Secretary of the Interior for inclusion in the National Registry of Natural Landmarks. As the agency responsible for maintaining the registry, the Park Service has developed criteria for eligibility (36 CFR Part 62).

### 4.3.6    Biosphere Reserves
Biosphere reserves are sites that are part of a worldwide network of natural reserves recognized for their roles in conserving genetic resources; facilitating long-term research and monitoring; and encouraging education, training, and the demonstration of sustainable resource use. A biosphere reserve is usually representative of a biogeographic province.

With the approval of the NPS Director, parks may be nominated for recognition as biosphere reserves, or as constituents of biosphere reserves. Specific guidance for recognition is provided by the United States Man and Biosphere (MAB) Programme based on the general guidance of the United Nations Education, Scientific, and Cultural Organization (UNESCO). Working within the Man and Biosphere Programme, the Park Service may assist in determining the suitability and feasibility of including parks in U.S. biosphere reserves, may participate in research and educational activities, and may furnish information on its biosphere reserves for inclusion in domestic and international information systems.

The designation of park lands as biosphere reserves or constituents of biosphere reserves does not alter the purposes for which the parks were established, change the management requirements, or reduce NPS jurisdiction over parks. To the extent practicable, superintendents of parks that are recognized as biosphere reserves will incorporate biosphere reserve objectives into general management plans, implementation plans, action plans, and park interpretive programs. Superintendents will pursue opportunities to use the biosphere reserve designation as a framework for local, regional, and international cooperation.

### 4.3.7    World Heritage List
Park properties containing natural features believed to possess outstanding universal value to humanity may qualify for placement on the World Heritage List under criteria described in the *World Heritage Committee*

*Operational Guidelines* and in accordance with the World Heritage Convention. Before they can be nominated, all such properties must be assessed according to World Heritage criteria, and before the United States can submit a nomination to the World Heritage Committee, the property must first be included on the U.S. Tentative List of Potential Future World Heritage Nominations.

Any park superintendent who believes that part or all of the park they manage should be considered for inscription on the World Heritage List must consult with the NPS Office of International Affairs, the NPS Director, and the Department of the Interior before proceeding. U.S. recommendations are approved by an interagency panel chaired by the Assistant Secretary for Fish and Wildlife and Parks based on criteria promulgated by the World Heritage Committee. These criteria and the rules for U.S. participation in the Convention Concerning the Protection of the World Cultural and Natural Heritage are published in 36 CFR Part 73.

Once a property is placed on the World Heritage List, the Park Service will recognize the designation in public information and interpretive programs. Where appropriate, superintendents should use the park's world heritage status to promote sustainable tourism (tourism that does not adversely impact park resources and values) and the preservation of the world's natural and cultural heritage. Placement on the World Heritage List will not alter the purposes for which a park was established, or its management requirements, or reduce NPS jurisdiction over the park.

*(See Nominations for World Heritage List Designation 5.1.3.2.3)*

## 4.4    Biological Resource Management

### 4.4.1    General Principles for Managing Biological Resources
The National Park Service will maintain as parts of the natural ecosystems of parks all plants and animals native to park ecosystems. The term "plants and animals" refers to all five of the commonly recognized kingdoms of living things and includes such groups as flowering plants, ferns, mosses, lichens, algae, fungi, bacteria, mammals, birds, reptiles, amphibians, fishes, insects, worms, crustaceans, and microscopic plants or animals. The Service will successfully maintain native plants and animals by

◆   preserving and restoring the natural abundances, diversities, dynamics, distributions, habitats, and behaviors of native plant and animal populations and the communities and ecosystems in which they occur;

◆   restoring native plant and animal populations in parks when they have been extirpated by past human-caused actions; and

◆   minimizing human impacts on native plants, animals, populations, communities, and ecosystems, and the processes that sustain them.

#### 4.4.1.1   Plant and Animal Population Management Principles

The individual plants and animals found in parks are genetically parts of species populations that may extend across both park and nonpark lands. As local populations within a group of populations naturally fluctuate in size, they become vulnerable to extirpation during periods when their numbers are low. The periodic disappearance of local populations is common in some species, and the regional persistence of these species depends upon the natural recolonization of suitable habitat by individuals from the remaining local populations. Thus, providing for the persistence of a species in a park may require maintaining a number of local populations, often both within and outside the park.

In addition, some populations of vertebrate and invertebrate animals, such as bats, caribou, warblers, marine turtles, frogs, salmon, whales, and butterflies, migrate at regular intervals into and out of parks. For these migratory populations, the parks provide only one of the several major habitats they need, and survival of the species in parks also depends on the existence and quality of habitats outside the parks, including in many cases outside the United States. The Service will adopt park resource preservation, development, and use management strategies that are intended to maintain the natural population fluctuations and processes that influence the dynamics of individual plant and animal populations, groups of plant and animal populations, and migratory animal populations in parks.

In addition to maintaining all native plant and animal species and their habitats inside parks, the Service will work with other land managers to encourage the conservation of the populations and habitats of these species outside parks whenever possible. To meet its commitments for maintaining native species in parks, the Service will cooperate with states, tribal governments, the U.S. Fish and Wildlife Service, NOAA Fisheries, and other countries, as appropriate, to

◆   participate in local and regional scientific and planning efforts, identify ranges of populations of native plants and animals, and develop cooperative strategies for maintaining or restoring these populations in the parks;

◆   suggest mutually beneficial harvest regulations for lands and waters outside the parks for populations that extend across park boundaries, such as resident deer or fishes; for short-distance seasonal migrant populations, such as elk or fishes; or for long-distance migrant populations, such as salmon;

◆   develop data, through monitoring, for use in plant and animal management programs (such as local land management decision-making for assessing resident plant and animal population trends and in international management negotiations for such far-ranging seasonal migrants as geese, whales, and marine turtles);

◆   present information about species life cycles, ranges, and population dynamics in park interpretive programs for use in increasing public awareness of management needs for all species, both resident and migrant, that occur in parks; and

◆   prevent the introduction of exotic species into units of the national park system, and remove, when possible, or otherwise contain individuals or populations of these species that have already become established in parks.

*(See Civic Engagement 1.7; Cooperative Conservation Beyond Park Boundaries 1.6)*

#### 4.4.1.2   Genetic Resource Management Principles

The Service will strive to protect the full range of genetic types (genotypes) of native plant and animal populations in the parks by perpetuating natural evolutionary processes and minimizing human interference with evolving genetic diversity.

The restoration of native plants and animals will be accomplished using organisms taken from populations as closely related genetically and ecologically as possible to park populations, preferably from similar habitats in adjacent or local areas. Deviations from this general policy may be made where the management goal is to increase the variability of the park gene pool to mitigate past, human-induced loss of genetic variability. Actions to transplant organisms for purposes of restoring genetic variability through gene flow between native breeding populations will be preceded by an assessment of the genetic compatibility of the populations.

The need to maintain appropriate levels of genetic diversity will guide decisions on what actions to take to manage isolated populations of species or to enhance the recovery of populations of rare, threatened, or endangered species. All resource management actions involving planting or relocating species, subspecies, or varieties will be guided by detailed knowledge of site ecological histories and knowledge of local adaptations, ranges, and habitat requirements.

When native plants or animals are removed for any reason—such as hunting, fishing, pest management, or culling to reduce unnatural population conditions resulting from human activities—the Service will maintain the appropriate levels of natural genetic diversity.

*(See Restoration of Natural Systems 4.1.5; Restoration of Native Plant and Animal Species 4.4.2.2)*

#### 4.4.1.3   Definition of Native and Exotic Species

Native species are defined as all species that have occurred, now occur, or may occur as a result of natural processes on lands designated as units of the national park system. Native species in a place are evolving in concert with each other. Exotic species are those species that occupy or could occupy park lands directly or indirectly as the result of deliberate or accidental human activities. Exotic species are also commonly referred to as nonnative, alien, or invasive species. Because an exotic species did not evolve in concert with the species native to the place, the exotic species is not

a natural component of the natural ecosystem at that place. Genetically modified organisms exist solely due to human activities and therefore are managed as exotic species in parks.

### 4.4.2    Management of Native Plants and Animals

Whenever possible, natural processes will be relied upon to maintain native plant and animal populations and influence natural fluctuations in populations of these species. The Service may intervene to manage individuals or populations of native species only when such intervention will not cause unacceptable impacts to the populations of the species or to other components and processes of the ecosystems that support them. The second is that at least one of the following conditions exists:

◆    Management is necessary

　◇    because a population occurs in an unnaturally high or low concentration as a result of human influences (such as loss of seasonal habitat, the extirpation of predators, the creation of highly productive habitat through agriculture or urban landscapes) and it is not possible to mitigate the effects of the human influences;

　◇    to protect specific cultural resources of parks;

　◇    to accommodate intensive development in portions of parks appropriate for and dedicated to such development;

　◇    to protect rare, threatened, or endangered species;

　◇    to protect human health as advised by the U.S. Public Health Service (which includes the Centers for Disease Control and the NPS public health program);

　◇    to protect property when it is not possible to change the pattern of human activities; or

　◇    to maintain human safety when it is not possible to change the pattern of human activities.

Or,

◆    Removal of individuals or parts thereof

　◇    is part of an NPS research project described in an approved management plan, or is part of research being conducted by others who have been issued a scientific research and collecting permit;

　◇    is done to provide plants or animals for restoring native populations in parks or cooperating areas without diminishing the viability of the park populations from which the individuals are taken; or

　◇    meets specific park management objectives.

In planning and implementing plant and animal population management actions, the Service will follow established planning procedures, including provisions for public review and comment. The Service will consult, as appropriate, with other federal land-management agencies, the U.S. Fish and Wildlife Service, the NOAA Fisheries, state wildlife management agencies, other appropriate state agencies,

tribal governments, and others. Such consultation will address (1) the management of selected animal populations, (2) research involving the taking of animal species of interest to these agencies, and (3) cooperative studies and plans dealing with the public hunting and fishing of animal populations that occur across park boundaries.

The Service's cooperative conservation efforts concerning fish and wildlife management will be consistent with departmental policy articulated at 43 CFR Part 24. This departmental policy recognizes the broad authorities and responsibilities of federal and state agencies with regard to the management of the nation's fish and wildlife resources; this policy also promotes cooperative management relationships among these agencies. In particular, the policy calls on the Service to consult with state agencies on certain fish and wildlife management actions and encourages the execution of memoranda of understanding as appropriate to ensure the conduct of programs that meet mutual objectives as long as they do not conflict with federal law or regulation.

The Service will assess the results of managing plant and animal populations by conducting follow-up monitoring or other studies to determine the impacts of the management methods on nontargeted and targeted components of the ecosystem.

### 4.4.2.1    NPS Actions That Remove Native Plants and Animals

Whenever the Service removes native plants or animals, manages plant or animal populations to reduce their sizes, or allows others to remove plants or animals for an authorized purpose, the Service will seek to ensure that such removals will not cause unacceptable impacts on native resources, natural processes, or other park resources. Whenever the Service identifies a possible need for reducing the size of a park plant or animal population, the Service will use scientifically valid resource information obtained through consultation with technical experts, literature review, inventory, monitoring, or research to evaluate the identified need for population management; the Service will document it in the appropriate park management plan.

In addition, the Service will manage such removals to prevent them from interfering broadly with

◆    natural habitats, natural abundances, and natural distributions of native species and natural processes

◆    rare, threatened, and endangered plant or animal species or their critical habitats

◆    scientific study, interpretation, environmental education, appreciation of wildlife, or other public benefits

◆    opportunities to restore depressed populations of native species

◆    breeding or spawning grounds of native species

Where the need to reduce animal populations may be due to persistent human/animal conflicts, the Service will determine whether or not it can eliminate or mitigate the

conflicts by modifying or curtailing the conflicting visitor use or other human activities. Where visitor use or other human activities cannot be modified or curtailed, the Service may directly reduce the animal population by using several animal population management techniques, either separately or together. These techniques include relocation, public hunting on lands outside a park or where legislatively authorized within a park, habitat management, predator restoration, reproductive

intervention, and destruction of animals by NPS personnel or their authorized agents. Where animal populations are reduced, destroyed animals may be left in natural areas of the park to decompose unless there are human safety concerns regarding attraction of potentially harmful scavengers to populated sites or trails or other human health and sanitary concerns associated with decomposition. Live animals or carcasses may be removed from parks according to the provisions of applicable laws, agreements, and regulations, including the granting of preference to Native Americans.

*(See Pest Management 4.4.5. Also see Director's Order #18: Wildland Fire Management)*

### 4.4.2.2    Restoration of Native Plant and Animal Species

The Service will strive to restore extirpated native plant and animal species to parks whenever all of the following criteria are met:

◆ Adequate habitat to support the species either exists or can reasonably be restored in the park and if necessary also on adjacent public lands and waters; once a natural population level is achieved, the population can be self-perpetuating.

◆ The species does not, based on an effective management plan, pose a serious threat to the safety of people in parks, park resources, or persons or property within or outside park boundaries.

◆ The genetic type used in restoration most nearly approximates the extirpated genetic type.

◆ The species disappeared or was substantially diminished as a direct or indirect result of human-induced change to the species population or to the ecosystem.

◆ Potential impacts upon park management and use have been carefully considered.

Programs to restore animal species may include confining animals in small field enclosures during restoration efforts, but only until the animals have become accustomed to the new area or they have become sufficiently established to minimize threats from predators, poaching, disease, or other factors. Programs to restore animal species may also include confining animals in cages for captive breeding to increase the number of offspring for release to the wild or to manage the population's gene pool. Programs to restore plant species may include propagating plants in

greenhouses, gardens, or other confined areas to develop propagation materials (propagules) for restoration efforts or to manage a population's gene pool.

*(See Restoration of Natural Systems 4.1.5)*

### 4.4.2.3    Management of Threatened or Endangered Plants and Animals

The Service will survey for, protect, and strive to recover all species native to national park system units that are listed under the Endangered Species Act. The Service will fully meet its obligations under the NPS Organic Act and the Endangered Species Act to both proactively conserve listed species and prevent detrimental effects on these species. To meet these obligations, the Service will

◆ cooperate with both the U.S. Fish and Wildlife Service and the NOAA Fisheries to ensure that NPS actions comply with both the written requirements and the spirit of the Endangered Species Act. This cooperation should include the full range of activities associated with the Endangered Species Act, including consultation, conferencing, informal discussions, and securing all necessary scientific and/or recovery permits;

◆ undertake active management programs to inventory, monitor, restore, and maintain listed species' habitats; control detrimental nonnative species; manage detrimental visitor access; and reestablish extirpated populations as necessary to maintain the species and the habitats upon which they depend;

◆ manage designated critical habitat, essential habitat, and recovery areas to maintain and enhance their value for the recovery of threatened and endangered species;

◆ cooperate with other agencies to ensure that the delineation of critical habitat, essential habitat, and/or recovery areas on park-managed lands provides needed conservation benefits to the total recovery efforts being conducted by all the participating agencies;

◆ participate in the recovery planning process, including the provision of members on recovery teams and recovery implementation teams where appropriate;

◆ cooperate with other agencies, states, and private entities to promote candidate conservation agreements aimed at precluding the need to list species; and

◆ conduct actions and allocate funding to address endangered, threatened, proposed, and candidate species.

The National Park Service will inventory, monitor, and manage state and locally listed species in a manner similar to its treatment of federally listed species to the greatest extent possible. In addition, the Service will inventory other native species that are of special management concern to parks (such as rare, declining, sensitive, or unique species and their habitats) and will manage them to maintain their natural distribution and abundance.

The Service will determine all management actions for the protection and perpetuation of federally, state, or locally

listed species through the park management planning process, and will include consultation with lead federal and state agencies as appropriate.

*(See Cooperative Conservation Beyond Park Boundaries 1.6; Partnerships 1.10 and 4.1.4; Cooperative Planning 2.3.1.8; Visitor Use 8.2)*

#### 4.4.2.4   Management of Natural Landscapes

Natural landscapes disturbed by natural phenomena, such as landslides, earthquakes, floods, hurricanes, tornadoes, and fires, will be allowed to recover naturally unless manipulation is necessary to (1) mitigate for excessive disturbance caused by past human effects, (2) preserve cultural and historic resources as appropriate based on park planning documents, or (3) protect park developments or the safety of people. Landscape and vegetation conditions altered by human activity may be manipulated where the park management plan provides for restoring the lands to a natural condition. Management activities to restore human-altered landscapes may include, but are not restricted to

◆   removing constructed features, restoring natural topographic gradients, and revegetating with native park species on acquired inholdings and on sites from which previous development is being removed;

◆   restoring natural processes and conditions to areas disturbed by human activities such as fire suppression;

◆   rehabilitating areas disturbed by visitor use or by the removal of hazard trees; and

◆   maintaining open areas and meadows in situations in which they were formerly maintained by natural processes that now are altered by human activities.

Landscape revegetation efforts will use seeds, cuttings, or transplants representing species and gene pools native to the ecological portion of the park in which the restoration project is occurring. Where a natural area has become so degraded that restoration with gene pools native to the park has proven unsuccessful, improved varieties or closely related native species may be used.

Landscape restoration efforts will use geological materials and soils obtained in accordance with geological and soil resource *Management Policies*. Landscape restoration efforts may use, on a temporary basis, appropriate soil fertilizers or other soil amendments so long as that use does not unacceptably alter the physical, chemical, or biological characteristics of the soil and biological community and does not degrade surface or groundwaters.

*(See Restoration of Natural Systems 4.1.5; Cultural Landscapes 5.3.5.2)*

#### 4.4.2.5   Maintenance of Altered Plant Communities

In altered plant communities managed for a specified purpose, plantings will consist of species that are native to the park or that are historically appropriate for the period or event commemorated. Communities altered to maintain habitat for threatened or endangered species may

only use native plants, and the manipulation of existing plants will be carried out to enhance the recovery of the threatened or endangered species or the recovery of the natural functioning of the plant and animal community that endangered species are a part of. Use of exotic plants must conform to exotic species policy. Use of nonnatural plantings in altered communities may be permitted under any of the following conditions:

◆   In localized, specific areas, screen plantings may be used to protect against the undesirable impacts of adjacent land uses provided that the plantings do not result in the invasion of exotic species.

◆   Where necessary to preserve and protect the desired condition of specific cultural resources and landscapes, plants and plant communities generally will be managed to reflect the character of the landscape that prevailed during the historic period. Efforts may be made to extend the lives of specimen trees dating from the historic period being commemorated. An individual tree or shrub known to be of historic value that is diseased beyond recovery and has become hazardous will be removed and may be replaced. While specimen trees or shrubs that need to be perpetuated are still healthy, their own progeny will be propagated from seeds or through vegetative reproduction, such as cuttings.

◆   Where cultivated crop plants may be needed for livestock or agricultural uses that are allowed as part of the cultural landscape, authorized by federal law, or retained as a property right, with rigorous review given to any proposal to introduce a genetically modified organism.

◆   Where needed for intensive development areas. Such plantings will use noninvasive native or nonnative historic species and materials to the maximum extent possible. Certain native species may be fostered for esthetic, interpretive, or educational purposes.

Exotic species may not be used to vegetate vista clearings in otherwise natural vegetation.

Limited, recurring use of soil fertilizers or other soil amendments may be allowed only as needed to maintain the desired condition of the altered plant community, and only where such use does not unacceptably alter the physical, chemical, or biological characteristics of the soil and biological community or degrade surface or groundwaters.

*(See Management of Exotic Species 4.4.4; Cultural Landscapes 5.3.5.2)*

#### 4.4.3   Harvest of Plants and Animals by the Public

Public harvesting of designated species of plants and animals, or their components, may be allowed in park units when

◆   hunting, trapping, subsistence use, or other harvesting is specifically authorized by statute or regulation and not subsequently prohibited by regulation;

- harvest of certain plant parts or unoccupied seashells for personal consumption or use is specifically authorized by the superintendent in accordance with 36 CFR 2.1(c)(1);

- recreational fishing is not specifically prohibited; or

- commercial fishing is specifically authorized by statute or regulation.

Where harvesting is allowed and subject to NPS control, the Service will allow harvesting only when (1) the monitoring requirement contained in section 4.4.2 and the criteria in section 4.4.2.1 above have been met, and (2) the Service has determined that the harvesting will not unacceptably impact park resources or natural processes, including the natural distributions, densities, age-class distributions, and behavior of

- harvested species

- native species that the harvested species use for any purpose, or

- native species that use the harvested species for any purpose

In consultation and cooperation, as appropriate, with individual state or tribal governments, the Service will manage harvesting programs and any associated habitat management programs intended to restore and maintain habitats supporting harvested plant or animal populations to conform with applicable federal and state regulations.

Habitat manipulation for harvested species may include the restoration of a disturbed area to its natural condition so it can become self-perpetuating, but this will not include the artificial manipulation of habitat to increase the numbers of a harvested species above its natural range in population levels.

The Service may encourage the intensive harvesting of exotic species in certain situations when needed to meet park management objectives.

The Service does not engage in activities to reduce the numbers of native species for the purpose of increasing the numbers of harvested species (i.e., predator control), nor does the Service permit others to do so on lands managed by the National Park Service.

The Service manages harvest to allow for self-sustaining populations of harvested species and does not engage in the stocking of plants or animals to increase harvest. In some special situations, the Service may stock native or exotic animals for recreational harvesting purposes, but only when such stocking will not unacceptably impact park natural resources or processes and when

- the stocking is of fish into constructed large reservoirs or other significantly altered large water bodies and the purpose is to provide for recreational fishing; or

- the intent for stocking is a treaty right or expressed in statute, other applicable law, or a House or Senate report accompanying a statute.

The Service will not stock waters that are naturally barren of harvested aquatic species.

### 4.4.4 Management of Exotic Species

Exotic species will not be allowed to displace native species if displacement can be prevented.

#### 4.4.4.1 Introduction or Maintenance of Exotic Species

In general, new exotic species will not be introduced into parks. In rare situations, an exotic species may be introduced or maintained to meet specific, identified management needs when all feasible and prudent measures to minimize the risk of harm have been taken and it is

- a closely related race, subspecies, or hybrid of an extirpated native species; or

- an improved variety of a native species in situations in which the natural variety cannot survive current, human-altered environmental conditions; or

- used to control another, already established exotic species; or

- needed to meet the desired condition of a historic resource, but only where it is noninvasive and is prevented from being invasive by such means as cultivating (for plants), or tethering, herding, or pasturing (for animals). In such cases, the exotic species used must be known to be historically significant, to have existed in the park during the park's period of historical significance, to be a contributing element to a cultural landscape, or to have been commonly used in the local area at that time; or

- an agricultural crop used to maintain the character of a cultural landscape, with rigorous review given to any proposal to introduce a genetically modified organism; or

- necessary to provide for intensive visitor use in developed areas and both of the following conditions exist:

  ◇ Available native species will not meet park management objectives.

  ◇ The exotic species is managed so it will not spread or become a pest on park or adjacent lands.

- a sterile, noninvasive plant that is used temporarily for erosion control; or

- directed by law or expressed legislative intent.

Domestic livestock such as cattle, sheep, goats, horses, mules, burros, reindeer, and llamas are exotic species that are maintained in some parks for commercial herding, pasturing, grazing, or trailing; for recreational use; or for administrative use for maintaining the cultural scene or supporting park operations. The policies applicable to the grazing of commercial domestic livestock are discussed in chapter 8, section 8.6.8. The Service will phase out the commercial grazing of livestock whenever possible and manage recreational and administrative uses of livestock to prevent those uses from unacceptably impacting park resources.

**48**

#### 4.4.4.2   Removal of Exotic Species Already Present

All exotic plant and animal species that are not maintained to meet an identified park purpose will be managed—up to and including eradication—if (1) control is prudent and feasible, and (2) the exotic species

◆   interferes with natural processes and the perpetuation of natural features, native species or natural habitats, or

◆   disrupts the genetic integrity of native species, or

◆   disrupts the accurate presentation of a cultural landscape, or

◆   damages cultural resources, or

◆   significantly hampers the management of park or adjacent lands, or

◆   poses a public health hazard as advised by the U.S. Public Health Service (which includes the Centers for Disease Control and the NPS public health program), or

◆   creates a hazard to public safety.

High priority will be given to managing exotic species that have, or potentially could have, a substantial impact on park resources, and that can reasonably be expected to be successfully controlled. Lower priority will be given to exotic species that have almost no impact on park resources or that probably cannot be successfully controlled. Where an exotic species cannot be successfully eliminated, managers will seek to contain the exotic species to prevent further spread or resource damage.

The decision to initiate management should be based on a determination that the species is exotic. For species determined to be exotic and where management appears to be feasible and effective, superintendents should (1) evaluate the species' current or potential impact on park resources; (2) develop and implement exotic species management plans according to established planning procedures; (3) consult, as appropriate, with federal, tribal, local, and state agencies as well as other interested groups; and (4) invite public review and comment, where appropriate. Programs to manage exotic species will be designed to avoid causing significant damage to native species, natural ecological communities, natural ecological processes, cultural resources, and human health and safety. Considerations and techniques regarding removal of exotic species are similar to those used for native species (see 4.4.2.1 NPS Actions That Remove Native Plants and Animals).

*(Also see Executive Order 13112 (Invasive Species))*

#### 4.4.5   Pest Management

All park employees, concessioners, contractors, permittees, licensees, and visitors on all lands managed or regulated by the National Park Service will comply with NPS pest *Management Policies.*

#### 4.4.5.1   Pests

Pests are living organisms that interfere with the purposes or management objectives of a specific site within a park or that jeopardize human health or safety. Decisions concerning whether or not to manage a pest or pest population will be influenced by whether the pest is an exotic or a native species. Exotic pests will be managed according to both the policies in this section (4.4.5) and the exotic species policies in section 4.4.4. Native pests will be allowed to function unimpeded, except as noted below. Many fungi, insects, rodents, disease organisms, and other organisms that may be perceived as pests are, in fact, native organisms existing under natural conditions and are natural elements of the ecosystem. Also, native pests that were evident in pesticide-free times are traditional elements in park cultural settings.

The Service may control native pests to

◆   conserve threatened, rare, or endangered species, or unique specimens or communities;

◆   preserve, maintain, or restore the historical integrity of cultural resources;

◆   conserve and protect plants, animals, and facilities in developed areas;

◆   prevent outbreaks of a pest from invading uninfested areas outside the park;

◆   manage a human health hazard when advised to do so by the U.S. Public Health Service (which includes the Centers for Disease Control and the NPS public health program); or

◆   to otherwise protect against a significant threat to human safety.

#### 4.4.5.2   Integrated Pest Management Program

The Service conducts an integrated pest management (IPM) program to reduce risks to the public, park resources, and the environment from pests and pest-related management strategies. Integrated pest management is a decision-making process that coordinates knowledge of pest biology, the environment, and available technology to prevent unacceptable levels of pest damage by cost-effective means while posing the least possible risk to people, resources, and the environment.

The Service and each park unit will use an IPM approach to address pest issues. Proposed pest management activities must be conducted according to the IPM process prescribed in Director's Order #77-7: Integrated Pest Management. Pest issues will be reviewed on a case-by-case basis. Controversial issues, or those that have potential to negatively impact the environment, must be addressed through established planning procedures and be included in an approved park management or IPM plan. IPM procedures will be used to determine when to implement pest management actions and which combination of strategies will be most effective for each pest situation.

Under the Service's IPM program, all pesticide use on lands managed or regulated by the Service, whether that use was authorized or unauthorized, must be reported annually.

### 4.4.5.3    Pesticide Use

A pesticide, as defined by the Federal Insecticide, Fungicide and Rodenticide Act, is any substance or mixture that is used in any manner to destroy, repel, or control the growth of any viral, microbial, plant, or animal pest. Except as identified in the next paragraph, all prospective users of pesticides in parks must submit pesticide use requests, which will be reviewed on a case-by-case basis, taking into account environmental effects, cost and staffing, and other relevant considerations. The decision to incorporate a chemical, biological, or bioengineered pesticide into a management strategy will be based on a determination by a designated IPM specialist that it is necessary and other available options are either not acceptable or not feasible. Pesticide applications will only be performed by or under the supervision of certified or registered applicators licensed under the procedures of a federal or state certification system.

Insect repellents, bear deterrent sprays, and insecticides applied to persons or to livestock must conform to NPS policies and approval procedures, except that pesticides used under the following conditions do not require approval:

◆   cleansers and disinfectants used in restrooms and restaurants

◆   personal insect repellents, insecticides, and bear deterrent sprays that employees or park visitors personally obtain and use to meet personal needs

◆   insect repellents and insecticides applied to personally owned pets and pack and saddle stock

### 4.4.5.4    Biological Control Agents and Bioengineered Products

The application or release of any bio-control agent or bioengineered product relating to pest management activities must be reviewed by designated IPM specialists in accordance with Director's Order #77-7 and conform to the exotic species policies in section 4.4.4.

### 4.4.5.5    Pesticide Purchase and Storage

Pesticides must not be stockpiled. No pesticides may be purchased unless they are authorized and expected to be used within one year from the date of purchase. Pesticide storage, transport, and disposal will comply with procedures established by (1) the Environmental Protection Agency; (2) the individual states in which parks are located; and (3) Director's Order #30A: Hazardous and Solid Waste Management, Director's Order #77-1: Wetland Protection, and Director's Order 77-7: Integrated Pest Management.

*(See Planning for Natural Resource Management 4.1.1; Genetic Resource Management Principles 4.4.1.2; Management of Exotic Species 4.4.4; Maintenance 9.1.4)*

## 4.5    Fire Management

Naturally ignited fire, including the smoke it produces, is part of many of the natural systems that are being sustained in parks. Such natural systems contain plant and animal communities that are characterized as fire-adapted or fire-dependent. They require periodic episodes of fire to retain their ecological integrity and, in the human-caused absence of fire, they can experience undesirable impacts that diminish their integrity—such as unnatural successional trends, loss of habitat for fire-adapted plant and animal species, or vulnerability to unnaturally intense wildland fire. Other park natural systems are characterized by a natural absence or very low frequency of fire. These systems are at risk of losing their ecological integrity when the natural fire regime is subjected to human interference.

Fires that burn natural or landscaped vegetation in parks are called wildland fires. Wildland fires occur from both natural and human sources of ignition. Wildland fires may contribute to or hinder the achievement of park management objectives, and management response to each wildland fire is determined by whether or not the fire occurs within prescription as identified in the park's fire management plan. Wildland fire use is the application of an appropriate management response to naturally ignited wildland fires to accomplish specific resource management objectives in predefined areas outlined in fire management plans. Prescribed fires are the deliberate ignition of fires under prescribed circumstances to accomplish resource management objectives in predefined areas outlined in approved fire management plans.

Fire management consists of a program of activities designed to meet management objectives for protection of resource values, life, and property and, where appropriate, for using naturally ignited and human-ignited wildland fires as management tools. Park fire management programs designed specifically to meet park resource management objectives—including allowing fire to perform its natural role as much as practicable—will ensure that firefighter and public safety are not compromised.

Parks with vegetation capable of burning will prepare a fire management plan that is consistent with federal law and departmental fire *Management Policies*, and that includes addressing the need for adequate funding and staffing to support the planned fire management program. The plan will be designed to guide a program that

◆   responds to the park's natural and cultural resource objectives;

◆   provides for safety considerations for park visitors, employees, and developed facilities;

◆   addresses potential impacts on public and private neighbors and their property adjacent to the park; and

◆   protects public health and safety.

The fire management plan will also include guidance on determining in which situations natural regeneration of a burned ecosystem is appropriate and when management actions are needed to restore, stabilize, or rehabilitate an area following wildland fire.

Environmental and cultural resource compliance documentation developed in support of the plan will consider the effects of fire on air quality, water quality, and human health and safety. It will also discuss the influence of fire, fire management, and the potential consequences and effects of fire exclusion on the ability of the park to meet its natural and cultural resource management objectives. Preparation of the plan and supporting documents will include collaboration with appropriate NPS natural and cultural resource offices, adjacent communities, interest groups, state and federal agencies, and tribal governments, with cooperating agency status granted when requested by eligible adjacent communities, state and federal agencies, and tribal governments.

All wildland fires will be effectively managed through application of the appropriate strategic and tactical management options as guided by the park's fire management plan. These options will be selected after comprehensive consideration of the resource values to be protected, firefighter and public safety, costs, availability of firefighting resources, weather, and fuel conditions. Naturally ignited and human-ignited fires managed to achieve resource management and fuel treatment objectives, and the smoke they produce, will both be managed to comply with applicable local, state, and federal air quality regulations. Such fires will also include monitoring programs that record fire behavior, smoke behavior, fire decisions, and fire effects to provide information on whether specific objectives are met and to improve future fire management strategies. All parks will use a systematic decision-making process identified in their fire management plans or other documents to determine the most appropriate management strategies for all unplanned ignitions and for any naturally or management-ignited fires that are no longer meeting resource management objectives.

Parks lacking an approved fire management plan may not use resource benefits as a consideration influencing the selection of a suppression strategy; they must consider the resource impacts of suppression alternatives in their decisions. Until a plan is approved, parks must immediately suppress all wildland fires, taking into consideration park resources and values to be protected, firefighter and public safety, costs, availability of firefighting resources, weather, and fuel conditions. Parks will use methods to suppress wildland fires that minimize the impacts of the suppression action and the fire and are commensurate with effective control, firefighter and public safety, and resource values to be protected.

Burnable vegetation in many parks includes areas that are hazardous to specific park resources or human safety and property because of the presence of fuels that could carry wildland fire into special resource protection zones, developed areas, or outside park boundaries. The fire management plan will address strategies for preventing the accumulation of hazardous fuels in specific areas and for eliminating hazardous conditions that may have developed over time due to past fire suppression programs or ongoing development activities. These strategies will entail strategic planning, interdisciplinary coordination, and interorganizational collaboration as needed to provide appropriate treatment using adaptive management practices that range from site specific to landscape level. Although prescribed fire remains the preferred and most widely used NPS tool for managing the accumulation of hazardous fuels, the strategies will incorporate other activities, such as manual, mechanical, biological and, rarely, chemical treatments (applying integrated pest management principles), that may be appropriate in specific instances, as guided by NPS and DOI policies and legal requirements.

More details on wildland fire management, including interagency and Department of the Interior policies and requirements, are contained in Director's Order #18: Wildland Fire Management.

Fire management or suppression activities conducted within wilderness, including the categories of designated, recommended, potential, proposed, and eligible areas, will be consistent with the "minimum requirement" concept identified in chapter 6 and Director's Order #41: Wilderness Preservation and Management.

*(See General Management Concepts 4.1; Partnerships 4.1.4; Restoration of Natural Systems 4.1.5; Air Resource Management 4.7; Fire Detection, Suppression, and Post-fire Rehabilitation and Protection 5.3.1.2; Fire Management 6.3.9; Visitor Safety 8.2.5.1; Structural Fire Protection and Suppression 9.1.8)*

## 4.6   Water Resource Management

### 4.6.1      Protection of Surface Waters and Groundwaters

The Service will perpetuate surface waters and groundwaters as integral components of park aquatic and terrestrial ecosystems.

### 4.6.2      Water Rights

Water for the preservation and management of the national park system will be obtained and used in accordance with legal authorities. The Park Service will consider all available authorities on a case-by-case basis and will pursue those that are the most appropriate to protect water-related resources in parks. While preserving its legal remedies, the Service will work with state water administrators to protect park resources and participate in negotiations to seek the resolution of conflicts among multiple water claimants. Water essential for NPS needs will be purchased if it is not otherwise available. NPS consumptive use of water will be efficient and frugal, especially in water-scarce areas.

All rights to the use of water diverted from or used on federal lands within the national park system by the United

States or its concessioners, lessors, or permittees will be perfected in the name of the United States.

Park surface waters or groundwater will be withdrawn for consumptive use only when such withdrawal is absolutely necessary for the use and management of the park. All park water withdrawn for domestic or administrative uses will be returned to the park watershed system once it has been treated to a degree that ensures that there will be no impairment of park resources.

The Service may enter into contracts for the sale or lease of water to persons, states, or their political subdivisions that provide public accommodations or services for park visitors outside and near the park that have no reasonable alternative sources of water. The Service will authorize such contracts only if

◆ the transfer does not jeopardize or unduly interfere with the natural or cultural resources of the park, and

◆ the government's costs are fully recovered, and

◆ the contract is for a short term, true emergency.

The Service will follow the requirements and procedures of Director's Orders #35A and #35B when considering the sale or lease of park water.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Cooperative Conservation Beyond Park Boundaries 1.6)*

### 4.6.3    Water Quality

The pollution of surface waters and groundwaters by both point and nonpoint sources can impair the natural functioning of aquatic and terrestrial ecosystems and diminish the utility of park waters for visitor use and enjoyment. The Service will determine the quality of park surface and groundwater resources and avoid, whenever possible, the pollution of park waters by human activities occurring within and outside the parks. The Service will

◆ work with appropriate governmental bodies to obtain the highest possible standards available under the Clean Water Act for the protection for park waters;

◆ take all necessary actions to maintain or restore the quality of surface waters and groundwaters within the parks consistent with the Clean Water Act and all other applicable federal, state, and local laws and regulations; and

◆ enter into agreements with other agencies and governing bodies, as appropriate, to secure their cooperation in maintaining or restoring the quality of park water resources.

*(See Pest Management 4.4.5; Soil Resource Management 4.8.2.4; Backcountry Use 8.2.2.4; Domestic and Feral Livestock 8.6.8; Mineral Exploration and Development 8.7; Water Supply Systems 9.1.5.1; Wastewater Treatment Systems 9.1.5.2; Waste Management and Contaminant Issues 9.1.6; Facilities for Water Recreation 9.3.4.2. Also see Director's Order #83: Public Health)*

### 4.6.4    Floodplains

In managing floodplains on park lands, the National Park Service will (1) manage for the preservation of floodplain values; (2) minimize potentially hazardous conditions associated with flooding; and (3) comply with the NPS Organic Act and all other federal laws and executive orders related to the management of activities in flood-prone areas, including Executive Order 11988 (Floodplain Management), the National Environmental Policy Act, applicable provisions of the Clean Water Act, and the Rivers and Harbors Appropriation Act of 1899. Specifically, the Service will

◆ protect, preserve, and restore the natural resources and functions of floodplains;

◆ avoid the long- and short-term environmental effects associated with the occupancy and modification of floodplains; and

◆ avoid direct and indirect support of floodplain development and actions that could adversely affect the natural resources and functions of floodplains or increase flood risks.

When it is not practicable to locate or relocate development or inappropriate human activities to a site outside and not affecting the floodplain, the Service will

◆ prepare and approve a statement of findings, in accordance with procedures described in Director's Order 77-2 (Floodplain Management);

◆ use nonstructural measures as much as practicable to reduce hazards to human life and property while minimizing the impact to the natural resources of floodplains;

◆ ensure that structures and facilities are designed to be consistent with the intent of the standards and criteria of the National Flood Insurance Program (44 CFR Part 60).

*(See Siting Facilities to Avoid Natural Hazards 9.1.1.5)*

### 4.6.5    Wetlands

The Service will manage wetlands in compliance with NPS mandates and the requirements of Executive Order 11990 (Protection of Wetlands), the Clean Water Act, the Rivers and Harbors Appropriation Act of 1899, and the procedures described in Director's Order 77-1 (Wetland Protection). The Service will (1) provide leadership and take action to prevent the destruction, loss, or degradation of wetlands; (2) preserve and enhance the natural and beneficial values of wetlands; and (3) avoid direct and indirect support of new construction in wetlands unless there are no practicable alternatives and the proposed action includes all practicable measures to minimize harm to wetlands.

The Service will implement a "no net loss of wetlands" policy. In addition, the Service will strive to achieve a longer-term goal of net gain of wetlands across the national park system through restoration of previously degraded or destroyed wetlands.

When natural wetland characteristics or functions have been degraded or lost due to previous or ongoing human actions, the Service will, to the extent practicable, restore them to predisturbance conditions.

The Service will conduct or obtain parkwide wetland inventories to help ensure proper planning with respect to the management and protection of wetland resources. Additional, more detailed wetland inventories will be conducted in areas that are proposed for development or are otherwise susceptible to degradation or loss due to human activities.

When practicable, the Service will not simply protect but will seek to enhance natural wetland values by using them for educational, recreational, scientific, and similar purposes that do not disrupt natural wetland functions.

For proposed new development or other new activities, plans, or programs that are either located in or otherwise could have adverse impacts on wetlands, the Service will employ the following sequence:

◆ Avoid adverse wetland impacts to the extent practicable.

◆ Minimize impacts that cannot be avoided.

◆ Compensate for remaining unavoidable adverse wetland impacts by restoring wetlands that have been previously destroyed or degraded.

Compensation for wetland impacts or losses will require that at least 1 acre of wetlands be restored for each acre destroyed or degraded.

Actions proposed by the Park Service that have the potential to cause adverse impacts on wetlands must be addressed in an environmental assessment or an environmental impact statement. If the preferred alternative will result in adverse impacts on wetlands, a statement of findings must be prepared and approved in accordance with Director's Order #77-1: Wetland Protection.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Siting Facilities to Avoid Natural Hazards 9.1.1.5)*

### 4.6.6    Watershed and Stream Processes

The Service will manage watersheds as complete hydrologic systems and minimize human- caused disturbance to the natural upland processes that deliver water, sediment, and woody debris to streams. These processes include runoff, erosion, and disturbance to vegetation and soil caused by fire, insects, meteorological events, and mass movements. The Service will manage streams to protect stream processes that create habitat features such as floodplains, riparian systems, woody debris accumulations, terraces, gravel bars, riffles, and pools. Stream processes include flooding, stream migration, and associated erosion and deposition.

The Service will protect watershed and stream features primarily by avoiding impacts on watershed and riparian vegetation and by allowing natural fluvial processes to proceed unimpeded. When conflicts between infrastructure (such as bridges and pipeline crossings) and stream processes are unavoidable, NPS managers will first consider relocating or redesigning facilities rather than manipulating streams. Where stream manipulation is unavoidable, managers will use techniques that are visually nonobtrusive and that protect natural processes to the greatest extent practicable.

*(See Floodplains 4.6.4; Shorelines and Barrier Islands; 4.8.1.1; Facility Planning and Design 9.1.1. Also see "Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management," 65 FR 62566, October 18, 2000)*

## 4.7    Air Resource Management

### 4.7.1    Air Quality

The National Park Service has a responsibility to protect air quality under both the 1916 Organic Act and the Clean Air Act (CAA). Accordingly, the Service will seek to perpetuate the best possible air quality in parks to (1) preserve natural resources and systems; (2) preserve cultural resources; and (3) sustain visitor enjoyment, human health, and scenic vistas. Vegetation, visibility, water quality, wildlife, historic and prehistoric structures and objects, cultural landscapes, and most other elements of a park environment are sensitive to air pollution and are referred to as "air quality-related values." The Service will actively promote and pursue measures to protect these values from the adverse impacts of air pollution. In cases of doubt as to the impacts of existing or potential air pollution on park resources, the Service will err on the side of protecting air quality and related values for future generations.

Superintendents will take actions consistent with their affirmative responsibilities under the Clean Air Act to protect air quality-related values in Class I areas. Class I areas are national parks over 6, 000 acres and national wilderness areas over 5,000 acres that were in existence on August 7, 1977. The act establishes a national goal of preventing any future and remedying any existing human-made visibility impairment in Class I areas. The Service supports that goal and will take advantage of opportunities created by the act to help achieve it. The federal land manager shares the responsibility to protect air quality-related values in Class I areas. As the federal land manager for the department, the Secretary of the Interior has delegated this responsibility to the Assistant Secretary for Fish and Wildlife and Parks.

The Clean Air Act also recognizes the importance of integral vistas, which are those views perceived from within Class I areas of a specific landmark or panorama located outside the boundary of the Class I area. Integral vistas have been identified by the Service and are listed in Natural Resources Reference Manual 77. There are no regulations requiring special protection of these integral vistas, but the

Service will strive to protect these park-related resources through cooperative means.

Although the Clean Air Act gives the highest level of air quality protection to Class I areas, it provides many opportunities for the Service to participate in the development of pollution control programs to preserve, protect, and enhance the air quality of all units of the national park system. Regardless of Class I designation, the Service will take advantage of these opportunities.

Air resource management requirements will be integrated into NPS operations and planning, and all air pollution sources within parks—including prescribed fire management and visitor use activities—will comply with all federal, state, and local air quality regulations and permitting requirements. Superintendents will make reasonable efforts to notify visitors and employees when air pollution concentrations within an area exceed the national or state air quality standards established to protect public health. Furthermore, because the current and future quality of park air resources depends heavily on the actions of others, the Service will acquire the information needed to effectively participate in decision-making that affects park air quality. The Service will

◆   inventory the air quality-related values associated with each park;

◆   monitor and document the condition of air quality and related values;

◆   evaluate air pollution impacts and identify causes;

◆   minimize air quality pollution emissions associated with park operations, including the use of prescribed fire and visitor use activities; and

◆   ensure healthful indoor air quality in NPS facilities.

External programs needed to remedy existing and prevent future impacts on park resources and values from human-caused air pollution will be aggressively pursued by NPS participation in the development of federal, state, and local air pollution control plans and regulations. Permit applications for major new air pollution sources will be reviewed, and potential impacts will be assessed. If it is determined that any such new source might cause or contribute to an adverse impact on air quality-related values, the Park Service will recommend to the permitting authority that the construction permit be denied or modified to eliminate adverse impacts.

The public's understanding of park air quality issues and the positive role and efforts of the Service toward improving the air quality in parks will be promoted through educational and interpretive programs.

*(See Cooperative Conservation Beyond Park Boundaries 1.6; Fire Management 4.5; Environmental Monitoring and Control 5.3.1.4; Resource Issue Interpretation and Education 7.5.3; Visitor Safety and Emergency Response 8.2.5; Energy Management 9.1.7)*

### 4.7.2   Weather and Climate

Earth's climate has changed throughout history. Although national parks are intended to be naturally evolving places that conserve our natural and cultural heritage for generations to come, accelerated climate change may significantly alter park ecosystems. Thus, parks containing significant natural resources will gather and maintain baseline climatological data for reference.

Because any human attempt to modify weather has the potential to alter the natural conditions in parks, the Service will not conduct weather-modification activities, the Service will seek to prevent weather modification activities conducted by others from affecting a park's weather, climate, and resources.

*(See NPS-conducted or -sponsored Inventory, Monitoring, and Research Studies 4.2.1; Miscellaneous Management Facilities 9.4.5)*

## 4.8   Geologic Resource Management

The Park Service will preserve and protect geologic resources as integral components of park natural systems. As used here, the term "geologic resources" includes both geologic features and geologic processes. The Service will (1) assess the impacts of natural processes and human activities on geologic resources; (2) maintain and restore the integrity of existing geologic resources; (3) integrate geologic resource management into Service operations and planning; and (4) interpret geologic resources for park visitors.

### 4.8.1   Protection of Geologic Processes

The Service will, except as identified below, allow natural geologic processes to proceed unimpeded. Geologic processes are the natural physical and chemical forces that act within natural systems and on human developments across a broad spectrum of space and time. Such processes include, but are not limited to, exfoliation, erosion and sedimentation, glaciation, karst processes, shoreline processes, and seismic and volcanic activity. Geologic processes will be addressed during planning and other management activities in an effort to reduce hazards that can threaten the safety of park visitors and staff and the long-term viability of the park infrastructure.

Intervention in natural geologic processes will be permitted only when

◆   directed by Congress;

◆   necessary in emergencies that threaten human life and property;

◆   there is no other feasible way to protect natural resources, park facilities, or historic properties;

◆   intervention is necessary to restore impacted conditions and processes, such as restoring habitat for threatened or endangered species.

#### 4.8.1.1   Shorelines and Barrier Islands

Natural shoreline processes (such as erosion, deposition, dune formation, overwash, inlet formation, and shoreline migration) will be allowed to continue without interference.

Where human activities or structures have altered the nature or rate of natural shoreline processes, the Service will, in consultation with appropriate state and federal agencies, investigate alternatives for mitigating the effects of such activities or structures and for restoring natural conditions. The Service will comply with the provisions of Executive Order 11988 (Floodplain Management) and state coastal zone management plans prepared under the Coastal Zone Management Act of 1972.

Any shoreline manipulation measures proposed to protect cultural resources may be approved only after an analysis of the degree to which such measures would impact natural resources and processes, so that an informed decision can be made through an assessment of alternatives.

Where erosion control is required by law, or where present developments must be protected in the short run to achieve park management objectives, including high-density visitor use, the Service will use the most effective method feasible to achieve the natural resource management objectives while minimizing impacts outside the target area.

New developments will not be placed in areas subject to wave erosion or active shoreline processes unless (1) the development is required by law; or (2) the development is essential to meet the park's purposes, as defined by its establishing act or proclamation, and

◆   no practicable alternative locations are available;

◆   the development will be reasonably assured of surviving during its planned life span without the need for shoreline control measures; and

◆   steps will be taken to minimize safety hazards and harm to property and natural resources.

*(See Floodplains 4.6.4; Cultural Resources Chapter 5; Siting Facilities to Avoid Natural Hazards 9.1.1.5. Also see Director's Order #77-2: Floodplain Management)*

#### 4.8.1.2   Karst

The Service will manage karst terrain to maintain the inherent integrity of its water quality, spring flow, drainage patterns, and caves. Karst processes (the processes by which water dissolves soluble rock such as limestone) create areas typified by sinkholes, underground streams, caves, and springs.

Local and regional hydrological systems resulting from karst processes can be directly influenced by surface land use practices. If existing or proposed developments do or will significantly alter or adversely impact karst processes, these impacts will be mitigated. Where practicable, these developments will be placed where they will not have an effect on the karst system.

#### 4.8.1.3   Geologic Hazards

Naturally occurring geologic processes, which the Park Service is charged to preserve unimpaired, can be hazardous to humans and park infrastructure. These include earthquakes, volcanic eruptions, mudflows, landslides, floods, shoreline processes, tsunamis, and avalanches. The Service will work closely with specialists at the U.S. Geological Survey and elsewhere, and with local, state, tribal, and federal disaster management officials, to devise effective geologic hazard identification and management strategies. Although the magnitude and timing of future geologic hazards are difficult to forecast, park managers will strive to understand future hazards and, once the hazards are understood, minimize their potential impact on visitors, staff, and developed areas. Before interfering with natural processes that are potentially hazardous, superintendents will consider other alternatives.

The Service will try to avoid placing new visitor and other facilities in geologically hazardous areas. Superintendents will examine the feasibility of phasing out, relocating, or providing alternative facilities for park developments subject to hazardous processes, consistent with other sections of these *Management Policies*.

*(See Siting Facilities to Avoid Natural Hazards 9.1.1.5)*

### 4.8.2   Management of Geologic Features

The Service will protect geologic features from the unacceptable impacts of human activity while allowing natural processes to continue. The term "geologic features" describes the products and physical components of geologic processes. Examples of geologic features in parks include rocks, soils, and minerals; geysers and hot springs in geothermal systems; cave and karst systems; canyons and arches in erosional landscapes; sand dunes, moraines, and terraces in depositional landscapes; dramatic or unusual rock outcrops and formations; and paleontological and paleoecological resources such as fossilized plants or animals or their traces.

#### 4.8.2.1   Paleontological Resources and Their Contexts

Paleontological resources, including both organic and mineralized remains in body or trace form, will be protected, preserved, and managed for public education, interpretation, and scientific research. The Service will study and manage paleontological resources in their paleoecological context (that is, in terms of the geologic data associated with a particular fossil that provides information about the ancient environment).

Superintendents will establish programs to inventory paleontological resources and systematically monitor for newly exposed fossils, especially in areas of rapid erosion. Scientifically significant resources will be protected by collection or by on-site protection and stabilization. The Service will encourage and help the academic community to conduct paleontological field research in accordance with the terms of a scientific research and collecting permit. Fossil localities and associated geologic data will

be adequately documented when specimens are collected. Paleontological resources found in an archeological context are also subject to the policies for archeological resources. Paleontological specimens that are to be retained permanently are subject to the policies for museum objects.

The Service will take appropriate action to prevent damage to and unauthorized collection of fossils. To protect paleontological resources from harm, theft, or destruction, the Service will ensure, where necessary, that information about the nature and specific location of these resources remains confidential, in accordance with the National Parks Omnibus Management Act of 1998.

Parks will exchange fossil specimens only with other museums and public institutions that are dedicated to the preservation and interpretation of natural heritage and qualified to manage museum collections. Fossils to be deaccessioned in an exchange must fall outside the park's scope of collection statement. Systematically collected fossils in an NPS museum collection in compliance with 36 CFR 2.5 cannot be outside the scope of collection statement. Exchanges must follow deaccession procedures in the Museum Handbook, Part II, chapter 6.

The sale of original paleontological specimens is prohibited in parks.

The Service generally will avoid purchasing fossil specimens. Casts or replicas should be acquired instead. A park may purchase fossil specimens for the park museum collection only after making a written determination that

◆   the specimens are scientifically significant and accompanied by detailed locality data and pertinent contextual data;

◆   the specimens were legally removed from their site of origin, and all transfers of ownership have been legal;

◆   the preparation of the specimens meets professional standards;

◆   the alternatives for making these specimens available to science and the public are unlikely; and

◆   acquisition is consistent with the park's enabling legislation and scope of collection statement, and acquisition will ensure the specimens' availability in perpetuity for public education and scientific research.

All NPS construction projects in areas with potential paleontological resources must be preceded by a preconstruction surface assessment prior to disturbance. For any occurrences noted, or when the site may yield paleontological resources, the site will be avoided or the resources will, if necessary, be collected and properly cared for before construction begins. Areas with potential paleontological resources must also be monitored during construction projects.

*(See Natural Resource Information 4.1.2; Studies and Collections 4.2; Independent Research 5.1.2; Artifacts and Specimens 10.2.4.6. Also see 36 CFR 2.5)*

### 4.8.2.2   Caves

As used here, the term "caves" includes karst (such as limestone and gypsum caves) and nonkarst caves (such as lava tubes, littoral caves, and talus caves). The Service will manage caves in accordance with approved cave management plans to perpetuate the natural systems associated with the caves, such as karst and other drainage patterns, air flows, mineral deposition, and plant and animal communities. Wilderness and cultural resources and values will also be protected.

Many caves or portions of caves contain fragile nonrenewable resources and have no natural restorative processes. In these cases, most impacts are cumulative and essentially permanent. As a result, no developments or uses, including those that allow for general public entry (such as pathways, lighting, and elevator shafts), will be allowed in, above, or adjacent to caves until it can be demonstrated that they will not unacceptably impact natural cave resources and conditions, including subsurface water movements, and that access will not result in unacceptable risks to public safety. Developments already in place above caves will be removed if they are impairing or threatening to impair natural conditions or resources.

Parks will manage the use of caves when such actions are required for the protection of cave resources or for human safety. Some caves or portions of caves may be managed exclusively for research, with access limited to permitted research personnel. In accordance with the Federal Cave Resources Protection Act of 1988, recreational use of undeveloped caves will be governed by a permit system, and cave use will be regulated or restricted if necessary to protect and preserve cave resources. Under 43 CFR Part 37 regulations for the act, all caves in the national park system are deemed to be significant. As further established by this act, specific locations of significant cave entrances may be kept confidential and exempted from FOIA requests.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Information Confidentiality 1.9.2.3; Caves 6.3.11.2)*

### 4.8.2.3   Geothermal and Hydrothermal Resources

Thermal resources, also known as geothermal or hydrothermal systems, comprise a subsurface heat source, heat conduit rock formations, and air and/or water that circulates through the formations and may discharge at the surface. Such resources create features such as geysers, hot springs, mudpots, fumaroles, unique/ rare mineral precipitates and formations, and hydrophilic biotic communities. Thermal resources in park units will be protected, preserved, and managed as a critical component of the units' natural resource systems, and for public education, interpretation, and scientific research.

Superintendents will strive to maintain the natural integrity of thermal systems, including the movement of air and/or water through the heated rock, cold water recharge, the proximity of the hot and warm water to the heat source, and the hydrostatic pressure and elevated temperature.

Superintendents will work to prevent unacceptable impacts on thermal resources caused by development. Such impacts include the loss of surface thermal features; land subsidence; an increase in seismic activity; the release of noxious gases; noise and surface disturbance from drilling or power plant construction; and the release of polluted water or brines. Because thermal systems may extend well beyond park boundaries, the Service will work closely with tribes and federal, state, local agencies to delineate the full extent of thermal resources and protect those that occur in parks. In protecting park thermal resources, superintendents should consider authorities available under the Geothermal Steam Act of 1970, as amended; state water rights; and mineral leasing laws.

As required by the Geothermal Steam Act, the Service will maintain a list of significant thermal features in park units. The criteria and procedures for designating significant thermal resources in parks are specified in the Geothermal Steam Act Amendments of 1988. In cooperation with the U.S. Geological Survey, the Service will conduct a monitoring program for the designated significant thermal features.

### 4.8.2.4    Soil Resource Management

The Service will actively seek to understand and preserve the soil resources of parks, and to prevent, to the extent possible, the unnatural erosion, physical removal, or contamination of the soil or its contamination of other resources. Parks will obtain adequate soil surveys for the management of park resources. All soil surveys will follow National Cooperative Soil Survey Standards. Products will include soil maps, determinations of the physical and chemical characteristics of soils, and the interpretations needed to guide resource management and development decisions.

Management action will be taken by superintendents to prevent or at least minimize adverse, potentially irreversible impacts on soils. Soil conservation and soil amendment practices may be implemented to reduce impacts. Importation of off-site soil or soil amendments may be used to restore damaged sites. Off-site soil normally will be salvaged soil, not soil removed from pristine sites, unless the use of pristine site soil can be achieved without causing any overall ecosystem impairment. Before using any off-site materials, parks must develop a prescription and select the materials that will be needed to restore the physical, chemical, and biological characteristics of original native soils without introducing any exotic species.

When soil excavation is an unavoidable part of an approved facility development project, the Service will minimize soil excavation, erosion, and off-site soil migration during and after the development activity.

When use of a soil fertilizer or other soil amendment is an unavoidable part of restoring a natural landscape or maintaining an altered plant community, the use will be guided by a written prescription. The prescription will be designed to ensure that such use of soil fertilizer or soil amendment does not unacceptably alter the physical, chemical, or biological characteristics of the soil, biological community, or surface or groundwaters.

*(See Evaluating Impacts on Natural Resources 4.1.3; Natural Resource Collections 4.2.3; Floodplains 4.6.4; Wetlands 4.6.5; Facility Planning and Design 9.1.1)*

## 4.9    Soundscape Management

Park natural soundscape resources encompass all the natural sounds that occur in parks, including the physical capacity for transmitting those natural sounds and the interrelationships among park natural sounds of different frequencies and volumes. Natural sounds occur within and beyond the range of sounds that humans can perceive, and they can be transmitted through air, water, or solid materials. The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks.

Some natural sounds in the natural soundscape are also part of the biological or other physical resource components of the park. Examples of such natural sounds include

◆    sounds produced by birds, frogs, or katydids to define territories or aid in attracting mates

◆    sounds produced by bats or porpoises to locate prey or navigate

◆    sounds received by mice or deer to detect and avoid predators or other danger

◆    sounds produced by physical processes, such as wind in the trees, claps of thunder, or falling water.

The Service will restore to the natural condition wherever possible those park soundscapes that have become degraded by unnatural sounds (noise), and will protect natural soundscapes from unacceptable impacts.

Using appropriate management planning, superintendents will identify what levels and types of unnatural sound constitute acceptable impacts on park natural soundscapes. The frequencies, magnitudes, and durations of acceptable levels of unnatural sound will vary throughout a park, being generally greater in developed areas. In and adjacent to parks, the Service will monitor human activities that generate noise that adversely affects park soundscapes, including noise caused by mechanical or electronic devices. The Service will take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values, or that exceeds levels that have been identified through monitoring as being acceptable to or appropriate for visitor uses at the sites being monitored.

*(See General 4.1; Cultural Soundscape Management 5.3.1.7; Recreational Activities 8.2.2; Use of Motorized Equipment 8.2.3; Overflights and Aviation Uses 8.4. Also see 36 CFR 2.12: Audio Disturbances)*

## 4.10   Lightscape Management

The Service will preserve, to the greatest extent possible, the natural lightscapes of parks, which are natural resources and values that exist in the absence of human-caused light. The absence of light in areas such as caves and at the bottom of deep bodies of water influences biological processes and the evolution of species, such as the blind cave fish. The phosphorescence of waves on dark nights helps hatchling sea turtles orient to the ocean. The stars, planets, and earth's moon that are visible during clear nights influence humans and many other species of animals, such as birds that navigate by the stars or prey animals that reduce their activities during moonlit nights.

Improper outdoor lighting can impede the view and visitor enjoyment of a natural dark night sky. Recognizing the roles that light and dark periods and darkness play in natural resource processes and the evolution of species, the Service will protect natural darkness and other components of the natural lightscape in parks. To prevent the loss of dark conditions and of natural night skies, the Service will minimize light that emanates from park facilities, and also seek the cooperation of park visitors, neighbors, and local government agencies to prevent or minimize the intrusion of artificial light into the night scene of the ecosystems of parks. The Service will not use artificial lighting in areas such as sea turtle nesting locations where the presence of the artificial lighting will disrupt a park's dark-dependent natural resource components.

The Service will

◆   restrict the use of artificial lighting in parks to those areas where security, basic human safety, and specific cultural resource requirements must be met;

◆   use minimal-impact lighting techniques;

◆   shield the use of artificial lighting where necessary to prevent the disruption of the night sky, natural cave processes, physiological processes of living organisms, and similar natural processes.

The decision about whether or not to install artificial lighting in particular circumstances is left to the discretion of the superintendent and is made through the planning process.

*(See Cooperative Conservation Beyond Park Boundaries 1.6; Visitor Safety and Emergency Response 8.2.5, Facility Planning and Design 9.1.1; Integration of Facilities into the Park Environment 9.1.1.2; Energy Management 9.1.7)*

## 4.11   Chemical Information and Odors

Natural chemicals and odors transmit information that is received by living organisms. Natural chemicals involved in the transmission of information are released by animals, plants, and geologic materials. Once released, these chemicals can be transmitted through air and water. Many animals can perceive these natural chemicals and modify their behaviors, such as mating, migration, feeding, predator

avoidance, prey selection, and the establishment of social structures, as a response. Specific examples of relationships that involve natural chemical information and odors include, among others,

◆   scent posts where one animal deposits one or more chemicals by rubbing, urination, defecation, or other means, and where other animals can detect the passage of the first animal because of the odor produced by a deposited chemical;

◆   flowers that produce odors that attract insects, birds, and other animals, with resulting cross-pollination of the flowers and reproduction of the species as the outcome;

◆   female insects that release chemicals (pheromones) that attract males, with fertilization of the female's eggs and reproduction of the species as the outcome;

◆   stressed trees that emit chemicals that some types of beetles use to find weakened trees, which they then successfully can colonize and use as habitat for reproducing themselves; and

◆   geologic materials (soils or bedrock) that emit characteristic chemicals that fish can sense and use as guides to find the places in streams where they hatched and where they subsequently return to breed and deposit fertilized eggs, with reproduction of the species as the outcome.

The Service will preserve, to the greatest extent possible, the natural flow of natural chemical information and odors by preventing (1) the release of human-generated chemicals that can block the release, deposition, or perception of natural chemicals; and (2) human actions that disrupt or commingle the pathways through which natural chemicals are dispersed.

The Service acknowledges that some of its management activities may necessarily alter the natural flow of natural chemical information and odors. The Service may, for example,

◆   introduce pesticides or pheromones into parks as part of an integrated pest management program;

◆   construct and operate intensive development areas that eliminate animal scent stations and introduce unnatural chemicals;

◆   change the vegetation and thereby change the kinds of natural plant chemicals released to the air;

◆   move water from one drainage to another through water and sewer systems; or

◆   provide for the use of exhaust-emitting motors in the air, on land, and on water.

Whenever the Service engages in activities that disrupt the natural flow of natural chemical information or odors, it will comply with all applicable laws, regulations, and policies and seek to minimize harm to the environment. In no case will the Service engage in an activity if it will impair park resources or values.

009523



5

# Cultural Resource Management

*The National Park Service will protect, preserve, and foster appreciation of the cultural resources in its custody and demonstrate its respect for the peoples traditionally associated with those resources through appropriate programs of research, planning, and stewardship.*

The National Park Service is steward of many of America's most important cultural resources, including the home of President Franklin D. Roosevelt in Hyde Park, NY.

**60**     **Introduction**

The National Park Service is the steward of many of America's most important cultural resources. These resources are categorized as archeological resources, cultural landscapes, ethnographic resources, historic and prehistoric structures, and museum collections. The Service's cultural resource management program involves

◆   research to identify, evaluate, document, register, and establish basic information about cultural resources and traditionally associated peoples;

◆   planning to ensure that management processes for making decisions and setting priorities integrate information about cultural resources and provide for consultation and collaboration with outside entities; and

◆   stewardship to ensure that cultural resources are preserved and protected, receive appropriate treatments (including maintenance) to achieve desired conditions, and are made available for public understanding and enjoyment.

The cultural resource *Management Policies* of the National Park Service are derived from a suite of historic preservation, environmental, and other laws, proclamations, executive orders, and regulations. A comprehensive list can be found in the Cultural Resource Management Handbook issued pursuant to Director's Order #28. Taken collectively, this guidance provides the Service with the authority and responsibility for managing cultural resources in every unit of the national park system so that those resources may be preserved unimpaired for future generations. Cultural resource management will be carried out in a manner that is consistent with these legislative and regulatory provisions and with implementing policies and procedures such as the Secretary of the Interior's *Standards and Guidelines for Archeology and Historic Preservation (48 Federal Register (FR) 44716-740)*, and *Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to the National Historic Preservation Act (63 FR 20497-508).*

Superintendents and qualified cultural resource professionals will work together to carry out the Park Service's cultural resource management program. Other NPS staff and volunteers participating in cultural resource research, planning, and stewardship activities will be supervised by full-performance-level cultural resource professionals of the appropriate disciplines. Law enforcement professionals will consult with full-performance-level cultural resource professionals of the appropriate disciplines when investigating cultural resource crimes.

Superintendents and cultural resource professionals will ensure that research about and stewardship of cultural resources are carried out only after adequate planning and consultation with interested or affected individuals, groups, and other outside entities.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7. Also see NHPA [16 USC 470h-4]; Secretary of the Interior's Professional Qualification Standards [48 FR 44738-44739]; Employee Training and Development Planning and Tracking Kit [1996])*

## 5.1     Research

### 5.1.1          NPS Research

The National Park Service will conduct a vigorous interdisciplinary program of research into the cultural resources of each park. The principal goals of such research will be to

◆   ensure a systematic, adequate, and current information base representing park cultural resources and traditionally associated peoples in support of planning, management, and operations;

◆   ensure appropriate protection, preservation, treatment, and interpretation of cultural resources, employing the best current scholarship;

◆   develop approaches for managing park cultural and natural resources that ensure consideration of the views held by traditionally associated peoples and others by emphasizing cooperative conservation and civic engagement;

◆   collect data on subsistence and other consumptive uses of park resources in order to reach informed decisions; and

◆   develop appropriate technologies and methods for monitoring, protecting, preserving, and treating cultural resources.

Adequate research to support informed planning and compliance with legal requirements will precede any final decisions about the treatment of cultural resources, or about park operations, development, and natural resource management activities that might affect cultural resources. Research will be periodically updated to reflect changing issues, sources, and methods. Research needs will be identified and justified in a park's approved resource stewardship strategy.

A written scope of work, research design, project agreement, proposal, or other description of work to be performed will be prepared and approved before any research is conducted. All archeological research, whether for inventory, data recovery, or other purposes, must comply with the Archaeological Resources Protection Act of 1979 (ARPA), the Antiquities Act, and the Native American Graves Protection and Repatriation Act (NAGPRA), as applicable. The National Park Service will not take or allow any action that reduces the research potential of cultural resources without first performing an appropriate level of research, consultation, and documentation. Because research involving physical intervention into cultural resources or the removal of objects or specimens is a destructive process entailing an irretrievable commitment of the resources and often affecting traditional practices associated with the resources, research in parks will employ nondestructive methods to the maximum extent feasible.

The features of sites, landscapes, and structures will be left in place unless impracticable. Field data, objects, specimens, and features of sites and structures retrieved for preservation during cultural resource research and treatment projects, together with associated records and reports, will be managed within the park museum collection, stored in NPS or non-NPS repositories, as appropriate, including repositories maintained by partners. All collections of archeological material remains and associated records will be maintained in repositories in accordance with applicable regulations.

Research conducted by NPS personnel, contractors, and cooperative researchers will be subjected to peer review both inside and outside the Service to ensure that it meets professional standards, reflects current scholarship, and adheres to the principles of conduct for the appropriate discipline. The data and knowledge acquired through research will be recorded on permanent and durable (long-lived) media, documented in the appropriate Service-wide databases, and placed permanently in park museum and library collections and park files. This information will be made widely available and be incorporated, as appropriate, into park planning documents, exhibits, and interpretive programs. As appropriate, information will be shared with proper state and tribal historic preservation offices, other tribal offices, and certified local governments.

Certain research data may be withheld from public disclosure to protect sensitive or confidential information about archeological, historic, or other NPS resources when doing so would be consistent with the Freedom of Information Act, section 304 of the National Historic Preservation Act, or section 9 of the Archaeological Resources Protection Act. In some circumstances, the Service may withhold information about ethnographic resources. The Solicitor's Office should be consulted when there is any question about the legal authority to withhold information.

*(See Levels of Park Planning 2.3; Studies and Collections 4.2; Confidentiality 5.2.3; Research and Scholarship 7.5.4; Use by American Indians and Other Traditionally Associated Groups 8.5. Also see 36 CFR 79; 36 CFR Part 800; 43 CFR Parts 3, 7, and 10; NHPA; Secretary of the Interior's Standards and Guidelines for Preservation Planning [48 FR 44716-720]; Secretary of the Interior's Standards and Guidelines for Historical Documentation [48 FR 44728-730]; Director's Order #28: Cultural Resource Management; Cultural Resource Management Handbook; Director's Order #66: FOIA and Protected Resource Information )*

## 5.1.2    Independent Research
The National Park Service will promote relationships with individuals and organizations qualified to perform research, and encourage them to direct their research toward park management objectives and the broader contexts within which park resources exist. The Park Service will encourage independent researchers to follow the Secretary of the Interior's standards and guidelines and NPS guidelines to the fullest extent possible; the Service will also require

that the views of traditionally associated peoples be fully considered. Research done in cooperation with tribal governments, tribal colleges, and tribal organizations should include mutually agreed upon conditions concerning the dissemination of data as well as consideration of the confidentiality of culturally sensitive information.

Research that includes taking plants, fish, wildlife, rocks, or minerals must comply with the permit requirements of 36 CFR 2.5. Permits that would allow cultural resources to be physically disturbed or allow objects or specimens to be collected will be issued only when there is compelling evidence that the proposed research is essential to significant research concerns, and when that the purpose of the research can be reasonably achieved only by using park resources. Permits must require provision for the long-term preservation and management of any recovered objects and specimens and for their cataloging, together with any associated records, in the NPS museum cataloging system. Independent researchers will be authorized to conduct archeological research on park lands only through the issuance of an ARPA or Antiquities Act permit by the appropriate regional director. This permitting authority cannot be further delegated. As appropriate, parks will also issue other necessary permits, such as a special use permit. Archeological research conducted by independent researchers must comply with the Native American Graves Protection and Repatriation Act when applicable.

NPS facilities, collections, and assistance will be made available to qualified scholars conducting NPS-authorized research as long as park operations are not substantially impeded or park resources are not adversely impacted.

*(See Independent Studies 4.2.2; Consultation 5.2.1; Natural and Cultural Studies, Research, and Collection Activities 8.10. Also see 43 CFR Parts 3, 7, and 10)*

## 5.1.3    Identification and Evaluation of Resources
The National Park Service will conduct surveys to identify and evaluate the cultural resources of each park, assessing resources within their larger cultural, chronological, and geographic contexts. The resulting inventories will provide the substantive data required for (1) nominating resources to the National Register of Historic Places; (2) general park planning and specific proposals for preserving, protecting, and treating cultural resources to achieve desired conditions; (3) land acquisition, development, and maintenance activities; (4) interpretation, education, and natural and cultural resource management activities; and (5) compliance with legal requirements.

### 5.1.3.1    Inventories
The Park Service will (1) maintain and expand the following inventories (or their successors) about cultural resources in units of the national park system, (2) enter information into appropriate related databases, and (3) develop an integrated information system—

◆   Archeological sites inventory for historic and prehistoric archeological resources and the related

Archeological Sites Management Information System (ASMIS) database

◆ Cultural Landscapes Inventory (CLI) of historic designed landscapes, historic vernacular landscapes, ethnographic landscapes, and historic sites

◆ List of Classified Structures (LCS), encompassing historic and prehistoric structures

◆ National Catalog of Museum Objects, encompassing all cultural objects, archival and manuscript materials, and natural history specimens in NPS collections and the related automated version, the Automated National Catalog System (ANCS+)

*(See Levels of Park Planning 2.3; Confidentiality 5.2.3. Also see Secretary of the Interior's Standards and Guidelines for Identification [48 FR 44720-723]; Director's Order #28: Cultural Resource Management; Cultural Resource Management Handbook)*

### 5.1.3.2    Evaluation and Categorization

Cultural resources will be professionally evaluated and categorized to assist in management decisions about their treatment and use. Cultural resources will be evaluated for significance using the National Register Criteria for Evaluation (36 CFR 60.4), and those meeting the criteria will be nominated for listing. Museum collections are inappropriate for listing and will not be evaluated using these criteria. Some collections in their original structures can be included as contributing elements to a listed structure. As appropriate, cultural resources will be categorized using other management categories established by the National Park Service and listed in the *Cultural Resource Management Handbook*.

Cultural resource professionals will evaluate cultural resources in consultation with the appropriate state and tribal historic preservation officers. Ethnographically meaningful cultural and natural resources, including traditional cultural properties, will be identified and evaluated in consultation with peoples having traditional associations to park resources. Examples of traditionally associated peoples include Acadians, African Americans, Hispanic Americans, and Native Americans. Some ethnographically meaningful resources do not meet the National Register Criteria for Evaluation, but will be inventoried in consultation with traditionally associated peoples and considered in management decisions about treatment and use.

*(See Consultation 5.2.1. Also see Secretary of the Interior's Standards and Guidelines for Evaluation [48 FR 44723-726])*

### 5.1.3.2.1    National Register Nomination

Park resources that appear to meet the criteria for the National Register of Historic Places will be nominated— either individually, as components of historic districts, or within multiple property nominations—for listing by the Keeper of the National Register. National historic sites, national historical parks, and other parks that are significant primarily for their cultural resources are entered automatically in the National Register upon establishment. However, nomination forms will be prepared and submitted to document the qualifying and contributing features of such parks and other National Register-eligible resources within them.

*(Also see 36 CFR Parts 60 and 63; Secretary of the Interior's Standards and Guidelines for Registration [48 FR 44726-728]; National Register Bulletins 16A and 16B [Guidelines for Completing National Register of Historic Places Forms])*

### 5.1.3.2.2    National Historic Landmark Designation

Historic and cultural units of the national park system are nationally significant by virtue of their authorizing legislation or presidential proclamation. National historic landmark designations are appropriate for park cultural resources that meet national historic landmark criteria if the national significance of those resources is not adequately recognized in the park's authorizing legislation or presidential proclamation. Cultural parks may warrant landmark designation as parts of larger areas encompassing resources associated with their primary themes. Modified National Register forms will be prepared and submitted to nominate such resources for landmark designation by the Secretary of the Interior.

*(Also see 36 CFR Part 65)*

### 5.1.3.2.3    Nominations for World Heritage List Designation

Park properties containing cultural features believed to possess outstanding universal value to humanity may qualify for placement on the World Heritage List under criteria described in the World Heritage Committee Operational Guidelines and in accordance with the World Heritage Convention. Before they can be nominated, all such properties must be assessed according to World Heritage criteria, and before the United States can submit a nomination to the World Heritage Committee the property must first be included on the U.S. Tentative List of Potential Future World Heritage Nominations.

Any park superintendent who believes that part or all of the park they manage should be considered for inscription on the World Heritage List must consult with the NPS Office of International Affairs, the NPS Director, and the Department of the Interior before proceeding. U.S. recommendations are approved by an interagency panel chaired by the Assistant Secretary for Fish and Wildlife and Parks, based on criteria promulgated by the World Heritage Committee. These criteria and the rules for U.S. participation in the Convention Concerning the Protection of World Cultural and Natural Heritage are published in 36 CFR Part 73.

Once a property is placed on the World Heritage List, the Park Service will recognize the designation in public information and interpretive programs. Where appropriate, superintendents should use a park's world heritage status to promote the park and encourage sustainable tourism (tourism that does not adversely impact park resources

and values) and the preservation of the world's natural and cultural heritage. Placement on the World Heritage List will not alter the purposes for which a park was established, change management requirements, or reduce NPS jurisdiction over a park.

*(See World Heritage Sites 4.3.7. Also see 36 CFR Part 73)*

## 5.2   Planning

Effective park stewardship requires informed decision-making about a park's cultural resources. This is best accomplished through a comprehensive planning process. Effective planning is based on an understanding of what a park's cultural resources are and why those resources are significant. To gain this understanding, the Service must obtain baseline data on the nature and types of cultural resources, and their (1) distribution; (2) condition; (3) significance; and (4) local, regional, and national contexts. Cultural resource planning, and the resource evaluation process that is part of it, will include consultation with cultural resource professionals and scholars having relevant expertise; traditionally associated peoples; and other groups and individuals. Current scholarship and needs for research are considered in this process, along with the park's legislative history and other relevant information.

Each park's resource stewardship strategy will provide comprehensive recommendations about specific actions needed to achieve and maintain the desired resource conditions and visitor experiences for the park's cultural resources. This will include activities necessary to identify, evaluate, manage, monitor, protect, preserve, and treat the park's cultural resources, and to provide for enjoyment and understanding of the resources by the public.

Superintendents will ensure full consideration of the park's cultural resources and values in all proposals for operations, development, and natural resource programs, including the management of wilderness areas. When proposed undertakings may adversely affect national historic sites, national battlefields, and other predominantly cultural units of the national park system that were established in recognition of their national historical significance, superintendents will provide opportunities for the same level of review and consideration by the Advisory Council on Historic Preservation and the Secretary of the Interior that the Advisory Council's regulations require for undertakings that may adversely affect national historic landmarks (36 CFR 800.10).

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Strategic Planning 2.3.3; Implementation Planning 2.3.4. Also see Executive Order 13007 (Indian Sacred Sites); Secretary of the Interior's Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to the National Historic Preservation Act [63 FR 20496-508]; Secretary of the Interior's Standards and Guidelines for Preservation Planning [48 FR 44716-720]; Secretary of the Interior's Standards for the Treatment of Historic Properties)*

### 5.2.1     Consultation

The National Park Service is committed to the open and meaningful exchange of knowledge and ideas to enhance (1) the public's understanding of park resources and values and the policies and plans that affect them; and (2) the Service's ability to plan and manage the parks by learning from others. Open exchange requires that the Service seek and employ ways to reach out to and consult with all those who have an interest in the parks.

Each superintendent will consult with outside parties having an interest in the park's cultural resources or in proposed NPS actions that might affect those resources, and provide them with opportunities to learn about and comment on those resources and planned actions. Consultation may be formal, as when it is required pursuant to the Native American Graves Protection and Repatriation Act or section 106 of the National Historic Preservation Act, or it may be informal, when there is not a specific statutory requirement. Consultation will be initiated, as appropriate, with tribal, state, and local governments; state and tribal historic preservation officers; the Advisory Council on Historic Preservation; other interested federal agencies; traditionally associated peoples; present-day park neighbors; and other interested groups.

Consultations on proposed NPS actions will take place as soon as practical and in an appropriate forum that ensures, to the maximum extent possible, effective communication and the identification of mutually acceptable alternatives. The Service will establish and maintain continuing relationships with outside parties to facilitate future collaboration, formal consultations, and the ongoing informal exchange of views and information on cultural resource matters.

Because national parks embody resources and values of interest to a national audience, efforts to reach out and consult must be national in scope. However, the Service will be especially mindful of consulting with traditionally associated peoples—those whose cultural systems or ways of life have an association with park resources and values that predates establishment of the park. Traditionally associated peoples may include park neighbors, traditional residents, and former residents who remain attached to the park area despite having relocated. Examples of traditionally associated peoples include both federally designated and nondesignated American Indian tribes in the contiguous 48 states, Alaska Natives, Native Hawaiians, African Americans at Jean Lafitte, Asian Americans at Manzanar, Hispanic Americans at Tumacacori, and others.

In particular, traditionally associated peoples should be consulted about

◆   proposed research on and stewardship of cultural and natural resources with ethnographic meaning for the groups;

◆   development of park planning and interpretive documents that may affect resources traditionally associated with the groups;

◆ proposed research that entails collaborative study of the groups;

◆ identification, treatment, use, and determination of affiliation of objects subject to the Native American Graves Protection and Repatriation Act;

◆ repatriation of Native American cultural items or human remains based on requests by affiliated groups in accordance with the Native American Graves Protection and Repatriation Act;

◆ planned excavations and proposed responses to inadvertent discoveries of cultural resources that may be culturally affiliated with the groups;

◆ other proposed NPS actions that may affect the treatment of, use of, and access to cultural and natural resources with known or potential cultural meaning for the groups; and

◆ designation of National Register, National Historic Landmark, and World Heritage Sites with known or potential cultural meaning for the groups.

Consultation with federally recognized American Indian tribes will be on a government-to-government basis. The Service will notify appropriate tribal authorities (such as tribal historic preservation officers) about proposed actions when first conceived, and by subsequently consulting their appointed representatives whenever proposed actions may affect tribal interests, practices, and traditional resources (such as places of religious value).

There are other groups and individuals with strong connections to the land through experiencing a significant life event within or near a park unit. Through its civic engagement activities, the Service will be sensitive to and carefully consider the views of those who have these associations.

Whenever groups are created, controlled, or managed for the purpose of providing advice or recommendations to the Service, the Service will first consult with the Office of the Solicitor to determine whether the Federal Advisory Committee Act requires the chartering of an advisory committee. Consultation with the Office of the Solicitor will not be necessary when the Service meets with individuals, groups, or organizations simply to exchange views and information or to solicit individual advice on proposed actions. The act does not apply to intergovernmental meetings held exclusively between federal officials and elected officers of state, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities, when (1) the meetings relate to intergovernmental responsibilities or administration, and (2) the purpose of the committee is solely to exchange views, information, or advice relating to the management or implementation of federal programs established pursuant to statute that explicitly or inherently share intergovernmental responsibilities or administration.

*(See Civic Engagement 1.7; Relationship with American Indian Tribes 1.11; Ethnographic Resources 5.3.5.3. Also see ARPA; NAGPRA; NEPA; NHPA [16 USC 470f]; 36 CFR Part 800; 40*

*CFR Parts 1500-1508; 41 CFR Part 101;, 43 CFR Parts 7 and 10; Executive Memorandum on Government-to-Government Relations with Native American Tribal Governments; Executive Order 13007 (Indian Sacred Sites); Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments); 512 Department of the Interior Manual [DM] 2; Director's Order #71: Government-to-government Relationships with Tribal Governments; NPS Guide to the Federal Advisory Committee Act)*

### 5.2.2   Agreements

The National Park Service will seek to establish mutually beneficial agreements with interested groups to facilitate collaborative research, consultation, park planning, training, and cooperative management approaches with respect to park cultural resources and culturally important natural resources. The NPS goal is to allow traditionally associated peoples to exercise traditional cultural practices in parks to the extent allowable by law and consistent with the criteria listed in section 8.2. To the extent this goal can be legally reached through agreements, park superintendents should do so.

Whenever parks have cultural resources that are owned or managed by others, agreements will clarify how the resources are to be managed. Agreements will provide ways for periodically reviewing their effectiveness, making mutually agreed-upon modifications, and avoiding and resolving disagreements and disputes. All agreements will conform to the requirements of Director's Order #20: Agreements.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Partnerships 1.10; Partnerships 4.1.4; Park Structures Owned or Managed by Others 5.3.5.4.8; Submerged Cultural Resources 5.3.5.1.6; Use by American Indians and Other Traditionally Associated Groups 8.5; Consumptive Uses 8.9. Also see Executive Order 13007 (Indian Sacred Sites); 36 CFR 2.1)*

### 5.2.3   Confidentiality

Sensitive or confidential information is sometimes acquired during consultations and during other research, planning, and stewardship activities. Under certain circumstances and to the extent permitted by law, information about the specific location, character, nature, ownership, or acquisition of cultural resources on park lands will be withheld from public disclosure. If a question arises about withholding information, and disclosure could result in a significant invasion of privacy or a risk of harm to a cultural resource, the Park Service will consult the provisions of the Archaeological Resources Protection Act (16 USC 470hh); the National Parks Omnibus Management Act (16 USC 5937); and the National Historic Preservation Act (16 USC 470w-3) before making a decision. Under some conditions, the Service may be required by law to disclose confidential information acquired during consultations, public meetings, and other research, planning, and stewardship activities, or in association with the acquisition of resources, including museum collections. Before these activities occur, NPS staff and authorized researchers will make every effort to inform

affected parties that, while the information they provide will not be shared voluntarily, confidentiality cannot be guaranteed.

To the extent permitted by law, the Service will withhold from public disclosure (1) information provided by individuals who wish the information to remain confidential, and (2) the identities of individuals who wish to remain anonymous and who are protected from release by exemption under the Freedom of Information Act. In each instance the Service will document its decision to disseminate or withhold sensitive or confidential information from public disclosure.

More detailed guidance on sensitive and confidential information can be found in Director's Order #66: FOIA and Protected Resource Information and the Museum Handbook, Part III.

*(See Information Confidentiality 1.9.2.3; Natural Resource Information 4.1.2. Also see 43 CFR Part 2; 43 CFR 7.18; Privacy Act)*

## 5.3   Stewardship

### 5.3.1   Protection and Preservation of Cultural Resources

The National Park Service will employ the most effective concepts, techniques, and equipment to protect cultural resources against theft, fire, vandalism, overuse, deterioration, environmental impacts, and other threats without compromising the integrity of the resources.

#### 5.3.1.1   Emergency Management

Measures to protect or rescue cultural resources in the event of an emergency, disaster, or fire will be developed as part of a park's emergency operations and fire management planning processes. Designated personnel will be trained to respond to all emergencies in a manner that maximizes visitor and employee safety and the protection of resources and property.

*(See Emergency Preparedness and Emergency Operations 8.2.5.2. Also see 36 CFR Part 78)*

#### 5.3.1.2   Fire Detection, Suppression, and Post-fire Rehabilitation and Protection

The Park Service will take action to prevent or minimize the impact of wildland, prescribed, and structural fires on cultural resources, including the impact of suppression and rehabilitation activities.

In the preservation of historic structures and museum and library collections, every attempt will be made to comply with national building and fire codes. When these cannot be met without significantly impairing a structure's integrity and character, management and use of the structure will be modified to minimize potential hazards rather than modifying the structure itself.

Subject to the previous paragraph, when warranted by the significance of a historic structure or a museum or library collection, adequate and appropriate fire detection, warning, and suppression systems will be installed. Pre-fire plans will be developed for historic structures and buildings housing museum or library collections; these plans will be designed to identify the floor plan, utilities, hazards, and areas and objects requiring special protection. This information will be kept current and made available to local and park fire personnel.

Park and local fire personnel will be advised of the locations and characteristics of cultural resources threatened by fire and of any priorities for protecting them during any planned or unplanned fire incident. At parks with cultural resources, park fire personnel will receive cultural resource protection training. At parks that have wildland or structural fire risks and programs, cultural resource management specialists will receive fire prevention and emergency response training. Cultural resource management specialists who assist with wildland fire programs will be certified for incident management positions commensurate with their individual responsibilities.

Smoking will not be permitted in spaces housing museum or library collections or in historic structures (except those used as residences in which smoking is permitted by the park superintendent).

*(See Fire Management 4.5; Fire Management 6.3.9; Structural Fire Protection and Suppression 9.1.8. Also see Director's Order #18: Wildland Fire Management; Director's Order #58: Structural Fire Management and Reference Manual 58)*

#### 5.3.1.3   Compensation for Injuries to Cultural Resources

The Service will use all legal authorities that are available to protect and restore cultural resources and the benefits they provide when actions of another party cause the destruction or loss of or injury to park resources or values. As a first step, damage assessments provide the basis for determining the restoration and compensation needs that address the public's loss and are a key milestone toward the ultimate goal, which is restoration of resources for the American public. In accordance with the National Park System Resource Protection Act, the Park Service will take all necessary and appropriate steps to recover costs and damages from any person who destroys, causes the loss of, or injures any resource of the national park system. When such incidents involve cultural resources, the Service will

◆   prevent or minimize the destruction or loss of or injury to the cultural resource, or abate or minimize the imminent risk of such destruction, loss, or injury;

◆   assess and monitor damage to the cultural resource;

◆   recover any and all costs associated with the restoration or replacement of the cultural resource or costs associated with the acquisition of an equivalent resource;

◆ recover the value of any significant loss of use of the cultural resource pending its restoration or replacement or the acquisition of an equivalent, or the value of the cultural resource in the event it cannot be restored or replaced; and

◆ recover any and all costs incurred in responding to, assessing, and/or monitoring damage to the cultural resource.

*(See Compensation for Injuries to Natural Resources 4.1.6. Also see Director's Order #14: Resource Damage Assessment and Restoration)*

### 5.3.1.4   Environmental Monitoring and Control

When necessary to preserve a historic structure or a museum collection, appropriate measures will be taken to control relative humidity, temperature, light, and air quality. When museum collections are housed in a historic structure, the needs of both the collection and the structure will be identified and evaluated, weighing relative rarity and significance, before environmental control measures are introduced. The environmental conditions of all areas housing museum collections will be regularly monitored, according to a schedule specific to each condition, to determine whether appropriate levels of relative humidity, temperature, and light are being maintained.

*(See Air Quality 4.7.1. Also see Director's Order #24: NPS Museum Collections Management)*

### 5.3.1.5   Pest Management

The Park Service will follow an integrated pest management approach in addressing pest problems (including invasive vegetation) related to cultural resources. Pest occurrences will be dealt with on a case-by-case basis according to the principles identified in section 4.4.5 and Director's Order #77: Natural Resource Protection to ensure the most effective and lowest risk management strategy.

*(See Pest Management 4.4.5)*

### 5.3.1.6   Visitor Carrying Capacity

Superintendents will set, enforce, and monitor carrying capacities to limit public visitation to or use of cultural resources that would be subject to adverse effects from unrestricted levels of visitation or use. This will include (1) reviewing the park's purpose; (2) analyzing existing visitor use of and related impacts on the park's cultural resources and traditional resource users; (3) prescribing indicators and specific standards for acceptable and sustainable visitor use; and (4) identifying ways to address and monitor unacceptable impacts resulting from overuse. Studies to gather basic data and make recommendations on setting, enforcing, and monitoring carrying capacities for cultural resources will be conducted in collaboration with cultural resource specialists representing the appropriate disciplines.

*(See Visitor Carrying Capacity 8.2.1)*

### 5.3.1.7   Cultural Soundscape Management

Culturally appropriate sounds are important elements of the national park experience in many parks. The Service will preserve soundscape resources and values of the parks to the greatest extent possible to protect opportunities for appropriate transmission of cultural and historic sounds that are fundamental components of the purposes and values for which the parks were established. Examples of appropriate cultural and historic sounds include native drumming (at Yosemite National Park, for example), music (at New Orleans Jazz National Historical Park, for example), and bands, marching, cannon fire, or other military demonstrations at some national battlefield parks. The Service will prevent inappropriate or excessive types and levels of sound (noise) from unacceptably impacting the ability of the soundscape to transmit the cultural and historic resource sounds associated with park purposes.

*(See Soundscape Management 4.9; Recreational Activities 8.2.2. Also see 36 CFR 2.12: Audio Disturbances)*

### 5.3.2   Physical Access for Persons with Disabilities

The National Park Service will provide persons with disabilities the highest feasible level of physical access to historic properties that is reasonable, consistent with the preservation of each property's significant historical features. Access modifications for persons with disabilities will be designed and installed to least affect the features of a property that contribute to its significance. Modifications to some features may be acceptable in providing access once a review of options for the highest level of access has been completed. However, if it is determined that modification of particular features would impair a property's integrity and character in terms of the Advisory Council's regulations at 36 CFR 800.9, such modifications will not be made. To the extent possible, modifications for access will benefit the greatest number of visitors, staff, and the public, and be integrated with or close to the primary path of travel for entrances and from parking areas. In situations where access modifications cannot be made, alternative methods of achieving program access will be adopted.

*(See Access to Interpretive and Educational Opportunities 7.5.2; Accessibility for Persons with Disabilities 8.2.4; Accessibility for Persons with Disabilities 9.1.2; Accessibility of Commercial Services 10.2.6.2. Also see Director's Order #42: Accessibility for Visitors with Disabilities in National Park Service Programs and Services)*

### 5.3.3   Historic Property Leases and Cooperative Agreements

The National Park Service may permit the use of a historic property through a lease or cooperative agreement if the lease or cooperative agreement will ensure the property's preservation. Proposed uses must not unduly limit public appreciation of the property; interfere with visitor use and enjoyment of the park; or preclude use of the property for park administration, employee residences, or other management purposes judged more appropriate or cost-effective.

If a lease or cooperative agreement requires or allows the lessee or cooperator to maintain, repair, rehabilitate, restore, or build upon the property, the work must be done in accordance with applicable Secretary of the Interior's standards and guidelines and other NPS policies, guidelines, and standards.

*(See Leases 8.12. Also see Director's Order #38: Real Property Leasing; NHPA [16 USC 470h-3]; 16 USC 460l-22(a); Omnibus Consolidated Appropriations Act, 1997 [16 USC 1g]; 36 CFR Part 18)*

### 5.3.4    Stewardship of Human Remains and Burials

Marked and unmarked prehistoric and historic burial areas and graves will be identified, evaluated, and protected. Every effort will be made to avoid impacting burial areas and graves when planning park development and managing park operations. Such burial areas and graves will not knowingly be disturbed or archeologically investigated unless threatened with destruction.

The Service will consult with American Indian tribes, Alaska Natives, Native Hawaiians, and other individuals and groups linked by demonstrable ties of kinship or culture to potentially identifiable human remains when such remains may be disturbed or are inadvertently encountered on park lands. Reinterment at the same park may be permitted and may include remains that may have been removed from lands now within the park.

American Indian, Alaska Native, and Native Hawaiian human remains and photographs of such remains will not be exhibited. Drawings, renderings, or casts of such remains may be exhibited with the consent of culturally affiliated Indian tribes, Alaska Natives, and Native Hawaiian organizations. The exhibit of non-Native American human remains, or photographs, drawings, renderings, or casts of such remains, is allowed in consultation with traditionally associated peoples. The Service may allow access to and study, publication, and destructive analysis of human remains, but must consult with traditionally associated peoples and consider their opinions and concerns before making decisions on appropriate actions. In addition, such use of human remains will occur only with an approved research proposal that describes why the information cannot be obtained through other sources or analysis and why the research is important to the field of study and the general public.

*(See Cultural Resources 6.3.8; Consultation 7.5.6; Cemeteries and Burials 8.6.10. Also see ARPA; NAGPRA; 36 CFR Part 79; 43 CFR Part 10)*

### 5.3.5    Treatment of Cultural Resources

The Park Service will provide for the long-term preservation of, public access to, and appreciation of the features, materials, and qualities contributing to the significance of cultural resources. With some differences by type, cultural resources are subject to several basic treatments, including (1) preservation in their existing states; (2) rehabilitation

to serve contemporary uses, consistent with their integrity and character; and (3) restoration to earlier appearances by the removal of later additions and replacement of missing elements. Decisions regarding which treatments will best ensure the preservation and public enjoyment of particular cultural resources will be reached through the planning and compliance process, taking into account

◆  the nature and significance of a resource and its condition and interpretive value

◆  the research potential of the resource

◆  the level of intervention required by treatment alternatives

◆  the availability of data and the terms of any binding restrictions

◆  the concerns of traditionally associated peoples and other groups and individuals

Except for emergencies that threaten irreparable loss without immediate action, no treatment project will be undertaken unless supported by an approved planning document appropriate to the proposed action.

The preservation of cultural resources in their existing states will always receive first consideration. Treatments entailing greater intervention will not proceed without the consideration of interpretive alternatives. The appearance and condition of resources before treatment and changes made during treatment will be documented. Such documentation will be shared with any appropriate state or tribal historic preservation office or certified local government and added to the park museum cataloging system. Pending treatment decisions reached through the planning process, all resources will be protected and preserved in their existing states.

As a basic principle, anything of historical appearance that the National Park Service presents to the public in a park will be either an authentic survival from the past or an accurate representation of that once existing there. Reconstructions and reproductions will be clearly identified as such.

The Service will holistically approach the treatment of related cultural resources in a park. All cultural resource and natural resource values will be considered in defining specific treatment and management goals. Research will be coordinated and sequenced so that decisions are not made in isolation. Each proposed action will be evaluated to ensure consistency or compatibility in the overall treatment of park resources. The relative importance and relationship of all values will be weighed to identify potential conflicts between and among resource preservation goals, park management and operation goals, and park user goals. Conflicts will be considered and resolved through the planning process, which will include any consultation required by 16 USC 470f.

Although each resource type is most closely associated with a particular discipline, an interdisciplinary approach is commonly needed to properly define specific treatment and management goals for cultural resources. Policies applicable to the various resource types follow.

*(See Park Management 1.4; Levels of Park Planning 2.3; Planning 5.2; Cultural Resources 6.3.8. Also see NEPA; Secretary of the Interior's Standards for the Treatment of Historic Properties)*

### 5.3.5.1   Archeological Resources

Archeological resources will be managed in situ, unless the removal of artifacts or physical disturbance is justified by research, consultation, preservation, protection, or interpretive requirements. Preservation treatments will include proactive measures that protect resources from vandalism and looting, and will maintain or improve their condition by limiting damage due to natural and human agents. Data recovery actions will be taken only in the context of planning, consultation, and appropriate decision-making. Preservation treatments and data recovery activities will be conducted within the scope of an approved research design. Archeological research will use nondestructive methods of testing and analysis wherever possible. The Park Service will incorporate information about archeological resources into interpretive, educational, and preservation programs. Artifacts and specimens recovered from archeological resources, along with associated records and reports, will be maintained together in the park museum collection.

*(Also see Director's Order #28A: Archeology; 36 CFR Part 79; Secretary of the Interior's Standards and Guidelines for Archeological Documentation [48 FR 44734-737]; Museum Handbook)*

### 5.3.5.1.1   Preservation

Archeological resources will be maintained and preserved in a stable condition to prevent degradation and loss. The condition of archeological resources will be documented, regularly monitored, and evaluated against initial baseline data. Parks are encouraged to enlist concerned local citizens in site stewardship programs to patrol and monitor the condition of archeological resources. The preservation of archeological components of cultural landscapes, structures, and ruins are also subject to the treatment policies for cultural landscapes, historic and prehistoric structures, and historic and prehistoric ruins.

*(See Volunteers in the Parks 1.9.1.6)*

### 5.3.5.1.2   Stabilization

Archeological resources subject to erosion, slumping, subsidence, or other natural deterioration will be stabilized using the least intrusive and destructive methods. The methods used will protect natural resources and processes to the maximum extent feasible. Stabilization will occur only after sufficient research demonstrates the likely success of the proposed stabilizing action and after existing conditions are documented.

### 5.3.5.1.3   Rehabilitation, Restoration, and Reconstruction

These terms are normally related to the treatment of historic structures and cultural landscapes. The Park Service will not normally undertake the rehabilitation, restoration, or reconstruction of archeological resources or features. Archeological studies undertaken in conjunction with the rehabilitation or restoration of cultural landscapes, structures, or ruins, or with the reconstruction of obliterated cultural landscapes or missing structures, will be guided by the treatment policies for archeological resources as well as those for the other associated resource types.

### 5.3.5.1.4   Protection

Archeological resources will be protected against human agents of destruction and deterioration whenever practicable. Archeological resources subject to vandalism and looting will be periodically monitored and, if appropriate, fencing, warning signs, remote-sensing alarms, and other protective measures will be installed. Training and public education programs will be developed to make park staff and the public aware of the value of the park's archeological resources and the penalties for destroying them. For public safety reasons, local citizens who are monitoring resources under site stewardship programs will be instructed to report incidents of vandalism and looting to law enforcement personnel for response.

*(See Volunteers in Parks 7.6.1; Shared Responsibilities 8.3.3)*

### 5.3.5.1.5   Archeological Data Recovery

Archeological data recovery is permitted if justified by research or interpretation needs. Significant archeological data that would otherwise be lost as a result of resource treatment projects or uncontrollable degradation or destruction will be recovered in accordance with appropriate research proposals and preserved in park museum collections. Data will be recovered to mitigate the loss of significant archeological data due to park development, but only after

◆   the redesign, relocation, and cancellation of the proposed development have all been considered and ruled out as infeasible through the planning process;

◆   the park development has been approved; and

◆   the project has provided for data recovery, cataloging, and the initial preservation of recovered collections.

*(See Planning 5.2)*

### 5.3.5.1.6   Earthworks

Appropriate and, when feasible, native vegetation will be maintained when necessary to prevent the erosion of prehistoric and historic earthworks, even when the historic condition might have been bare earth. Because earthwork restorations and reconstructions can obliterate surviving remains and are often difficult to maintain, other means of representing and interpreting the original earthworks will receive first consideration.

*(See Management of Native Plants and Animals 4.4.2; Management of Exotic Species 4.4.4)*

### 5.3.5.1.7   Submerged Cultural Resources

Historic shipwrecks and other submerged cultural resources will be protected, to the extent permitted by law, in the same manner as terrestrial archeological resources. Protection activities involve inventory, evaluation, monitoring, interpretation, and establishing partnerships to provide for the management of historic shipwrecks and other submerged cultural resources in units of the national park system. The Service will not allow treasure hunting or commercial salvage activities at or around historic shipwrecks or other submerged cultural resources located within park boundaries unless legally obligated to do so. Parks may provide recreational diving access to submerged cultural resources that are not susceptible to damage or the removal of artifacts. The Service will ensure that the activities of others in park waters do not adversely affect submerged cultural resources or the surrounding natural environment. The Service will consult with the owners of non-abandoned historic shipwrecks and enter into written agreements with them to clarify how the shipwrecks will be managed by the Park Service. Shipwrecks owned by a state government pursuant to the Abandoned Shipwreck Act of 1987 will be managed in accordance with the Abandoned Shipwreck Act Guidelines (55 FR 50116-145, 55 FR 51528, and 56 FR 7875).

*(See Recreational Activities 8.2.2. Also see 36 CFR Part 2; 485 DM 27; Director's Order #4: Diving Management)*

### 5.3.5.2   Cultural Landscapes

The treatment of a cultural landscape will preserve significant physical attributes, biotic systems, and uses when those uses contribute to historical significance. Treatment decisions will be based on a cultural landscape's historical significance over time, existing conditions, and use. Treatment decisions will consider both the natural and built characteristics and features of a landscape, the dynamics inherent in natural processes and continued use, and the concerns of traditionally associated peoples.

The treatment implemented will be based on sound preservation practices to enable long-term preservation of a resource's historic features, qualities, and materials. There are three types of treatment for extant cultural landscapes: preservation, rehabilitation, and restoration.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7. Also see Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes)*

### 5.3.5.2.1   Preservation

A cultural landscape will be preserved in its present condition if

◆   that condition allows for satisfactory protection, maintenance, use, and interpretation; or

◆   another treatment is warranted but cannot be accomplished until some future time.

### 5.3.5.2.2   Rehabilitation

A cultural landscape may be rehabilitated for contemporary use if

◆   it cannot adequately serve an appropriate use in its present condition; and

◆   rehabilitation will retain its essential features and not alter its integrity and character or conflict with approved park management objectives.

### 5.3.5.2.3   Restoration

A cultural landscape may be restored to an earlier appearance if

◆   all changes after the proposed restoration period have been professionally evaluated and the significance of those changes has been fully considered;

◆   restoration is essential to public understanding of the park's cultural associations;

◆   sufficient data about that landscape's earlier appearance exist to enable its accurate restoration; and

◆   the disturbance or loss of significant archeological resources is minimized and mitigated by data recovery.

### 5.3.5.2.4   Reconstruction of Obliterated Landscapes

No matter how well conceived or executed, reconstructions are contemporary interpretations of the past rather than authentic survivals from it. The National Park Service will not reconstruct an obliterated cultural landscape unless

◆   there is no alternative that would accomplish the park's interpretive mission;

◆   sufficient data exist to enable its accurate reconstruction, based on the duplication of historic features substantiated by documentary or physical evidence, rather than on conjectural designs or features from other landscapes;

◆   reconstruction will occur in the original location;

◆   the disturbance or loss of significant archeological resources is minimized and mitigated by data recovery; and

◆   reconstruction is approved by the Director.

A landscape will not be reconstructed to appear damaged or ruined. General representations of typical landscapes will not be attempted.

### 5.3.5.2.5   Biotic Cultural Resources

Biotic cultural resources, which include plant and animal communities associated with the significance of a cultural landscape, will be duly considered in treatment and management. The cultural resource and natural resource components of the park's resource stewardship strategy will jointly identify acceptable plans for the management and treatment of biotic cultural resources. The park's resource stewardship strategy will anticipate and plan for the natural and human-induced processes of change. Before any major treatment of a cultural landscape is undertaken, there must be an understanding of the degree to which change

contributes to or compromises the historic character of the landscape, and the way in which natural cycles influence the ecological processes within the landscape. Treatment and management of a cultural landscape will establish acceptable parameters for change and manage the biotic resources within those parameters.

*(See Maintenance of Altered Plant Communities 4.4.2.5)*

### 5.3.5.2.6   Land Use and Ethnographic Value

Many cultural landscapes are significant because of their historic land use and practices. When land use is a primary reason for the significance of a landscape, the objective of treatment will be to balance the perpetuation of use with the retention of the tangible evidence that represents its history. The variety and arrangement of cultural and natural features in a landscape often have sacred or other continuing importance in the ethnic histories and cultural vigor of associated peoples. These features and their past and present-day uses will be identified, and the beliefs, attitudes, practices, traditions, and values of traditionally associated peoples will be considered in any treatment decisions.

Contemporary use of a cultural landscape is appropriate if it

◆   does not adversely affect significant landscape characteristics and features; and

◆   either follows the historic use or does not impede public appreciation of it.

All uses of cultural landscapes are subject to legal requirements, policy, guidelines, and standards for natural and cultural resource preservation, public safety, and special park uses.

### 5.3.5.2.7   New Construction

Contemporary alterations and additions to a cultural landscape must not radically change, obscure, or destroy its significant spatial organization, materials, and features. New buildings, structures, landscape features, and utilities may be constructed in a cultural landscape if

◆   existing structures and improvements do not meet essential management needs;

◆   new construction is designed and sited to preserve the landscape's integrity and historic character; and

◆   the alterations, additions, or related new construction is differentiated from yet compatible with the landscape's historic character—unless associated with an approved restoration or reconstruction.

New additions will meet the Secretary of the Interior's Standards for Rehabilitation.

### 5.3.5.3   Ethnographic Resources

Park ethnographic resources are the cultural and natural features of a park that are of traditional significance to traditionally associated peoples. These peoples are the contemporary park neighbors and ethnic or occupational communities that have been associated with a park for two or more generations (40 years), and whose interests in the park's resources began before the park's establishment. Living peoples of many cultural backgrounds—American Indians, Inuit (Eskimos), Native Hawaiians, African Americans, Hispanics, Chinese Americans, Euro-Americans, and farmers, ranchers, and fishermen—may have a traditional association with a particular park.

Traditionally associated peoples generally differ as a group from other park visitors in that they typically assign significance to ethnographic resources—places closely linked with their own sense of purpose, existence as a community, and development as ethnically distinctive peoples. These places may be in urban or rural parks and support ceremonial activities or represent birthplaces of significant individuals, group origin sites, migration routes, or harvesting or collecting places. Although these places have historic attributes that are of great importance to the group, they may not necessarily have a direct association with the reason the park was established or be appropriate as a topic of general public interest. Some ethnographic resources might also be traditional cultural properties. A traditional cultural property is one that is eligible for inclusion in the National Register of Historic Places because of its association with cultural practices or beliefs of a living community that are (1) rooted in that community's history, and (2) important in maintaining the continuing cultural identity of the community.

The Service's primary interest in these places stems from its responsibilities under

◆   the NPS Organic Act—to conserve the natural and historic objects within parks unimpaired for the enjoyment of future generations;

◆   the National Historic Preservation Act (NHPA)—to preserve, conserve, and encourage the continuation of the diverse traditional prehistoric, historic, ethnic, and folk cultural traditions that underlie and are a living expression of our American heritage;

◆   the American Indian Religious Freedom Act (AIRFA)—to protect and preserve for American Indians access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites;

◆   the Archeological Resources Protection Act (ARPA)—to secure, for the present and future benefit of the American people, the protection of archeological resources and sites that are on public lands and Indian Lands;

◆   the National Environmental Policy Act (NEPA)—to preserve important historic, cultural, and natural aspects of our national heritage; and

◆   Executive Order 13007 (Indian Sacred Sites)—to accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and avoid adversely affecting the physical integrity of such sacred sites.

The Service must therefore be respectful of these ethnographic resources and carefully consider the effects

that NPS actions may have on them. When religious issues are evident, the Service must also consider constraints imposed on federal agency actions by the First and Fourteenth Amendments to the U.S. Constitution.

The National Park Service will adopt a comprehensive approach towards appreciating the diverse human heritage and associated resources that characterize the national park system. The Service will identify the present-day peoples whose cultural practices and identities were, and often still are, closely associated with each park's cultural and natural resources.

The Alaska National Interest Lands Conservation Act (ANILCA) recognizes the importance of maintaining Alaska Native and non-Native subsistence lifestyles and contains provisions that authorize activities by the Park Service to assist Alaska Natives in the preservation of cultural resources. For many rural Alaskans, the land and the way of life are inseparable. The Service will explore opportunities in Alaska to forge a mutually beneficial relationship between Alaska Natives, rural Alaskans, and the Service. In Alaska and elsewhere, the Service will try to strengthen the ability of traditional and indigenous peoples to perpetuate their culture and to enrich the parks with a deeper sense of place and applicable traditional knowledge held by associated groups.

Ethnographic information will be collected through collaborative research that recognizes the sensitive nature of such information. Cultural anthropologists/ethnographers will document the meanings that traditionally associated groups assign to traditional natural and cultural resources and the landscapes they form. The park's ethnographic file will include this information, as well as data on the traditional management practices and knowledge systems that affect resource uses and the short- and long-term effects of use on the resources.

*(See Confidentiality 5.2.3. Also see Director's Order #28B: Ethnography Program)*

### 5.3.5.3.1  Resource Access and Use

Consistent with the requirements of the Organic Act, the National Historic Preservation Act, American Indian Religious Freedom Act, the Archaeological Resources Protection Act, the National Environmental Policy Act, and Executive Order 13007 (Indian Sacred Sites) cited in section 5.3.5.3 above, the Service will strive to allow American Indians and other traditionally associated peoples access to and use of ethnographic resources. Continued access to and use of ethnographic resources is often essential to the survival of family, community, or regional cultural systems, including patterns of belief and sociocultural and religious life. However, the Service may not allow access and use if it would violate the criteria listed in section 8.1.

The Service generally supports traditional access and use when reasonable accommodations can be made under NPS authorities to allow greater access and use. Park superintendents may reasonably control the times when and

places where specific groups may have exclusive access to particular areas of a park.

With regard to consumptive use of park resources, current NPS policy is reflected in regulations published at 36 CFR 2.1. These regulations allow superintendents to designate certain fruits, berries, nuts, or unoccupied seashells that may be gathered by hand for personal use or consumption if it will not adversely affect park wildlife, the reproductive potential of a plant species, or otherwise adversely affect park resources. The regulations do not authorize the taking, use, or possession of fish, wildlife, or plants for ceremonial or religious purposes except where specifically authorized by federal statute or treaty rights or where hunting, trapping, or fishing are otherwise allowed. These regulations are currently under review, and NPS policy is evolving in this area.

Regulations addressing traditional subsistence uses that are authorized in Alaska by the Alaska National Interest Lands Conservation Act are published at 36 CFR Part 13. Some park-specific enabling acts (for example, Big Cypress National Preserve and Kaloko-Honokohau National Historical Park) allow subsistence or other traditional uses of park resources.

*(See Appropriate Use 8.1.1; Use by American Indians and Other Traditionally Associated Groups 8.5; Special Park Uses 8.6; Collecting Natural Products 8.8; Consumptive Uses 8.9)*

### 5.3.5.3.2  Sacred Sites

The National Park Service acknowledges that American Indian tribes, including Native Alaskans, treat specific places containing certain natural and cultural resources as sacred places having established religious meaning and as locales of private ceremonial activities. Consistent with Executive Order 13007 (Indian Sacred Sites), the Service will, to the extent practicable, accommodate access to and ceremonial use of Indian sacred sites by religious practitioners from recognized American Indian tribes and Alaska Natives, and avoid adversely affecting the physical integrity of such sacred sites.

In consultation with the appropriate groups, the Service will develop a record about such places, and identify any treatments preferred by the groups. This information will alert superintendents and planners to the potential presence of sensitive areas and will be kept confidential to the extent permitted by law. The Service will collaborate with affected groups to prepare mutually agreeable strategies for providing access to ordinarily gated or otherwise inaccessible locales, and for enhancing the likelihood of privacy during religious ceremonies. Any strategies that are developed must comply with constitutional and other legal requirements. To the extent feasible and allowable by law, accommodations will also be made for access to and the use of sacred places when interest is expressed by other traditionally associated peoples (especially Native Hawaiians and other Pacific islanders) and by American Indian peoples and others who often have a long-standing connection and identity with a particular park or resource.

Various ethnic groups, local groups with recently developed ties to resources in neighboring parks, and visitors to family and national cemeteries and national memorials also might use park resources for traditional or individual religious ceremonies. Mutually acceptable agreements may be negotiated with known groups to provide access to and the use of such places, consistent with constitutional and other legal constraints.

*(See Confidentiality 5.2.3; Resource Access and Use 5.3.5.3.1; Use by American Indians and Other Traditionally Associated Groups 8.5; First Amendment Activities 8.6.3. Also see Director's Orders #66: FOIA and Protected Resource Information, and #71B: Indian Sacred Sites; NHPA [16 USC 470w-3]; Executive Order 13007 (Indian Sacred Sites); 512 DM 3)*

### 5.3.5.3.3   Research

The Park Service will maintain a program of professional cultural anthropological/ethnographic research designed to provide NPS managers with information about relationships between park resources and associated peoples. Research will be undertaken in cooperation with associated peoples in an interdisciplinary manner whenever reasonable, especially in studies of natural resource use and ethnographic landscapes. Research findings will be used to inform planning, cultural and natural resource management decision-making, and interpretation, as well as to help managers meet responsibilities to associated peoples and other stakeholders in the outcomes of NPS decisions.

Collaborative research dealing with recent or contemporary cultural systems and the resources of park-associated peoples will involve the groups in the design and implementation of the research and the review of research findings to the fullest possible extent. The Service will provide individuals or groups involved with or directly affected by the research with copies or summaries of the reports, as appropriate.

*(See Levels of Park Planning 2.3; Studies and Collections 4.2; Consultation 7.5.6; Use by American Indians and Other Traditionally Associated Groups 8.5. Also see Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes)*

### 5.3.5.4   Historic and Prehistoric Structures

The treatment of historic and prehistoric structures will be based on sound preservation practice to enable the long-term preservation of a structure's historic features, materials, and qualities. There are three types of treatment for extant structures: preservation, rehabilitation, and restoration.

*(Also see Secretary of the Interior's Standards for the Treatment of Historic Properties)*

### 5.3.5.4.1   Preservation

A structure will be preserved in its present condition if

◆ that condition allows for satisfactory protection, maintenance, use, and interpretation; or

◆ another treatment is warranted but cannot be accomplished until some future time.

### 5.3.5.4.2   Rehabilitation

A historic structure may be rehabilitated (rehabilitation does not apply to prehistoric structures) for contemporary use if

◆ it cannot adequately serve an appropriate use in its present condition; and

◆ rehabilitation will retain its essential features and will not alter its integrity and character or conflict with approved park management objectives.

### 5.3.5.4.3   Restoration

A structure may be restored to an earlier appearance if

◆ all changes after the proposed restoration period have been professionally evaluated, and the significance of those changes has been fully considered;

◆ restoration is essential to public understanding of the park's cultural associations;

◆ sufficient data about that structure's earlier appearance exist to enable its accurate restoration; and

◆ the disturbance or loss of significant archeological resources is minimized and mitigated by data recovery.

### 5.3.5.4.4   Reconstruction of Missing Structures

No matter how well conceived or executed, reconstructions are contemporary interpretations of the past rather than authentic survivals from it. The National Park Service will not reconstruct a missing structure unless

◆ there is no alternative that would accomplish the park's interpretive mission;

◆ sufficient data exist to enable its accurate reconstruction based on the duplication of historic features substantiated by documentary or physical evidence rather than on conjectural designs or features from other structures;

◆ reconstruction will occur in the original location;

◆ the disturbance or loss of significant archeological resources is minimized and mitigated by data recovery; and

◆ reconstruction is approved by the Director.

A structure will not be reconstructed to appear damaged or ruined. Generalized representations of typical structures will not be attempted.

*(See Environmental Monitoring and Control 5.3.1.4; Physical Access for Persons with Disabilities 5.3.2; Historic and Prehistoric Ruins 5.3.5.4.10)*

### 5.3.5.4.5   Movement of Historic Structures

Proposals for moving historic structures will consider the effects of movement on the structures, their present environments, their proposed environments, and the archeological research value of the structures and their sites. No historic structure will be moved if its preservation

would be adversely affected or until the appropriate recovery of significant archeological data has occurred. Prehistoric structures will not be moved.

A nationally significant historic structure may be moved only if

◆ it cannot practically be preserved on its present site; or

◆ the move constitutes a return to a previous historic location, and the previous move and present location are not important to the structure's significance.

A historic structure of less-than-national significance may be moved if

◆ it cannot practically be preserved on its present site; or

◆ its present location is not important to its significance, and its relocation is essential to public understanding of the park's cultural associations.

In moving a historic structure, every effort will be made to reestablish its historic orientation, immediate setting, and general relationship to its environment.

The Park Service will not acquire historic structures for relocation to parks unless those structures were removed from the park and are necessary to achieve the park purpose or authorized by legislation.

### 5.3.5.5.4.6   New Construction

In preference to new construction, every reasonable consideration will be given to using historic structures for park purposes compatible with their preservation and public appreciation. Additions may be made to historic structures when essential to their continued use and when new construction will not destroy historic materials, features, and spatial relationships that characterize the structure. Structural additions will harmonize in size, scale, proportion, and materials with, but be readily distinguishable from, the older work, and will not intrude upon the historic scene. New additions will meet the *Secretary of the Interior's Standards for Rehabilitation*.

In those areas of parks managed for the preservation, protection, and interpretation of cultural resources and their settings, new structures, landscape features, and utilities will be constructed only if

◆ existing structures and improvements do not meet essential park management needs; and

◆ new construction is designed and sited to preserve the integrity and character of the area.

Unless associated with an approved restoration or reconstruction, all alterations, additions, or related new construction will be differentiated from yet compatible with the historic character of the structure.

*(See Rehabilitation 5.3.5.4.2; Use of Historic Structures 5.3.5.4.7; Adaptive Use 9.1.1.4. Also see Executive Order 13006 (Locating Federal Facilities on Historic Properties); National Historic Preservation Act)*

### 5.3.5.4.7   Use of Historic Structures

NHPA (16 USC 470h-2(a)(1)) and Executive Order 13006 (Locating Federal Facilities on Historic Properties) require each federal agency—before acquiring, constructing, or leasing buildings—to use, to the maximum extent feasible, historic properties available to it whenever operationally appropriate and economically prudent. The *National Historic Preservation Act* also requires each agency to implement alternatives for the adaptive use of historic properties it owns if that will help ensure the properties' preservation. Therefore, compatible uses for structures will be found whenever possible. This policy will help prevent the accelerated deterioration of historic structures due to neglect and vandalism. Unused significant historic structures should be stabilized and protected through appropriate measures (such as mothballing) until long-term decisions are made through the planning process.

All uses of historic structures are subject to preservation and public safety requirements. No administrative or public use will be permitted that would threaten the stability or character of a structure, the museum objects within it, or the safety of its users, or that would entail alterations that would significantly compromise its integrity.

*(See Fire Detection, Suppression, and Post-fire Rehabilitation and Protection 5.3.1.2; Physical Access for Persons with Disabilities 5.3.2; Adaptive Use 9.1.1.4; Energy Management 9.1.7; Historic Structures 9.4.3.3. Also see Executive Order 13287 (Preserve America))*

### 5.3.5.4.8   Park Structures Owned or Managed by Others

Structures and related property owned or managed by others will be managed in accordance with NPS policies, guidelines, and standards to the extent permitted by the Service's interest. This includes structures and property owned but not occupied by the Service, and structures and property owned by others in which the Service has a less-than-fee interest or plays a major management or preservation role. Interests acquired or retained by the Service will enable the application of this policy.

*(See Land Protection Plans 3.3; Historic Property Leases and Cooperative Agreements 5.3.3; Commercial Visitor Services Planning 10.2.2)*

### 5.3.5.4.9   Damaged or Destroyed Historic Structures

Historic structures damaged or destroyed by fire, storm, earthquake, war, or any other accident may be preserved as ruins; be removed; or be rehabilitated, restored, or reconstructed in accordance with these policies.

### 5.3.5.4.10   Historic and Prehistoric Ruins

The stabilization of historic and prehistoric ruins will be preceded by studies leading to the recovery of any data that would be affected by stabilization work. Ruins and related features on unexcavated archeological sites will be stabilized only to the extent necessary to preserve research values or to arrest structural deterioration, recognizing that it is preferable to preserve archeological sites in situ

than to excavate them. Archeological ruins to be exhibited will not be excavated until consultation has occurred with traditionally associated peoples and adequate provisions are made for data recovery and stabilization. Structures will not be deliberately reduced to ruins, and missing structures will not be reconstructed to appear damaged or ruined.

### 5.3.5.5   Museum Collections

The Service will collect, protect, preserve, provide access to, and use objects, specimens, and archival and manuscript collections (henceforth referred to collectively as "collections," or individually as "items") in the disciplines of archeology, ethnography, history, biology, geology, and paleontology to aid understanding among park visitors, and to advance knowledge in the humanities and sciences. As appropriate, the Service will consult with culturally affiliated or traditionally associated peoples before treating or reproducing items in NPS collections that are subject to the Native American Graves Protection and Repatriation Act.

*(Also see Museum Handbook)*

### 5.3.5.5.1   Preservation

An item in a museum collection will be preserved in its present condition through ongoing preventive care if

◆   that condition is satisfactory for exhibit or research; or

◆   another treatment is warranted but it cannot be accomplished until some future time.

An item will be stabilized if

◆   preventive measures are insufficient to reduce deterioration to a tolerable level; or

◆   the item is so fragile that it will be endangered under any circumstances.

Active conservation treatment (intervention) will be minimized to reduce the possibility of compromising the item's integrity. All active treatment will be documented.

### 5.3.5.5.2   Restoration

An item in a museum collection may be restored to an earlier appearance if

◆   restoration is required for exhibit or research purposes;

◆   sufficient data about that item's earlier appearance exist to enable its accurate restoration; and

◆   restoration will not modify that item's known original character.

Restoration will be accomplished using the techniques and materials that least modify the item and so that the materials can be removed at a later time with minimal adverse effect. Restored areas will be documented and distinguishable from original material. Restoration will take into account the possible importance of preserving signs of wear, damage, former maintenance, and other historical and scientific evidence.

### 5.3.5.5.3   Reproduction

Items needed for interpretive and educational presentations will be reproduced for such use when the originals (1) are unavailable, or (2) would be subject to undue deterioration or loss, or (3) are otherwise inappropriate for exhibit. If an object is inappropriate for exhibit because of its religious or spiritual significance to a traditionally associated people, it will be reproduced only after consultation with such people.

### 5.3.5.5.4   Acquisition, Management, Disposition, and Use

Collections and related documentation essential to achieving the purposes and objectives of parks will be acquired and maintained in accordance with approved scope of collection statements for each park. When museum objects, specimens, or archival documents become available and fall within a park's approved scope of collection statement, every reasonable effort will be made to acquire them if they can be managed and made accessible according to NPS standards.

Archeological objects systematically collected in a park, and natural history specimens systematically collected in a park for exhibit or permanent retention, will be managed as part of the park's museum collection. The management and care of museum collections will be addressed at all appropriate levels of planning. Requisite levels of care will be established through the interdisciplinary efforts of qualified professionals.

Museum collections will be acquired and disposed of in conformance with legal authorizations and current NPS procedures. The National Park Service will acquire only collections having legal and ethical pedigrees. Each park will maintain complete and current accession records to establish the basis for legal custody of the collections in its possession, including intellectual property rights when acquired. Each park will prepare museum catalog records to record basic property management data and other documentary information about the park's museum collection. Collections will be inventoried in accordance with current procedures. Archeological, cultural landscape, ethnographic, historic and prehistoric structure, historic furnishings, natural resource, and other projects that generate collections for parks will provide for cataloging and initial preservation of those collections in the project budget.

The Service may cooperate with qualified entities in the management, use, and exhibition of museum collections, and may loan items to or borrow items from such entities for approved purposes. The Service may deaccession items using means authorized in the Museum Act and the Native American Graves Protection and Repatriation Act.

Interested persons will be permitted to inspect and study NPS museum collections and records in accordance with standards for the preservation and use of collections, and subject to laws and policies regarding the confidentiality of resource data. At-cost copies of documents may be provided.

*(See Natural Resource Collections 4.2.3; Paleontological Resources and Their Contexts 4.8.2.1; Confidentiality 5.2.3; Fire Detection, Suppression, and Post-fire Rehabilitation and Protection 5.3.1.2; Environmental Monitoring and Control 5.3.1.4; Consultation 7.5.6; Special Park Uses 8.6; Museum Collections Management Facilities 9.4.2. Also see 16 USC 18f; 43 USC 1460; 36 CFR Part 79; 43 CFR Part 10; and Museum Handbook)*

### 5.3.5.5.5  Historic Furnishings

When historic furnishings are present in their original arrangement in a historic structure, every effort will be made to preserve them as an entity. Such historic furnishings will not be moved or replaced unless required for their protection or repair or unless the structure is designated for another use in an approved planning document. The original arrangement of historic furnishings will be properly documented. A structure may be refurnished in whole or in part if

◆ all changes after the proposed refurnishing period have been professionally evaluated, and their significance has been fully considered;

◆ a planning process has demonstrated that refurnishing is essential to public understanding of the park's cultural associations; and

◆ sufficient evidence of the design and placement of the structure's furnishings exists to enable its accurate refurnishing without reliance on evidence from comparable structures.

Generalized representations of typical interiors will not be attempted except in exhibit contexts that make their representative nature obvious. Reproductions may be used in place of historic furnishings, but only when photographic evidence or prototypes exist to ensure the accurate re-creation of historic pieces.

*(See Levels of Park Planning 2.3; Nonpersonal Services 7.3.2)*

### 5.3.5.5.6  Archives and Manuscripts

Archival and manuscript collections are museum collections; they will be preserved, arranged, cataloged, and described in finding aids. They will be maintained and used in ways that preserve the collections and their context (provenance and original order) intact while providing controlled access. With few legal exemptions, the Park Service will make archives and manuscripts available to researchers. Electronic documents that are to be preserved in archival and manuscript collections will be migrated so that their information remains accessible.

All documentation associated with natural and cultural resource studies and other resource management actions will be retained in the park's museum collection for use in managing park resources over time. Parks will retain notes or copies of records significant to their administrative histories when they periodically transfer their official records to federal record centers.

*(See Managing Information 1.9.2; Confidentiality 5.2.3)*

009541



**6**

# Wilderness Preservation and Management

*All NPS lands will be evaluated for their eligibility for inclusion within the national wilderness preservation system. For those lands that possess wilderness characteristics, no action that would diminish their wilderness eligibility will be taken until after Congress and the President have taken final action. The superintendent of each park containing wilderness will develop and maintain a wilderness management plan or equivalent document. Wilderness considerations will be integrated into all planning documents to guide the preservation, management, and use of the park's wilderness area and ensure that wilderness is unimpaired for future use and enjoyment as wilderness.*

A wilderness is an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain.

**78**   **6.1   General Statement**

The National Park Service will manage wilderness areas for the use and enjoyment of the American people in such a manner as will leave them unimpaired for future use and enjoyment as wilderness. Management will include the protection of these areas, the preservation of their wilderness character, and the gathering and dissemination of information regarding their use and enjoyment as wilderness. The purpose of wilderness in the national parks includes the preservation of wilderness character and wilderness resources in an unimpaired condition and, in accordance with the Wilderness Act, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use.

The policies contained in this chapter are supplemented by Director's Order #41: Wilderness Preservation and Management and Reference Manual 41, which accompanies the director's order. Those documents should be referred to for more detailed information on the topics covered in this chapter.

## 6.2   Identification and Designation of the Wilderness Resource

The National Park Service will use the following wilderness study process to consider NPS areas for inclusion within the congressionally designated national wilderness preservation system.

### 6.2.1   Assessment of Wilderness Eligibility or Ineligibility

All lands administered by the National Park Service, including new units or additions to existing units since 1964, will be evaluated for their eligibility[2] for inclusion in the national wilderness preservation system. Additionally, lands that were originally assessed as ineligible for wilderness because of nonconforming or incompatible uses must be reevaluated if the nonconforming uses have been terminated or removed. A wilderness eligibility assessment will consist of a brief memorandum from the regional director to the Director that makes a managerial determination as to the eligibility of the park lands for wilderness designation.

The assessment may include information important for other park planning purposes, and other park planning efforts may likewise produce information important to wilderness. The assessment should therefore be completed in a timely manner and thoughtfully coordinated with other planning activities. The assessment may be combined with the wilderness study described below if the combined document can be completed in a timely manner.

---

2   *Management Policies 2001* used the term "suitability" to refer to the Park Service's initial screening assessment as to whether lands meet the minimum criteria for inclusion in the national wilderness preservation system. The Wilderness Act, however, uses "suitability" to refer to the Secretary's determinations in forwarding recommendations to the President. For purposes of clarity, the NPS initial screening assessment has been renamed an "eligibility" assessment. The change from "suitability" to "eligibility" in no way lessens the protected status of these lands.

### 6.2.1.1   Primary Eligibility Criteria

NPS lands will be considered eligible for wilderness if they are at least 5,000 acres or of sufficient size to make practicable their preservation and use in an unimpaired condition, and if they possess the following characteristics (as identified in the Wilderness Act):

◆   The earth and its community of life are untrammeled by humans, where humans are visitors and do not remain.

◆   The area is undeveloped and retains its primeval character and influence without permanent improvements or human habitation.

◆   The area generally appears to have been affected primarily by the forces of nature, with the imprint of humans' work substantially unnoticeable.

◆   The area is protected and managed so as to preserve its natural conditions.

◆   The area offers outstanding opportunities for solitude or a primitive and unconfined type of recreation.

### 6.2.1.2   Additional Considerations in Determining Eligibility

In addition to the primary eligibility criteria, the following considerations should be taken into account in determining eligibility:

◆   A wilderness area may contain significant ecological, geological, or other features of scientific, educational, scenic, or historical value, although it does not need these things to be considered eligible for wilderness designation.

◆   Lands that have been logged, farmed, grazed, mined, or otherwise used in ways not involving extensive development or alteration of the landscape may also be considered eligible for wilderness designation if, at the time of assessment, the effects of these activities are substantially unnoticeable or their wilderness character could be maintained or restored through appropriate management actions.

◆   An area will not be excluded from a determination of wilderness eligibility solely because established or proposed management practices require the use of tools, equipment, or structures if those practices are necessary to meet minimum requirements for the administration of the area as wilderness.

◆   In the process of determining wilderness eligibility, lands will not be excluded solely because of existing rights or privileges (e.g., mineral exploration and development, commercial operations, agricultural development, grazing, or stock driveways). If the National Park Service determines that these lands possess wilderness character, they may be included in the eligibility determination so that they can be considered for designation as wilderness or potential wilderness.

◆   Lands containing aboveground or buried utility lines will normally not be considered as eligible for wilderness designation, but they can be considered as

eligible for "potential" wilderness designation if there is a long-term intent to remove the lines. No new utility lines may be installed in wilderness, and existing utility lines may not be extended or enlarged except as may be allowed pursuant to section 1106 of the Alaska National Interest Lands Conservation Act (16 USC 1133(c)).

◆   Historic features that are primary attractions for park visitors will generally not be recommended as eligible for wilderness designation. However, an area that attracts visitors primarily for the enjoyment of solitude and unconfined recreation in a primitive setting may also contain cultural resource features and still be included in wilderness. Historic trails may serve and be maintained as part of the wilderness trail system, as identified and coordinated within an approved wilderness management plan and the park's cultural resource plan. The presence of historic structures does not make an area ineligible for wilderness. A recommendation may be made to include a historic structure in wilderness if (1) the structure would be only a minor feature of the total wilderness proposal; and (2) the structure will remain in its historic state, without development.

◆   Dams within or affecting the area being studied do not make a waterway ineligible for wilderness designation. The nature and extent of impacts and the extent to which the impacts can be mitigated would need to be addressed in subsequent wilderness studies.

◆   The established use of motorboats, snowmobiles, or aircraft does not make an area ineligible for wilderness. The nature and extent of any impacts on the environment and on eligibility, and the extent to which the impacts can be mitigated would need to be addressed in subsequent wilderness studies, along with the possible need to discontinue the use.

◆   Overflights do not make an area ineligible for wilderness designation. The nature and extent of any overflight impacts and the extent to which the impacts can be mitigated would need to be addressed in subsequent wilderness studies.

### 6.2.1.3   The Assessment Process

The Service will involve the public in the wilderness eligibility assessment process through notification of its intentions to conduct the assessment and publication of the Director's determination, either as "eligible" or as "ineligible" for further wilderness study. Notification will include the issuance of news releases to local and regional news media and the publication of a final eligibility determination in the *Federal Register*. The final determination of an area's eligibility, or ineligibility, for further study must be approved by the Director before publication of the final eligibility determination in the *Federal Register*. For areas determined to be ineligible for wilderness designation, the wilderness preservation provisions in the NPS *Management Policies* are not applicable. However, ineligible lands will be managed in accordance with the NPS Organic Act and all other laws, executive orders, regulations, and policies applicable to units of the national park system.

### 6.2.2   Wilderness Studies

Lands and waters found to possess the characteristics and values of wilderness, as defined in the Wilderness Act and determined eligible pursuant to the wilderness eligibility assessment, will be formally studied to develop the recommendation to Congress for wilderness designation. The National Park Service will continue to undertake wilderness studies of all lands that have been determined to be eligible as a result of the wilderness eligibility assessment. Also, studies will be made of lands for which subsequent legislation directs that wilderness studies be completed.

Wilderness studies will be supported by appropriate documentation of compliance with the National Environmental Policy Act and the National Historic Preservation Act. The Council on Environmental Quality requires environmental impact statements for wilderness studies that will result in recommendations for designations (i.e., proposals for legislation to designate as wilderness).

### 6.2.2.1   Potential Wilderness

A wilderness study may identify lands that are surrounded by or adjacent to lands proposed for wilderness designation but that do not themselves qualify for immediate designation due to temporary nonconforming or incompatible conditions. The wilderness recommendation forwarded to the Congress by the President may identify these lands as "potential" wilderness for future designation as wilderness when the nonconforming use has been removed or eliminated. If so authorized by Congress, these potential wilderness areas will become designated wilderness upon the Secretary's determination, published in the *Federal Register*, that they have finally met the qualifications for designation by the cessation or termination of the nonconforming use.

### 6.2.2.2   Proposed Wilderness

The findings and conclusions of a formal wilderness study will be reviewed by the Director, who will then determine which lands will be forwarded to the Department of the Interior (Assistant Secretary's Office) as "proposed" wilderness. The Director's proposed wilderness will identify park lands that the Director believes the Secretary should recommend for immediate wilderness designation, as well as any other lands identified as "not proposed" or as "potential" wilderness.

### 6.2.3   Recommended Wilderness

The Secretary of the Interior is responsible for recommending to the President those lands under his/her jurisdiction that are suitable or nonsuitable for inclusion within the national wilderness preservation system. The Secretary performs this function through the Assistant Secretary's Office by reviewing NPS proposed wilderness and either approving or revising the proposal. The final result is forwarded by the Secretary for the President's consideration. The President is then responsible for transmitting his recommendations with respect to wilderness designation to both houses of Congress. These recommendations must be accompanied by maps and boundary descriptions. The National Park Service will

track the status of the wilderness designation process in Congress.

### 6.2.4   Designated Wilderness

After the President's wilderness recommendation is formally sent to and considered by Congress, Congress may subsequently enact the legislation needed to include the area within the national wilderness preservation system as "designated" and/or "potential" wilderness. The National Park Service will assist the department and Congress in this process as requested. Lands released by Congress from further wilderness consideration will be managed in accordance with the NPS Organic Act and all other laws, executive orders, regulations, and policies applicable to nonwilderness areas of the national park system.

## 6.3   Wilderness Resource Management

### 6.3.1   General Policy

For the purposes of applying these policies, the term "wilderness" will include the categories of eligible, study, proposed, recommended, and designated wilderness. Potential wilderness may be a subset of any of these five categories. The policies apply regardless of category except as otherwise provided herein.

In addition to managing these areas for the preservation of the physical wilderness resources, planning for these areas must ensure that the wilderness character is likewise preserved. This policy will be applied to all planning documents affecting wilderness.

The National Park Service will take no action that would diminish the wilderness eligibility of an area possessing wilderness characteristics until the legislative process of wilderness designation has been completed. Until that time, management decisions will be made in expectation of eventual wilderness designation. This policy also applies to potential wilderness, requiring it to be managed as wilderness to the extent that existing nonconforming conditions allow. The National Park Service will apply the principles of civic engagement and cooperative conservation as it determines the most appropriate means of removing the temporary, nonconforming conditions that preclude wilderness designation from potential wilderness. All management decisions affecting wilderness will further apply the concept of "minimum requirement" for the administration of the area regardless of wilderness category. The only exception is for areas that have been found eligible, but for which, after completion of a wilderness study, the Service has not proposed wilderness designation. However, those lands will still be managed to preserve their eligibility for designation.

*(See Minimum Requirement 6.3.5)*

### 6.3.2   Responsibility

NPS responsibility for carrying out wilderness preservation mandates will be shared by the Director, regional directors, and superintendents of parks with eligible, study area,

## WILDERNESS REVIEW AND MANAGEMENT PROCESS



proposed, recommended, and designated wilderness. Interagency cooperation and coordination and training responsibilities will also be carried out at the Washington, D.C., region, and park levels. Specific wilderness management responsibilities will be assigned at each of these administrative levels to carry out these responsibilities effectively and to facilitate efforts for establishing agency and interagency consistency in wilderness management techniques.

Superintendents will provide the information needed to prepare an annual wilderness report to Congress and to report to the Director on the status of wilderness management in the national park system. Based on this information, the Associate Director for Visitor and Resource Protection will provide the Directorate with recommendations and advice to permanently establish a system of accountability, consistency, and continuity for NPS wilderness management.

### 6.3.3    Consistency

The National Park Service will seek to achieve consistency in wilderness management objectives, techniques, and practices on both an agency and an interagency basis. Accordingly, the National Park Service will seek to maintain effective intra-agency and interagency communications, and will encourage, sponsor, and participate in intra-agency and interagency training and workshops designed to promote the sharing of ideas, concerns, and techniques related to wilderness management. However, the need for interagency consistency will in no way diminish any established NPS wilderness standards and values.

### 6.3.4    Wilderness-related Planning and Environmental Compliance

Policies on wilderness planning and compliance include the following.

### 6.3.4.1    Zoning for Wilderness

When necessary, all categories of wilderness may be zoned for visitor experiences and resource conditions consistent with their wilderness values within the established management zoning system for each park. However, management zoning or other land use classifications cannot and will not diminish or reduce the maximum protection to be afforded lands with wilderness values. Transition zones adjacent to wilderness may be identified to help protect wilderness values, but no transitional or "buffer" zones are appropriate within wilderness boundaries.

### 6.3.4.2    Wilderness Management Planning

The superintendent of each park containing wilderness resources will develop and maintain a wilderness management plan or equivalent planning document to guide the preservation, management, and use of these resources. The wilderness management plan will identify desired future conditions, as well as establish indicators, standards, conditions, and thresholds beyond which management actions will be taken to reduce human impacts on wilderness resources.

The park's wilderness management plan may be developed as a separate document or as an action component of another planning document. Whether prepared as a stand-alone plan or as part of another planning document, all wilderness management plans must meet the same standards for process and content as specified in this section 6.3.4. Wilderness management plans will be supported by appropriate documentation of compliance with the National Environmental Policy Act and the National Historic Preservation Act. The plan will be developed with public involvement and will contain specific, measurable management objectives that address the preservation and management of natural and cultural resources within wilderness as appropriate to achieve the purposes of the Wilderness Act and other legislative requirements.

*(See Visitor Carrying Capacity 8.2.1)*

### 6.3.4.3    Environmental Compliance

Proposals having the potential to impact wilderness resources will be evaluated in accordance with NPS procedures for implementing the National Environmental Policy Act. Those procedures include the use of categorical exclusions, environmental assessments (EAs), or environmental impact statements (EISs). Administrative actions impacting wilderness must be addressed in either the environmental assessment or environmental impact statement accompanying the approved wilderness management plan or as a separate environmental compliance document.

Managers contemplating the use of aircraft or other motorized equipment or mechanical transportation within wilderness must consider impacts to the character, esthetics, and traditions of wilderness before considering the costs and efficiency of the equipment.

In evaluating environmental impacts, the National Park Service will take into account (1) wilderness characteristics and values, including the primeval character and influence of the wilderness; (2) the preservation of natural conditions (including the lack of man-made noise); and (3) assurances that there will be outstanding opportunities for solitude, that the public will be provided with a primitive and unconfined type of recreational experience, and that wilderness will be preserved and used in an unimpaired condition. Managers will be expected to appropriately address cultural resources management considerations in the development and review of environmental compliance documents impacting wilderness resources.

*(Also see Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

### 6.3.5    Minimum Requirement

All management decisions affecting wilderness must be consistent with the minimum requirement concept. This concept is a documented process used to determine if administrative actions, projects, or programs undertaken by the Service or its agents and affecting wilderness character, resources, or the visitor experience are necessary, and if so how to minimize impacts. The minimum requirement concept will be applied as a two-step process that determines

◆   whether the proposed management action is appropriate or necessary for administration of the area as wilderness and does not cause a significant impact to wilderness resources and character, in accordance with the Wilderness Act; and

◆ the techniques and types of equipment needed to ensure that impacts on wilderness resources and character are minimized.

In accordance with this policy, superintendents will apply the minimum requirement concept in the context of wilderness stewardship planning, as well as to all other administrative practices, proposed special uses, scientific activities, and equipment use in wilderness. The only exception to the minimum requirement policy is for eligible areas that the Service has not proposed for wilderness designation. However, those lands will still be managed to preserve their eligibility.

When determining minimum requirements, the potential disruption of wilderness character and resources will be considered before, and given significantly more weight than, economic efficiency and convenience. If a compromise of wilderness resources or character is unavoidable, only those actions that preserve wilderness character and/or have localized, short-term adverse impacts will be acceptable.

Although park managers have flexibility in identifying the method used to determine minimum requirement, the method used must clearly weigh the benefits and impacts of the proposal, document the decision-making process, and be supported by an appropriate environmental compliance document. Parks must develop a process to determine minimum requirement until the plan is finally approved. Parks will complete a minimum requirement analysis on those administrative practices and equipment uses that have the potential to impact wilderness resources or values. The minimum requirement concept cannot be used to rationalize permanent roads or inappropriate or unlawful uses in wilderness.

Administrative use of motorized equipment or mechanical transport will be authorized only

◆ if determined by the superintendent to be the minimum requirement needed by management to achieve the purposes of the area, including the preservation of wilderness character and values, in accordance with the Wilderness Act; or

◆ in emergency situations (for example, search and rescue, homeland security, law enforcement) involving the health or safety of persons actually within the area.

Such management activities will also be conducted in accordance with all applicable regulations, policies, and guidelines and, where practicable, will be scheduled to avoid creating adverse resource impacts or conflicts with visitor use.

While actions taken to address search and rescue, homeland security and law enforcement issues are subject to the minimum requirement concept, preplanning or programmatic planning should be undertaken whenever possible to facilitate a fast and effective response and reduce paperwork.

For more detailed guidance, see Director's Order #41 and the National Wilderness Steering Committee Guidance Paper #3: "What Constitutes the Minimum Requirements in Wilderness?"

*(See Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

### 6.3.6   Scientific Activities in Wilderness

The statutory purposes of wilderness include scientific activities, and these activities are encouraged and permitted when consistent with the Service's responsibilities to preserve and manage wilderness.

### 6.3.6.1   General Policy

The National Park Service has a responsibility to support appropriate scientific activities in wilderness and to use science to improve wilderness management. The Service recognizes that wilderness can and should serve as an important resource for long-term research into and study and observation of ecological processes and the impact of humans on these ecosystems. The National Park Service further recognizes that appropriate scientific activities may be critical to the long-term preservation of wilderness.

Scientific activities are to be encouraged in wilderness. Even those scientific activities (including inventory, monitoring, and research) that involve a potential impact to wilderness resources or values (including access, ground disturbance, use of equipment, and animal welfare) should be allowed when the benefits of what can be learned outweigh the impacts on wilderness resources or values. However, all such activities must also be evaluated using the minimum requirement concept and include documented compliance that assesses impacts against benefits to wilderness. This process should ensure that the activity is appropriate and uses the minimum tool required to accomplish project objectives. Scientific activities involving prohibitions identified in section 4(c) of the Wilderness Act (16 USC 1133(c)) may be conducted within wilderness when the following occur:

◆ The desired information is essential for the understanding health, management, or administration of wilderness, and the project cannot be reasonably modified to eliminate or reduce the nonconforming wilderness use(s); or if it increases scientific knowledge, even when this serves no immediate wilderness management purposes, provided it does not compromise wilderness resources or character. The preservation of wilderness resources and character will be given significantly more weight than economic efficiency and/or convenience.

◆ Compliance with the National Environmental Policy Act (including completion of documented categorical exclusions, environmental assessments/findings of no significant impact, or environmental impact statements/records of decision) and other regulatory compliance (including compliance with section 106 of the National Historic Preservation Act (16 USC 470f)) are accomplished and documented.

◆ All scientific activities will be accomplished in accordance with terms and conditions adopted at the time the research permit is approved. Later requests for exceptions to the Wilderness Act will require additional review and approval.

◆ The project will not significantly interfere with other wilderness purposes (recreational, scenic, educational, conservation, or historical) over a broad area or for a long period of time.

◆ The minimum requirement concept is applied to implementation of the project.

Research and monitoring devices (e.g., video cameras, data loggers, meteorological stations) may be installed and operated in wilderness if (1) the desired information is essential for the administration and preservation of wilderness and cannot be obtained from a location outside wilderness without significant loss of precision and applicability; and (2) the proposed device is the minimum requirement necessary to accomplish the research objective safely.

Park managers will work with researchers to make NPS wilderness area research a model for the use of low-impact, less intrusive techniques. New technology and techniques will be encouraged if they are less intrusive and cause less impact. The goal will be for studies in NPS wilderness to lead the way in "light on the resource" techniques.

Devices located in wilderness will be removed when determined to be no longer essential. Permanent equipment caches are prohibited within wilderness. Temporary caches must be evaluated using the minimum requirement concept.

All scientific activities, including the installation, servicing, removal, and monitoring of research devices, will apply minimum requirement concepts and be accomplished in compliance with *Management Policies*, director's orders, and procedures specified in the park's wilderness management plan.

*(See Studies and Collections 4.2; Social Science Studies 8.11)*

### 6.3.6.2    Monitoring Wilderness Resources

In every park containing wilderness, the conditions and long-term trends of wilderness resources will be monitored to identify the need for or effects of management actions. The purpose of this monitoring will be to ensure that management actions and visitor impacts on wilderness resources and character do not exceed standards and conditions established in an approved park plan.

As appropriate, wilderness monitoring programs may assess physical, biological, and cultural resources and social impacts. Monitoring programs may also need to assess potential problems that may originate outside the wilderness to determine the nature, magnitude, and probable source of those impacts.

### 6.3.7    Natural Resources Management

The National Park Service recognizes that wilderness is a composite resource with interrelated parts. Without natural resources, especially indigenous and endemic species, a wilderness experience would not be possible. Natural resources are critical, defining elements of the wilderness resource, but they need to be managed within the context of the whole ecosystem. Natural resource management plans will be integrated with and cross-reference wilderness management plans. Pursuing a series of independent component projects in wilderness, such as single-species management, will not necessarily accomplish the over-arching goal of wilderness management. Natural resources management in wilderness will include and be guided by a coordinated program of scientific inventory, monitoring, and research.

The principle of nondegradation will be applied to wilderness management, and each wilderness area's condition will be measured and assessed against its own unimpaired standard. Natural processes will be allowed, insofar as possible, to shape and control wilderness ecosystems. Management should seek to sustain the natural distribution, numbers, population composition, and interaction of indigenous species. Management intervention should only be undertaken to the extent necessary to correct past mistakes, the impacts of human use, and influences originating outside of wilderness boundaries.

Management actions, including the restoration of extirpated native species, the alteration of natural fire regimes, the control of invasive alien species, the management of endangered species, and the protection of air and water quality, should be attempted only when the knowledge and tools exist to accomplish clearly articulated goals.

*(See Chapter 4: Natural Resource Management. Also see Director's Order #77 series on natural resources management)*

### 6.3.8    Cultural Resources

The Wilderness Act specifies that the designation of any area of the park system as wilderness "shall in no manner lower the standards evolved for the use and preservation of" such unit of the park system under the various laws applicable to that unit (16 USC 1133(a)(3)). Thus, the laws pertaining to historic preservation also remain applicable within wilderness but must generally be administered to preserve the area's wilderness character. The responsible decision-maker will include appropriate consideration of the application of these provisions of the Wilderness Act in analyses and decision-making concerning cultural resources.

Cultural resources that have been included within wilderness will be protected and maintained according to the pertinent laws and policies governing cultural resources using management methods that are consistent with the preservation of wilderness character and values. These laws include the Antiquities Act and the Historic Sites, Buildings and Antiquities Act, as well as subsequent historic

preservation legislation, including the National Historic Preservation Act, the Archaeological Resources Protection Act, and the Native American Graves Protection and Repatriation Act. The *Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation* projects provide direction for protection and maintenance. Cemeteries or commemorative features, such as plaques or memorials, that have been included in wilderness may be retained (including approved access to these sites), but no new cemeteries or additions to existing cemeteries may be made unless specifically authorized by federal statute, existing reservations, or retained rights.

*(See Chapter 5: Cultural Resource Management)*

### 6.3.9   Fire Management

All fire management activities conducted in wilderness areas will conform to the basic purposes of wilderness. Actions taken to suppress wildfires must use the minimum requirements concept unless the on-site decision-maker determines in his professional judgment that conditions dictate otherwise. Preplanning is critical to ensure that emergency response incorporates minimum requirements to the greatest extent possible. Fire suppression activities should be managed in ways that protect natural and cultural resources and minimize the lasting impacts of the suppression actions. Information on developing a fire management program in wilderness is contained in Director's Order #18: Wildland Fire Management.

Guidance on the need to suppress wildland fire or to use some wildland fires to achieve desired future conditions should appear in the park's planning documents (for example, in the wilderness management plan and fire management plan). Information in these documents will guide managers in the selection of fire management tactics that protect natural and cultural resources from fire and from fire suppression actions.

The park's fire management plan will provide guidance for responses to natural and human-caused wildland fires based on fuel conditions, climatic conditions, resources at risk, potential for damage to property or loss of life, both within and adjacent to the wilderness, as well as the availability of fire suppression resources.

If a wildland fire use program is implemented, planning documents will also include the prescriptions and procedures under which the program will be conducted within wilderness.

*(See Fire Management 4.5)*

### 6.3.10   Management Facilities

Part of the definition of wilderness as provided by the Wilderness Act is "undeveloped federal land retaining its primeval character and influence, without permanent improvements." Accordingly, authorizations of NPS administrative facilities in wilderness will be limited to the types and minimum number essential to meet the minimum requirements for the administration of the wilderness area. A decision to construct, install, or remove an administrative facility will be based primarily on whether or not the facility is required to preserve wilderness character or values, not on considerations of administrative convenience, economic effect, or convenience to the public or park staff. Maintenance or the removal of historic structures will also comply with cultural resource protection and preservation policies and directives, and with the concept of minimum requirement management techniques for wilderness.

#### 6.3.10.1   Administrative Facilities

Administrative facilities (for example, ranger stations and/or patrol cabins, fire lookouts, radio and/or cellular telephone antennas, radio repeater sites, associated storage or support structures, drift fences, and facilities supporting trail stock operations) may be allowed in wilderness only if they are determined to be the minimum requirement necessary to carry out wilderness management objectives and are specifically addressed within the park's wilderness management plan or other appropriate planning documents. New roads will not be built in wilderness. Temporary vehicular access may be permitted only to meet the minimum requirements of emergency situations. As rapidly as possible, disturbed resources will be restored according to an approved restoration plan. Where abandoned roads have been included within wilderness, they may be used as trails, restored to natural conditions, or managed as a cultural resource.

No permanent heliports, helipads, or airstrips will be allowed in wilderness unless specifically authorized by statute or legislation. Temporary landing facilities may be used to meet the minimum requirements of emergency situations. Site improvements determined to be essential for safety reasons during individual emergency situations may be authorized, but no site markings or improvements of any kind may be installed to support nonemergency use. In Alaska, any prohibitions or restrictions on the use of fixed-wing aircraft should follow the procedures in 43 CFR 36.11(f).

Permanent storage caches are prohibited in wilderness unless necessary for health and safety purposes or when such caches are determined necessary, justified, documented, and approved through a minimum requirements analysis.

*(See Overflights and Aviation Uses 8.4)*

#### 6.3.10.2   Trails in Wilderness

Trails will be permitted within wilderness when they are determined to be necessary for resource protection and/or for providing for visitor use for the purposes of wilderness. The identification and inventory of the wilderness trail system will be included as an integral part of the wilderness management plan or other appropriate planning document.

Trails will be maintained at levels and conditions identified within the approved wilderness management plan or other planning document. Trail maintenance structures (such as water bars, gabions) may be provided, under minimum requirement protocols, where they are essential for resource preservation or where significant safety hazards exist during normal use periods. Historic and/or prehistoric trails will be administered in keeping with approved cultural resource and wilderness management plan requirements.

Borrow pits are not permitted in wilderness areas, with the exception of small-quantity use of borrow material for trails, which must be in accordance with an approved minimum requirements analysis.

### 6.3.10.3   Shelters and Campsites

The construction of new shelters for public use will generally not be allowed, in keeping with the values and character of wilderness. An existing shelter may be maintained or reconstructed only if the facility is necessary to achieve specific wilderness management objectives as identified in the park's wilderness and cultural resources management plans. The construction, use, and occupancy of cabins and other structures in wilderness areas in Alaska are governed by applicable provisions of the Alaska National Interest Lands Conservation Act and by NPS regulations in 36 CFR Part 13; such structures may be permitted only under conditions prescribed in the park's wilderness management plan.

Although the development of facilities to serve visitors will generally be avoided, campsites may be designated when essential for resource protection and preservation or to meet other specific wilderness management objectives. In keeping with the terms of the park's wilderness management plan, campsite facilities may include a site marker, fire rings, tent sites, food storage devices, and toilets if these are determined by the superintendent to be the minimum facilities necessary for the health and safety of wilderness users or for the preservation of wilderness resources and values. Toilets will be placed only in locations where their presence and use will resolve health and sanitation problems or prevent serious resource impacts, especially where reducing or dispersing visitor use is impractical or has failed to alleviate the problems. Picnic tables will not be allowed in wilderness except in those limited circumstances when they are necessary for resource protection and when documented and approved through a minimum requirements analysis.

### 6.3.10.4   Signs

Signs detract from the wilderness character of an area and make the imprint of man and management more noticeable. Only those signs necessary for visitor safety or to protect wilderness resources, such as those identifying routes and distances, will be permitted. Where signs are used, they should be compatible with their surroundings and the minimum size possible.

### 6.3.11   Wilderness Boundaries

Policies related to wilderness boundaries include the following.

#### 6.3.11.1   Legal Descriptions and Boundary Maps

Every park with designated wilderness will possess a written legal description of the wilderness area and a map (or maps) that illustrates the legal description of the wilderness. Each park will ensure that the legal description and map(s) are filed in the appropriate locations. Wilderness boundaries have the force of federal law and may only be modified through the legislative process—unless minor adjustments and corrections are specifically authorized within the wilderness designation enabling legislation.

#### 6.3.11.2   Caves

All cave passages located totally within the surface wilderness boundary will be managed as wilderness. Caves that have entrances within wilderness but contain passages that may extend outside the surface wilderness boundary will be managed as wilderness. Caves that may have multiple entrances located both within and exterior to the surface wilderness boundary will be managed consistent with the surface boundary; those portions of the cave within the wilderness boundary will be managed as wilderness.

*(See Caves 4.8.2.2)*

#### 6.3.11.3   Waters in Wilderness

In keeping with established jurisdictions and authorities, the Service will manage as wilderness all waters included within wilderness boundaries, and the lands beneath these waters (if owned by the United States).

*(See Water Resource Management 4.6)*

### 6.3.12   American Indian Access and Associated Sites

American Indian access rights and protection of sites associated with Indian tribes will be protected and maintained according to applicable laws and policies. The American Indian Religious Freedom Act reaffirms the First Amendment rights of Native Americans to access national park system lands for the exercise of their traditional religious practices. Native American human remains that were removed from wilderness areas and are subject to the NAGPRA repatriation may be reinterred at or near the site from which they were removed. American Indian religious areas and other ethnographic and cultural resources will be inventoried and protected. American Indians will be permitted access within wilderness for sacred or religious purposes consistent with the intent of the American Indian Religious Freedom Act, the Wilderness Act, and other applicable authorities provided by federal statues and executive orders.

*(See also Executive Order 13007 (Indian Sacred Sites))*

**86**   **6.4    Wilderness Use Management**

The National Park Service will encourage and facilitate those uses of wilderness that are in keeping with the definitions and purposes of wilderness and do not degrade wilderness resources and character. Appropriate restrictions may be imposed on any authorized activity in the interest of preserving wilderness character and resources or to ensure public safety.

When resource impacts or demands for use exceed established thresholds or capacities, superintendents may limit or redirect use. If these actions are determined to be the minimally required level of management, physical alterations, public education, general regulations, special regulations, permit systems, and the local restrictions, public use limits, closures, and designations implemented under the discretionary authority of the superintendent (36 CFR 1.5 and Part 13; 43 CFR Part 36 for Alaska units) may all be used in managing use and protecting wilderness.

### 6.4.1    General Policy

Park visitors need to accept wilderness on its own unique terms. Accordingly, the National Park Service will promote education programs that encourage wilderness users to understand and be aware of certain risks, including possible dangers arising from wildlife, weather conditions, physical features, and other natural phenomena that are inherent in the various conditions that comprise a wilderness experience and primitive methods of travel. The National Park Service will not modify the wilderness area to eliminate risks that are normally associated with wilderness, but it will strive to provide users with general information concerning possible risks, any recommended precautions, related user responsibilities, and applicable restrictions and regulations, including those associated with ethnographic and cultural resources.

### 6.4.2    Wilderness Interpretation and Education

In the context of interpretive and educational planning, national park system units with wilderness resources will (1) operate public education programs designed to promote and perpetuate public awareness of and appreciation for wilderness character, resources, and ethics while providing for acceptable use limits; (2) focus on fostering an understanding of the concept of wilderness that includes respect for the resource, willingness to exercise self-restraint in demanding access to it, and an ability to adhere to appropriate, minimum-impact techniques; and (3) encourage the public to use and accept wilderness on its own terms—that is, the acceptance of an undeveloped, primitive environment and the assumption of the potential risks and responsibilities involved in using and enjoying wilderness areas. NPS interpretive plans and programs for wilderness parks will address the primary interpretive themes for wilderness. Education is among the most effective tools for dealing with wilderness use and management problems and should generally be applied before more restrictive management tools.

*(See Visitor Safety 8.2.5.1)*

### 6.4.3    Recreational Use Management in Wilderness

Recreational uses of NPS wilderness are generally those traditionally associated with wilderness and identified by Congress in the legislative record for the development of the Wilderness Act and in keeping with the language provided by sections 2(a) and 2(c) of the act itself (16 USC 1131(a) and (c)). These recreational uses of wilderness will be of a type and nature that ensures that its use and enjoyment (1) will leave it unimpaired for future use and enjoyment as wilderness, (2) provides for the protection of the area as wilderness, and (3) provides for the preservation of wilderness character. Recreational uses in NPS wilderness areas will be of a nature that

◆   enables the areas to retain their primeval character and influence;

◆   protects and preserves natural conditions;

◆   leaves the imprint of man's work substantially unnoticeable;

◆   provides outstanding opportunities for solitude or primitive and unconfined types of recreation; and

◆   preserves wilderness in an unimpaired condition.

*(See Management of Recreational Use 8.2.2.1)*

### 6.4.3.1    Recreation Use Evaluation

Recreational uses—particularly new and emerging activities that compromise the stated purposes and definitions of wilderness or unduly impact the wilderness resource or the visitor experience within wilderness—will be evaluated to determine if these uses are appropriate or should be limited or disallowed through use of the superintendent's compendium in 36 CFR 1.5. Evaluation or reevaluation should be accomplished within wilderness management plans or similar implementation plans. Recreational uses that do not meet the purposes and definitions of wilderness should be prohibited in NPS wilderness.

Significant changes in patterns or increased levels of use will not be authorized by special permit, administrative discretion, or authorities under the superintendents' compendia, except in cases where sufficient information exists to adequately determine there is no significant impact on wilderness resources and values, including visitor experiences. These increased levels of use and changes in patterns of existing use will normally not qualify for a categorical exclusion under the National Environmental Policy Act. Decisions regarding significant changes in patterns and new levels of use will require environmental analysis and review, including opportunity for public comment, in accordance with the NEPA requirements.

*(See Appropriate Use of the Parks 1.5; Visitor Carrying Capacity 8.2.1)*

### 6.4.3.2    Outdoor Skills and Ethics

Leave-no-trace principles and practices will be applied to all forms of recreation management within wilderness, including commercial operations. Wilderness users will generally be required to carry out all refuse. Refuse is defined in 36 CFR 1.4.

### 6.4.3.3    Use of Motorized Equipment

Public use of motorized equipment or any form of mechanical transport will be prohibited in wilderness except as provided for in specific legislation. Operating a motor vehicle or possessing a bicycle in designated wilderness outside Alaska is prohibited (see NPS regulations in 36 CFR 4.30(d)(1)).

However, section 4(d)(1) of the Wilderness Act (16 USC 1133(d)(1)) authorizes the Secretary—where legislation designating the wilderness specifically makes this provision applicable—to allow the continuation of motorboat and aircraft use under certain circumstances in which those activities were established prior to wilderness designation. Section 4(d)(1) gives the Secretary the discretion to manage and regulate the activity in accordance with the Wilderness Act, the NPS Organic Act, and individual park enabling legislation. As authorized, the National Park Service will administer this use to be compatible with the purpose, character, and resource values of the particular wilderness area involved. The use of motorized equipment by the public in wilderness areas in Alaska is governed by applicable provisions of the Alaska National Interest Lands Conservation Act, NPS regulations in 36 CFR Part 13, and Department of the Interior regulations in 43 CFR Part 36. The specific conditions under which motorized equipment may be used by the public will be outlined in each park's wilderness management plan.

*(See Soundscape Management 4.9; Use of Motorized Equipment 8.2.3)*

### 6.4.4    Commercial Services

Wilderness-oriented commercial services that contribute to public education and visitor enjoyment of wilderness values or provide opportunities for primitive and unconfined types of recreation may be authorized if they meet the "necessary and appropriate" tests of the National Park Service Concessions Management Improvement Act of 1998 and section 4(d)(6) of the Wilderness Act (16 USC 1133(d)(5)), and if they are consistent with the wilderness management plan, including the application of the minimum requirement concept. Activities such as guide services for outfitted horseback, hiking, mountain climbing, or river trips and similar activities may be appropriate and may be authorized if conducted under the terms and conditions outlined in the park's wilderness management plan and/or in legislation authorizing these types of commercial uses.

The only structures or facilities used by commercial services that will be allowed in wilderness will be temporary shelters, such as tents, or other specifically approved facilities that

may be required within the wilderness management plan for resource protection and the preservation of wilderness values. Temporary facilities will generally be removed from the wilderness after each trip, unless such removal will cause degradation of the wilderness resources. In Alaska, additional guidance for the management of temporary facilities for hunting and fishing guides is found in the Alaska National Interest Lands Conservation Act section 1316 (16 USC 3204). The use of permanent equipment and supply caches by commercial operators is prohibited within wilderness.

Managers will ensure that commercial operators are in compliance with established leave-no-trace protocols.

*(See Visitor Use 8.2; Commercial Use Authorizations 10.3)*

### 6.4.5    Special Events

The National Park Service will not sponsor or issue permits for special events to be conducted in wilderness if those events are inconsistent with wilderness resources and character or if they do not require a wilderness setting to occur. Permits will not be issued in NPS wilderness areas for commercial enterprises or competitive events, including activities involving animal, foot, or watercraft races; the physical endurance of a person or animal; organized survival exercises; war games; or similar exercises.

*(See Special Events 8.6.2. Also see 36 CFR 2.50)*

### 6.4.6    Existing Private Rights

Wilderness designation does not extinguish valid existing private rights (for example, fee-simple interest, less-than-fee-simple interest, valid mineral operations, rights-of-way, grazing permits). The validity of private rights within wilderness must be determined on a case-by-case basis. Valid private rights in wilderness must be administered in keeping with the specific conditions and requirements of the valid right.

### 6.4.7    Grazing and Livestock Driveways

Commercial grazing or driving of livestock in park wilderness will be allowed only as specifically authorized by Congress. Where these activities are authorized, they will be managed under conditions and requirements identified within the approved wilderness management plan and corresponding allotment management plans. The use of motorized vehicles, motorized equipment, or mechanical transport by grazing permittees will not be allowed except as provided for by a specific authority—that is, a valid existing right, the enabling legislation, or an NPS determination of minimum requirement. The construction of livestock management facilities other than those specifically authorized by legislation is prohibited.

Noncommercial grazing of trail stock used as part of an approved livestock management program within wilderness may be authorized in accordance with NPS regulations and conditions outlined in the wilderness management plan or stock use management plan. All approved livestock

use must ensure the preservation of wilderness resources and character. Superintendents will be responsible for monitoring livestock use in wilderness to the same degree as human use, and may use the same management tools and techniques, including the application of the minimum requirement concept to manage livestock use that are available for managing other wilderness uses.

*(See 8.6.8 Domestic and Feral Livestock)*

### 6.4.8   Rights-of-Way

Existing rights-of-way that have been included in wilderness should be terminated or phased out where practicable. Rights-of-way subject to NPS administrative control should be administered under conditions outlined in the park's wilderness management plan that protect wilderness character and resources and limit the use of motorized or mechanical equipment. The Service will not issue any new rights-of-way or widen or extend any existing rights-of-way in wilderness. Rights-of-way and access procedures affecting wilderness areas in Alaska are governed by applicable provisions of the Alaska National Interest Lands Conservation Act and regulations in 43 CFR Part 36, and 36 CFR Part 13.

*(See Existing Private Rights 6.4.6)*

### 6.4.9   Mineral Development

The National Park Service will seek to remove or extinguish valid mining claims and nonfederal mineral interests in wilderness through authorized processes, including purchasing valid rights. In parks where Congress has authorized the leasing of federal minerals, the Park Service will take appropriate actions to preclude the leasing of lands or minerals within wilderness whenever and wherever it is authorized to do so. Lands included within wilderness will be listed as "excepted areas" under applicable regulations in 43 CFR Parts 3100 and 3500 (see section 3500.8).

Unless and until mineral interests and mining claims within NPS wilderness are eliminated, they must be managed pursuant to existing NPS regulations, policies, and procedures. (See 36 CFR Part 9, Subpart A, for mineral development on mining claims; 36 CFR Part 9, subpart B, for nonfederal oil and gas development; and 43 CFR Parts 3100 and 3500 for federal mineral leasing.). A validity

examination of unpatented claims in wilderness affected by a proposed plan of operations must be conducted by a certified mineral examiner before plan approval. Motorized use in wilderness is allowed only with an approved plan of operations on valid mineral claims and where there is no reasonable alternative. Motorized use for access can occur only on existing or approved roads. There will be no new roads or improvement of existing roads unless documented as being necessary for resource protection. Any plan of operations that is approved will include stipulations on operations and reclamation that will ensure that long-term effects on the wilderness area are substantially unnoticeable. For access to mining claims in NPS wilderness in Alaska, see 43 CFR 36.10.

### 6.4.10   Accessibility for Persons with Disabilities

The National Park Service has legal obligations to make available equal opportunities for people with disabilities in all programs and activities. This requirement includes the opportunity to participate in wilderness experiences. Management decisions responding to requests for special consideration to provide wilderness use by persons with disabilities must be in accord with the Architectural Barriers Act of 1968, the Rehabilitation Act of 1973 (as amended in 1978), and section 507(c) of the Americans with Disabilities Act of 1990 (42 USC 12207(c)). Such decisions should balance the intent of access and wilderness laws and find a way of providing the highest level of protection to the wilderness resource.

Section 17.550 of the Secretary of the Interior's regulations regarding the enforcement of nondiscrimination on the basis of disability in Department of Interior programs (43 CFR Part 17, subpart E) states that agencies are not required to take any actions or provide access that would result in a fundamental alteration in the nature of a program or activity. However, the agency has the burden of proving that compliance would result in a fundamental alteration. This concept is also found in section 507 of the Americans with Disabilities Act.

*(See Accessibility for Persons with Disabilities 1.9.3, 8.2.4, and 9.1.2. Also see Director's Order #42: Accessibility for Visitors with Disabilities in National Park Service Programs and Services)*

**7**

# Interpretation and Education

*National parks are among the most remarkable places in America for recreation, learning, and inspiration. Interpretive programs are the methods the Service uses to connect people to their parks, with opportunities for all visitors to form their own intellectual, emotional, and physical connections to the meanings and values found in the parks' stories. Facilitating those opportunities through effective interpretive and educational programs will encourage the development of a personal stewardship ethic and broaden public support for preserving and protecting park resources so that they may be enjoyed by present and future generations.*



The visitor experience is heightened when it progresses from enjoyment to an understanding of the reasons for a park's existence and the significance of its resources.

**90**   **Introduction**

The Organic Act of 1916 created the National Park Service to conserve park resources and "provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for future generations." The purpose of the NPS interpretive and educational programs is to advance this mission by providing memorable educational and recreational experiences that will (1) help the public understand the meaning and relevance of park resources, and (2) foster development of a sense of stewardship. The programs do so by forging a connection between park resources, visitors, the community, and the national park system. That connection is made by linking a park's tangible resources to the intangible values and meanings found in those resources. An important outcome of the park experience is that visitors more readily retain information, grasp meanings, and adopt new behaviors and values because they are directly involved with cultural and natural heritage resources and sites.

As a result of technological advances, people can visit a national park "virtually" and connect with park resources at their convenience. Hence, for purposes of this chapter, the terms "visitor" and "park visitor" are defined as anyone who uses a park's interpretive and education services, regardless of where such use occurs.

The Service will maintain the capability to deliver visitor and interpretive services of the highest quality. Those services should provide understandable interpretation of the major features in the parks and the events that occurred there, with an emphasis on experiences that will lead visitors to appreciate the park's authentic qualities. Excellent and effective interpretation and education will be the shared responsibility of everyone, from the Washington and regional directorates, through park superintendents and chief interpreters, to field interpreters, noninterpretive staff, and partners. Excellence in interpretation and education will be achieved through specific visitor activities, interpretive media, ongoing scholarly research, planning, technical excellence in implementation, broad public input, continual reevaluation, sound business practices, and training to professional standards for all who provide interpretive services.

Enjoyment of the parks is a fundamental part of the visitor experience. That experience is heightened when it progresses from enjoyment to an understanding of the reasons for a park's existence and the significance of its resources. To determine the quality and quantity of the visitor experience, levels of visitor satisfaction, safety, understanding, and appreciation will be measured. Director's Order #6 and Reference Manual 6 provide additional guidance for the development of interpretive and educational programs.

## 7.1   Interpretive and Educational Programs

Since its inception, one of the chief functions of the national parks has been to serve educational purposes. The Service is committed to extend its leadership in education, build on what is in place, and pursue new relationships and opportunities to make national parks even more meaningful in the life of the nation. Within the rich learning environments of national parks and facilitation by NPS interpreters, visitors will be offered authentic experiences and opportunities to immerse themselves in places where events actually happened, experience the thrill of connecting with real objects used by previous generations, enjoy some of the most beautiful and historic places in America, and understand the difficult moments our nation has endured.

Every park will develop an interpretive and educational program that is grounded in (1) park resources, (2) themes related to the park's legislative history and significance, and (3) park and Service-wide mission goals. The intent will be to provide each visitor with an interpretive experience that is enjoyable and inspirational within the context of the park's tangible resources and the meanings they represent. In addition, visitors should be made aware of the purposes and scope of the national park system.

Interpretation will encourage dialogue and accept that visitors have their own individual points of view Factual information presented will be current, accurate, based on current scholarship and science, and delivered to convey park meanings, with the understanding that audience members will draw their own conclusions. Interpretation will also reach out to park neighbors, segments of the population that do not visit national parks, and community decision-makers to stimulate discussions about the park and its meanings in local, regional, and national contexts. In addition, interpretive services will help employees better understand the park's history, resources, processes, and visitors.

An effective park interpretive and educational program will include

◆   information and orientation programs that provide visitors with easy access to the information they need to have a safe and enjoyable park experience;

◆   interpretive programs that provide both on- and off-site presentations and are designed to encourage visitors to form their own intellectual or emotional connections with the resource. Interpretive programs facilitate a connection between the interests of visitors and the meanings of the park;

◆   curriculum-based educational programs that link park themes to national standards and state curricula and involve educators in planning and development. These programs include previsit and postvisit materials, address different learning styles, include an evaluation mechanism, and provide learning experiences that are linked directly to clear objectives. Programs develop

a thorough understanding of a park's resources in individual, regional, national, and global contexts and of the park's place within the national park system; and

◆ interpretive media that provide visitors with relevant park information and facilitate more in-depth understanding of—and personal connection with—park stories and resources. This media will be continually maintained for both quality of content and condition based upon established standards.

*(See Air Quality 4.7.1; Geologic Resource Management 4.8; Wilderness Interpretation and Education 6.4.2; Energy Management 9.1.7; Visitor Facilities 9.3. Also see Director's Order #6: Interpretation and Education)*

## 7.2    Interpretive Planning

General management plans and comprehensive interpretive plans (CIPs) will serve as the backbone of interpretive and educational program planning and direction. The CIP process will guide park staff in defining themes, determining desired visitor experience opportunities, identifying challenges, and recommending which stories to tell, how to tell them, and how to reach specific audiences. All interpretive and educational services, including personal services, interpretive media, and partnerships that work to support the delivery of interpretive and educational programs, will be based on and coordinated with the comprehensive interpretive plan. The resulting parkwide interpretation and education program will thus communicate park significance and meanings in the most effective and efficient way. Recognition that concessioners, cooperating associations, friends groups, and other partners may have an important role in providing interpretive and educational services will be most important in planning for the overall visitor services program, and such entities should be included where appropriate in the planning process.

The CIP process will be initiated by superintendents. The life span of a CIP will be seven to ten years. Superintendents and chiefs of interpretation will be accountable to ensure that their parks have a completed and current comprehensive interpretive plan as defined in Director's Order #6 and Reference Manual 6. Harpers Ferry Center and regional offices will provide support.

*(See also Director's Order #75A: Civic Engagement and Public Involvement)*

## 7.3    Personal and Nonpersonal Services

### 7.3.1    Personal Services

Personal interpretive services feature contacts with visitors. Anyone who works in a park and makes contact with the public can and should provide an enjoyable, appropriate, and valuable visitor service. Superintendents and chiefs of interpretation will demand quality in the delivery of a multidimensional personal services program by park staff, volunteers, contractors, cooperating associations, concessioners, and other partners. In addition to basic

information and orientation services, personal interpretive services can include walks, talks, tours, campfire programs, roving contacts, curriculum-based education programs, and Junior Ranger programs. These types of activities and programs will be designed to offer opportunities for greater enjoyment and in-depth understanding and appreciation of the park's resources.

Personal services will provide opportunities for diverse audiences to enjoy and connect to parks and nurture future stewards of America's national heritage. Park staff will help visitors have a safe, meaningful, and satisfying park experience; help them decide how to spend their time in the park, and inform them about the wonders that await their discovery. Personal services programs presented in parks will be recorded annually in the Service-wide interpretive report, which will document the number of programs offered, visitors served, and the costs associated with those programs. Park chiefs of interpretation will be responsible for submitting their park's portion of the report to the Washington Office Division of Interpretation and Education.

#### 7.3.1.1    Curriculum-based Education Programs

Parks will be managed as places to demonstrate the principles of science, to illustrate the national experience as history, to engage learners throughout their lifetimes, and to do these things while challenging visitors in exciting and motivating settings. Schools represent a microcosm of society and present myriad opportunities for the Service to foster stewardship in future generations. Therefore, curriculum-based programs will be designed to link classroom learning with experiences in the parks. Programs will complement school curricula by matching a group's educational objectives with park resources. Curriculum-based programs will focus on the stories and meanings attached to park resources; the threats to the condition of those resources; and conservation or preservation issues relevant to the park, the national park system, and the park's place within that system. To continue to meet the demand from schools for NPS programs, parks will identify, in cooperation with park partners, alternative means for program delivery, such as publications, Internet deliveries, and distance learning.

### 7.3.2    Nonpersonal Services

Nonpersonal services are interpretive media (publications such as a unigrid brochure or park newspaper, films, exhibits, web-based programs). They do not require the presence of staff. Nonpersonal services, which can reach large audiences, must maintain a consistent quality of presentation over time. Used in conjunction with personal services, they will provide opportunities for visitor information, orientation, and personal connections to park resources. The Center for Media Services will establish Service-wide standards for all NPS informational media.

Harpers Ferry Center will also provide guidance and assistance to parks for interpretive media planning, design and production for museum and visitor center exhibits,

wayside exhibits, audiovisual productions, publications, and directional signs. Plans or proposals to be accomplished by parks and regions, including privately funded projects, may be reviewed by the Center for Media Services for appropriateness and quality of design and execution. Proposals from concessioners, cooperating associations, and others may also be reviewed. To provide data for parks to maintain these assets, the condition of the NPS inventory of exhibits and interpretive trails (currently recorded in the Media Inventory Database System or MIDS) will be tracked through the Facilities Maintenance Management System.

Parks will be responsible for the conservation of historic furnishings and artifacts on exhibit in parks. They may obtain conservation services from the Center for Media Services or from outside contractors.

### 7.3.2.1   Park Brochures

Official park brochures are an important part of the NPS identity and a valuable and desired part of the park experience. Each brochure should provide a map of the park, address critical safety and resource protection issues, introduce park interpretive themes, and describe significant park resources. The Service's goal will be that 100% of parks have an adequate allotment of park brochures to meet demands and ensure that adequate numbers of brochures are available in other languages as needed.

### 7.3.3   Technology and Interpretation

Innovative use of existing and emerging technology can maximize both the visitor experience and employee effectiveness. Parks should use technological communications, such as the Internet and distance learning, to enhance their informational, orientation, interpretive, and educational programs. The National Park Service will maintain a site on the World Wide Web (nps.gov) to provide an opportunity for all parks and programs to reach beyond their borders to a worldwide audience. Each park will maintain a home page for the purpose of reaching this audience. Parks should link from their home pages to web pages of entities that support the NPS mission. Park home pages will comply with Director's Order #11C: Web Publishing and Department of the Interior policy, particularly as relates to security.

*(See Managing Information 1.9.2)*

### 7.3.4   Interpretive and Educational Services Beyond Park Boundaries

The Service will continually adjust to changing patterns of visitation and an increasingly multiracial, multiethnic, and multicultural society to ensure that the national park system remains high among societal concerns and relevant to future generations. Each park's interpretation and education program will reach out to park neighbors, those who are not visiting national parks, and community decision-makers to stimulate discussions about the park and its values in local, regional, and national contexts. Parks will use community programs and special events such as

pageants, anniversaries, dedications, festivals, and other observances as opportunities to highlight meaningful connections between the park, its resources, the event, and the public. These activities, as well as other interpretive and educational services, support civic engagement and contribute to public understanding of the park's significance and the significance of the national park system.

National Park Service interpretive and educational programs must explore new and innovative approaches to inform a diverse constituency, many of whom may never set foot inside a park's boundaries. A planned outreach program will be employed to firmly establish each park as part of the local, national, and global community. Outreach will be used to disseminate park information and interpretive and educational programs beyond park boundaries. Everyone should have the opportunity to connect to the parks through NPS outreach services.

### 7.4   Interpretive Competencies and Skills

All interpretive services should be provided by highly trained personnel who have access to a continual supply of current information from research programs and other sources. All employees who provide interpretive services will be required to meet the Service's national standards of interpretation and education. To support that effort, the Service will develop a web-based distance learning and credentialing platform based on the interpretive development program (IDP) to teach interpretive and educational skills and competencies and test for knowledge of those skills and competencies.

NPS interpretation and education employees will be held to the most comprehensive standards and act as models and coaches for other NPS staff, especially law enforcement, volunteers, and other partners. Partners (including cooperating associations, contractors, and concessioners) will have access to and will be required to meet NPS national standards in the competency areas in which they work. Those who give formal programs will meet the appropriate national standards for such competencies. The cooperating association standard agreement, concession contracts, and other contracts that include interpretive services will require the demonstration of standards. Similarly, contractors for media projects will use the web-based distance learning and credentialing platform to both learn about NPS requirements and demonstrate their mastery of required standards. Permanent interpreters and seasonal interpreters will be required to certify in relevant and park-appropriate interpretive competencies of the interpretive development program. The certification will be designed to establish a consistent Service-wide professional standard and to fortify the full-performance interpretive ranger as a provider of interpretive services while also serving as standard bearer, coach, mentor, and facilitator for all others who provide those services.

## 7.5   Requirements for All Interpretive and Educational Services

The following factors must be considered in the development and review of all personal and nonpersonal services.

### 7.5.1   Interpretation and 21st Century Relevancy

Demographic trends in the United States indicate an ever increasing array of diversity within the population. The National Park Service must change its traditional approach of interpretation to improve relevancy in the 21st century to our visitors. To enact this change the National Park Service will implement new and innovative ways to reach out, engage, and cultivate the support of the increasingly diverse array of visitors. The unique qualities of the national parks—qualities that highlight, for example, America's diverse heritage and the principles of democracy—are what make them relevant. These qualities will be used to advantage in educating Americans and visitors to America about topics such as the civic experience of our country; the complex, diverse ecology of our nation and the world; and the influence of global climate change. Interpretation and education will seek to provide opportunities for more NPS audiences to have experiences that connect them to parks, so that they will come to value and enjoy these special places. The national park system and the Interpretation and Education program provide opportunities for facilitation of civic dialogue to engage Americans in understanding past and current issues of importance on a local-to-global basis. These opportunities should be pursued.

### 7.5.2   Access to Interpretive and Educational Opportunities

National parks belong to all of the nation's people and should have opportunities to enjoy them. Efforts will be made to ensure that interpretive and educational programs are available to all people and consider the special needs of children, senior citizens, non-English speaking visitors, and the economically disadvantaged. Foreign-language translations of park publications will be provided as needed in those parks visited by substantial numbers of non-English-speaking visitors.

The National Park Service will also ensure that persons with disabilities receive the same interpretive opportunities as those without disabilities. Interpretive and educational programs, exhibits, publications, and all other interpretive media will comply with Department of the Interior regulations at 43 CFR Part 17, subpart E, and with standards required by the Architectural Barriers Act. Accordingly, the Park Service will ensure that persons with disabilities have the opportunity to participate in all programs and activities in the most integrated setting appropriate. Additionally, the Service will take all feasible steps to ensure effective communication with individuals with hearing, visual, and cognitive disabilities. These steps should include but not be limited to providing sign language interpreters, audio/visual presentations, Braille, and large-print versions of printed materials.

*(See Physical Access for Persons with Disabilities 5.3.2; Accessibility for Persons with Disabilities 8.2.4; Accessibility for Persons with Disabilities 9.1.2; Accessibility of Commercial Services 10.2.6.2. Also see Director's Order #42; Reference Manual 41; 43 CFR 17.550)*

### 7.5.3   Resource Issue Interpretation and Education

Park managers are increasingly called upon to make difficult resource decisions, some of which may be highly controversial. Interpretation and education programs can provide opportunities for civic engagement with Indian tribes and residents and officials of gateway and neighboring communities, the region, and the state(s) surrounding a park and beyond. Such opportunities for civic dialogue about resource issues and broad initiatives are often the most effective means for eliminating resource threats and gaining input and feedback from stakeholder constituents. Therefore, parks should, in balanced and appropriate ways, thoroughly integrate resource issues and initiatives of local and Service-wide importance into their interpretive and educational programs. Whenever possible, the appropriate interpretive managers at the national, regional, or park level should be involved in the process.

In instances in which programming affects resources managed by other agencies, such agencies should be consulted during program planning. For interpretation of resource issues to be effective, frontline interpretive staff must be informed about the reasoning that guided the decision-making process, and interpreters must present balanced views. Acknowledging multiple points of view does not require interpretive and educational programs to provide equal time or disregard the weight of scientific or historical evidence. Resource issue interpretation should be integrated into both on- and off-site programs, as well as into printed and electronic media whenever deemed appropriate by the park manager.

### 7.5.4   Research and Scholarship

Interpretive and educational programs will be based on current scholarship and research about the history, science, and condition of park resources, and on research about the needs, expectations, and behavior of visitors. To accomplish this, a dialogue must be established and maintained among interpreters, education specialists, resource managers, scientists, archeologists, sociologists, ethnographers, historians, and other experts for the purpose of offering the most current and accurate programs to the public. When appropriate, parks are encouraged to use a master interpreter to foster, facilitate, and maintain this dialogue.

*(See Levels of Park Planning 2.3)*

### 7.5.5   Evaluation of Interpretation and Education Effectiveness

Evaluation is also critically important for continuous improvement of educational and interpretive programs that lead to achievement of the NPS mission. Evaluation, systematically applied, is necessary to ensure that the NPS interpretation and education program is cost-effective

and financially accountable. The Service will maintain an evaluation strategy that fosters a Service-wide commitment to program planning and reflection, information sharing, and application of research-based results.

### 7.5.6   Consultation

The National Park Service will present factual and balanced presentations of the many American cultures, heritages, and histories. Diverse constituencies will be consulted to (1) ensure appropriate content and accuracy, and (2) identify multiple points of view and potentially sensitive issues. When appropriate, state and local agencies involved in heritage tourism and history (such as state historic preservation officers) should be included in consultations to foster coordination and partnerships. Acknowledging multiple points of view does not require interpretive and educational programs to provide equal time or disregard the weight of scientific or historical evidence.

Park managers will take culturally sensitive steps to preserve the knowledge of American Indian tribes and other traditionally associated peoples and secure the benefit of their deep understanding of the nature and spirit of places within the parks by encouraging their participation in park activities. A related goal is to ensure that irreplaceable connections such as place names, migration routes, harvesting practices, prayers, and songs are cataloged for use in current and future activities.

The Service will respectfully consult traditionally associated peoples and other cultural and community groups in the planning, development, presentation, and operation of park interpretive programs and media relating to their cultures and histories. Cooperative programs will be developed with tribal governments and cultural groups to help the Service present accurate perspectives on their cultures. Ethnographic or cultural anthropological data and concepts will also be used in interpretive programs.

The Service will not display Native American human remains or photographs of those remains. Drawings, renderings, or casts of such remains will not be displayed without the consent of culturally affiliated Indian tribes, Alaska Natives, and Native Hawaiian organizations. The Service may exhibit non-Native American remains, photographs, drawings, renderings, or casts thereof, in consultation with appropriate traditionally associated peoples. The Service will consult with culturally affiliated or traditionally associated peoples to determine the religious status of any object whose sacred nature is suspected but not confirmed. These consultations will occur before an object is exhibited or any action is taken that may have an adverse effect on its religious qualities.

*(See Relationship with American Indian Tribes 1.11; Evaluation and Categorization 5.1.3.2; Stewardship of Human Remains and Burials 5.3.4; Ethnographic Resources 5.3.5.3; Museum Collections 5.3.5.5)*

### 7.5.7   Cultural Demonstrators

Cultural demonstrators can provide unique insights into their cultures. To facilitate their successful interaction with the public, parks may provide cultural demonstrators with training and direction. Cultural demonstrators (in parks outside the National Capital Region) who are not NPS employees may be permitted to sell self-made handcrafted items to park visitors, keeping the proceeds for themselves, where such handicrafts are related to the park's interpretive themes. This is allowed under 16 USC 1a-2(g), which authorizes the sale of products produced in the conduct of living exhibits, interpretive demonstrations, or park programs. When this practice is permitted, all materials used in creating such items must be the private property of the demonstrator, collected from outside the park. The superintendent may permit this practice through a cooperative agreement, special use permit, concession contract, or other legal instrument.

Titles 8 and 13 of the Alaska National Interest Lands Conservation Act regulate the taking of fish, wildlife, and other natural resources for subsistence and other purposes in the Alaska parks.

*(See Reenactments 7.5.9; Special Events 8.6.2; Collecting Natural Products 8.8; Merchandise 10.2.4.5. Also see 36 CFR 5.3; 60 FR 17639)*

### 7.5.8   Historic Weapons

All uses of historic weapons in parks will strictly comply with the Historic Weapons Demonstrations Safety Standards contained in Reference Manual 6, and will follow the procedures specified therein for the particular weapon(s) being used.

Weapons firing demonstrations conducted in NPS-administered areas are restricted to reproduction black powder weapons only. Original NPS museum weapons will not be used. Requests by outside groups or individuals to use non-NPS original weapons will follow the exemption request procedure prescribed in Reference Manual 6, and will be granted or denied in writing by the superintendent.

### 7.5.9   Reenactments

Battle reenactments and demonstrations of battle tactics that involve exchanges of fire between opposing lines, the taking of casualties, hand-to-hand combat, or any other form of simulated warfare are prohibited in all parks. Even the best-researched and most well-intentioned representation of combat cannot replicate the tragic complexity of real warfare. Respect for the memory of those whose lives were lost at these sites and whose unrecovered remains are often still interred in these grounds precludes the staging of inherently artificial battles at these memorial sites. Battle reenactments create an atmosphere that is inconsistent with the memorial qualities of the battlefields and other military sites placed in the Service's trust. The safety risks to participants and visitors, and the inevitable

damage to the physical resource that occurs during such events are also unacceptably high when seen in light of the NPS mandate to preserve and protect park resources and values.

## 7.6    Interpretive and Educational Partnerships

The National Park Service will increase the effectiveness and accountability of park interpretation and education activities by collaborating with volunteers, cooperating associations, concessioners, and other partners to provide interpretive and educational services that adhere to Service-wide standards. To be successful, this will require all NPS interpretation and education practitioners, employees and partners, personal service providers, and media professionals to have access to training, coaching, and program evaluation results that meet national standards. NPS interpreters and educators will provide the leadership, example, and standards for all partners to deliver effective interpretation and education services.

Interpretation and education operational capacity will be improved in parks by actively pursuing additional partnerships. Partnerships for this purpose will be sought with willing and able organizations with compatible purposes, such as historical societies, museums, colleges and universities, school districts, tourism commissions, conservation groups, health organizations, libraries, and others.

### 7.6.1    Volunteers in Parks (VIPs)

Interpretation and education operational capacity will be increased in parks by actively pursuing volunteers and dedicating NPS staff time to coordinate volunteer programs in parks. Although the bulk of volunteer hours support interpretation and education, volunteer services may be used in various aspects of park operation under the authority of the Volunteers in the Parks Act of 1969. Pursuant to this legislation, volunteers may be recruited without regard to civil service regulations, are covered for tort liability and work-injury compensation, and may be reimbursed for out-of-pocket expenses while participating in the program. Volunteers will be accepted without regard

to race, creed, religion, age, sex, color, national origin, disability, or sexual orientation. Volunteers will not displace NPS employees. NPS housing may be used for volunteers. Director's Order #7 and Reference Manual 7 provide additional guidance for the volunteer program.

*(See Protection 5.3.5.1.4; Housing Management Plan 9.4.3.1. Also see Handbook 36 on Housing)*

### 7.6.2    Cooperating Associations

The National Park Service will continue to nurture its relationship with nonprofit organizations that support park programs. Cooperating associations may provide publications and other items that enhance the interpretive story, allow visitors to explore particular interests, and enable them to take the park story home through their purchases.

When appropriate, cooperating associations will join the National Park Service in presenting interpretive and educational programs and supporting research efforts as authorized in 16 USC 1-3, 6, and 17j-(2)e. In accordance with the standard, nonnegotiable cooperating association agreement, cooperating associations may, consistent with a park's scope-of-sales statement, purchase for resale, or produce for sale, interpretive and educational items that are directly related to the understanding and interpretation of the park or the national park system. Associations may offer appropriate and approved interpretive services that support but do not supplant interpretive and educational services offered by the Park Service. Associations may accept donations on behalf of the Service when appropriate and when conducted through approved fund-raising efforts. Service housing may be used for cooperating association employees only if available and not needed for NPS employees. Guidance for managing NPS partnerships with cooperating associations is included in Director's Order #32 and Reference Manual 32.

*(See Housing Management Plan 9.4.3.1. Also see Director's Order #21: Donations and Fundraising; Handbook 36 on Housing)*

009561



8

# Use of the Parks

*National parks belong to all Americans, and the National Park Service will welcome all Americans to experience their parks. The Service will focus special attention on visitor enjoyment of the parks while recognizing that the NPS mission is to conserve unimpaired each park's natural and cultural resources and values for the enjoyment, education, and inspiration of present and future generations. The Service will also welcome international visitors, in keeping with its commitment to extend the benefits of natural and cultural resource conservation and outdoor recreation throughout the world.*

**Many different types of uses take place in the hundreds of park units that make up the national park system. The Service must ensure that these uses are appropriate to the park in which they occur.**

**98**   **8.1   General**

Many different types of uses take place in the hundreds of park units that make up the national park system. Some of those uses are carried out by the National Park Service, but many more are carried out by park visitors, permittees, lessees, and licensees. The 1916 Organic Act, which created the National Park Service, directs the Service to conserve park resources "unimpaired" for the enjoyment of future generations. The 1970 National Park System General Authorities Act, as amended in 1978, prohibits the Service from allowing any activities that would cause derogation of the values and purposes for which the parks have been established (except as directly and specifically provided by Congress). Taken together, these two laws establish for NPS managers (1) a strict mandate to protect park resources and values; (2) a responsibility to actively manage all park uses; and (3) when necessary, an obligation to regulate their amount, kind, time, and place in such a way that future generations can enjoy, learn, and be inspired by park resources and values and appreciate their national significance in as good or better condition than the generation that preceded them. (Throughout these *Management Policies*, the term "impairment" is construed to also encompass "derogation.")

**8.1.1   Appropriate Use**

The concept of appropriate use is especially important with regard to visitor enjoyment because, in accordance with the Organic Act, the fundamental purpose of all parks also includes providing for the enjoyment of park resources and values by present and future generations. The scope of enjoyment contemplated by the Organic Act is described in section 1.4.3. Appropriate forms of visitor enjoyment emphasize appropriate recreation consistent with the protection of the park. This includes interpretation of park resources and contemplation and understanding of the purposes for which a park unit's resources are being preserved. Many of these forms of enjoyment support the federal policy of promoting the health and personal fitness of the general public, as set forth in Executive Order 13266 (Activities to Promote Personal Fitness).

While providing opportunities for appropriate public enjoyment is an important part of the Service's mission, other park uses—unrelated to public enjoyment—may sometimes be allowed as a right or a privilege if they are not otherwise prohibited by law or regulation. In exercising its discretionary authority, the Service will allow only uses that are (1) appropriate to the purpose for which the park was established, and (2) can be sustained without causing unacceptable impacts. Recreational activities and other uses that would impair a park's resources, values, or purposes cannot be allowed. The only exception is when an activity that would cause impairment is directly and specifically mandated by Congress.

The fact that a park use may have an impact does not necessarily mean it will be unacceptable or impair park resources or values for the enjoyment of future generations. Impacts may affect park resources or values and still be within the limits of the discretionary authority conferred by the Organic Act. In these situations, the Service will ensure that the impacts are unavoidable and cannot be further mitigated. Even when they fall far short of impairment, unacceptable impacts can rapidly lead to impairment and must be avoided. For this reason, the Service will not knowingly authorize a park use that would cause unacceptable impacts.

When a use is mandated by law but causes unacceptable impacts on park resources or values, the Service will take appropriate management actions to avoid or mitigate the adverse effects. When a use is authorized by law but not mandated, and when the use may cause unacceptable impacts on park resources or values, the Service will avoid or mitigate the impacts to the point where there will be no unacceptable impacts; or, if necessary, the Service will deny a proposed activity or eliminate an existing activity.

*(See Park Management 1.4; Unacceptable Impacts 1.4.7.1; Consumptive Uses 8.9. Also see Director's Order #12; 36 CFR 1.5; 36 CFR 2.1)*

**8.1.2   Process for Determining Appropriate Uses**

All proposals for park uses will be evaluated for

◆   consistency with applicable laws, executive orders, regulations, and policies;

◆   consistency with existing plans for public use and resource management;

◆   actual and potential effects on park resources and values;

◆   total costs to the Service; and

◆   whether the public interest will be served.

Superintendents must continually monitor and examine all park uses to ensure that unanticipated and unacceptable impacts do not occur. Superintendents should also be attentive to existing and emerging technologies that might further reduce or eliminate impacts from existing uses allowed in parks. Unless otherwise mandated by statute, only uses that meet the criteria listed in section 8.2 may be allowed.

Specific park uses will be guided by the following subsections of this chapter, and must comply also with the other chapters of these *Management Policies*. The Service will coordinate with appropriate state authorities regarding activities that are subject to state regulation or to joint federal/state regulation. The regulatory framework for implementing NPS policies governing use of the parks, and for determining when and where activities may be allowed, is found in 36 CFR Parts 2, 3, 4, 5, 7, 12, and 13. Procedures for implementing or terminating a restriction, condition, public use limit, or closure within a park area are found in 36 CFR 1.5 (but see also 36 CFR 13.30 and 43 CFR 36.11(h) for procedures specific to park areas in Alaska). Some activities may be allowed in parks only after park-specific regulations have been published, which requires extensive analysis and opportunities for civic engagement.

*The following illustration shows the process by which potential uses are evaluated for appropriateness.*

## Process for Determining New Appropriate Uses



The National Park Service will always consider allowing activities that are appropriate to the parks, although conditions may preclude certain activities or require that limitations be placed on them. In all cases, impacts from park uses must be avoided, minimized, or mitigated through one or more of the following methods:

◆ visitor education and civic engagement

◆ temporal, spatial, or numerical limitations on the use

◆ the application of best available technology

◆ the application of adaptive management techniques

If, in monitoring a park use, unanticipated impacts become apparent, the superintendent must further manage or constrain the use to minimize the impacts, or discontinue the use if the impacts are unacceptable.

*(See Park Purposes and Legislatively Authorized Uses 1.4.3.1; Park System Planning Chapter 2; Use of the Parks Chapter 8. Also see 36 CFR 1.5)*

## 8.2   Visitor Use

Enjoyment of park resources and values by the people of the United States is part of the fundamental purpose of all parks. The Service is committed to providing appropriate, high-quality opportunities for visitors to enjoy the parks, and the Service will maintain within the parks an atmosphere that is open, inviting, and accessible to every segment of American society. However, many forms of recreation enjoyed by the public do not require a national

park setting and are more appropriate to other venues. The Service will therefore

◆ provide opportunities for forms of enjoyment that are uniquely suited and appropriate to the superlative natural and cultural resources found in the parks;

◆ defer to local, state, tribal, and other federal agencies; private industry; and nongovernmental organizations to meet the broader spectrum of recreational needs and demands.

To provide for enjoyment of the parks, the National Park Service will encourage visitor activities that

◆ are appropriate to the purpose for which the park was established; and

◆ are inspirational, educational, or healthful, and otherwise appropriate to the park environment; and

◆ will foster an understanding of and appreciation for park resources and values, or will promote enjoyment through a direct association with, interaction with, or relation to park resources; and

◆ can be sustained without causing unacceptable impacts to park resources or values.

The primary means by which the Service will actively foster and provide activities that meet these criteria will be through its interpretive and educational programs, which are described in detail in chapter 7. The Service will also welcome the efforts of nongovernmental organizations, tour companies, guides, outfitters, and other private sector entities to provide structured activities that meet these

criteria. In addition to structured activities, the Service will, to the extent practicable, afford visitors ample opportunity for inspiration, appreciation, and enjoyment through their own personalized experiences—without the formality of program or structure.

The Service may allow other visitor uses that do not meet all the above criteria if they are appropriate to the purpose for which the park was established and they can be sustained without causing unacceptable impacts to park resources or values. For the purposes of these policies, unacceptable impacts are impacts that, individually or cumulatively, would

◆ be inconsistent with a park's purposes or values, or

◆ impede the attainment of a park's desired conditions for natural and cultural resources as identified through the park's planning process, or

◆ create an unsafe or unhealthy environment for visitors or employees, or

◆ diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values, or

◆ unreasonably interfere with

◇ park programs or activities, or

◇ an appropriate use, or

◇ the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park, or

◇ NPS concessioner or contractor operations or services.

Management controls and conditions must be established for all park uses to ensure that park resources and values are preserved and protected for the future. If and when a superintendent has a reasonable basis for believing that an ongoing or proposed public use would cause unacceptable impacts to park resources or values, the superintendent must make adjustments to the way the activity is conducted to eliminate the unacceptable impacts. If the adjustments do not succeed in eliminating the unacceptable impacts, the superintendent may (1) temporarily or permanently close a specific area, or (2) place limitations on the use, or (3) prohibit the use. Restrictions placed on recreational uses that have otherwise been found to be appropriate will be limited to the minimum necessary to protect park resources and values and promote visitor safety and enjoyment.

Any closures or restrictions—other than those imposed by law—must be consistent with applicable laws, regulations, and policies, and (except in emergency situations) require a written determination by the superintendent that such measures are needed to

◆ protect public health and safety;

◆ prevent unacceptable impacts to park resources or values;

◆ carry out scientific research;

◆ minimize visitor use conflicts; or

◆ otherwise implement management responsibilities.

When practicable, restrictions will be based on the results of study or research, including (when appropriate) research in the social sciences. Any restrictions imposed will be fully explained to visitors and the public. Visitors will be given appropriate information on how to keep adverse impacts to a minimum, and how to enjoy the safe and lawful use of the parks.

*(See Park Management 1.4; Management of Recreational Use 8.2.2.1. Also see 36 CFR 1.5: "Closures and Public Use Limits"; Director's Order #17: National Park Service Tourism)*

### 8.2.1     Visitor Carrying Capacity

Visitor carrying capacity is the type and level of visitor use that can be accommodated while sustaining the desired resource and visitor experience conditions in the park. By identifying and staying within carrying capacities, superintendents can manage park uses that may unacceptably impact the resources and values for which the parks were established. Superintendents will identify visitor carrying capacities for managing public use. Superintendents will also identify ways to monitor for and address unacceptable impacts on park resources and visitor experiences.

When making decisions about carrying capacity, superintendents must use the best available natural and social science and other information, and maintain a comprehensive administrative record relating to their decisions. The decision-making process should be based on desired resource conditions and visitor experiences for the area, quality indicators and standards that define the desired resource conditions and visitor experiences, and other factors that will lead to logical conclusions and the protection of park resources and values. The level of analysis necessary to make decisions about carrying capacities is commensurate with the potential impacts or consequences of the decisions. The greater the potential for significant impacts or consequences on park resources and values or the opportunities to enjoy them, the greater the level of study and analysis and civic engagement needed to support the decisions.

The planning process will determine the desired resource and visitor experience conditions that are the foundation for carrying capacity analysis and decision-making. If the time frame for making decisions is insufficient to allow the application of a carrying capacity planning process, superintendents must make decisions based on the best available science, public input, and other information. In either case, such planning must be accompanied by appropriate environmental impact analysis, in accordance with Director's Order #12.

As park use changes over time, superintendents must continue to decide if management actions are needed to

keep use at sustainable levels and prevent unacceptable impacts. If indicators and standards have been prescribed for an impact, the acceptable level is the prescribed standard. If indicators and standards do not exist, the superintendent must determine how much impact is acceptable before management intervention is required.

If and when park uses reach a level at which they must be limited or curtailed, the preferred choice will be to continue uses that are encouraged under the criteria listed in section 8.2, and to limit or curtail those that least meet those criteria. The Service will consult with tourism organizations and other affected service providers in seeking ways to provide appropriate types and levels of visitor use while sustaining the desired resource and visitor experience conditions.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; General Management Planning 2.3.1; Visitor Carrying Capacity 5.3.1.6; Management of Recreational Use 8.2.2.1. Also see Director's Order #2: Park Planning; 36 CFR 1.5)*

## 8.2.2   Recreational Activities

The National Park Service will manage recreational activities according to the criteria listed in sections 8.1 and 8.2 (and 6.4 in wilderness areas). Examples of the broad range of recreational activities that take place in parks include, but are not limited to, boating, camping, bicycling, fishing, hiking, horseback riding and packing, outdoor sports, picnicking, scuba diving, cross-country skiing, caving, mountain and rock climbing, earth caching, and swimming. Many of these activities support the federal policy of promoting the health and personal fitness of the general public, as set forth in Executive Order 13266. However, not all of these activities will be appropriate or allowable in all parks; that determination must be made on the basis of park-specific planning.

Service-wide regulations addressing aircraft use, off-road bicycling, hang gliding, off-road vehicle use, personal watercraft, and snowmobiling require that special, park-specific regulations be developed before these uses may be allowed in parks. (The Alaska National Interest Lands Conservation Act statutory provisions (e.g., section 1110(a)) and regulatory provisions in 36 CFR Part 13 and 43 CFR 36.11(h) apply to snowmobile, motorboat, aircraft, and other means of access in units of the national park system in Alaska.)

The Service will monitor new or changing patterns of use or trends in recreational activities and assess their potential impacts on park resources. A new form of recreational activity will not be allowed within a park until a superintendent has made a determination that it will be appropriate and not cause unacceptable impacts. Restrictions placed on recreational uses that have been found to be appropriate will be limited to the minimum necessary to protect park resources and values and promote visitor safety and enjoyment.

Sounds that visitors encounter affect their recreational and/or educational experience. Many park visitors have certain expectations regarding the sounds they will hear as part of their experience. The type of park unit (for example, national battlefield, national seashore, national recreation area, national park) and its specific features often help shape those expectations. In addition to expectations of muted to loud sounds associated with nature (such as wind rustling leaves, elk bugling, waves crashing on a beach), park visitors also expect sounds reflecting our cultural heritage (such as cannons firing, native drumming, music) and sounds associated with people visiting their parks (such as children laughing, park interpretive talks, motors in cars and motorboats).

Park managers will (1) identify what levels and types of sounds contribute to or hinder visitor enjoyment, and (2) monitor, in and adjacent to parks, noise-generating human activities—including noise caused by mechanical or electronic devices—that adversely affect visitor opportunities to enjoy park soundscapes. Based on this information, the Service will take action to prevent or minimize those noises that adversely affect the visitor experience or that exceed levels that are acceptable to or appropriate for visitor uses of parks.

*(See Soundscape Management 4.9; Cultural Soundscape Management 5.3.1.7. Also see 36 CFR 2.12: Audio Disturbances)*

## 8.2.2.1   Management of Recreational Use

Superintendents will develop and implement visitor use management plans and take action, as appropriate, to ensure that recreational uses and activities in the park are consistent with its authorizing legislation or proclamation and do not cause unacceptable impacts on park resources or values. Depending on local park needs and circumstances, these plans may be prepared (1) as coordinated, activity-specific documents (such as a river use plan, a backcountry use plan, a wilderness management plan, an off-road vehicle use plan, a winter use plan); (2) as action-plan components of a resource management plan or general management plan; or (3) as a single integrated plan that addresses a broad spectrum of recreational activities. Regardless of their format or complexity, visitor use management plans will (1) contain specific, measurable management objectives related to the activity or activities being addressed; (2) be periodically reviewed and updated; and (3) be consistent with the carrying capacity decisions made in the general management plan.

The Service will seek consistency in recreation management policies and procedures on both a Service-wide and interagency basis to the extent practicable. However, because of differences in the enabling legislation and resources of individual parks, and differences in the missions of the Service and other federal agencies, an activity that is entirely appropriate when conducted in one location may be inappropriate when conducted in another. The Service will consider a park's purposes and the effects

on park resources and visitors when determining the appropriateness of a specific recreational activity.

Superintendents will consider a wide range of techniques in managing recreational use to avoid adverse impacts on park resources and values or desired visitor experiences. Examples of appropriate techniques include visitor information and education programs, separation of conflicting uses by time or location, "hardening" sites, modifying maintenance practices, and permit and reservation systems. Superintendents may also use their discretionary authority to impose local restrictions, public use limits, and closures and designate areas for a specific use or activity (see 36 CFR 1.5). Any restriction of appropriate recreational uses will be limited to what is necessary to protect park resources and values, to promote visitor safety and enjoyment, or to meet park management needs. To the extent practicable, public use limits established by the Service will be based on the results of scientific research and other available support data. However, an activity will be restricted or prohibited when, in the judgment of the superintendent, its occurrence, continuation, or expansion would (1) violate the criteria listed in section 8.2, or (2) conflict with the findings of a carrying capacity analysis with no reasonable alternative that would avoid or satisfactorily mitigate the violation or conflict.

Recreational activities that are proposed as organized events or that involve commercialization, advertising, or publicity on the part of participants or organizers are defined as special events; these events are managed in accordance with the policies in section 8.6.2, regulations in 36 CFR 2.50, and criteria and procedures in Director's Order #53: Special Park Uses.

*(See Levels of Park Planning 2.3; Wilderness Management Planning 6.3.4.2; General Policy 6.4.1; Visitor Carrying Capacity 8.2.1; Commercial Visitor Services 8.2.2.2; River Use 8.2.2.3, Backcountry Use 8.2.2.4; Fishing 8.2.2.5; Hunting and Trapping 8.2.2.6; Motorized Off-road Vehicle Use 8.2.3.1; Snowmobiles 8.2.3.2; Visitor Safety 8.2.5.1; Use by American Indians and Other Traditionally Associated Groups 8.5; Special Park Uses 8.6; Collecting Natural Products 8.8. Also see Director's Order #2: Park Planning, and #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

### 8.2.2.2    Commercial Visitor Services

For information on commercial visitor services, see Commercial Services 6.4.4, Commercial Visitor Services Planning 10.2.2, and Commercial Use Authorizations 10.3.

### 8.2.2.3    River Use

A river use management plan will be developed for each park having significant levels of river use unless the planning is accomplished through some other planning document. Appropriate types and levels of public uses will be identified and managed to prevent unacceptable impacts, particularly adverse impacts on aquatic resources, the riparian environment, and visitor enjoyment. Each river use management plan will include specific procedures for

disposing of refuse and human waste. Using cooperating agency status where appropriate, plans should be coordinated with interested tribal, state and/or local governments and will include public participation.

*(See Implementation Planning 2.3.4; National Wild and Scenic Rivers System 4.3.4; Water Resource Management 4.6; Floodplains 4.6.4; Wetlands 4.6.5; Domestic and Feral Livestock 8.6.8)*

### 8.2.2.4    Backcountry Use

The Park Service uses the term backcountry to refer to primitive, undeveloped portions of parks. This is not a specific management zone, but rather refers to a general condition of land that may occur anywhere within a park. Backcountry use will be managed in accordance with a backcountry management plan (or other plan addressing backcountry uses) designed to avoid unacceptable impacts on park resources or adverse effects on the visitor enjoyment of appropriate recreational experiences. The Service will seek to identify acceptable limits of impacts, monitor backcountry use levels and resource conditions, and take prompt corrective action when unacceptable impacts occur. Strategies designed to guide the preservation, management, and use of the backcountry and to achieve the park's management objectives will be integrated into the park's backcountry management plan. Backcountry under study, proposed, or recommended for wilderness designation will be managed consistent with the wilderness stewardship policies in chapter 6.

The number and types of facilities to support visitor use in backcountry areas, including sanitary facilities, will be maintained at the minimum necessary to achieve a park's backcountry management objectives and to provide for the health and safety of park visitors. To avoid the need for sanitary facilities, public use levels will be managed, where practicable, in accordance with the natural system's ability to absorb human waste. The Service will not provide refuse containers in backcountry areas. All refuse must be carried out, except that combustible materials may be burned when authorized by the superintendent.

*(See Water Resource Management 4.6, Management Facilities 6.3.10; Wilderness Use Management 6.4; Visitor Carrying Capacity 8.2.1; Waste Management 9.1.6.1; Comfort Stations 9.3.3. Also see Director's Order #83: Public Health).*

### 8.2.2.5    Fishing

Recreational fishing will be allowed in parks when it is authorized or not specifically prohibited by federal law provided that it has been determined to be an appropriate use per section 8.1 of these policies. When fishing is allowed, it will be conducted in accordance with applicable federal laws and treaty rights, and nonconflicting state laws and regulations. The Service will manage fishing activities to achieve management objectives. Before the Service issues regulations or other restrictions, representatives of appropriate tribes and state and federal agencies will be consulted to ensure that all available scientific data are considered in the decision-making process. Any such

regulations or other restrictions will be developed with public involvement and in consultation with fish and wildlife management agencies as appropriate, consistent with departmental policy at 43 CFR Part 24, and as described in section 4.4.3

For NPS units in Alaska, fishing will additionally be managed in accordance with the Alaska National Interest Lands Conservation Act.

Commercial fishing will be allowed only when specifically authorized by federal law or treaty right.

*(See Implementation Planning 2.3.4; Planning for Natural Resource Management 4.1.1; Harvest of Plants and Animals by the Public 4.4.3; Facilities for Water Recreation 9.3.4.2)*

### 8.2.2.6   Hunting and Trapping

Hunting, trapping, or any other methods of harvesting wildlife by the public will be allowed where it is specifically mandated by federal law. Where hunting activity is not mandated but is authorized on a discretionary basis under federal law, it may take place only after the Service has determined that the activity is an appropriate use and can be managed consistent with sound resource management principles.

Hunting and trapping, whether taking place as a mandated or a discretionary activity, will be conducted in accordance with federal law and applicable laws of the state or states in which a park is located. However, except for Alaska park units (which are subject to the Alaska National Interest Lands Conservation Act and regulations published at 36 CFR Part 13), the park in which hunting and trapping occur must also publish special regulations to govern the activity. Those regulations may be more restrictive than applicable state laws when necessary to prevent unacceptable impacts. Before the Service issues regulations or other restrictions, representatives of appropriate tribes and state and federal agencies will be consulted to ensure that all available scientific data are considered in the decision-making process. Any such regulations or other restrictions will be developed with public involvement.

The Service's cooperative consultation concerning fish and wildlife management will be consistent with departmental policy at 43 CFR Part 24. This policy recognizes the broad authorities and responsibilities of federal and state agencies with regard to the management of the nation's fish and wildlife resources, and promotes cooperative management relationships among these agencies. In particular, the policy calls on the Service to consult with state agencies on certain fish and wildlife management actions, and encourages the execution of memoranda of understanding as appropriate to ensure the conduct of programs that meet mutual objectives as long as they do not conflict with federal law or regulation.

*(See Harvest of Plants and Animals by the Public 4.4.3; Genetic Resource Management Principles 4.4.1.2. Also see Director's Order #75A: Civic Engagement and Public Involvement)*

### 8.2.2.7   Parachuting

Parachuting (or BASE jumping), whether from an aircraft, structure, or natural feature, is generally prohibited by 36 CFR 2.17(a)(3). However, if determined through a park planning process to be an appropriate activity, it may be allowed pursuant to the terms and conditions of a permit.

*(See Appropriate Use 8.1.1)*

### 8.2.2.8   Recreational Pack and Saddle Stock Use

Equine species such as horses, mules, donkeys and burros, and other types of animals (including llamas, alpacas, goats, oxen, dogs and reindeer) may be employed when it is an appropriate use to support backcountry transport of people and materials and will not result in unacceptable impacts. NPS regulations at 36 CFR 2.16 prohibit the use of animals other than those designated as "pack animals" for transporting equipment.

Planning for recreational stock use should be conducted in the context of visitor use planning to address social, biological, and physical carrying capacity considerations, and to make allocation decisions that minimize potential conflicts between and among user groups. The plan should (1) establish routes, trails, and areas of travel; and (2) identify the need for supporting infrastructure such as designated horse camps, hitch rails, corrals, and appropriate trailhead facilities designed for vehicles towing horse trailers. The plan should also identify sensitive natural and cultural resource areas and develop management strategies to protect these resources.

In areas where demand for available grazing for recreational and administrative stock exceeds allowable limits, alternative strategies must be developed. If available, and to prevent the spread of invasive exotic plant species, certified weed seed free hay or pellet rations should be considered as alternative feeding strategy to supplement grazing. Administrative stock use should generally follow the same rules and guidelines that are established for recreational stock use.

*(See Domestic and Feral Livestock 8.6.8)*

### 8.2.3   Use of Motorized Equipment

The variety of motorized equipment—including visitor vehicles, concessioner equipment, and NPS administrative or staff vehicles and equipment—that operates in national parks could adversely impact park resources, including the park's natural soundscape and the flow of natural chemical information and odors that are important to many living organisms. In addition to their natural values, natural sounds (such as waves breaking on the shore, the roar of a river, and the call of a loon), form a valued part of the visitor experience. Conversely, the sounds of motor vehicle traffic, an electric generator, or loud music can greatly diminish the solemnity of a visit to a national memorial, the effectiveness of a park interpretive program, or the ability of a visitor to hear a bird singing its territorial song. Many parks that

appear as they did in historical context no longer sound the way they once did.

The Service will strive to preserve or restore the natural quiet and natural sounds associated with the physical and biological resources of parks. To do this, superintendents will carefully evaluate and manage how, when, and where motorized equipment is used by all who operate equipment in the parks, including park staff. Uses and impacts associated with the use of motorized equipment will be addressed in park planning processes. Where such use is necessary and appropriate, the least impacting equipment, vehicles, and transportation systems should be used, consistent with public and employee safety. The natural ambient sound level—that is, the environment of sound that exists in the absence of human-caused noise—is the baseline condition, and the standard against which current conditions in a soundscape will be measured and evaluated.

To meet its responsibilities under Executive Order 13149 (Greening the Government through Federal Fleet and Transportation Efficiency), the Service will develop and implement a strategy to reduce its vehicle fleet's annual petroleum consumption.

*(See Soundscape Management 4.9; Chemical Information and Odors 4.11)*

### 8.2.3.1   Motorized Off-road Vehicle Use

Off-road motor vehicle use in national park units is governed by Executive Order 11644 (Use of Off-road Vehicles on Public Lands, as amended by Executive Order 11989), which defines off-road vehicles as "any motorized vehicle designed for or capable of cross-country travel on or immediately over land, water, sand, snow, ice, marsh, swampland, or other natural terrain" (except any registered motorboat or any vehicle used for emergency purposes). Unless otherwise provided by statute, any time there is a proposal to allow a motor vehicle meeting this description to be used in a park, the provisions of the executive order must be applied.

In accordance with 36 CFR 4.10(b), routes and areas may be designated only in national recreation areas, national seashores, national lakeshores, and national preserves, and only by special regulation. In accordance with the executive order, they may be allowed only in locations where there will be no adverse impacts on the area's natural, cultural, scenic, and esthetic values, and in consideration of other existing or proposed recreational uses. The criteria for new uses, appropriate uses, and unacceptable impacts listed in sections 8.1 and 8.2 must also be applied to determine whether off-road vehicle use may be allowed. As required by the executive order and the Organic Act, superintendents must immediately close a designated off-road vehicle route whenever the use is causing or will cause unacceptable impacts on the soil, vegetation, wildlife, wildlife habitat, or cultural and historic resources.

NPS administrative off-road motor vehicle use will be limited to what is necessary to manage the public use of designated off-road vehicle routes and areas; to conduct

emergency operations; and to accomplish essential maintenance, construction, and resource protection activities that cannot be accomplished reasonably by other means.

*(See Park Management 1.4; Minimum Requirement 6.3.5. Also see 36 CFR 4.10)*

### 8.2.3.2   Snowmobiles

Snowmobile use is a form of off-road vehicle use governed by Executive Order 11644 (Use of Off-road Vehicles on Public Lands, as amended by Executive Order 11989), and in Alaska also by provisions of the Alaska National Interest Lands Conservation Act (16 USC 3121 and 3170). Implementing regulations are published at 36 CFR 2.18, 36 CFR Part 13, and 43 CFR Part 36. Outside Alaska, routes and areas may be designated for snowmobile and oversnow vehicle use only by special regulation after it has first been determined through park planning to be an appropriate use that will meet the requirements of 36 CFR 2.18 and not otherwise result in unacceptable impacts. Such designations can occur only on routes and water surfaces that are used by motor vehicles or motorboats during other seasons. In Alaska, the Alaska National Interest Lands Conservation Act provides additional authorities and requirements governing snowmobile use.

NPS administrative use of snowmobiles will be limited to what is necessary (1) to manage public use of snowmobile or oversnow vehicles routes and areas; (2) to conduct emergency operations; and (3) to accomplish essential maintenance, construction, and resource protection activities that cannot be accomplished reasonably by other means.

*(See Unacceptable Impacts 1.4.7.1; Minimum Requirement 6.3.5; Management Facilities 6.3.10; General Policy 6.4.1; Process for Determining New Appropriate Uses 8.1.2; Visitor Use 8.2; Recreational Activities 8.2.2 )*

### 8.2.3.3   Personal Watercraft Use

Personal watercraft use is generally prohibited by 36 CFR 3.24. However, it may be allowed within a park by special regulation if it has first been determined through park planning to be an appropriate use that will not result in unacceptable impacts.

*(See Unacceptable Impacts 1.4.7.1; Process for Determining New Appropriate Uses 8.1.2; Visitor Use 8.2; Recreational Activities 8.2.2. Also see 36 CFR Part 3: Boating and Water Use)*

### 8.2.4   Accessibility for Persons with Disabilities

All reasonable efforts will be undertaken to make NPS facilities, programs, and services accessible to and usable by all people, including those with disabilities. This policy reflects the commitment to provide access to the widest cross section of the public, and to ensure compliance with the intent of the Architectural Barriers Act of 1968 and the Rehabilitation Act of 1973. The Service will also comply with section 507 of the Americans with Disabilities Act

(42 USC 12207), which relates specifically to the operation and management of federal wilderness areas. Specific guidance for implementing these laws is found in the Secretary of the Interior's regulations regarding enforcement of nondiscrimination on the basis of disability in Department of the Interior programs (43 CFR Part 17, Subpart E), and General Service Administration regulations adopting accessibility standards for the Architectural Barriers Act (41 CFR Part 102-76, Subpart C).

One primary tenet of accessibility is that, to the highest degree reasonable, people with disabilities should be able to participate in the same programs and activities available to everyone else. In choosing among methods for providing accessibility, higher priority will be given to those methods that offer programs and activities in the most integrated setting appropriate. Special, separate, or alternative facilities, programs, or services will be provided only when existing ones cannot reasonably be made accessible. The determination of what is reasonable will be made only after careful consultation with persons with disabilities or their representatives. Any decision that would result in less than equal opportunity is subject to the filing of an official disability rights complaint under the departmental regulations cited above.

*(See Accessibility for Persons with Disabilities 1.9.4; Physical Access for Persons with Disabilities 5.3.2; Accessibility for Persons with Disabilities 6.4.10; Accessibility for Persons with Disabilities 9.1.2. Also see Director's Order #16A: Reasonable Accommodation for Applicants and Employees with Disabilities; Director's Order #42: Accessibility for Visitors with Disabilities in National Park Service Programs and Services; Americans with Disabilities Act and Architectural Barriers Act Accessibility Standards)*

## 8.2.5   Visitor Safety and Emergency Response
### 8.2.5.1   Visitor Safety
The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. The Service will do this within the constraints of the 1916 Organic Act. The primary—and very substantial—constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values.

While recognizing that there are limitations on its capability to totally eliminate all hazards, the Service and its concessioners, contractors, and cooperators will seek to provide a safe and healthful environment for visitors and employees. The Service will work cooperatively with other federal, tribal, state, and local agencies; organizations; and individuals to carry out this responsibility. The Service will strive to identify and prevent injuries from recognizable threats to the safety and health of persons and to the protection of property by applying nationally accepted codes, standards, engineering principles, and the guidance contained in Director's Orders #50B, #50C, #58, and #83 and their associated reference manuals. When practicable and consistent with congressionally designated purposes

and mandates, the Service will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education. In doing so, the Service's preferred actions will be those that have the least impact on park resources and values.

The Service recognizes that the park resources it protects are not only visitor attractions, but that they may also be potentially hazardous. In addition, the recreational activities of some visitors may be of especially high-risk, high-adventure types, which pose a significant personal risk to participants and which the Service cannot totally control. Park visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments.

These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs or artificial lighting, distribute weather warnings or advisories, initiate search-and-rescue operations or render emergency aid, eliminate potentially dangerous animals, close roads and trails or install guardrails and fences, and grant or deny backcountry or climbing permits. Some forms of visitor safeguards typically found in other public venues—such as fences, railings, and paved walking surfaces—may not be appropriate or practicable in a national park setting.

*(See Air Quality 4.7.1; Lightscape Management 4.10; General Policy 6.4.1; Siting Facilities to Avoid Natural Hazards 9.1.1.5; Waste Management and Contaminant Issues 9.1.6; Risk Management Program 10.2.4.8; Food Service Sanitation Inspections 10.2.4.14)*

### 8.2.5.2   Emergency Preparedness and Emergency Operations
The National Park Service will develop a program of emergency preparedness in accordance with title VI of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 USC 5195-5197g); National Security Decision Directive 259 (February 4, 1987); Department of the Interior policy; and other considerations at the Washington headquarters, regional, and park levels. The program will (1) provide guidance for incident management at the park level and management and relief for emergency incidents and events beyond park capabilities; (2) ensure the agency complies with the Presidential Homeland Security Directives, the National Emergency Response Plan, and the National Incident Management System standards; and (3) support interagency and national response to major incidents. The purpose of the program will be to provide for visitor and employee safety and the protection of resources and property to the extent possible. This program will include a systematic method for alerting visitors about potential disasters and evacuation procedures.

Superintendents may assist other agencies with emergencies outside of parks, as authorized by 16 USC 1b(1). To the extent practicable and in accordance with Director's Order #20, written agreements with other agencies must first be in effect. NPS employees who are outside the area of their jurisdiction and who are directed by their supervisors to provide emergency assistance to other agencies will be considered to be acting within the scope of their employment.

NPS emergency operations will be conducted using the Incident Command System of the National Interagency Incident Management System (NIIMS). The Unified Command System (within the Incident Command System) will be used when other agencies are involved. Each park superintendent will develop and maintain an emergency operations plan to ensure an effective response to all types of emergencies that can be reasonably anticipated.

As one element of the emergency operations plan, or as a separate document, each park must have an oil and chemical spill response management plan for spills that result from NPS activities or from activities that are beyond NPS control (such as commercial through-traffic on roads that pass through a park). The plans will place first priority on responder and public safety.

Employees will not be permitted to respond to hazardous material spills unless they are properly qualified and certified in accordance with Director's Order #30B: Hazardous Spill Response. The Service will seek to recover all allowable direct and indirect costs for responding to oil or hazardous materials spills.

Parks that have their own aircraft or contract for the use of aircraft must have an aircraft crash rescue response plan or other planning document in place.

*(See Compensation for Injuries to Natural Resources 4.1.6; Emergency Management 5.3.1.1. Also see Director's Order #55: Incident Management Program; Director's Order #60: Aviation Management)*

### 8.2.5.3   Search and Rescue

To provide for the protection and safety of park visitors, the Service will make reasonable efforts to search for lost persons and rescue sick, injured, or stranded persons. This responsibility may be fulfilled by NPS staff or by qualified search-and-rescue organizations or agencies that are capable of responding to life-threatening emergencies pursuant to the terms of a formal agreement. Deceased persons will be evacuated unless the level of risk to the rescue party is found to be unacceptably high. Search managers and superintendents will jointly determine when to terminate a search. The Service will not charge visitors for search-and-rescue operations. Search-and-rescue operations will be conducted using the Incident Command System.

*(See Management Facilities 6.3.10; General Policy 6.4.1. Also see Director's Order #59: Search and Rescue)*

### 8.2.5.4   Dive Operations

NPS dive operations in rivers, lakes, reservoirs, and oceans will be used to support other park operations, including scientific inquiry, search and rescue, law enforcement, public education, and resource and facility management. The level of service provided within a park will be determined through a dive program needs assessment. Personal safety of those engaged in diving activities is of primary importance and will not be compromised for any reason. NPS diving activities will not be permitted in any park that does not have an approved safe practices manual (dive safety plan).

*(See Director's Order #4: Diving Management. Also see 29 CFR 1910, subpart T, 485 DM 28)*

### 8.2.5.5   Public Health Program

The Service will work to identify public health issues and disease transmission potential in the parks and to conduct park operations in ways that reduce or eliminate these hazards. Park managers will pursue these goals with technical assistance provided under the auspices of a Service-wide public health program. The public health program will use the consultation services of commissioned officers of the U.S. Public Health Service.

*(See Pest Management 4.4.5. Also see Director's Order #83: Public Health)*

### 8.2.5.6   Emergency Medical Services

The Service will make reasonable efforts to provide appropriate emergency medical services for persons who become ill or injured. An emergency medical services program will be maintained, where appropriate, to provide transportation and prehospital care of the sick and injured, which may range from minor first aid to advanced life support in various environmental settings. Transportation may include everything from patrol cars and ambulances to fixed-wing planes and helicopter air ambulances, consistent with departmental policies regarding aircraft use.

Qualified emergency medical services in local communities may be used if such services can respond rapidly enough in life-threatening emergencies. When such services are not available, the Park Service will make a reasonable effort to provide a level of emergency medical service commensurate with park needs and in response to an emergency medical needs assessment. Each superintendent will develop and implement a program to meet those needs in accordance with Director's Order #51: Emergency Medical Services. Extended emergency medical services operations will be conducted using the Incident Command System.

*(Also see Director's Order #55: Incident Management Program)*

### 8.2.6   Recreation Fees and Reservations

The National Park Service may charge a recreation entrance or expanded amenity recreation (use) fee at parks when authorized by law. Although these fees may provide for the support of the overall management and operation

of parks, as set forth in the Federal Lands Recreation Enhancement Act and other relevant statutes, they are not intended to offset the operational costs associated with a park. Such services include protection; resource management; information and orientation; maintenance of park facilities; and interpretation to foster an understanding and appreciation of each park's resources, management procedures, regulations, and programs. Fees may be instituted for secondary or special services that the Service cannot or elects not to offer because of economic constraints or the need for special skills or equipment or because they are purely supplemental programs. The Service may also contract or enter into an agreement for the collection of recreational fees if there is a demonstrated benefit to the collecting park unit. In all cases, fee programs will support park purposes and comply with appropriate Service policies and standards and federal law.

*(See Commercial Use Authorizations 10.3. Also see Director's Order #22: Fee Program)*

### 8.2.6.1    Recreation Fees

Visitors who use federal facilities and services for recreation may be required to pay a greater share of the cost of providing those opportunities than the population as a whole. Under the guidelines and criteria established by law and regulation, the Service will collect recreation fees of the appropriate type for its parks, facilities, and programs. No fees will be collected in circumstances in which the costs of collection would exceed revenue or where fee collection is prohibited by law or regulation. Fees charged for recreational activities will be collected only in accordance with the applicable authority, and recreation fee revenues will be managed according to law and policy. Fee rates will be reasonable and equitable and consistent with criteria and procedures contained in law and NPS guidance documents. Those who lawfully enter or use a park for activities not related to recreation will not be charged an entrance fee, expanded amenity recreation use fee, or special recreation permit fee. Examples of nonrecreation exemptions include persons entering parks for

◆   First Amendment activities, which are exempt from all fees;

◆   special park uses such as agricultural, grazing, and commercial filming activities (all of which are subject to special park use fees);

◆   NPS-authorized research activities;

◆   federal, state, tribal, and local government business;

◆   hospital in-patients involved in medical treatment or therapy;

◆   a leaseholder or property owner accessing their property;

◆   outings conducted for noncommercial educational purposes by schools and other bona fide academic institutions.

Current law (the Federal Lands Recreation Enhancement Act) prohibits charging entrance fees to persons 15 years of age and younger. In Alaska, the Alaska National Interest Lands Conservation Act prohibits charging entrance fees to all national parks except Denali National Park.

*(See Fees 8.6.1.2; First Amendment Activities 8.6.3)*

### 8.2.6.2    National Recreation Reservation Service

Superintendents are encouraged to participate in a reservation service for campgrounds and other facilities, and for tours or other services operated or provided by the Park Service for visitors when doing so will

◆   better serve park visitors, or

◆   ensure the protection of park resources, or

◆   increase public awareness of lesser-known parks, or

◆   improve the efficiency of park operations or administration.

To avoid duplicative costs and confusion, if a reservation service will be employed in a park, the Service-wide recreation reservation vendor will be the preferred provider of that service. The vendor's services may be expanded or new services may be developed based on NPS needs and the vendor's capacity to accommodate the needs. If a superintendent wishes to participate in a different reservation system, a determination must first be made that the Service-wide vendor will not accommodate the park's reservation needs. Authorization must be obtained from the Director before participating in a different reservation system. Concessioners who manage lodging and camping services are not required to transfer their existing reservation services to the NPS reservation system. However, they are encouraged to do so when it is administratively, operationally, and financially feasible, in order to provide more seamless reservation services to the public.

*(See Chapter 7: Interpretation and Education)*

### 8.2.7    Tourism

The Service will support and promote appropriate visitor use through cooperation and coordination with the tourism industry. As part of this effort, the Service will

◆   develop and maintain a constructive dialogue and outreach effort with public and private organizations and businesses, including state and local tourism and travel offices;

◆   establish positive and effective working relationships with park concessioners and others in the tourism industry to ensure a high quality of service to park visitors;

◆   collaborate with industry professionals to promote sustainable and informed tourism that incorporates socioeconomic and ecological concerns and supports long-term preservation of park resources and quality visitor experiences; and

◆   use this collaboration as an opportunity to encourage and showcase environmental leadership by the Service and by the tourism industry, including park concessioners.

*(Also see Director's Order #17: National Park Service Tourism)*

8.3    Law Enforcement Program

MANAGEMENT POLICIES 2006

### 8.3.1    General

The law enforcement program is an important tool in carrying out the NPS mission. The objectives of the NPS law enforcement program are (1) the prevention of criminal activities through resource education, public safety efforts, and deterrence; and (2) the detection and investigation of criminal activity and the apprehension and successful prosecution of criminal violators. In carrying out the law enforcement program, the Service will make reasonable efforts to protect the natural and cultural resources entrusted to its care and to provide for the protection, safety, and security of park visitors, employees, concessioners, and public and private property.

Law enforcement is characterized by high risks and inherent dangers to enforcement officers, and by high public expectations that law enforcement activities will be performed in a lawful and professional manner. It is therefore essential that the Service issue clear policies and procedures to guide the law enforcement program, and that commissioned employees receive the training and equipment necessary to perform their duties successfully. The NPS law enforcement program will be managed and supervised in accordance with all applicable laws and regulations; Part 446 of the *Department of the Interior Manual*; all applicable Secretarial directives, these Management Policies; and Director's Order #9: Law Enforcement Program and Reference Manual #9 (or U. S. Park Police General Orders, as appropriate). To help sustain the high level of public trust necessary for an effective law enforcement program, commissioned employees will adhere to the Department of the Interior's law enforcement code of conduct and the standards of ethical conduct found in Reference Manual 9.

All necessary and appropriate steps will be taken to ensure that the Park Service maintains a professional law enforcement program. The authority and responsibility to manage the NPS Commissioned Park Ranger program and U.S. Park Police operations will flow in a logical order from the Director and in accordance with departmental policy.

### 8.3.2    The Context for Law Enforcement

Park law enforcement activities will be managed by superintendents as part of a comprehensive, interdisciplinary effort to protect resources, manage public use, and promote public safety and appropriate enjoyment. This is in keeping with guidance provided by Congress in 1976 when it amended the General Authorities Act (16 USC 1a-6):

> The Committee intends that the clear and specific enforcement authority contained in this subsection, while necessary for the protection of the Federal employees so involved, will be implemented by the Secretary to ensure that law enforcement activities in our National Park System will continue to be viewed as one function of a broad program of visitor and resource protection. (House Report No. 94-1569, September 16, 1976)

### 8.3.3    Shared Responsibilities

Congress has authorized the designation of certain employees as law enforcement officers, with the responsibility to "maintain law and order and protect persons and property within areas of the National Park System" (16 USC 1a 6(b)). Only employees who meet the standards prescribed by and who are designated by the Secretary of the Interior may perform law enforcement duties. The duties of these commissioned employees will not be limited to just law enforcement; they will also continue to incorporate a diversity of other protection concerns, as stipulated in House Report No. 94-1569.

The Service recognizes that effective enforcement requires a cooperative community effort. Therefore, employees without law enforcement commissions will continue to share responsibility for the protection of park resources and visitors, and they will be expected to report any apparent violations or suspicious activities. All park employees will be trained to recognize, observe, and record criminal acts and illegal activities. The Service will also encourage and assist park neighbors in the development of cooperative crime prevention and detection programs.

Extended law enforcement operations will be conducted using the Incident Command System of the National Interagency Incident Management System.

### 8.3.4    Enforcement Authority

Within national park system boundaries, the Service will fulfill its law enforcement responsibilities using NPS employees. However, the Park Service is authorized by 16 USC 1a-6(c) to appoint (deputize) another agency's qualified law enforcement personnel as special police when it will benefit the administration of a park area. Deputations may be issued for the purpose of obtaining supplemental law enforcement assistance when deemed economical and in the public interest, and with the concurrence of the other agency. All such appointments must be approved by the senior NPS law enforcement official or his/her designee and supported by a written agreement with the other agency at the park or national level, except when there is insufficient time because of an emergency law enforcement situation. While deputations may be used to supplement NPS law enforcement capabilities, they may not be used to transfer NPS law enforcement responsibilities to state or local governments.

The Service is authorized to use appropriated funds for "rendering of emergency rescue, fire fighting, and [other] cooperative assistance to nearby law enforcement and fire prevention agencies and for related purposes outside of the National Park System" (16 USC 1b(1)). Further, insofar as 16 USC 1b(1) does not confer arrest authority to NPS personnel who act outside park boundaries, state arrest authority is first needed before NPS personnel can enforce state law or engage in law enforcement activity outside national park system boundaries.

This authority will be used in emergency situations, only after first determining that such actions will facilitate the

administration of the park or be an effective management tool for obtaining mutual assistance from other agencies. Furthermore, the authority is intended for use only in response to an unexpected occurrence that requires immediate action, which may include one or more of the following:

◆ emergency responses such as life-or-death incidents, serious injury/fatality accident/incident scenes, crime scenes involving the protection of human life, officer needs assistance, threats to health or safety of the public;

◆ emergency or law enforcement incidents directly affecting visitor safety or resource protection;

◆ probable-cause felonies and felonies committed in the presence of and observed by U.S. Park Rangers, Special Agents, or U.S. Park Police;

◆ misdemeanors committed in the presence of U.S. Park Rangers, Special Agents, or U.S. Park Police that present an immediate threat to the health and safety of the public.

Except where specifically provided by acts of Congress codified in the District of Columbia Code, sections 5-201 to 5-208 (2001), the Service may not assume law enforcement responsibility outside of a park in lieu of the legitimate responsibilities of nearby agencies. Cooperative assistance rendered to nearby law enforcement agencies outside park boundaries should be limited to only those actions or efforts that support or assist those agencies.

### 8.3.5   Jurisdiction

The term jurisdiction defines the sphere of authority and outlines the boundaries or territorial limits within which any particular authority may be exercised. Jurisdiction may be either exclusive, partial, concurrent, or proprietary. Insofar as is practicable, the Service will seek to acquire concurrent legislative jurisdiction for all units of the national park system, as required by the 1976 amendment to the General Authorities Act. Concurrent jurisdiction allows the Service to enforce federal criminal statutes and also to assimilate state law under 18 USC 13 when no applicable federal law or regulation exists. Concurrent jurisdiction will allow for the more efficient conduct of both state and federal law enforcement functions within the parks.

### 8.3.6   Use of Force

Commissioned employees may use a wide variety of defensive equipment and force options in response to various threats and other enforcement situations. The primary consideration is the timely and effective application of the appropriate level of force required to establish and maintain lawful control.

### 8.3.7   Law Enforcement Public Information and Media Relations

The National Park Service will provide information to the public and the news media in accordance with applicable laws, departmental policy, and Director's Order #75B: Media Relations. Superintendents should identify appropriate opportunities to (1) enhance deterrence by publicizing arrests, weapons seizures, and successful prosecutions; (2) highlight cooperation and assistance activities (e.g., Park Watch); and (3) educate the public about the full range of threats to and the difficulty in protecting park resources.

The right of the public to obtain information about government operations and activities is subject to the requirements of the Freedom of Information Act and the Privacy Act.

*(See Civic Engagement 1.7. Also see Director's Order #66: FOIA and Protected Resource Information; Director's Order #75A: Civic Engagement and Public Involvement)*

### 8.3.8   Homeland Security

The Park Service will work cooperatively with the Department of the Interior; Department of Homeland Security; and other federal, state, and local agencies to prevent and respond to foreign and domestic attacks on American soil. The Park Service will maintain a capacity to rapidly move law enforcement personnel to critical asset and infrastructure or other identified areas in the event of a terrorist attack, elevated threat level, or other major emergency incident.

*(See National Emergency Response Plan)*

## 8.4   Overflights and Aviation Uses

A variety of aircraft, including military, commercial, general aviation, and aircraft used for NPS administrative purposes, fly in the airspace over national parks. Although there are many legitimate aviation uses, overflights can adversely affect park resources and values and interfere with visitor enjoyment. The Service will take all necessary steps to avoid or mitigate unacceptable impacts from aircraft overflights.

Because the nation's airspace is managed by the Federal Aviation Administration (FAA), the Service will work constructively and cooperatively with the Federal Aviation Administration and national defense and other agencies to ensure that authorized aviation activities affecting units of the national park system occur in a safe manner and do not cause unacceptable impacts on park resources and values and visitor experiences. The Service will build and maintain a cooperative and problem-solving relationship with national defense agencies to address the congressionally mandated mission of each agency and prevent or mitigate unacceptable impacts of military training or operational flights on park resources, values and the visitor experience. Cooperation is essential because the other agencies involved have statutory authorities and responsibilities that must be recognized by the Service.

*(See Soundscape Management 4.9. Also see Director's Orders #47: Soundscape Preservation and Noise Management; #60: Aviation Management)*

### 8.4.1   Alaska and Remote Areas

Aviation can provide an important, and in some cases the preferred, means of access to remote areas in certain parks, especially in Alaska. In such cases, access by aircraft may make an important contribution to the protection and enjoyment of those areas. Dependence on aviation will be fully considered and addressed in the planning process for those parks. Alaska parks have specific regulations concerning fixed-wing aircraft, published at 36 CFR Part 13 and 43 CFR 36.11(f).

### 8.4.2   Education

For the general public and for aviation interests, the Service will develop educational materials describing the importance of the natural soundscape and tranquility to park visitors, as well as the need for cooperation from the aviation community.

*(See Chapter 7: Interpretation and Education; Soundscape Management 4.9)*

### 8.4.3   General Aviation

The Service will work closely with the Federal Aviation Administration and with general aviation organizations to ensure that general aviation operations over units of the national park system are conducted in accordance with applicable FAA advisories and "fly-friendly" techniques and procedures designed to help pilots minimize impacts on national parks. The Service will seek the assistance of these organizations in problem resolution if general aviation concerns arise over national parks.

### 8.4.4   Administrative Use

Aviation is a necessary and acceptable management tool in some parks when used in a manner consistent with the NPS mission. Aviation activities will comply with all applicable policies and regulations issued by the Department of the Interior, the Federal Aviation Administration, and the National Park Service. In its administrative use of aircraft, the Service will

◆   use, to the maximum extent practicable, the quietest aircraft available for its aviation operations;

◆   limit official use of flights over parks to those needed to support or carry out emergency operations or essential management activities in cases where there are no practical alternatives or when alternative methods would be unreasonable;

◆   give full consideration to safety; wilderness management implications; impacts on resources, values, and opportunity for visitor enjoyment; impacts on other administrative activities; and overall cost-effectiveness;

◆   plan, schedule, and consolidate flights so as to avoid or minimize unacceptable impacts on park resources and values and visitor enjoyment;

◆   work cooperatively with other agencies using aircraft and airspace over parks to adhere to the above standards.

*(Also see Director's Order #60: Aviation Management)*

### 8.4.5   Military Aviation

The Service will work cooperatively with agencies of the Department of Defense to address the congressionally mandated missions of all agencies. In addition, the Service will prevent or strive to mitigate any unacceptable impacts of overflights related to military training or operational low-level overflights. Superintendents are responsible for opening lines of communication with base commanders controlling military training routes or military operations areas that may affect their parks, and for developing formal agreements that mitigate identified impacts.

### 8.4.6   Commercial Air Tour Management

The National Parks Air Tour Management Act of 2000 and implementing FAA regulations provide for a joint FAA/NPS planning process that will lead to the management by the Federal Aviation Administration of commercial air tours over national parks (with the exception of parks in Alaska and Rocky Mountain National Park, which are specifically excluded from the process). The Service, as a cooperating agency, will assist the Federal Aviation Administration in developing an air tour management plan (ATMP) for each park with existing or proposed air tours. Superintendents will work cooperatively with the Federal Aviation Administration, air tour operators, and other stakeholders in the development of these plans and will determine the nature and extent of impacts on natural and cultural resources and visitor experience opportunities inside park boundaries. The Federal Aviation Administration, with responsibility for ensuring the safe and efficient use of the nation's airspace and protecting the public health and welfare from aircraft noise, will implement the air tour management plans and regulate commercial air tours in accordance with it.

### 8.4.7   Permitted Overflights

When issuing permits for activities such as filming or research in which the use of aircraft is proposed, the superintendent will determine whether use is appropriate and apply conditions to protect park resources and values from unacceptable impacts. Permit requests will be denied if the activity will have unacceptable impacts on a park's resources, values, or desired visitor experiences.

### 8.4.8   Airports and Landing Sites

Private or commercial aircraft may be operated in parks only on lands or water surfaces designated by the Park Service as landing sites through special regulation. (See section 8.4.1 regarding Alaska and some remote areas.) The Service will evaluate and manage aircraft landing sites under its jurisdiction to ensure that the use of the sites will have no unacceptable impacts on park resources and values, public safety, or visitor enjoyment. Existing sites that meet these criteria and that have been designated as a result of previously established use may be retained as long as the administrative need for them continues. New sites will be designated only where essential to provide administrative access to remote areas (other than wilderness), and only where the site can be established, used, and maintained without the need for new construction or major site improvements.

The National Park Service will also work with entities having jurisdiction over landing sites and airports adjacent to parks for the purpose of preventing, reducing, or otherwise mitigating the effects of aircraft operations. Whether landing sites or airports are situated within or adjacent to parks, the objective will be to minimize noise and other impacts and confine them to the smallest and most appropriate portion of the park, consistent with safe aircraft operations.

*(Also see 36 CFR 2.17; 43 CFR 36.11 (f))*

## 8.5   Use by American Indians and Other Traditionally Associated Groups

The National Park Service will develop and implement its programs in a manner that reflects knowledge of and respect for the cultures of American Indian tribes or groups with demonstrated ancestral ties to particular resources in parks. Evidence of such ties will be established through systematic archeological or anthropological studies, including ethnographic oral history and ethnohistory studies or a combination of these sources. For purposes of these policies, the term American Indian tribe means any tribe, band, nation, or other organized group or community of Indians, including any Alaska Native Village, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians. Other groups of people with traditional associations to park lands or resources include native peoples of the Caribbean; Native Hawaiians and other native Pacific islanders; and state-recognized tribes and other groups who are defined by themselves and known to others as members of a named cultural unit that has historically shared a set of linguistic, kinship, political, or other distinguishing cultural features.

The Service will regularly and actively consult with American Indian tribal governments and other traditionally associated groups regarding planning, management, and operational decisions that affect subsistence activities, sacred materials or places, or other resources with which they are historically associated. Information about the outcome of these consultations will be made available to those consulted.

In developing its plans and carrying out its programs, the Service will ensure the following:

◆   NPS general regulations governing access to and use of natural and cultural resources in parks will be applied in an informed and balanced manner consistent with park purposes that (1) does not unreasonably interfere with American Indian tribal use of traditional areas or sacred resources, and (2) does not violate the criteria listed in section 8.2 for use of the parks.

◆   Superintendents will establish and maintain consulting relationships with potentially affected American Indian tribes or traditionally associated groups.

◆   Management decisions will reflect knowledge about and understanding of potentially affected American

Indian cultures and people, gained through research and consultations with the potentially affected groups.

The American Indian Religious Freedom Act (42 USC 1996) states that

> Henceforth it shall be the policy of the United States to protect and preserve for American Indians their inherent right to freedom to believe, express, and exercise the traditional religions of the American Indians, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

The National Park Service recognizes that site-specific worship is vital to Native American religious practices. As a matter of policy and in keeping with the spirit of the law, and provided the criteria listed in section 8.2 for use of the parks are not violated, the Service will be as unrestrictive as possible in permitting Native American tribes access to park areas to perform traditional religious, ceremonial, or other customary activities at places that have been used historically for such purposes. In allowing religious access by other entities, including nonrecognized Indian groups, the Service will consider requests individually, being mindful not to take actions that will either advance or inhibit religion. The Service will not direct visitor attention to the performance of religious observances unless the Native American group so wishes.

With regard to consumptive use of park resources, current NPS policy is reflected in regulations published at 36 CFR 2.1 and 36 CFR Part 13. These regulations allow superintendents to designate certain fruits, berries, nuts, or unoccupied seashells that may be gathered by hand for personal use or consumption if it will not adversely affect park wildlife, the reproductive potential of a plant species, or otherwise adversely affect park resources. The regulations do not authorize the taking, use, or possession of fish, wildlife, or plants for ceremonial or religious purposes, except where specifically authorized by federal statute or treaty rights or where hunting, trapping, or fishing are otherwise allowed.

When authorized under National Historic Preservation Act, the Archeological Resources Protection Act or other provisions of law, the Service will protect sacred resources to the extent practicable and in a manner consistent with the goals of American Indian tribes or other traditionally associated groups. The location and character of sacred sites will be withheld from public disclosure if disclosure will cause significant invasion of privacy, risk harm to the historic resource, or impede the use of a traditional religious site by practitioners.

Members of American Indian tribes or traditionally associated groups may enter parks for traditional nonrecreational activities without paying an entrance fee.

The ceremonial use of peyote will be limited to members of the Native American Church during religious ceremonies,

in accordance with regulations of the Department of Justice, Drug Enforcement Administration ("Special Exempt Persons, Native American Church," 21 CFR 1307. 31).

(See Relationship with American Indian Tribes 1.11; Consultation 5.2.1; Ethnographic Resources 5.3.5.3; first Amendment Activities 8.6.3; Consumptive Uses 8.9. Also see Executive Order 13007 (Indian Sacred Sites); Director's Orders #71A: Government-to-government Relationships with Tribal Governments, and #71B: Indian Sacred Sites)

## 8.6    Special Park Uses

### 8.6.1    General

A special park use is defined as an activity that takes place in a park area, and that

◆    provides a benefit to an individual, group, or organization rather than the public at large;

◆    requires written authorization and some degree of management control from the Service in order to protect park resources and the public interest;

◆    is not prohibited by law or regulation;

◆    is not initiated, sponsored, or conducted by the Service; and

◆    is not managed under a concession contract (see chapter 10), a recreation activity for which the NPS charges a fee, or a lease (see chapter 5).

#### 8.6.1.1    Requests for Permits

Using criteria and procedures outlined in Director's Order #53: Special Park Uses, each request to permit a special park use or renew authorization of an existing use will be reviewed and evaluated by the superintendent according to the terms of applicable legislation, regulations, and management planning documents. When considering permit requests, superintendents will take into account the Service-wide implications of their decisions. A superintendent must deny initial requests or requests for renewal upon finding that the proposed activity would cause unacceptable impacts. The superintendent likewise must terminate previously authorized special park uses based on such a finding.

*(See Appropriate Use of the Parks 1.5; Unacceptable Impacts 1.4.7.1; Process for Determining New Appropriate Uses 8.1.2)*

#### 8.6.1.2    Fees

Cost recovery and performance bond and liability insurance requirements will be imposed, consistent with applicable statutory authorities and regulations. All costs incurred by the Service in receiving, writing, and issuing the permit, monitoring the permitted use, restoring park areas, or otherwise supporting a special park use may be paid by the permittee. The money will be retained by the park as reimbursement.

When appropriate, the Service will also collect a fee for the use of the land or facility based on a market evaluation. Fees

collected for use of the land or facility will be deposited into the U.S. Treasury.

Based on the published schedule, commercial filming and still photography activities requiring a permit are subject to a location fee. The money will be retained by the Park Service in accordance with the fee demonstration program.

*(See Park Management 1.4; Recreation Fees and Reservations 8.2.6.; Special Events 8.6.2)*

### 8.6.2    Special Events
#### 8.6.2.1    General

Special events—such as sports, pageants, regattas, public spectator attractions, entertainment, ceremonies, and encampments—may be permitted by the superintendent when (1) there is a meaningful association between the park area and the event, and (2) the event will contribute to visitor understanding of the significance of the park area. However, a permit must be denied if the event would be disallowed under the criteria listed for unacceptable impacts in sections 1.4.7.1 and 8.2.

Superintendents must ensure that appropriate permit conditions are imposed for special events. Permit conditions are intended to mitigate damage to park resources and values while ensuring that any necessary resource restoration and rehabilitation is completed. Permit conditions should include conditions on resource protection as well as requirements for cost recovery and fees, a hold-harmless clause, liability insurance, and bonding.

The Park Service will not permit the staging of an event in an area that is open to the public, or the closure of an area that is open to the public, when the event

◆    is conducted primarily for the material or financial benefit of a for-profit entity; or

◆    awards participants an appearance fee or prizes of more than nominal value; or

◆    requires in-park advertising or publicity (unless the event is co-sponsored by the Service); or

◆    charges a separate public admission fee.

However, park buildings or specially designated locations that are suitable and appropriate may be made available for private, invitation-only events. Admission fees or any other monies associated with the event will not be collected by the permittee on park premises.

Large-scale events will be managed using the Incident Command System. Donor recognition associated with special events is addressed in Director's Order #21: Donations and Fundraising.

*(See Special Events 6.4.5; Personal Services 7.3.1; Cultural Demonstrators 7.5.7; Facilities for Arts and Culture 9.3.1.7. Also see Director's Order #55: Incident Management Program; 36 CFR 2.50; 36 CFR 7.96)*

### 8.6.2.2   Helium-filled Balloons

Helium-filled balloons pose a danger to the health and safety of marine wildlife (such as sea turtles and sperm whales) and create a litter problem. Therefore, no releases of helium-filled balloons into the atmosphere within a park will be authorized, except for research or planning purposes. Releasing balloons indoors where they can be retrieved may be authorized under permit.

### 8.6.2.3   Fireworks Displays

Fireworks displays will be considered unless they pose an unacceptable risk of wildland or structural fire or will cause unacceptable impacts on park resources or values or jeopardize public safety. In all instances, the decision to approve or deny a request will be made by the superintendent following consultation with the regional safety officer. Fireworks displays will be conducted in compliance with the National Fire Protection Association Code for the Display of Fireworks (NFPA 1123).

### 8.6.2.4   Sale of Food or Merchandise

The sale of food and merchandise in the parks may be allowed when managed under a commercial use authorization that does not conflict with a concession contract and that complies with applicable public health codes and Director's Order #83: Public Health. The sale of printed matter as defined in 36 CFR 2.52, 36 CFR 7.96(k) and Reference Manual 53 is allowed under a special use permit. The sale of products produced as part of living exhibits, interpretive demonstrations, or park programs is addressed in section 7.5.7.

*(See Commercial Use Authorizations 10.3)*

### 8.6.3   First Amendment Activities

The National Park Service will authorize the use of park land for public assemblies, meetings, demonstrations, religious activities, and other public expressions of views protected under the First Amendment of the U. S. Constitution, in accordance with 36 CFR 2.51 or 36 CFR 7.96. To ensure public safety and the protection of park resources and values, and to avoid assigning the same location and time to two or more activities, the Service may manage these activities by issuing a permit to regulate the time, location, number of participants, use of the facilities, and number and type of equipment used, but not the content of the message presented.

For all parks except those within designated portions of the National Capital Region, locations that are available for public assemblies and other First Amendment activities, including the sale and distribution of printed matter, will be so designated by the superintendent on a map in accordance with procedures and criteria found in NPS regulations (36 CFR 1.5, 1.7, 2.51, and 2.52), unless the sites are otherwise protected from public disclosure, such as sites sacred to American Indians or sites with vulnerable natural and cultural resources. Selected National Capital Region parks are subject to special demonstration regulations found at 36 CFR 7.96(g)(4)(iii) and do not have such areas designated by the superintendent.

When the Service allows one group to use an area or facility for expressing views, it must provide other groups with a similar opportunity, if requested. No group wishing to assemble lawfully may be discriminated against or denied the right of assembly provided that all permit conditions are met. Whenever religious activities are conducted in parks, any NPS actions pertaining to them must reflect a clearly secular purpose, must have a primary effect that neither advances nor inhibits religion, and must avoid "excessive governmental entanglement with religion."

NPS staff on duty in an area in which a First Amendment activity is being conducted will be neutral toward the activity, but will remain responsible for the protection of participants, spectators, private property, public property, and park resources. On-duty staff may not participate in a First Amendment activity. NPS employees exercising their First Amendment rights when off-duty must not in any way imply any official NPS endorsement of the activity.

When a permit is requested for the exercise of First Amendment rights, including freedom of assembly, speech, religion, and the press, the superintendent will issue the permit without any requirement for fees, cost recovery, bonding, or insurance. The superintendent will issue or deny a First Amendment permit request under 36 CFR 2.51 within two (2) business days after receiving a proper application. In National Capital Parks subject to special demonstration regulations found at 36 CFR 7.96(g)(3), permits are deemed granted subject to all applicable limitations and restrictions, unless denied within 24 hours of receipt.

*(See Confidentiality 5.2.3. Also see Reference Manual 53)*

### 8.6.4   Rights-of-Way for Utilities and Roads
### 8.6.4.1   General

A right-of-way is a special park use allowing a utility to pass over, under, or through NPS property. It may be issued only pursuant to specific statutory authority, and generally only if there is no practicable alternative to such use of NPS lands. The criteria listed in section 8.2 must also be met. New roads may not be permitted with a right-of-way permit, but require specific statutory authority. Procedures for roads are addressed in section 8.6.4.4.

Before a written application is submitted to the park, potential applicants for a right-of-way permit should meet with the staff to discuss the proposed project. Once an application for a right-of-way is submitted, a compliance analysis must be conducted according to NEPA, NHPA, and other statutory compliance requirements as appropriate. Due to the potentially high costs and values associated with rights-of-way, special attention will be paid to charges and a fair market value for use of the land. Permits will be drafted by park staff and should include terms and conditions necessary to protect park resources and values. New right-of-way permits will be executed by the regional director; conversions from other authorizing documents, amendments, and renewals of existing permits may be signed by the superintendent. A right-of-way permit issued

by the Park Service is considered a temporary document and does not convey an interest in the land. The permit is subject to termination for cause or at the discretion of the regional director.

NPS regulations pertaining to the issuance of rights-of-way are in 36 CFR Part 14; Department of the Interior regulations pertaining to rights-of-way in Alaska are found in 43 CFR Part 36. Additional guidance can be found in Director's Order #53 and Reference Manual 53: Special Park Uses. A utility or road right-of-way proposed for a park in Alaska is subject to the authorities and procedural requirements of title XI of the Alaska National Interest Lands Conservation Act.

*(See Park Management 1.4, Rights-of-way 6.4.8. Also see Director's Order #53)*

### 8.6.4.2   Utilities

Utility rights-of-way over lands administered by the Park Service are governed by statutory authorities in 16 USC 5 (electrical power transmission and distribution, radio and TV, and other forms of communication facilities) and 16 USC 79 (electrical power, telephone, and water conduits). If not incompatible with the public interest, rights-of-way issued under 16 USC 5 or 79 are discretionary and conditional upon a finding by the Service that the proposed use will not cause unacceptable impacts on park resources, values, or purposes.

### 8.6.4.3   Telecommunication Sites

Requests to site non-NPS telecommunication antennas and related facilities on NPS lands will be considered in accordance with the Telecommunications Act of 1996 (47 USC 332 note), which authorizes but does not mandate a presumption that such requests be granted absent unavoidable conflict with the agency mission, or the current or planned use of the property or access to that property. The currently applicable government-wide procedures are contained in GSA Bulletin FPMR D-242.

Superintendents will accept an application for a telecommunications site only from a Federal Communications Commission licensee or from an agency regulated by the Department of Commerce through the National Telecommunications and Information Administration. In recognition of the growing prevalence of wireless telecommunications, the manner in which the park will manage the technology and related facilities should be addressed in an appropriate planning document.

As with other special park uses, telecommunication proposals must meet the criteria listed in sections 1.4.7.1 and 8.2 to prevent unacceptable impacts. In addition, when considering whether to approve, deny, or renew permits, superintendents will

◆ hold preliminary meetings with telecommunication facility applicants to discuss pending applications and policy and procedural issues (such as the application

process, impact analysis, estimated cost recovery charges and fees) and other NPS concerns. Similar meetings should be held during the decision-making process, as necessary, particularly if the superintendent is considering denying the application;

◆ conduct NEPA and NHPA analysis expeditiously and consistent with all applicable statutes and Director's Order #12, and within timetables established pursuant to Director's Order #53;

◆ consider the potential benefit of having telephone access to emergency law enforcement and public safety services;

◆ consider whether the proposal would cause unavoidable conflict with the park's mission, in which case the permit will be denied.

New facilities frequently require the installation of new electrical and telephone lines and vehicular access to the site. Superintendents will therefore evaluate the entire footprint of the new facilities when evaluating requests.

Superintendents will avoid or minimize potential impacts of current and future telecommunications facilities by ensuring that the facilities and their supporting infrastructure

◆ are located where they would have the least impact on park resources and values;

◆ are not located in scenic, historic, and/or sensitive areas integral to the park's mission;

◆ include maximum potential for future co-location.

Superintendents will require the best technology available. For example, consideration should be given first to co-locating new facilities, constructing towers that are camouflaged to blend in with their surroundings, and installing micro-sites. New traditional towers (i.e., monopole or lattice) should be approved only after all other options have been explored. If a traditional tower is necessary, it should not be visible from any significant public vantage point.

As appropriate, superintendents should consider making use of available interpretive media to caution park users of the limited (or nonexistent) cellular service and their personal responsibility to plan accordingly.

When construction of telecommunication facilities on nonpark lands might adversely impact park resources and values, superintendents will actively participate in the applicable planning and regulatory processes and seek to prevent or mitigate the adverse impacts.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Cooperative Conservation Beyond Park Boundaries 1.6; Integration of Facilities into the Park Environment 9.1.1.2; Signs 9.3.1.1)*

#### 8.6.4.4 Roads and Highways and Petroleum-based Pipelines

There are no general NPS statutory authorities for non-NPS roads or for gas pipelines. However, such authorization is sometimes contained in park-specific enabling legislation. Roads and highways within the federal aid highway system are generally authorized by statutes found at 23 USC 107(d) or 317. The Service will generally object to proposals for the use of park lands for highway purposes that do not directly benefit a park. A request for lands for road or highway purposes is subject to compliance with 23 USC 138—commonly referred to as 4(f). The 4(f) evaluation is completed by the Secretary of Transportation and requires the concurrence of the Secretary of the Interior. Approved road or highway requests are authorized by a highway easement deed (not a right-of-way permit).

*(See Fees 8.6.1.2; Non-NPS Roads 9.2.1.2, Construction and Expansion Proposals 9.2.1.2.2. Also see Director's Order #87D: Non-NPS Roads)*

#### 8.6.5 Access to Private Property

The Park Service will allow access to the private property of adjacent landowners and property of landowners within park boundaries, when

◆ it would contribute in a material way to the park's mission without causing unacceptable impacts on park resources or values or the purposes for which the park was established; or

◆ access is the landowner's right by law or by deed reservation.

When one of these circumstances exists, commercial vehicles will be allowed access to private property only in accordance with 36 CFR 5.6, "Commercial Vehicles." Access to nonfederal lands in Alaska that requires access across NPS-administered lands will be provided in accordance with the applicable regulations implementing title 11 of the Alaska National Interest Lands Conservation Act.

#### 8.6.6 Filming and Photography
#### 8.6.6.1 General

The Service's policies and procedures governing filming and photography are governed by Public Law 106-206 (16 USC 460l-6d), which distinguishes filming from photography in that filming involves movement or motion of the subject, whereas photography does not (thus still photography is simply photography). Filming and photography activities—whether commercial or noncommercial—will be allowed in parks provided that the activities do not cause unacceptable impacts under sections 1.4.7.1 or 8.2. For the purposes of NPS policy, filming and photography encompass any technology that may be used for recording images or the sound tracks associated with them.

#### 8.6.6.2 Permits and Fees

A permit will not be required for a visitor's personal, noncommercial filming and photography activities within normal visitation areas and hours. (Outside normal visitation areas and hours, a permit may be required.)

However, all commercial filming activities will require a permit. Commercial filming means filming that involves the digital or film recording of a visual image or sound recording by a person, business, or other entity for a market audience. This includes recordings such as those used for a documentary, television or feature film, advertisement, or similar project.

In accordance with Public Law 106-206, still photography (whether commercial or noncommercial) will not require a permit unless

◆ it takes place at a location(s) where or when members of the public are generally not allowed, or

◆ it uses model(s) or prop(s) that are not a part of the location's natural or cultural resources or administrative facilities, or

◆ the Park Service would need to provide management and oversight to prevent unacceptable impacts.

Notwithstanding the above policies, commercial media coverage of breaking news never requires a permit. However, it is subject to the restrictions and conditions necessary to protect park resources from unacceptable impacts.

Performance bond and liability insurance requirements must be met, and all costs incurred by the Service in writing the permit, monitoring, providing protection services, or otherwise supporting filming or photography activities will be reimbursed by the permittee as a condition of the permit. A location fee will also be required as a condition of the permit. The amount of the fee will be based on the fee schedule current at the time the permit is approved. Neither the location fee nor the cost recovery charges may be waived.

#### 8.6.6.3 NPS Participation

The Service's participation is governed by the following:

◆ The Service will encourage and may actively assist filming and photography activities that promote public understanding and appreciation of the national park system, and the Director may authorize use of the arrowhead symbol for such filming projects.

◆ A superintendent may request a credit line, provided that the content or subject matter of the filming project would not reflect adversely on the National Park Service.

◆ NPS employees, while on duty or in uniform, will not be employed by filming permittees.

◆ Identifiable NPS equipment, uniforms, or insignia must not be portrayed in any way that would imply Service endorsement of a product or service.

◆ The Service will not censor the content of any filming project, or require finished film products for review, files, or documentation purposes. However, a superintendent may review a story board or other material if requested by the applicant to help determine whether (1) the information about the park is accurate,

**116**

(2) a credit line would be appropriate, or (3) it would be appropriate for the Service to actively assist a filming activity or authorize use of the arrowhead symbol.

Additional guidance is provided by Director's Order #53: Special Park Uses; and by Reference Manual 53.

*(Also see Director's Order #52D: Use of the Arrowhead Symbol)*

## 8.6.7   Agricultural Uses

Agricultural uses and activities are authorized in parks in accordance with the direction provided by a park's enabling legislation and general management plan. Agricultural practices and techniques, including the use of pesticides and other biocontrol agents such as genetically modified or engineered organisms, should be specified in an approved resource stewardship strategy, and are subject to review and approval by the NPS integrated pest management (IPM) program manager. These practices and techniques are also subject to the provisions of federal and state laws, NPS regulations and policies, and Director's Orders #53: Special Park Uses and #77-7: Integrated Pest Management. In general, agricultural activities should be conducted in accordance with accepted best management practices.

Agricultural activities, including demonstration farms, prescribed to meet a park's management objectives will be allowed if (1) they do not result in unacceptable impacts on park resources, values, or purposes; (2) they conform to activities that occurred during the historic period; and (3) they support the park's interpretive themes. Agricultural uses that do not conform to those in practice during the historic period may be allowed if (1) they are authorized by the park's enabling legislation, (2) they are retained as a right subsequent to NPS land acquisition, (3) they contribute to the maintenance of a cultural landscape, or (4) they are carried out as part of a living exhibit or interpretive demonstration.

The Service may issue leases or special use permits to individuals or organizations to conduct agricultural activities that are allowed on park lands under the criteria listed in the preceding paragraph. The use of a lease (versus a special use permit) is appropriate only when (1) specifically authorized by the park's enabling legislation, or (2) it is part of an historic leasing program authorized by 16 USC 470h-3, or (3) it is associated with a building that is leased pursuant to 16 USC 1a-2( k). NPS and concession employees living in parks may cultivate gardens for personal use under the terms and conditions established by the superintendent. Such use will not be permitted if it would have unacceptable impacts on park resources, values, or purposes or visitor enjoyment thereof. In urban parks, areas may be designated for community recreational gardening under the same conditions.

*(See Levels of Park Planning 2.3; Biological Resource Management 4.4; Pest Management 4.4.5; Cultural Landscapes 5.3.5.2; Personal Services 7.3.1; Process for Determining New Appropriate Uses 8.1.2. Also see Director's Order #77-7: Integrated Pest Management)*

## 8.6.8   Domestic and Feral Livestock
### 8.6.8.1   General

Livestock uses in parks fall into four categories: (1) recreational pack and saddle stock use, (2) administrative stock use, (3) agricultural (commercial and administrative) grazing, and (4) trespass and feral stock. Grazing that is incidental to the recreational use of stock is regulated by the horse and pack stock regulations at 36 CFR 2.16, and the policy direction for such use is discussed in section 8.2.2.8. Agricultural stock use regulations are found at 36 CFR 2.60.

### 8.6.8.2   Managing Agricultural Grazing

Agricultural (commercial and administrative) grazing occurs in some parks. The Park Service will only allow agricultural grazing in parks where it is

◆   specifically authorized by federal law, or

◆   required under a reserved right of use arising from the acquisition of a tract of land, or

◆   required to maintain an historic scene, or

◆   carried out as part of a living exhibit or interpretive demonstration; or

◆   used to achieve resource conditions (e.g., using sheep to remove leafy spurge) as part of an IPM plan, and

◆   does not cause unacceptable impacts on park resources and values.

The National Park Service must manage its resources in a manner that conserves them for future generations. Parks with agricultural livestock use, including parks where such use is administered by another agency, must address this use in an appropriate planning document. Agricultural livestock grazing will use best management practices to protect park resources, with particular attention being given to protecting wetland and riparian areas, sensitive species and their habitats, water quality, and cultural resources. Managers must regulate livestock so that (1) ecosystem dynamics and the composition, condition, and distribution of native plants and animal communities are not significantly altered or otherwise threatened; and (2) cultural values are protected. A comprehensive monitoring program must be implemented, and adaptive management practices must be used to protect park resources.

Integrated pest management methods must conform to NPS pest management policy in section 4.4.5.

### 8.6.8.2.1   Permitting Agricultural Grazing

Agricultural livestock activities by parties other than the Park Service will be conducted only pursuant to the terms and conditions of a special use permit or lease. The use of a lease is appropriate only when (1) specifically authorized by the park's enabling legislation, or (2) it is part of an historic preservation program authorized by 16 USC 470h-3, or (3) the livestock use is associated with a building that is leased pursuant to 16 USC 1a-2(k).

In addition to any other penalty provisions, violation of the terms and conditions of the permitting instrument may result in revocation of the livestock use privilege. In

parks where the Park Service shares livestock allotment management with another government agency, or where through legislation another government agency administers the use, a general agreement between agencies is necessary to describe the relationship and responsibilities.

### 8.6.8.2.2  Structures for Agricultural Grazing

Appropriate structures may be approved by the National Park Service and may be allowed in parks when the structures

◆ are consistent with a livestock management plan or another appropriate management plan;

◆ are consistent with park purposes and other applicable laws, regulations, or policies; and

◆ will not cause unacceptable impacts on park resources and values.

The Service will not expend funds to construct or maintain livestock structures unless there is a direct benefit to the protection of park resources. The permittee will generally be required to remove structures when livestock activities are no longer authorized.

*(See Chapter 2: Park System Planning; Management of Exotic Species 4.4.4; Water Resource Management 4.6; Identification and Designation of the Wilderness Resource 6.2; Grazing and Livestock Driveways 6.4.7; Equestrian Trails 9.2.2.3; Miscellaneous Management Facilities 9.4.5. Also see Director's Order #77-3: Domestic and Feral Livestock Management, and Reference Manual 77-3; Director's Order #53: Special Park Uses, and Reference Manual 53; Director's Order #77-7: Integrated Pest Management)*

### 8.6.8.3  Trespass and Feral Livestock

Livestock trespassing on park lands may be impounded and disposed of pursuant to the provisions of 36 CFR 2.60, with the owner charged for expenses incurred. Wild living or feral livestock having no known owner may also be disposed of in accordance with 36 CFR 2.60.

Parks having shared jurisdiction with state fish and wildlife agencies should coordinate with their counterparts in the determination of how a particular animal is classified in that state. Good communication with state and other officials will be fostered to minimize conflicts.

### 8.6.9  Military Operations

In general, military activities are discouraged in parks, except for study of military history at related NPS sites. Periodically, an armed services unit may request the use of park areas for noncombat exercises such as search-and-rescue and outdoor survival. Determining when and where military units may conduct such activities is a discretionary decision of the superintendent.

A permitted military activity must conform to the following conditions:

◆ A permit will be issued that clearly states all necessary conditions or stipulations to protect park resources and visitor safety.

◆ All applicable park rules and regulations will be followed.

◆ No weaponry will be carried, displayed, or used, except for ceremonial purposes or authorized public demonstrations.

◆ The activity will be conducted away from visitor use locations and out of public view (except where a public demonstration is specifically authorized).

◆ The military organization will designate a liaison officer who will be available to the superintendent throughout the exercise.

◆ Permittees will be educated about how the purpose, mission, and regulations of the park differ from their own missions, especially in regard to resource protection and visitor use and enjoyment.

National security and law enforcement agencies, such as the Central Intelligence Agency, Federal Bureau of Investigation, Secret Service, Department of Homeland Security, and state police, may wish to conduct similar exercises. These requests should be evaluated in the same way as military special use requests.

### 8.6.10  Cemeteries and Burials
### 8.6.10.1  National Cemeteries

All NPS-administered national cemeteries will be managed as historically significant resources and as integral parts of larger historical parks. Burials in national cemeteries will be permitted, pursuant to applicable regulations, until available space has been filled. The management and preservation of national cemeteries are subject to the provisions of the National Cemeteries Act of 1973; NPS "National Cemetery Regulations" (36 CFR Part 12); and Director's Order #61: National Cemeteries.

The enlargement of a national cemetery for additional burials constitutes a modern intrusion, compromising the historical character of both the cemetery and the historical park, and will not be permitted.

### 8.6.10.2  Family Cemeteries

The burial of family members in family cemeteries that have been acquired by the Park Service in the course of establishment of parks will be permitted to the extent practicable, pursuant to applicable regulations, until space allotted to the cemeteries has been filled. Family members (or their designees) will be allowed access for purposes of upkeep and commemoration (such as wreath-laying and religious rituals) that do not jeopardize safety or resource protection. Whenever applicable, park managers will keep active files on cemeteries for the purpose of responding to requests and inquiries.

*(Also see Director's Order #19: Records Management)*

### 8.6.10.3  Other Burials and the Scattering of Ashes

Other burials or reinterments outside established cemeteries in parks will be prohibited except where permitted by cultural resource policies. The scattering of ashes from cremation may be permitted by a superintendent, in

accordance with NPS general regulations in 36 CFR 2.62 and applicable state laws. Authorization to scatter ashes must take into account potential conflicts with the spiritual or cultural practices of the indigenous people associated with the area.

*(See Stewardship of Human Remains and Burials 5.3.4; Cultural Resources 6.3.8, Consultation 7.5.6)*

### 8.6.11   Other Special Park Uses

Other special park uses that may be allowed under permit or special regulations include the use of explosives and the use of portable power equipment. Specific guidance is provided in 36 CFR Part 2; Director's Order #53: Special Park Uses; and Reference Manual 53.

## 8.7   Mineral Exploration and Development

Mineral exploration and development include exploration, extraction, production, storage, and transportation of minerals. Mineral exploration or development may be allowed in parks only when prospective operators demonstrate that they hold rights to valid mining claims, federal mineral leases, or nonfederally owned minerals. If this right is not clearly demonstrated, the National Park Service will inform the prospective operator that, until proof of a property right is documented, the Service will not further consider the proposed activity. Unless otherwise directed by Congress, if the Service determines that the proposed mineral development would impair park resources or values, or that such development is not consistent with park purposes or does not meet approval standards under applicable NPS regulations and cannot be sufficiently modified to meet those standards, the Service will seek to extinguish the associated mineral right through acquisition. In some parks, all or certain types of mineral development are specifically prohibited by law.

All persons who conduct mineral development within parks will do so only in conformance with applicable statutes, regulations, and NPS policies. These statutes include the Mining in the Parks Act, the Mineral Leasing Act, the Acquired Lands Mineral Leasing Act, the Surface Mining Control and Reclamation Act of 1977, the National Park System General Authorities Act, the Alaska National Interest Lands Conservation Act, and enabling statutes for individual parks. Applicable regulations include 36 CFR Part 9, Subpart A and Subpart B; 43 CFR Parts 3100-3500; and special use regulations.

Persons may not use or occupy surface lands in a park for purposes of removing minerals outside the park unless provided for in law. General management plans, land protection plans, and other planning documents for parks with mining claims, federal mineral leases, or nonfederally owned mineral interests will address these nonfederal property interests as appropriate. Lands with mineral interests will be zoned according to their anticipated management and use—based on their resource values, park management objectives, and park-specific legislative provisions relating to mineral interests.

*(See Levels of Park Planning 2.3; Land Protection Plans 3.3; Identification and Designation of the Wilderness Resource 6.2; Mineral Development 6.4.9)*

### 8.7.1   Mining Claims

The location of new mining claims pursuant to the General Mining Act of 1872 is prohibited in all park areas. Under the Mining in the Parks Act, the National Park Service may permit mineral development only on existing patented and valid unpatented mining claims in conformance with the park's enabling legislation and the regulations for mining claims in 36 CFR Part 9, Subpart A. The Service may initiate a validity examination on unpatented mining claims at any time. The Service will require a validity examination of all unpatented mining claims before approving any operations on such claims in accordance with 36 CFR Part 9, Subpart A. However, a validity examination is not required before NPS authorization of activities that are conducted only to reclaim a site. All mineral development and use of resources in connection with a claim will be confined to the boundaries of the claim itself, except for the access and transport that are permitted under 36 CFR Part 9, Subpart A; or, for Alaska, 43 CFR Part 36.

### 8.7.2   Federal Mineral Leases

All parks are closed to new federal mineral leasing except for three national recreation areas (Lake Mead, Whiskeytown, and Glen Canyon) where Congress has explicitly authorized federal mineral leasing in each area's enabling legislation. Through park planning documents, the National Park Service has closed portions of these areas to federal mineral leasing because of the presence of sensitive resources. No person may explore for federal minerals in any of these areas except under a lease issued pursuant to regulations in 43 CFR Part 3100 or a prospecting permit pursuant to 43 CFR 3500. Before consenting to a federal mineral lease or subsequent mineral development connected with a lease, the regional director must find, in writing, that leasing and subsequent mineral development will not result in a significant adverse effect on park resources or administration.

Some park areas contain leases that existed at the time the park was created or expanded. These leases are valid existing rights and will continue to exist until they expire under the regulations that govern federal mineral leasing (43 CFR Parts 3100 and 3500).

### 8.7.3   Nonfederally Owned Minerals

Nonfederal mineral interests in park units consist of oil and gas interests, rights to mineral interests other than oil and gas (such as private outstanding mineral rights, mineral rights through general land grant patents, homestead patents, or other private mineral rights that did not derive from the General Mining Act). The Park Service governs activities associated with these two categories of nonfederal mineral rights under separate regulatory schemes.

The Park Service may approve operations associated with nonfederal oil and gas interests under the standards and procedures in 36 CFR Part 9, Subpart B. If an operator's plan

fails to meet the approved standards of these regulations, the Park Service generally has authority to deny the operation and may initiate acquisition. Absent a decision to acquire the property, application of the regulations is not intended to result in a taking of the property interest, but rather to impose reasonable regulation of the activity.

Operations associated with nonfederal mineral interests, other than oil and gas, are subject to the requirements of 36 CFR Part 5, "Commercial and Private Operations," and 36 CFR 1.6.

The Service must determine that operations associated with these mineral interests would not adversely impact "public health and safety, environmental or scenic values, natural or cultural resources, scientific research, implementation or management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities …." If the impacts from the operation on the resource cannot be sufficiently mitigated to meet this standard, the Park Service may seek to acquire the mineral interest.

## 8.8   Collecting Natural Products

The collection of natural products for personal use or consumption is governed by NPS general regulations contained in 36 CFR 2.1 and 36 CFR Part 13. A superintendent may designate certain fruits, berries, nuts, or unoccupied seashells that can be gathered by hand for personal use or consumption upon a written determination by the superintendent that such an activity will not adversely affect park wildlife or the reproductive potential of a plant species or otherwise adversely affect park resources. In some cases, peer-reviewed scientific information may be needed to support the determination. The regulations do not authorize the taking, use, or possession of fish, wildlife, or plants for ceremonial or religious purposes, except where specifically authorized by federal statute or treaty rights or where hunting, trapping, or fishing are otherwise allowed. The collection of minerals or rocks for personal use will be allowed only when specifically authorized by federal law or treaty rights.

The gathering of firewood will be allowed only where subsistence use is authorized by federal law, or in specific areas designated by a superintendent in which dead and down wood may be collected for campfires or in small quantities for other uses within the park. Natural resource products that accumulate as a result of site clearing for development, hazard tree removal, vista clearing, or other management actions will be recycled through the ecosystem when practicable. When recycling is not practicable, the products may be disposed of by other means. Disposal may be accomplished by contract, if the result of the work done under contract and the value are calculated in the contract cost, or by sale at fair market value in accordance with applicable laws and regulations. Wood that accumulates as a result of the management actions described above may also

be used for park purposes, such as heating public buildings or offices or for interpretive campfire programs.

*(See Consumptive Uses 8.9, Natural and Cultural Studies, Research, and Collection Activities 8.10. Also see Director's Order #18: Wildland Fire Management)*

## 8.9   Consumptive Uses

Consumptive uses of park resources may be allowed only when they are

◆   specifically authorized by federal law or treaty rights (such as hunting, trapping, or mining, or subsistence use in specifically identified parks);

◆   specifically authorized pursuant to other existing rights (such as a right retained by a donor of the land on which the use would occur);

◆   grazing activities authorized in accordance with section 8.6.8.1; or

◆   traditional visitor activities, such as fishing or berry picking, that are authorized in accordance with NPS general regulations.

As a matter of policy, the Service generally supports the limited and controlled consumption of natural resources for traditional religious and ceremonial purposes and is moving toward a goal of greater access and accommodation. As a general matter, a superintendent may not allow consumptive use of park resources by any particular group to the exclusion of others.

Current NPS policy is reflected in regulations published at 36 CFR Part 13. The general regulations at 36 CFR 2.1 allow superintendents to designate certain fruits, berries, nuts, or unoccupied seashells that may be gathered by hand for personal use or consumption if it will not adversely affect park wildlife, the reproductive potential of a plant species, or otherwise adversely affect park resources. The regulations do not authorize the taking, use, or possession of fish, wildlife, or plants for ceremonial or religious purposes, except where specifically authorized by federal statute or treaty rights or where hunting, trapping, or fishing are otherwise allowed.

The 36 CFR Part 13 regulations address the consumptive use of park resources for subsistence purposes in Alaska, where it is allowed in the 10 parks and "expanded areas" established by the Alaska National Interest Lands Conservation Act. Some park-specific enabling acts (e.g., Big Cypress National Preserve and Kaloko-Honokohau National Historical Park) also allow subsistence or other traditional uses of park resources.

*(See Park Management 1.4; Harvest of Plants and Animals by the Public 4.4.3; Resource Issue Interpretation and Education 7.5.3; General 8.; Use by American Indians and Other Traditionally Associated Groups 8.5. Also see 36 CFR Part 13, Subpart B)*

**120**

## 8.10   Natural and Cultural Studies, Research, and Collection Activities

Studies, research, and collection activities by non-NPS personnel involving natural and cultural resources will be encouraged and facilitated when they otherwise comport with NPS policies. Scientific activities that involve field work or specimen collection, or that have the potential to disturb resources, the visitor experience, or park operations, require a permit issued by the superintendent that prescribes appropriate conditions for protecting park resources, visitors, and operations. Such studies may require additional permits from other jurisdictions.

*(See Studies and Collections 4.2; Independent Research 5.1.2; Independent and Commercial Studies 8.11.3)*

## 8.11   Social Science Studies

### 8.11.1   General

Understanding the changing demographics of our nation is critical to the future of the National Park Service. The Park Service will actively seek to better understand the values and connections the changing U.S. population has, or does not have, for our natural and cultural heritage so that the Service can be responsive and relevant to public needs and desires. This includes understanding why people do or do not visit national parks.

The National Park Service will facilitate social science studies that support the NPS mission by providing an understanding of park visitors, the nonvisiting public, gateway communities and regions, and human interactions with park resources. This approach will provide a scientific basis for park planning, development, operations, management, education, and interpretive activities. Investigators will be encouraged to use the parks for scientific studies whenever such use is consistent with NPS policies that recognize the scientific value of parks as laboratories. Specific guidance is provided in Director's Orders #75A: Civic Engagement and Public Involvement, and #78: Social Science.

Studies include short- or long-term scientific investigations in NPS areas that may involve social science surveys and research. The data and information acquired through scientific activities conducted in the parks will be made broadly available to park managers, the scientific community, and the public, except where legal restrictions apply. Studies may include both internally and externally conducted projects by researchers and scholars with universities; foundations and other nongovernmental organizations; federal, state and local agencies; chambers of commerce; industry organizations; and NPS staff. The Park Service will promote cooperative relationships with educational and scientific institutions and qualified individuals (1) when specialized expertise exists that can be of significant assistance to the Service in obtaining information, and (2) when the opportunity for research and study in the parks offers institutions a significant benefit to their programs. NPS facilities and assistance may be made available to qualified researchers conducting NPS-authorized studies. NPS or other federally funded studies that rely on survey instruments or focus groups are strictly regulated and must be approved by the Park Service, the Department of the Interior, and the Office of Management and Budget before they can be used to gather information directly from visitors or the general public.

*(See Managing Information 1.9.2; Studies and Collections 4.2; Research 5.1, Planning 5.2; Appropriate Use 8.1.1; Special Park Uses 8.6; NPS-supported Studies 8.11.2; Independent and Commercial Studies 8.11.3; Department of the Interior Interim Guidelines for Collection of Information from the Public. Also see Director's Order #17: Tourism))*

### 8.11.2   NPS-supported Studies

The National Park Service is responsible for the identification and acquisition of needed inventory, monitoring, and research, as well as for the interpretation of the management and operational implications of such studies. The Service will use the best available science to assist park managers in addressing management needs and objectives that have been identified in legislation and planning documents.

The Service will support studies to

◆ reach a level of understanding that will minimize "crisis" management;

◆ ensure a systematic and fully adequate park information base;

◆ provide a sound basis for policy, planning, and decision-making;

◆ develop effective strategies, methods, and technologies to predict, avoid, or minimize unacceptable impacts on resources, visitors, and related activities;

◆ determine causes of resource management problems;

◆ further understand park ecosystems and related human social systems, and document their components, condition, and significance;

◆ evaluate visitor satisfaction with services, facilities, and recreational opportunities;

◆ ensure that the interpretation of park resources and issues reflects current standards of scholarship for the history, science, and condition of the resources;

◆ evaluate performance measures in support of strategic plan goals;

◆ establish economic measures and impact indicators of interest or importance;

◆ improve understanding of local, regional, and national demographics and trends.

Superintendents may authorize park staff to carry out routine duties without requiring a research/collecting permit. NPS-supported research will rely on high-quality methods and undergo peer review. NPS-supported scientists will be expected to publish their findings in refereed journals, among other outlets.

### 8.11.3   Independent and Commercial Studies

Non-NPS social science studies conducted in parks are not required to address specifically identified NPS management issues or information needs. However, these studies (excluding research in museum collections) require an NPS research/collecting permit. Pursuant to the terms and conditions of the permit, the studies must conform to NPS policies and other guidance regarding activities such as the collection and publication of data, conduct of studies, and wilderness restrictions. NPS research/collecting permits may also include requirements that permittees provide parks, within reasonable time-frames, with the appropriate field notes (subject to ethical guidelines of the appropriate discipline), data, information about the data, catalog data, progress reports, interim and final reports, and publications derived from the permitted activities. Projects will be administered and conducted only by fully qualified personnel, and will conform to current standards of scholarship.

The collection of data from the public and employees to support the research, development, and marketing of commercial products or services may be permitted only in limited circumstances. Such activity will not be permitted when the superintendent determines that it would impose an undue burden on visitors and/or employees, and/or when it has the potential to adversely impact park resources or detract from visitors' experiences in the park. All necessary data collection permits must be obtained, including a scientific research and collecting permit and the permission of the superintendent. Names and addresses and any other unique identifying information collected from park visitors and/or employees cannot be distributed, shared, or sold for commercial purposes.

*(Also see Director's Order #84: Library Management)*

### 8.11.4   Management and Conduct of Studies

All studies in parks will employ nondestructive methods to the maximum extent possible to avoid the irretrievable commitment of park resources. Studies will be preceded by an approved scope of work, proposal, or other detailed written description of the work to be performed.

*(See Studies and Collections 4.2. Also see Director's Order #74: Studies and Collecting)*

## 8.12   Leases

In accordance with 36 CFR Part 18, the National Park Service may enter into a lease for the use of any park property—historic or nonhistoric (except nonhistoric land)—if the following determinations are first made by the appropriate regional director (who may redelegate this authority to superintendents):

(1)   The lease will not result in degradation of the purposes and values of the park area.

(2)   The lease will not deprive the park area of property necessary for appropriate park protection, interpretation, visitor enjoyment, or administration.

(3)   The lease contains such terms and conditions as will ensure that the leased property will be used for an activity and in a manner that are consistent with the purposes established by law for the park area in which the property is located.

(4)   The lease is compatible with NPS programs.

(5)   The lease is for rent at least equal to the fair market value rent of the leased property.

(6)   The proposed activities under the lease are not subject to authorization through a concession contract, commercial use authorization, or similar instrument.

(7)   If the lease includes historic property, the lease will adequately ensure the preservation of the historic property. (In addition, a lease that includes historic property may be executed by the Park Service only after compliance with the CFR Part 800, the commenting procedures of the Advisory Council on Historic Preservation).

It is likely that lease uses will be permissible under paragraph (6) if

◆   the leased property where the proposed services are to be provided is not near a particular visitor destination of the park area, and

◆   the patrons of the lessee are expected to be primarily persons who come to the park area only to use the lessee's services.

### 8.12.1   Additional Criteria

◆   All leases must be at fair market value.

◆   The term of the lease will be the shortest time needed for the proposed use, taking into account required lessee investments and other factors related to determining an appropriate lease term.

◆   No lease will exceed 60 years.

◆   Lease terms may not be extended except that leases with a term of one (1) year or more may be extended once for a period not to exceed one (1) additional year if it is determined that an extension is necessary because of circumstances beyond NPS control.

### 8.12.2   Prior Approval

No lease instrument may be awarded or amended without prior written approval by the Solicitor's Office.

Prior to their execution by a regional director or superintendent, the Director must approve—

◆   proposed leases with terms of more than ten (10) years;

◆   proposed leases or lease amendments that provide for a leasehold mortgage or similar encumbrance; and

◆   proposed amendments of existing leases that required the Director's approval prior to execution.

### 8.12.3   Noncompetitive Awards

The Service generally may not enter into a Part 18 lease without issuing a Request for Bids or a Request for Proposals. The Service may, however, enter into Part 18 leases on a noncompetitive basis in two circumstances:

(1)   The Part 18 lease is with a nonprofit organization or a unit of government and the Service determines that the nonprofit or governmental use of the property will contribute to the purposes and programs of the park area; or

(2)   The lease is short-term (sixty (60) continuous days or less) and the Service determines that to award the lease noncompetitively is in the best interests of the administration of the park area. This authority is not limited to nonprofit organizations or units of government; any qualified person or entity may be awarded a lease with a term of sixty (60) days or less. These leases cannot require any rehabilitation or improvements to the applicable property.

Noncompetitive leases must in all other ways meet the requirements of 36 CFR Part 18 and Director's Order #38: Real Property Leasing.

### 8.12.4   Historic Properties

If a lease agreement requires or allows the lessee to maintain, repair, rehabilitate, restore, or build upon historic property, the work must be done in accordance with the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation and other NPS policies, guidelines, and standards.



# Park Facilities

*The National Park Service will provide visitor and administrative facilities that are necessary, appropriate, and consistent with the conservation of park resources and values. Facilities will be harmonious with park resources, compatible with natural processes, esthetically pleasing, functional, energy- and water-efficient, cost-effective, universally designed, and as welcoming as possible to all segments of the population. NPS facilities and operations will demonstrate environmental leadership by incorporating sustainable practices to the maximum extent practicable in planning, design, siting, construction, and maintenance.*

**More people are able to enjoy their visit when park facilities are designed and constructed to meet universal design standards.**

**124**   **9.1 General**

The Organic Act, which created the National Park Service in 1916, directs the Service to conserve park resources "unimpaired" for the enjoyment of future generations. The 1970 National Park System General Authorities Act, as amended in 1978, prohibits the Service from allowing any activities that would cause derogation of the values and purposes for which the park units have been established. Taken together, these two laws impose on NPS managers a strict mandate to protect park resources and values. (Throughout Management Policies, "impairment" is construed to also encompass "derogation.") In protecting park resources and values, the Service will demonstrate environmental leadership and a commitment to the principles of sustainability and asset management in all facility developments and operations. This commitment will be made obvious to the public in the choices and decisions that are made, and through appropriate educational opportunities.

Support facilities necessary to house, transport, inform, and serve visitors and staff require proper planning, design, programming, construction, operation, and maintenance. The Service must avoid the construction of buildings, roads, and other development that will cause unacceptable impacts on park resources values. The Service must also avoid the future operation and maintenance costs of unnecessary or ineffective facilities, regardless of how the asset investment is funded. The Service must also recognize the ongoing operations and maintenance costs of its facilities and be able to sustain them over time. Therefore, the Service will not develop or redevelop a facility within a park until a determination has been made that the facility is necessary and appropriate, and that it would not be practicable for the facility to be developed or the service to be provided outside the park. This policy recognizes, for example, that a gas station or a grocery store may be necessary to park use and enjoyment, but that it may not need to be located within the park. Special considerations may be necessary in Alaska, given section 1306 of the Alaska National Interest Lands Conservation Act (16 USC 3196).

Partnership construction projects will be held to the same standards articulated above. In addition, where donated funds are used, the Service will follow the requirements of Director's Order #21: Donations and Fundraising.

*(See Park Management 1.4; Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Evaluating Impacts on Natural Resources 4.1.3; Planning 5.2; Commercial Visitor Services Planning 10.2.2; Director's Order #80: Asset Management; Director's Order #21: Donations and Fundraising)*

### 9.1.1    Facility Planning and Design

The protection of each park's resources and values will be the primary consideration in facility development decisions. Facilities for visitor use and park management will be consistent with each park's authorizing legislation, and with approved general management plans, development concept plans, and associated planning documents. The planning and design of park facilities will be accomplished by interdisciplinary teams constituted to meet the resource stewardship, programmatic, and technical requirements of the project. Public input will be sought at the earliest stage of planning and design, particularly in those cases where controversy is likely.

The Park Service will meet its facility development needs in a cost-effective manner, ensuring that value is returned for every decision made. Only development projects that are shown to be an appropriate use of funds and economically feasible will be approved. Value analysis and value engineering techniques, such as functional analysis and cost evaluation, will be applied to achieve the lowest life-cycle cost that is consistent with environmental, energy performance, reliability, quality, safety, and resource protection requirements. Construction and operational cost estimates will be continually reviewed throughout the planning and development processes to avoid excessive, unwarranted, or unnecessary costs. Development projects will also be continually reviewed for opportunities to add value and benefits that will help achieve the NPS mission.

Designs for park facilities, regardless of their origin (NPS, contractor, concessioner, or other), will use NPS facility models for space and function requirement and will be harmonious with and integrated into the park environment. They will also be subject throughout all phases of design and construction to the same code compliance; the same high standards of sustainable design, universal design, and functionality; and the same review and approval processes. NPS requirements for sustainable design and functionality include protection of the natural and cultural environments, resource conservation, energy conservation, pollution prevention, defensible space for fire safety, and fostering education about sustainable design and practices.

The Service will issue, and update as necessary, guiding principles for sustainable design to be applied throughout the national park system, consistent with federal regulations such as Executive Order 13123 (Greening the Government through Efficient Energy Management), Executive Order 13101 (Greening the Government through Waste Prevention, Recycling and Federal Acquisition), and Executive Order 13327 (Federal Real Property Asset Management).

*(See Levels of Park Planning 2.3; General Management Concepts 4.1; Lightscape Management 4.10. Also see Director's Orders #13A: Environmental Management Systems; and #90: Value Analysis; NPS Guiding Principles of Sustainable Design)*

### 9.1.1.1    Life-cycle Costs

The total cost of a system, facility, or other product will be considered in its planning, design, and construction. Total cost will be computed over a product's or system's useful life or other specified period of time using economic analysis. Life-cycle costs include acquisition, shipping, initial construction or installation, operation and maintenance, environmental and energy consumption, water, wastewater,

and the costs of eventual disposal or deconstruction of the system, facility, and/or product. To the extent practicable, the waste implications of materials, products, and by-products (including product life-cycle pollution) should be considered as part of life-cycle costs. When the cost of facility deconstruction is included in the life-cycle cost analysis, deductions may be factored in for the salvage value of the recyclable materials.

*(Also see Director's Orders #13A: Environmental Management Systems; and #90: Value Analysis)*

### 9.1.1.2    Integration of Facilities in the Park Environment

Whenever feasible and authorized by Congress, major park facilities—especially those that can be shared with other entities—should be developed outside park boundaries. The Service will encourage the private sector to meet facility needs in gateway communities and thus contribute to local economic development, encourage competition, increase choices for visitors, and minimize the need for in-park construction. Where feasible, appropriate, and authorized, the Park Service will cooperatively establish and maintain administration/information facilities with other federal, state, or local entities.

If facilities must be located inside park boundaries, the preferred locations will be those that minimize impacts on park resources and are situated to stimulate the use of alternative transportation systems, bicycle routes, and pedestrian walkways. Major facilities within park boundaries will be placed only in locations identified in an approved general management plan or implementation planning document as being suitable and appropriate. Facility siting will take into account the need for protection from fires and take maximum advantage of factors such as solar energy, wind direction and speed, natural landscaping, and other natural features.

When structures are no longer functional in their present locations or are determined to be inappropriately placed in important resource areas, they will be removed subject to appropriate compliance.

When the determination has been made through a planning process that it is appropriate for a facility to be constructed within park boundaries, all facilities will be integrated into the park landscape and environs with sustainable designs and systems to minimize environmental impact. Development will not compete with or dominate park features or interfere with natural processes, such as the seasonal migration of wildlife or hydrologic activity associated with wetlands.

If a cohesive design theme is desired, recommended, or required, the theme will reflect the purpose and character of the park, or in a large park the theme will reflect an individual developed area. Standard designs and components may be used, but they will be adapted as appropriate to the specific site and conditions as part of the design process.

The full integration of facilities into the park environment will involve

◆  sensitivity to cultural, regional, esthetic, and environmental factors (e.g., solar orientation, prevailing winds, landscaping, vulnerability to wildfire and other natural hazards) in the selection of site, construction materials, and forms;

◆  innovative concepts for grouping facilities and activities, both in the design of new development and in the redesign of existing complexes while building on the architectural and landscape elements already present;

◆  thorough interdisciplinary resource, user, and short- and long-term structure maintenance analyses;

◆  the long-term need for and sustainable use of water, energy, and waste disposal resources;

◆  assessment of the transportation and mobility needs of park visitors and concessioner and NPS employees, and of access to the park from gateway communities; and

◆  knowledge about the values and sociocultural interests of American Indians and other groups traditionally associated with the park.

*(See Environmental Leadership 1.8; General Management Planning 2.3.1; Lightscape Management 4.10; Historic and Prehistoric Structures 5.3.5.4; Protection of Cultural Values 9.1.1.3; Siting Facilities to Avoid Natural Hazards 9.1.1.5; Visitor Centers 9.3.1.3; Commercial Visitor Services Planning 10.2.2)*

### 9.1.1.3    Protection of Cultural Values

When important cultural resources are present, efforts will be made to use existing contributing structures. New visitor or administration structures will harmonize with the area and the cultural resources in proportion, color, and texture. No attempt will be made to duplicate or mimic a historic design, nor will any modern construction be portrayed to the public as being historic. However, vernacular styles of architecture are appropriate when they provide visual compatibility with the cultural landscape. Application of the criteria of effect promulgated by the Advisory Council on Historic Preservation and compliance with the council's regulations on "Protection of Historic Properties" (36 CFR Part 800) will precede any development. These criteria apply to all historic properties.

*(See Identification and Evaluation of Resources 5.1.3; Planning 5.2; Treatment of Cultural Resources 5.3.5. Also see Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation)*

### 9.1.1.4    Adaptive Use

The National Historic Preservation Act and Executive Order 13006 (Locating Federal Facilities on Historic Properties) require each federal agency— before acquiring, constructing, or leasing buildings— to use, to the maximum extent feasible, historic properties available to it whenever operationally appropriate and economically prudent. (16 USC 470h-2(a)(1)). The act also requires each agency

to implement alternatives for the adaptive use of historic properties it owns if that will help ensure the properties' preservation. Therefore, the adaptive use of historic and nonhistoric buildings for operations such as visitor centers, hostels, and administrative offices will be considered first, before new construction, provided that (1) it can meet park objectives and current code requirements, (2) its use will not be an intrusion on significant natural or cultural resources, and (3) a cost savings will be realized. Even when the cost of adaptive use is greater than new construction, it may still be justified. Use of historic buildings will comply with all laws, regulations, and policies regarding the treatment and use of cultural resources.

*(See Physical Access for Persons with Disabilities 5.3.2; Use of Historic Structures 5.3.5.4.7; Leases 8.12))*

### 9.1.1.5    Siting Facilities to Avoid Natural Hazards

The Service will strive to site facilities where they will not be damaged or destroyed by natural physical processes. Natural hazard areas include sites with unstable soils and geologic conditions, fault zones, thermal areas, floodplains, flash-flood zones, fire-prone vegetation, and coastal high-hazard areas. Park development that is damaged or destroyed by a hazardous or catastrophic natural event will be thoroughly evaluated for relocation or replacement by new construction at a different location. If a decision is made to relocate or replace a severely damaged or destroyed facility, it will be placed, if practicable, in an area that is believed to be free from natural hazards. In areas where dynamic natural processes cannot be avoided, such as seashores, developed facilities should be sustainably designed (e.g., removable in advance of hazardous storms or other conditions). When it has been determined that facilities must be located in such areas, their design and siting will be based on

◆   a thorough understanding of the nature of the physical processes; and

◆   avoiding or mitigating (1) the risks to human life and property, and (2) the effect of the facility on natural physical processes and the ecosystem.

Requirements for development in floodplains and wetlands are contained in Executive Order 11988 (Floodplain Management); Executive Order 11990 (Protection of Wetlands); Director's Orders #77-1: Wetland Protection and #77-10: Natural Resource Inventorying and Monitoring; and other NPS guidance documents.

*(See Levels of Park Planning 2.3; Floodplains 4.6.4; Wetlands 4.6.5; Shorelines and Barrier Islands 4.8.1.1; Geologic Hazards 4.8.1.3; Visitor Safety and Emergency Response 8.2.5; Concession Facilities 10.2.6)*

### 9.1.1.6    Sustainable Energy Design

Any facility development, whether it is a new building, a renovation, or an adaptive reuse of an existing facility, must include improvements in energy efficiency and reduction in greenhouse gas emissions for both the building envelope and the mechanical systems that support the facility. Maximum energy efficiency should be achieved using solar thermal and photovoltaic applications, appropriate insulation and glazing strategies, energy-efficient lighting and appliances, and renewable energy technologies. Energy-efficient construction projects should be used as an educational opportunity for the visiting public.

All projects that include visitor centers or major visitor services facilities must incorporate LEED (Leadership in Energy and Environmental Design) standards to achieve a silver rating.

### 9.1.2    Accessibility for Persons with Disabilities

The Service will design, construct, and operate all buildings and facilities so they are accessible to and usable by persons with disabilities to the greatest extent reasonable, in accord with all applicable laws, regulations, and standards. This means that all new and altered buildings and facilities will comply with the General Services Administration's regulations adopting accessibility standards for the Architectural Barriers Act of 1968 (41 CFR Part 102-76, Subpart C), and 43 CFR, Part 17, Subpart E, Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Interior. It also means that some buildings and facilities will be modified to ensure that programs can be provided in an accessible location.

Accessibility will be provided consistent with preserving park resources and providing visitor safety and high-quality visitor experiences. In most instances, the degree of accessibility provided will be proportionately related to the degree of human-made modifications in the area surrounding the facility and the importance of the facility to people visiting or working in the park. Accordingly, most administrative offices, some overnight visitor accommodations, some employee housing, and most interpretive and visitor service facilities will be accessible. Undeveloped areas, such as those outside the immediate influence of buildings and roads, will not normally be modified, nor will special facilities be provided for the sole purpose of providing access to all segments of the population. Accessibility to facilities in threshold areas will be determined on the basis of topography, the significance of the attraction, the number of physical modifications being made to the environment, and the modifications necessary to ensure programmatic accessibility.

Transportation systems in parks, including water transportation, will have a sufficient percentage of fully accessible vehicles or watercraft to provide effective services to persons with disabilities. In the case of existing systems, the necessary vehicles will be provided on a replacement or retrofit basis. Until the transportation system has been made fully accessible, a separate accessible vehicle will be provided, or disabled persons will be allowed to drive their personal vehicles on otherwise-restricted roadways. In meeting the goal of accessibility, emphasis will be placed on ensuring that persons with disabilities are afforded

experiences and opportunities along with other visitors to the greatest extent reasonable. Separate facilities for people with disabilities are not a substitute for full accessibility to other park facilities, but they may be allowed where the need for specialized services is clearly demonstrated.

*(See Physical Access for Persons with Disabilities 5.3.2; Accessibility for Persons with Disabilities 8.2.4; Accessibility of Commercial Services 10.2.6.2. Also see Director's Order #42: Accessibility for Visitors with Disabilities in National Park Service Programs and Services)*

### 9.1.3   Construction

The Service will incorporate sustainable principles and practices into design, siting, construction, building materials, utility systems, recycling of all unusable materials, and waste management. Best management practices will be used for all phases of construction activity, including preconstruction, actual construction, and postconstruction. Although construction of new assets is often a viable alternative for meeting visitor needs or protecting resources, the Service will consider nonbuild alternatives to meet its needs. The nonbuild alternative is developed and evaluated as part of the early facility planning and design process.

#### 9.1.3.1   Construction Sites

Construction sites will be limited to the smallest feasible area. The selection of construction sites will consider opportunities for taking advantage of natural sources of lighting, heating, and cooling (e.g., near an existing or potential stand of deciduous trees) to maximize energy conservation. Ground disturbance and site management will be carefully controlled to prevent undue damage to vegetation, soils, and archeological resources and to minimize air, water, soil, and noise pollution. Protective fencing and barricades will be provided for safety and to preserve natural and cultural resources. Effective storm water management measures specific to the site will be implemented, and appropriate erosion and sedimentation control measures will be in place at all times. Solid, volatile, and hazardous wastes will be avoided when possible. When they cannot be avoided, they will be properly stored, transported, and disposed of in compliance with federal, state, and local laws and regulations. All materials will be recycled whenever possible.

A review and approval of any "hot work" (e.g., welding, use of open flame, grinding) will be done to ensure fire safety at the construction site. Visual intrusions will be kept to a minimum. Construction equipment will be in satisfactory condition; i.e., it will be equipped with required safety components and not be leaking hazardous liquids or emitting hazardous or undesirable fumes above allowable legal limits. Care will be exercised to ensure that construction equipment and all construction materials imported into the park are free of undesirable species. The cost of restoring areas impacted by construction will be considered part of the cost of construction, and funding for restoration will be included in construction budgets.

*(See Air Resource Management 4.7; Water Resource Management 4.6; Soil Resource Management 4.8.2.4. Also see Denver Service Center specifications section 01570)*

#### 9.1.3.2   Revegetation and Landscaping

The selection of plant materials and cultivation practices will be guided by the policies for management of plant materials in section 4.4 and the need for fire-resistant vegetation for defensible space. To the maximum extent possible, plantings will consist of species that are native to the park or that are historically appropriate for the period or event commemorated. The use of exotic plant species is restricted to situations that conform to the exotic species policy in section 4.4.4. Irrigation to maintain exotic plantings will be avoided, except when it is part of an approved management program essential to achieve park objectives and when adequate and dependable supplies of water are available. Low water use practices that measure soil moisture content and other technologies (such as drip irrigation and appropriate timing of water applications) should be employed.

Prior to using soil fertilizers or other soil amendments in park natural or altered landscapes, parks must develop a prescription to ensure that the amendments will not unacceptably alter the physical, chemical, or biological characteristics of the soil, biological community, or surface or groundwaters.

Wherever practicable, soils and plants affected by construction will be salvaged for use in site restoration. Any surplus soils and plants may be used, as appropriate, for the restoration of other degraded areas in the park. Surplus soils not used in this way should be stockpiled for future use. If additional soil and plants are needed to restore disturbed sites, they may be obtained from other sites in the park if it is determined that the use of an in-park source will not significantly affect cultural or natural resources or ecological processes. In any case, imported soils must (1) be compatible with existing soils, (2) be free of undesired seeds and organisms, and (3) fulfill the horticultural requirements of plants used for restoration.

*(See Management of Native Plants and Animals 4.4.2; Genetic Resource Management Principles 4.4.1.2; Management of Exotic Species 4.4.4; Water Resource Management 4.6; Soil Resource Management 4.8.2.4; Cultural Landscapes 5.3.5.2; Water Supply Systems 9.1.5.1; Wastewater Treatment Systems 9.1.5.2. Also see Executive Order 13148 (Greening the Government through Leadership in Environmental Management) section 207, "Environmentally and Economically Beneficial Landscaping")*

#### 9.1.3.3   Borrow Pits and Spoil Areas

Materials from borrow pits, quarries, and other clay, stone, gravel, or sand sources on NPS lands, including submerged lands, will be extracted and used only

◆   by the Park Service or its agents or contractors;

◆   for in-park administrative uses;

◆ after compliance with the National Environmental Policy Act and National Historic Preservation Act, including written findings that

◇ extraction and use of in-park borrow materials does not or will not impair park resources or values; and

◇ it is the park's most reasonable alternative based on economic, environmental, and ecological considerations; and

◇ no outside sources are reasonably available;

◆ after compliance with other applicable federal, state, and local requirements.

Parks should use existing pits, quarries, or sources, or create new pits, quarries, or sources in the park only after developing and implementing a parkwide borrow management plan that addresses the cumulative effects of borrow site extraction, restoration, and importation. NPS guidance documents, as well as natural and cultural resources and facilities management staff, should be consulted during plan development and the review of specific proposals.

In designated wild and scenic rivers, no new sources may be established, and existing sources should be closed and reclaimed. Borrow material may be extracted in proposed or designated wilderness areas only in small quantities for trail use and in accordance with an approved wilderness management plan.

Spoil may be used for beach nourishment or another resource management activity only if the superintendent first finds that the proposed nourishment or activity will not impair park resources and values and that the proposed activity is consistent with park planning documents.

All existing spoil areas within park units that meet the definition of "solid waste disposal site" (36 CFR Part 6) will be brought into compliance with NPS solid waste regulations in 36 CFR 6.5. The development of new spoil areas or borrow pits, or the expansion of existing ones, will be analyzed through the NEPA and NHPA processes. In addition, superintendents will comply with NPS solid waste regulations and other specific NPS requirements.

Proposed borrow pits and spoil areas outside parks will also be evaluated to ensure that use by the Service or its contractors does not impair resources or values inside the park, and that extraction operations comply with all applicable statutes and regulations, including the National Environmental Policy Act and National Historic Preservation Act.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Geologic Resource Management 4.8; Nonfederally Owned Minerals 8.7.3; Revegetation and Landscaping 9.1.3.2)*

### 9.1.4   Maintenance
#### 9.1.4.1   General
There is a maintenance responsibility and cost for every asset that is administered by the National Park Service. A regular, periodic inventory and condition assessment of park assets will be performed to identify deficiencies and to ensure the cost-effective maintenance of all facilities. The costs of operation and the useful life of facilities and equipment are directly related to the type and level of maintenance provided. Therefore, the Service will conduct a program of preventive and rehabilitative maintenance and preservation to (1) provide a safe, sanitary, environmentally protective, and esthetically pleasing environment for park visitors and employees; (2) protect the physical integrity of facilities; and (3) preserve or maintain facilities in their optimum sustainable condition to the greatest extent possible. Preventive and rehabilitative maintenance programs will incorporate sustainable design elements and practices to ensure that water and energy efficiency, pollution prevention, and waste prevention and reduction are standard practice.

*(Also see NPS Solid Waste Management Handbook; Executive Order 13101 (Greening the Government through Waste Prevention, Recycling, and Federal Acquisition); Executive Order 13148 (Greening the Government through Leadership in Environmental Management); Executive Order 13149 (Greening the Government through Federal Fleet and Transportation Efficiency); Executive Order 13327 (Federal Real Property Asset Management); and Director's Order #80: Asset Management)*

#### 9.1.4.2   Acquisition of Environmentally Preferable and Energy-Efficient Products
In carrying out its maintenance responsibilities, the Park Service will acquire environmentally preferable and energy-efficient products, as required by the Solid Waste Disposal Act, federal regulations, and executive orders, and will strive to meet and exceed any Department of the Interior affirmative acquisition goals that are established. The Service will consider a variety of attributes when purchasing products, including cost, energy efficiency, biodegradability, toxicity, recovered material content, packaging, transport cost, and other life-cycle environmental impacts, such as disposal. The Service will actively pursue opportunities to test and demonstrate environmentally preferable and energy-efficient products, consistent with its goal of demonstrating sustainable practices that avoid or minimize environmental impacts.

*(See Environmental Leadership 1.8; Concession Operations 10.2.4. Also see Director's Order #13A: Environmental Management Systems)*

### 9.1.5   Utilities
Energy, water, and wastewater systems will be sited outside park boundaries whenever possible. In-park utilities will be as unobtrusive as possible and have the least possible resource impact. The Service will use municipal or other utility systems outside parks whenever economically and

environmentally practicable, and it may participate, when authorized, in cost-sharing with municipalities and others in meeting new, expanded, or replacement park utility needs. The Service will use the least polluting power supply options, either through on-site generation or through power purchases, where appropriate, available, and cost-effective, or where such purchase helps meet federal or state emissions goals or alternative energy goals.

*(See Utilities and Services 10.2.6.4. Also see Director's Order #35A: Sale or Lease of Park Services, Resources, or Water in Support of Activities Outside the Boundaries of National Park Areas; and Director's Order #35B: Sale of National Park Service-produced Utilities)*

### 9.1.5.1    Water Supply Systems

The National Park Service will use water efficiently and sustainably. Water systems will be designed to maximally conserve water and the energy used in its treatment and distribution. Water supply and delivery systems will be designed and maintained to provide sufficient water to operate fire sprinkler systems and fire hydrants. Water efficient devices will be installed in retrofitting structures and building new structures. New water systems, or extensions to existing systems, will be constructed only if reasonable conservation measures will not be sufficient to cover park needs. Where a new system or an expansion is justified, the system must be properly sized, and the available or projected water supply must be sufficient for expected needs. Where feasible and appropriate, and given resource availability, groundwater sources will generally be developed rather than surface water diversions in parks.

Water supply systems and their operators must comply with all applicable state and federal health standards. Outdoor use of water will be limited to those applications deemed essential to park operations or to protect park values. Consistent with native plant policies, the Service will use efficient methods for outdoor irrigation. Where appropriate, rainwater should be collected for uses such as maintenance of landscape features and general cleaning.

*(See Water Resource Management 4.6; Campgrounds 9.3.2.1; Comfort Stations 9.3.3. Also see Director's Order #83: Public Health)*

### 9.1.5.2    Wastewater Treatment Systems

New wastewater systems, or extensions or expansions of existing systems, will be constructed only if a determination has first been made that reasonable conservation measures will not be sufficient to cover park needs. In the selection of an appropriate method of wastewater treatment, factors such as all-season reliability, regulatory and public health issues, cost-effectiveness, and minimum adverse impact on the environment will all be considered. Alternatives to traditional methods may be used, especially in environmentally sensitive regions or in areas where water is in short supply. Where alternative technologies are used, such as composting toilets, there should be interpretation for visitors regarding the value of recycling organic solid waste. Wastewater will be adequately treated so that on its return to water courses or when recycled it meets or exceeds applicable state and federal water quality standards.

Water and wastewater systems and their operators are subject to state and federal health standards. Superintendents must ensure that operators are certified and that operations are inspected and conducted in accordance with all laws, regulations, and policies.

*(See Water Resource Management 4.6; Campgrounds 9.3.2.1; Comfort Stations 9.3.3; Miscellaneous Management Facilities 9.4.5. Also see Director's Order #83: Public Health)*

### 9.1.5.3    Utility Lines

Where feasible, NPS utility lines will be placed underground, except where such placement would cause significant damage to natural or cultural resources (such as historic structures or cultural landscapes). When placed aboveground, utility lines and appurtenant structures will be located and designed to minimize their impact on park resources and values. Whenever possible and visually acceptable, all utilities will share a common corridor and be combined with transportation corridors. Cost-effectiveness, reliability of service, and visual impact will be considered when deciding whether to install utility lines aboveground or underground. To minimize the impact of on-grid utility lines, consideration will be given to long-term, cost-effective, renewable-energy applications, such as the use of photovoltaic, wind, fuel cell, and/or bio-fuel technologies (either as stand-alones or as hybrid systems), particularly in remote areas.

*(See Potential Wilderness 6.2.2.1)*

### 9.1.5.4    Historic Utilities

Utilities that were present during the historic period will be managed as cultural resources and governed by the same policies as other cultural resources. Where current aboveground needs require upgraded lines and facilities, they will conform insofar as possible to the appearance and location of the historic utilities.

*(See Treatment of Cultural Resources 5.3.5; Utility Lines 9.1.5.3)*

### 9.1.6    Waste Management and Contaminant Issues

The National Park Service recognizes the far-reaching impacts that waste products, contaminants, and wasteful practices have, not only on national park resources, but also on biotic and abiotic resources elsewhere in the nation and around the world. The Service will therefore demonstrate environmental leadership and serve as a model for others to follow in managing wastes and contaminants.

### 9.1.6.1    Waste Management

The Service will implement solid and hazardous waste management practices that integrate waste reduction, reuse, and recycling programs to minimize the generation and disposal of solid and hazardous waste at and from NPS sites.

For purposes of this section, solid and hazardous wastes include any materials that are so defined in the Solid Waste Disposal Act, as amended. The Service will require the use of biodegradable materials, the reuse and recycling of materials, and other appropriate measures to minimize solid waste and conserve natural resources to the fullest extent possible. Innovation in the use of recyclable or reusable materials is encouraged. For example, the Service may encourage the remanufacturing of recyclable materials into acceptable sales items for willing markets, including the Park Service.

The disposal in parks of solid wastes generated by non-NPS activities is, in most cases, incompatible with national park values. All disposal of solid waste on lands and waters within the boundaries of a unit of the park system, whether federally or nonfederally owned, must comply with NPS regulations in 36 CFR Part 6, which implement Public Law 98-506 (16 USC 460l-22(c)). These regulations are designed to ensure that all activities associated with the operation of solid waste disposal sites within the boundaries of national park units are conducted in a manner that will (1) prevent the deterioration of air and water quality; (2) prevent the degradation of natural and cultural resources; and (3) reduce adverse effects on visitor enjoyment. In accordance with the spirit and intent of these requirements, the Park Service will, to the extent practicable, avoid the use of park lands for landfills by such means as (1) implementing waste minimization and substitution practices, (2) diverting material to recycling facilities or other appropriate locations, and (3) using storage or treatment facilities that meet or exceed DOI and all legal and regulatory standards for any generated waste that is not diverted.

The Park Service will remove landfill operations and associated impacts from parks where feasible. Cooperative waste management solutions that minimize adverse impacts on park resources are also encouraged for areas where alternatives to landfilling are scarce for both parks and adjacent communities.

Open burning for solid waste disposal will not be permitted in parks, except in the very limited circumstances described in Director's Order #18: Wildland Fire Management.

Any hazardous waste that the Service generates will be disposed of separately from solid waste, in full accord with all applicable legal requirements.

*(See Air Quality 4.7.1; River Use 8.2.2.3; Backcountry Use 8.2.2.4; Miscellaneous Management Facilities 9.4.5. Also see Director's Order #18: Wildland Fire Management; Director's Order #30A: Damage Assessments)*

### 9.1.6.2    NPS Response to Contaminants

The Service will make every reasonable effort to prevent or minimize the release of contaminants on or that will affect NPS lands or resources, and the Service will take all necessary actions to control or minimize such releases when they occur. For purposes of this section, contaminants include any substance that may pose a risk to NPS resources

or is regulated or governed by statutes referenced in this subsection. Prevention and minimization will include, but not be limited to, (1) the acquisition, use, and selection of non-toxic or less toxic materials; (2) implementation of safe use, storage, and disposal practices; (3) recycling of spent materials; (4) implementation of effective hazard communication programs for employees, contractors, concessioners, and visitors; (5) development and extension of appropriate emergency response programs; and (6) ensuring that parties responsible for contamination or threatened contamination of NPS property bear the responsibility for addressing such contamination.

Activities pertaining to contaminants, including response actions or handling, acquisition, storage, transportation, and disposal of such substances, will comply with federal, state, and local laws and regulations including, but not limited to, (1) the Solid Waste Disposal Act, including the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984, as amended; (2) the Comprehensive Environmental Response, Compensation and Liability Act of 1980; (3) the Oil Pollution Act of 1990; (4) the Clean Water Act; (4) the Hazardous Materials Transportation Act; and (5) the Toxic Substances Control Act. Such activities will also comply with the NPS integrated pest management program.

The Service will identify, assess, and take response actions as promptly as possible to address releases and threatened releases of contaminants into the environment. Each park will have an oil and chemical spill response management plan for spills that result from NPS activities or from activities that are beyond NPS control (such as commercial through-traffic on roads that pass through a park). The plans will place first priority on responder and public safety. Employees will not be permitted to respond to hazardous materials spills unless they are properly qualified and certified in accordance with Director's Order #30B: Hazardous Spill Response.

The Service will take affirmative and aggressive action to ensure that all NPS costs and damages associated with the release of contaminants are borne by those responsible for the contamination of NPS property. In addition, when lands are proposed for acquisition by the Park Service, the Service will take steps to avoid or minimize its liability for the contamination of NPS property caused by other parties. The Service will include in the preacquisition environmental assessment process the identification of recognizable environmental conditions, such as those associated with prior or existing commercial facilities, mining sites, and landfills. Any recognizable existing or potential environmental contamination of lands proposed for inclusion in a park will be brought to the attention of the regional director as soon as they are identified.

*(See Criteria for Inclusion 1.3; Chapter 3: Land Protection; Pest Management 4.4.5; Emergency Preparedness and Emergency Operations 8.2.5.2. Also see Director's Orders #25: Land Protection; #30A: Damage Assessments; #30B: Hazardous Spill Response)*

### 9.1.7      Energy Management

The National Park Service will conduct its activities in ways that use energy wisely and economically. Park resources and values will not be degraded to provide energy for NPS purposes. The Service will adhere to all federal policies governing energy and water efficiency, renewable resources, use of alternative fuels, and federal fleet goals as established in the Energy Policy Act of 1992. The Service will also comply with applicable executive orders, including Executive Order 13123 (Greening the Government through Efficient Energy Management), and Executive Order 13149 (Greening the Government through Federal Fleet and Transportation Efficiency).

All facilities, vehicles, and equipment will be operated and managed to minimize the consumption of energy, water, and nonrenewable fuels. Full consideration will be given to the use of alternative fuels. Alternative transportation programs and the use of bio-based fuels will be encouraged, where appropriate. Renewable sources of energy and new developments in energy-efficiency technology, including products from the recycling of materials and waste, will be used where appropriate and cost-effective over the life cycle. However, energy efficiencies will not be pursued if they will cause adverse impacts on park resources and values.

To conserve energy, park personnel and visitors may be provided with opportunities for in-park public transportation or trails and walks for nonmotorized transport. As an environmental leader, the Service will interpret for the public the overall resource protection benefits from the efficient use of energy, and will actively educate and motivate park personnel and visitors to use sustainable practices in conserving energy. The Service will also pursue partnership efforts with the Department of Energy and others to further develop and meet NPS energy conservation goals.

*(See Air Quality 4.7.1; Lightscape Management 4.10; Resource Issue Interpretation and Education 7.5.3; Maintenance 9.1.4; Transportation Systems and Alternative Transportation 9.2; Trails and Walks 9.2.2; Sustainable Energy Design 9.1.1.6. Also see Director's Order #13A: Environmental Management Systems)*

### 9.1.8      Structural Fire Protection and Suppression

Superintendents will manage structural fire activities as part of a comprehensive interdisciplinary effort to protect resources and promote the safe and appropriate public enjoyment of those resources. Fire prevention, protection, and suppression will be primary considerations in the design, construction, rehabilitation, maintenance, and operation of all facilities. Structural fires will be suppressed to prevent the loss of human life and minimize damage to property and resources. The Service's structural fire protection and suppression program will provide, through Director's Order #58: Structural Fire Management and Reference Manual 58, additional policy, standards, operational procedures, and accountability to meet the diverse needs and complexities of individual park units. The goal is to ensure that all national park areas receive an appropriate level of fire protection that is provided in a safe and cost-effective manner by qualified personnel.

Each superintendent will complete a structural fire assessment and develop a structural fire plan to meet park needs. Structural fire protection and suppression capabilities will be maintained in accordance with those plans. Prevention priorities will focus on occupied structures and cultural resources, with emphasis placed evenly on code compliance, early warning detection, suppression systems, and employee training and awareness.

Fire prevention through code-compliant new construction, upgrading of existing structures, standardized and regularly scheduled fire inspections, and properly installed and maintained detection and suppression systems will be the primary means of addressing and correcting NPS structural fire deficiencies. Where these measures are not sufficient to meet park needs, agreements will be entered into with non-NPS entities capable of providing requisite fire suppression assistance. Support from neighboring fire protection organizations is encouraged, and superintendents should enter into appropriate agreements whenever possible to enhance fire-fighting capabilities. Development of a park fire brigade will be considered only when all other options have been explored and found unacceptable.

*(See Fire Management 4.5; Fire Detection, Suppression, and Postfire Rehabilitation and Protection 5.3.1.2; Water Supply Systems 9.1.5.1. Also see Director's Order #58: Structural Fire Management)*

## 9.2      Transportation Systems and Alternative Transportation

The location, type, and design of transportation systems and their components (e.g., roads, bridges, trails, and parking areas), and the use of alternative transportation systems, all strongly influence the quality of the visitor experience. These systems also affect, to a great degree, how and where park resources will be impacted. For these reasons, management decisions regarding transportation facilities require a full, interdisciplinary consideration of alternatives and a full understanding of their consequences. Traditional practices of building wider roads and larger parking areas to accommodate more motor vehicles are not necessarily the answer. The Service must find transportation solutions that will preserve the natural and cultural resources in its care while providing a high-quality visitor experience.

Early NPS participation in transportation studies and planning processes is crucial to the long-term strategy of working closely with other federal agencies; tribal, state and local governments; regional planning bodies; citizen groups; and others to enhance partnering and funding opportunities. The Service will participate in all transportation planning forums that may result in links to parks or impacts on park resources. Working with federal, tribal, state, and local agencies on transportation issues, the Service will seek reasonable access to parks and connections to external transportation systems. The Service will also

**132**

advocate corridor crossings for terrestrial and aquatic wildlife and other accommodations to promote biodiversity and avoid or mitigate (1) harm to individual animals, (2) the fragmentation of plant and animal habitats, and (3) the disruption of natural systems.

Depending on a park unit's size, location, resources, and level of use, the Service will, where appropriate, emphasize and encourage alternative transportation systems, which may include a mix of buses, trains, ferries, trams, and—preferably—nonmotorized modes of access to and moving within parks. In general, the preferred modes of transportation will be those that contribute to maximum visitor enjoyment of, and minimum adverse impacts on, park resources and values.

Before a decision is made to design, construct, expand, or upgrade access to or within a park, nonconstruction alternatives—such as distributing visitors to alternative locations—must be fully explored. If nonconstruction alternatives will not achieve satisfactory results, then a development solution should consider whether the project

◆ is appropriate and necessary to meet park management needs or to provide for visitor use and enjoyment;

◆ is designed with extreme care and sensitivity to the landscape through which it passes;

◆ will not cause unacceptable impacts on natural and cultural resources and will minimize or mitigate those impacts that cannot be avoided;

◆ will reduce traffic congestion, noise, air pollution, and adverse effects on park resources and values;

◆ will not cause use in the areas it serves to exceed the areas' visitor carrying capacities;

◆ will incorporate the principles of energy conservation and sustainability;

◆ is able to demonstrate financial and operational sustainability;

◆ will incorporate universal design principles to provide for accessibility for all people, including those with disabilities;

◆ will take maximum advantage of interpretive opportunities and scenic values;

◆ will not violate federal, state, or local air pollution control plans or regulations;

◆ is based on a comprehensive and multidisciplinary approach that is fully consistent with the park's general management plan and asset management plan;

◆ will enhance the visitor experience by offering new or improved interpretive or recreational opportunities, by simplifying travel within the park, or by making it easier or safer to see park features.

All transportation systems may be considered conceptually. Before advancing beyond the conceptual stage, appropriate approvals must be obtained from the Director.

If a decision is made to construct, expand, or reconstruct a park transportation system, the Service will address the need for terrestrial and aquatic wildlife corridor crossings and other accommodations to avoid or mitigate harm to individual animals, the fragmentation of plant and animal habitats, and the disruption of natural systems.

*(See Environmental Leadership 1.8; General Management Planning 2.3.1; Implementation Planning 2.3.4; Air Quality 4.7.1; General 9.1; Accessibility for Persons with Disabilities 9.1.2; Energy Management 9.1.7. Also see Director's Orders #87A: Park Roads and Parkways; #87B: Alternative Transportation Systems; #87C: Transportation System Funding; #87D: Non-NPS Roads)*

### 9.2.1    Road Systems
#### 9.2.1.1    Park Roads

Park roads will be well constructed, sensitive to natural and cultural resources, reflect the highest principles of park design, and enhance the visitor experience. Park roads are generally not intended to provide fast and convenient transportation; rather, they are intended to enhance the quality of a visit while providing for safe and efficient travel with minimal or no impacts on natural and cultural resources. For most parks, a road system is already in place. When plans for meeting the transportation needs of these parks are updated, a determination must be made as to whether the road system should be maintained as is, reduced, expanded, reoriented, eliminated, or supplemented by other means of travel. Before roads are chronically at or near capacity, the use of alternative destination points or transportation systems or limitations on use will be considered as alternatives to road expansion.

Park road designs are subject to NPS Park Road Standards, which are adaptable to each park's unique character and resource limitations. Although some existing roads do not meet current engineering standards, they may be important cultural resources whose values can and should be preserved with attention to visitor safety.

*(Also see Director's Order #87A: Park Roads and Parkways)*

#### 9.2.1.2    Non-NPS Roads

Many parks contain roads that were not constructed by the Park Service and may not be under NPS jurisdiction. Most often, these roads existed before the areas became part of the national park system, and the Park Service must rely heavily on tribal, state, or local authorities to maintain the roads consistent with park management goals. These other government authorities sometimes propose to expand an existing road or construct a new road within a park, with significant potential for adversely affecting park resources and values. Superintendents must consider road proposals in strict accordance with section 9.2.1.2.2, and Director's Order #87D: Non-NPS Federal Aid Roads. Where practicable, and after concurrence of the entity with road jurisdiction, non-NPS roads that are no longer needed will be closed or removed, and the area will be restored to a natural condition. The Service will not permit the public or

private construction of new roads for access to inholdings unless specifically authorized by law.

Access to inholdings in Alaska will be managed in accordance with the provisions of section 1110(b) of the Alaska National Interest Lands Conservation Act (16 USC 3170 (b)) and 43 CFR Part 36.

*(See General 8.6.4.1)*

#### 9.2.1.2.1   Existing Commercial and Other Through-Traffic

The Service will work with appropriate governments and private organizations and individuals to minimize the impacts of traffic on park resources and values. Whenever possible, commercial traffic will be prohibited on roads within parks, except for the purpose of serving park visitors and park operations. However, in accordance with section 8.6.5 and applicable NPS regulations (36 CFR 5.6)

◆   superintendents will permit commercial vehicles to use park roads when necessary for access to private lands within or adjacent to a park area to which access is otherwise not available; and

◆   superintendents may issue permits for commercial vehicle traffic to pass through the park in emergencies.

When a determination is made that existing through-traffic routes have adverse impacts on park resources and values, the Service will work with the appropriate government authorities to minimize these impacts, or to have the traffic flow rerouted over an alternative route. Where feasible and practicable, roads that are no longer needed will be closed or removed, and the area will be restored to a natural condition.

#### 9.2.1.2.2   Construction and Expansion Proposals

Superintendents must take an active role in overall community and transportation planning activities to educate all parties about the NPS mandate to protect park resources. The Park Service will work closely with the U. S. Department of Transportation and state departments of transportation when new highways or roads or expansions of existing road corridors that may impact park lands are proposed. In accordance with 23 USC 138 and the Organic Act, the Service will object to any proposal to route a state or local road through national park lands, or to increase the size of a right-of-way for an existing road, unless the Service first determines (or concurs with a DOT determination) the following:

◆   There is no feasible and prudent alternative.

◆   All possible planning has taken place to minimize and mitigate harm to the park.

◆   It will not be contrary to the public interest, or inconsistent with the purposes for which the park was established.

◆   It will not cause health and safety risks to visitors or park staff.

◆   It will conform to NPS standards and practices for road design, engineering, and construction.

In making these determinations, the Service will take into account the factors listed in section 9.2.

Responsibility for future maintenance—meeting NPS standards—must be identified before NPS approval of a proposal.

*(Also see Director's Order #87D: Non-NPS Roads)*

### 9.2.2   Trails and Walks

Trails and walks provide the only means of access into many areas within parks. These facilities will be planned and developed as integral parts of each park's transportation system and incorporate principles of universal design. Trails and walks will serve as management tools to help control the distribution and intensity of use. All trails and walks will be carefully situated, designed, and managed to

◆   reduce conflicts with automobiles and incompatible uses;

◆   allow for a satisfying park experience;

◆   allow accessibility by the greatest number of people; and

◆   protect park resources.

Heavily used trails and walks in developed areas may be surfaced as necessary for visitor safety, accessibility for persons with impaired mobility, resource protection, and/or erosion control. Surface materials should be carefully selected, taking into account factors such as the purpose and location of a trail or walk and the potential for erosion and other environmental impacts.

The visitor use and management aspects of trails and walks are addressed in section 8.2.2, "Recreational Activities." In addition, trail planning will take into account NPS interest in cooperating with federal, state, local, and tribal governments, as well as individuals and organizations, to advance the goal of a seamless networks of parks. These partnership activities are intended to establish corridors that link together, both physically and with a common sense of purpose, open spaces such as those found in parks, other protected areas, and compatibly managed private lands.

*(See Cooperative Conservation Beyond Park Boundaries 1.6; Chapter 7: Interpretation and Education; Accessibility for Persons with Disabilities 9.1.2. Also see Director's Order #42: Accessibility for Visitors with Disabilities in National Park Service Programs and Services)*

### 9.2.2.1   Cooperative Trail Planning

The Park Service will cooperate with other land managers, nonprofit organizations, and user groups to facilitate local and regional trail access to parks. When parks abut other public lands, the Service will participate in interagency, multi-jurisdictional trail planning. When an effective trail system exists, and when otherwise permitted, hostels or

similar low-cost overnight facilities may be provided if they are consistent with the park's general management plan and harmonize with the natural and/or cultural resources.

*(See Hostels and Shelters 9.3.2.3)*

### 9.2.2.2    Hiking Trails

Trail design will vary to accommodate a wide range of users and be appropriate to user patterns and site conditions. Wetlands will generally be avoided, and where possible they will be spanned by a boardwalk or other means, using sustainable materials that will not disturb hydrologic or ecological processes. Backcountry trails will offer visitors a primitive outdoor experience, and these trails will be unsurfaced and modest in character except where a more durable surface is needed. The use of nonnative materials is generally not permitted on backcountry trails.

*(See Trails in Wilderness 6.3.10.2; General Policy 6.4.1; Backcountry Use 8.2.2.4)*

### 9.2.2.3    Equestrian Trails

Equestrian trails and related support facilities, such as feed boxes and hitch rails, may be provided when they are consistent with park objectives and when site conditions are suitable. Horse camps should be designed with user interest in mind and consistency with NPS policy. Photovoltaic systems should be evaluated to power any necessary water systems. Ramps for mounting the animals must be provided for persons with disabilities.

*(See Grazing and Livestock Driveways 6.4.7; Domestic and Feral Livestock 8.6.8; Accessibility of Commercial Services 10.2.6.2)*

### 9.2.2.4    Bicycle Trails

Bicycle routes may be considered as an alternative to motor vehicle access. Bicycle travel may be integrated with park roads when determined to be safe and feasible. Bicycle trails may be paved or stabilized for the protection of resources and for the safety and convenience of travelers. In accordance with 36 CFR 4.30, bicycle use is allowed on park roads, in parking areas, and on routes designated for bicycle use. The designation of bicycle routes is allowed in developed areas and in special use zones based on a written determination that such use is (1) consistent with the protection of a park's natural, cultural, scenic, and esthetic values; (2) consistent with safety considerations; (3) consistent with management objectives; and (4) will not disturb wildlife or other park resources. A similar determination may be made to designate routes outside developed areas and special use zones; however, the designation must be made by promulgating a special regulation.

*(See General Policy 6.4.1; Backcountry Use 8.2.2.4. Also see 36 CFR 4.30)*

### 9.2.2.5    Water Trails

Water access and use may be provided when consistent with resource protection needs. Appropriate locations and levels of use will be determined in the park's general management plan. The Park Service will work with other agencies and organizations, as appropriate, to develop and provide education and interpretation for water trails that access parks; to promote understanding and enjoyment; and to protect waterways and adjacent lands.

### 9.2.2.6    Interpretive Trails

Interpretive trails and walks, both guided and self-guiding, may be used for purposes of visitor appreciation and understanding of park values.

### 9.2.2.7    National Trails

Several components of the National Trails System which are administered by the Service, have been designated as units of the national park system. These trails are therefore managed as national park areas and are subject to all the policies contained herein, as well as to any other requirements specified in the National Trails System Act.

Other scenic, historic, connecting/side, and recreational trails designated under the National Trails System Act are in or adjacent to park units. Some of these may also be administered by the Service, though not as units of the national park system. In all cases, the Service will cooperate with other land managers, nonprofit organizations, and user groups to facilitate appropriate trail use in accordance with the laws and policies applicable to such trails, and to the extent that trail management and use would not cause unacceptable impacts.

*(See Cooperative Conservation Beyond Park Boundaries 1.6. Also see Director's Order #45-1: National Scenic and Historic Trails; National Trails System Act)*

### 9.2.2.8    Trailheads

Trailheads, and trail access points from which trail use can begin, will be carefully tied into other elements of the park development and circulation system to facilitate safe and enjoyable trail use and efficient management.

### 9.2.2.9    Trail Bridges

Trail bridges may be used for crossing swift waters areas prone to flash-flooding, and other places that present potential safety hazards. Less obtrusive alternatives to bridges (such as, fords) and trail relocation will be considered before a decision is made to build a bridge. A bridge may be the preferred alternative when necessary to prevent stream bank erosion or protect wetlands or fisheries. If a bridge is determined to be appropriate, it will be kept to the minimum size needed to serve trail users, and it will be designed to harmonize with the surrounding natural scene and be as unobtrusive as possible.

*(See Water Resource Management 4.6)*

### 9.2.3 Traffic Signs and Markings

Signs will be limited to the minimum necessary to meet information, warning, and regulatory needs and to avoid confusion and visual intrusion. Signs should be planned to provide a pleasing, uniform appearance. Traffic signs and pavement markings on park roads will be consistent with the standards contained in the Manual on Uniform Traffic Control Devices, as supplemented by the NPS Sign Manual. All roadside signs and markings will conform to good traffic engineering practices. Park signs—especially those that display the NPS arrowhead—are an important part of the total identity system for the Park Service and must conform to the standards contained in Director's Order #52C: Park Signs.

*(See Navigation Aids 9.2.5; Signs 9.3.1.1)*

### 9.2.4 Parking Areas

Parking areas and overlooks will be located to not unacceptably intrude, by sight, sound, or other impact, on park resources or values. When parking areas are deemed necessary, they will be limited to the smallest size appropriate, and they will be designed to harmoniously accommodate motor vehicles and other appropriate users. When large parking areas are needed, appropriate plantings and other design elements will be used to reduce negative visual and environmental impacts. When overflow parking is provided to meet peak visitation, it should be in areas that have been stabilized or are otherwise capable of withstanding the temporary impacts of parking without causing unacceptable impacts on park resources. Permanent parking areas will not normally be sized for the peak use day, but rather for the use anticipated on the average weekend day during the peak season of use.

*(See Management of Native Plants and Animals 4.4.2; General 9.1; Transportation Systems and Alternative Transportation 9.2)*

### 9.2.5 Navigation Aids

Necessary aircraft and water navigation aids will be planned in collaboration with the Federal Aviation Administration and U. S. Coast Guard, respectively, and will be installed, maintained, and used in conformance with the standards established by these agencies only if there are no appropriate alternatives outside park boundaries. Exceptions to the standards may be authorized when necessary to meet specific park and public safety needs, provided the exceptions are jointly agreed to by the Park Service and the agency having primary jurisdiction.

*(See Overflights and Aviation Uses 8.4; Traffic Signs and Markings 9.2.3)*

### 9.3 Visitor Facilities

While striving for excellence in visitor services, the Park Service will limit visitor facility development to that which is necessary and appropriate. Facilities like gas stations and grocery stores may be necessary to park use and enjoyment, but it does not necessarily follow that these facilities must be located inside a park. The Park Service will encourage the development of private sector visitor services in gateway communities to contribute to local economic development, encourage competition, increase choices for visitors, and minimize the need for in-park facilities. When visitor facilities are found to be necessary and appropriate within a park, they will be designed, built, and maintained in accordance with accepted NPS standards for quality and the NPS commitment to visitor satisfaction.

### 9.3.1 Informational and Interpretive Facilities

Informational and interpretive facilities may be provided to assist park visitors in appreciating and enjoying the park and understanding its significance, provided that the facilities can be developed without impairing the park's natural or cultural resources.

*(See Chapter 7: Interpretation and Education; Accessibility for Persons with Disabilities 9.1.2)*

### 9.3.1.1 Signs

Signs will be carefully planned and designed to fulfill their important roles of conveying an appropriate NPS and park image and providing information and orientation to visitors. Each park should have an approved parkwide sign plan based on Service-wide design criteria and tailored to meet individual park needs. Entrance and other key signs will be distinctively designed to reflect the character of the park while meeting Service-wide standards for consistency.

Signs will be held to the minimum number, size, and wording required to serve their intended functions and to minimally intrude upon the natural and historic settings. They will be placed where they do not interfere with park visitors' enjoyment and appreciation of park resources. Roadside information signs are subject to the standards established in the National Park Service Sign Manual. Interpretive signs will be guided by sign and wayside exhibit plans.

*(See Signs 6.3.10.4; Visitor Safety 8.2.5.1; Traffic Signs and Markings 9.2.3; Navigation Aids 9.2.5. Also see Director's Order #52C: Park Signs)*

### 9.3.1.2 Entrance Stations

Entrance and fee collection stations will be harmonious with the park environment, and these stations should reflect the architectural character of the park. Entrance and fee collection stations should (1) reasonably accommodate the average peak season visitor traffic, (2) incorporate best available technology, and (3) use best management practices to minimize delays—thus reducing vehicle emissions at the entrance station and enhancing the visitor experience.

### 9.3.1.3   Visitor Centers

When necessary to provide visitor information and interpretive services, visitor centers may be constructed at locations identified in approved plans. To minimize visual intrusions and impacts on major park features, visitor centers will generally not be located near such features. Where an in-park location would create unacceptable environmental impacts, authorization should be obtained to place a visitor center outside the park.

Visitor centers are not substitutes for personal or self-guiding on-site interpretation. They will be constructed only when it has been determined that indoor media are the most effective means of communicating major elements of the park story and that a central public contact point is needed.

As appropriate, a visitor center may include information services, sales of educational materials and theme-related items, audiovisual programs, museums, museum collections storage, exhibits, and other staffed or self-help programs and spaces necessary for a high-quality visitor experience. Additionally, the need for restrooms, drinking fountains, and other basic visitor requirements will be considered during the planning and design stage. The size and scope of all visitor centers will be evaluated using the Visitor Center Planning Model or similar tool before submitting any visitor center project to the Director for approval.

*(See Park Management 1.4; Environmental Leadership 1.8; Nonpersonal Services 7.3.2; Integration of Facilities into the Park Environment 9.1.1.2; Accessibility for Persons with Disabilities 9.1.2; Museum Collections Management Facilities 9.4.2)*

### 9.3.1.4   Amphitheaters

Amphitheaters may be provided in campgrounds and in other locations where formal interpretive programs are desirable. Campfire circles may be provided in campgrounds to accommodate evening programs and informal social gatherings. Artificial lighting must be carefully directed and kept to a minimum, with due regard for natural night sky conditions.

*(See Lightscape Management 4.10; Campgrounds 9.3.2.1)*

### 9.3.1.5   Wayside Exhibits

Wayside exhibits may be provided along roads and heavily used walks and trails to interpret on-site resources.

*(See Nonpersonal Services 7.3.2)*

### 9.3.1.6   Viewing Devices

Viewing devices, such as pedestal binoculars or telescopes, may be provided at appropriate locations when the superintendent determines that such devices are desirable for the meaningful interpretation or understanding of park resources. Such devices may be provided by the Service or by others under a concession contract or commercial use authorization.

### 9.3.1.7   Facilities for Arts and Culture

Various cultural events (such as concerts, films, lectures, plays, craft shows, and art exhibits) are permitted when they will support a park's purposes and objectives. However, permanent facilities may be built specifically for cultural activities only when all of the following criteria are met:

◆   The permanent facility is required for programs of major importance in conveying the park story.

◆   It would be impossible or impractical to use demountable or temporary facilities.

◆   It would be impossible to adaptively use other park facilities.

◆   Neither the facility nor its operation would impair cultural or natural resources or hinder the use of the park for its intended purposes.

◆   It would not be feasible for others outside the park to provide the facility.

*(See Use of Historic Structures 5.3.5.4.7; Special Events 8.6.2)*

### 9.3.2   Overnight Accommodations and Food Services

Overnight facilities and food services will be restricted to the kinds and levels necessary and appropriate to achieve each park's purposes. In many cases, overnight accommodations and food services are not needed within a park. In general, they should be provided only when the private sector or other public agencies cannot adequately provide them in the park vicinity. However, in-park facilities or services may be justified when the distance and travel time to accommodations and services outside the park are too great to permit reasonable use, or when leaving the park to obtain incidental services would substantially detract from the quality of the visitor experience. Certain activities, such as backcountry use, may require overnight stays. Types of overnight accommodations may vary from unimproved backcountry campsites to motel- or hotel-type lodging, as appropriate. Commercial facilities run by concessioners are addressed in greater detail in chapter 10.

*(See Accessibility for Persons with Disabilities 9.1.2; Commercial Visitor Services Planning 10.2.2)*

### 9.3.2.1   Campgrounds

When campgrounds are determined to be necessary, their design will accommodate the differences between recreation-vehicle camping and tent camping, and cultural landscapes, terrain, soils, vegetation, wildlife, climate, special needs of users, visual and auditory privacy, and other relevant factors will be considered.

The Service will determine the range of amenities and utility hookups that are appropriate to each campground based on the park's mission, campground location and size, availability of commercial campgrounds in the area, cost of installing and maintaining the amenities and utilities, and other considerations. To eliminate the need for generators,

electric utilities may be provided on a limited basis. Shower facilities may be provided where feasible. Modestly sized play areas for small children are permissible, as are informal areas for field sports associated with organized group camps. Wood fires in fire rings are generally permissible; however, whenever it is necessary to restrict such fires at individual campsites because of fire danger, air pollution, or other hazards, alternatives may be provided or allowed—such as facilities for the use of charcoal or other fuels or central cook sheds. When a need exists, sanitary dump stations will be provided in or near campgrounds that accommodate recreation vehicles.

When necessary for basic safety requirements, pathways and the exteriors of buildings and structures may be lighted. Such lighting will be energy efficient and shielded as much as possible so that visitors have the opportunity to experience the natural darkness and night skies.

Campgrounds intended to accommodate large recreation vehicles or buses will be located only where existing roads can safely accommodate such vehicles and the resulting increased traffic load.

No campground will exceed 250 sites unless a larger number of sites has been approved by the Director.

When desirable for purposes of management, tent camping may be accommodated in separate campgrounds or in separately designated areas within campgrounds. Provision may also be made for accommodating organized groups in separate campgrounds or in separately designated areas.

Boating campgrounds may be provided in parks with waters used for recreational boating. The need for campgrounds—and their sizes, locations, and numbers—will be determined by (1) the type of water body (for example, river, lake, reservoir, saltwater); (2) the availability and resiliency of potential campsites; (3) the feasibility of providing and maintaining docking, beaching, mooring, camping, and sanitary facilities; and (4) the potential for unacceptable impacts on park resources or values.

*(See Soundscape Management 4.9; Lightscape Management 4.10; Recreation Fees 8.2.6.1; National Recreation Reservation Service 8.2.6.2; Collecting Natural Products 8.8; Water Supply Systems 9.1.5.1; Wastewater Treatment Systems 9.1.5.2; Concession Facilities 10.2.6. Also see Director's Order #47: Soundscape Preservation and Noise Management; Director's Order #83: Public Health)*

### 9.3.2.2    Backcountry Campsites

Backcountry and wilderness campsites may be permitted, but only within the acceptable limits of use determined by the park's wilderness management plan, resource management plan, or other pertinent planning document.

*(See Wilderness Use Management 6.4; Backcountry Use 8.2.2.4)*

### 9.3.2.3    Hostels and Shelters

Hostels are low-cost, supervised accommodations that encourage and facilitate the energy-efficient, nonmotorized enjoyment of parks and their surrounding regions by individuals and families. Such facilities, along with hostel-like accommodations such as huts and shelters, will be considered in the planning process if overnight use is determined to be an appropriate use of the park, particularly as a means of encouraging and facilitating the use of trails and backcountry areas. The Service will cooperate with other agencies, nonprofit organizations, park concessioners, and others to plan and develop hostels, where appropriate. If a decision is reached to develop a hostel accommodation, it will be managed by others under the provisions of concession policies and procedures.

Hostels will, at a minimum, contain sheltered overnight accommodations and sanitary facilities, and they will usually contain cooking, eating, and recreation spaces. Hostels may be used for other park programs, such as environmental education or interpretation. Although nonmotorized access to hostels is emphasized, motorized transportation may also be available.

*(See Facility Planning and Design 9.1.1; Chapter 10: Commercial Visitor Services)*

### 9.3.3    Comfort Stations

Comfort facilities will have waste disposal systems that meet Public Health Service standards. Levels of use will determine the size and nature of the utility systems provided. Low-water use or waterless (oil and composting) toilets will be considered in locations where there are water-supply and wastewater-disposal problems. Chemical toilets in portable enclosures may be used for temporary purposes when necessary. Vault toilets and composting toilets that meet public health standards may be used where development or expansion of utilities may not be practical or cost-effective. Pit privies that meet public health standards may suffice in areas of infrequent use and when utility services are not readily available.

*(See General Policy 6.4.1; Backcountry Use 8.2.2.4; Accessibility for Persons with Disabilities 8.2.4; Water Supply Systems 9.1.5.1; Wastewater Treatment Systems 9.1.5.2; Campgrounds 9.3.2.1. Also see Director's Order #83: Public Health)*

### 9.3.4    Other Visitor Facilities

Other visitor facilities may be provided when necessary for visitor enjoyment of the area and when consistent with the protection of park values. Visitor facilities determined to be detrimental to park resources or values will not be permitted.

### 9.3.4.1    Picnic and Other Day Use Areas

Picnic areas and other day use areas to be used for specific purposes (such as play areas) may be provided on a limited basis as appropriate to meet existing visitor needs.

### 9.3.4.2    Facilities for Water Recreation

Boating facilities (such as access points, courtesy docks, boat ramps, floating sewage pump-out stations, navigational aids, and marinas), breakwaters, and fish cleaning stations may be provided as appropriate for the safe enjoyment by visitors of water recreation resources, when (1) they are consistent with the purposes for which the park was established, and (2) there is no possibility that adequate private facilities will be developed. Facilities must be carefully sited and designed to avoid unacceptable adverse effects on aquatic and riparian habitats and minimize conflicts between boaters and other visitors who enjoy use of the park. A decision to develop water-based facilities must take into account not only the primary impacts (such as noise, air, and water pollution) of the development, but also the secondary impacts (including cumulative effects over time) that recreational use associated with the development may have on park resources and visitor enjoyment.

*(See Park Management 1.4; Soundscape Management 4.9; Visitor Use 8.2; River Use 8.2.2.3; Fishing 8.2.2.5; Campgrounds 9.3.2.1; Water Trails 9.2.2.5. Also see Director's Order #47: Soundscape Preservation and Noise Management)*

### 9.3.4.3    Skiing Facilities

The Park Service will not permit new downhill skiing facilities or associated structures in any unit of the national park system. Downhill skiing is an activity that requires extensive development with resulting significant environmental impacts, and it should only be provided outside park areas. When such facilities have been provided based on previous policy, their use may continue unless the development and use have caused or may cause impairment of park resources or values. Any proposal to eliminate or change the capacity of existing facilities will be accomplished through the NPS planning process, and will involve public participation and an environmental assessment of impacts.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7; Recreational Activities 8.2.2)*

### 9.3.5    Advertising

Commercial notices or advertisements will generally not be displayed, posted, or distributed on the federally owned or federally controlled land, water, or airspace of a park. A superintendent may permit advertising only if the notice or advertisement is for goods, services, or facilities available within the park, and if such notices and advertisements are found to be desirable and necessary for the convenience and guidance of the public. Acceptable forms of advertising will be addressed, as necessary, in concession contracts and cooperating association agreements.

Billboard advertising will in no case be permitted within a park and, in general, will be discouraged on approach roads outside of parks when it would adversely affect a park's scenic values.

NPS policy allows donor recognition, which occurs when the Park Service publicly thanks an individual, corporation, or some other entity for their gift or service to the Park Service. Such recognition must be consistent with the provisions of Director's Order #21: Donations and Fundraising.

In accordance with Part 470 of the DOI manual, the Service will not use paid advertising in any publication in connection with its programs and activities, except where special legal requirements and authority exist. If a superintendent believes paid advertising is necessary because of the significant benefits it affords in enhancing public participation, prior approval must be obtained from the Washington Office of Public Affairs.

*(See Cooperating Associations 7.6.2; Concession Contracting 10.2.3. Also see Director's Order #21: Donations and Fundraising, 36 CFR 5.1)*

## 9.4    Management Facilities

Where authorized by Congress, management facilities will be located outside park boundaries whenever the management functions being served can be adequately supported from such a location. When management facilities must be located inside the park, they will be located away from primary resources and features of the park and sited so as to not adversely affect park resources or values or detract from the visitor experience. Historic properties will be used to the maximum extent practicable, provided that the use will not affect their significance.

Modular, precut, or prefabricated structures may be used for management facilities, including administrative offices, employee housing, and maintenance structures, when products meeting design requirements are available. Standard plans will be modified to (1) reflect regional and park design themes and harmonize with the natural surroundings; (2) preserve the natural and cultural environments; (3) provide for resource conservation; (4) provide for energy efficiency or the use of renewable energy sources; (5) limit chemical emissions; and (6) foster education about sustainable design.

*(See Park Management 1.4; Environmental Leadership 1.8; Use of Historic Structures 5.3.5.4.7; Accessibility for Persons with Disabilities 8.2.4; Facility Planning and Design 9.1.1; Accessibility for Persons with Disabilities 9.1.2. Also see Director's Orders #89: Acquisition and Management of Leased Space; and #90: Value Analysis)*

### 9.4.1    Administrative Offices

The location of administrative offices will be determined by conditions specific to each park, including impacts on park resources, availability and adequacy of leasable space outside the park, relationship to adjacent communities, convenience to visitors, weather, energy consumption, comparative costs, commuting distance for employees, and management effectiveness.

*(See Facility Planning and Design 9.1.1; Energy Management 9.1.7)*

### 9.4.2    Museum Collections Management Facilities

Park curatorial facilities should be adapted to the needs of each park. They may share space in visitor centers or administrative office buildings, or be housed in completely separate buildings. Incorporation with facilities in which there would be a heightened danger of fire, chemical spills, and similar accidents should be avoided. Curatorial facilities will meet each collection's special requirements for security, fire suppression, and environmental controls.

The operation of environmental control systems to meet the temperature, relative humidity, particulate, and, as necessary, pollutant control specifications for museum collections are typically more energy intensive than those for structures with staff and offices. To ensure energy efficiency and the correct performance of the systems to protect the resource, the thermal performance of the building envelope and the efficiency of the systems must be addressed in facility planning and design. Before planning a collections management facility, the park, in consultation with subject-matter specialists, must complete a value analysis that evaluates various options for addressing the collections management needs of the park, including on-site and off-site locations and joint facilities with other NPS units and entities outside the Park Service.

*(See Museum Collections 5.3.5.5; Fire Detection, Suppression, and Post-fire Rehabilitation and Protection 5.3.1.2; Environmental Monitoring and Control 5.3.1.4. Also see Director's Order #24: NPS Museum Collections Management)*

### 9.4.3    Employee Housing

The Park Service will generally rely on the private sector to provide housing for NPS employees. If reasonable price and quality housing is not available in the private sector, the Service will provide only the number of housing units necessary to support the NPS mission.

Occupancy may be permitted or may be required to provide for timely response to park protection needs, to ensure reasonable deterrence to prevent threats to resources, and to protect the health and safety of visitors and employees. Acceptable and appropriate locations for employee housing will be determined based on these prevention or response services provided for the benefit of the government in meeting the NPS mission.

### 9.4.3.1    Housing Management Plan

A housing management plan will be prepared and updated every three to five years to determine the necessary number of housing units in a park. Park superintendents are accountable to their regional directors for employee housing in their parks. Regional directors are responsible for approval of park housing management plans and ensuring the consistent application of Service-wide housing policy.

### 9.4.3.2    Eligible Residents

Park housing will be provided for persons who are essential to the management and operation of the park. These may include not only NPS employees, but also concession employees, volunteers in the parks, Student Conservation Association volunteers, researchers, essential cooperators (for example, schoolteachers, health personnel, contractors, state or county employees), and employees of another federal agency.

### 9.4.3.3    Historic Structures

The use of historic structures for housing is encouraged when NPS managers determine that this use contributes to the preservation of these structures, and after feasible cost-effective alternatives have been considered.

*(See Use of Historic Structures 5.3.5.4.7; Adaptive Use 9.1.1.4)*

### 9.4.3.4    Design and Construction

Because of location, use, and other unique factors, special design concerns must be considered for housing constructed in parks. Housing must be designed to be as much a part of the natural or cultural setting as possible, yet it must be well built, functional, energy efficient, and cost-effective. The design of park housing will minimize impacts on park resources and values, comply with the standards for quality design, and consider regional design and construction influences. Value analysis principles will be applied in all NPS housing construction projects. Design costs will be kept to a minimum by using designs from the NPS Standard Design Catalog and a cost model.

*(See Facility Planning and Design 9.1.1. Also see Director's Orders #36: Housing Management, and #90: Value Analysis)*

### 9.4.4    Maintenance Structures

Maintenance structures will be consistent in design, scale, texture, and details with other park facilities. Optimally, they will be screened or located in areas remote from public use. Wherever feasible, NPS and concessioner maintenance facilities will be adjacent and integrated in design to facilitate operations and reduce impacts on park resources.

### 9.4.5    Miscellaneous Management Facilities

When installations such as landing sites and airstrips, security structures, protection devices, fire towers, weather monitors, research stations, communication towers, and pump houses are necessary, they will be located and designed to minimize their impact on resources and their intrusion on the visitor experience. Whenever possible and practicable, such installations will be located within developed park areas or outside park boundaries. When totally utilitarian facilities such as maintenance storage yards, sewage lagoons, and solid waste disposal sites absolutely must be developed inside a park, they will be screened from view, sited to avoid adverse impacts on resources, and not detract from the visitor experience. Facilities that illustrate technologies important to interpretive and educational objectives may be located in more visible areas. Examples include alternative energy applications and sustainable wastewater treatment facilities, such as aquaculture ponds, wetlands, and rootzone beds.

*(See Environmental Leadership 1.8; Studies and Collections 4.2; General Policy 6.3.1; Airports and Landing Sites 8.4.8; Facility Planning and Design 9.1.1; Water Supply Systems*

9.1.5.1; Wastewater Treatment Systems 9.1.5.2; Waste Management 9.1.6.1; Maintenance Structures 9.4.4)

## 9.5   Dams and Reservoirs

Dams and reservoirs will not be constructed in parks. The National Park Service will not seek to acquire and operate dams and will seek to deactivate existing structures unless they contribute to the cultural, natural, or recreational resource bases of the area or are a necessary part of a park's water supply system.

All dams will be subject to annual safety inspections. Each park with a dam or reservoir will prepare an emergency action plan. The emergency action plan will also address potential hazards posed by dams outside the park and beyond the Service's control. The National Park Service inventory of dams will be used to record all NPS and non-NPS dams and reservoirs, and any other type of stream flow control structures affecting units of the national park system, including those that are proposed or have been deactivated.

*(See Water Quality 4.6.3; Floodplains 4.6.4; Wetlands 4.6.5; Watershed and Stream Processes 4.6.6; Emergency Preparedness and Emergency Operations 8.2.5.2; Water Supply Systems 9.1.5.1; Wastewater Treatment Systems 9.1.5.2. Also see Director's Order #40: Dams and Appurtenant Works—Maintenance, Operation, and Safety)*

## 9.6   Commemorative Works and Plaques

### 9.6.1   General

For the purpose of this section, the term "commemorative work" means any statue, monument, sculpture, memorial, plaque, or other structure or landscape feature, including a garden or memorial grove, designed to perpetuate in a permanent manner the memory of a person, group, event, or other significant element of history. It also includes the naming of park structures or other features—including features within the interior of buildings. Within the District of Columbia and its environs, the Commemorative Works Act prohibits the establishment of commemorative works unless specifically authorized by an act of Congress. Outside of the District of Columbia and its environs, commemorative works will not be established unless authorized by Congress or approved by the Director (36 CFR 2.62). The consultation process required by section 106 of the National Historic Preservation Act must be completed before the Director will make a decision to approve a commemorative work.

To be permanently commemorated in a national park is a high honor, affording a degree of recognition that implies national importance. At the same time, the excessive or inappropriate use of commemorative works—especially commemorative naming—diminishes its value as a tool for recognizing people or events that are truly noteworthy. This situation can also divert attention from the important resources and values that park visitors need to learn about. Therefore, the National Park Service will discourage and

curtail the use and proliferation of commemorative works except when

◆   Congress has specifically authorized their placement; or

◆   there is compelling justification for the recognition, and the commemorative work is the best way to express the association between the park and the person, group, event, or other subject being commemorated.

In general, compelling justification for a commemorative work will not be considered unless

◆   the association between the park and the person, group, or event is of exceptional importance; and

◆   in cases where a person or event is proposed for commemoration, at least five years have elapsed since the death of the person (or the last member of a group), or at least 25 years have elapsed since the event. (Within the District of Columbia and its environs, refer to the Commemorative Works Act for more specific requirements.)

Simply having worked in a park, or having made a monetary or other type of donation to a park, does not necessarily meet the test of compelling justification. In these and similar cases other forms of recognition should be pursued.

With regard to the naming of park structures, names that meet the criteria listed above may be approved by the Director. Names that do not meet those criteria will require legislative action. All donor recognition must be consistent with Director's Order #21: Donations and Fundraising. In accordance with Director's Order #21, the naming of rooms, features, or park facilities will not be used to recognize monetary or in-kind donations to a park or to the National Park Service.

### 9.6.2   Interpretive Works That Commemorate

The primary function of some commemorative works—most often in the form of a plaque presented by an outside organization—is to describe, explain, or otherwise attest to the significance of a park's resources. These devices are not always the most appropriate medium for their intended purpose, and their permanent installation may not be in the best long-term interests of the park. Therefore, permanent installations of this nature will not be allowed unless it can be clearly demonstrated that the work will substantially increase visitors' appreciation of the significance of park resources or values, and do so more effectively than other interpretive media.

With regard to Civil War parks, new commemorative works will not be approved, except where specifically authorized by legislation. However, consideration may be given to proposals that would commemorate groups that were not allowed to be recognized during the commemorative period.

In those parks where there is legislative authorization to erect commemorative works, superintendents will prepare a plan to control their size, location, materials, and other factors necessary to protect the overall integrity of the park.

The plan may include a requirement for an endowment to cover the costs of maintaining the commemorative work.

### 9.6.3     Approval of Commemorative Works

Before being approved, a determination must be made, based on consultation with qualified professionals that the proposed commemorative work will

◆   be designed and sited to avoid disturbance of natural and cultural resources and values;

◆   be located in surroundings relevant to its subject;

◆   be constructed of materials suitable to and compatible with the local environment;

◆   meet NPS design and maintenance standards;

◆   not encroach on any other preexisting work or be esthetically intrusive;

◆   not interfere significantly with open space and existing public use;

◆   not divert attention from a park's primary interpretive theme; and

◆   not be affixed to the historic fabric of a structure.

The Director may order the removal or modification of commemorative works that were installed without proper authorization, or that are inconsistent with the policies in this section. Temporary forms of in-park recognition, and permanent forms that will not be installed within park boundaries, do not require the Director's approval.

The naming of geographic features is subject to approval by the U. S. Board on Geographic Names. NPS proposals for naming geographic features will follow the procedures described in Director's Order #63: Geographic Names.

*(Also see Director's Order #67: Copyright and Trademarks; U. S. Board on Geographic Names "Principles, Policies, and Procedures: Domestic Geographic Names")*

### 9.6.4     Preexisting Commemorative Works

Many commemorative works have existed in the parks long enough to qualify as historic features. A key aspect of their historical interest is that they reflect the knowledge, attitudes, and tastes of the persons who designed and placed them. These works and their inscriptions will not be altered, relocated, obscured, or removed, even when they are deemed inaccurate or incompatible with prevailing present-day values. Any exceptions from this policy require specific approval by the Director.

### 9.6.5     Donated Commemorative Works

Although commemorative works and other forms of in-park permanent recognition will not be used to recognize monetary contributions or other donations to a park or the Service, there may be occasions when an authorized or approved commemorative work will be offered or provided by a private donor. Placing donor names on commemorative works will be discouraged. If they do appear, donor names will be conspicuously subordinate to the subjects commemorated. Donations of commemorative works should include sufficient funds to provide for their installation, and an endowment for their permanent care.

*(See Nonpersonal Services 7.3.2; Cemeteries and Burials 8.6.10. Also see Director's Order #64: Commemorative Works and Plaques)*

### 9.6.6     Commemorative Works in
###            National Cemeteries

Regulations governing commemorative works associated with national cemeteries are found in 36 CFR Part 12; and Director's Order #61: National Cemetery Operations.

009607



**10**

# Commercial Visitor Services

*Through the use of concession contracts or commercial use authorizations, the National Park Service will provide commercial visitor services that are necessary and appropriate for public use and enjoyment. Concession operations will be consistent to the highest practicable degree with the preservation and conservation of resources and values of the park unit. Concession operations will demonstrate sound environmental management and stewardship.*

**Public accommodations, facilities, and services must be consistent to highest practicable degree with the preservation and conservation of park resources and values.**

**144**

## 10.1  General

Commercial visitor services will be authorized through concession contracts or commercial use authorizations, unless otherwise provided by law. Section 10.2 below addresses concession authorizations; section 10.3 addresses commercial use authorizations.

*(See Leases 8.12. Also see Director's Orders #48A: Concession Management, and #48B: Commercial Use Authorizations)*

### 10.1.1  Leasing

See Section 8.12.

## 10.2  Concessions

### 10.2.1  Concession Policies

Concession operations are subject to the provisions of the National Park Service Concessions Management Improvement Act of 1998; NPS regulations published at 36 CFR Part 51; this chapter of NPS Management Policies; Director's Order #48A: Concession Management; and other specific guidance that may be issued under the Director's authority. In Alaska, concession operations are also subject to the provisions of the Alaska National Interest Lands Conservation Act and 36 CFR Part 13.

### 10.2.2  Commercial Visitor Services Planning

Commercial visitor services planning will identify the appropriate role of commercial operators in helping parks to provide opportunities for visitor use and enjoyment. This planning will be integrated into other plans and planning processes and will comply with all Service policies regarding planning and environmental analysis. The number, location, and sizes of facilities and sites assigned through concession authorizations will be the minimum necessary for proper and satisfactory operation of the facilities.

A park commercial services strategy must be in place to ensure that concession facilities and services are necessary and appropriate, financially viable, and addressed in an approved management plan. Commercial services plans may be developed to further implement a park's commercial services strategy and to guide decisions on whether to authorize or expand park concessions. A decision to authorize or expand a park concession will consider the effect on, or need for, additional infrastructure and management of operations and be based on a determination that the facility or service

◆  is consistent with enabling legislation, and

◆  is complementary to a park's mission and visitor service objectives, and

◆  is necessary and appropriate for the public use and enjoyment of the park in which it is located, and

◆  is not, and cannot be, provided outside park boundaries, and

◆  incorporates sustainable principles and practices in planning, design, siting, construction, and maintenance, and

◆  adopts appropriate energy and water conservation, source reduction, and environmental purchasing standards and goals, and

◆  will not cause unacceptable impacts.

Prior to initiating new services authorized under a concession contract, a market and financial viability study/ analysis will be completed to ensure the overall contract is feasible.

For information about leasing structures for appropriate uses, see section 8.12 and Director's Order #38: Real Property Leasing.

*(See Unacceptable Impacts 1.4.7.1)*

### 10.2.3  Concession Contracting

Approved standard contract language will be used in all NPS concession contracts. Any deviations from such language must be approved in writing by the Director.

#### 10.2.3.1  Terms and Conditions of Contracts

Concession services will be authorized under concession contracts unless otherwise authorized by law. The term of a concession contract will generally be 10 years or less. However, the Director may award a contract for a term of up to 20 years if the Director determines that the contract terms and conditions, including the required construction of capital improvements, warrant a longer term. In this regard, the term of concession contracts should be as short as is prudent, taking into account the financial requirements of the concession contract, the required construction of capital improvements, resource preservation and conservation, visitor needs, and other factors that the Director may deem appropriate. Proposed concession operations must be economically feasible and supported by a feasibility study prepared by a qualified individual.

#### 10.2.3.2  Modifications/Amendments

Concession contracts may be modified only by written amendment. Amendments developed after the issuance of a concession contract must be consistent with current NPS policies and orders. Unless otherwise authorized by the contract, a concession contract may be amended to provide minor additional visitor services that are a reasonable extension of the existing services.

#### 10.2.3.3  Extension

Concession contracts may be extended only in accordance with the requirements of 36 CFR Part 51, subpart D. The signature authority for contract extensions or amendments must be consistent with delegations of authority from the Director.

#### 10.2.3.4  Competition

To obtain the best service provider and maximize benefits to the government, the National Park Service encourages competition in the awarding of concession contracts. Through outreach, the National Park Service also encourages the participation of American Indian, minority,

and women-owned businesses when new business activities occur.

### 10.2.3.5   Third-party Agreements and Subconcessions

Unless specified in the contract, sub-concession or other third-party agreements (including management agreements) for the provision of visitor services that are required and/or authorized under concession contracts are not permitted. The Park Service may also advertise for a new concession contract to provide these additional services.

### 10.2.3.6   Multipark Contracts

Concessioners operating in more than one park unit must have separate contracts for each park unit. When approved by the Director, an exception may be made in the case of those park units having common NPS management or where service is provided in contiguous park areas (for example, a pack trip that crosses the boundary of two adjoining parks, or where lack of opportunity for profit, geographic location, and type of service is not feasible within a single location).

### 10.2.3.7   Termination

The Service may terminate concession contracts for default and under any other circumstances specified in the concession contract.

### 10.2.4   Concession Operations
### 10.2.4.1   Operating Plans

The operating plan is an exhibit to the concession contract; the plan will describe operational responsibilities authorized in the contract between the concessioner and the Park Service. The plan is reviewed and updated annually by the Service in accordance with the terms of the contract. Operating plans are considered an integral part of a concessioner's contractual performance compliance. Some aspects of a concessioner's operating requirements may also be contained in general or specific provisions unique to that contract.

### 10.2.4.2   Service Type and Quality

It is the objective of the National Park Service that park visitors be provided with high-quality facilities and services. Where appropriate, the concession contract will specify a range of facility, accommodation, and service types that are to be provided at reasonable rates and standards to ensure optimal facility maintenance and quality services to visitors. Concessioners are not permitted to use or encourage pseudo-ownership concepts such as time shares or long-term rental agreements.

### 10.2.4.3   Evaluation of Concession Operations

Concession operations will be regularly evaluated to ensure that park visitors are provided with high-quality services and facilities that are safe and sanitary and meet NPS environmental, health, safety, and operational standards. As outlined in the concessioner operational evaluation program, the evaluation results will provide a basis for NPS management to determine (1) whether to continue or terminate a concession contract, and (2) whether a concessioner is eligible to exercise a right of preference in the award of a qualified new concession contract for those categories of contracts where such a right is available by law.

### 10.2.4.4   Interpretation by Concessioners

Concessioners will be required to appropriately train their employees and, through their facilities and services, to instill in their guests an appreciation of the park, its purpose and significance, its proper and sustainable management, and the stewardship of its resources. When the provision of interpretive services is required by the contract, concessioners will provide formal interpretive training, approved by the Park Service, for their employees, or will participate in formal interpretive training that is either offered by the Park Service or cosponsored by the concessioner.

Visitor appreciation of the park can be instilled in many ways. For example, it can be accomplished through guided activities; the design, architecture, landscape, and decor of facilities; educational programs; interpretive menu design and menu offerings; and involvement in the park's overall interpretive program. Gift shop merchandise and displays also present opportunities to educate visitors about park history; natural, cultural, and historical resources; and sustainable environmental management.

Concession contracts will require the concessioner to provide all visitor services in a manner that is consistent with and supportive of the interpretive themes, goals, and objectives articulated in each park's planning documents, mission statement, and/or interpretive prospectus.

*(See Interpretive Competencies and Skills 7.4)*

### 10.2.4.5   Merchandise

The National Park Service will approve the nature, type, and quality of merchandise to be offered by concessioners. Although there is no Service-wide list of specific preferred merchandise, priority will be given to sale items that foster awareness, understanding, and appreciation of the park and its resources and that interprets those resources. Merchandise should have interpretive labeling or include other information to indicate how the merchandise is relevant to the park and its interpretive program and themes.

Each concession operation with a gift shop will have a mission statement based on the park's concession service plan or general management plan. Concessioners will develop and implement a merchandise plan based on the park's gift shop mission statement. The merchandise plan must be satisfactory to the Director, and should ensure that merchandise sold or provided reflects the significance of the park and promotes the conservation of the park's geological resources, wildlife, plant life, archeological resources, local Native American culture, local ethnic and traditional culture, historical significance, and other park resources and values. The plan should also integrate pollution prevention and waste-reduction objectives and strategies for merchandise and packaging.

Merchandise must be available at a range of prices. Theme-related merchandise manufactured or handcrafted in the United States—particularly in a park's geographic vicinity—will be encouraged. The revenue derived from the sale of United States Indian, Alaska Native, native Samoan, and Native Hawaiian handicrafts is exempt from any franchise fee payments.

### 10.2.4.6   Artifacts and Specimens

Concessioners will not be permitted to sell any merchandise in violation of laws, regulations, or NPS policies. The park superintendent may prohibit the sale of some items for retail sale because the merchandise is locally sensitive or inappropriate for sale. The sale of original objects, artifacts, or specimens of a historic, archeological, paleontological, or biological nature is prohibited. Replicated historic, archeological, paleontological, or biological objects, artifacts, or specimens may be sold if they are obvious replicas and clearly labeled.

Any geological merchandise approved for sale or exhibit by concessioners must be accompanied by appropriate educational material and a written disclaimer clearly stating that such items were not obtained from inside park boundaries. The proposed sale of any replicas, or of geological merchandise, must be addressed in the gift shop merchandise plan.

### 10.2.4.7   Rates

The National Park Service must approve all rates charged to visitors by concessioners. The reasonableness of a concessioner's rates and charges to the public will, unless otherwise provided in the contract, be judged primarily on the basis of comparison with current rates and charges for facilities and services of comparable character under similar conditions. Due consideration will be given to length of season, provision for peak loads, average percentage of occupancy, accessibility, availability and costs of labor and materials, type of patronage, and other factors deemed significant by the NPS Director.

### 10.2.4.8   Risk Management Program

Concession contracts require each concessioner to develop a risk management program that is (1) appropriate in scope to the size and nature of the operation, (2) in accord with the Occupational Safety and Health Act of 1970 and the NPS concession risk management program, and (3) approved by the superintendent. Concessioners are responsible for managing all of their operations to minimize risk and control loss due to accident, illness, or injury. To ensure compliance, the Service will include a risk management evaluation as part of its standard operational review of concession operations.

### 10.2.4.9   Natural and Cultural Resource Management Requirements

Concessioners are required to comply with applicable provisions of all laws, regulations, and policies that apply to natural and cultural resource protection. The use, maintenance, repair, rehabilitation, restoration, or other modification of concession facilities that are listed in or eligible for the National Register of Historic Places are subject to the applicable provisions of all laws, executive orders, regulations, and policies pertaining to cultural properties. The National Park Service will assist concessioners in understanding and complying with regulations for the protection of historic properties (36 CFR Part 800) promulgated by the Advisory Council on Historic Preservation. Historic structures and their contents and museum objects that are in the control of concessioners will be treated in accordance with the appropriate standards contained in NPS guidance documents. The Service will work closely with concessioners to integrate into concession activities the policies, procedures, and practices of Executive Order 13287 (Preserve America).

*(See Chapter 4: Natural Resource Management; Use of Historic Structures 5.3.5.4.7. Also see Reference Manual 24: the Museum Handbook; Director's Order #28: Cultural Resource Management; #38: Real Property Leasing, and #48A: Concession Management)*

### 10.2.4.10  Environmental Program Requirements

In the operation of visitor services, concessioners will be required by contract to meet environmental compliance objectives by

◆ complying with all applicable laws pertaining to the protection of human health and the environment; and

◆ incorporating best management practices in all operations, construction, maintenance, acquisition, provision of visitor services, and other activities under the contract.

Concessioners will also be required by contract to develop, document, implement, and comply fully with—to the satisfaction of the Director—a comprehensive, written environmental management program (EMP) to achieve environmental management objectives. The EMP

◆ should be appropriate to the nature and size of the operation;

◆ must account for all activities with potential environmental impacts conducted by the concessioner, or to which the concessioner contributes;

◆ must be updated at least annually; and

◆ must be approved by the superintendent.

The scope and complexity of the EMP may vary based on the type, size, and number of concessioner activities. Exceptions to the requirement for an EMP must be approved by the Director.

The National Park Service will review concessioner compliance with the EMP under the contract. The Park Service will also

◆ assist concessioners in understanding environmental program requirements;

◆ conduct environmental compliance audits of all commercial visitor services at least every three years

in accordance with the concessions environmental audit program (the concessioner will be responsible for corrective actions required by law and identified during the environmental compliance audits); and

◆   include an environmental management evaluation as part of its annual standard operational reviews of concession operations.

*(See Compensation for Injuries to Natural Resources 4.1.6; Integrated Pest Management Program 4.4.5.2; Compensation for Injuries to Cultural Resources 5.3.1.3; Overnight Accommodations and Food Services 9.3.2. Also see Director's Order #48A: Concession Management; Director's Order #83: Public Health)*

### 10.2.4.11   Insurance

Concession contracts will identify the types and minimum amounts of insurance coverage required of concessioners to

◆   provide reasonable assurance that concessioners have the ability to cover bona fide claims for bodily injury, death, or property damage arising from an action or omission of the operator;

◆   protect the government against potential liability for claims based on the negligence of the operators; and

◆   enable rapid repair or replacement of essential visitor facilities located on park lands that are damaged or destroyed by fire or other hazards.

Concessioners will not be permitted to operate without liability insurance. Under limited conditions, concessioners may operate without property insurance, as described in Director's Order #48A: Concession Management.

### 10.2.4.12   Food Service Sanitation Inspections

Concessioners who prepare food on or off park lands or serve food on park lands will be subject to inspection for compliance with all applicable health and sanitation requirements of local and state agencies, the U.S. Public Health Service, and the Food and Drug Administration.

*(Also see Director's Order #83: Public Health)*

### 10.2.4.13   Smoking

Generally, all NPS concession facilities will be smoke free. The only exceptions—which the Service does not encourage—will be specifically designated smoking areas and rooms if allowed by state and local law. The sale of tobacco products through vending machines is prohibited.

*(Also see Director's Order #50D: Smoking Policy; Executive Order 13058 (Protecting Federal Employees and the Public from Exposure to Tobacco Smoke in the Federal Workplace))*

### 10.2.4.14   Wireless Local Area Networks

Concessioners may be authorized to provide wireless local area network access for park visitors and for administrative and employee use within concessioner assigned facilities. If this type of service is found to be necessary and appropriate and otherwise in accord with the park's planning and other guidance documents, the concession authorization's operating plan must identify the need for the service and the standards for offering the service. A request to construct telecommunications equipment and infrastructure outside the concessioner's assigned facilities must be processed in accordance with section 8.6.4.3.

### 10.2.5   Concessions Financial Management

Concession contracts must provide for payment to the government of a franchise fee, or other monetary consideration as determined by the Secretary, upon consideration of the probable value to the concessioner of the privileges granted by the particular contract involved. Such probable value will be based upon a reasonable opportunity for net profit in relation to capital invested and the obligations of the contract. Consideration of revenue to the United States is subordinate to the objectives of protecting and preserving park areas and providing necessary and appropriate services for visitors at reasonable rates.

### 10.2.5.1   Franchise Fees

The amount of the franchise fee or other monetary consideration paid to the United States for the term of the concession contract must be specified in the concession contract and may only be modified to reflect extraordinary unanticipated changes from the conditions expected as of the effective date of the contract. Contracts with a term of more than five years will include a provision that allows reconsideration of the franchise fee at the request of the Director or the concessioner in the event of such extraordinary unanticipated changes. Such provision will provide for binding arbitration in the event that the Director and the concessioner are unable to agree upon an adjustment to the franchise fee in these circumstances.

### 10.2.5.2   Franchise Fee Special Account

All franchise fees and other monetary considerations will be deposited into a Department of the Treasury special account. In accordance with the NPS Concessions Management Improvement Act of 1998, twenty percent (20%) will be available to support activities throughout the national park system, and eighty percent (80%) will be available to the park unit in which it was generated for visitor services and funding high-priority and urgently necessary resource management programs and operations.

### 10.2.5.3   Record-keeping System

All concessioners will establish and maintain a system of accounts and a record-keeping system that use written journals and general ledger accounts to facilitate the preparation of annual concessioner financial reports.

### 10.2.5.4   Annual Financial Reports

For each concession contract, concessioners will be required to submit a separate annual financial report that reflects only the operations they are authorized to provide under that particular contract.

#### 10.2.5.5   Donations to the National Park Service

The National Park Service will not solicit or accept direct donations or gifts from entities that have or are seeking to obtain a concessions contract. The Park Service will not require any concessioner to donate or make contributions to the Service under any circumstance, including the incorporation of such a requirement in concession contracts. Further guidance on donations is available in Director's Order #21: Donations and Fundraising.

### 10.2.6   Concession Facilities

All buildings under a concession contract are U.S. government/Service-owned structures and are part of the overall facility inventory at each park. Depending on the contract, the concessioner may have a contractual right of compensation in the form of a leasehold surrender interest or possessory interest in one, some, or all of the buildings. Responsibilities for maintenance, environmental management, and other operational issues must be included in each concession contract. Park facility managers will work closely with the park's concession program managers to ensure that these government buildings are part of the overall park inventory and tracking systems. Park managers will ensure that possessory interests and leasehold surrender interest valuations conform to the terms and conditions of the concession contract.

#### 10.2.6.1   Design

Concession facilities will be of a size and at a location that the Service determines to be necessary and appropriate for their intended purposes. All concession facilities must comply with applicable federal, state, and local construction codes, and meet accessibility requirements as set forth in applicable accessibility guidelines. Proposed concession facilities must conform to NPS standards for sustainable design, universal design, and architectural design. Concession development or improvement proposals must undergo review for compliance with the National Environmental Policy Act of 1969 and section 106 of the National Historic Preservation Act (16 USC 470f), and proposals must be carried out in a manner consistent with applicable provisions of the *Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation* and other applicable legal requirements.

In addition to general park design requirements, the Park Service will apply value analysis during the design process to analyze the functions of facilities, processes, systems, equipment, services, and supplies. Value analysis must be used to help achieve essential functions at the lowest life-cycle cost, consistent with required performance, reliability, environmental quality, and safety criteria and standards.

*(See Facility Planning and Design 9.1.1)*

#### 10.2.6.2   Accessibility of Commercial Services

Concessioners share the National Park Service's responsibility to provide employees and visitors with the greatest degree of access to programs, facilities, and services that is reasonable, within the terms of existing contracts and agreements. Applicable laws include, but are not limited

to (1) regulations issued under the authority of section 504 of the Rehabilitation Act of 1973, as amended (43 CFR Part 17), which prohibits discrimination on the basis of disability in programs or activities conducted by federal executive agencies; and (2) the Architectural Barriers Act of 1968, which requires physical access to buildings and facilities. Where there is no specific language identifying applicable accessibility laws in an existing concession contract, the Park Service will address the issue of compliance in the annual concession operating plan.

*(See Physical Access for Persons with Disabilities 5.3.2; Accessibility for Persons with Disabilities 1.9.3, 8.2.4 and 9.1.2. Also see Director's Order #42: Accessibility for Visitors with Disabilities in National Park Service Programs and Services)*

#### 10.2.6.3   Maintenance

Concession contracts will require concessioners to be responsible for all maintenance and repair of facilities, lands, and utility systems assigned for their use, in accordance with standards acceptable to the Service. Exceptions will be made only in extraordinary circumstances, as determined by the Director. All concession contracts must include a current maintenance plan as specified in the concession contract. Maintenance plans are an exhibit to the concession contract and will be considered an integral part of a concessioner's contractual performance compliance.

Maintenance of historic properties and cultural landscapes will be carried out in a manner consistent with applicable provisions of the *Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation.*

#### 10.2.6.4   Utilities and Services

Utilities include, but are not limited to, electricity, fuel, natural gas, water, disposal of wastewater and solid waste, and communication systems. When available, the Service may provide utilities to the concessioner for use in connection with the operations required or authorized under the contract at rates to be determined in accordance with applicable laws. If the Service does not provide utilities to the concessioner, the concessioner will, with the written approval of the Director and under any requirements prescribed by the Director, (1) secure necessary utilities at its own expense from sources outside the area; or (2) install the utilities within the area, subject to conditions of the contract.

*(Also see Director's Order #35B: Sale of National Park Service-produced Utilities)*

#### 10.2.6.5   Closure of Commercial Operations during Government Shutdown

The Anti-Deficiency Act requires federal agencies to suspend all nonessential activities whenever there is a failure to enact an appropriations bill or adopt a continuing resolution. All concessioner-operated programs and services must cease, and visitors must be asked to leave within 48 hours. All commercial facilities and services in a park will be closed to protect the safety of visitors and the

integrity of park resources. Exceptions to this policy include concessions that are required for health and safety purposes or protection of the environment, or that are necessary to support park operations that are deemed essential, such as law enforcement.

Commercial facilities located on through-roads (roads or public highways that begin and end outside of a park, plus parkways) and public highways may remain open if doing so does not result in additional costs to the park (for example, the staffing of entrance stations). These commercial facilities may include operations such as service stations, food services, stores, and lodging, or portions of such operations. The commercial facility in question should have access directly from the road or highway and not require the reopening of park roads having other destinations. More specific aspects of closures may be guided by a Service-wide shutdown plan.

### 10.2.7 Concessioner Employees and Employment Conditions
#### 10.2.7.1 Nondiscrimination

Concessioners will comply with all applicable laws and regulations relating to nondiscrimination in employment and the provision of services to the public. As the National Park Service strives to achieve workforce diversity, so too will concessioners be encouraged to recognize workforce diversity as a sound business practice.

#### 10.2.7.2 Substance Abuse

In compliance with state and federal regulations condemning substance abuse, the Park Service prohibits the unlawful possession, use, or distribution of illicit drugs and alcohol. The Service also prohibits the unlawful manufacture, cultivation, processing, or transportation of illicit drugs. This policy applies to concessioners and their employees, at any facility or in any activity taking place on NPS lands. Concessioners are required to provide and advise employees about the availability of employee assistance programs addressing substance abuse problems.

### 10.2.8 NPS Employees
#### 10.2.8.1 Accepting Gifts and Reduced Rates from Concessioners

NPS employees may not receive concessioner goods or services at a discount unless it is in connection with official business, is to the government's advantage, and is provided for under the terms of a concession contract. However, employees may accept reduced rates or discounts offered by the concessioner when those same reduced rates or discounts are available to the general public.

 NPS employees may not solicit or accept, directly or indirectly, any gift, gratuity, favor, entertainment, loan, or any other thing of monetary value from a concessioner or other person who conducts operations and activities that are regulated by the Department of the Interior. Employees should consult with their ethics counselor regarding the limited exceptions to the general prohibition on accepting gifts from outside sources.

#### 10.2.8.2 Employment of NPS Personnel or Family Members by Concessioners

Federal law prohibits government employees from making recommendations, decisions, or approvals relating to applications, contracts, controversies, or other matters in which the employee or the employee's spouse or minor child has a financial interest. Park employees may not make decisions, approvals, or recommendations related to concession activities when their spouse or dependent child is employed by a park concessioner in that particular park. For example, the spouse or dependent child of the superintendent, assistant superintendent, concession staff, environmental manager, or public health specialist may not be employed by a concessioner in the specific park in which the NPS employee works.

*(Also see Director's Order #37: Home Businesses in Park Housing)*

#### 10.2.8.3 NPS Employee Ownership or Investment in Concession Businesses

Department of the Interior policy prohibits employees and their spouses and minor children from acquiring or retaining for commercial purposes any permit, lease, or other rights granted by the Department for conducting commercial services on federal lands. Therefore, no NPS concession contract or commercial use authorization to conduct commercial services in a park will be issued to NPS employees or their spouses and minor children who are owners, partners, corporate officers, or general managers of any business seeking such a contract in federal land managed by the Department of the Interior. Further, to avoid the appearance of partiality and conflicts of interest, and to comply with ethics laws that apply to all federal employees, NPS employees may not work on any matter involving a business in which they, their spouse, or their minor children have a financial interest.

#### 10.2.8.4 Concession Management Personnel Qualifications

To effectively carry out the concession management program, managers and supervisors will make every effort to ensure that personnel selected for positions meet the essential competencies established for the position being filled. When concession management personnel lack the full complement of essential competencies or require refresher training for their position, managers and supervisors will ensure that those employees are trained and certified as competent. All personnel vacancy announcements issued for concession management must include program competencies.

## 10.3 Commercial Use Authorizations

Commercial use authorizations (CUAs), which are not considered as concession contracts, may be issued pursuant to section 418 of the National Park Service Concessions Management Improvement Act of 1998 (16 USC 5966). A commercial use authorization is a permit that authorizes suitable commercial services to park area visitors in limited circumstances as described in 10.3.1. A concession contract

may be issued instead of the commercial use authorization when the Director determines that the services are necessary and appropriate, and/or provision of the services require certain protections such as legal, financial, and resource provisions that are more typical of a concession contract. A more detailed discussion of commercial use authorizations is included in Director's Order #48B: Commercial Use Authorizations.

### 10.3.1   General

Commercial use authorizations may be issued only to authorize services that (1) are determined to be an appropriate use of the park; (2) will have minimal impact on park resources and values; and (3) are consistent with the purpose for which the unit was established, as well as all applicable management plans and park policies and regulations.

### 10.3.2   Requirements

By law, a commercial use authorization must provide for

◆ payment of a reasonable fee, such fees to be used, at a minimum, to recover associated management and administrative costs;

◆ provision of services in a manner consistent to the highest practicable degree with the preservation and conservation of park resources and values; and

◆ limitation of liability of the federal government arising from the commercial use authorization.

No park may issue commercial use authorizations in a quantity inconsistent with the preservation and proper management of park resources and values. Each park issuing commercial use authorizations will ensure that it contains provisions for the protection of visitors and the resources and values of the park.

### 10.3.3   Limitations

By law, commercial use authorizations may be issued only for

◆ commercial operations with annual gross receipts of not more than $25,000 resulting from services originating and provided solely within a unit of the national park system pursuant to such authorization;

◆ the incidental use of resources of the unit by commercial operations that provide services originating and terminating outside of the boundaries of the park unit; or

◆ such uses by organized children's camps, outdoor clubs, nonprofit institutions (including backcountry use), and such other uses as the Secretary of the Interior deems appropriate.

Nonprofit institutions will be required to obtain commercial use authorizations only when they generate taxable income from the authorized use.

### 10.3.4   Construction Prohibition

By law, under no circumstances will a commercial use authorization provide for or allow construction of any structure, fixture, or improvement on federally owned land within any unit of the national park system.

### 10.3.5   Duration

By law, the maximum term for any commercial use authorization is two years in length. No rights of renewal are associated with commercial use authorizations.

### 10.3.6   Other Contracts

Holding or seeking to obtain a commercial use authorization does not preclude a person, corporation, or other entity from submitting proposals for concessions contracts.

# Appendix A

## Laws Cited in Text

**Abandoned Shipwreck Act of 1987**
43 USC[1] 2101—2106; PL[2] 100-298

**(popularly known as) Acquired Lands Mineral Leasing Act**
30 USC 301—306; May 21, 1930, ch. 307, 46 Stat. 373

**Administrative Procedure Act (APA)**
5 USC 551 et seq.[3], June 11, 1946, ch. 324, 60 Stat. 237

**Alaska National Interest Lands Conservation Act (ANILCA)**
16 USC 3101—3233; PL 96-487

**American Indian Religious Freedom Act (AIRFA)**
42 USC 1996—1996a; PL 95-341, 103-344

**Americans with Disabilities Act of 1990 (ADA)**
42 USC 12101—12213; PL 101-336

**Animal Welfare Act**
7 USC 2131—2159; PL 89-544; 94-279

**Anti-Deficiency Act**
31 USC 1341; July 12, 1870, ch. 251, 16 Stat. 251, PL 97-258

**Antiquities Act of 1906**
16 USC 431—433; June 8, 1906, ch. 3060, 34 Stat. 225

**Archaeological Resources Protection Act of 1979 (ARPA)**
16 USC 470aa—470mm; PL 96-95

**Architectural Barriers Act of 1968**
42 USC 4151—4157; PL 90-480

**Clean Air Act (CAA)**
42 USC 7401—7671q; PL 88-206

**Coastal Zone Management Act of 1972 (CZMA)**
16 USC 1451—1465; PL 89-454, 92-583

**Commemorative Works Act**
40 USC 8901—8909; PL 99-652, 107-217

**Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA)**
42 USC 9601—9675; PL 96-510

**Endangered Species Act of 1973**
16 USC 1531—1544; PL 93-205

**Energy Policy Act of 1992**
42 USC 13201—13556; PL 102-486

**Equal Employment Opportunity Act of 1972**
42 USC 2000e-16(a)[4]; PL 92-261

**Federal Advisory Committee Act (FACA)**
5 USC App. 1—16; PL 92-463

**Federal Cave Resources Protection Act of 1988 (FCRPA)**
16 USC 4301—4310; PL 100-691

**Federal Insecticide, Fungicide and Rodenticide Act**
7 USC 136—136y; PL 92-516

**Federal Lands Recreation Enhancement Act (FLREA)**
16 USC 6801—6814; PL 108-447[5]

**Federal Managers' Financial Integrity Act of 1982**
31 USC 3512(d); PL 97-255, 97-452[6]

**Federal Water Pollution Control Act (commonly known as the Clean Water Act)**
33 USC 1251—1387; PL 92-500, 95-217

**Freedom of Information Act (FOIA)**
5 USC 552; PL 89-554, 90-23

**General Mining Act of 1872**
30 USC 22 et seq.[7]; May 10, 1872, ch. 152, 17 Stat. 91

**Geothermal Steam Act of 1970**
30 USC 1001—1028; PL 91-581, 100-443

**Government Performance and Results Act of 1993 (GPRA)**
31 USC 1115[8] et seq. ; PL 103-62

**Hazardous Materials Transportation Act**
49 USC 5101—5127; PL 93-633, 101-615, 103-311

---

[1]  The United States Code (USC) can be accessed on the Internet, e.g., at <http://www4.law.cornell.edu/uscode/>, or <http://www.gpoaccess.gov/uscode/index.html>.

[2]  The text of any Public Law (PL) enacted by the 101st or a later Congress (1989 onward) can be accessed at the Library of Congress's THOMAS website, <http://thomas.loc.gov/>.

[3]  Act of June 11, 1946, ch. 324, has been codified to 5 USC §§551—559, 701—706, 1305, 3105, 3344, 4301, 5335, 5372, and 7521.

[4]  PL 92-261 was codified to 42 USC §§2000e—4301—6309, 2000e-8, 2000e-9, 2000e-13, 2000e-14, 2000e-16 and 2000e-17, and 5 USC §§5108 and 5314—5316.

[5]  The Federal Lands Recreation Enhancement Act is division J, title VIII of PL 108-447, the Consolidated Appropriations Act, 2005.

[6]  PL 97-452, the Jan. 12, 1983 revision of title 31, in particular section 1(12), redesignated 16 USC 3512(b) as 16 USC 3512(d).

[7]  The General Mining Act of 1872 was the basis of 30 USC §§22-24, 26-30, 33-35, 37, 39-43, and 47.

[8]  PL 103-62 was codified to: 5USC 306; 31 USC 1105(a)(29); 1115—1119, 9703, 9704; and 39 USC 2801—2805.

**(popularly known as) Historic Sites, Buildings and Antiquities Act**
16 USC 461—467; Aug. 21, 1935, ch. 593, 49 Stat. 666

**Land and Water Conservation Fund Act of 1965**
16 USC 460l-4—460l-11; PL 88-578

**Mineral Leasing Act**
30 USC 181—287; Feb. 25, 1920, ch. 85, 41 Stat. 437

**Mining in the Parks Act**
16 USC 1901—1912; PL 94-429

**(popularly known as) Museum Act**
16 USC 18f—18f-3; July 1, 1955, ch. 259, 69 Stat. 242, PL 104-333[9]

**National Cemeteries Act of 1973**
38 USC 2400—2410; PL 93-43

**National Environmental Policy Act of 1969 (NEPA)**
42 USC 4321—4370d; PL 91-190

**National Historic Preservation Act (NHPA)**
16 USC 470—470x-6; PL 89-665, 96-515

**National Parks Air Tour Management Act of 2000**
114 Stat. 61; PL 106-181 (title VIII)

**National Parks Omnibus Management Act of 1998**
16 USC 5901—6011[10] ; PL 105-391

**National Park Service Concessions Management Improvement Act of 1998**
16 USC 5951—5966; PL 105-391 (title IV)

**National Park Service Organic Act**
16 USC 1—4; Aug. 25, 1916, ch. 408, 39 Stat. 535[11]

**National Park System General Authorities Act**
16 USC 1a-1 et seq.[12]; PL 91-383, 94-458, 95-250[13]

**(popularly known as) National Park System Resource Protection Act**
16 USC 19jj—19jj-4; PL 101-337, 104-333

**National Trails System Act**
16 USC 1241—1251; PL 90-543, 98-11

**Native American Graves Protection and Repatriation Act (NAGPRA)**
25 USC 3001—3013; PL 101-601

**Occupational Safety and Health Act of 1970**
29 USC 651—678; PL 91-596[14]

**Oil Pollution Act of 1990**
33 USC 2701—2761; PL 101-380

**(popularly known as) Omnibus Consolidated Appropriations Act, 1997**
16 USC 1g et seq.[15]; PL 104-208

**Privacy Act of 1974**
5 USC 552a; PL 93-579

**Rehabilitation Act of 1973**
29 USC 701—797b; PL 93-112, 105-220

**Rivers and Harbors Appropriation Act of 1899**
33 USC 401 et seq.[16]; Mar. 3, 1899, ch. 425, 30 Stat. 1121

**Robert T. Stafford Disaster Relief and Emergency Assistance Act**
42 USC 5121—5204c[17]; PL 93-288, 100-707, 103-337

**Solid Waste Disposal Act**
42 USC 6901—6992k; PL 89-272, 94-580[18], 98-616[19]

**Surface Mining Control and Reclamation Act of 1977**
30 USC 1201—1328; PL 95-87

**Telecommunications Act of 1996**
47 USC 332 note; PL 104-104[20]

**Toxic Substances Control Act**
15 USC 2601—2692; PL 94-469

**Volunteers in the Parks Act of 1969**
16 USC 18g—18j; PL 91-357

**Wild and Scenic Rivers Act**
16 USC 1271—1287; PL 90-542

**Wilderness Act**
16 USC 1131—1136; PL 88-577

---

9    Section 804 of division 1, title VIII of PL 104-333, the Omnibus Parks and Public Lands Management Act of 1996, amended 16 USC 18f, and enacted §§18f-2 and 18f-3

10    In addition to enacting §§19o and 5901—6011 of title 16, PL 105-391 amended 16 USC 1a-2, 1a-5, 1a-7, and 3, and repealed 16 USC 17b-1, 20, 20a—20g.

11    See also §10(a) of PL 108-352.

12    PL 91-383, as originally enacted, added §§1a-1 and 1a-2, and amended §§1b and 1c, of title 16.

13    PL 95-250, an act expanding Redwood National Park, also amended the National Park System General Authorities Act by adding the second and third sentences to 16 USC 1a-1. See also, §10(b) of PL 108-352.

14    PL 91-596 enacted 29 USC 651—678 and 42 USC 3142-1, and amended 29 USC 553, 5 USC 5108, 5314, 5315, and 7902, 15 USC 633 and 636, 18 USC 1114, and §1421 of former title 49.

15    The Omnibus Consolidated Appropriations Act, 1997 enacted §§1g and 1011 of title 16, and amended §§773 ,773c, 917, 917a, 971, 971b, 971d, 971e, 972c, 973a, 1362, 1371, 1383a, 1387, 1417, 1432, 1445a, 1827, 2803, 2804, 3125, 3343, 3373, 3377, 3631, 4120, 5102, 5103, 5106, 5107a, 5107b, 5503, 5504 and 5609 of the same title.

16    The Rivers and Harbors Appropriation Act of 1899 was codified to 33 USC §§401, 403, 404, 406—409, 411—416, 418, 502, 549 note, 686, and 687.

17    The Federal Civil Defense Act of 1950, 50 USC App. 2251—2303, was repealed, and restated in title VI (42 USC 5195—5197g) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, by PL 103-337.

18    The Solid Waste Disposal Act was amended and essentially re-written by PL 94-580, the Resource Conservation and Recovery Act of 1976.

19    PL 98-616, the Hazardous and Solid Waste Amendments of 1984, enacted §§6917, 6936 to 6939a, 6949a, 6979a, 6979b, and 6991 to 6991i of title 42 of the US Code (and provisions set out as notes to §§6905, 6921 and 6926), and amended §§6901, 6902, 6905, 6912, 6915, 6916, 6921 to 6933, 6935, 6941 to 6945, 6948, 6956, 6962, 6972, 6973, 6976, 6982 and 6984 of the same title.

20    The provision of the Telecommunications Act of 1996 dealing with the granting of rights-of-way, etc., by federal departments and agencies to wireless telecommunications providers is §704(c), title VII, of PL 104-104.

# Appendix B

## Executive Orders and Memoranda Cited in Text

**Executive Order No. 11644 (Use of Off-road Vehicles on the Public Lands)**
February 8, 1972, 37 FR 2877, as amended by **Ex. Ord. No. 11989**, May 24, 1977, 42 FR 26959; **Ex. Ord. No. 12608**, September 9, 1987, 52 FR 34617 [42 USC 4321][1]

**Executive Order No. 11988 (Floodplain Management)**
May 24,1977, 42 FR 26951, as amended by **Ex. Ord. No. 12148**, July 20, 1979, 44 FR 43239 [42 USC 4321]

**Executive Order No. 11990 (Protection of Wetlands)**
May 24, 1977, 42 FR 26961, as amended by **Ex. Ord. No. 12608**, September 9, 1987, 52 FR 34617 [42 USC 4321]

**Executive Order No. 12898 (Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations)**
February 11, 1994, 59 FR 7629, as amended by **Ex. Ord. No. 12948**, January 30, 1995, 60 FR 6381 [42 USC 4321]

**Memorandum on Government-to-Government Relations with Native American Tribal Governments**
April 29, 1994, 59 FR 22951 [25 USC 450]

**Executive Order No. 13006 (Locating Federal Facilities on Historic Properties in Our Nation's Central Cities)**
May 21, 1996, 61 FR 26071 [40 USC 3306]

**Executive Order No. 13007 (Indian Sacred Sites)**
May 24, 1996, 61 FR 26771 [42 USC 1996]

**Executive Order No. 13058 (Protecting Federal Employees and the Public from Exposure to Tobacco Smoke in the Federal Workplace)**
August 9, 1997, 62 FR 43451 [5 USC 7301]

**Executive Order No. 13101 (Greening the Government Through Waste Prevention, Recycling and Federal Acquisition)**
September 14, 1998, 63 FR 49643 [42 USC 6961]

**Executive Order No. 13112 (Invasive Species)**
February 3, 1999, 64 FR 6183, as amended by **Ex. Ord. No. 13286**, February 28, 2003, 68 FR 10619 [42 USC 4321]

**Executive Order No. 13123 (Greening the Government Through Efficient Energy Management)**
June 3, 1999, 64 FR 30851 [42 USC 8251]

**Executive Order No. 13148 (Greening the Government Through Leadership in Environmental Management)**
April 21, 2000, 65 FR 24595 [42 USC 4321]

**Executive Order No. 13149 (Greening the Government Through Federal Fleet and Transportation Efficiency)**
April 21, 2000, 65 FR 24607 [42 USC 13212]

**Executive Order No. 13175 (Consultation and Coordination with Indian Tribal Governments)**
November 6, 2000, 65 FR 67249 [25 USC 450]

**Executive Order No. 13266 (Activities to Promote Personal Fitness)**
June 20, 2002, 67 FR 42467 [42USC 300u]

**Executive Order No. 13287 (Preserve America)**
March 3, 2003, 68 FR 10635 [16 USC 470h-2]

**Executive Order No. 13327 (Federal Real Property Asset Management)**
February 4, 2004, 69 FR 5897 [40 USC 121]

**Executive Order No. 13352 (Facilitation of Cooperative Conservation)**
August 26, 2004, 69 FR 52989 [42 USC 4332]

---

[1]   The citation in brackets indicates where the Executive Order or Memorandum may be found in notes to the US Code.

# Appendix C

## Director's Orders

Director's Orders provide guidance for implementing certain aspects of NPS *Management Policies,* and are used as a vehicle for updating Management Policies between publishing dates.

In many cases, Director's Orders are further supplemented by handbooks or reference manuals.

Director's Orders marked with an asterisk (*) in this list have not been completed as of the publication date of Management Policies. Copies of those that have been completed and those that are completed or added in the future may be obtained by contacting the NPS Office of Policy or the appropriate NPS program office, or by accessing the NPS World Wide Web site at <http://www.nps.gov/policy>.

Please note that the numbers assigned to some of the Director's Orders on this list may be revised as the Directives system evolves in the future. A status chart at the web site should be consulted for the most current listing of Director's Orders.

| | |
|---|---|
| 1. | National Park Service Directives System |
| 2. | Park Planning |
| 2-1. | Resource Stewardship Planning* |
| 3. | Delegations of Authority* |
| 4. | Diving Management |
| 5. | Paper and Electronic Communications |
| 6. | Interpretation and Education |
| 7. | Volunteers in Parks |
| 8. | Budget and Programming* |
| 9. | Law Enforcement Program |
| 10A. | Design and Construction Drawings |
| 10B. | Drawing and Map Numbers* |
| 11A. | Information Technology Management* |
| 11B. | Ensuring Quality of Information Disseminated by the NPS |
| 11C. | Web Publishing* |
| 12. | Conservation Planning, Environmental Impact Analysis, and Decision-making |
| 13A. | Environmental Management Systems |
| 13B. | Solid and Hazardous Waste Management* |
| 14. | Resource Damage Assessment and Restoration |
| 15. | NPS Wireless Spectrum Management |
| 16A. | Reasonable Accommodation for Applicants and Employees with Disabilities |
| 16B. | Diversity in the Workplace* |
| 16C. | Discrimination Complaints Process* |
| 16D. | Equal Employment Opportunity and Zero Tolerance for Discrimination |
| 16E. | Sexual Harassment |

| | |
|---|---|
| 17. | National Park Service Tourism |
| 18. | Wildland Fire Management |
| 19. | Records Management |
| 20. | Agreements |
| 21. | Donations and Fundraising |
| 22. | Fee Program* |
| 23. | (reserved) |
| 24. | NPS Museum Collections Management |
| 25. | Land Protection |
| 26. | Youth Programs |
| 27. | Challenge Cost-share Program* |
| 28. | Cultural Resource Management |
| 28A. | Archeology |
| 28B. | Ethnography Program* |
| 28C. | Oral History* |
| 29. | (reserved) |
| 30. | (reserved) |
| 31. | Travel Procedures* |
| 32. | Cooperating Associations |
| 33. | (reserved) |
| 34. | (reserved) |
| 35A. | Sale or Lease of Park Services, Resources, or Water in Support of Activities Outside the Boundaries of National Park Areas |
| 35B. | Sale of National Park Service-Produced Utilities* |
| 36. | Housing Management* |
| 37. | Home Businesses in Park Housing* |
| 38. | Real Property Leasing |
| 39. | (reserved) |
| 40. | Dams and Appurtenant Works—Maintenance, Operation, and Safety* |
| 41. | Wilderness Preservation and Management |

42.    Accessibility for Visitors with Disabilities in National Park Service Programs and Services

43.    Uniform Program

44.    Personal Property Management

45-1.   National Scenic and Historic Trails*

46A.   Wild and Scenic Rivers Within the National Park System*

47.    Soundscape Preservation and Noise Management

48A.   Concession Management*

48B.   Commercial Use Authorizations*

49.    (reserved)

50A.   Worker's Compensation Case Management

50B.   Occupational Safety and Health

50C.   Public Risk Management Program*

50D.   Smoking Policy

51.    Emergency Medical Services

52A.   Communicating the National Park Service Mission

52B.   Graphic Design Standards*

52C.   Park Signs

52D.   Use of the Arrowhead Symbol*

53.    Special Park Uses

54.    Management Accountability*

55.    Incident Management Program*

56.    International Affairs*

57.    Occupational Medical Standards, Health and Fitness

58.    Structural Fire Management

59.    Search and Rescue*

60.    Aviation Management

61.    National Cemetery Operations*

62.    Property Acquisition*

63.    Geographic Names*

64.    Commemorative Works and Plaques*

65.    Explosives Use and Blasting Safety

66.    FOIA and Protected Resource Information*

67.    Copyright and Trademarks*

68.    Notification Protocol for Conduct of Employee Investigations

69.    Serving on Boards of Directors*

70.    (See 11 C)

71A.   Government-to-Government Relationships with Tribal Governments*

71B.   Indian Sacred Sites*

72.    Receiving or Generating Individual Indian Trust Data

73.    (reserved)

74.    Studies and Collecting*

75A.   Civic Engagement and Public Involvement

75B.   Media Relations*

76.    Legislative and Congressional Affairs

77-1.   Wetland Protection

77-2.   Floodplain Management

77-3.   Domestic and Feral Livestock Management*

77-4.   Use of Pharmaceuticals for Wildlife*

77-5.   Bioengineered Organisms*

77-6.   Cooperative Research and Development Agreements*

77-7.   Integrated Pest Management*

77-8.   Endangered Species*

77-9.   In-park Borrow Material*

77-10.  Natural Resource Inventorying and Monitoring

78.    Social Science

79.    Relocation Policies and Procedures*

80.    Asset Management*

81.    (reserved)

82.    Public Use Data Collecting and Reporting Program*

83.    Public Health

84.    Library Management*

85.    Garnishments and Levies*

86.    (reserved)

87A.   Park Roads and Parkways*

87B.   Alternative Transportation Systems*

87C.   Transportation System Funding*

87D.   Non-NPS Roads

88.    Documents Needed for Litigation*

89.    Acquisition and Management of Leased Space

90.    Value Analysis

91.    Advisory Committees*

92.    Human Resources*

93.    Conflict Resolution

94.    Appeals and Hearings*

# Glossary

Some of the words, terms, and concepts used in these Management Policies will have different meanings for different readers.  For the purposes of understanding and applying these policies, their meanings are as shown below.

**Accessibility**—occurs when individuals with disabilities are able to read, use, understand, or appreciate NPS programs, facilities, and services, or to enjoy the same benefits that are available to persons without disabilities. See also, "universal design."

**Accession**— a transaction whereby a museum object or specimen is acquired for a museum collection. Accessions include gifts, exchanges, purchases, field collections, loans, and transfers.

**Adaptive management**—a system of management practices based on clearly identified outcomes, monitoring to determine if management actions are meeting outcomes, and, if not, facilitating management changes that will best ensure that outcomes are met or to re-evaluate the outcomes. Adaptive management recognizes that knowledge about natural resource systems is sometimes uncertain and is the preferred method of management in these cases. *(Source: Departmental Manual 516 DM 4.16)*

**Administrative record**— the "paper trail" that documents an agency's decision making process and the basis for the agency's decision. It includes all materials directly or indirectly considered by persons involved in the decision making process, including opinions or information considered but rejected. These are the documents that a judge will review to determine whether the process and the resulting agency decision were proper, and that future managers will use to understand the evolution of the issue(s) and how decisions were reached and made.

**American Indian tribe**— any band, nation, or other organized group or community of Indians, including any Alaska Native Village, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

**Appropriate use**—a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park.

**Archeological resource**— any material remains or physical evidence of past human life or activities which are of archeological interest, including the record of the effects of human activities on the environment. An archeological resource is capable of revealing scientific or humanistic information through archeological research.

**Asset**—a physical structure or grouping of structures, land features, or other tangible property which has a specific service or function.

**Asset management**—a systematic process of maintaining, upgrading, and operating assets cost-effectively by combining engineering principles with sound business practices and economic theory.

**Backcountry**— primitive, undeveloped portions of parks, some of which may be managed as "wilderness."

**Best available technology**— technology that will help achieve efficient and economically viable facilities and services, while offering the greatest protection and environmental benefit for park visitors, employees, resources and values.

**Best management practices (BMPs)**— practices that apply the most current means and technologies available to not only comply with mandatory environmental regulations, but also maintain a superior level of environmental performance. See also, "sustainable practices/principles."

**Carrying capacity**—the maximum population of a particular species that a particular region can support without hindering future generations' ability to maintain the same population. A visitor, or user, carrying capacity is the type and level of use that can be accommodated while sustaining the desired resource and visitor experience conditions.

**Civic Engagement**— as a philosophy, a discipline, and a practice, it can be viewed as a continuous, dynamic conversation with the public on many levels that reinforces the commitment of the NPS and the public to the preservation of park resources and strengthens understanding of the full meaning and contemporary relevance of these resources. Civic engagement is the philosophy of welcoming people into the parks and building relationships around a shared stewardship mission, whereas public involvement (also called public participation) is the specific, active involvement of the public in NPS planning and other decision-making processes.

**Commemorative work**— any statue, monument, sculpture, plaque, memorial, or other structure or landscape feature, including a garden or memorial grove, designed to perpetuate the memory of a person, group, event, or other significant element of history.

**Conserve**—to protect from loss or harm; preserve.  Historically, the terms conserve, protect, and preserve have come collectively to embody the fundamental purpose of the NPS— preserving, protecting and conserving the national park system.

**Consultation**— a discussion, conference, or forum in which advice or information is sought or given, or information or ideas are exchanged. Consultation generally takes place on an informal basis; formal consultation requirements for compliance with section 106 of NHPA are published in 36 CFR Part 800. Consultation with recognized tribes is done on a government-to-government basis.

**Cooperating associations**— private, nonprofit corporations established under state law which support the educational, scientific, historical, and interpretive activities of the NPS in a variety of ways, pursuant to formal agreements with the Service.

**Cooperative conservation**—as defined in Executive Order 13352, actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among federal, state, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals. It is one of several "tools" or authorities that park managers may employ as they use the full scope of NPS authorities to protect park resources and values, while encouraging others to use theirs toward the same purpose.  As with civic engagement, the Service applies the principles of cooperative conservation to cultural resources as well as natural resources.

**Critical habitat**— specific areas within a geographical area occupied by a threatened or endangered species which contain those physical or biological features essential to the conservation of the species, and which may require special management considerations or protection; and specific areas outside the geographical area occupied by the species at the time of its listing, upon a determination by the Secretary of the Interior that such areas are essential for the conservation of the species. (See 16 USC 1342)

**Cultural landscape**— a geographic area, including both cultural and natural resources and the wildlife or domestic animals therein, associated with a historic event, activity, or person, or exhibiting other cultural or esthetic values. There are four non-mutually exclusive types of cultural landscapes: historic sites, historic designed landscapes, historic vernacular landscapes, and ethnographic landscapes.

**Cultural resource**— an aspect of a cultural system that is valued by or significantly representative of a culture, or that contains significant information about a culture. A cultural resource may be a tangible entity or a cultural practice. Tangible cultural resources are categorized as districts, sites, buildings, structures, and objects for the National Register of Historic Places, and as archeological resources, cultural landscapes, structures,

museum objects, and ethnographic resources for NPS management purposes.

**Defensible space**— the space needed for firefighters to adequately defend structures from oncoming wildland fires, or to stop a structural fire before it ignites wildland vegetation. Defensible space describes the desired result of planning, siting, landscaping and constructing developed facilities in a way that minimizes their vulnerability to wildfire threats and maximizes their protection against wildfire hazards.

**Derogation**— see "impairment."

**Decision-maker**—the managerial-level employee who has been delegated authority to make decisions or to otherwise take an action that would affect park resources or values. Most often it refers to the park superintendent or regional director, but may at times include, for example, a resource manager, facility manager, or chief ranger to whom authority has been re-delegated.

**Desired conditions**— a park's natural and cultural resource conditions that the NPS aspires to achieve and maintain over time, and the conditions necessary for visitors to understand, enjoy, and appreciate those resources. These conditions are identified through a park's planning process.

**Developed area**— an area managed to provide and maintain facilities (e.g., roads, campgrounds, housing) serving visitors and park management functions. Includes areas where park development or intensive use may have substantially altered the natural environment or the setting for culturally significant resources.

**Directives system**— policy guidance system established by Director's Order #1 in 1996. The system replaces and updates guidance documents formerly known as NPS Guidelines, Special Directives, and Staff Directives. The system consists of 3 levels:

> Level 1— NPS Management Policies— the primary policy document for managing the national park system.

> Level 2— Director's Orders— operational policies and procedures that supplement Level 1.

> Level 3— Reference Manuals and other detailed guidance on how to implement Service-wide policies and procedures.

**Ecosystem**— a system formed by the interaction of a community of organisms with their physical and biological environment, considered as a unit.

**Environmental assessment**— a brief NEPA document that is prepared, with public involvement, (a) to help determine whether the impact of a proposed action or its alternatives could be significant; (b) to aid the NPS in compliance with NEPA by evaluating a proposal that will have no significant impacts, but may have measurable adverse impacts; or (c) as an evaluation of a proposal that is either not described on the list of categorically excluded actions, or is on the list, but exceptional circumstances apply.

**Environmental impact statement**— a detailed NEPA analysis document that is prepared, with extensive public involvement, when a proposed action or alternatives have the potential for significant impact on the human environment.

**Environmental leadership**— advocating, on a personal and organizational level, cooperative conservation, best management practices, best available technology, adaptive management, and the principles of sustainability, and making collaborative decisions that demonstrate a commitment to those practices and principles.

**Ethnographic landscape**— an area containing a variety of natural and cultural resources that traditionally associated people define as heritage resources. The area may include plant and animal communities, structures, and geographic features, each with their own special local names.

**Ethnographic resources**— objects and places, including sites, structures, landscapes, and natural resources, with traditional cultural meaning and value to associated peoples. Research and consultation with associated people identifies and explains the places and things they find culturally meaningful. Ethnographic resources eligible for the National Register of Historic Places are called traditional cultural properties.

**Foundation statement**—a statement that begins a park's planning process and sets the stage for all future planning and decision-making by identifying the park's mission, purpose, significance, special mandates and the broad, park-wide mission goals. Incorporated into a park's GMP, but may also be produced as a stand-alone document for a park.

157

GLOSSARY  A–F

**158**

**Gateway community**— a community that exists in close proximity to a unit of the national park system whose residents and elected officials are often affected by the decisions made in the course of managing the park, and whose decisions may effect the resources of the park. Because of this, there are shared interests and concerns regarding decisions. Gateway communities usually offer food, lodging, and other services to park visitors. They also provide opportunities for employee housing, and a convenient location to purchase goods and services essential to park administration.

**Geologic resources**— features produced from the physical history of the earth, or processes such as exfoliation, erosion and sedimentation, glaciation, karst or shoreline processes, seismic, and volcanic activities.

**General management plan (GMP)**— a plan which clearly defines direction for resource preservation and visitor use in a park, and serves as the basic foundation for decision making. GMPs are developed with broad public involvement.

**Historic property**—a district, site, building, structure, or object significant in the history of American archeology, architecture, culture, engineering, or politics at the national, state, or local level.

**Impact**— the likely effect of an action or proposed action upon specific natural, cultural or socioeconomic resources. Impacts may be direct, indirect, individual, cumulative, beneficial, or adverse. (Also see Unacceptable impacts.)

**Impairment**— An impact that, in the professional judgment of a responsible NPS manager, would harm the integrity of park resources or values and violate the 1916 NPS Organic Act's mandate that park resources and values remain unimpaired.

**Implementation plan**—a plan that focuses on how to implement an activity or project needed to achieve a long-term goal. An implementation plan may direct a specific project or an ongoing activity.

**Integrated pest management**—a decision-making process that coordinates knowledge of pest biology, the environment, and available technology to prevent unacceptable levels of pest damage, by cost-effective means, while posing the least possible hazard to people, resources, and the environment.

**Leave-no-trace**— principles and practices that emphasize the ethic of leaving a place clear of the residual evidence of human presence; applied to all forms of recreational activities within wilderness, backcountry, and frontcountry areas.

**Life cycle costing (analysis)**— an accounting method that analyzes the total costs of a product or service, including construction, maintenance, manufacturing, marketing, distribution, useful life, salvage, and disposal.

**Lightscape management (natural ambient)**— the effective use of good design to appropriately light areas and minimize or eliminate light clutter, the spill over of light into areas where light is not wanted, and light pollution, all of which wastes energy and impacts park visitors, neighbors and resources.

**Manager**— the managerial-level employee who has authority to make decisions or to otherwise take an action that would affect park resources or values.  Most often it refers to the park superintendent or regional director, but may at times include, for example, a resource manager, facility manager, or chief ranger to whom authority has been redelegated.

**Management prescriptions**— a planning term referring to statements about desired resource conditions and visitor experiences, along with appropriate kinds and levels of management, use, and development for each park area.

**Minimum requirement**— a documented process used by the NPS to determine the appropriateness of all actions affecting wilderness.

**Minimum tool**— a use or activity, determined to be necessary to accomplish an essential task, which makes use of the least intrusive tool, equipment, device, force, regulation, or practice that will achieve the wilderness management objective.

**Mission-critical**— something that is essential to the accomplishment of an organization's core responsibilities.

**Mitigation**— a modification of a proposal to lessen the intensity of its impact on a particular resource.

**National park system**— the sum total of the land and water now or hereafter administered by the Secretary of the Interior through the National Park Service for park, monument, historic, parkway, recreational or other purposes.

**Native American**— of or relating to, a tribe, people, or culture that is or was indigenous to the United States.

**Native Hawaiian**— any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii.

**NEPA process**— the objective analysis of a proposed action to determine the degree of its impact on the natural, physical, and human environment; alternatives and mitigation that reduce that impact; and the full and candid presentation of the analysis to, and involvement of, the interested and affected public –as required of federal agencies by the National Environmental Policy Act of 1969.

**New use**— a use that has not previously taken place within a particular park, or that has taken place previously and been discontinued due to public disinterest or as a result of a management action.

**Organic Act (NPS)**— the 1916 law (and subsequent amendments) that created the National Park Service and assigned it responsibility to manage the national parks.

**Paleontological/paleoecological resources**— resources such as fossilized plants, animals, or their traces, including both organic and mineralized remains in body or trace form. Paleontological resources are studied and managed in their paleoecological context (that is, the geologic data associated with the fossil that provides information about the ancient environment).

**Park**— any one of the hundreds of areas of land and water administered as part of the national park system. The term is used interchangeably in this document with "unit," "park unit," and "park area."

**Practicable**— capable of being done or put into practice.  Practicable reflects not only what is possible to do, but also what is reasonable, after considering all of the consequences.

**Prescribed burning**— the deliberate ignition of fires to accomplish specified resource management objectives and under an identified range of conditions documented in a prescribed burn plan.

**Preserve**— to protect from loss or harm; conserve.  Historically, the terms preserve, protect and conserve have come collectively to embody the fundamental purpose of the NPS— preserving, protecting and conserving

the national park system. (See also "preservation.")

**Preservation**— for the purposes of the Secretary of the Interior's Standards for the Treatment of Historic Properties, preservation means the act or process of applying measures necessary to sustain the existing form, integrity and materials of an historic property.

**Professional judgment**— a decision or opinion that is shaped by study and analysis and full consideration of all the relevant facts, and that takes into account

◆ the decision-maker's education, training, and experience;

◆ advice or insights offered by subject matter experts and others who have relevant knowledge and experience;

◆ good science and scholarship; and, whenever appropriate,

◆ the results of civic engagement and public involvement activities relating to the decision.

**Public involvement (also called public participation)**— the active involvement of the public in NPS planning and decision-making processes. Public involvement occurs on a continuum that ranges from providing information and building awareness, to partnering in decision-making.

**Record of decision (ROD)**—the document which is prepared to substantiate a decision based on an analysis of a range alternatives (e.g., an EIS). When applicable, it includes a detailed discussion of rationale and reasons for not adopting all mitigation measures analyzed.

**Sacred sites**— certain natural and cultural resources treated by American Indian tribes and Alaska Natives as sacred places having established religious meaning, and as locales of private ceremonial activities.

**Scholarship**— knowledge resulting from study and research in a particular field, or the mastery of a particular area of learning reflected in a scholar's work. A scholar is a learned person; someone who by long study has gained mastery in one or more disciplines and practices, and whose mastery is recognized by a peer group.

**Soundscape (natural)**— the aggregate of all the natural, nonhuman-caused sounds that occur in parks, together with the physical capacity for transmitting natural sounds.

**Special Regulation**— a regulation that is prescribed for a specific park area. A special regulation may amend, modify, relax or make more stringent the "general" regulations that are applicable to all areas of the national park system.

**Stakeholder**— an individual, group or other entity that has a strong interest in decisions concerning park resources and values. Stakeholders may include, for example, recreational user groups, permittees, and concessioners. In the broadest sense, all Americans are stakeholders in the national parks.

**Stewardship**— the cultural and natural resource protection ethic of employing the most effective concepts, techniques, equipment, and technology to prevent, avoid, or mitigate unacceptable impacts.

**Strategic plan**— a Service-wide, 5-year plan required by GPRA (5 USC 306) in which the NPS states (1) how it plans to accomplish its mission during that time, and (2) the value it expects to produce for the tax dollars expended. Strategic plans serve as "performance agreements" with the American people.

**Superintendent**— the senior on-site NPS official in a park. Used interchangeably with "park superintendent," "park manager," or "unit manager."

**Sustainable design**— design that applies the principles of ecology, economics, and ethics to the business of creating necessary and appropriate places for people to visit, live in, and work. Development that has a sustainable design sits lightly upon the land, demonstrates resource efficiency, and promotes ecological restoration and integrity, thus improving the environment, the economy, and society.

**Sustainable practices/principles**— those choices, decisions, actions and ethics that will best achieve ecological/ biological integrity; protect qualities and functions of air, water, soil, and other aspects of the natural environment; and preserve human cultures. Sustainable practices allow for use and enjoyment by the current generation, while ensuring that future generations will have the same opportunities. See also, "environmental leadership" and "best management practices."

**Traditional**— pertains to recognizable, but not necessarily identical, cultural patterns transmitted by a group across

at least two generations. Also applies to sites, structures, objects, landscapes, and natural resources associated with those patterns. Popular synonyms include "ancestral" and "customary."

**Traditionally associated peoples**— social/cultural entities such as tribes, communities, and kinship units, as well as park neighbors, traditional residents, and former residents who remain attached to a park area despite having relocated, are "traditionally associated" with a particular park when (1) the entity regards park resources as essential to its development and continued identity as a culturally distinct people; (2) the association has endured for at least two generations (40 years); and (3) the association began prior to establishment of the park.

**Traditional cultural property**— a property associated with cultural practices, beliefs, the sense of purpose, or existence of a living community that is rooted in that community's history or is important in maintaining its cultural identity and development as an ethnically distinctive people. Traditional cultural properties are ethnographic resources eligible for listing in the National Register.

**Unacceptable impacts**— impacts that, individually or cumulatively, would

◆ be inconsistent with a park's purposes or values, or

◆ impede the attainment of a park's desired future conditions for natural and cultural resources as identified through the park's planning process, or

◆ create an unsafe or unhealthful environment for visitors or employees, or

◆ diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values, or

◆ unreasonably interfere with

  ◇ park programs or activities, or

  ◇ an appropriate use, or

  ◇ the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park.

  ◇ NPS concessioner or contractor operations or services.

**Unit**—see "park."

**160**

**Universal design**— the design of products and environments to be usable by all people to the greatest extent possible, without the need for adaptation or specialized design.

**Value analysis/value engineering**— an organized, multi-disciplined team effort that analyzes the functions of facilities, processes, systems, equipment, services, and supplies for the purpose of achieving essential functions at the lowest life-cycle cost consistent with required performance, reliability, quality, and safety.

**Visitor**— anyone who physically visits a park for recreational, educational or scientific purposes, or who otherwise uses a park's interpretive and educational services, regardless of where such use occurs (e.g., via Internet access, library, etc.).

**Visitor Experience and Resource Protection (VERP) framework**— a visitor carrying capacity planning process applied to determine the desired resource and visitor experience conditions, and used as an aid to decision-making.

**Waiver (of policy)**— an exemption from a particular policy provision. A waiver may be granted only by the Director of the National Park Service or a higher authority (e.g., the Secretary of the Interior).

**Wilderness (designated)**—federal land that has been designated by Congress as a component of the National Wilderness Preservation System.

**Wilderness (eligible, study, proposed and recommended)**—federal lands that have been found to possess wilderness character based on the criteria specified in the Wilderness Act.  The four categories reflect different stages of the wilderness review process, and all are managed to preserve the wilderness resources and values that make them eligible for wilderness designation.  Differences in the management of these categories are specified in Chapter 6.

**Wilderness (potential)**— federal lands that are surrounded by, or adjacent to, lands proposed for wilderness designation but that do not themselves qualify for designation due to temporary, non-conforming uses or incompatible conditions. Potential wilderness is a subset of the other wilderness categories (it can be eligible, study, proposed, recommended or designated potential wilderness).

**Wildland fires**— unplanned fires that burn vegetation in parks.  Wildland fires occur from both natural and human sources of ignition, and may contribute to or hinder the achievement of park management objectives.

**Wildland fire use**— the application of an appropriate, prescribed management response to naturally ignited wildland fires under prescribed circumstances to accomplish resource management objectives in predefined areas outlined in approved fire management plans.

# Index

## A

Access and circulation systems
    See Transportation
Access to private property 8.6.5
Accessibility for disabled persons 1.9.3;5.3.2; 6.4.7; 7.5.2; 8.2.4;
    9.1.2; 10.2.6.2
        to concessions 10.2.6.2
        to historic properties 5.3.2
        to interpretive programs 7.5.2
        to transportation systems 9.1.2; 9.2; 9.3
        to undeveloped areas 9.1.2
        to visitor and management facilities 9.1.2
        to wilderness 6.4.7
Accountability *Introduction*; 1.9.5
Adaptive use of historic structures      5.3.5.4.6, 5.3.5.4.7; 9.1.1.4;
    9.4.3.3
Adjacent lands and land protection plans 3.3
        donation of 3.6
        encouragement of compatible land uses 3.4
        managing fires 4.1.4; 4.5
        need for park awareness of land usage 3.4
        owners involved in planning 2.1.3; 2.3.1.4; 2.3.1.7
        partnerships to improve natural resource management
            4; 4.1.4
Administrative facilities
        in wilderness 6.3.10.1
        offices 9.4.1
Administrative history of the national park system
        depositories for 5.3.5.5.6
Advertising 9.3.5
        at special events 8.6.2.1
Advisory committees 1.10; 2.3.1.5; 5.2.1
Advisory Council on Historic Preservation
        consultation with 5.2.1
Affiliated areas 1.3.4
Agreements 1.9; 4.1.4; 5.2.2;, 8.12 9.1.8
Agriculture
        agricultural use of parks 8.6.7
        in cultural landscapes 5.3.5.2; 5.3.5.2.6;
            also see 4.4.2.5
Air quality
        air quality related values 4.7.1
        effect of fire management plan on 4.5
        management of class I areas 4.7.1
        partnerships to improve 4.1.4
        review of permits 4.7.1
Aircraft use 8.4
        administrative 8.4.4
        in Alaska 6.3.10.1; 8.4.1
        in wilderness 6.2.1.2
        landing sites 8.4.8
        military aviation 8.4.5
        navigation aids 9.2.5
        overflights 8.4.7
Airstrips
        in wilderness 6.3.10.1
        Alaska
        Park Units 2.3.1.10
        Alaska National Interest Lands Conservation Act
        cultural resources 5.3.5.3
        general exceptions to policy *Introduction*

provisions related to rights-of-way 8.6.4.1
provisions related to snowmobiles 8.2.3.2
provisions related to subsistence 7.5.7
provisions related to wilderness 6.2.1.2; 6.3.10.1; 6.3.10.3;
    6.4.6.1
Alternative transportation systems 9.2
American Indians
        Also see Native Americans
        access to and activities in wilderness 6.3.12
        collection of natural products in parks 5.3.5.3.1; 8.8
        confidentiality of information 5.2.3
        consultation regarding burials 5.3.4
        consultation regarding cultural interpretation 7.5.6
        consultation regarding cultural resources 5.2.1
        consultation regarding ethnographicresources see
            5.3.5.3.1
        consultation regarding game harvest regulations 4.4.3
        consultation regarding government-to-government
            relationship 1.11.2
        consultation regarding museum objects 5.3.5.5
        cultural demonstrators 7.5.7
        definition of 8.5
        exhibit of sacred objects 5.3.5.5; 7.5.6
        fee waivers for 8.5
        participation in interpretive programs 7.5.6
        repatriation of cultural items or human remains 5.2.1;
            5.3.5.5.4
        relationship with American Indian tribes 1.11
        resource access and use 5.3.5.3.1; 8.5
        trust resources 1.11.3
        use of traditional areas or sacred resources 5.3.5.3.2
American Indian Religious Freedom Act 5.3.5.3
Amphitheaters 9.3.1.4
Animals
        biological resource management 4.4
        corridor crossings 9.2
        disposal of carcasses 4.4.2.1
        exotic species 4.4.4
        harvest of, by the public 4.4.3
        livestock 8.6.8
        migratory species 4.4.1.1
        native species 4.4.1.3; 4.4.2; 4.4.2.1; 4.4.2.2
        population management 4.4.1.1
        recreational stock use 8.2.2.8
        removing 4.4.2.1
        threatened and endangered species 4.4.2.3
Appropriate Use 1.5, 8.1.1, 8.1.2, Glossary
Archeological Resource Protection Act 5.3.5.3
Archeological resources
        data recovery 5.3.5.1.5
        display and storage of collections 5.3.5.5.4
        in wilderness 6.3.8
        inventory of 5.1.3.1
        relocation of 5.3.5.1; 5.3.5.4.5
        sale of in concessions 10.2.4.6
        treatment of 5.3.5.1.1–5.3.5.1.4
Archives and Manuscripts 5.3, 5.5.6
Art and cultural facilities
        See Facilities for arts and culture
Asset management  1.9.5.3; 9.1; 9.4.1
Aviation 8.4

## B

Backcountry use and management 8.2.2.4
Base Jumping 8.2.2.7
Balloons, use of 8.6.2.2
Best management practices
    and agricultural use of parks 8.6.7
    and livestock use 8.6.8.2
    by concessioners 10.2.4.10
    during construction 9.1.3
Bicycles
    bicycle trails 9.2.2.4
    in wilderness 6.4.3.3
    off-road use of 8.2.2
Biodegradable materials 9.1.6.1
Bio-engineered products 4.4.5.4
Biological Resources 4.4.1.0
Biosphere reserves 4.3.6
Black-powder weapons 7.5.7
Boating 8.2.2
    navigation aids 9.2.5
    support facilities 9.3.4.2
Borrow pits 9.1.3.3
Boundary studies
    authority for 1.3.4; 1.5
Burials
    historic burial areas and graves 5.3.4
    in family cemeteries 8.6.10.2
    in national cemeteries 8.6.10.1
    other burials and scattering of ashes 8.6.10.3

## C

Campfires 8.8; 9.3.2.1
    firewood gathering 8.8
Campgrounds 9.3.2.1
    reservation systems for 8.2.6.2
Camping 8.2.2
    in wilderness 6.3.10.3
Carrying capacity 5.3.1.6; 8.2.1
Caves 4.8.2.2
    in wilderness 6.3.11.2
Caving 4.8.2.2
Cemeteries and Burials 8.6.10.
    Also see Burials
Chemicals 4.11
Civic Engagement 1.7
Closures 8.2
Coastal zone management program 4.8.1.1
Collecting
    and development of commercial
    products 4.2.4
    natural products 8.8
    research specimens 4.2; 5.1.2; 8.10
Collections 133
    acquisition, management, and
    disposition of 5.3.5.5.4
    archives and manuscripts 5.3.5.5.6
    curatorial facilities 9.4.2
    loan of museum objects 5.3.5.5.4
    museum catalog records 5.3.5.5.4
    museum collections 5.3.5.5
    National Catalog of Museum Objects 5.1.3.1
    natural products 8.8
    of natural resources 4.2.3
    of paleontologic resources 4.8.2.1
    of submerged archeological resources 5.3.5.1.7
    preservation of items in 5.3.5.5.1
    repatriation of museum objects 5.3.5.5; 5.3.5.5.4
    reproduction of objects in 5.3.5.5.3
    restoration of objects in 5.3.5.5.2
    specimens 4.2.3
Comfort stations 9.3.3. Also see Toilets
Commemorative works 9.6
Commercial activities 6.4.4; 8.6.2.1
Commercial use authorizations 10.3
Communication towers.
    Also see Telecommunications antennas
    in wilderness 6.3.10.1

Compensation for damages
    to cultural resources 5.3.1.3
    to natural resources 4.1.6
Compliance and accountability 7
Concession contracts 10.2.3
    extension of 10.2.3.3
    length of term 10.2.3.1
    modifications 10.2.3.2
Concessioners
    construction by 10.2.2; 10.2.3.1; 10.2.4.10; 10.2.6.1
    donations and contributions 10.2.5.5
    employment of NPS personnel 10.2.8.2
    financial management 10.2.5
    franchise fees 10.2.5; 10.2.5.1; 10.2.5.2
    housing 9.4.3.1, 9.4.3.2
    insurance 10.2.4.11
    interpretation by 7.6; 10.2.4.4
    liability insurance requirements 10.2.4.11
    minority businesses 10.2.3.4
    preference given to satisfactory concessioners10.2.4.3
    risk management program 10.2.4.8
    subconcessioners 10.2.3.5
Concessions 10.2
    accessibility of 10.2.6.2
    criteria for 10.2.2
    design of 10.2.6.1
    environmental compliance 10.2.4.10
    facilities 10.2.6
    maintenance of 10.2.6.3
    rates charged 10.2.4.7
    sales merchandise 10.2.4.5
    utilities 10.2.6.4
Condemnation of nonfederal lands 3.2; 3.7,3.8
Confidential information 1.7.1.3; 4.1.2; 5.2.3
Construction 9.1.3
    controls to avoid introduction of
    exotics 9.1.3.2
    project supervision 9.1.1
    roads 9.2.1.2.2
    sites 9.1.3.1
Consultation
    See Cooperation and consultation
Consumptive use 8.9
Contaminants 9.1.6.2
Cooperating associations
    interpretation by 7.6.2
    sales by 8.6.2.4
Cooperation and consultation.
    Also see American Indians and Native Americans
    during planning 2.1.3
    conservation 1.6
    hunting, trapping, and fishing 4.4.3, 8.2.2.6
    interpretation of ethnographic resources 7.5.6
    land protection 3.2; 3.4
    law enforcement 8.3.3
    management of aircraft overflights 8.4; 8.4.6
    management of animal populations 4.1.4; 4.4.3
    management of cemeteries and burial sites 5.3.4
    management of cultural resources 5.2.1
    management of ethnographic resources 5.3.5.3
    management of museum objects 5.3.5.5
    management of natural resources 4
    management of submerged resources 5.3.5.1.7
    management of threatened or endangered
    species  4.4.2.3
    national trails 9.2.2.7
    protection of air quality 4.1.4; 4.7.1
    protection of water resources 4.6.2; 4.6.3
    research 4.2, 4.2.1; 5.1.2; 5.2.1; 8.11
    response to emergencies 8.2.5.2
    sacred sites 5.3.5.3.2
    trail planning 9.2.2.1
    transportation planning and services 9.2
    visitor safety 8.2.5.1
    wilderness preservation 6.3.2
Cooperative management 1.9
Cooperative research 8.11.1
Criteria for affiliated areas 1.3.4

009627

Criteria for national parks 1.3
Cultural events 9.3.1.7
Cultural landscapes 5.3.5.2
        biotic cultural resources 5.3.5.2.
        construction 5.3.5.2.7
        inventory of 5.1.3.1
        preservation of 5.3.5.2.1
        reconstruction of 5.3.5.2.4
        rehabilitation of 5.3.5.2.2
        restoration of 5.3.5.2.3
Cultural Landscapes Inventory 5.1.3.1
Cultural resources
        Also see individual resource categories, such as Historic
                structures
        agreements 5.2.2
        carrying capacity 5.3.1.6
        categorization 5.1.3.2
        conservation of 5.3.1
        damaged by natural forces 5.3.5.4.9
        designation of National Historic
         Landmarks  5.1.3.2.2
        evaluation of 5.1.3, 5.1.3.2
        in wilderness 6.3.8
        inventories of 5.1.3.1
        movement of 5.3.5.4.5
        nominations to Natural Register of Historic
         Places 5.1.3.2.1
        planning and proposal formulation 5.2
        protection from fire 5.3.1.1
        protection from exotic species 4.4.4.2
        protection from pests 5.3.1.5
        protection of 5.3.1
        rescue of, in event of emergency 5.3.1.1
        research 5.1
        security for 5.3.5.1.4; 8.3.3
        submerged 5.3.5.1.7
        treatment of 5.3.5
        World Heritage List designation 5.1.3.2.3
Curatorial facilities 9.4.2

D
Damage Assessment and Recovery 4.1.6; 5.3.1.3
Dams and reservoirs 9.5
Demonstrators (cultural) 7.5.7
Derogation 1.4.2
Design
        duplication of historic design 9.1.1.3
        parkwide themes 9.1.1.2
        signs 9.3.1.1
        standard plans and designs 9.1.1.2
        sustainable energy design 9.1.1.7
Desired Park Conditions 2.1.4, 2.2
Development.
        Also see Construction
        accessibility for disabled persons 9.1.2
        adaptive re-use of historic structures 9.1.1.4
        avoiding natural hazards 9.1.1.6
        in floodplains 4.6.4
        in shoreline areas 4.8.1.1
        in wetlands 4.6.5
        in wilderness 6.2.1.2; 6.3.10.3
        life-cycle costs 9.1.1; 9.1.1.1; 10.2.6.1
        location of 9.1.1.5
        management facilities 9.4
        outside park boundaries 3.4; 9.1
        planning and design 2.2; 2.3.1.1; 4.4.2.5; 9.1.1
        principles 9.1; 9.1.1.2; 9.1.1.3; 9.1.1.4; 9.1.7
        replacement/relocation of 4.1.5; 4.4.2.4
        soil protection 4.8.2.4
        transportation 9.2
        utilities 9.1.5
        facilities 1.9.5.2; 9.3
Directives system Introduction
Director of the National Park Service
        authorities related to policy Introduction
Disabled persons. Also see Accessibility for
        disabled persons
        interpretive programs for 7.5.2

special facilities for 9.1.2
Disease control
        See Pests
Domestic and feral livestock 8.6.8
Donations
        from concessioners 10.2.5.5

E
Earthworks 5.3.5.1.6
Education
        Also see Interpretation
        curriculum-based educational programs 7.1
        outreach services 7.3.4
        resource issues 7.5.3
        wilderness 6.4.2
Emergencies
        emergency operations plan 8.2.5.2
        emergency preparedness 8.2.5.2
        in wilderness see 6.3.5
        involving cultural resources 5.3.1.1
        medical services 8.2.5.4
        outside park boundaries 8.2.5.2
        search and rescue 8.2.5.3
        temporary access to wilderness 6.3.5; 6.3.10.1
        use of off-road vehicles 8.2.3.1
Employees
        employment by a concessioner 10.2.8.2; 10.2.8.3
        gardens 8.6.7
        housing 9.4.3
        participation in First Amendment activities 8.6.3
        safety 8.2.5.1
        training 1.9.1.1
Energy management 9.1.7
        alternative energy 9.1.5; 9.2; 9.4.5
        charges to concessioners 10.2.6.4
        conservation 9.1.1; 9.1.3.1; 9.1.7; 9.2
        efficiency 9.1.4.1; 9.1.4.2; 9.1.7; 9.3.2.1; 9.3.2.3
        performance 9.1.1
        sustainable design 9.1.7
Endangered species
        See Threatened or endangered species
Entrance stations 9.3.1.2; 10.2.6.5
Environmental Analysis 2.3.1.7, 2.3.4.1
Environmental auditing program 1.6
Environmental monitoring and control 5.3.1.4
Environmental impact statements
        for general management plans 2.3.1.5
        for natural resources 4.1.3
        for wilderness studies 6.2.2
Environmental leadership 1.6; 9.1.6
Equestrian trails 9.2.2.3
Ethnographic resources 5.3.5.3
        in exhibits 7.5.6
        inventory of 5.1.3.1
        resource access and use 5.3.5.3.1
        sacred sites 5.3.5.3.2
Executive Order 13007 5.3.5.3
Exhibits 7.3.2
        ethnographic resources in 7.5.6
Exotic species
        management of 4.4.4
        definition of 4.4.1.3
        fish stocking with exotics 4.4.4.1
        found in soils 4.8.2.4
        introduction of 4.4.4.1
        removal of 4.4.4.2
Experimental research areas 4.3.2
External influences on parks 1.5.; 3.4

F
Facilities
        See Development
Facilities for arts and culture 9.3.1.7
Federal Advisory Committee Act 1.9; 2.3.1.4; 5.2.1
Fees
        entrance fees 8.2.6
        franchise fees 10.2.5.1
        recreation fees 8.2.6.1

reimbursement of costs associated with special use  permits 8.6.1.2
Fertilizer 4.4.2.4; 4.4.2.5; 4.8.2.4; 9.1.3.2
Filming and photography 8.6.6
Financial sustainability 1.9.5.1
Fire management 4.5
    cultural resources 5.3.1.2
    in wilderness 6.3.9
    prescribed fires 4.5
    wildland fires 4.5
Fire pits, for campers 9.3.2.1
Fire prevention and suppression
    agreements with local fire departments 9.1.8
    compliance with fire codes 5.3.1.2; 9.1.8
    in wilderness 6.3.9
    special provisions for cultural resources 5.3.1.2
    structural fires 9.1.8
Fire towers 9.4.5
Firewood 8.8
Fireworks 8.6.2.3
First Amendment activities 8.6.3
Fish stocking 4.4.3
Fishing 8.2.2; 8.2.2.5
    commercial fishing 4.4.3; 8.2.2.5
    restrictions on 8.2.2.5
    sport fishing 4.4.3; 8.2.2.5
    support facilities 9.3.4; 9.3.4.2
Floodplains 4.6.4
Food sales 8.6.2.4
Food services 9.3.2; 10.2.4.12
Foreign-language publications 7.5.2
Fossils
    See Paleontologic resources
Franchise fees 10.2.5.1; 10.2.5.2
Future
    Alternative Evaluation 2.3.1.6
Fund raising 7.6.2
Fundamental purpose of NPS 1.4.3

**G**

Gardens 8.6.7
General Authorities Act 1.4
General management plan
    See Plans
Generators
    for recreation vehicles 9.3.2.1
Genetic resources 4.2.4; 4.3.1; 4.3.6; 4.4.1.2
Geologic resources 4.8
    hazards 4.8.1.3
    management of 4.8.3
    process, protection of 4.8.1
Geothermal resources 4.8.2.3
Government Performance and Results Act 1.7.4.1;  2.3.3
Graves
    See Burials, Cemeteries and burials
Grazing 4.4.4.1; 8.6.8.2
    Also see Domestic and feral livestock
    commercial 4.4.3
    criteria for 8.6.8.1
    in wilderness 6.4.6.3
    management plans 8.6.8.2
    support facilities 8.6.8.2.2
Groundwater
    See Water resources
Guidelines.
    See Directives system
Guides and outfitters
    operations in wilderness 6.4.4

**H**

Handcrafts
    sale by concessioners 10.2.4.4
    sale by cultural demonstrators 7.5.7
Hang-gliding 8.2.2
Harvested species
    management of 4.4.3
Hazardous materials 9.1.6.1; 9.1.6.2

Hazards
    floodplains 4.6.4
    geologic 4.8
    landscape restoration following 4.1.5
    shorelines 4.8.1.1
    siting development to avoid 4.8.1.3; 9.1.1.6
Heritage area 1.3.4
Hiking 8.2.2
    hiking trails 9.2.2.2
Historic districts
    See Cultural landscapes
Historic furnishings 5.3.5.5.5
Historic landscapes 5.3.5.2
Historic objects
    See Collections
Historic resources
    See Cultural resources
Historic ships
    See Historic structures. Also see Shipwrecks
Historic structures 5.3.5.4
    accessibility for disabled persons 5.3.2
    acquisition of 5.3.5.4.5
    adaptive use of 5.3.5.4.7
    additions to 5.3.5.4.6
    damaged or destroyed 5.3.5.4.9
    in shoreline areas 4.8.1.1; 5.3.5.4.5;5.3.5.4.9
    in wilderness 6.2.1.2; 6.3.8
    leasing of 5.3.3
    movement of 5.3.5.4.5; 5.3.5.4.9
    new construction in conjunction with 5.3.5.4.6
    owned or managed by others 5.3.5.4.8
    preservation of 5.3.5.4.1
    reconstruction of 5.3.5.4.4
    refurnishing of 5.3.5.5.5
    rehabilitation of 5.3.5.4.2
    restoration of 5.3.5.4.3
    use for employee housing 5.3.1.2; 5.3.5.4.7; 9.4.3.3
Historic trails
    in wilderness 6.2.1.2
    national trails 9.2.2.7
Historic utilities 9.1.5.4
Historic weapons 7.5.8
Homeland Security 8.3.8
Horseback riding 8.2.2
    equestrian trails 9.2.2.3
    trail stock 8.6.8
Hostels 9.3.2.3
Housing 9.4.3
    concessioner 9.4.3.2
    eligible residents 9.4.3.2
    use of historic structures 5.3.5.4.7; 9.4.3.3
Human health and safety 8.2.5
    concessioner responsibilities for 10.2.4.8
    removal of hazards 8.2.5.1
Hunting and trapping
    cooperative management of 4.4.3
    federal regulation of 8.2.2.6
    genetic resource management principles 4.4.1.2

**I**

Impairment pg. 4 1.4, 4.1, 4.1.3
    decision-making to avoid 1.4.7
    definition of 1.4.5
    how to treat existing impairment 1.4.7
    how to treat potential impairment 1.4.7
    prohibition of 1.4.4
    versus derogation 1.4.2
Incineration 9.1.6.1
Indians
    See American Indians.  Also see Native Americans
Information
    See Public information
Information base 1.7.1; 2.3.1; 2.3.1.4; 4.1.1; 4.1.2; 4.2.1; 5.1.1; 5.1.3.1
Insect control.
    See Pests
Insurance
    for concessions 10.2.4.11

Integrated pest management 4.4.5.2
Interpretation
        Also see Education
        balance and accuracy 7.5.3; 7.5.6
        by concessioners 7.6
        by cooperating associations 7.6.2
        consultation 7.5.6
        cultural demonstrations 7.5.7
        electronic 7.3.3
        elements of 7.1
        exhibit of sacred objects 7.5.6
        for special populations 7.5.2
        nonpersonal services 7.3.2
        of resource issues 7.5.3
        outreach programs 7.3.4
        personal services 7.3.1
        reenactments 7.5.9
        research and scholarship 7.5.4
        special needs 7.5.2
        training 7.4
        wilderness 6.4.2
Interpretive competencies and skills 7.4
Interpretive planning 7.2
Invasive species 4.4.1.3
Inventories
        of cultural resources 5.1.3.1
        of natural resources 4.2.1
Irrigation 4.6.2; 9.1.3.2; 9.1.5.1
Islands 4.8.1.1

K

Karst 4.8.1.2

L

Land acquisition 3.6; 3.7
Land protection 3
        addressing external threats 3.4
        boundary adjustments 3.5
        land acquisition authority 3.6
        land acquisition funding 3.7
        land protection plans 3.3
        land protection methods 3.2
Landfills 9.1.6.1; 9.4.5
Landscape management
        at construction sites 9.1.3.1; 9.1.3.2
        of cultural landscapes 5.3.5.2
        of natural landscapes 4.4.2.4
        prescribed burns 4.5
Law enforcement 8.3, 8.3.1
        authority 8.3.4
        jurisdiction 8.3.5
        public information 8.3.6
Leasing 8.12
        agricultural land 8.6.7
        federal mineral leases 8.7.2
        for livestock 8.6.8.2
        historic structures 5.3.3
Legislative authorized use 1.4.3.1
Legislative exceptions to policy 6; 1.4.4
Life-cycle costs
        and value analysis 9.1.1; 10.2.6.1
        computation of 9.1.1.1
        facility planning and design 9.1.1
Light, artificial 4.10
        control of light pollution 4.10
List of Classified Structures 5.1.3.1
Livestock 4.4.4.1; 8.6.8

M

Maintenance 9.1.4
        in general 9.1.4.1
        support facilities 9.4.4; 9.4.5
        use of environmentally friendly and energy
        efficient products 9.1.4.2
Man and the Biosphere program 4.3.6
Management
        accountability 1.9.5

facilities 9.4
in wilderness 6.3.10
of parks 1.3.4; 1.4
for resource conservation 1.4.7.1
plans 2.2
zoning 2.3.1.2
for wilderness 6.3.4.1
Management Excellence 1.9
Marina operations 9.3.4.2
        controls to avoid water pollution 4.6.3
Medical services 8.2.5.4
Media 1.9.4
Memorials 9.6
Merchandise 10.2.4.5
Meteorological stations
        in wilderness 6.3.6.1
Migratory species
        management of 4.4.1.1
Military Use and Operation 8.6.9
Mineral development 8.7
Mineral interests
        addressed in planning 8.7
        federal mineral leases 8.7.2
        in wilderness 6.4.6; 6.4.6.2
        mining claims 8.7.1
        non-federal mineral interests 8.7.3
Minimum requirement 6.3.5
Mining claims 8.7.1
Monuments 9.6
Motion picture filming 8.6.6
Motorized equipment and vehicles 8.2.3
Mountain and rock climbing 8.2.2
Museum collections
        See Collections

N

National Catalog of Museum Objects 5.1.3.1
National Environmental Policy Act 5.3.5.3
National historic landmarks 5.1.3.2.2
National Historic Preservation Act 5.3.5.3
National Interagency Incident Management System 8.2.5.2
National natural landmarks 4.3.5
National Park Service Organic Act 1.1; 1.4; 4; 4.4.2.3; 4.7.1;
        5.3.5.3; 8.2.5.1
National Park System Resource Protection Act 5.3.1.3
National park system
        criteria for additions to 1.3
        extent of 1.2
        legislation governing management of 1.4
National Register of Historic Places 5.1.3.2.1
National significance criteria for new areas 1.3;1.3.1
National trails 9.2.2.7
National wild and scenic rivers 1.2; 2.3.1.8; 4.3.4
Native Americans
        Also see American Indians
consultation regarding natural resource
        management 4.1.4
        involvement in planning 2.1.3; 2.3.1.4
        participation in interpretive programs 7.5.6
        preference given to sales of Native
        American handcrafts 10.2.4.5
        preference to, in removing animals from parks 4.4.2.1
Native Hawaiians, Pacific Islanders, and Caribbean Islanders 1.12
Native plants and animals
        definition of 4.4.1.3
        management of 4.4.2
        removal of 4.4.2.1; 5.3.5.3.1
        restoration of 4.4.2.2
Natural landmarks 4.3.5
Natural resources 4
        change caused by natural phenomena 4.1
        compensation for injuries to 4.1.6
        disturbance by human activities, and
        restoration of natural processes/systems 4.1;4.1.5
        management planning 4.1.1
        park resources and values 1.4.6
Navigation aids 9.2.5

New park units 1.3
Noise 8.2.3
        Also see Soundscape management
Nonfederal lands
        acquisition of 3.6, 3.7

## O

Odors 4.11
Off-road vehicle use 8.2.3.1
Oil and gas development.
        See Mineral development, Mineral interests
Outdoor sports 8.2.2
Overflights 8.4.7
Overnight accommodations 9.3.2

## P

Paleontological resources
        management of 4.8.2; 4.8.2.1
        protection of 4.1.2; 4.8.2.1
        sale of in concessions 10.2.4.6
Park Uses Preferred 1.5
Parking areas 9.2.4
Parkways 9.2.1.1
Partnerships 1.10, 4.1.4, 7.6
Performing arts 7.3.1
        Also see Facilities for arts and culture
Permits 8.6.1.1
Personal watercraft 8.2.3.3
Pesticides 4.4.5.3, 4.4.5.5
Pests
        management of 4.4.5
        and cultural resources 5.3.1.5
        definition of 4.4.5.1
Photography and filming 8.6.6
Picnic areas 9.3.4.1
Picnicking 8.2.2
Planning
        assessment of alternatives 2.1.2; 2.3.1.5
        consultation with American Indians 5.2;  7.5.6
        cooperative planning 2.3.1.8
        cooperative trail planning 9.2.2.1
        decision making 2.1.1
        environmental analysis 2.3.1.7, 2.3.4.1
        for concessions 10.2.2
        for cultural resource management 5.2
        for natural resource management 4.1.1
        for park development 9.1.1
        general principles 2.1
        identification of issues and problems 7.5.3
        implementation planning 2.3.4
        in a regional context 2.3.1.7
        information base 2.3.1
        interpretive 7.2
        major elements of 2.2
        planning team 2.3.1; 2.3.1.3
        tiers of 2.2
        public participation in 2.1.3; 2.3.1.4
        succession 1.9.1.2
        workforce 1.9.1.3
Plans
        air tour management plan 8.4.6
        Alaska units 2.3.1.10
        annual performance plan 2.2, 2.3.4, 2.3.4.2
        annual performance report 2.2
        backcountry management plan 8.2.2.4
        cave management plan 4.8.2.2
        comprehensive interpretive plan 7.2
        concession management plan 10.2.2
        development concept plan 9.1.1
        emergency plans 5.3.1.1; 8.2.5.2; 9.5
        exotic species management plans 4.4.4.2
        fire management plan 4.5; 5.3.1.1; 5.3.1.2; 9.1.8
        foundation document 2.2
        general management plan 2.2, 2.3.2.1, 2.3.1.11
        implementation plan 2.3.3
        land protection plan 3.3
        livestock management plan 8.6.8.2
        park-wide sign plan 9.3.1.1
        program management plan 2.2, 2.3.2
        relationship between strategic plan and GMP 2.3.2.1
        river management plan 8.2.2.3
        strategic plan 2.2, 2.3.2.1,2.3.3
        structural fire plan 5.3.1.2
        visitor use management plans 8.2.2.1
        wayside exhibit plan 9.3.1.1
        wilderness management plan 6.3.10; 6.3.10.2; 6.4.3.1;
            6.4.3.3; 6.4.4; 6.4.6.1; 6.4.6.3
Plants
        altered communities 4.4.2.5
        and earthworks 5.3.5.1.6
        cultural landscapes 5.3.5.2
        disposal of cut vegetation 8.8
        exotic species 4.4.4; 5.3.1.5
        natural landscapes 4.4.2.4
        native species 4.4.1.3
        population management 4.4.1.1
        revegetation 9.1.3.2
        threatened and endangered species 4.4.2.3
Plaques 9.6
Playgrounds 9.3.2.1
Policy *Introduction*
Predators 4.4.1
Prescribed burning
        See fire management
Private Property 8.6.5
Professional judgment 1.4.7, 1.5, 1.9, Glossary
Public assemblies 8.6.3
Public information
        access to museum collections 5.3.5.5.4
        and law enforcement 8.3.6
        confidentiality 1.9.2.3
        confidentiality of ethnographic information 5.2.3; 5.3.5.3
        confidentiality of sensitive resource
        information 5.2.3
        sharing and management of 1.9.2
Public participation
        in developing hunting regulations 8.2.2.6
        in facility planning 9.1.1
        in land protection planning 2.1.3; 2.3.1.4; 3.3
        in planning 2.1.3; 2.3.1.4; 5.2
        in wilderness assessment and studies 6.2.1.3; 6.2.2
        in wilderness planning 6.3.4.2; 6.3.4.3
Public transportation systems 9.2
Public use 8.2
        controls on 5.3.1.6; 8.2
        consumptive uses 8.9
        management of recreational use 8.2.2.1
        special park uses 8.6
Publications 7.3.2

## R

Reconstructions and reproductions
        identification of 5.3.5
        of damaged or destroyed structures 5.3.5.4.9
        of earthworks 5.3.5.1.6
        of furnishings 5.3.5.5.5
        of landscapes 5.3.5.2.3
        of museum objects 5.3.5.5.3
        of structures 5.3.5.4.4
        ruins 5.3.5.4.10
Recreation vehicles
        Also see Off-road vehicle use
        campgrounds 9.3.2.1
Recreational activities 6.4.3; 8.2.2
        management of 8.2.2.1
Recycling 9.1.4.2; 9.1.5.2; 9.1.6.1; 9.1.7
Reenactments 7.5.9
Regional directors
        and research permits 5.1.2
        authorities related to policy *Introduction*
Regional planning.
        See Planning
Regulations *Introduction*
Religion
        American Indian religious traditions 5.3.5.3.2
        religious activities in parks 5.3.5.3.2

Rescue
        See Search and rescue
Research
        activities in park 8.10
        anthropological studies 5.1.1; 5.3.5.3.7; 8.11.1
        archeological studies 5.3.5.1
        by others 4.2.2; 5.1.2; 8.11.3
        by NPS 4.2.1; 5.1.1; 8.11.2
        criteria for 4.2.2
        cultural studies 5.1
        ethnographic studies 5.3.5.3; 5.3.5.3.3
        for commercial purposes 4.2.4
        in interpretive and educational programs 7.5.4
        in wilderness 6.3.6
        paleontological studies 4.8.2.1
        permits for 4.2.2; 5.1.2; 8.10
        publication of data 4.1.2; 5.1.1; 8.11.2; 8.11.3
        removal of animals for 4.2; 4.4.2.1
        scientific and scholarly 2.3.1.4
        social science 8.11
        sociological studies 8.11
        specimen collecting 4.2.3; 4.2.4
Research natural areas 4.3.1
Reservation systems 8.2.6.2
Reservoirs 9.5
        fisheries management 4.4.3
Resource Damage 4.1.6; 5.3.1.3
Resources and values
        definition of 1.4.6
Restoration
        of cultural landscapes 5.3.5.2.3
        of degraded areas 9.1.3.2
        of historic structures 5.3.5.4.3
        of museum objects 5.3.5.5.2
        of native plants 4.4.2.2
        resource conditions 1.4.7.2
Revegetation 9.1.3.2
Rights-of-way 8.6.4
        in wilderness 6.4.6.1
        telecommunications antennas 8.6.4.3
        roads and highways 8.6.4.4
        utilities 8.6.4.2
        private property 8.6.5
Riparian Lands 4.6.6, 8.2.2.3, 8.6.8.2, 9.3.4.2
River use 8.2.2.3
Rivers
        Also see Water resources
Wild and scenic rivers 2.3.1.9
Roads
        Also see Transportation
        commercial use of park roads 9.2.1.2.1
        criteria for new roads 9.2
        design features 9.2.1.1
        facility siting 9.1.1.5
        in wilderness 6.3.5; 6.3.10.1; 6.4.3.3
        non-NPS roads 9.2.1.2
        purpose of park roads 9.2.1.1
        systems 9.2.1
Ruins 5.3.5.4.10

S
Sacred sites 5.3.5.3.2; 6.3.8
Safety 1.9.1.4; 8.2.5;
Sales
        of concessioner merchandise 8.6.2.4; 10.2.4.5
        of handcrafted items by demonstrators 7.5.7
        of interpretive items by cooperating
        associations  7.6.2; 8.6.2.4
Sanitary facilities.
        See Comfort stations, Toilets
Science
        Also see Research
        in decision making 1.4.7; 2.3.1.4 8.2.1
        in wilderness 6.3.6
Scuba diving 8.2.2
Sculpture
        indoor see Collections 5.3.5.5
        outdoor see Historic structures 5.3.5.4

Search and rescue 8.2.5.3
Secretary of the Interior
        authorities related to policy *Introduction*
Sewage treatment facilities
        use of NPS plants by others 9.1.6.1
Shell collecting 8.8
Shipwrecks
        management of 5.3.5.1.7
Shorelines
        management of 4.8.1.1
Shower facilities 9.3.2.1
Signs
        in wilderness 6.3.10.4
        informational signs 9.3.1.1
        navigation aids 9.2.5
        traffic signs 9.2.3
Skiing 8.2.2
        ski area development 9.3.4.3
Smoking
        in concession facilities 10.2.4.13
        in historic structures and museums 5.3.1.2
Snowmobiles 8.2.3.2
Soil resources
        management of 4.8.2.4
        protection of, during construction 9.1.3.1
Solid waste
        Also see Waste management
        addressed in river management plans 8.2.2.3
        backcountry use 8.2.2.4
Soundscape management 4.9
        in association with cultural resources 5.3.1.7
        in association with recreational activities 8.2.2
Special directives
        See Directives system
Special events 8.6.2
        in wilderness 6.4.4
Special park uses 8.6
Specimen collecting 4.2.3
Specimen trees 4.4.2.5
State historic preservation officers
        consultation with 5.2.1; 7.5.6
Statues 9.6.1
Stewardship
        cultural Resources 5.3
        human remains and burials 5.3.4
Structural fires 5.3.1.2; 9.1.8
Studies
        See Research
Submerged cultural resources
        management of 5.3.5.1.7
Subsistence 7.5.7
Superintendents
        authorities related to policy *Introduction*
        authorities related to visitor use 8.2
        responsibilities related to policy *Introduction*
Sustainability 1.8; 8.2; 9.1
Swimming 8.2.2

T
Telecommunications antennas 8.6.4.3
Threatened or endangered species
        management of 4.4.2.3
Through-traffic 9.2.1.2.1
Toilets
        in the backcountry 8.2.2.4
        in wilderness 6.3.10.3
        portable 9.3.3
        waterless 9.3.3
Tourism 8.2.7
        consultation with industry 7.5.6
        partnerships with commissions 7.6
        role in providing appropriate use 8.2
        commercial air tours 8.4.6
Toxic substances
        control to prevent water pollution see 4.6.3
        disposal of 9.1.6.1
Traditionally associated peoples
        partnerships 4.1.4

**168**

MANAGEMENT POLICIES 2006

research 5.1
consultation 5.2.1
stewardship of human remains and burials 5.3.4
cultural landscapes 5.3.5.2
ethnographic resources 5.3.5.3
consultation 7.5.6
American Indian uses 8.5
Traffic signs 9.2.3
Trail stock
    See Domestic and feral livestock, Grazing
Trailheads 9.2.2.8
Trails and walks
    backcountry trails 9.2.2.2
    bicycle trails 9.2.2.4
    bridges 9.2.2.9
    equestrian trails 9.2.2.3
    hiking trails 9.2.2.2
    interpretive trails 9.2.2.6
    in wilderness 6.3.10.2
    national trails 1.2; 9.2.2.7
    surfacing of 9.2.2
    water trails 9.2.2.5
Tramways 9.2
Transportation
    accessibility 9.1.2
    aircraft 8.4
    alternative systems 9.1.7; 9.2
    construction 9.2.1.2.2
    design 9.2
    facilities 9.2
    off-road vehicles 8.2.3.1
    planning 9.2
    public transportation systems 9.2
    roads 9.2.1
    snowmobiles 8.2.3.2
    trails 9.2.2
Trapping 4.4.3; 8.2.2.6
Trash disposal
    See Waste management
Treaty rights
    authorization of consumptive use 8.9
    authorization of fishing 8.2.2.5
    authorization of mineral or rock collection 8.8
    authorization of American Indian
    activities 5.3.5.3.1
    authorization of subsistence 5.3.5.3.1
Trust resources 1.11.3

**U**

Unacceptable impacts 1.4.7.1; 8.2, Glossary
Universal design 9.1.1, 9.2, 9.2.2, 10.2.6.1
U.S. Constitution
    as source of policy *Introduction*
Utilities
    cost-sharing with municipalities and others 9.1.5
    criteria 9.1.5
    for concessions 10.2.6.4
    historic utilities 9.1.5.4
    in campgrounds 9.3.2.1
    in wilderness 6.2.1.2
    rights-of-way 8.6.4; 8.6.4.2
    use of municipal systems 9.1.5
    utility lines 9.1.5.3

**V**

Viewing devices 9.3.1.6
Visitor centers 9.3.1.3
    media in 7.3.2
Visitor experience and resource protection framework
    See Carrying capacity
Visitor facilities
    See Development
Visitor safety
    See Human health and safety
Visitor use
    See Public use
Volunteers in Parks 1.9.1.6; 7.6.1

**W**

Waivers of policy.
    See *Introduction*
Waste management 9.1.6.1
    Also see Solid waste
Wastewater treatment 9.1.5.2
Watershed and Streams 4.6.6
Water quality 4.6.3
Water resources 4.6
    conservation of 4.6.2; 9.1.5.1
    withdrawal for consumptive use 4.6.2
    sale of water to others 4.6.2
Water rights 4.6.2
Water systems 9.1.5.1
Wayside exhibits 7.3.2
Weather and climate 4.7.2
Weather monitors 9.4.5
Wetlands 4.6.5
Wild and scenic rivers 4.3.4
Wilderness
    accessibility in 6.4.6
    administrative facilities in 6.3.10.1
    airstrips in 6.3.10.1
    assessment process 6.2.13
    boundaries in 6.3.11
    campsites in 6.3.10.3
    commercial services in 6.4.3
    conditions and status of 6.3.4.2
    criteria for 6.2.11
    cultural resources in 6.3.8
    definition of 6.2.11
    designated wilderness 6.2.4
    education 6.3.12
    eligibility for 6.2.1
    environmental impacts 6.3.4.3
    ethics of 6.4.2.2
    facilities 6.3.10; 6.3.10.1
    fire management in 6.3.9
    grazing in 6.4.5.3
    management of 6.4
    mineral development in 6.4.5.2
    minimum requirement 6.3.5
    minimum tool management concept 6.3.6.1
    motorized equipment and vehicles in 6.4.2.3
    national wilderness preservation system 6.2
    planning 6.3.4
    potential wilderness 6.2.2.1
    private rights in 6.4.5
    proposed wilderness 6.2.2.2
    public use shelters in 6.3.10.3
    recommended wilderness 6.2.3
    recreational use in 6.4.2
    resource management 6.3.7
    resource and use monitoring 6.3.6.2
    review process 6.2
    rights-of-way in 6.4.5.1
    scientific activities/research 6.3.6
    signs in 6.3.10.4
    special events in 6.4.4
    special provisions of ANILCA 6.4.3.3; 6.4.4
    structures in 6.2.1.2
    toilets in 6.3.10.3
    trails and roads in 6.3.10.2
    wilderness study process 6.2
    zoning for 6.3.4.1
Wildfires
    See fire management
Wildlife
    See Animals
World heritage sites 4.3.7; 5.1.3.2.3

**Z**

Zones and zoning
    See Management zoning

## The NPS Directives System

The NPS Directives System consists of internal instructions and guidance documents to ensure that NPS managers and staff have clear information on NPS policy and on required and/or recommended actions. It is composed of three "levels" of documents:

◆ **Level 1** consists of the policies that appear in the book entitled *Management Policies*, and which set the broad framework, provide direction, and prescribe parameters for making management decisions.

◆ **Level 2** is Director's Orders, which articulate new or revised policy on an interim basis between publication dates of NPS *Management Policies*. They also provide more detailed interpretation of *Management Policies* and outline requirements applicable to NPS functions, programs and activities, and are a vehicle by which the Director may delegate specific authorities and responsibilities. The main target audience for Director's Orders is park superintendents, for whom they serve as an "executive summary" of important policies and procedures.

◆ **Level 3** materials include handbooks, reference manuals and other documents containing comprehensive information in support of field and programmatic operations. A typical handbook or reference manual will include information about relevant legislation, regulations, Servicewide policies, and other instructions or requirements issued through a Director's Order, as well as examples, illustrations, recommended practices, forms, etc.

In many cases, Level 3 handbooks and reference manuals will look very similar to the old NPS Guidelines. They may serve as a source of "one-stop shopping" for comprehensive information about a particular program or function. But they will be carefully crafted to clearly distinguish between what is mandatory or required, and what is merely recommended. Those who issue Level 3 documents may not impose any requirements beyond  what has already been issued in *Management Policies* or Director's Orders,  unless they have been authorized by the Director to do so.

**Keep up to date on new or revised policies by visiting the National Park Service policy website at**

### *http://www.nps.gov/policy*

009634



**National Park Service**
U.S. Department of the Interior

Abraham Lincoln Birthplace **Acadia** Adams **African Burial Ground** Agate Fossil Beds **Algnak River** Alibates Flint Quarries **Allegheny Portage Railroad** Amistad **Andersonville** Andrew Johnson **Aniakchak** Antietam **Apostle Islands** Appalachian Trail **Appomattox Court House** Arches **Arkansas Post** Arlington House **Assateague Island** Aztec Ruins **Badlands** Bandelier **Bent's Old Fort** Bering Land Bridge **Big Bend** Big Cypress **Big Hole** Big South Fork River **Big Thicket** Bighorn Canyon **Biscayne** Black Canyon of the Gunnison **Blue Ridge Parkway** Bluestone River **Booker T. Washington** Boston **Boston African American** Boston Harbor Islands **Brices Cross Roads** Brown v. Board of Education **Bryce Canyon** Buck Island Reef **Buffalo River** Cabrillo **Canaveral** Cane River Creole **Canyon de Chelly** Canyonlands **Cape Cod** Cape Hatteras **Cape Krusenstern** Cape Lookout **Capitol Reef** Capulin Volcano **Carl Sandburg Home** **Carlsbad Caverns** Carter G. Woodson Home Casa Grande Ruins **Castillo de San Marcos** Castle Clinton **Catoctin Mountain** Cedar Breaks Cedar Creek & Belle Grove Chaco Culture **Chamizal** Channel Islands **Charles Pinckney** Chattahoochee River **Chesapeake & Ohio Canal** Chickamauga & Chattanooga **Chickasaw** Chiricahua **Christiansted** City of Rocks **Clara Barton** Colonial **Colorado** Congaree **Constitution Gardens** Coronado **Cowpens** Crater Lake **Craters of the Moon** Cumberland Gap **Cumberland Island** Curecanti **Cuyahoga Valley** Dayton Aviation Heritage **De Soto** Death Valley **Delaware River** Delaware Water Gap **Denali** Devils Postpile **Devils Tower** Dinosaur **Dry Tortugas** Ebey's Landing **Edgar Allan Poe** Edison **Effigy Mounds** Eisenhower **El Malpais** El Morro **Eleanor Roosevelt** Eugene O'Neill **Everglades** Federal Hall **Fire Island** First Ladies **Flight 93** Florrisant Fossil Beds **Ford's Theatre** Fort Bowie **Fort Caroline** Fort Davis **Fort Donelson** Fort Frederica **Fort Laramie** Fort Larned **Fort Matanzas** Fort McHenry **Fort Necessity** Fort Point **Fort Pulaski** Fort Raleigh **Fort Scott** Fort Smith **Fort Stanwix** Fort Sumter **Fort Union** Fort Union Trading Post **Fort Vancouver** Fort Washington **Fossil Butte** Franklin Delano Roosevelt Memorial **Frederick Douglass** Frederick **Law Olmsted** **Fredericksburg & Spotsylvania County Battlefields Memorial** Friendship Hill **Gates of the Arctic** Gateway **Gauley River** General Grant **George Rogers Clark** George Washington Birthplace **George Washington Carver** George Washington Memorial Parkway **Gettysburg** Gila Cliff Dwellings **Glacier** Glacier Bay **Glen Canyon** Golden Gate **Golden Spike** Governors Island **Grand Canyon** Grand Portage **Grand Teton** Grant-Kohrs Ranch **Great Basin** Great Egg **Harbor River** **Great Sand Dunes** Great Smoky Mountains **Greenbelt** Guadalupe Mountains **Guilford Courthouse** Gulf Islands **Hagerman Fossil Beds** Haleakalā **Hamilton Grange** Hampton **Harpers Ferry** Harry S Truman **Hawai'i Volcanoes** Herbert Hoover **Hohokam Pima** Home of Franklin D. Roosevelt **Homestead NM of America** Hopewell Culture **Hopewell Furnace** Horseshoe Bend **Hot Springs** Hovenweep **Hubbell Trading Post** Independence **Indiana Dunes** Isle Royale **James A. Garfield** Jean Lafitte NHP & Preserve **Jefferson National Expansion** Jewel Cave **Jimmy Carter** John D. Rockefeller Jr. Memorial Parkway **John Day Fossil Beds** John Fitzgerald Kennedy **John Muir** Johnstown Flood **Joshua Tree** Kalaupapa **Kaloko Honokohau** Katmai **Kenai Fjords** Kennesaw Mountain **Keweenaw** Kings Canyon **Kings Mountain** Klondike Gold Rush **Knife River Indian Villages** Kobuk Valley **Korean War Veterans** Lake Clark **Lake Mead** Lake Meredith **Lake Roosevelt** Lassen Volcanic Lava Beds **Lewis & Clark** Lewis & Clark Trail **Lincoln Boyhood** Lincoln Home **Lincoln Memorial** Little Bighorn Battlefield **Little River Canyon** Little Rock Central High School **Longfellow** Lowell **Lyndon B. Johnson** Lyndon Baines Johnson Memorial Grove **Maggie L. Walker** Mammoth Cave **Manassas** Manzanar **Marsh Billings-Rockefeller** Martin Luther King, Jr. **Martin Van Buren** Mary McLeod Bethune Council House **Mesa Verde** Minidoka Internment **Minute Man** Minuteman Missile **Mississippi River** Missouri River **Mojave** Monocacy **Montezuma Castle** Moores Creek **Morristown** Mount Rainier **Mount Rushmore** Muir Woods **Natchez** Natchez Trace Parkway **Natchez Trace Trail** National Capital Parks **National Mall** NP of American Samoa **Natural Bridges** Navajo **New Bedford Whaling** New Orleans Jazz **New River Gorge** Nez Perce **Nicodemus** Ninety Six **Niobrara River** Noatak **North Cascades** Obed River **Ocmulgee** Olympic **Oregon Caves** Organ Pipe Cactus **Ozark Riverways** Padre Island **Palo Alto Battlefield** Pea Ridge **Pecos** Pennsylvania Avenue **Perry's Victory** Petersburg **Petrified Forest** Petroglyph **Pictured Rocks** Pinnacles **Pipe Spring** Pipestone **Piscataway** Point Reyes **Potomac Heritage Trail** Poverty Point **Prince William Forest** Pu'uhonua o Hōnaunau **Puukoholā Heiau** Rainbow Bridge **Redwood** Richmond **Rio Grande River** Rock Creek **Rocky Mountain** Roger Williams **Rosie the Riveter/World War II Home Front** Ross Lake **Russell Cave** Sagamore Hill **Saguaro** Saint Croix Island **Saint Croix Riverway** Saint Gaudens **Saint Paul's Church** Salem Maritime **Salinas Pueblo Missions** Salt River Bay **San Antonio Missions** San Francisco Maritime **San Juan** San Juan Island **Santa Monica Mountains** Saratoga **Saugus Iron Works** Scotts Bluff **Sequoia** Shenandoah **Shiloh** Sitka **Sleeping Bear Dunes** Springfield Armory **Statue of Liberty** Steamtown **Stones River** Sunset Crater Volcano **Tallgrass Prairie** Thaddeus Kosciuszko **Theodore Roosevelt** Theodore Roosevelt Birthplace **Theodore Roosevelt Inaugural** Theodore Roosevelt Island **Thomas Jefferson Memorial** Thomas Stone **Timpanogos Cave** Timucuan **Tonto** Tumacacori **Tupelo** Tuskegee Airmen **Tuskegee Institute** Tuzigoot **Ulysses S. Grant** Upper Delaware River **USS Arizona Memorial** Valley Forge **Vanderbilt Mansion** Vicksburg **Vietnam Veterans Memorial** Virgin Islands **Virgin Islands Coral Reef** Voyageurs **Walnut Canyon** War in the Pacific **Washington Monument** Washita Battlefield **Weir Farm** Whiskeytown Unit **White House** White Sands **Whitman Mission** William Howard Taft **Wilson's Creek** Wind Cave **Wolf Trap** Women's Rights **World War II Memorial** Wrangell-St. Elias **Wright Brothers** Wupatki **Yellowstone** Yosemite **Yucca House** Yukon Charley Rivers **Zion**

009635

**DECISION MEMORANDUM FOR THE NLC EXECUTIVE COUNCIL**

**FROM:**            Associate Director – Park Planning, Facilities, and Lands
**TELEPHONE:**  202-208-3264
**SUBJECT:**      Revised Framework for the National Planning Program

**STATEMENT OF THE ISSUE**
For some time, NPS has grappled with the issue of effectiveness, timeliness, and costs associated with General Management Plans (GMPs).  The planning program is transitioning from the traditional GMP product to a broader range of products to address these concerns and to effectively address pressing park needs.   Plans also need to do a better job of limiting expectations for new facilities and operating cost increases by assuring that proposals are reviewed early in plan development by an interdisciplinary team before alternatives are released to the public.  Clarification of roles and responsibilities and approval of the change in focus is needed for an effective transition.  A new Director's Order may be needed to provide guidance for implementing the transition.

This proposal for action by the Executive Council focuses on big picture changes and does not go into detail on implementation.  PPFL will work collaboratively with the Planning Leadership Group to develop implementation strategies and work plans if the Executive Council approves of the overall change in program direction.

**BACKGROUND**
The parks and regions previously had limited flexibility to plan and implement solutions due to the restriction that planning funds were used for GMPs only.  At the request of the NLC, a 'unit management plan approach' was instituted in the 2011 Greenbook for the Park Planning and Special Studies (PPSS) program.   The Greenbook language allows for a broad range of planning activities that could be funded under the 409 fund source beyond the traditional limitation of GMPs.  The previous AD-PPFL conveyed a charge at the beginning of FY 2011 to revise the park planning framework, and this work is underway.

**PROPOSAL**
Revise the Planning Framework based on the following principles:
- Enhance planning capacity servicewide through integration of other NPS program planning needs into regional and national planning programs.
- Confirm the Park Foundation Document as a baseline for all future planning and decision-making at the park.
- Introduce the concept of the 'planning portfolio' to implement a responsive and flexible approach to meet park planning needs.

The NPS will move forward with the following activities:
- Complete Foundation Documents for all parks by 2016, including a prioritized assessment of planning needs at each park.  This will provide an opportunity for the NLC to understand the range and scope of system-wide planning needs.
- Develop a priority setting process for selecting projects for national program funding and for building a five-year prioritized plan.  The process will be integrated with priority setting at the regional level and, as appropriate and feasible, with other national programs.

- Foster integration in planning activities at both the regional and WASO levels to leverage funds, realize efficiencies, and meet objectives across multiple programs and disciplines.
- Develop new internal procedures for review of facilities, operating cost increases and other major investments proposed in plans.  The review would emphasize need and sustainability of operations, seeking to ensure that alternatives presented to the public do not raise unrealistic expectations.
- Establish a program-funded position in each regional planning office to add capacity to improve servicewide management of the planning program and to develop a wide range of planning products.  The position will be that of  'portfolio manager', who will be the lead regional contact for maintaining the planning portfolio and formulating the assessment of planning needs for units; participate in the national priority setting process; and assist in reducing planning fund source carryover.  This capacity will be achieved through changes in the planning program fund source rules. No new funding is needed.

**Work plan for implementation**:

There are several key ideas that need to be incorporated into the planning process.  Among these issues are:

- The need for planning documents to better manage both internal and public expectations for funding and implementation.  This will be critical at all levels of planning, including in the new types of planning products envisioned in the revised Framework.
- The proactive, interdisciplinary review process for planning documents, especially as they relate to investment decisions.  A procedure for vetting investment (both capital and non-capital) proposals early in the plan's development is necessary.
- The definition of roles and responsibilities to provide direction for implementing the revised framework.  Along with new responsibilities assigned to the portfolio manager, there will be accompanying shifts within the WASO park planning program, regional planning offices and DSC.
- The criteria to be developed for priority setting of projects funded under the planning fund source.  The prioritization must reflect a broad range of non-GMP plans and new ways of doing business.

**OPTIONS**

1. No action/do nothing.

2. Concur with proposed program transformation, and implement program staffing in regional offices to effect the transition.  Assign AD-PPFL primary responsibility for shepherding the proposed program transformation, consistent with the principles and discussion topics identified above.  Implementation details will be developed by PPSS in consultation with the Planning Leadership Group.   As substantive progress proceeds, the NLC will be briefed at key milestones.

**RECOMMENDATION**

Option 2 best provides the planning flexibility to address key park issues, deals with long-standing capacity issues, facilitates the alignment of national and regional programs and adds needed review for proposed NPS investments.

**EXECUTIVE COUNCIL DECISION**

Option 1 _____        Option 2 __X____        Further Discussion _____

**Approved at the Executive Council meeting:  4-24-2012**

**PREPARED BY:**  Patrick Gregerson, Chief of Planning
**DATE:** 12-12-2011

009638

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

## Revising the NPS Framework for Planning:
## Better meeting park needs in the second century of the Service

*VISION: The National Park Service (NPS) Park Planning Program provides a broader range of products and services to help parks address and make decisions about the variety of issues they face. Planning is an ongoing process that is connected to parks' everyday activities. Planning is coordinated with other program areas and is able to tap the most relevant information in the Service. A nimble planning program allows parks to respond to the Director's and Secretary's priority issues in a timely fashion.*

For some time, the NPS has grappled with the issue of effectiveness, timeliness, and costs associated with General Management Plans (GMPs). In 2011, the National Leadership Council approved language for the NPS Budget Greenbook under which park planning funds were to be spent on "unit management plans", allowing these funds to be spent on a broad range of park plans, not exclusively on GMPs. Subsequent to this initial change, the Park Planning and Special Studies Division worked with the nationwide Planning Leadership Group (PLG) to develop a new NPS planning framework that would address pressing park needs more effectively. On April 24, 2012, the National Leadership Council Executive Committee approved a decision memorandum adopting the new planning framework and a series of implementation steps.

The Planning Leadership Group developed concepts for revising the NPS planning framework that were advanced through several versions of a working paper. This guidance document was adapted from the most recent working paper (version of April 12, 2012). In conjunction with the approved decision memorandum, this document will guide revisions of the Park Planning Program Standards (2004) and the development of accompanying guidance. It is anticipated that revised standards will be formally approved in a new Director's Order for Planning (DO-2).

**NPS Planning Process Reviews and Revisions**
Planning is a basic element of management throughout the National Park System and other agencies. The planning process for the National Park Service (and most other Federal agencies) is guided by several distinctly different but inter-related factors:

- Specific legal mandates for types of plans and their components
- General legal/compliance requirements including NEPA and Section 106 of the NHPA
- Agency policies and guidelines
  - Interpretation of those policies and guidelines
  - Popular assumptions or misunderstandings about policies and guidelines
- Agency budgets and funding systems or policies adopted by programs for projects and staff
- Program and project staffing capacity: expertise and competing demands on time
- Internal review and approval systems for NPS and DOI
- External influences from interested individuals, organizations, agencies, and Congress

009639

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

The National Parks and Recreation Act of 1978 (16 USC 1a-7(b)) requires the NPS to conduct comprehensive general planning for all units of the system. A General Management Plan (GMP) must satisfy the following statutory requirements mandated in the Act:

- Effective measures for the preservation of the area's resources
- Appropriate indications of the types and general intensities of development (including visitor circulation and transportation patterns), along with locations, timing, and anticipated costs.
- Identification of visitor carrying capacities
- Indications of potential modifications to the external boundaries of the unit

This legislative provision has shaped the current program, and the GMP product is featured in policy (Management Policies 2006), program standards (Park Planning Program Standards, 2004), and guidance (General Management Planning Dynamic Sourcebook, 2008). Although the GMP is only one of over 80 different types of plans developed by parks and NPS programs, it is intended to provide a comprehensive framework for decisions that follow in more detailed plans. Beginning with the broad-scale GMP, progressively more specific program, strategic, implementation, and annual planning products are undertaken to fill in the park planning framework. Components of the park foundation document and the desired condition statements of a GMP are the common threads that connect the different planning components.



One of the persistent concerns of both management and staff has been that GMPs take too long and cost too much, resulting in a dramatic gap between available funds and the number of parks that have a current GMP. Over the past 20-30 years, the NPS "planning process" and the framework for delivering planning services have been the subject of several rounds of evaluation, reinvention, reorganization, and streamlining attempts. In general, these efforts have focused on the description of various processes and products of planning and how they are linked together in the planning framework, or flow chart, expressed in the current program standards. These linkages do influence the rate at which products and

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

processes can be completed, but factors outside the flow chart may affect this more strongly than those within.  This revision moves somewhat beyond the flow chart, particularly in building capacity for planning services that can respond efficiently to park needs.

## A.  WHY REVISE THE FRAMEWORK?

*The NPS park planning program has evolved – we're not just funding GMPs anymore.  Current program guidance doesn't speak to the new flexibility we have and the needs and challenges that parks are expressing.  As a Washington Office program manager noted, "planning as a discipline today is evolving rapidly with new needs being placed upon practitioners."*

## 1.  Purpose and Need

*Almost 50% of park units lack a current GMP*
Meeting the objective of providing a GMP product for each park and maintaining the currency of existing plans has proven difficult.  In 2010, the number of parks with GMPs considered current was 214, or 54.7%.  GMP completions have averaged around 12-15 annually, and the percentage achieving currency has varied only within a few points since 2007.  The consequences for parks range from inefficiencies in management, missed partnership opportunities, lack of public engagement and support, inconsistent resource management activities, and diminished quality of visitor experiences (among others).

*Project costs and capacity constraints limit the number of GMP projects that can be undertaken*
The average cost of a GMP ranges from $500,000 to $750,000.  With average annual funding of less than $8,000,000 under the 409 fund source, the WASO Park Planning Program faces constraints in fully funding park GMP needs.  The program funds a range of planning services that support the GMP program systemwide, in addition to individual park plans.

The regional planning offices play a key role in GMP production, with staff experienced in conducting general management planning work. But staffing levels are low; even when capacity is bolstered by the DSC Planning Division, the regions lack the capacity to provide each park with a full-scale GMP.  There is a long waiting list for GMP projects, and it has been difficult to get new projects started in a timely way due to overall demands on both funds and capacity.  Within a constrained fund source, the cost of a comprehensive plan means that fewer parks can undertake them.

*The lengthy planning process typical of a full scale GMPs reduces its effectiveness*
The comprehensive scale of GMPs along with a host of other factors, including the need to accommodate shifts in planning team roles as staff inevitably change over a multi-year process, often result in lengthy planning periods.  While GMPs provide value, the time involved in producing them reduces their relevancy to parks seeking timely solutions to planning needs, and it has affected the perception throughout the agency of how useful they are.

In a survey effort sponsored by the Planning Leadership Group, regional representatives interviewed park managers to gain information for the framework revision.  In almost 50% of the park units included in the survey, managers noted some type of time-related issue as an element of less successful planning. A desire to streamline the planning process to shorten the timeline was frequently expressed in the

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

interviews. Many commenters called for simpler, consolidated, and/or cyclical planning processes that would be effective at meeting the needs of parks, yet in a timely manner. The results of the interviews are reported in "Park Planning Needs: Survey of Park Units (2011)".

***Funding policies led to the perception that GMPs were the only solution to planning issues***.
The 409 fund source was, until the adoption of the unit management approach in 2011, largely focused on the first tier in the sequential planning framework. The fund source was relegated to the GMP product by policy and practice, although funds could be applied with some flexibility to cover the full-scale plan, GMP amendments targeted to a specific issue or geographic area, supporting studies, and readiness work at the region. Regions sought to get parks placed on the priority list for GMPs, in order to secure funds for general park planning. There is no similar nationally-based fund source to support other park plans called for in the sequential framework approach, promoting full implementation.

***Planning takes place across the agency, but efforts are not coordinated***
The Division of Park Planning and Special Studies manages the GMP program but has no direct authority over the more detailed plans and broader range of planning activity within the NPS. Many programs are responsible for some aspect of park planning. The spread of efforts among multiple programs represents an aspect of servicewide park planning capacity, yet this is generally not recognized as such.

The Planning Leadership Group sponsored an on-line survey of WASO programs in 2011 to inform development of the framework revision proposals and guidance during implementation. Respondents noted the presence of "stove-piped" funding and lack of coordination across programs that are responsible for different planning products. Several suggested the need for more coordination and frequent interaction among various planning programs to share knowledge and integrate best practices, which they thought would lead to improved consistency and efficiencies. Seventeen program representatives participated in the survey, and results are reported in "Program Planning Needs: Survey of NPS Programs (2011)".

***Planning must produce realistic outcomes for facility proposals***
In some cases, general management planning has fostered an unrealistic approach to new facilities. This tendency became more evident as agency funding levels decreased, deferred maintenance costs ballooned, and the directorate began to focus on the cost of investing in new structures and the benefits gained. While the park planning program sought to provide guidance for a systemwide approach to estimating the costs of facilities, planning teams struggled to provide the needed rationale for significant investments. More recently, the Development Advisory Board has modified its charge from a reactive mode to an investment review approach, setting the stage for planning efforts that can address park needs adequately, and achieve sustainability objectives at both the park and agency level.

## 2. <u>Challenge by the NLC</u>

During 2010 and 2011, the National Leadership Council challenged the park planning program to reduce the cost and time required to complete GMP's and to find new ways of meeting the planning needs of the parks. The NLC requested a change in the name of the program funding source, from GMPs to unit management plans; this was instituted in the FY11 Greenbook. The unit management plan approach

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

broadened the range of products that could be funded in a more formal way.  This is a key building block for revisions in the framework.

### 3.  PLG deliberations and development of the framework revision working paper

The PLG, whose function is to promote collaboration within the planning program, is composed of professional planning staff, program representatives, and managers at regional offices, the Denver Service Center, and the Washington Office (WASO) Park Planning Division.  The group convened in December 2010, having received a charge to revise the planning framework from Steve Whitesell, at that time the Associate Director, Park Planning, Facilities, and Lands.  The PLG reached a major conclusion that the program must find ways to be more responsive to park needs in terms of available products and timeliness.  There was a broad agreement among PLG members to re-engineer the program to diversify products and services; modify processes to become more efficient; change the organization of the program in order to better meet long-range needs of the Service; and do a better job of communicating the value of planning to the NPS.

As a follow-up to the December meeting, a survey effort was undertaken to gain more information on park planning needs and to better understand how they are being met.  Two surveys, of park managers and WASO program managers, were conducted in early 2011; they are briefly described above. A primary finding was that while GMPs are valued, there are other equally important planning needs that are not being met.

A second PLG meeting was held in February 2011 and the first version of the framework revision working paper followed (Proposed Revised Planning Framework, March 2011).  The document put forward recommendations to streamline the production of the traditional GMP; this content was omitted in the later versions of the working paper, due to the detailed level of the recommendations.

As the PLG deliberated further, it became clear that a national focus for the planning program should receive some emphasis, so that integration among different programs and disciplines across the system can be furthered to support park planning.  A working group was established to refine key ideas, and the group's discussion informed the briefing statement on the framework revision prepared for the Director and Deputy Director for Operations in July 2011.  The Park Planning Program Manager and division staff met with the directorate on July 27 and a decision memorandum for the Executive Committee of the NLC was requested.

 On August 17, Program Manager Patrick Gregerson addressed the NLC and gave a presentation on the framework revision project.  The session was designed to elicit input from members on the planning framework.  The resulting table discussions reflected many of the concerns about the park planning program expressed here, as well as opportunities for change.

Victor Knox, Associate Director, Park Planning Facilities and Lands, led further revisions of the decision memorandum, and input from regional directors was incorporated.  On April 24, 2012, the National Leadership Council Executive Committee approved the decision memorandum adopting this planning framework and a series of implementation steps.

009643

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

## B.  KEY ELEMENTS OF THE FRAMEWORK:

*The framework clarifies the products and services delivered by the planning program*
*and the relationships among them.*

### 1.  Introducing the Concept of the Planning Portfolio

A park's planning needs are met through the totality of planning documents currently in use at the park, and not through a single document.  Through the use of targeted, small scale planning products, it will be possible to meet a broader range of park planning needs more efficiently for a larger number of parks, and at lower cost, than is possible currently.  While the park planning program cannot affect funding levels, it will be able to leverage its ability to meet park planning needs more effectively in the revised framework.



A compilation or amalgamation of individual plan components represents the "Portfolio of Management Plans", or "portfolio".  This is not a new idea, as it is recognized in current program guidance and standards that park planning needs are met through a range of planning documents.  However, the ideal structure envisioned for their delivery is through a tiered or sequential approach in conjunction with a GMP.  In this contrasting approach, a park's planning portfolio would consist of an assemblage of individual plans, updated as needed to provide timely guidance.  This new structure for delivering planning products introduces greater flexibility for park managers, supporting formal planning efforts for some issues while acknowledging that existing plans and guidance are adequate for other issues. The portfolio can be visualized as a loose-leaf binder, in which particular planning elements can be removed and updated, and new elements added, without revising the entire body of work.  As the park foundation document; assessment of planning and data needs; the GMP and any amendments; targeted implementation plans; resource studies and other documents are completed, they would be tabbed and added to the portfolio.  In some parks, the portfolio may take on the physical structure of a shelf or bookcase filled with plans; in others, it might exist electronically as a virtual compilation of cross-referenced documents.  Whatever the format, the portfolio represents a series of building blocks to guide future actions for park management and resource staff, with individual items updated as needed.

009644

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

In conjunction with the regional planning offices, a park manager must assure that a park's portfolio meet all legal and policy requirements for that unit. An important shaping element of the portfolio will relate to how the portfolio approach would meet the legislative provision that each park have a GMP. It is understood that NEPA compliance would be required for portfolio components that propose specific actions. The place of NEPA analysis of connected actions and cumulative impacts within a series of individual plan segments in the portfolio must also be addressed. These two topics will be explored in the implementation phase and development of guidance.

In addition, the portfolio must be able to meet park needs in a sustainable way, and implementation guidance will identify the vehicles for evaluating facility needs parkwide in the absence of the traditional GMP product.

## 2.  Integration of other Programs into Planning Efforts

There is a broad potential for programs to contribute to park planning more effectively. The Park Planning Division has been perceived as the main deliverer of planning products, yet activities to support park planning or that have the capacity to do so take places across the agency. The framework revision recognizes the profile of planning within the agency and builds on existing capacity to improving the effectiveness of park planning.

The shift in emphasis from the traditional GMP product to unit management plans has started to influence the relationship of WASO program areas to park planning. The Park Planning Division is leveraging the 409 fund source to support a park's ability to take on a specific program plan, which provides opportunities for integration among programs. In addition, new and revamped efforts to assure program representation in the planning process are being implemented. This has resulted in part from directorate concerns, but the review procedures are creating new relationships among programs, planning teams, and parks to an increasing extent.

Several broad ideas and aspects of existing practice that relate to the integration of programs in park planning efforts are described below. While guidance and procedures will be part of implementation, program integration takes place at multiple levels and will be highly dependent on the roles and responsibilities of described in Part 3. It is at the regional level that the connection between a park plan and programs can be handled most effectively. Building sufficient capacity in the regional planning office to accomplish integrative efforts is a key aspect of implementing the revised framework. The role of a planning portfolio manager who will help to facilitate this is described in 'roles and responsibilities'.

### *Bringing program assets to the planning table*
The revised framework supports a coordinated approach to bringing the resources of a program to the planning table at the appropriate time. Program resources or 'assets' that could be targeted to park planning include studies, inventories, data, technical assistance, planning product templates, training, planning funds, and others. Coordination with the Park Planning Division and/or regional program offices can help to assure that access to data is secured; any necessary preparatory studies are undertaken; an interdisciplinary team has been assembled; key policy provisions are understood as a planning project begins, among other objectives.

009645

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

The foundation process can be a coordinating point with programs.  One result of the foundation document is a better understanding of the park's situation, which is helpful to programs in general.  The assessment of planning needs, undertaken in the park foundation process and updated periodically, is a key point for integration.  There may be a need for coordination with other program areas as recommendations are developed for plans and supporting data collection, studies, or other work that is needed.  Parks may need guidance from regional and program experts to determine which particular set of projects would best meet their needs, among the array of NPS park planning products.

The assessment can serve as an information tool for WASO and regional programs in identifying connections to park planning needs.  The availability of data that that is key to resource and science-based decision making can be furthered through linkages to the programs, which may be able to support priority information needs.  The assessment is an avenue to formalize coordination with natural and cultural resources and science programs.

As an example, the Climate Change Response Program is working with the Park Planning Division to develop climate change information resources than can be accessed readily in park planning efforts, beginning with the park foundation document.  The program is mobilizing its resources to prepare the park data sets relevant for this stage of planning, and its work plan will follow the planned foundation work, as prioritized for the national initiative to complete park foundation document by the year 2016.  Similarly, the Planning Technical Assistance Group in NRSS is working with the Park Planning Division to be able to respond more effectively to park planning needs.  Currently the focus is on how the group can best contribute to the policy review of plans, but it is recognized that the earlier that the program area specialists are involved in a planning process, the more they will be able to benefit the project.

In the survey of WASO programs in 2011 noted above, program representatives identified a number of issues relevant to the park planning framework in addition to the presence of "stove-piped" funding and lack of coordination across programs.  Respondents called attention to the lack of awareness of existing directives, the presence of sometimes competing authorities, and challenges in supporting and facilitating consensus at the park level, factors that may constrain responses to park planning needs.

***Planning processes that support program input and an interdisciplinary approach***
Collaboration with other programs can happen throughout the process, and is essential to success.  The two topics mentioned here are examples of the process issues to be addressed in implementation of the revision.

The review process is an important tool in park planning and is receiving emphasis at the WASO level.  Current park planning procedures at the WASO and regional levels provide for review of many planning documents, at the draft document (policy review) and/or concurrence to print stages.  Within the WASO Park Planning Division, review procedures are increasingly oriented towards assuring that input from programs during policy review is fully considered and incorporated as appropriate.  As programs find ways to contribute resources to planning projects early on, and to be involved prior to development of a draft document, the policy review process will become a more efficient tool.

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

In the review of an earlier version of this working paper, several PLG members called attention to the inter-disciplinary approach that full-scale general management planning fostered, made possible through the focusing of resources on comprehensive planning. They cautioned that it may be difficult for an interdisciplinary approach to be applied as individual unit management plans are developed.

*Collaborative approach to park planning program leadership*
The Park Planning Division has sought to expand the number of WASO programs represented within the Planning Leadership Group (PLG), so as to support collaboration and communication among park planning and other programs at the national level. The group has played a consistent role in guiding the park planning program through representation among the regional planning offices, but has remained loosely structured. The framework revision provides an opportunity to recognize the role of the PLG in a formal way, and it is an entity included in the following section, Roles and Responsibilities.

*Alignment of NPS park planning practice with new priorities and policies*
At the national level, there are opportunities to align park planning with agency priorities such as those resulting from changes in policies and management focus; and with new practices, such as web mapping. Formal and informal initiatives have arisen to organize the agency's response to climate change and to address challenges resulting from lawsuits over a unit's visitor capacity. Interagency initiatives often have implications for park planning. Whether inter- or intra-agency, these types of collaborative efforts bring in important perspectives for park planning and management, and at the same time build relationships between planning and other programs. Two examples are the Interagency Visitor Use Management Council, led by the national planning program and the Wilderness Character Integration Team, for which the Park Planning Division has supported with staff and funding support.

The challenge is in incorporating new policies, understandings, or practice within WASO and regional programs in support of park planning. For individual programs, this may involve changing program standards that are related to park planning, and identifying funding streams to allow these processes to take place.

## 3.  <u>Roles and Responsibilities</u>

The WASO Park Planning Division leverages staffing from several sources to accomplish program goals: WASO, regional offices, DSC, parks, term positions, and other program areas. Along with new responsibilities assigned to the portfolio manager, there will be accompanying shifts within the division, regional planning offices and DSC. The roles of each of these staffing groups must be clearly defined to ensure efficiency and avoid duplication. In addition, the framework revision enhances opportunities for programs to contribute more effectively to park planning. A definition of responsibilities in the context of park planning needs will clarify the tasks involved.

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

The following responsibilities are in part drawn from the 2004 Park Planning Program Standards, with additions and updates related to implementing the revised framework:

a. WASO Park Planning Division – overall direction, coordination of reviews, funding, policy development, training
b. Planning Leadership Group – composed of the chief of the Park Planning Division; the regional planning chiefs; the regional associate or deputy directors responsible for park planning; chief of the DSC Planning Division and the branch managers; representatives of several program areas; and one or more superintendents.  Its function is to provide leadership and guidance for the park planning program as a whole.
c. Denver Service Center – completing assigned projects, providing technical support and consulting services project
d. WASO program managers – formulating and advising on NPS management policy; managing servicewide program funds to support the planning and information needs of parks in ways that provide the most benefit for the National Park System as a whole
e. Regional planning offices – responsible for production coordination, relationship with parks, liaison to DSC and other regional programs, portfolio management. **The revised framework introduces a new program-funded, permanent position in each regional planning office.**  The new position is that of **portfolio manager**, who will be the lead regional contact for maintaining park planning portfolios and formulating the assessment of planning needs for units.  Operationally, the national planning fund source will fund this permanent position to reinforce the connection to the national level.  The portfolio manager will add capacity to support servicewide management of the park planning program.
f. Regional directors – ensure that the foundation document and GMP are prepared in consultation with the associate directors and WASO program managers; recommends further consultation with the NPS director and officials in the Department of the Interior on issues that may be of special interest to the director and secretary.
g. Park superintendents – responsible for assuring a commitment to planning among staff; and in collaboration with the regional planning offices, identifying planning needs, prioritizing planning work, and securing funding
h. The superintendent and regional director are accountable for accomplishing planning projects; and ensuring that they are consistent with all legal mandates, NPS management policy, generally accepted preservation standards and practices, and servicewide direction

## C.  PHASES OF PLANNING IN THE FRAMEWORK

*Plans and other supporting products in the planning portfolio can be divided into three parts:*

### Part I of the Planning Portfolio: Foundation Document

#### *The foundation is a baseline for all future planning at the park*
All parks must have a basic understanding of resources and history on which to make management decisions.  The foundation serves as the underlying guidance for all future planning work in the park.  The foundation should be durable and not vary widely over time, with the exception of the assessment of planning needs (discussed below).  The foundation document should also be revisited briefly at the

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

beginning of any new planning project to assure its ongoing relevance and durability, and to guide the project to preserve the core elements of the park.

The park foundation document has been a core element of the park planning program since the 1998 Park Planning Program Standards.  It had typically been undertaken as part of the general management planning process and foundation components were included in the first chapter of the GMP.  The revised framework places the foundation at the core of the planning portfolio, independently of other planning products.  It also expands the scope of the document to include more information that will help parks guide basic decision making and prepare for future planning efforts.  The revised framework complements the NLC's initiative to complete park foundation documents for all units by 2016.

### *Objectives of the foundation*

- Helps focus NPS efforts on protecting the park's most important resources and values before turning to items that are also important but not critical to achieving the park purpose and maintaining park significance
- Provides a basis for ensuring consistency in all park planning and decision making, and for ensuring that all programs and actions contribute to achieving the park's purpose and other mandates
- Provides a means of communicating, via a tangible document, what is most important about a park unit to stakeholders (including NPS employees)
- Describes policy-level condition of resources, threats, and issues facing the park's key resources and values
- Identifies plans that are needed for a park and key issues that need to be addressed
- Serves as the basis for the development/amendment of a GMP and all other plans

### *Components of the foundation document*

Part 1 of the foundation

    A.  Park Atlas
    B.  Description of the Park
    C.  Park Purpose
    D.  Park Significance
    E.  Primary Interpretive Themes
    F.  *Special Mandates and Administrative Commitments
    G.  Identification of Fundamental Resources and Values
    H.  *Identification of Other Important Resources and Values
    I.   Documentation of Information on Fundamental Resources and Values
    J.  *Documentation of Information on Other Important Resources and Values

* Inclusion of the asterisked components should be considered in all foundation documents.  However, they may not be relevant in all cases.  If other important resources and values are identified, documentation must be provided for them.

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

Part 2 of the foundation
    K.  Assessment of Planning and Data Needs
        o  Analysis of fundamental and important resources and values
        o  Identification of key or major issues that need to be addressed in future planning
        o  Identification of planning needs

***Assessment of planning and data needs***
The assessment of planning needs identifies issues and the focused planning solutions needed to address them.  The assessment represents a strategy for park planning, updated periodically, which provides information for building PMIS requests for both pre-planning activities and planning projects.  Data, resource inventories, studies, and similar efforts needed to support a planning project are also identified in the assessment.

The assessment will be undertaken on a regular basis in order to assure that the park's planning needs can be addressed appropriately.  It could also be revisited whenever the park wishes to take on a new planning project or when major conditions change.

***The assessment contributes to regional and systemwide understanding of park planning needs***
Once there is sufficient data from a series of individual assessments, it will be possible to identify trends in planning needs nationally and regionally.  This will provide for a more effective response at the program level.

## <u>Part II of the Planning Portfolio: Decision Plans</u>

<u>Comprehensive plans</u> are those which provide overall direction and guidance on a number of issues in one document.  Comprehensive plans may be undertaken on a park-wide scale, or on a smaller scale, such as for a unit (where the park has multiple units) or for a district, or another distinct area. Comprehensive plans seek to make decisions and therefore typically require compliance. Comprehensive planning also requires civic engagement to be successful at articulating a vision for the future of the planning area.  Examples of comprehensive plans are the congressionally-mandated comprehensive management plans (CMPs) for trails, comprehensive river management plans (CRMPs) for wild and scenic rivers, and GMPs for parks.

A comprehensive plan would be considered current as long as it, when considered with other plans in the portfolio, provides adequate management guidance and meets legal requirements. GMP requirements in the 1978 Parks and Recreation Act could be achieved through a single comprehensive document, as well as through the totality of planning documents containing decisions made at different times that, when taken together, meet law and policy.

<u>Implementation Plans</u> are program or project specific plans that provide direction and guidance for specific geographic or program areas within a park unit.  Examples are fire management plans, transportation plans, wilderness plans, site plans for specific locations, commercial services plans, etc. In producing implementation plans, parks and planners need to take care that the park is not subverting or disguising the need for a comprehensive plan looking at the entire park by completing multiple plans. Some plans will follow sequentially the decisions made in a comprehensive plan; others will be able to

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

stand alone.  As in comprehensive plans, these plans would be considered current as long as they provide adequate management guidance.

Decision plans require the inclusion of the appropriate NEPA pathway.

**Part III of the Planning Portfolio: Strategic Plans**

Strategic Program Plans
These are products which do not seek to make decisions, but provide additional program guidance. These products may be recommended when park management needs more information or general guidance about how to handle particular resources.  The resource stewardship strategy, long range interpretive plan, and visitor use strategy are examples.

**Part IV of the Planning Portfolio: Data and Studies**

Studies/inventories/data collection and analysis
These products provide more information and fill data gaps identified in the needs assessment may be required before any other planning process can take place.  Examples may be a transportation study is required before undertaking an alternative transportation plan, or if a visitor use study is necessary before beginning a backcountry use plan.  Cultural Landscape Inventories or Historic Structure Reports may be crucial elements before site-specific planning can take place.

**D.  COMPARISON OF KEY ASPECTS OF THE REVISED FRAMEWORK TO EXISTING PROGRAM STANDARDS AND GUIDANCE**

*The revised framework reinterprets or emphasizes aspects of existing program standards and guidance and introduces new elements*.  *The revised framework:*
- Confirms the foundation document as a baseline for all future planning and decision-making at the park and as the first step in any planning process.  A park foundation was typically undertaken as part of the general management planning process and foundation components were included in the first chapter of the GMP.  The revised framework places the foundation at the core of the planning portfolio, independently of other planning products.
- Introduces the "Park Planning Portfolio".  Under existing program standards and guidance, the GMP serves as the comprehensive base element for park planning from which a tier or sequence of plans would be developed.  The portfolio is a compilation of individual plan components, in which a comprehensive plan is one element.
- Shifts the program focus from full-scale GMPs as the principle means of meeting the four legislative requirements of general management planning to individual plan components. Implementation guidance will define how the requirements of the 1978 Parks and Recreation Act can be achieved and currency maintained in the absence of a formally produced GMP.
- Articulates that responsiveness to park planning needs can be best met at the regional level and that to promote the needed collaboration and coordination, planning capacity at the region is needed.  Through a key implementation step for enhancing capacity, capacity, a portfolio manager position in each regional planning office will be created.

009651

**NPS Planning Framework**
**Revision Guidance**
**May 30, 2012**

- Adds a new component (Part 2) to the foundation document, the assessment of planning needs, which the park will use to prioritize funding requests and build a planning portfolio, and which will contribute to an understanding of planning needs at the regional level and systemwide.
- Provides direction for developing new opportunities for program integration so as to leverage funds, realize efficiencies, and meet objectives across multiple programs and disciplines; and carries forward the inter-disciplinary approach to park planning that has characterized general management planning.

## E.  IMPLEMENTATION

The following list presents selected topics that will be developed further in implementation.  It includes some, though not all, of the topics identified in this paper.

- Addressing the need for planning documents to better manage both internal and public expectations for funding and implementation.  Plans must create a realistic future for our parks and recognize constraints on federal budgets.
- Development of guidance on facility investments and operating costs in planning projects and a process to review investment decisions as plans are drafted.  A procedure for vetting investment (both capital and non-capital) proposals early in a plan's development is necessary.  Park Planning, Facilities and Lands will lead the development of this guidance using a nationwide, interdisciplinary team.
- Development of criteria and a priority setting process for national program funding, and the creation of a five-year prioritized plan.  The process will be integrated with priority setting at the Regional level and, as appropriate and feasible, with other national programs.
- Definition of the relationship between plan components in a park planning portfolio; and development of guidance on meeting the four legislative requirements of general management planning through individual components.
- As implementation guidance is developed, it will be helpful to see park planning as a cycle in which monitoring and assessment are recurring actions, such as in the following activities:
  1. collect and organize information about the status of the park and its planning documents,
  2. process the information through analysis of data gaps and planning needs,
  3. recommend appropriately scaled plans, studies, or other actions for the nature of the issues at hand,
  4. convene programs, partners, and funding needed to produce plans,
  5. manage plan production to a successful completion,
  6. provide implementation assistance at the completion of plans,
  7. monitor the effects of the action to determine if needs were met and what has changed, and;
  8. continue the planning cycle by integrating new information and reanalyzing planning needs.

009652



# United States Department of the Interior

### NATIONAL PARK SERVICE
1849 C Street, N.W.
Washington, D.C.  20240

IN REPLY REFER TO:

**ELECTRONIC TRANSMISSION – NO HARD COPY TO FOLLOW**

D18 (2501)

**June 4, 2012**

Memorandum

To:             National Leader Council

From:        Associate Director, Park Planning, Facilities, and Lands */s/Victor W. Knox*

Subject:     New Framework for Park Planning

For some time, the National Park Service (NPS) has grappled with the issue of effectiveness, timeliness, and costs associated with General Management Plans (GMPs).  In 2011, the National Leadership Council approved language for the NPS Budget Greenbook under which park planning funds were to be spent on "unit management plans", allowing these funds to be spent on a broad range of park plans, not exclusively on GMPs.  Subsequent to that initial change, the Park Planning and Special Studies Division worked with the nationwide Planning Leadership Group to develop a new NPS planning framework that would address pressing park needs more effectively.  On April 24, 2012, the National Leadership Council Executive Committee (Executive Council) approved a decision memorandum (attached) adopting this new planning framework and a series of implementation steps.

The new planning framework introduces the concept of a park planning portfolio, which is the assemblage of the individual plans, studies and inventories needed to guide park decision- making.  The portfolio can be visualized as a loose-leaf binder, in which particular planning elements can be removed and updated, and new elements added, without revising the entire body of work.  The new portfolio structure encourages the use of targeted, small-scale planning products to meet a broader range of park planning needs more efficiently.  At the same time, comprehensive plans such as GMPs are still a critical piece of the park planning portfolio but will be updated only when their guidance is no longer relevant to current park conditions.  Also attached to this memorandum is a document with background and guidance on the new planning framework.

The basic building block of the park planning portfolio is the Foundation Document, which describes the park purpose, significance, fundamental resources and primary interpretive themes.  Under the new planning framework, park Foundation Documents will be completed separately from GMPs and will form a durable basis for the entire park planning portfolio.  The Foundation Document is accompanied by an assessment of park planning needs to provide direction for developing the overall park planning portfolio and to guide park, regional and national planning priorities.  To move forward with the new planning framework, the NLC has committed to

complete Foundation Documents at all park units by the end of 2016.  Foundation Documents have been already been completed at many parks and others are underway.  A five-year plan to complete park Foundation Documents is being developed and will be available soon.

In the next four to five years, planning program funds will be used to support the Foundation Document initiative and the approximately 50 ongoing GMPs targeted for completion through 2015.  As available, funds will also be used to complete targeted, small-scale planning products to address high-priority park needs.  It is important to note that GMPs will continue to be done under the revised framework, as GMP projects will be undertaken for new units as well as for parks that have identified a GMP revision as a high priority in their assessments of planning needs.

Among the next steps in implementing the revised framework is the development of a priority setting process for national program funding and the creation of a five-year prioritized plan.  The process will be integrated with priority setting at the regional level and, as appropriate and feasible, with other national programs.

A key to success will be to ensure that the regional offices have adequate capacity to implement and manage the new planning program.  The Executive Council decision memorandum recommends the establishment of program-funded "portfolio manager" positions at each Region. The portfolio managers will assist parks in managing their planning portfolios, completing their assessment of planning needs, and identifying funding for high-priority projects.  The park planning program is currently developing a strategy to pay for these positions with existing funds.

The Executive Council decision memorandum also identifies the need for planning documents to better manage internal and public external expectations for plan funding and implementation. Plans must create a realistic future for our parks and recognize constraints on federal budgets. Park Planning, Facilities and Lands will convene a nationwide, interdisciplinary team to develop guidance on addressing facility investments and operating costs in planning projects and recommendations for a process to review investment decisions as plans are drafted.

The park planning program is developing tools to support regions and parks in implementation of the new planning framework.  These include a frequently asked questions document and a series of webinars on topics such as the Foundation Document, the park planning portfolio concept, and preparing Project Management Information System statements to compete for planning funds. Planning program staff are also available to participate in meetings with park and regional office staff to discuss the new planning concepts and implementation steps.

Please contact Patrick Gregerson, Chief of Park Planning and Special Studies, at pgregerson@nps.gov or 202-354-6972 for more information.

Attachments

cc:     Deputy Regional Directors
        Park Planning, Facilities, and Lands Division Chiefs

# National Park Service
# NEPA Handbook



**2015**

009655

009656

# ACRONYMS

| | |
|---|---|
| **ACHP** | Advisory Council on Historic Preservation |
| **CE** | categorical exclusion |
| **CEQ** | Council on Environmental Quality |
| **CFR** | Code of Federal Regulations |
| **DM** | Departmental Manual |
| **DO-12** | Director's Order 12 |
| **DO-75A** | Director's Order 75A |
| **DOI** | Department of the Interior |
| **DEIS** | draft environmental impact statement |
| **EA** | environmental assessment |
| **ECM** | environmental compliance memorandum |
| **EIS** | environmental impact statement |
| **EO** | executive order |
| **EPA** | Environmental Protection Agency |
| **EQD** | Environmental Quality Division |
| **ERM** | environmental review memorandum |
| **ESA** | Endangered Species Act |
| **ESF** | environmental screening form |
| **ESM** | environmental statement memorandum |
| **FEIS** | final environmental impact statement |
| **FONSI** | finding of no significant impact |
| **GMP** | general management plan |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National Historic Preservation Act |
| **NOA** | notice of availability |
| **NOI** | notice of intent to prepare an environmental impact statement |
| **NPOMA** | National Parks Omnibus Management Act of 1998 |
| **NPS** | National Park Service |
| **OEPC** | Office of Environmental Policy and Compliance (Department of the Interior) |
| **PEPC** | Planning, Environment and Public Comment |
| **REC** | regional environmental coordinator |
| **ROD** | record of decision |
| **SOF** | statement of findings |
| **USC** | United States Code |
| **WASO** | Washington Support Office (National Park Service) |

i

ii

# CONTENTS

ACRONYMS ........................................................................................................................ I

HANDBOOK USER'S GUIDE ............................................................................................. 1

**CHAPTER 1: INTRODUCTION TO THE  NATIONAL ENVIRONMENTAL POLICY ACT** ............ 5

1.1    INTRODUCTION ................................................................................................. 5
1.2    LEGAL AND POLICY OVERVIEW ..................................................................... 5

*A.     A Procedural Act* ....................................................................................... 5
*B.     NEPA and the Council on Environmental Quality* ................................... 6
*C.     Department of the Interior NEPA Regulations  and Policies* ................... 7
*D.     National Park Service NEPA Policies and Procedures* ........................... 7

1.3    DETERMINING WHETHER NEPA APPLIES ..................................................... 9

*A.     Actions Requiring NEPA Review* .............................................................. 9
*B.     Actions Exempt from NEPA Review* ....................................................... 11
*C.     Emergency Actions* ................................................................................. 11

1.4    NEPA FUNDAMENTALS ................................................................................... 12

*A.     Characteristics of NEPA Review* ........................................................... 12
*B.     Timing of NEPA Review* ......................................................................... 14
*C.     Specificity and Quality of Data Needed* ................................................ 15

1.5    THE NEPA PATHWAYS ..................................................................................... 16

*A.     Categorical Exclusion for which No Documentation is Required* ........... 16
*B.     Categorical Exclusion for which Documentation is Required* ................ 17
*C.     Environmental Assessment* ................................................................... 17
*D.     Environmental Impact Statement* .......................................................... 18
*E.     Actions that Normally Require an Environmental Impact Statement* ...... 19

1.6    CONSIDERING WHETHER A PROPOSAL HAS THE POTENTIAL FOR SIGNIFICANT IMPACTS ......................................................................................................... 19

**CHAPTER 2: USING EXISTING NEPA ANALYSES** ......................................................... 23

2.1    INTRODUCTION ............................................................................................... 23
2.2    MEMORANDUM TO FILE .................................................................................. 23
2.3    INCORPORATION BY REFERENCE ................................................................. 24
2.4    TIERING .............................................................................................................. 25
2.5    ADOPTING ANOTHER AGENCY'S EXISTING ENVIRONMENTAL ASSESSMENT OR ENVIRONMENTAL IMPACT STATEMENT ....................................................... 26

**CHAPTER 3: CATEGORICAL EXCLUSIONS** ................................................................... 29

3.1    INTRODUCTION ............................................................................................... 29
3.2    CATEGORICAL EXCLUSIONS FOR WHICH NO DOCUMENTATION IS REQUIRED ..... 30
3.3    CATEGORICAL EXCLUSIONS FOR WHICH DOCUMENTATION IS REQUIRED ............ 33
3.4    PROCESS FOR CATEGORICAL EXCLUSIONS REQUIRING DOCUMENTATION ........... 38

iii

3.5    EXTRAORDINARY CIRCUMSTANCES ......................................................... 40
3.6    USE OF CATEGORICAL EXCLUSIONS FOR ONGOING AND RECURRING ACTIONS ... 41


CHAPTER 4: THE NEPA PROCESS FOR ENVIRONMENTAL ASSESSMENTS AND
           ENVIRONMENTAL IMPACT STATEMENTS ....................................................... **43**

4.1    INTRODUCTION ....................................................................................... 43
4.2    SCOPING .................................................................................................. 43

   A.    *Identifying Purpose, Need, and Objectives* ......................................................... 47
   B.    *Defining the Proposed Action (the Proposal)* .................................................... 48
   C.    *Identifying Connected and Similar Actions* ....................................................... 49
   D.    *Identifying Environmental Issues and Impact Topics* ........................................ 50
   E.    *Determining Whether to Retain Issues for Detailed Analysis* .............................. 51

4.3    ALTERNATIVES ......................................................................................... 52

   A.    *Range of Alternatives* ..................................................................................... 52
   B.    *The No-Action Alternative* ............................................................................. 55
   C.    *The Preferred Alternative* .............................................................................. 56
   D.    *The Environmentally Preferable Alternative* .................................................... 57
   E.    *Mitigation* .................................................................................................... 58
   F.    *Adaptive Management* .................................................................................... 58

4.4    DESCRIBING THE AFFECTED ENVIRONMENT ........................................ 60
4.5    IMPACT ANALYSIS .................................................................................... 61

   A.    *Direct Impacts* ............................................................................................... 62
   B.    *Indirect Impacts* ............................................................................................ 62
   C.    *Cumulative Impacts* ....................................................................................... 62

4.6    CIRCULATING ENVIRONMENTAL ASSESSMENTS AND ENVIRONMENTAL IMPACT
       STATEMENTS, SOLICITING PUBLIC COMMENTS, AND RESPONDING TO
       COMMENTS ............................................................................................... 64

   A.    *Circulating an Environmental Assessment and Responding to Comments* ............ 65
   B.    *Circulating an Environmental Impact Statement and Responding to Comments* ... 66

4.7    CONCLUDING THE NEPA PROCESS AND DOCUMENTING A DECISION ..................... 67

   A.    *Environmental Assessments* ............................................................................. 68
   B.    *Environmental Impact Statements* ................................................................... 70

4.8    IMPLEMENTING A DECISION .................................................................. 71

   A.    *Finding of No Significant Impact* ..................................................................... 71
   B.    *Record of Decision* ......................................................................................... 71

4.9    THE DECISION FILE .................................................................................. 71
4.10   SUPPLEMENTS TO DRAFT AND FINAL ENVIRONMENTAL IMPACT STATEMENTS .. 72
4.11   TERMINATING THE NEPA PROCESS PRIOR TO COMPLETION ................................ 73

   A.    *Environmental Assessments* ............................................................................. 73
   B.    *Environmental Impact Statements* ................................................................... 73

4.12   USING CONTRACTORS ............................................................................. 74
4.13   WORKING WITH OTHER AGENCIES AND ENTITIES ................................ 74

   A.    *Lead Agencies* ................................................................................................ 74
   B.    *Cooperating Agencies* ..................................................................................... 75

iv

4.14    INTEGRATING NEPA WITH OTHER ENVIRONMENTAL REVIEW AND
        CONSULTATION REQUIREMENTS ........................................................................ 76

**CHAPTER 5: NPS REVIEW OF EXTERNAL ENVIRONMENTAL REVIEW DOCUMENTS** .......... 81

5.1    INTRODUCTION ............................................................................................................ 81
5.2    DOI AND NPS EXTERNAL ENVIRONMENTAL REVIEW PROCESSES .............................. 81
5.3    COMMENTING ON EXTERNAL ENVIRONMENTAL REVIEW DOCUMENTS ................. 82

*A.*    *Scope of Comments* .............................................................................................. 82
*B.*    *Substance of Comments* ........................................................................................ 82
*C.*    *Commenting on NEPA Documents as a Reviewing Agency* .................................... 83

5.4    REVIEW OF DRAFT VS. FINAL DOCUMENTS .............................................................. 83
5.5    FORMAT OF COMMENTS FOR EXTERNAL ENVIRONMENTAL REVIEWS ..................... 84

**GLOSSARY** ........................................................................................................................ 87

**APPENDIX A: ENVIRONMENTAL ASSESSMENT REQUIRED CONTENT AND ADDITIONAL
        CONSIDERATIONS** ............................................................................................. 91

**APPENDIX B: ENVIRONMENTAL IMPACT STATEMENT REQUIRED CONTENT AND
        RECOMMENDED FORMAT** ................................................................................. 93

vi

# HANDBOOK USER'S GUIDE

This handbook synthesizes the legal and policy requirements and considerations related to the National Environmental Policy Act (NEPA) (42 United States Code (USC) 4321 et seq.) and associated guidance applicable to the National Park Service (NPS). It contains the information necessary to comply with NEPA and conduct sound environmental planning.

This handbook, along with supplemental guidance that will be issued on an as-needed basis to address specific NEPA-related topics, is intended to assist you in carrying out your NEPA responsibilities. The handbook will be maintained electronically; only a limited number of hard copies will be distributed. It will be modified and reissued periodically based on changes to Council on Environmental Quality (CEQ) and Department of the Interior (DOI) regulations and guidance, as well as NPS policy. The most up-to-date version of the handbook can be accessed on the NPS policy website: http://www.nps.gov/applications/npspolicy/DOrders.cfm.

In addition to managing units of the national park system, the NPS administers programs that serve the conservation and recreation needs of the nation but are not directly related to the national park system. Examples include the Land and Water Conservation Fund Grants Program; the Rivers, Trails, and Conservation Assistance Program; and the National Heritage Areas Program. Pursuant to *Director's Order 12: Conservation Planning, Environmental Impact Analysis, and Decision-making* (DO-12), these programs may develop their own program-specific NEPA guidance. However, where other directives or guidelines appear to differ from the information in this handbook, this handbook takes precedence (DO-12, 4.2).

This handbook is intended only to improve the internal management of the National Park Service and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.

**Chapter 1: Introduction to the National Environmental Policy Act** provides a general overview of several aspects of the act, including how NEPA relates to the NPS mission, the circumstances that trigger the need to comply with NEPA, the basic characteristics of a NEPA review, and the methods for documenting compliance with NEPA.

**Chapter 2: Using Existing NEPA Analyses** describes options and procedures for using existing NEPA analyses to meet a proposal's NEPA documentation and analysis requirements, either in full or in part.

**Chapter 3: Categorical Exclusions** provides information about the use of categorical exclusions to meet NEPA review requirements for certain types of NPS actions and the process for applying and documenting categorical exclusions.

1

**Chapter 4: The NEPA Process for Environmental Assessments and Environmental Impact Statements** describes the elements of the NEPA planning and analysis process for environmental assessments and environmental impact statements in detail.

**Chapter 5: NPS Review of External Environmental Review Documents** discusses how the National Park Service provides comments on other agencies' environmental review documents through a formal process required by DOI.

Although this handbook is intended to be comprehensive, it is not an all-inclusive, step-by-step NEPA "cookbook." Therefore, in addition to becoming familiar with this handbook, you are encouraged to pursue opportunities for NEPA training and to seek NEPA-related advice, when needed, from your regional environmental coordinator (REC) and the Environmental Planning and Compliance Branch of the Washington Support Office (WASO) Environmental Quality Division (EQD).

This handbook contains numerous references to NEPA, the CEQ NEPA regulations and *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations* (40 Questions), the DOI NEPA regulations and Departmental Manual (DM), and DO-12. The guidance provided in this handbook is derived primarily from these authorities. The nature of these authorities is discussed in Section 1.1 of this handbook. Although this handbook has been written with these authorities in mind, if a conflict should be found between the handbook and these authorities, the authorities take precedence. These authorities are cited as follows:

> NEPA – The referenced section number is in parentheses: (sec. 101(b))

> CEQ regulations – The referenced section number from 40 *Code of Federal Regulations* (CFR) Parts 1500–1508 is in parentheses: (1500.2)

> 40 Questions – The number of the question referenced is in parentheses: (Q23)

> DOI NEPA regulations – The referenced section number from 43 CFR Part 46 is in parentheses: (46.30)

> Departmental Manual – The referenced chapter from part 516 of the DM is in parentheses as 516 DM followed by the relevant chapter: (516 DM 2)

> Director's Order 12 – The referenced section number from the Director's Order is in parentheses as DO-12 followed by the relevant section: (DO-12, 4.2)

Guidance found in the DOI Office of Environmental Policy and Compliance (OEPC) Environmental Statement Memorandum (ESM) series is also incorporated throughout the handbook.

This handbook uses the pronoun "you" to address the reader. While the guidance in this handbook is intended for use by NPS personnel, it may be consulted by other

agencies, tribal representatives, applicants, contractors, and members of the public who are involved with the NPS NEPA process.

The "NEPA process" refers to all measures taken in order to meet NEPA-related legal and policy requirements associated with a particular NPS action. The term "NEPA review" is used to refer to the process, analyses, and documents developed under NEPA to inform a decision. "NEPA document" generally refers to an environmental assessment (EA) or environmental impact statement (EIS), and can also refer to documentation that is prepared for a categorical exclusion (CE).

The terms "must" and "should" appear throughout this handbook. "Must" is used in association with requirements imposed on the NPS by law, regulation, or policy. "Should" is used in association with instructions that are not explicitly required by law, regulation, or policy, but are "best practices" to be followed in most cases, and are intended to help ensure that NPS NEPA practice meets both the letter and spirit of NEPA-related requirements. The same is true for references to "standard" and "recommended" NPS NEPA practices. You are encouraged to consult with your REC if you have questions about any particular requirements or instructions.

As with the CEQ regulations (1508.8), this handbook uses the terms "impact" and "effect" interchangeably. When the term "resource" or "environmental resource" is used, it should be understood to mean an element of the human environment. The human environment includes the natural and physical environment and the relationship of people with that environment (1508.14).

> *The terms "must" and "should" appear throughout this handbook. "Must" is used in association with requirements imposed on the NPS by law, regulation, or policy. "Should" is used in association with instructions that are not explicitly required by law, regulation, or policy, but are "best practices" to be followed in most cases, and are intended to help ensure that NPS NEPA practice meets both the letter and spirit of NEPA-related requirements.*

009665

4

# CHAPTER 1: INTRODUCTION TO THE NATIONAL ENVIRONMENTAL POLICY ACT

## 1.1    INTRODUCTION

The NEPA process is intended to, "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment" (1500.1). The stated purposes of NEPA include (42 USC 4321):

- declaring a national policy which will encourage productive and enjoyable harmony between man and his environment;

- promoting efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man;

- enriching the understanding of the ecological systems and natural resources important to the Nation; and

- establishing the Council on Environmental Quality.

The purposes of NEPA and the mission of the NPS express very similar goals. Both contain language designed to result in the conservation and protection of our nation's resources for the benefit of future generations.

This chapter provides a general overview of several aspects of NEPA, including the circumstances that trigger the need to comply with NEPA, the basic characteristics of a NEPA review, and the methods for documenting compliance with NEPA. The sections discussing these topics are:

1.2 Legal and Policy Overview
1.3 Determining Whether NEPA Applies
1.4 NEPA Fundamentals
1.5 NEPA Pathways
1.6 Considering Whether a Proposal has the Potential for Significant Impacts

## 1.2    LEGAL AND POLICY OVERVIEW

### A.    A Procedural Act

NEPA includes the declaration of a national policy that encourages harmony between human beings and the environment and the promotion of efforts to prevent or eliminate environmental harm. As a means of furthering its purposes, it requires federal agencies to fully consider the impacts of proposals that would affect the human environment prior to deciding to take an action. NEPA also requires federal agencies to involve the interested and affected public in decision-making processes.

NEPA is a "procedural" or process-oriented law rather than a "substantive" or substance-oriented one. It defines a process that federal agencies must follow when

5

009667

proposing to take actions that have environmental impacts. NEPA does not, however, dictate what decision an agency must make with regard to actions affecting the environment. If meeting an agency's goal requires taking actions with adverse environmental impacts, even severe ones, such actions are not prohibited under NEPA.

### Relationship to Decision-making

Although NEPA is purely a procedural statute, it is important to note that the NPS Organic Act, which is a substantive statute, and NPS *Management Policies 2006*, which set forth the NPS interpretation of the Organic Act, prohibit the NPS from taking any action that would result in impairment of park resources or values (NPS *Management Policies 2006,* 1.4.4). Furthermore, while the NPS has discretion to allow adverse impacts, NPS managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values (NPS *Management Policies 2006*, 1.4.3). The conclusions regarding impacts to park resources and values that are reached during the NEPA process are used by NPS managers when making decisions about NPS-administered resources, including when assessing whether or not an action would result in impairment to park resources. A written non-impairment determination for the selected action must be appended to each finding of no significant impact (FONSI) and record of decision (ROD) (NPS *Management Policies 2006*, 1.4.3; *NPS Guidance for Non-Impairment Determinations and the NEPA Process*)[1].

## B.      NEPA and the Council on Environmental Quality

When NEPA was signed into law in 1970, it created the White House Council on Environmental Quality, part of the Executive Office of the President, to be the "caretaker" of NEPA. In 1978, CEQ promulgated regulations (40 CFR 1500–1508) that apply to all federal agencies and that provide instruction to agencies regarding compliance with the procedural requirements of NEPA. To elaborate on its regulations, CEQ periodically issues NEPA guidance, most notably the *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, published in 1981. In recent years, CEQ has issued guidance on a number of NEPA-related topics, including the establishment and use of CEs, use of mitigation, use of programmatic NEPA reviews, and improving the process for preparing timely and efficient NEPA reviews. This guidance is available on the CEQ website.

CEQ also oversees federal agency implementation of NEPA and CEQ regulations; provides assistance in developing environmental policies and proposed legislation as requested by the president; consults with federal agencies regarding legislation and litigation; mediates interagency disputes; acts on referrals to CEQ; and interprets NEPA and CEQ regulations for agencies and citizens.

---

[1] NPS program activities unrelated to managing units of the national park system are not subject to the provisions of the Organic Act or NPS Management Policies 2006 (DO-12, 2; Management Policies 2006, Introduction). Therefore, a written non-impairment determination is not required for actions related to those programs unless an action would have environmental effects on an NPS unit.

6

### C.    Department of the Interior NEPA Regulations and Policies

The CEQ regulations direct federal agencies to "implement procedures to make the NEPA process more useful to agency decision makers and the public" (1500.2; 1507.3). In 2008, DOI promulgated regulations (43 CFR Part 46) to establish procedures applicable to DOI bureaus and offices for complying with NEPA. The DOI NEPA regulations supplement, and are intended to be used in conjunction with, the CEQ regulations. DOI provides further guidance on NEPA implementation in Part 516, chapters 1–4, of the DM. Additionally, DOI OEPC provides NEPA-related information and explanatory guidance in its ESM series.

Most of the requirements found in the DOI NEPA regulations and policies are included in this handbook. If an issue is addressed by the DOI regulations or policies but is not addressed in this handbook or some other NPS policy, you should consult with your REC in order to determine the best way to comply with the DOI regulations and policies.

#### Departmental Manual Chapter 12, Part 516

516 DM 12 provides supplementary requirements for implementing the DM that are specific to the NPS. It delegates certain responsibilities related to NEPA and establishes actions that normally require preparation of an EIS and NPS-specific CEs.

### D.    National Park Service NEPA Policies and Procedures

#### Director's Order 12 and Accompanying Handbook

*Director's Order 12: Conservation Planning, Environmental Impact Analysis, and Decision-making* sets forth the policy and procedures by which the NPS will comply with NEPA and assigns the roles and responsibilities of NPS organizations and employees for carrying out NPS NEPA obligations. This DO-12 Handbook provides an overview of the legal and policy framework that the NPS uses to implement NEPA. Taken together, DO-12, the handbook, and the supplemental guidance will help you meet the requirements of NEPA. If you have additional questions after reviewing these sources, you should consult your REC.

#### Roles and Responsibilities

As set forth in DO-12, Section 5:

**The Associate Director for Natural Resource Stewardship and Science** is responsible for issuing and updating procedures for implementing DO-12 and for working with others to ensure training, technical assistance, and other resources are available to implement the requirements of DO-12.

**The WASO Environmental Quality Division** is the servicewide focal point for NEPA-related matters and other related environmental mandates. The division provides technical assistance to parks and regions, coordinates NPS review of EAs and EISs prepared by other agencies, and provides policy review and clearance for EISs on a case-by-case basis.

7

**Regional Directors** are responsible to the NPS Director for integrating the NEPA process into all regional activities and for NEPA planning in their regions. Regional directors are specifically responsible for:

- accepting or rejecting requests for the NPS to be a cooperating or joint lead agency on another agency's EA or EIS;

- approving EAs for public release and signing FONSIs;

- approving most EISs for public release and signing most RODs[2] ; and

- approving emergency actions that would normally require an EA or an EIS [*See Section 1.3 C: Emergency Actions.*]

**Regional Environmental Coordinators,** subject to the direction of the regional director, are responsible for:

- having functional oversight responsibility for all environmental compliance activities within a given region;

- in most cases, serving as the point of contact with the Washington Office and Department of the Interior offices, such as the Office of the Solicitor, on significant environmental issues;

- providing policy review for all NPS NEPA documents within their region;

- coordinating review of non-NPS environmental documents for the region; and

- serving as a resource to other NPS professionals for understanding the various environmental requirements under which the NPS operates.

**Park Superintendents** are responsible for day-to-day implementation of NEPA for activities related to parks under their administration, which includes the following:

- designating a park resource specialist (or other park employee with the appropriate background and training) to serve as coordinator for NEPA and related impact analysis activities;

- ensuring that within-park actions are adequately analyzed, an adequate range of alternatives is considered, and the public and other agencies are appropriately involved;

- ensuring that ample resource information appropriate to a decision is available, and the technical and scientific studies appropriate to analyze proposed actions are conducted;

- approving actions that fall under established NPS CEs;

- approving emergency actions that would normally require a CE [*See Section 1.3 C: Emergency Actions.*];

- recommending EAs, EISs, FONSIs, and RODs for approval by the regional director;

---

[2] The Director retains signature and approval authority for proposals of nationwide application and may assume signature and approval authority for any proposal that is unusually controversial or that involves major policy issues.

- ensuring that resource conflicts and allocations are adequately resolved before projects are implemented;

- ensuring that all actions approved under a FONSI or ROD are implemented;

- ensuring that mitigation measures are included in projects once they are approved (this means ensuring mitigation measures committed to in a FONSI or ROD are implemented);

- emergency actions that would normally require a CE; and

- ensuring that park comments on external project proposals are consistent with NPS guidelines for review of non-NPS NEPA documents.

**Park Resource Specialists**, subject to the direction of the superintendent, are responsible for:

- having knowledge of existing technical and scientific information on park resources and the quality of such information;

- identifying additional resource information needs and technical and scientific studies necessary to ensure that ample resource information appropriate to analyze proposed actions is available;

- serving as park NEPA coordinator to facilitate conservation planning and impact analysis (this role could also be filled by another park employee who is not a resource specialist);

- having knowledge of impact analysis processes and procedures;

- working with the park superintendent and other park staff to ensure consideration of potential resource impacts in park proposals; and

- working with contracting officers to ensure that mitigating measures identified in environmental documents are included in the subsequent contract documents implementing projects.

**Project Managers and Contracting Officers** are responsible for working with park staff to ensure that mitigation measures and other items identified in environmental documents to provide for resource protection are included in the subsequent documents implementing projects.

## 1.3   DETERMINING WHETHER NEPA APPLIES

This section provides the background you need to determine if a proposed NPS activity is subject to or exempt from NEPA review. It also provides specific guidance on how to comply with the procedural requirements of NEPA when you must take an action in response to an emergency.

### A.   Actions Requiring NEPA Review

Regardless of the nature of the action, the first consideration when determining if the NPS must undertake a NEPA review is to assess whether or not the procedural requirements of the act are triggered.

NEPA applies to a broad range of federal actions, which include (1508.18(b)):

1. Adoption of official policy such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 USC 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies that will result in or substantially alter agency programs.

2. Adoption of formal plans, such as official documents prepared or approved by federal agencies, which guide or prescribe alternative uses of federal resources on which future agency actions will be based.

3. Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

4. Approval of specific projects, such as construction or management activities, located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

Whether or not NEPA applies depends on the extent to which the NPS exercises control and responsibility over a proposed action and whether NPS funding or approval is necessary to implement it. The greater the NPS control and responsibility, or degree of NPS funding required to implement an action, the more likely it is that NEPA would apply. In instances where the NPS provides funding with no control over the expenditure of funds by the recipient, NEPA does not apply (46.100).

Examples of the types of actions described above that would trigger NEPA include:

- promulgation of a special regulation;

- approval or adoption of plans whose implementation would result in environmental impacts such as a general management plan, fire management plan, or wildlife management plan;

- construction of a visitor contact station or trail system;

- building and road maintenance activities;

- issuance of commercial use authorizations or special use permits;

- approval of National Heritage Area management plans; and

- approval of specific actions for funding on non-NPS lands, such as providing grants, when NPS has control over how the funds will be spent.

Although the level of documentation and analysis required for these examples would vary, some level of NEPA review—CE, EA, or EIS—would be required for all of these actions.

In addition to new projects and programs, "continuing activities" are also subject to NEPA's procedural requirements (1508.18). For continuing activities, the procedural requirements of NEPA are triggered if the NPS is affirmatively making a decision to

10

continue an activity subject to NEPA and for which either a NEPA review was never conducted or for which the documentation produced by a previous NEPA review is inadequate or outdated.

If you have questions regarding whether a proposed action triggers the procedural requirements of NEPA, you should consult with your REC.

## B.   Actions Exempt from NEPA Review

Some actions are exempt from NEPA review; however, such instances are rare. If you believe a particular action or proposal may be exempt from NEPA review, you should consult with your REC. Furthermore, whenever you are interpreting legislation to determine whether an action is exempt from NEPA, you should seek advice from the DOI Office of the Solicitor.

### Actions Exempted by Statute

Some actions are specifically exempted from NEPA compliance by Congress. In such instances, the exemption is applicable only to the specific action or actions addressed in the relevant statutory language.

### Actions Required by Statute

Sometimes the NPS is required by law to take or allow a specific action. The question of whether NEPA applies to a statutorily required action hinges largely on the level of decision-making discretion retained by the NPS in carrying out the action. If the law essentially removes all NPS decision-making discretion with regard to the action, NEPA likely does not apply. However, if the NPS maintains some level of discretion regarding how a required action is carried out, NEPA likely would apply. For instance, several national park system units have enabling legislation that requires them to allow hunting pursuant to state law, and authorizes them to enact certain types of restrictions (to protect park resources and values, or for other reasons). In such cases, a NEPA review is not required to allow hunting consistent with state law since hunting has been mandated by Congress. However, NEPA would be triggered if the unit were to implement restrictions on hunting beyond those included in state law, because setting restrictions on hunting is a discretionary activity that is authorized, but not mandated, in the enabling legislation.

## C.   Emergency Actions

Actions taken in response to an emergency are not exempt from NEPA review. However, the CEQ and DOI NEPA regulations provide procedures for taking emergency response actions, when necessary, without first completing a NEPA review. If an emergency exists, you may take immediate actions that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources (46.150). When taking an emergency action, the environmental impacts of the response actions must be mitigated to the extent practicable (46.150(a)). If you believe there is an emergency situation, you should consult with EQD through your REC as soon as possible.

As set forth in the DOI NEPA regulations, the Responsible Official determines whether an emergency exists (46.150). For emergency actions that would normally require an EA or EIS, the Responsible Official is the regional director. For emergency

*For emergency actions that would normally require an EA or EIS, the Responsible Official is the regional director. For emergency actions that typically would be covered by a CE, the Responsible Official is the superintendent.*

actions that typically would be covered by a CE, the Responsible Official is the superintendent. The Responsible Official is required to document in writing that an emergency exists and describe the actions taken in response to the emergency (46.150(b)).

Follow-up actions that are taken in response to an emergency, but that are beyond the scope of actions needed to control immediate harm to life, property, or resources presented by the emergency, are subject to the normal NEPA process. However, if you believe that the follow-up actions must be taken before a NEPA review can be completed, alternative arrangements for complying with NEPA may be granted by DOI in cases where follow-up actions would normally require an EA, and by CEQ in cases where the follow-up actions would normally require an EIS. You are required to coordinate consultations for alternative arrangements through WASO (46.150(c)). To do so, contact EQD through your REC. EQD will facilitate consultations with DOI OEPC who, in turn, will facilitate discussions with CEQ when necessary. [*For more information on emergency actions and details regarding the process for requesting alternative arrangements, see supplemental guidance: Complying With NEPA When Taking Emergency Actions; see also ESM 13-3: NEPA Compliance in Emergency Situations*.]

## 1.4   NEPA FUNDAMENTALS

### A.   Characteristics of NEPA Review

NEPA reviews that follow both the letter and spirit of the law display several key characteristics:

#### *Part of Planning and Decision-Making*

Within the NPS, planning takes place on many different levels. NEPA is the environmental analysis component of agency planning (NPS *Management Policies 2006*, 2.3). While various aspects of planning may take place prior to initiating the NEPA process, the appropriate level of NEPA review must be completed before the NPS takes an action that has the potential to affect the quality of the human environment. The CEQ regulations direct agencies to "integrate the NEPA process with other planning at the earliest possible time to ensure that planning and decisions reflect environmental values" (1501.2). [*See Section 1.4 B: Timing of NEPA Review.*]

#### *Part of a Public Process*

Public involvement is a key component of the NEPA process. The CEQ regulations require agencies to "encourage and facilitate public involvement" to the fullest extent possible in making decisions that would have environmental impacts and to make diligent efforts to involve the public in the NEPA process (1500.2(d); 1506.6(a)). Though you should always seek ways to involve the interested and affected public in the NEPA process, the type and extent of public involvement will vary depending on the nature of a proposed action, its impacts, the degree to which the public is interested and affected, and the level of NEPA review. As set forth in *Director's Order 75A: Civic Engagement and Public Involvement* (DO-75A), NPS decision makers are required to plan early for appropriate opportunities for public

involvement when decisions are made for actions or policies that will significantly affect or interest the public.

### Based on an Interdisciplinary Approach

NEPA requires the use of an "interdisciplinary approach" in planning and decision-making (sec. 102(2) (A)). This interdisciplinary approach is meant to ensure that information from a variety of appropriate disciplines, including the natural and social sciences and cultural resources, is integrated into the analysis and decision-making process (1502.6). When conducting NEPA reviews, you should encourage the participation of specialists from a variety of backgrounds who can contribute their relevant expertise. Members of an interdisciplinary team can come from park and other NPS offices and could also include contractors and individuals from other federal, state, and local government agencies.

The requirement to use an interdisciplinary approach does not mean that you must assemble a large group of specialists for every NEPA review. It means that the information you use as the basis for your decision comes from the appropriate disciplines and covers the scope of analysis and the issues to be examined. Even for simple actions with limited NEPA review, there should be some degree of interdisciplinary involvement in the process. One convenient way of gathering input from interdisciplinary team members without the need for in-person meetings is to use the NPS Planning, Environment, and Public Comment (PEPC) system.

*Even for simple actions with limited NEPA review, there should be some degree of interdisciplinary involvement in the process.*

### Inclusive

NEPA requires analysis and disclosure of the impacts an agency's actions would have on the human environment. The CEQ regulations define human environment as "the natural and physical environment and the relationship of people with that environment" (1508.14). In addition to evaluating the impacts of an action on natural and cultural resources, agencies must evaluate social and economic impacts of that action when they are interrelated with natural or physical environmental effects. It is important to note, however, that the CEQ regulations state that social or economic impacts, by themselves, are not intended to require preparation of an EIS (1508.14). This means that when an action would cause significant adverse impacts only in relation to socioeconomic concerns and not to any other part of the human environment, an EIS is not required. [*See Section 1.6: Considering Whether a Proposal has the Potential for Significant Impacts.*]

Agencies are required to consider direct, indirect, and cumulative impacts and connected and similar actions during a NEPA review (1508.25) and are specifically prohibited from segmenting projects. "Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action" are to be evaluated in a single NEPA document (1502.4).

### Focused and Concise

Although NEPA imposes numerous procedural and documentary requirements on federal agencies, the CEQ regulations direct agencies to prepare NEPA documents that are "concise, clear, and to the point" (1500.2(b)). NEPA reviews should focus on important environmental issues and avoid "amassing needless detail" (1500.1(b)). Although it can be challenging to produce a focused analysis, CEQ has stated,

*The CEQ regulations direct agencies to prepare NEPA documents that are "concise, clear, and to the point" (1500.2(b)).*

"NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action" (1500.1(c)).

Environmental analysis should focus on significant issues (meaning pivotal issues, or issues of critical importance), discussing insignificant issues only briefly (1500.4(c)). Impacts should be discussed in proportion to their significance, and if the impacts are not deemed significant there should be only enough discussion to show why more study is not warranted (1502.2(b)). EAs and EISs should be written in plain language so that decision makers and the public can understand them (1502.8). Scoping, incorporation by reference, and integrating other environmental analyses are additional methods that may be used to avoid redundant or repetitive discussion of issues (1500.4). [*See Section 2.3: Incorporation by Reference, Section 2.4: Tiering, and Section 4.2: Scoping; see also supplemental guidance: Writing Impact Analysis Sections for EAs and EISs, and supplemental guidance: Preparing Focused and Concise EAs.*]

### Objective and Science-Informed

To support excellent decision-making, the NEPA process must be objective. The CEQ regulations require the use of "high quality" information during the NEPA process (1500.1(b)) and require agencies to ensure the professional and scientific integrity of information and analyses used in the NEPA process (1502.24). If you rely on the professional judgment of a specialist or expert, this judgment should be based on data, education, or experience and should be substantiated with literature or other experts' opinions. [*See Section 1.4 C: Specificity and Quality of Data Needed.*]

### Ultimately Site Specific

NEPA reviews may address broad actions such as adoption of a policy or program, or very specific ones like building a new visitor contact station at a park. The analysis contained in a NEPA document will vary in specificity according to the nature of the proposal being analyzed. However, before implementing any action, environmental effects must be analyzed in "adequate detail" so as to inform decision making (1501.2(b)). For site-specific actions, this means site-specific detail. Depending on the situation, it may be appropriate to conduct a programmatic NEPA review in order to provide a basis for a broad decision and a later, site-specific NEPA review to provide a basis for implementing a particular component of that decision. This step-wise approach to planning and compliance is called "tiering" (1508.28; 46.140).

For example, adoption of a general management plan (GMP) may be a broad-based decision informed by a NEPA review that is often correspondingly broad. However, implementation of a particular action called for in a GMP such as construction of a visitor contact station, will often require an additional, site-specific NEPA review that is tiered from the GMP. [*See Section 1.4 C: Specificity and Quality of Data Needed, and Section 2.4: Tiering.*]

## B.   Timing of NEPA Review

The CEQ regulations state that agencies must apply NEPA early in the planning and decision-making process (1501.2). The NEPA process should begin when the NPS has a goal for which it is actively preparing to make a decision and has developed a proposal to the point where its environmental impacts can be meaningfully analyzed

(1508.23; 46.100(b)). This means that you do not need to begin the NEPA process if your park unit or program is examining the feasibility of taking an action. For instance, if your park unit is considering whether to prepare a wildlife management plan, you should consider the feasibility of adopting and implementing such a plan and whether NPS policies would support such an action before beginning a NEPA review.

You may meet with interested parties prior to initiating the NEPA process to gather input on a proposed action, the purpose and need for taking action, and other issues. In some cases, such interactions can be useful in determining whether to move forward with a proposal. [*See Section 4.2 B: Defining the Proposed Action; see also DO-75A: Civic Engagement and Public Involvement.*] As set forth in DO-75A, parks and programs should engage in continuous, ongoing civic engagement outside of the NEPA process in order to reinforce the commitment of both NPS and the public to the preservation of heritage resources, both cultural and natural, and strengthen public understanding of the full meaning and contemporary relevance of these resources (DO-75A, V).

*You may meet with interested parties prior to initiating the NEPA process to gather input on a proposed action, the purpose and need for taking action, and other issues. In some cases, such interactions can be useful in determining whether to move forward with a proposal.*

Determining when to begin a NEPA process can be difficult. You must start early enough to ensure that all steps of the NEPA process are finished "so that it can serve practically as an important contribution to the decision-making process" and to ensure that the process is not "used to rationalize or justify decisions already made" (1502.5). However, a NEPA review should begin only after a proposed action is developed. [*See Section 4.2 B: Defining the Proposed Action.*]

Although the NEPA process will not begin until you have developed a proposed action, you should begin considering requirements related to NEPA as soon as you determine you may need to take an action because in many cases it is necessary to gather data or to conduct feasibility studies or other analyses prior to beginning a NEPA review. These activities often take a considerable amount of time but can be invaluable in defining a realistic goal or proposal and ensuring there is sufficient data to complete impact analyses. Depending on the level of complexity, controversy, and availability of data, funding and staff time, the NEPA process can take a number of years to complete, so it is important to consider many factors when addressing timelines for making decisions.

Developing and putting forth a proposed action is necessary to the NEPA process and is not pre-decisional. [*See Section 4.2 B: Defining the Proposed Action.*] However, you may not take an action that is the subject of a NEPA review or that would limit the choice of alternatives until the NEPA process is complete (1506.1). Put another way, agencies may not commit resources that prejudice the selection of alternatives before completing the NEPA process (1502.2(f)). To do so would be pre-decisional. For example, if your proposed action is to build a visitor contact station, you may not begin construction or any related work on a construction site until the NEPA review is complete and a decision document is signed.

### C.    Specificity and Quality of Data Needed

The CEQ regulations require information of "high quality" and professional integrity (1500.1; 1502.24). The National Parks Omnibus Management Act of 1998 (NPOMA)

states that park management generally should be guided by "the highest quality science and information" and requires the NPS to use the results of scientific study when considering management decisions pertaining to national park system units (54 USC 100702, 100706).

The specificity of data needed for analysis will vary according to the nature of the action. For actions of a more programmatic or broad nature, such as development of a parkwide facilities management plan, the NEPA review and the data on which it is based may be correspondingly broad. For site-specific projects such as construction of a new picnic area or rehabilitation of a parking lot, the data on which analyses are based should be correspondingly specific.

Ultimately, you must be able to carry out a meaningful analysis of impacts based on the available data in order to support a decision to take an action. Analyses should be substantiated by information included in the decision file, and peer review should be used when appropriate. [*See Section 4.9: The Decision File; see also supplemental guidance: Compiling a Decision File for NEPA Reviews*.] If there are key uncertainties regarding the environmental effects of an action under consideration, an adaptive management approach should be used when appropriate (46.145). [*See Section 4.3 F: Adaptive Management*.]

In cases where you have no data or poor quality data, you are required to obtain additional information that is "relevant to reasonably foreseeable significant adverse impacts," if it is "essential to a reasoned choice among alternatives," and if "the overall costs of obtaining it are not exorbitant" (1502.22(a)). The costs of obtaining additional information are measured not only in money, but also in time (to complete a research study or survey, for instance).

If essential information is unavailable or if the costs of obtaining it are exorbitant, an EIS must include statements to inform the public of this lack of information and its effect on the ability of the NPS to predict environmental impacts. When information cannot be obtained, existing credible scientific evidence must be summarized and the impact predicted based on this evidence (1502.22(b)). When preparing an EA, you should take the same approach. Lack of data can be an important consideration when preparing an EA because if you do not have enough reliable data to support a finding at the conclusion of the EA process that there will be no significant adverse impacts as a result of implementing the selected action, an EIS will need to be prepared.

## 1.5   THE NEPA PATHWAYS

The NPS uses four pathways, or levels of analysis and documentation, to comply with NEPA. A brief description of each pathway is included below. More detailed information about the pathways can be found in Chapters 3 and 4.

### A.   Categorical Exclusion for which No Documentation is Required

This pathway is applicable to actions that have been found to have no potential for significant environmental impacts under ordinary circumstances and whose potential for environmental impacts of any kind is so minimal the NEPA review does

not require formal documentation. The source of these CEs is the DOI NEPA regulations; they apply to all DOI bureaus (46.215). [*See Section 3.2: Categorical Exclusions for which No Documentation is Required.*]

### B.  Categorical Exclusion for which Documentation is Required

This pathway is applicable to actions that have been found to have no potential for individual or cumulative significant environmental impacts under ordinary circumstances, but whose potential for environmental impacts warrants some level of analysis and formal documentation. The source of these CEs is the NPS-specific chapter of the DM (516 DM 12). [*See Section 3.3: Categorical Exclusions for which Documentation is Required.*]

### C.  Environmental Assessment

This pathway is applicable to a variety of situations. Although an EA was originally envisioned as a tool for determining whether to prepare an EIS and is still used this way in some instances, in most cases the EA has become a distinct pathway. An EA is a means for documenting compliance with NEPA and assisting in the planning and decision-making process when a CE is not appropriate but an EIS is not necessary.

Any of the following indicates a need to prepare an EA:

- the proposal has no applicable CE, is not an action that normally requires preparation of an EIS, and is unlikely to result in significant adverse environmental impacts;

- the proposal has an applicable CE but may trigger an extraordinary circumstance (46.205) [*See Section 3.5: Extraordinary Circumstances.*]; or

- it is unknown whether the proposal would result in significant adverse environmental impacts (i.e., the preparation of the EA is to determine whether an EIS is necessary).

In addition to the circumstances above, an EA may be prepared when it would assist with or inform agency planning and decision-making (1501.3(b); 46.300(b)).

It is important to understand some fundamental differences between EAs and EISs in order to prevent the EA document and process from simply becoming an "EIS in disguise." An EIS is meant to be a "detailed written statement" on the environmental impacts of major actions significantly affecting the environment (1508.11). Its fundamental purpose is to promote detailed consideration and disclosure of the environmental costs and benefits of a proposal.

An EA, on the other hand, while still analytical and explanatory, is meant to be a "brief" and "concise" document at a level of detail limited to that necessary to demonstrate that the proposal would not result in significant environmental impacts (1508.9; 46.310(e)). It should be kept brief by carefully developing the scope to identify pivotal issues; focusing discussions and analysis on the relevant issues and dismissing issues that are not meaningful to the decision; discussing impacts in proportion to their importance; and using tiering and incorporation by reference techniques, when appropriate, to minimize bulk. You should strive to keep an EA to no more than 50 pages, and closer to 15 pages when you are preparing an EA for

*An EA should be kept brief by carefully developing the scope to identify pivotal issues; focusing discussions and analysis on the relevant issues and dismissing issues that are not meaningful to the decision; discussing impacts in proportion to their importance; and using tiering and incorporation by reference techniques, when appropriate, to minimize bulk.*

situations where you are reasonably sure there is no potential for significant adverse impacts (such as when there is an activity that has minimal impact but does not fit within any established CEs). On the other hand, an EA may be longer than 50 pages where the issues involved are controversial or very complex (assuming, of course, there is still no potential for significant adverse impacts that would trigger the need for an EIS). In all cases, the length of an EA should be sufficient to demonstrate that NPS has taken a hard look at the environmental impacts of the proposed action and any alternatives.

[*For more information, see Section 2.3: Incorporation by Reference, and Section 2.4: Tiering; see also supplemental guidance: Preparing Focused and Concise EAs, supplemental guidance: Writing Impact Analysis Sections for EAs and EISs, and CEQ guidance: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act. For information on the required content for an EA, see Appendix B: Environmental Assessment Required Content and Additional Considerations.*]

### D.   Environmental Impact Statement

This pathway is applicable to proposals that could result in significant adverse environmental impacts. An EIS is a detailed written statement required by Section 102(2)(C) of NEPA (1508.11).There are several circumstances that indicate an EIS is the appropriate NEPA pathway:

- the proposal is designated by the NPS as an action normally requiring preparation of an EIS;

- the proposal is expected to or has the potential to result in significant adverse environmental impacts;

- there is incomplete or unavailable information to the extent that a FONSI cannot be supported [*See Section 4.7: Concluding the NEPA Process and Documenting a Decision.*];

- there is a high degree of controversy over the environmental impacts of a proposed action [For more information on controversy, see Section 1.6: Considering Whether a Proposal has the Potential for Significant Impacts.]; or

- an EIS is legislatively or judicially mandated.

You should strive to keep an EIS to no more than 150 pages, and for proposals of unusual scope or complexity to less than 300 pages (1502.7). As with EAs, you should carefully develop the scope to identify pivotal issues; focus discussions and analysis on the relevant issues and dismiss issues that are not meaningful to the decision; discuss impacts in proportion to their importance; and use tiering and incorporation by reference techniques, when appropriate, to minimize bulk.

[*For more information, see Section 2.3: Incorporation by Reference, and Section 2.4: Tiering; see also Writing Impact Analysis Sections for EAs and EISs, and CEQ guidance: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act. For information on the required content for an*

*EIS, see Appendix B: Environmental Impact Statement Required Content and Recommended Format.]*

### E. Actions that Normally Require an Environmental Impact Statement

The CEQ regulations require that agencies designate actions that normally require preparation of an EIS (1507.3(b)(2)(i)). For the NPS, an EIS is normally required for the following types of actions (516 DM 12):

- proposals to designate Wild and Scenic Rivers, National Trails, or Wilderness;

- GMPs for major national park system units;

- grants, including multi-year grants whose size and/or scope will result in major natural or physical changes, including interrelated social and economic changes and residential and land use changes within the project area or its immediate environs; and

- grants which foreclose other beneficial uses of mineral, agricultural, timber, water, energy, or transportation resources important to national or state welfare.

While the actions listed above normally require preparation of an EIS, an EIS is not required in every case. If you are able to document that there is no potential for significant adverse impacts as a result of implementing one of those actions, you may prepare an EA. However, if you prepare an EA for an action that normally requires an EIS, you must make the FONSI available for public review for 30 days prior to making a final determination whether to prepare an EIS and may not implement the selected action until after the 30-day period has passed (1501.4(e)(2)).

It is important to note that *NPS Management Policies 2006* require an EIS to be prepared for wilderness studies that will result in recommendations for designation, and therefore a waiver from that requirement would need to be obtained in order to prepare an EA rather than an EIS for such studies (NPS *Management Policies 2006*, 6.2.2). NPS *Management Policies 2006* also state that in most cases an EIS will be prepared for GMPs, but provide for a regional director to approve an exception to that general rule after consulting with EQD through the Associate Director, Natural Resource Stewardship and Science when: (1) scoping indicates there is no public controversy concerning environmental effects; and (2) preliminary impact analysis clearly indicates there is no potential for significant impacts from any alternative under consideration (NPS *Management Policies 2006*, 2.3.1.7).

## 1.6   CONSIDERING WHETHER A PROPOSAL HAS THE POTENTIAL FOR SIGNIFICANT IMPACTS

The concept of significance is central to NEPA reviews. If an action has the potential to result in significant adverse impacts and applying mitigation measures cannot ensure that significant adverse impacts will be avoided, an EIS must be prepared. Although evaluation of significance often relies on subjective judgment, the CEQ

*Although evaluation of significance often relies on subjective judgment, the CEQ regulations require that evaluations of significance consider both an impact's context and intensity (1508.27).*

regulations require that evaluations of significance consider both an impact's context and intensity (1508.27).

### Context

An impact's significance is influenced by the importance of the resource or value being impacted, the geographic location and timing, and other relevant factors that provide context for more fully understanding the severity of the impact. For example, a ground disturbance that takes place in a previously disturbed maintenance area of a park would be less likely to have a significant adverse impact than the same ground disturbance in an area containing important archeological resources.

The context in which impacts are considered should generally be specific to the area and resources being affected. For most NPS actions, this means considering impacts in the context of the affected locale, such as a national park system unit as opposed to the state, country, or world as a whole (1508.27(a)), although in many cases it is also appropriate to consider the role of a park unit in the larger landscape. The relationship of an affected resource to a park unit's purpose and significance can be an important factor when considering context.

### Intensity

Intensity refers to the severity of an impact (1508.27(b)), which may be direct, indirect, or cumulative (1508.25(c)). When evaluating intensity, the CEQ regulations require you to consider (1508.27(b)):

> *Impacts that may be both beneficial and adverse. A significant impact may exist even if the federal agency believes that on balance the effect will be beneficial.*
> This means that even in situations where beneficial impacts outweigh adverse ones, or where the ultimate environmental outcomes of an action may be beneficial, it is possible that adverse impacts associated with taking the action can be significant when considered in context and therefore trigger the need to prepare an EIS. Only those actions with the potential to cause significant adverse impacts require preparation of an EIS.

> *The degree to which the proposed action affects public health or safety.*
> For example, consider impacts related to hazardous and solid wastes, air and water quality, and their relation to public health and safety.

> *Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.*
> Most actions taken by the NPS affect park lands that protect many of the unique characteristics mentioned. This does not mean that an EIS must be prepared for every action the NPS takes. When assessing whether an impact would be significant, consider the magnitude of the impact in the context of the particular resource.

> *The degree to which the effects on the quality of the human environment are likely to be highly controversial.*

20

Controversy does not refer simply to the existence of opposition to a proposal whose effects are relatively undisputed (46.30). Rather, the term "controversial" refers to cases where a substantial dispute exists as to the nature of the environmental consequences of a proposed action. This consideration specifically references effects that are "highly controversial." While in many cases there will be some disagreement about the nature of the effects of a proposed action, the mere existence of controversy does not necessarily equate to significance. However, substantial dispute within the scientific community about the effects of a proposed action would indicate that the effects are likely to be highly controversial and therefore likely significant.

***The degree to which the potential impacts are highly uncertain or involve unique or unknown risks.***
There will often be some uncertainty about the impacts of management actions and some level of associated risk. The focus of this consideration is on high levels of uncertainty and risks that are unique or unknown, which would make it difficult or impossible to reasonably predict impacts of an action. When a high level of uncertainty over potential impacts involves an important resource or value, there is increased potential for impacts to be significant and thus require analysis in an EIS.

***The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.***
This consideration should be limited to those future considerations that are reasonably foreseeable, as defined in the DOI NEPA regulations, "…activities not yet undertaken, but sufficiently likely to occur, that a Responsible Official of ordinary prudence would take such activities into account in reaching a decision" (46.30). Reasonably foreseeable future actions do not include those actions that are highly speculative or indefinite.

***Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.***
When considering whether your proposal has significant impacts, you must look at the incremental impacts of your proposal plus the impacts of other past, present, and reasonably foreseeable future actions and determine whether or not the total (i.e., cumulative) impact on a specific resource is significant, even if the impact of your proposal, by itself, may not be significant. [*See Section 4.5 C: Cumulative Impacts.*] If significant cumulative adverse impacts already exist as a result of past, present, or reasonably foreseeable actions and the incremental adverse impacts of your action will make existing impacts worse but will not take the resource past an environmental or regulatory "tipping point" (e.g., causing a violation of the National Ambient Air Quality Standards), then your action would not be considered to result in significant cumulative adverse impacts and you would not need to prepare an EIS.

***The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the***

*National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.*
A finding of adverse effect under the National Historic Preservation Act (NHPA) Section 106 consultation process does not necessarily trigger the need to prepare an EIS; a determination of effect is made according to different criteria than a determination regarding significance. When assessing whether an impact would be significant, consider the magnitude of the impact in the context of the particular resource.

*The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*
A finding under the Endangered Species Act (ESA) Section 7 consultation process that an action is likely to adversely affect a listed species or designated critical habitat does not necessarily trigger the need to prepare an EIS; a determination of effect is made according to different criteria than a determination regarding significance. As with Section 106 above, you must consider the magnitude of an impact in the context of the particular resource to determine whether or not there would be a significant impact.

*Whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.*
Not every violation of environmental requirements imposed by other governmental entities constitutes a significant impact, especially when the violation is trivial or the impacts of the violation can be mitigated.

22

# CHAPTER 2: USING EXISTING NEPA ANALYSES

## 2.1   INTRODUCTION

This chapter describes options and procedures for using existing NEPA analyses to meet a current proposal's NEPA documentation and analysis requirements, either in full or in part. The CEQ and DOI NEPA regulations encourage the use of existing NEPA analyses to the extent possible and appropriate to reduce unnecessary analysis and paperwork (1502.20; 1502.21; 46.120). This chapter discusses several ways of doing so. Section 2.2 describes the use of the memorandum to file, which documents a determination that an existing NPS NEPA document provides complete and accurate documentation sufficient to cover a specific proposal. Section 2.3 describes the use of incorporation by reference, which can be used to reduce the amount of text included in a NEPA document and to facilitate the use of existing scientific studies and environmental reviews prepared by state and local governments. Section 2.4 discusses tiering, which is a specific type of incorporation by reference that can be used to focus the scope of a proposal and its consequent NEPA documentation and analysis. Section 2.5 discusses options and procedures for adopting an existing EA or EIS prepared by another agency to serve as NEPA documentation for an NPS action.

*The CEQ and DOI NEPA regulations encourage the use of existing NEPA analyses to the extent possible and appropriate to reduce unnecessary analysis and paperwork (1502.20; 1502.21; 46.120).*

## 2.2   MEMORANDUM TO FILE

A memorandum to file (memo to file) is used to document that a specific proposal and its impacts were adequately described and analyzed in site-specific detail in an existing NPS NEPA document, meaning that additional NEPA review is not required.

A memo to file should be used when an NPS NEPA review was previously completed for a specific proposal, but its implementation was delayed because of unavailability of funds or other reasons. For example, if your park unit completed an EA five years ago that resulted in a decision to construct new park housing but funding was not available and construction could not proceed as intended, when you receive the funding you should review the EA and FONSI to ensure that the action and its impacts are still accurately described. You would then document the adequacy of the existing NEPA review through preparation of a memo to file. A memo to file may also be used when an action is being taken that is not specifically called out in an existing NPS NEPA document, but it logically falls within the effects of substantially similar actions that have been evaluated in site-specific detail in an existing NPS NEPA document. When preparing a memo to file, you should consider whether information regarding other required consultation processes (such as ESA Section 7, NHPA Section 106, and tribal consultations) needs to be updated. If so, depending on the outcome of additional consultations, a new NEPA review may need to be initiated. [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements.*]

There is no required format for a memo to file. However, it should at a minimum contain the following:

- ▪ a description of the current action;

- the name and date of the existing NPS NEPA document that describes and analyzes the action;

- identification of the associated decision document;

- a statement that the existing NPS NEPA document has been reviewed and that there are no substantive differences between the current proposal and its associated environmental impacts and the proposal and impacts as described in the existing NEPA document and associated decision document;

- a reference to correspondence documenting updated consultation if other required consultation processes have been updated; and

- approval (signature) of the park superintendent or his/her designee.

When reviewing an existing NPS NEPA document to determine if it covers your current action, consider the following questions:

- Is the action as currently proposed the same or essentially the same as the action described in the existing NEPA document and associated decision document?

- Is the project location as currently proposed the same or essentially the same as that described in the existing NEPA document and associated decision document?

- Is the range of alternatives in the existing NEPA document appropriate with respect to the current action? For example, if there is a substantially different option for meeting the purpose and need of the proposal that was not available, and therefore not analyzed at the time the existing NEPA document was prepared, the answer would be "no."

- Are current resource conditions substantially the same as those described in the NEPA document and associated decision document? For example, if there is a threatened or endangered species currently present in the project area that was not listed, and therefore not analyzed at the time the existing NEPA document was prepared, the answer would be "no."

- Are the direct, indirect, and cumulative impacts associated with the action as currently proposed the same or essentially the same as those described in the existing NEPA document and associated decision document?

- Is consultation that was completed for the action covered by the earlier NEPA review (e.g., ESA Section 7 and NHPA Section 106) still adequate?

If you are able to answer "yes" to all of these questions, a memo to file would be appropriate. If you are unable to answer "yes" to all of these questions, you will likely need to complete an additional NEPA review. If you have questions regarding whether a memo to file is appropriate or whether additional consultation with other agencies is necessary, you should consult with your REC.

## 2.3   INCORPORATION BY REFERENCE

Incorporation by reference is the citation and summary of reasonably available material that addresses actions, issues, resources, or impacts that are relevant to the

actions under consideration in your NEPA review. Incorporation by reference allows such material to be briefly summarized rather than extensively repeated in the NEPA document. The purpose of incorporation by reference is to "cut down on bulk without impeding agency and public review of the action" (1502.21).

Many different types of material may be incorporated by reference, including written material of all kinds, conversations, taped public meetings or workshops, etc. Specific examples of materials that might be incorporated by reference into a NEPA document include other NEPA documents, species lists relevant to the project area, scientific studies, monitoring data, and environmental reviews prepared by state and local governments. For material to be incorporated by reference, the analysis and assumptions used in the incorporated document must be appropriate for the analysis at hand (46.135(a)). In addition, the incorporated material must be "reasonably available for inspection by potentially interested persons within the time allowed for comment" on the NEPA document (1502.21). There are many options available to make referenced material readily available, such as placing material on a park unit's website or PEPC, notifying the public that the referenced material is available at a park unit's headquarters upon request, and placing materials in local libraries or facilities accessible to the public.  Material that is not or cannot be made reasonably available, such as proprietary information, may not be incorporated by reference (1502.21).

Incorporating by reference is accomplished through two steps: (1) citing the incorporated material, and (2) summarizing its content. Citation consists of identifying the material in as specific a manner as possible to inform the reader of what material is being incorporated. Summarizing the material consists of briefly describing its content and placing the material and its use in the context of your specific NEPA review. Citations of specific information or analysis from incorporated material should include pertinent page numbers or other relevant identifying information (46.135(b)). All documents incorporated by reference must be listed in a bibliography (46.135(c)) and copies of materials incorporated by reference should be included in the decision file. [*See Section 4.9: The Decision File; see also supplemental guidance: Compiling a Decision File for NEPA Reviews*.]

## 2.4   TIERING

Tiering is using the coverage of general matters in broader or programmatic NEPA documents in subsequent, more narrowly focused NEPA documents (1508.28). The purpose of tiering is to eliminate repetitive discussions across NEPA documents and focus successive NEPA processes on the particular issues ripe for decision (1502.20). The broad NEPA document to which a subsequent, more narrowly focused NEPA document is tiered may  be an EA or EIS. [*See CEQ guidance: Effective Use of Programmatic NEPA Reviews*.] You should use tiering in situations when an action is proposed that, although addressed in general or program-level terms in a previous, valid NEPA document, requires additional refinement and site-specific analysis prior to implementation.

For example, suppose your park unit recently completed an EIS for a GMP and the selected action includes construction of a visitor contact station within one particular

management zone. Although the analysis in the EIS is up-to-date and accurate, the EIS does not contain a site-specific analysis of the proposed visitor contact station because details, such as exact location and size, were not available at the time the EIS was prepared. In this situation, you would need to complete a site-specific NEPA review before the visitor contact station could be constructed. By tiering the subsequent site-specific NEPA review to the EIS prepared for the GMP, the scope of the subsequent NEPA review could be narrowed to address the particulars of the visitor contact station, such as where specifically to site it within the area designated in the GMP and how large it should be. This narrow scope for the site-specific NEPA review would be proper because the question of whether to build a visitor contact station has already been decided based on the earlier, broader EIS and therefore does not need to be addressed again so soon.

A NEPA document that is tiered to a previous, broader NEPA document must include a finding that environmental conditions and impacts as described in the earlier NEPA document are still valid; or if not, address any exceptions (46.140). If conditions or impacts have changed, the tiered document must explain this and provide any updated information or analysis (46.140(b)). Tiering is not appropriate when the previous, broader NEPA document is outdated because new information or changed conditions require that the original decision and analysis be revisited. Consider the example above involving the visitor contact station and the GMP. Suppose that some years pass between adoption of the GMP and the park unit's ability to proceed with the proposed visitor contact station. In the intervening years, park staff discover that there has been an unforeseen increase in visitation, making the previous visitor contact station location unsuitable because of access and parking limitations. In this instance, the decision regarding whether and where to build a visitor contact station should be revisited and tiering would not be appropriate.

Tiering is essentially a specific form of incorporation by reference. When tiering a new NEPA document to an existing one, you must state that you are tiering to another NEPA document, give a brief description of the earlier document, and state where the earlier document is available. Following the procedures for incorporation by reference, cite and summarize the relevant portions of the broader document to which the new NEPA document is tiered (1502.20; 1502.21).

*A finding of no significant impact other than those already disclosed and analyzed in the EIS to which the EA is tiered may also be called a "finding of no new significant impact" (46.140(c)).*

An EA may be prepared for a proposed action with significant effects if the EA is tiered to a broader EIS that fully analyzed those significant effects. In such a case, a FONSI could be prepared as long as any previously unanalyzed effects are not significant. A finding of no significant impact other than those already disclosed and analyzed in the EIS to which the EA is tiered may also be called a "finding of no new significant impact" (46.140(c)).

## 2.5   ADOPTING ANOTHER AGENCY'S EXISTING ENVIRONMENTAL ASSESSMENT OR ENVIRONMENTAL IMPACT STATEMENT

When available, the NPS should use existing NEPA documents and analyses to evaluate the impacts of a proposed action and any alternatives (46.120). The NPS may adopt an EA or EIS prepared by another agency or entity, including an applicant, as the basis for an NPS decision if the document meets all NEPA

26

requirements applicable to the NPS and the NPS takes full responsibility for its content. When determining whether an existing EA or EIS is sufficient for purposes of the NPS action under consideration, the NPS must consider whether new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects (46.120(c)).

Scoping is not required when the NPS adopts another agency's EA or EIS. However, parks and programs are expected to consult, cooperate, and coordinate with other federal, state, local, and tribal governments and other bureaus and federal agencies whenever possible (46.155). Furthermore, when adopting another agency's EA or EIS, the NPS is responsible for providing the appropriate level of public review, as discussed further below, and for completing other required consultation processes (such as ESA Section 7, NHPA Section 106, and tribal consultations). [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements.*] If you are considering adopting an existing EA or EIS, you should consult with your REC.

In the event that adoption is not appropriate because the existing document is only partially relevant or applicable to the NPS action, you should still make the best use of existing information by supplementing, tiering to, and incorporating by reference relevant or applicable portions of the existing EA or EIS in order to avoid redundancy and unnecessary paperwork (46.120(d)). [*See Section 2.3: Incorporation by Reference, and Section 2.4: Tiering.*]

### Adopting an Environmental Assessment

The NPS may adopt another federal agency's EA as the basis for a FONSI and decision on an NPS action if it covers the NPS action and the NPS independently reviews the existing EA and determines that it meets all NEPA requirements applicable to the NPS (e.g., the CEQ and DOI NEPA regulations, DO-12, etc.). You should use an interdisciplinary approach to determine the applicability and adequacy of the existing EA in relation to the NPS proposal. When appropriate, the NPS may augment an EA prepared by another federal agency to be consistent with an NPS proposed action. When doing so, the augmented EA must cite to the original EA (46.320). Prior to adopting an existing EA, the NPS must also ensure that its own public involvement requirements have been met (46.320(d)). [*See Section 4.6: Circulating Environmental Assessments and Environmental Impact Statements, Soliciting Public Comments, and Responding to Comments.*] If the NPS elects to adopt an existing EA, it must prepare and approve its own FONSI and must notify the public of the availability of a FONSI once it is signed (516 DM 1.2; 46.305(c)). [*See Section 4.7: Concluding the NEPA Process and Documenting a Decision.*]

### Adopting an Environmental Impact Statement

As with EAs, the NPS may adopt another federal agency's EIS as the basis for a decision on an NPS action as long as it adequately covers the NPS action and meets all NEPA requirements applicable to the NPS (e.g., the CEQ and DOI NEPA regulations, DO-12, etc.). As with adoption of an EA, you should use an interdisciplinary approach to determine the applicability and adequacy of the existing EIS in relation to the NPS proposal. If the NPS elects to adopt an existing

009689

EIS, it must sign its own ROD and make it available to the public through appropriate notice (1506.6(b), Q30). [*See Section 4.7: Concluding the NEPA Process and Documenting a Decision.*]

The applicable procedures for adopting another agency's EIS depend on whether the NPS participated as a cooperating agency during preparation of the EIS. [*See Section 4.13 B: Cooperating Agencies.*] If the NPS participated as a cooperating agency it may adopt the EIS without recirculating the document, provided that all NPS comments and suggestions were addressed in a satisfactory manner during preparation and it meets all NEPA requirements applicable to the NPS (1506.3). In such a case, the NPS would adopt the document and issue its own ROD (Q30). If the EIS prepared by another agency does not adequately address NPS comments or does not meet NPS NEPA requirements, all or portions of the EIS may be adopted, supplemented to meet NPS requirements, and circulated as a draft EIS (DEIS) for public comment prior to issuing a final EIS and signing a ROD (1506.3; Q30).

In the event that the NPS did not participate as a cooperating agency in the preparation of the existing EIS, the NPS may adopt the final EIS as long as the NPS proposed action is substantially the same as the action addressed in the existing EIS. In this instance, the NPS would be required to recirculate the existing EIS as an NPS final EIS (FEIS) and issue its own ROD (1506.3; Q30). If the NPS did not participate as a cooperating agency and the NPS proposed action is not substantially the same as the actions analyzed in the existing EIS (i.e., if an EIS for one action is being adapted for use in a decision on another action) or requires additional information in order to meet NEPA requirements applicable to the NPS, the NPS would need to augment and recirculate the EIS that is being adopted as a DEIS, and seek public comment prior to issuing a final EIS and signing its own ROD (1506.3; Q30).

28

# CHAPTER 3: CATEGORICAL EXCLUSIONS

## 3.1    INTRODUCTION

A CE describes a category or type of actions that do not cumulatively or individually have the potential for significant environmental impacts (1508.4). If an action fits within a CE it is not exempt from NEPA; however, it is exempted from the requirement to prepare an EA or EIS. You are encouraged to use CEs when applicable, in order to reduce paperwork and delays associated with approvals of certain federal actions (1500.4; 1500.5).

*If an action fits within a CE it is not exempt from NEPA; however it is exempted from the requirement to prepare an EA or EIS (1508.4)*

The NPS categorizes CEs into two types based on documentation requirements associated with the CE: (1) CEs for which no documentation is required; and (2) CEs for which documentation is required.

CEs applicable to NPS actions come from two sources:

1. The DOI NEPA regulations (46.210), which include CEs available for use by all DOI bureaus and offices.

2. The NPS chapter of the DM (516 DM 12), which includes additional CEs available specifically to the NPS.

These CEs are listed below. You may rely on the CE lists included in this handbook and cite the CEs listed below by referring to chapter 3.2 or 3.3 and the CE letter/number, for example, "CE 3.2Y" or "CE 3.3 A.4.," rather than citing to the DOI NEPA regulations or the DM.

Information regarding when a CE may be used, approval authority for CEs, and public involvement considerations is included in this section. Other sections in this chapter describe the various NPS actions that may be categorically excluded and discuss associated documentation requirements and procedures, consideration of extraordinary circumstances, and use of CEs for ongoing and recurring actions. The sections discussing these topics are:

3.2    Categorical Exclusions for which No Documentation is Required
3.3    Categorical Exclusions for which Documentation is Required
3.4    Process for Categorical Exclusions Requiring Documentation
3.5    Extraordinary Circumstances
3.6    Use of Categorical Exclusions for Ongoing and Recurring Actions

### *Determining Whether a Categorical Exclusion May be Used*

In order to use a CE, you must ensure a proposed action fits within the category of actions described in a specific CE. A proposed action is "the bureau activity under consideration" (46.30). The proposed action does not have to be specifically mentioned in the text of a CE, but should easily fit into the category of actions described by the CE. Many of the CEs listed below include guidance that is intended to help you understand how they should best be applied. Where the guidance provides examples of actions that would be appropriate under a specific CE, the examples are meant to be illustrative and not exclusive. If the proposed action does

not fit within the category of actions described in a CE you must either modify the proposal so that it does, or prepare an EA or EIS (46.205). If multiple CEs are required to cover different elements of the proposed action that is a sign that a CE is likely not appropriate.

Once you determine that a proposed action fits within a CE, you must consider whether any of the extraordinary circumstances listed in the DOI NEPA regulations apply. [*See Section 3.5: Extraordinary Circumstances*.] If extraordinary circumstances do apply, you may not use a CE. In such circumstances you must either modify the proposal so that extraordinary circumstances no longer apply, or prepare an EA or EIS (46.205).

As long as the proposed action fits within a CE and no extraordinary circumstances apply, you should use the CE as your pathway for complying with NEPA.

### Approval of Categorical Exclusions

Authority for categorically excluding an action rests with the park unit's superintendent (DO-12, 5.4).

Prior to the approval of a CE, all other necessary consultation and coordination (such as ESA Section 7, NHPA Section 106, and tribal consultations) should be completed and related documentation should be included in the decision file. If the action under consideration triggers the need to comply with Section 106 of the NHPA, you must complete the Section 106 consultation before the CE is approved. You may implement an action that is categorically excluded immediately upon approval of the CE by the superintendent as long as all other necessary consultation and coordination requirements have been completed. [*See Section 4.14: Integrating NEPA and other Environmental Requirements*.]

### Public Involvement

Public comment is not required when using a CE. However, you may wish to seek public comment in situations where there is a high degree of public interest or uncertainty regarding potential effects of a proposed action. Public input can help identify environmental issues [*See Section 4.2 D: Identifying Environmental Issues and Impact Topics*] and provide information that will help determine whether any extraordinary circumstances exist. If you decide to seek public comment regarding the use of a CE, you generally should provide only a short period for the public to submit written comments.

Regardless of whether or not you seek public comment, when using a CE that requires documentation, you should consider notifying the public once the CE is approved by the superintendent. This can be accomplished by posting a brief notice on PEPC or your park unit or program's website, or by other means.

## 3.2   CATEGORICAL EXCLUSIONS FOR WHICH NO DOCUMENTATION IS REQUIRED

A variety of CEs exist to cover actions that typically have little or no potential for environmental impacts of any kind, let alone potential for significant adverse

impacts. For such actions, documentation regarding use of a CE is generally not required. These types of actions typically have such little potential to cause environmental impacts that in many instances, NPS personnel may not even realize they are taking an action to which NEPA applies.

While the CEs in this section may be applied without any associated documentation, there may be some instances where documentation is desired for administrative purposes. In such cases, you may prepare documentation following the procedures described in Section 3.4 or document use of the CE in some other way such as a memorandum to the project file. Voluntary documentation of CEs that do not require documentation should be considered on a case-by-case basis. If documentation is prepared for a CE that does not require documentation, it should not be considered to set a precedent for the need to document the use of that same CE in the future.

Although no documentation is required for the purposes of NEPA, if the proposed action triggers the need to comply with other laws, such as the ESA or NHPA, you should develop a decision file for the CE and include the results of any studies or consultations related to other laws.

**Available CEs:**

A.  Personnel actions and investigations and personnel services contracts.

B.  Internal organizational changes and facility and bureau reductions and closings.

C.  Routine financial transactions including such things as salaries and expenses, procurement contracts (e.g., in accordance with applicable procedures and executive orders for sustainable or green procurement), guarantees, financial assistance, income transfers, audits, fees, bonds, and royalties.

D.  Departmental legal activities including, but not limited to such things as arrests, investigations, patents, claims, and legal opinions. This does not include bringing judicial or administrative civil or criminal enforcement actions which are outside the scope of NEPA in accordance with 40 CFR 1508.18(a).

E.  Routine and continuing government business, including such things as supervision, administration, operations, maintenance, renovations, and replacement activities having limited context and intensity (e.g., limited size and magnitude or short-term effects).

*Guidance: Examples of routine and continuing maintenance and operations include trash removal, sweeping parking lots, cleaning restrooms, fixing machinery, snow removal, and small-scale building repairs and renovations.*

F.  Management, formulation, allocation, transfer, and reprogramming of the department's budget at all levels. (This does not exclude the preparation of environmental documents for proposals included in the budget when otherwise required).

31

G. Legislative proposals of an administrative or technical nature (including such things as changes in authorizations for appropriations and minor boundary changes and land title transactions) or having primarily economic, social, individual, or institutional effects, and comments and reports on referrals of legislative proposals.

H. Policies, directives, regulations, and guidelines that are of an administrative, financial, legal, technical, or procedural nature, or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.

*Guidance: Consider documenting this CE if you are promulgating a regulation.*

I. Activities that are educational, informational, advisory, or consultative to other agencies, public and private entities, visitors, individuals, or the general public.

J. Land and boundary surveys.

K. Preparation and issuance of publications.

L. Technical assistance to other federal, state, and local agencies or the general public.

M. Routine reports required by law or regulation.

N. Issuance of individual hunting and/or fishing licenses in accordance with state and federal regulations.

O. Changes in interpretive and environmental education programs.

P. Plans, including priorities, justifications and strategies, for non-manipulative research, monitoring, inventorying, and information gathering.

*Guidance: This CE also applies to agreements between NPS offices and other federal and state agencies for plans and studies.*

Q. Authorization, funding, or approval for the preparation of statewide comprehensive outdoor recreation plans.

*Guidance: This CE applies to equivalent plans such as comprehensive statewide historic preservation plans.*

R. Adoption or approval of surveys, studies, reports, plans, and similar documents which will result in recommendations or proposed actions which would cause no or only minimal environmental impact.

S. Sanitary facilities operation.

*Guidance: This may also include upgrades to equipment to incorporate new technologies.*

T. Development of standards for, and identification, nomination, certification, and determination of eligibility of properties for listing in the National Register of Historic Places and the National Historic Landmark and National Natural Landmark Programs.

*Guidance: This CE also applies to biosphere reserves.*

U. Statements for management, outlines of planning requirements, and task directives for plans and studies.

*Guidance: Statements for management and outlines of planning requirements are now known as foundation statements and assessments of planning needs, respectively.*

V. Preparation of internal reports, plans, studies, and other documents containing recommendations for action which NPS develops preliminary to the process of preparing a specific Service proposal or set of alternatives for decision.

W. Documents which interpret existing mineral management regulations and policies and do not recommend action.

X. Stabilization by planting native plant species in disturbed areas.

Y. Day-to-day resource management and research activities.

## 3.3 CATEGORICAL EXCLUSIONS FOR WHICH DOCUMENTATION IS REQUIRED

A variety of CEs exist for actions that generally result in some level of environmental impact but that do not have the potential to cause significant adverse impacts under normal circumstances. For such actions, documentation is required indicating that the action fits within a CE and that no extraordinary circumstances exist. Documenting the use of a CE provides the NPS an opportunity to demonstrate why a decision to use a CE is appropriate.

**Available CEs:**

A. **Actions Related to General Administration.**

1. Changes or amendments to an approved action when such changes would cause no or only minimal environmental impact.

2. Minor boundary changes.

*Guidance: This CE applies to boundary changes that are accomplished through existing statutory authorities, such as including an area within a park boundary and maintaining the area as open space, or including a historic structure within the boundaries of a park unit and retaining that structure.*

3. Reissuance/renewal of permits, rights-of-way, or easements not involving new environmental impacts.

4. Conversion of existing permits to rights-of-way when such conversions do not continue or initiate unsatisfactory environmental conditions.

5. Issuances, extensions, renewals, reissuances, or minor modifications of concession contracts or permits not entailing new construction.

6. Commercial use licenses involving no construction.

*Guidance: Commercial use licenses are now known as commercial use authorizations.*

7. Leasing of historic properties in accordance with 36 CFR Part 18 and NPS-38.

*Guidance: NPS-38 is now Director's Order 38: Real Property Leasing.*

8. Modifications or revisions to existing regulations or the promulgation of new regulations for NPS-administered areas, provided the modifications, revisions, or new regulations do not:

    a. increase public use to the extent of compromising the nature and character of the area or causing physical damage to it,

    b. introduce noncompatible uses that might compromise the nature and characteristics of the area or cause physical damage to it,

    c. conflict with adjacent ownerships or land uses, or

    d. cause a nuisance to adjacent owners or occupants.

*Guidance: "Area" should be interpreted to mean NPS unit.*

9. At the direction of the NPS Responsible Official, actions where NPS has concurrence or co-approval with another bureau and the action is a categorical exclusion for that bureau.

**B. Plans, Studies, and Reports.**

1. Changes or amendments to an approved plan, when such changes would cause no or only minimal environmental impact.

2. Cultural resources maintenance guides, collection management plans, and historic furnishings reports.

*Guidance: This CE also applies to equivalent documents related to cultural resources.*

3. Interpretive plans (interpretive prospectuses, audio-visual plans, museum exhibit plans, wayside exhibit plans).

*Guidance: This CE also applies to equivalent documents related to interpretation.*

4. Land protection plans which propose no significant change to existing land or visitor use.

**C. Actions Related to Development.**

1. Land acquisition within established park boundaries.

2. Land exchanges which will not lead to significant changes in the use of land.

*Guidance: Land exchanges under this CE include transfers of jurisdiction in the District of Columbia.*

3. Routine maintenance and repairs to non-historic structures, facilities, utilities, grounds, and trails.

4. Routine maintenance and repairs to cultural resource sites, structures, utilities, and grounds under an approved Historic Structures Preservation

Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource.

5. Installation of signs, displays, kiosks, etc.

   *Guidance: Other examples include wayside exhibits, small solar collectors on poles, boundary marking signs, and small solar or wind generator system installations on a building.*

6. Installation of navigation aids.

7. Establishment of mass transit systems not involving construction, experimental testing of mass transit systems, and changes in operation of existing systems (e.g., routes and schedule changes).

8. Replacement in kind of minor structures and facilities with little or no change in location, capacity, or appearance.

   *Guidance: Examples of minor structures and facilities include comfort stations, pit toilets, fences, kiosks, signs, sheds, foot logs, small trail bridges, and campfire circles.*

9. Repair, resurfacing, striping, installation of traffic control devices, repair/replacement of guardrails, etc., on existing roads.

   *Guidance: This CE also applies to road maintenance, rehabilitation, repaving, and reconstruction on existing roads within the existing road prism. Actions taken under this CE may also include repair or replacement of culverts, signs, surfacing of right-turn lanes at intersections in previously disturbed areas, seal coating a parking lot, maintenance of an existing gravel road in the same footprint, routine roadside brushing, routine ditching, adding gravel, grading, and other modifications.*

10. Installation of wells, comfort stations, and pit toilets in areas of existing use and in developed areas.

    *Guidance: Other examples include pump houses and vault toilets.*

11. Minor trail relocation, development of compatible trail networks on logging roads or other established routes, and trail maintenance and repair.

12. Upgrading or adding new overhead utility facilities to existing poles or replacement poles which do not change existing pole line configurations.

13. Issuance of rights-of-way for overhead utility lines to an individual building or well from an existing line where installation will not result in significant visual intrusion and will involve no clearance of vegetation other than for placement of poles.

    *Guidance: This CE also applies to the installation of overhead poles and utility lines that meet the other requirements of the CE (not just the issuance of a right-of-way permit for another entity).*

14. Issuance of rights-of-way for minor overhead utility lines not involving placement of poles or towers and not involving vegetation management or significant visual intrusion in an NPS-administered area.

15. Installation of underground utilities in previously disturbed areas having stable soils or in an existing utility right-of-way.

16. Landscaping and landscape maintenance in previously disturbed or developed areas.

17. Construction of fencing enclosures or boundary fencing posing no effect on wildlife migrations.

   *Guidance: Other examples include installation or construction of exclosures or other internal fencing that may be used to control adverse effects of wildlife. This CE may also be used for security fencing around park buildings or facilities.*

18. Construction of minor structures, including small improved parking lots, in previously disturbed or developed areas.

   *Guidance: Some examples of minor structures include adding a small support building such as a pump house or small equipment cache in an existing maintenance yard, bus stop (transportation) or picnic shelters, comfort stations, or similar small-scale structures; walkways, ramps, signs, or other small features incidental to the use of a developed area or to improve accessibility; small-scale development of new parking spaces adjacent to existing parking areas; addition or relocation of a small number of camping spaces in an existing campground or picnic sites in an existing picnic area and small, compatible additions to existing buildings (such as making an "L" into a "T").*

19. Construction or rehabilitation in previously disturbed or developed areas, required to meet health or safety regulations, or to meet requirements for making facilities accessible for the handicapped.

D.   **Actions Related to Visitor Use.**

1. Carrying capacity analysis.

2. Minor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations.

3. Minor changes in programs and regulations pertaining to visitor activities.

4. Issuance of permits for demonstrations, gatherings, ceremonies, concerts, arts and crafts shows, etc., entailing only short-term or readily mitigable environmental disturbance.

5. Designation of trailside camping zones with no or minimal improvements.

E.   **Actions Related to Resource Management and Protection.**

1. Archeological surveys and permits involving only surface collection or small-scale test excavations.

2. Restoration of noncontroversial native species into suitable habitats within their historic range and elimination of exotic species.

3. Removal of park resident individuals of non-threatened/endangered species which pose a danger to visitors, threaten park resources, or become a

36

nuisance in areas surrounding a park when such removal is included in an approved resource management plan.

*Guidance: Resource management plan should be interpreted broadly.*

4. Removal of non-historic materials and structures in order to restore natural conditions.

5. Nondestructive data collection, inventory (including field, aerial, and satellite surveying and mapping), study, research, and monitoring activities.

*Guidance: Some examples include vegetation plots and monitoring, soil surveys, species monitoring, and other nondestructive research activities that require a research permit. This CE should be used for activities that are not covered under the CE for day-to-day resource management. [See CE 3.2 Y.]*

6. Designation of environmental study areas and research natural areas.

**F.   Actions Related to Grant Programs.**

1. Proposed actions essentially the same as those listed in paragraphs A–E above.

*Guidance: This CE applies to approval of a grant by the NPS that would result in actions taken by others that are the same or similar to those listed in paragraphs A–E above.*

2. Grants for acquisition of areas that will continue in the same or lower density use with no additional disturbance to the natural setting.

3. Grants for replacement or renovation of facilities at their same location without altering the kind and amount of recreational, historical, or cultural resources of the area, or the integrity of the existing setting.

4. Grants for construction of facilities on lands acquired under a previous NPS or other federal grant provided that the development is in accord with plans submitted with the acquisition grant.

5. Grants for the construction of new facilities within an existing park or recreation area, provided that the facilities will not:

    a.  conflict with adjacent ownerships or land use, or cause a nuisance to adjacent owners or occupants, e.g., extend use beyond daylight hours;

    b.  introduce motorized recreation vehicles;

    c.  introduce active recreation pursuits into a passive recreation area;

    d.  increase public use or introduce noncompatible uses to the extent of compromising the nature and character of the property or causing physical damage to it; or

    e.  add or alter access to the park from the surrounding area.

6. Grants for the restoration, rehabilitation, stabilization, preservation, and reconstruction (or the authorization thereof) of properties listed on or

eligible for listing on the National Register of Historic Places at their same location and provided that such actions:

    a.  will not alter the integrity of the property or its setting;

    b.  will not increase public use of the area to the extent of compromising the nature and character of the property; and

    c.  will not cause a nuisance to adjacent property owners or occupants.

**G.  Actions Related to Hazardous Fuels Reduction and Post-fire Rehabilitation.**[3]

1.  Post-fire rehabilitation activities not to exceed 4,200 acres (such as tree planting, fence replacement, habitat restoration, heritage site restoration, repair of roads and trails, and repair of damage to minor facilities such as campgrounds) to repair or improve lands unlikely to recover to a management-approved condition from wildland fire damage, or to repair or replace minor facilities damaged by fire. Such activities must comply with the following (Refer to the ESM Series for additional, required guidance.):

    a.  shall be conducted consistent with bureau and departmental procedures and applicable land and resource management plans;

    b.  shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and

    c.  shall be completed within three years following a wildland fire.

## 3.4   PROCESS FOR CATEGORICAL EXCLUSIONS REQUIRING DOCUMENTATION

*The steps described below should be accomplished through an internal scoping process that uses an interdisciplinary approach.*

This section details the process for applying and documenting CEs described in Section 3.3. The steps described below should be accomplished through an internal scoping process that uses an interdisciplinary approach.

### 1.  *Define the Proposed Action, Identify Issues, and Evaluate Associated Impacts*

The first steps in the process should be to define the proposed action, identify potential issues, and evaluate associated impacts. Be certain to consider whether there are any connected or similar actions that should be considered as part of the proposal. [*See Section 4.2 D: Identifying Environmental Issues and Impact, and Section 4.2 C: Identifying Connected and Similar Actions.*]

You should complete this step with input from subject matter experts. You may wish to use an environmental screening form (ESF), which can be generated in PEPC, to assist with identifying issues and impacts, although you are not required to do so.

---

[3] The DOI NEPA regulations include an additional CE for hazardous fuels reduction activities (43 CFR 46.210 (k)) that is not listed here. That hazardous fuels reduction CE is not available for use in areas within the jurisdiction of the U.S. Court of Appeals for the 9th Circuit Court at this time, as discussed in the preamble to the final rule (73 FR 61305 October 15, 2008). As a matter of policy, NPS does not currently use this CE.

When evaluating impacts, be sure to consider cumulative impacts in addition to direct and indirect impacts. If your evaluation of impacts indicates there is a potential for significant adverse impacts as a result of implementing the proposed action, a CE may not be used unless the proposal is modified to reduce impacts to a level below significance.

### 2. Determine Whether There is a CE That Could Apply to the Proposed Action

After defining the proposed action and determining that there is no potential for significant adverse impacts, you should review the CE list to determine whether there is a CE that applies. As stated in Section 3.1, the proposed action does not have to be specifically described, but should easily fit into the category of actions described by the CE. If you are unsure whether a CE applies, you should consult with your REC.

### 3. Determine Whether Any Extraordinary Circumstances Exist

Prior to categorically excluding an action, you must consider the extraordinary circumstances listed in the DOI NEPA regulations and determine whether any apply. [*See Section 3.5: Extraordinary Circumstances.*] If any of the extraordinary circumstances apply, you may not use a CE. In such circumstances you must either modify the proposal so that extraordinary circumstances no longer apply, or prepare an EA or EIS (46.205).

### 4. Document the Potential Impacts of the Action Covered by the CE

When using a CE that requires documentation, you must create a concise record that identifies the CE being used and which should document: (1) that the proposed action fits within the category of actions described in the CE; and (2) no extraordinary circumstances exist. [*See CEQ guidance: Final Guidance for Federal Departments and Agencies on Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act.*] The standard NPS practice is to use a Categorical Exclusion Documentation Form, which can be generated in PEPC, in order to document the required information.

In addition to the information above, if you decide to use an ESF, you should include it in the decision file. Furthermore, if the proposed action triggers the need to comply with other laws, such as the ESA or NHPA, you should include the results of any studies or consultations related to other laws in the decision file. You may also include additional documentation pertinent to the action, such as notes from internal scoping meetings, photographs or field notes documenting a site visit, and documents generated from public involvement efforts (press releases, newsletters, public comments received, etc.). [*See Section 4.9: The Decision File; see also supplemental guidance: Compiling a Decision File for NEPA Reviews.*] The documentation you prepare should be as concise as possible in order to avoid unnecessary delays and administrative burdens. However, the level of detail, length of discussions, and amount of materials you include in the decision file will vary based on the type of action involved, the potential for extraordinary circumstances to apply, and the compliance requirements of other laws.

The superintendent must provide written approval of a CE that requires documentation (typically by signing the Categorical Exclusion Documentation

39

Form), and other required consultation processes (such as ESA Section 7, NHPA Section 106, and tribal consultations) must be complete prior to implementing an action covered by a documentable CE. [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements*.]

## 3.5    EXTRAORDINARY CIRCUMSTANCES

As described in Section 3.1 above, CEs apply under normal circumstances. When applying CEs, you must consider the impacts of the action in question to ensure that no extraordinary circumstances exist. If extraordinary circumstances do exist a CE may not be used and an EA or EIS must be prepared (46.205(c)). If you determine that extraordinary circumstances exist that preclude the use of a CE, you can modify the proposed action or apply mitigation so that extraordinary circumstances would no longer apply, and then use the CE. Significant impacts as referred to in the list of extraordinary circumstances below should be interpreted to mean significant adverse impacts.

The DOI NEPA regulations establish the following extraordinary circumstances and mandate that prior to categorically excluding an action, the NPS must consider whether the action would (46.215):

   a.   have significant impacts on public health or safety;

   b.   have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation, or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas;

   c.   have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources (Sec. 102(2)(E));

   d.   have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks;

   e.   establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects;

   f.   have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects;

   g.   have significant impacts on properties listed or eligible for listing in the National Register of Historic Places as determined by the bureau;

   h.   have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated critical habitat for these species;

   i.   violate a federal law, or a state, local, or tribal law or requirement imposed for the protection of the environment;

40

j.  have a disproportionately high and adverse effect on low income or
    minority populations (EO 12898);

k.  limit access to and ceremonial use of Indian sacred sites on federal
    lands by Indian religious practitioners or significantly adversely affect
    the physical integrity of such sacred sites (EO 13007); or

l.  contribute to the introduction, continued existence, or spread of
    noxious weeds or nonnative invasive species known to occur in the
    area or actions that may promote the introduction, growth, or
    expansion of the range of such species (Federal Noxious Weed
    Control Act and EO 13112).

## 3.6   USE OF CATEGORICAL EXCLUSIONS FOR ONGOING AND RECURRING ACTIONS

Many NPS actions, especially routine activities related to park administration and
maintenance, are of an ongoing or recurring nature. Some examples of these types of
actions include routine maintenance and repair of non-historic structures (CE 3.3
C.4) and trail maintenance and repair (CE 3.3 C.11). Such activities, although routine,
are at the same time subject to NEPA. In the case of these examples and similar
actions, a CE with documentation would typically be required. However, you may
avoid preparing separate CE documentation for each instance that one of these types
of activities is conducted by making use of "programmatic CEs." Programmatic CEs
provide NEPA documentation for multiple instances of an ongoing or recurring
activity, when the activity or activities and the impacts that result, are predictable.
For example, if your park unit routinely makes repairs to non-historic structures, you
could develop a programmatic CE that serves as the NEPA review for routine
maintenance and repairs rather than preparing CE documentation each time a repair
is made.

When a CE is used in this manner, you should clearly describe the specific activities
that are meant to be covered and describe any conditions that must be met for the CE
to apply to a particular activity. Although a programmatic CE can be established to
cover activities for some time, you should periodically review and updated the CE as
necessary to ensure the documentation is still accurate and that no circumstances
have changed that would warrant additional NEPA review. While in some cases an
annual review may be appropriate, CEs used for ongoing and recurring actions
should be reviewed every five years at a minimum, consistent with CEQ guidance
regarding supplementation of EISs for ongoing programs (Q32).

You must also consider cumulative impacts and other required consultation
processes when preparing and reviewing programmatic CEs. You are encouraged to
consult with your REC if you have any questions about developing and using
programmatic CEs.

41

42

# CHAPTER 4: THE NEPA PROCESS FOR ENVIRONMENTAL ASSESSMENTS AND ENVIRONMENTAL IMPACT STATEMENTS

## 4.1   INTRODUCTION

This chapter discusses the elements of the NEPA process for EAs and EISs in detail and describes a number of important requirements that must be met for NEPA reviews involving EAs and EISs. The first part of the chapter, Sections 4.2 through 4.11, is organized by key steps in the NEPA process that generally apply to both EAs and EISs. Because specific requirements for EAs and EISs differ in many cases, when applicable, this chapter provides specific guidance for EAs and EISs separately within each section.

Although there is a general sequence to the NEPA process, many of the steps are iterative; it is common to find yourself revisiting earlier steps in the process to make refinements. For example, after developing alternatives or receiving public input, you may realize that an issue you initially thought would require detailed analysis in fact does not, or that an issue that you had initially dismissed, should be analyzed.

*Although there is a general sequence to the NEPA process, many of the steps are iterative; it is common to find yourself revisiting earlier steps in the process to make refinements.*

Sections 4.2 through 4.11 provide detail regarding the following key steps in the process for preparing EAs and EISs:

| | |
|---|---|
| 4.2 | Scoping |
| 4.3 | Alternatives |
| 4.4 | Describing the Affected Environment |
| 4.5 | Impact Analysis |
| 4.6 | Circulating Environmental Assessments and Environmental Impact Statements, Soliciting Public Comments, and Responding to Comments |
| 4.7 | Concluding the NEPA Process and Documenting a Decision |
| 4.8 | Implementing a Decision |
| 4.9 | The Decision File |
| 4.10 | Supplements to Draft and Final EISs |
| 4.11 | Terminating the NEPA Process Prior to Completion |

The second part of this chapter, Sections 4.12 through 4.14, highlights additional important considerations to think about when conducting a NEPA review for EAs and EISs. Those sections are:

| | |
|---|---|
| 4.12 | Using Contractors |
| 4.13 | Working with other Agencies and Entities |
| 4.14 | Integrating NEPA and other Environmental Requirements |

## 4.2   SCOPING

Scoping is "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action"

(1501.7). The scoping process should be focused on determining the extent and nature of issues and alternatives that should be considered during a NEPA review. The scoping process includes both internal and external (other agency and public) elements and should continue throughout the planning and early stages of preparation of an EA or EIS.

### Internal Scoping

Internal scoping refers to the use of NPS staff to accomplish the outcomes discussed above. An interdisciplinary team that is familiar with the issues and affected resources is essential to a successful internal scoping process. To ensure that all relevant issues and alternatives are considered early in the NEPA process, you should encourage the participation of and consult with staff that has a variety of expertise in natural resources, cultural resources, law enforcement, facilities management, interpretation, planning, and other disciplines.

During internal scoping, NPS staff should identify the purpose and need for taking action; describe the proposed action; identify environmental issues requiring detailed analysis; eliminate issues that are not important; identify data needs; identify connected, similar, and cumulative actions; and determine or confirm the appropriate NEPA pathway. You may wish to use an ESF, which can be generated in PEPC, to assist with identifying issues, although you are not required to do so [*See Section 4.2 D: Identifying Environmental Issues and Impact Topics*.]

The development of alternatives is also part of the scoping process, but for purposes of this handbook, alternatives are addressed separately from scoping. [*See Section 4.3: Alternatives*.]

### Agency Scoping

When preparing an EIS, you must use scoping to engage potentially affected federal, state, and local agencies and tribal governments in order to gather input regarding their concerns, potential impacts, sources of data, and alternatives that should be considered (1501.7; 46.235(a)). At a minimum, you should notify and invite the input of potentially affected agencies and tribes in writing. Depending on the issues relating to affected agencies or tribes, you may choose to hold agency scoping meetings.

While scoping is not required for an EA, parks and programs are expected to consult, cooperate, and coordinate with other federal, state, local, and tribal governments and other bureaus and federal agencies whenever possible (46.235; 46.155). Therefore, when preparing an EA, you should, at a minimum, contact all potentially affected federal, state, and local agencies and tribal governments early in the process to discuss information related to the EA.

At the time you reach out to other agencies and tribal governments regarding NEPA-related issues, you should also initiate contact with relevant agencies or entities regarding other required consultation (such as ESA Section 7 or NHPA Section 106) or from whom you might require a permit (such as the US Army Corps of Engineers for Clean Water Act Section 404). While you may not have all the information you need to consult at that time, engaging at that point in the process can help identify

potential issues early on and may save you time later. Note that engaging tribal governments during agency scoping may be part of, but is not a substitute for, government-to-government consultation that may be required by other authorities. [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements*.]

### Public Scoping

Public scoping refers to the engagement of the interested and affected public early in the process on matters related to the proposed action, environmental issues that should be addressed, potential alternatives, and sources of data that should be considered. To be most helpful, public scoping should take place after internal scoping so that the public can see the purpose and need for action, and consider the proposed action and any preliminary alternatives or alternative elements put forward by the NPS. When preparing an EIS, you are required to include a proposed action and possible alternatives, to the extent they are developed, in a notice of intent to prepare an EIS (NOI) that formally announces the beginning of the public scoping period (1501.7; 1508.22). [*See Section 4.2 B: Defining the Proposed Action*.]

Whether you are preparing an EA or EIS you are encouraged to identify a preliminary range of alternatives or preliminary alternative elements, including the proposed action that NPS intends to consider, at the public scoping phase; it is not pre-decisional to do so. Including such information can enhance the value of public scoping comments and create efficiencies by allowing you to address the public's concerns about a proposed action and alternatives while you are still developing them, rather than waiting until a proposal and alternatives are fully developed. When preparing an EIS, allowing the public to comment on a preliminary range of alternatives may alleviate the need to issue a supplemental draft EIS later in the process, by reducing the chances that a member of the public will suggest an additional alternative that must be addressed after the draft EIS is issued (Q29b).

*Whether you are preparing an EA or EIS you are encouraged to identify a preliminary range of alternatives or preliminary alternative elements, including the proposed action that NPS intends to consider, at the public scoping phase; it is not pre-decisional to do so.*

Public scoping, like scoping in general, is a process rather than a single event or meeting. You have flexibility to determine how exactly to engage the public and are encouraged to use a variety of means to solicit early input, including public notices, public meetings, direct or electronic mailings, and solicitation of comments through the PEPC system. The standard NPS practice is to accept written comments by mail, at public meetings if applicable, at a park unit headquarters, and online through the PEPC system. The preferred method for receiving public comments is through the PEPC system; this should be clearly communicated in public outreach materials requesting comments. If minority or low-income populations exist that could be affected by a proposed action, be sure to use suitable media, such as local newspapers and radio programs, to provide notification about the proposed action and the scoping process. In such instances, you should provide multiple forms of communication (written, oral, pictorial), as appropriate, to accommodate varied levels of reading proficiency and also provide translation service, as appropriate, to facilitate meaningful engagement.

*The preferred method for receiving public comments is through the PEPC system; this should be clearly communicated in public outreach materials requesting comments.*

All public scoping comments that are received should be reviewed and substantive comments should be considered. You are not required to provide responses to public scoping comments and standard NPS practice is not to do so. Instead, you

45

should address the issues that are raised in public scoping comments during the process of preparing your EA or EIS; most issues should be addressed to some degree in the text of the EA or EIS itself. Addressing scoping comments in this manner is sufficient to demonstrate that NPS has reviewed and considered the comments. If you have questions about public scoping for a specific proposal, you are encouraged to consult with your REC.

### Public Scoping for Environmental Assessments

The DOI NEPA regulations require that public notification and public involvement be conducted to the "extent practicable" when an EA is being prepared (46.305(a)). Therefore, public scoping for an EA is strongly encouraged. The recommended practice with regard to public scoping for EAs is a comment period announced on PEPC and through a press release, direct or electronic mailings, or other effective means of communication. In some instances, public meetings during the scoping period may be helpful or appropriate, but they are not required.

There is no required minimum length for a public scoping comment period for an EA. However, a comment period of 30 days is recommended. In certain situations, less than 30 days may be appropriate. Although a closing date for public scoping is typically established, comments received after the closing date should be considered when feasible.

### Public Scoping for Environmental Impact Statements

Public scoping is required when preparing an EIS, as is publication of a NOI in the *Federal Register* (1501.7; 46.235). Publication of a NOI initiates the formal public scoping period, although it is possible to begin scoping activities in advance of publication (Q13). Contact your REC to determine specific procedures for initiating the NOI process in your region. In addition to publication of the NOI, it is standard NPS practice to announce public scoping on PEPC and through a press release, direct or electronic mailings, or other effective means of communication.

A NOI must, at a minimum, (1508.22):

- describe the proposed action and possible alternatives;

- describe the public scoping process; this typically includes instructions on how to submit scoping comments and a date by which comments should be submitted;

- indicate whether, when, and where any public meetings will be held; and

- include the name and address of an NPS contact who can answer questions about the proposed action and the EIS.

In many cases, complete alternatives are not developed by the time a NOI is published, since that represents the beginning of the public scoping process for an EIS. In such cases, you should include alternative concepts or elements of alternatives that the NPS intends to consider.

As with EAs, public scoping meetings for EISs may be helpful or appropriate in certain circumstances, but they are not required. If public meetings are held, you

should include the dates, times, and locations of those meetings in the NOI if that information is known. In many cases, meeting locations and times are yet to be determined at the time the NPS publishes a NOI. In such cases, a description of how and where meeting locations and dates will be announced should be included in the NOI instead.

As with EAs, there is no required length for the public scoping comment period for an EIS. The standard NPS practice is a comment period of 30 days; however, depending on a number of factors, including the degree of public interest, a longer or shorter period may be appropriate. As with EAs, although a closing date is typically established for the public scoping period, comments received after the closing date should be considered when feasible.

### A.        Identifying Purpose, Need, and Objectives

A key part of the scoping process is the development and refinement of the purpose and need for taking action.

#### *Purpose and Need*

The CEQ and DOI NEPA regulations require a brief discussion in an EIS of the underlying purpose and need for taking action (1502.13; 46.415; 46.420(a)). For EAs, the regulations require a discussion of the need for taking action, however in some cases development of a purpose statement can be helpful (1508.9; 46.310).

The regulations do not require that you distinguish purpose from need in an EIS. However, it may be helpful for you to do so in order to better convey why the NPS is proposing an action and what that action is meant to achieve. Treated distinctly:

- Purpose is a broad statement of goals that the NPS intends to fulfill through taking action and should be stated in terms of the desired outcome, to the extent possible (46.420(a)).

- The need for action is the underlying problem or opportunity to which the NPS is responding and may include factors such as existing conditions that need to be changed, problems that need to be remedied, decisions that need to be made, and/or policies or mandates that need to be implemented.

Put another way, purpose answers the question of what the NPS intends to accomplish through taking action, while need answers the question of why the NPS is proposing to take an action at this time. The purpose and need set the parameters for determining which alternatives are considered reasonable and must therefore be analyzed in detail in an EA or EIS. [*See Section 4.3 A: Range of Alternatives*.]

Regardless of whether you address purpose and need separately, you should clearly explain why the NPS is proposing an action and what that action is intended to accomplish. Ideally, you should be able to describe your purpose and need in one or two direct, unambiguous statements. In many cases, the basis for these statements may be elaborated upon in detail to provide more context for the reader.

Federal agencies have great latitude in defining the purpose and need for action. There are several considerations you should bear in mind as you begin developing a

*Purpose and need should not discuss the purpose or need for preparing an EA or EIS or for "doing NEPA."*

purpose and need for your EA or EIS. First, purpose and need reflect the purpose and need for taking action. Purpose and need should not discuss the purpose or need for preparing an EA or EIS or for "doing NEPA." Second, purpose and need represent the NPS purpose and need in taking action. Therefore, in the case of externally generated proposals, such as an application for an NPS permit, the purpose and need should reflect the NPS purpose and need (e.g., determining whether to issue a permit for a cell tower) as opposed to the applicant's need for the permit (e.g., enhance cell coverage by building a new tower) (46.420(a)(2)).

You should not define purpose and need too narrowly or too broadly. Defining purpose and need too narrowly could hinder the development of a full range of alternatives. At its most extreme, an overly narrow purpose and need could result in an insufficient NEPA review because options for taking action could be restricted to a point where it appears that a decision was already made prior to completion of the NEPA review. On the other hand, defining your purpose and need too broadly could lead to an unwieldy range of alternatives that do not need be considered in order to achieve your goals for taking action. [*See Section 4.3 A: Range of Alternatives.*]

### Objectives

Purpose and need statements articulate broad goals that an action is meant to achieve. If your proposal has more specific goals, you should consider developing objectives, which are more specific statements of purpose that provide additional bases for comparing the effectiveness of alternatives in achieving the desired outcomes of the action. You are not required to develop objectives as part of the NEPA process; however, it may be helpful to do so, especially for more complex actions.

## B.      Defining the Proposed Action (the Proposal)

A proposed action is "the bureau activity under consideration" (46.30). Put another way, a proposed action is the initial NPS proposal to address a purpose and need. A proposed action is one option (alternative) for addressing purpose and need. When preparing an EA or EIS, you will develop alternatives to the proposed action that constitute different ways to address purpose and need. The terms "proposed action" and "proposal" are synonymous (Q5a).

A proposed action must be clearly described in order to proceed with NEPA analysis, and is required to be included in EAs and EISs (46.30; 46.310; 46.415). However, the level of detail of a proposed action can vary. While you are encouraged to include as much detail as possible in the description of the proposed action, in many cases you will not know all of the details at the scoping phase, and therefore your description may be vague at that time. As the NEPA process moves forward and additional details are developed, you should update the description of the proposed action so that by the time an EA or draft EIS is released, the proposed action constitutes an alternative that is developed to the same level of detail as the other alternatives under consideration (Q5b). In cases where specific details are not known at the scoping phase, your scoping materials should still include, to the extent practicable, information regarding what action is being proposed and how, when, and where it could be implemented.

A proposed action is not necessarily, but may become during the NEPA process, the preferred and/or environmentally preferable alternative (46.30). While you will start the NEPA process with a proposed action, during the development of alternatives and impact analysis you may determine that there are other, better or less impactful ways to address the purpose and need and ultimately one of those other alternatives may become the preferred alternative. [*See Section 4.3 C: The Preferred Alternative*.]

You are encouraged to include a proposed action in the materials you share with the public during public scoping and are required to include a proposed action in a NOI when preparing an EIS (1501.7; 1508.22). A description of the proposed action at the beginning of the NEPA process can be beneficial for a number of reasons. It can lead to better identification of potential issues and impacts, early input on a range of alternatives, and a more focused NEPA review. You should make sure to communicate to the public in your scoping materials: (1) that the proposed action is only an initial proposal; and (2) that no decision to implement any action can be made until the NEPA process, which in most cases requires the NPS to develop and consider reasonable alternatives to the proposed action, is complete.

*You should make sure to communicate to the public in your scoping materials: (1) that the proposed action is only an initial proposal; and (2) that no decision to implement any action can be made until the NEPA process, which in most cases requires the NPS to develop and consider reasonable alternatives to the proposed action, is complete.*

## C.    Identifying Connected and Similar Actions

CEQ requires that agencies consider connected and similar actions during a NEPA review. Failure to do so creates a risk of overlooking important issues related to the proposed action and alternatives under consideration. Agencies are specifically prohibited from segmenting projects. "Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action" are to be evaluated in a single NEPA document (1502.4).

### Connected Actions

Connected actions are actions that are closely related to the proposal and should be analyzed in the same NEPA document. Actions are connected if they automatically trigger other actions, cannot or will not proceed unless other actions have been taken previously or simultaneously, or are interdependent parts of a larger action and depend on the larger action for justification (1508.25(a)(1)). For example, if there is a proposal to construct new park housing on an existing parking lot, resulting in the need to move the existing parking lot, the parking lot relocation is an action connected to the proposal to build the housing. The impacts of removing the existing parking lot and relocating it must be addressed as part of the same NEPA analysis as the housing. Because of their nature, connected actions should generally be considered as part of the proposed action and alternatives.

### Similar Actions

Similar actions are those with similar geography, timing, purpose, or other features that provide a basis for evaluating the combined impacts in a single NEPA review (1508.25(a)(3)). Similar actions are those that can proceed independently from the proposed action and have independent utility. For example, if there is a proposal to build a new visitor contact station in your park unit and there are also proposals for a new trail and a new campground in the same vicinity, because of the similarities related to geography, timing, and purpose, all three would be considered similar actions. While you are not required to analyze similar actions in one NEPA document, you should do so when the best way to assess the combined impacts of

*Connected actions are actions that are closely related to the proposal and should be analyzed in the same NEPA document.*

*Similar actions are those that can proceed independently from the proposed action and have independent utility.*

similar actions or reasonable alternatives to such actions is to address them together (1508.25(a)(3)). If similar actions are not combined into a single NEPA document, those similar actions that are not included in your proposal should be addressed as cumulative actions in your NEPA review. For instance, in the example above, if the visitor contact station is addressed in its own EA or EIS, the impacts of the trail and campground proposals should be considered in the cumulative impact analysis.

### D.    Identifying Environmental Issues and Impact Topics

Identifying significant issues related to a proposed action is an important part of scoping (1501.7(a)(3)). In the context of NEPA reviews, "issues" or "environmental issues" can be problems, concerns, conflicts, obstacles, or benefits that would result if the proposed action or alternatives, including the no-action alternative, are implemented. Issues may be raised by the NPS, other agencies, tribal governments, or the public. You should use an interdisciplinary approach to identify issues during internal scoping. In many cases, it may be helpful to begin thinking about issues in terms of what resources would be affected by the proposed action and alternatives under consideration.

Identifying issues will allow you to emphasize the important environmental concerns related to a proposal and will help focus your impact analysis. When describing issues, you should do so in terms of the relationship between the potential impacts of an action and specific resources that would be affected. For example, if there is a proposal involving construction of a new visitor contact station in your park unit, an associated issue might be "construction activities could temporarily displace native bird species in the project area during critical nesting seasons" or "the contact station is proposed to be built on the edge of a cultural landscape and would intrude on the historic viewshed."

Public opposition to a project, when the environmental effects are relatively undisputed, should not be considered an environmental issue. However, if the public is opposed to a project because of concerns about impacts to water quality or increased traffic in a neighborhood, then you would consider issues related to water quality and visitor use or local traffic patterns during your NEPA review.

Ultimately, it is important for decision makers and the public to be able to understand the impacts that each of the alternatives under consideration would have on specific resources. Therefore, even though a NEPA review should focus on significant issues, when preparing a NEPA document, you should clearly indicate which resources would be affected by each issue and organize the discussions of the affected environment and environmental consequences by resource, as described below. For NPS NEPA reviews, the standard practice is to use "impact topics" as headings that represent specific resources that would be affected if the proposed action or alternatives under consideration are implemented. Using these headings consistently throughout the NEPA document allows the reader to track the issues, current condition and potential impacts related to a specific resource.

Depending on how broadly or narrowly your issue is stated, an impact topic could apply to one resource generally, several specific species, or one specific species. For instance, an issue associated with the example of building a new visitor contact

*In the context of NEPA reviews, "issues" or "environmental issues" can be problems, concerns, conflicts, obstacles, or benefits that would result if the proposed action or alternatives, including the no-action alternative, are implemented.*

*Impact topics are a means of organizing the discussion of issues and analysis of impacts.*

station discussed above is that construction activities could temporarily displace native bird species in the project area during critical nesting seasons. In that example, the analysis of the issue should be focused on the impacts to the resource involved, e.g., the impact topic of "native bird species." However, if the issue was focused more narrowly on displacement of bald eagles, the impact topic should be correspondingly narrow, e.g., "bald eagles." Conversely, if the issue was stated more broadly in terms of impacts to all wildlife species in the area that would be affected by construction activities, the impact topic should be correspondingly broad, e.g., "wildlife."

In cases where you focus your impact topics narrowly, an issue could apply to more than one impact topic, e.g., "native bird species" and "threatened and endangered bird species". Generally, you should lump or split affected resources into impact topics in a manner that is most useful for creating a concise, focused document that avoids repetition. In instances where an issue applies to more than one impact topic, you should note that in the NEPA document.

You may wish to use an ESF as a tool to help identify issues and impact topics related to your particular NEPA review. An ESF can be generated in PEPC, and is intended to be customized to include resources relevant to your park unit and the specific action under consideration.

### E.      Determining Whether to Retain Issues for Detailed Analysis

Analysis in an EA or EIS should focus on significant issues (meaning pivotal issues, or issues of critical importance) and only discuss insignificant issues briefly (1502.2(b)). Therefore, you should determine whether issues that are identified should be retained for detailed analysis or dismissed. When doing so, you should use an interdisciplinary approach to ensure that all relevant concerns are considered.

During scoping, you may initially identify numerous issues associated with a proposal and will make an initial determination regarding whether or not to retain them for detailed analysis. It is important as you progress through the NEPA review to revisit issues, as necessary, to determine whether you should reconsider your initial determination based on new information. Likewise, you should consider whether there are additional issues associated with the proposal that were not identified during the scoping phase that should be addressed.

As a general rule, issues should be retained for consideration and discussed in detail if:

- the environmental impacts associated with the issue are central to the proposal or of critical importance;

- a detailed analysis of environmental impacts related to the issue is necessary to make a reasoned choice between alternatives;

- the environmental impacts associated with the issue are a big point of contention among the public or other agencies; or

- there are potentially significant impacts to resources associated with the issue.

<div align="center">51</div>

If none of the considerations above apply to an issue, you should dismiss it from detailed analysis. When dismissing an issue, you should be sure to indicate which specific resources or impact topics are included in the dismissal for that issue. While you may decide not to carry an issue forward for detailed analysis, environmental impacts to specific resources can still be discussed in some detail in your dismissal, as appropriate. The level of detail for a dismissal will vary according to the nature of the issue, but remember that the CEQ regulations emphasize that NEPA reviews should be focused on the important issues and that the treatment of issues dismissed should be limited to a brief discussion of why related environmental impacts do not warrant detailed analysis (1501.7(a)(3); 1502.2(b)).

Not all issues discussed by an interdisciplinary team need to be explicitly dismissed in a NEPA document. You should only include a dismissal of the issues that were initially thought to be relevant to your NEPA review but were later determined to be insignificant. For example, if your park unit is rehabilitating a parking lot in a previously disturbed area, the interdisciplinary team may have briefly discussed whether museum collections could be affected while completing an ESF; however, there is no need to explicitly dismiss impacts to museum collections if there are no issues or impacts related to museum collections from the proposed parking lot rehabilitation or alternatives under consideration.

## 4.3   ALTERNATIVES

The alternatives section is often referred to as the heart of an EIS (1502.1; Q7a). Alternatives represent different means of solving the problems and meeting the goals articulated in the purpose and need for action.

### A.    Range of Alternatives

The term "range of alternatives" refers to the set of all reasonable alternatives as well as other alternatives considered but eliminated from detailed analysis (46.420(c); Q1a). The range of alternatives will vary based on the complexity of the proposal and extent of related environmental issues. Suggestions for alternatives can be generated from within the NPS, the public, or other agencies.

Alternatives are distinguished based on differences in their approach to resolving the purpose and need for action and the environmental impacts of implementing them, not on mere differences in cost, technical elements, etc. Put another way, alternatives should represent substantively different options for the decision maker to consider, as opposed to simply representing different designs of a substantively equivalent option.

For example, if there is a need to provide an exhibit space for a large object from a park unit's museum collection that is not currently on display to the public due to a lack of suitable space, the purpose for taking action could be to provide a location to display the museum collection and the proposed action could be building a new structure in a specific location to provide the necessary space. Designs for a less expensive structure and a more expensive structure, each with substantially the same location, footprint, and character, would not constitute distinct alternatives under NEPA, as their differences are not based on their approach to resolving the purpose

and need, nor on the difference in environmental impacts that would result from selecting one alternative over the other. Possible alternatives that would meet the purpose and need that are truly distinct might include an alternative to build a structure similar in design but in a substantially different location in the park, modifying an existing structure in the park to be capable of displaying the object, or coordinating with a museum in a nearby town to provide space to display the object in the museum. Each of these alternatives would have different implications with regard to the environmental impacts relevant to the proposal and would present substantively different options to the decision maker.

Although the CEQ and DOI NEPA regulations require consideration of all reasonable alternatives, in situations involving a very large number of possible alternatives, a limited number of alternatives encompassing the full spectrum of options may be evaluated in lieu of every conceivable possibility (46.420(c); Q1b). For example, if your park unit proposes to establish a daily limit for snowshoe trips on a popular backcountry trail and you determine that to meet the purpose and need for action the daily limit needs to be between 25 and 100 trips, there are 76 distinct options for the daily limit. However, rather than evaluate every possibility, you might choose to look at alternatives involving limits of 25, 50, 75, and 100 daily trips. Such an approach would allow you to evaluate the full spectrum of reasonable options without looking at every individual approach.

### Reasonable Alternatives

Reasonable alternatives are those alternatives that meet the purpose and need for action and are technically and economically feasible (46.420(b)). An alternative is not considered reasonable if technical, economic, or jurisdictional obstacles make the ability to implement the alternative remote and speculative.

Reasonable alternatives must be rigorously explored and objectively evaluated during the decision-making process (1505.1(e); 46.420(c)). When developing alternatives, you should not exclude alternatives just because they are not the easiest, cheapest, or most popular solution; an alternative is not rendered unreasonable simply because it would be challenging or expensive to implement. In some situations, it may be appropriate for you to consider a proposed action or alternative that may be outside NPS jurisdiction (Q2b). For example, if your park unit is considering an application to place a telecommunications facility just inside the unit's boundary, depending on a number of factors, you may  consider alternative sites outside of the boundary (i.e., outside of NPS jurisdiction). However, an alternative that would require a major change to a law, regulation, or policy should not be considered reasonable in most cases. If you are considering such an alternative, you should consult with your REC.

### Alternatives Considered but Dismissed from Detailed Analysis

Included in the range of alternatives are those alternatives considered during the NEPA process but eliminated from detailed analysis (46.420(c)). This category may include alternative elements (specific proposals that would alter an alternative but not completely change it) as well as completely developed alternatives. You are required to briefly discuss the reasons for eliminating alternatives from detailed discussion in an EIS (1502.14.(a)) and are encouraged to do so in an EA.

*Reasonable alternatives are those alternatives that meet the purpose and need for action and are technically and economically feasible (46.420(b)).*

Alternatives and alternative elements may be eliminated from detailed analysis for a variety of reasons. However, it is important that you do not pare the list of reasonable alternatives down to only those alternatives that are cheap, easy, or represent your park unit management's favorite approach.

Alternatives and alternative elements may be dismissed for the following reasons:

- technical or economic infeasibility. This means the alternative could not be implemented if it were selected or would be unreasonably expensive;

- inability to resolve the purpose and need for taking action, to a large degree;

- duplication with other, less environmentally damaging or less expensive alternatives;

- the alternative conflicts with an up-to-date and valid park plan, statement of purpose and significance, or other policy, such that a major change in the plan or policy would be needed.

- the alternative would require a major change to a law, regulation, or policy;

- too great of an environmental impact;

- the alternative addresses issues beyond the scope of the NEPA review; and

- if the alternative would not be allowed by another agency from which a permit is required, it should be eliminated as "environmentally infeasible."

Above all, when eliminating an alternative from detailed analysis, be sure that you can explain why you are eliminating it. If you dismiss specific alternative elements, consider including those in the description of alternatives considered but dismissed as well. However, you do not need to dismiss every option that is considered throughout the process in the NEPA document itself, as long as the decision file reflects those additional options that were considered.

### Range of Alternatives for an Environmental Assessment

Generally, development of a range of alternatives is required when preparing an EA, as is a description of the no-action alternative (46.310). There is no minimum number of alternatives that must be developed when preparing an EA. In some cases, the range of alternatives for an EA can be two—the proposal and the no-action alternative.

Furthermore, in instances where it is determined that there are "no unresolved conflicts about the proposed action with respect to alternative uses of available resources," the requirement to consider a range of alternatives, including the no-action alternative, does not apply (46.310(b)). In such circumstances, an EA need only evaluate the impacts of the proposed action. This would be most likely to occur for simple proposals that would have limited environmental impacts, but for which there is not an existing CE. If you are involved with preparation of an EA for which you believe 46.310(b) applies, you should consult with your REC to discuss the appropriateness of using that provision.

### Range of Alternatives for an Environmental Impact Statement

Development of a range of alternatives is required when preparing an EIS, as is a description of the no-action alternative (1502.14; 46.415(b)). In almost all cases, an EIS will include multiple action alternatives retained for detailed analysis in addition to the no-action alternative; however no specific number of alternatives is prescribed (46.415).

### Consensus-Based Alternative

The DOI NEPA regulations require bureaus to incorporate consensus-based management whenever practicable (46.110(c)). Consensus-based management involves outreach to persons, organizations, or communities who may be interested in or affected by a proposed action and seeks to achieve agreement from diverse interests regarding proposed actions (46.110(a)). To be selected for implementation, a consensus-based alternative must be consistent with NEPA, the CEQ regulations, all applicable statutory and regulatory provisions, and NPS and DOI policies and guidance (46.110(b)). If a consensus-based alternative is carried forward for detailed analysis and is not identified as the preferred alternative in an EA or EIS, the document must state the reasons the consensus-based alternative is not preferred (46.110(d)). When practicing consensus-based management, you must ensure that its use is in accordance with the Federal Advisory Committee Act and all other applicable laws (46.110(e)). [*See ESM 13-12: Incorporating Consensus-Based Management in Agency Planning and Operations; see also DO-75A: Civic Engagement and Public Involvement and The National Park Service Guide to the Federal Advisory Committee Act.*]

## B.     The No-Action Alternative

If you are preparing an EIS, you must describe and analyze the alternative of "no action" (1502.14). Except in limited circumstances (when there are no unresolved conflicts with respect to alternative uses of available resources), you must also describe and analyze the no-action alternative when preparing an EA (46.310(b)).

The term "no action" has two interpretations. It may mean "no change" from a current management direction or level of management intensity, which would be the case for proposals involving an update to an existing plan, policy, or ongoing management program. Alternatively, it may mean "no project" in cases where a new project, such as construction of a visitor contact station is proposed for implementation (46.30).

It is important to accurately define the no-action alternative. One reason is so that you can accurately describe the environmental impacts of not taking an action under consideration. This is important because the no-action alternative provides a benchmark for a decision maker to compare what would happen to the environment if current management were to continue, versus what would happen to the environment if one of the action alternatives were selected for implementation. A second reason is that the no-action alternative is often a viable choice for a decision maker. This is especially true in the case of applicant-generated proposals.

*The term "no action" has two interpretations. It may mean "no change" from a current management direction or level of management intensity, which would be the case for proposals involving an update to an existing plan, policy, or ongoing management program. Alternatively, it may mean "no project" in cases where a new project, such as construction of a visitor contact station is proposed for implementation (46.30).*

It is important to note that the no-action alternative is different than the baseline used for predicting changes to the condition of resources. The current state of the resources affected (typically what is described in the affected environment section of a NEPA document) serves as the baseline for predicting changes to the human environment that could occur if any of the alternatives under consideration, including the no-action alternative, are implemented. [*See Section 4.4: Describing the Affected Environment*.] While in many cases the impacts of no action may essentially be the same as the baseline, meaning there would be no change to current conditions under the no-action alternative, the two concepts are distinct. The no-action alternative describes what would happen if current management were to continue into the future and an analysis of the no-action alternative should discuss how the current condition of affected resources would change if current management were to continue. For example, if your park unit currently makes routine repairs to a road, and is considering a road rehabilitation project, the no-action alternative would be to continue making routine repairs. In that scenario, the impact analysis of the no-action alternative would disclose what would happen if the rehabilitation project does not take place (e.g., the routine repairs may eventually not be adequate and the road will continue to deteriorate, which could create the need to reconstruct the road in the future).

Because it is required to be included by the CEQ regulations, the no-action alternative does not need to be reasonable in order to be carried forward for detailed analysis. If choosing a true no-action alternative would violate laws, regulations, or policies, you may want to add a "minimum management" alternative to your range, which would represent current management with the minimum amount of changes required to bring management into compliance with laws, policies, or regulations. A "minimum management" alternative should be considered in addition to, not instead of, a no-action alternative.

## C.    The Preferred Alternative

A preferred alternative is the alternative that "would best accomplish the purpose and need of the proposed action while fulfilling [the NPS] statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors" (46.420(d)). It is standard NPS practice to identify the preferred alternative in EAs and is required by the CEQ regulations in most instances for DEISs and in all instances for final EISs unless another law prohibits the expression of a preference (46.425(b)). The only instances where a preferred alternative does not need to be identified in a DEIS is when the NPS truly does not have a preferred alternative at the time the DEIS is released or when another law prohibits the expression of a preference (46.425(a)). You should consult with your REC if you intend to release an EA or DEIS without a preferred alternative.

Identification of a preferred alternative is within the sole discretion of the NPS decision maker. Within the NPS, generally, decision-making authority for an EA or EIS is delegated to the regional director (DO-12, 5.3). A preliminary impact analysis should be complete prior to identifying a preferred alternative. While there is no required process for identifying a preferred alternative, pursuant to DO-12, a superintendent may make recommendations to the regional director regarding the identification of a preferred alternative. Prior to making a recommendation, a

superintendent should consider the input of the project team (referred to in DO-12 as interdisciplinary teams or project review teams), which includes resource and compliance specialists who have worked on and provided input into the NEPA review. The preferred alternative need not, however, reflect a consensus or majority opinion of the project team.

It is important to note that a preferred alternative is not "selected," and identification of a preferred alternative is not a final agency action. The purpose of identifying a preferred alternative is to let the public know which alternative the agency is leaning toward selecting at the time an EA, DEIS, or FEIS is released. There is no requirement to provide a rationale as to why a particular alternative is identified as the preferred alternative. It is only when an alternative is selected for implementation in a FONSI or ROD that a rationale is required to explain why that particular alternative was selected.

Because identification of a preferred alternative is within the sole discretion of the NPS decision maker and no decision is made when identifying a preferred alternative, structured decision-making processes such as "choosing by advantages" and other value analysis processes should not be relied upon to identify a preferred alternative. [*See supplemental guidance: Identifying a Preferred Alternative.*]

## D.    The Environmentally Preferable Alternative

The environmentally preferable alternative is the alternative developed and analyzed during the NEPA process "that causes the least damage to the biological and physical environment and best protects, preserves, and enhances historical, cultural, and natural resources" (46.30). An environmentally preferable alternative must be identified in a ROD and may be identified in EAs, FONSIs, and draft and final EISs (1505.2(b); 46.450).

When identifying an environmentally preferable alternative, you should briefly document the rationale for why you identified the particular alternative as environmentally preferable (i.e., why that alternative would cause the least damage to the environment and best protect resources). The environmentally preferable alternative does not need to be the NPS preferred alternative, nor does it need to be the alternative that is ultimately selected for implementation (46.420; 46.450). When you identify an environmentally preferable alternative, you are not required to explain why other alternatives are not environmentally preferable.

*The environmentally preferable alternative does not need to be the NPS preferred alternative, nor does it need to be the alternative that is ultimately selected for implementation*

In limited circumstances, it is possible that you may identify more than one environmentally preferable alternative if different alternatives have different impacts on affected resources (46.30). For example, if one alternative in the EA or EIS is highly protective of biological resources but has substantial impacts to cultural resources, and another alternative is highly protective of cultural resources but has substantial impacts to biological resources, the former alternative may be identified as environmentally preferable with regard to biological resources while the latter may be identified as environmentally preferable with regard to cultural resources.

### E.    Mitigation

NEPA promotes efforts to prevent or eliminate environmental harm. Mitigation often plays a central role in the avoidance or minimization of adverse environmental impacts. The CEQ regulations define mitigation as including (1508.20):

- avoidance of an impact through not taking an action or parts of an action;

- minimizing impacts through limiting the degree or magnitude of an action;

- rectifying impacts by repairing, rehabilitating, or restoring the affected environment;

- reduction or elimination of impacts by preservation and maintenance operations during the life of the action; and

- compensation for the impact by replacing or providing substitute resources or environments.

The CEQ regulations require inclusion of appropriate mitigation measures in alternatives (1502.14(f)). In most cases, mitigation measures should be developed and incorporated as integral elements of the alternatives. Often, mitigation consists of best management practices designed to minimize impacts that are included as elements common to all alternatives. Although not common in the NPS, it is possible to develop a "mitigation alternative" for consideration and analysis in the NEPA process. This would most likely occur in association with an applicant-generated proposal.

When developing mitigation measures, you should ensure that the NPS has the authority to carry out the measures and that there is a reasonable expectation of having the human and capital resources needed to perform the mitigation and monitoring to ensure mitigation is effective. The mitigation measures that you develop should be reasonable, effective, and feasible ways to reduce, eliminate, or compensate for impacts to one or more affected resources.

For example, if you are considering constructing a new parking lot in your park unit, a mitigation measure that you might identify to reduce impacts to air quality might involve using water to suppress fugitive dust during construction. Such a measure would likely constitute a reasonable, effective, and feasible mitigation. But if the parking lot is proposed in a location that would require felling numerous 400-year-old trees, a mitigation measure involving the planting of saplings in a nearby location to compensate for the loss of the old-growth trees would not, by contrast, constitute reasonable or effective mitigation because saplings cannot adequately replace or substitute for the ecosystem functions provided by the old-growth trees.

### F.    Adaptive Management

Adaptive management is "a system of management practices based on clearly identified outcomes and monitoring to determine whether management actions are meeting desired outcomes; and if not, facilitating management changes that will best ensure that outcomes are met or re-evaluated" (46.30). Adaptive management addresses the fact that our knowledge of natural systems is incomplete and uncertainty often exists with respect to whether actions will achieve desired

58

outcomes. Through use of adaptive management, it is possible to adjust management actions over time as knowledge of the natural system is gained through monitoring, thereby allowing management actions to more fully achieve the intended results. Adaptive management is a structured and iterative process. It is not "trial and error" management.

*Adaptive management is a structured and iterative process. It is not "trial and error" management.*

A framework for adaptive management should include a variety of components. Some central components are described below. [*See Adaptive Management: The U.S. Department of the Interior Technical Guide.*] At a minimum, an adaptive management framework must include (ESM 13-11):

- desired outcomes of the management actions that are clearly defined;

- initial management actions aimed at achieving the desired outcome;

- activities that are monitored to determine whether the desired outcome is being achieved; and

- adaptive actions that will be taken if monitoring indicates that desired outcomes are not being achieved.

You should use adaptive management as appropriate (46.145). Adaptive management is most appropriate in situations where there are key uncertainties about the long-term implications of management actions and monitoring can be used to determine whether adjustments should be made to future implementation decisions. For example, if you are preparing a wildlife management plan where there is a close relationship between deer browsing and vegetation regeneration, using adaptive management would likely be appropriate. As part of the plan, you might define a particular level of vegetation regeneration as the key desired outcome of deer management activities. An adaptive management framework would describe how monitoring would be used to determine whether initial management actions achieve desired outcomes, and describe and evaluate the environmental impacts of additional management actions to take if desired outcomes are not met.

Adaptive management is less appropriate in situations where the impacts of management actions are relatively certain or there is little opportunity to adjust the implementation of the action in the future. For example, if there is a proposal involving construction of a new parking lot in your park unit, you are not likely to use adaptive management because the impacts of the action are likely well understood and the action, once taken, does not easily lend itself to subsequent adjustments.

If you propose using adaptive management, an adaptive management framework should be incorporated as an element of one or more of the alternatives under consideration. Regardless of whether adaptive management is included in multiple alternatives or exists as a stand-alone alternative, you should make sure the description and analysis of the adaptive management framework in your NEPA document describes and analyzes the central adaptive management components discussed above.

If the adaptive management framework and its impacts, including those of potential subsequent actions, are clearly pre-specified and described, then in most cases

actions may be adjusted during implementation without the need for further NEPA review (46.310(d); 46.415(b)(3)).

## 4.4    DESCRIBING THE AFFECTED ENVIRONMENT

The affected environment consists of "the environment of the area(s) to be affected or created by the alternatives under consideration" (1502.15). Put another way, the affected environment describes the existing condition of the resources that could be impacted by implementing any of the alternatives. You should organize the discussion of resources in the affected environment by impact topics; only impact topics that are related to issues carried forward for detailed analysis should be included in the affected environment. When applicable, the affected environment should discuss resource condition trends and identify contributing factors, such as climate change. Such information can provide a basis for considering how a changing, dynamic environment could affect conclusions that are reached regarding the environmental consequences of implementing any of the alternatives under consideration.

*The affected environment serves as the baseline for predicting changes to the human environment that could occur if any of the alternatives under consideration (including no action) are implemented.*

The affected environment serves as the baseline for predicting changes to the human environment that could occur if any of the alternatives under consideration, including the no-action alternative, are implemented. The affected environment is separate and distinct from the no-action alternative, which describes current management rather than the current state of affected resources, and discloses how the current condition of affected resources would change if current management were to continue. [*See Section 4.3 B: The No-Action Alternative.*]

As you refine the proposed action and develop alternatives, you should define a boundary for analysis that consists of the area in which the proposal's impacts on a resource would be felt. The analysis boundary may be different for the various resources affected by the proposal. For example, if there is a small sewage treatment plant proposed for a park unit, two issues associated with the proposal might be that grading the construction site could impact vegetation and that wastewater discharge associated with plant operation could impact water quality. The affected environment for vegetation might be confined to the construction footprint whereas the affected environment for water quality might extend beyond the boundary of the park unit from the site of the discharge to where effects are no longer discernible. If you were evaluating multiple sites for the plant, you would need to be sure to include the areas that would be affected by each site under consideration in your analysis boundary.

In order to describe the affected environment (and ultimately analyze environmental impacts), you should collect and compile information on the resources that could be affected by the proposed action and alternatives. As a first step, consider existing sources in which the affected environment is already described. The CEQ regulations encourage incorporation by reference as a means to limit the amount of material included in a NEPA document.

As you collect and compile information on the affected environment, remember that descriptions of the affected environment "shall be no longer than is necessary to

understand the effects" and that "[d]ata and analyses in a statement shall be commensurate with the importance of the impact" (1502.15). This means that your description of the affected environment should focus on the condition of resources that are expected to be impacted most by the proposed action or alternatives. For example, there is no value to including several pages of detail on the chemical and physical properties of a stream when the only expected impact on water quality is the potential to discharge a small amount of sediment that would only affect turbidity in a very small area of the stream for a short amount of time. Additionally, consider appending any highly technical material or background material to your EA or EIS or incorporating it by reference, rather than including it as part of the affected environment description. [*See Section 2.3: Incorporation by Reference, and Section 2.4: Tiering.*]

## 4.5    IMPACT ANALYSIS

NEPA reviews must take a "hard look" at impacts that alternatives under consideration would have on the human environment if implemented. This means that there must be evidence that the NPS considered all foreseeable direct, indirect, and cumulative impacts, used sound science and best available information, and made a logical, rational connection between the facts presented and the conclusions drawn.

Analyzing impacts means considering how the condition of a resource would change, either negatively or positively, as a result of implementing each of the alternatives under consideration. A written impact analysis that focuses on significant issues should be included in the environmental consequences section of a NEPA document. As with the affected environment section, while your analysis should remain focused on significant issues, you should organize the environmental consequences section by impact topic so that the reader can track the current condition and potential impacts related to specific resources throughout the NEPA document. A written impact analysis should:

- describe the impacts that each of the alternatives under consideration would have on affected resources;

- use quantitative data to the extent practicable;

- discuss the importance of impacts through consideration of their context and intensity; and

- provide a clear, rational link between the facts presented and the conclusions drawn.

When conducting an impact analysis, you must consider the potential direct, indirect, and cumulative impacts of actions and must also consider adverse and beneficial impacts (1508.7; 1508.8). You should not combine adverse and beneficial impacts of a proposed action or alternatives into a single, net impact. Rather, you should assess adverse and beneficial impacts separately because an action may result in a significant adverse impact even though there may be an overall beneficial effect (1508.27).

You should address issues related to climate change, when applicable. There are two distinct ways that climate change may be relevant to an impact analysis: 1) an action's contribution to climate change through GHG emissions; and 2) the implications of climate change effects on an action and its environmental impacts.

For an EA, the level of detail and depth of analysis should normally be limited to the minimum needed to determine whether there would be significant environmental effects (46.310(e)). The analysis of the impacts of the preferred alternative forms the basis for the decision of whether to prepare an EIS or a FONSI (1508.9(a)(1)).

[*For more information, see supplemental guidance: Preparing Focused and Concise EAs, and supplemental guidance: Writing Impact Analysis Sections for EAs and EISs.*]

### A.    Direct Impacts

Direct impacts are impacts "which are caused by the action and occur at the same time and place" (1508.8(a)). For example, if there is a proposal to construct a new transit center in your park unit in order to encourage more visitors to use a shuttle system, construction activities might directly affect wildlife due to noise and ground disturbance, and air quality through equipment-related exhaust emissions and production of fugitive dust.

### B.    Indirect Impacts

Indirect impacts are impacts "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable" (1508.8(b)). For example, consider the transit center proposal discussed above. A reasonably foreseeable consequence of taking the action might be a reduction of private vehicles on park roads and a corresponding decrease in related vehicle exhaust emissions. The resulting impact on air quality (in this instance, a beneficial one) would represent an indirect impact. It would occur later in time and at a greater distance than the action of building the transit center, but would nonetheless be a consequence of the proposal.

You do not need to differentiate direct impacts from indirect impacts. However, you may choose to do so if you wish. Regardless of how you present the information, you should make sure to distinctly describe all direct and indirect impacts that could occur from implementation of each of the alternatives under consideration.

### C.    Cumulative Impacts

In addition to direct and indirect impacts, you are required to analyze the cumulative impacts of each alternative (1508.25(c)). A cumulative impact is an "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions" (1508.7). A cumulative impact analysis must consider the overall effects of the direct and indirect impacts of the proposed action, when added to the impacts of past, present, and reasonably foreseeable actions on a given resource. This is typically described as:

direct and indirect effects of the proposed action + impacts of past, present, and reasonably foreseeable future actions = cumulative impacts.

If there are no direct or indirect effects from an action on a particular resource, there can be no cumulative effects on that resource from that action.

In order to accurately assess cumulative impacts, you will need to identify past, present, and reasonably foreseeable future actions that affect the same resources as the proposed action or alternatives. Past, present, and reasonably foreseeable future actions are not limited to NPS actions, but could be actions taken or proposed by any federal, state, or local government or a private entity, and are actions that are not included in the proposal or alternatives under consideration. To be considered under the cumulative analysis section of your EA or EIS, past actions should have ongoing impacts that are presently occurring. Reasonably foreseeable future actions include those federal and non-federal activities not yet undertaken, but sufficiently likely to occur, that a decision maker should take such activities into consideration in reaching a decision. This includes, but is not limited to, activities for which there are existing decisions, funding, or proposals. Reasonably foreseeable future actions do not include those actions that are highly speculative or indefinite (46.30).

For example, if there is a small sewage treatment plant proposed for your park unit that would impact water quality by discharging treated wastewater into a river, the scope of your impact analysis should include analysis of the incremental impacts of past, present, and reasonably foreseeable future actions on water quality, combined with the impact of your proposal. Suppose in this example that cattle ranching on public land immediately upstream of the park has resulted in and continues to result in impacts to the river's water quality. Inside the park, future road construction activities are expected to have impacts on the river's water quality. Immediately downstream of the park there is agricultural use on private land that contributes additional impacts to the river's water quality. These represent past, present, and reasonably foreseeable future actions; although they are not part of the sewage treatment plant proposal, their collective impact on the river's water quality must nonetheless be analyzed in combination with those of the plant in the cumulative impact analysis performed as part of the NEPA review of the plant (1508.7; 1508.25(a)(2)).

It is important to note that past, present, and reasonably foreseeable future actions are limited to human actions, meaning they are attributable to specific individuals or entities. Naturally occurring incidents, such as storm events or floods, are not actions per se and therefore the effects of these types of incidents should be considered as part of the affected environment rather than as part of a cumulative impact analysis. Similarly, changes to the environment that are not attributable to specific actions, such as general urban encroachment or population growth, should be addressed as part of the affected environment. [*See Section 4.4: Describing the Affected Environment*.]

When characterizing cumulative impacts, it is generally not necessary to individually list and analyze the effects of each past cumulative action. Rather, it is appropriate to discuss them in sum. [*See CEQ guidance: Guidance on the Consideration of Past Actions in Cumulative Effects Analysis*.] When describing cumulative impacts in an EA or EIS, you should separate the cumulative impact analysis from the analysis of direct and indirect impacts. While the cumulative impact analysis should include the same

elements of a written impact analysis discussed above, in many cases due to the nature of available information, the description of cumulative impacts may be less detailed than description of direct and indirect impacts. [*For more information on cumulative impact analysis, see CEQ guidance: Considering Cumulative Effects under the National Environmental Policy Act.*]

## 4.6   CIRCULATING ENVIRONMENTAL ASSESSMENTS AND ENVIRONMENTAL IMPACT STATEMENTS, SOLICITING PUBLIC COMMENTS, AND RESPONDING TO COMMENTS

The CEQ regulations require that agencies involve the public in decisions that would have environmental impacts to the fullest extent possible (1500.2(d)). Furthermore, DO-75A requires NPS managers to involve the public when making discretionary decisions where, "(1) the public has an identifiable interest or is likely to be interested, (2) there may be applicable knowledge or expertise likely to be available only through public consultation, or (3) there are complex or potentially controversial issues." (DO-75A, IV). One way to meet these requirements is by making EAs and EISs available for public review and comment.

### Soliciting Comments

There are a variety of mechanisms for notifying the public of the availability of EAs and EISs, including the Federal Register, direct or electronic mailings, press releases, website updates, newsletters, and on PEPC. You are encouraged to use electronic communications and digital media whenever possible to facilitate public review and comment. One tool that is particularly useful for disseminating information and facilitating public comments is the PEPC system, which is specifically designed to help with collection, management, and analysis of public comments. The standard NPS practice is to accept written comments by mail, at public meetings if applicable, at a park unit headquarters, and online through the PEPC system. The preferred method for receiving comments is through the PEPC system; this should be clearly communicated in public outreach materials requesting comments.

Requests for an extension of a comment period should be considered on a case-by-case basis. When considering whether to extend a comment period, you should consider the length of the original comment period, the time frame in which a decision is needed, and any extenuating circumstances that would warrant additional time (such as a natural disaster during the comment period in the area of the NPS unit). For EISs, in most cases where the comment period is 60 days or more, there should be no need to extend the comment period. If a comment period is extended for an EIS, it should be done formally through the Environmental Protection Agency (EPA); an NPS *Federal Register* notice is not required. Extensions of comment periods for an EA should be accomplished by providing notice to the public in the same or similar manner that the original comment period was announced.

### Responding to Comments

The NPS is required to respond to substantive comments submitted during the public review period for DEISs (1503.4). For EAs, the NPS must consider all comments that are timely received, and the standard NPS practice is to respond to

substantive comments that are submitted during the public review period for EAs (46.305(a)(1)).

Substantive comments are those that:

- question, with reasonable basis, the accuracy of the information in the NEPA document;

- question, with reasonable basis, the adequacy of the environmental analysis;

- present reasonable alternatives other than those presented in the NEPA document; or

- cause changes or revisions in the proposal.

In other words, substantive comments raise, debate, or question a point of fact or analysis. Comments that merely support or oppose a proposal or that merely agree or disagree with NPS policy are not considered substantive and do not require a formal response.

Responding to substantive comments in many cases means more than just providing a written response and can include:

- making factual corrections in the EA or EIS;

- supplementing, improving, or modifying the analysis;

- modifying alternatives;

- developing and evaluating new alternatives; and

- explaining why the comments do not warrant further response by citing sources, authorities, or reasons in support of the NPS position.

When preparing written responses, you do not necessarily need to respond to every individual substantive comment received; it is acceptable to summarize similar comments and create a single response (Q29a). In most cases you should use the PEPC system to help with organizing and responding to comments. PEPC can be particularly helpful when there are a large number of comments.

## A.     Circulating an Environmental Assessment and Responding to Comments

The NPS must provide for public involvement in an EA process to the extent practicable (46.305(a)). In all cases, the NPS is required to notify the public of the availability of an EA (46.305(c)). The DOI NEPA regulations state that the NPS may seek public comment on an EA when deemed appropriate, such as when public interest or uncertainty of effects warrants (46.305(b)), and require consideration of comments received on EAs whether they are specifically solicited or not (46.305(a)(1)).

DO-75A sets forth the philosophy of the NPS with respect to public involvement, which is to "do more than meet the minimum legal requirements for public involvement in our decisions and activities" and commits the NPS to seek public input into discretionary decision-making (DO-75A, I). Therefore, unless there is a

specific situation that precludes it, public review and comment should be sought for every EA. The standard practice for EAs is to allow for a public review period of 30 days that is announced on PEPC and through a press release, direct or electronic mailings, or other effective means of communication. The comment period should commence on the day you announce the availability of the EA.

In some instances public meetings to present information on the EA and solicit comments may be helpful to or appropriate for the planning effort. If there is known public interest in the proposal or if a cooperating agency expresses a desire for a public meeting, you should hold one. If you do hold public meetings, notice of those meetings should be included as part of the announcement of EA availability. When practicable, you should provide notice at least 15 days prior to the meeting dates.

Following the close of the comment period, if necessary, you should make changes and respond to substantive comments in errata rather than reissuing the EA. If a large number of changes need to be made as a result of public comments, you may issue a revised EA with comment responses appended. A revised EA may be issued without the need to initiate another comment period (46.305). If, prior to releasing an EA, you anticipate that substantial changes could be necessary following a public review and comment period, you may wish to circulate a draft EA, make necessary changes based on comments received, and then issue a final EA. A final EA should include an appendix containing responses to comments and does not require another comment period.

## B.  Circulating an Environmental Impact Statement and Responding to Comments

The CEQ regulations require issuance of both draft and final versions of an EIS (1502.9). The regulations also require agencies to make a DEIS available for public review, invite comments, and affirmatively solicit comments from those persons or organizations who may be interested or affected (1503.1).

EISs (both draft and final) must be filed with the EPA at the time of public release (1506.9; 46.415(c)). Upon filing, the EPA publishes a notice of availability (NOA) of the draft or final EIS in the *Federal Register* (1506.10(a)). Copies of the EIS must also be sent to the appropriate EPA regional office for review and comment pursuant to Section 309 of the Clean Air Act.

The CEQ regulations require a DEIS public comment period of at least 45 days (1506.10(c)) after publication of the EPA NOA in the *Federal Register* (1506.10(a)). In the NPS, however, consistent with the philosophy and policies set forth in DO-75A, the standard practice is to allow a 60-day comment period. If you are considering a comment period of less than 60 days, you should consult with your REC. Depending on the level of controversy, interest, and complexity, a comment period longer than 60 days may be appropriate for some actions.

The standard NPS practice is to hold public meetings to present information on the DEIS and to solicit comments, although public meetings are not required. When determining whether to hold public meetings or hearings, the CEQ regulations require consideration of factors such as the level of environmental controversy

*The CEQ regulations require a DEIS public comment period of at least 45 days (1506.10(c)) after publication of the EPA NOA in the Federal Register (1506.10(a)). In the NPS, however, consistent with the philosophy and policies set forth in DO-75A, the standard practice is to allow a 60-day comment period.*

associated with the proposal, the level of public interest in meetings or hearings, and requests by other agencies for meetings or hearings (1506.6(c)). Meetings or hearings may be conducted in any format, but should be planned with a goal of facilitating submission of substantive comments on the DEIS.

If public meetings are held, you should provide notice at least 15 days prior to the meeting dates when practicable. It is standard NPS practice to announce meetings or hearings on PEPC and through a press release, direct or electronic mailings, or other effective means of communication.

The NPS must respond to substantive comments on a DEIS (1503.4). Responses to comments must be included in the FEIS and factual changes should also be made in the text of the FEIS wherever possible (1502.9; Q29a; 1503.4). If comments on a DEIS lead to the discovery of substantial new information or substantive changes to the proposal with environmental ramifications, preparation of a supplemental DEIS may be required. [*See Section 4.10: Supplements to Draft and Final EISs.*]

The release of a FEIS and publication of the EPA NOA for the FEIS is followed by a 30-day period during which the NPS cannot make a final decision; i.e., a ROD cannot be signed until at least 30 days after publication of the EPA NOA. This is commonly called the "30-day no action period." It is not a formal comment period; however, agencies or members of the public may make comments before a final decision is made. If you receive comments on a FEIS, you should consider them to the extent practicable, but you are not required to respond to or affirmatively address the comments. [*See Section 4.7: Concluding the NEPA Process and Documenting a Decision.*]

### Abbreviated Final Environmental Impact Statement

In situations where comments on a DEIS result in minor changes involving only factual corrections or explanations of why comments do not warrant further response, an abbreviated FEIS may be prepared (1503.4(c)). In the case of an abbreviated FEIS, the DEIS is not updated and republished as a full-length FEIS. Rather, responses to comments and text changes are made in errata.

An abbreviated FEIS should include a cover sheet, an explanation of what the abbreviated FEIS contains, substantive comments received, comment responses, and errata sheets. As long as the draft EIS is incorporated by reference and is readily available to agencies and the public through PEPC or other means, there is no need to circulate it along with the abbreviated final EIS. If an abbreviated FEIS is prepared in this format, it should be filed with the EPA along with copies of the original DEIS. If you are considering the use of an abbreviated FEIS, you should consult with your REC to discuss this option in more detail.

## 4.7   CONCLUDING THE NEPA PROCESS AND DOCUMENTING A DECISION

For the NPS, FONSIs and RODs are formal decision documents resulting from NEPA reviews. Once a FONSI or ROD is signed by the regional director, the NEPA process formally ends. In some circumstances, the NEPA process can be terminated

without issuing a decision. [See Section 4.11: Terminating the NEPA Process Prior to Completion.] Pursuant to the NPS Guidance for Non-Impairment Determinations and the NEPA Process, a non-impairment determination must be appended to a FONSI or a ROD.

## A.    Environmental Assessments

The EA process concludes with one of the following (46.325):

- the signing of a FONSI by the regional director;

- a decision to switch to preparation of an EIS for the proposal and publication of a NOI to prepare an EIS in the Federal Register; or

- a decision that no further action will be taken on the proposal [*See Section 4.11: Terminating the NEPA Process Prior to Completion*.]

It is important to note that although alternatives under consideration in an EA may have the potential for significant adverse impacts, an EIS would not need to be prepared if an alternative that does not have significant adverse impacts is selected for implementation or if the impacts of the selected alternative can be mitigated to a level below significance.

### *Finding of No Significant Impact*

A FONSI serves two functions in the NPS. First, it documents the NPS decision on a proposal evaluated in an EA. Second, it documents the conclusion that implementation of the selected action would not result in significant adverse impacts. A FONSI is typically signed by the regional director and should be signed only after all EA process requirements and other consultation requirements (such as ESA Section 7 and NHPA Section 106) have been met. [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements*.]

There are two instances when a FONSI should be prepared:

1.    The analysis contained in the EA shows that the alternative selected for implementation would not have significant effects.

2.    The analysis contained in the EA shows the alternative selected for implementation would have no significant effects beyond those already analyzed in an EIS to which the EA is tiered. This may be referred to as a "finding of no new significant impact" (46.140(c)). When preparing a finding of no new significant impact, you should affirmatively state that the EA has been tiered from an earlier EIS and that there are no significant adverse impacts beyond those already disclosed in the EIS. [*See Section 2.4: Tiering*.]

### *FONSI Content*

Neither the CEQ nor DOI NEPA regulations provide detailed requirements for the content of FONSIs. The standard content of NPS FONSIs is reflective of the dual purposes described above.

The FONSI must include, summarize, or attach and incorporate by reference, the EA. It should then do the following:

68

- clearly identify and describe the selected alternative; if the selected alternative has been changed since release of the EA as a result of public or agency comments, briefly describe the changes, the reasons for the changes, and whether and how the changes alter the impact analysis that was included in the EA;

- discuss the rationale for the decision reached;

- state any mitigation measures that are not included as an integral part of implementation of the selected action; and

- succinctly state why implementation of the selected action would not result in significant adverse impacts

- this discussion should provide a rational basis for the finding as opposed to simply making conclusory statements regarding the absence of significant adverse impacts

- if relevant, state which factors for significance included in the CEQ NEPA regulations were weighted most heavily in the consideration (1508.27; Q37a).

A non-impairment determination must be appended to the FONSI (*See NPS Guidance for Non-Impairment Determinations and the NEPA Process*). Errata sheets and comment responses, if applicable, should be appended to the FONSI.

### *Mitigated FONSI*

A mitigated FONSI can be signed when a project's adverse environmental effects will be reduced below the significance threshold by the application of specific mitigation measures included in the FONSI. A mitigated FONSI must include a commitment by the NPS to enforce the mitigation measures and to monitor the effectiveness of the mitigation measures. [*See CEQ guidance: Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact.*]

### *Public Notification of a FONSI*

The NPS must notify the public of the availability of a FONSI once it is signed (46.305(c); Q38). The standard NPS practice to meet this requirement is to announce its availability on PEPC and through a press release, direct or electronic mailings, or other effective means of communication. You may wish to post the FONSI on PEPC as well.

For actions with effects of national concern, the NPS must publish a NOA for the FONSI in the *Federal Register* and provide notice to organizations reasonably expected to be interested in the matter (1506.6(b)). In practice, most actions selected in a FONSI should not be considered to have effects of national concern.

The NPS must make a FONSI available for public review for 30 days prior to making a final determination whether to prepare an EIS and may not implement the selected action until after the 30-day period has passed in the following circumstances: (1) the proposed action is, or is closely similar to, one which normally requires the

preparation of an EIS; or (2) the nature of the proposed action is one without precedent (1501.4(e)(2)).

## B.   Environmental Impact Statements

### Record of Decision

A ROD documents the NPS decision on a proposal evaluated in an EIS. A ROD is typically signed by the regional director and should be signed only after all EIS process requirements and other consultation requirements (such as ESA Section 7 and NHPA Section 106) have been met. [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements.*] In rare cases, signature authority may be elevated to the NPS director or to the assistant secretary level within DOI. A non-impairment determination must be appended to a ROD (*See NPS Guidance for Non-Impairment Determinations and the NEPA Process*).

### ROD Content

The ROD, which typically begins with a brief summary or background of the proposal, must do the following (1505.2):

- clearly identify and describe the selected action/alternative; if the selected alternative has been changed since release of the FEIS as a result of public or agency comments, briefly describe the changes, the reasons for the changes, and whether and how the changes alter the impact analysis that was included in the FEIS;

- briefly describe other alternatives considered and analyzed in detail;

- discuss the rationale for the decision reached (i.e., why the alternative was chosen as the selected action);

- identify the environmentally preferable alternative. A brief discussion of the rationale for the identification should be provided;

- state any mitigation measures that are not inherently integral to the selected action's implementation and a summary of any monitoring or enforcement programs associated with the mitigation; and

- include a statement of whether all practical means to avoid or minimize environmental harm from the selected action have been adopted, and if not, why.

### Public Notification of a ROD[4]

A signed ROD must be made available to the public through appropriate notice (1506.6(b); Q34a). It is standard NPS practice to announce the availability of a ROD on PEPC and through a press release, direct or electronic mailings, or other effective means of communication. You may wish to post the ROD on PEPC as well.

For actions with effects of national concern, the NPS must publish a NOA for the ROD in the *Federal Register* and provide notice to organizations reasonably expected

---

[4] Note that in some instances, NPS policies not related to NEPA may require notice of a ROD be published in the Federal Register. For example, Director's Order 41: Wilderness Stewardship requires a Federal Register notice for RODs associated with wilderness studies.

to be interested in the matter (1506.6(b)). As with EAs, although NPS lands are managed for the use and enjoyment of the American public, most actions should not be considered to have effects of national concern. Large-scale projects at iconic park units (e.g., uranium mining at Grand Canyon National Park) are more likely to have effects of national concern than adopting a wildlife management plan at a smaller national park system unit.

## 4.8   IMPLEMENTING A DECISION

### A.   Finding of No Significant Impact

In general, once the availability of the signed FONSI is announced to the public, you can immediately begin implementing the selected action. If changes to the selected action occur after the FONSI is signed but before the action is implemented, additional NEPA review may be required. If the changes are minor, then a memorandum to file or a CE may be prepared to document the changes. On the other hand, if changes would represent implementation of a substantially different action than that analyzed in the EA and selected in the FONSI or would give rise to new impacts not considered in the EA, then it would likely be necessary to prepare a new EA and FONSI. This underscores the importance of broad and thorough public and agency involvement throughout the NEPA process. You should consult with your REC if you have questions about changes to a selected action after a FONSI is signed.

### B.   Record of Decision

For most actions, implementation of the selected action may commence once the ROD is signed and proper notice of its availability is announced to the public. If changes to the selected action occur after the ROD is signed but before the action is implemented, additional NEPA review may be required, as discussed above for FONSIs. You should consult with your REC if you have questions about changes to a selected action after a ROD is signed.

## 4.9   THE DECISION FILE

The decision file consists of the collection of documents that, taken together, detail and support the NEPA review and decision-making process. The decision file contains the "story" of the decision-making process and provides a basis for explaining the decision reached. Though the decision file is sometimes referred to as the administrative record, the NPS prefers the term "decision file." "Administrative record" has a specific meaning under the Administrative Procedure Act: it is the record prepared after litigation is initiated. While an administrative record is generally drawn from the decision file, it does not necessarily include the entire decision file, and it is only prepared in the event of litigation.

*The decision file contains the "story" of the decision-making process and provides a basis for explaining the decision reached.*

The decision file should include substantive information that was relied on during the NEPA process and should document that the process met relevant requirements and led to a reasoned decision. Documents that should be placed in the decision file include, but are not necessarily limited to the following:

- NEPA and decision documents, including draft versions or sections that demonstrate the evolution of the analysis and decision-making process;

- documentation of compliance with other environmental requirements such as NHPA Section 106 and ESA Section 7;

- documents cited or incorporated by reference in the text of the NEPA document that are not otherwise publicly available;

- notes of interdisciplinary meetings or discussions where key decisions on the NEPA process were reached, such as on purpose and need, issues to be retained for detailed analysis, alternatives, etc.;

- correspondence, such as e-mails or phone call notes among the interdisciplinary team addressing similar key decisions;

- documentation of public involvement efforts;

- public comments; and

- memos to the decision file that clarify confusing elements of other records in the file, explain the resolution of points of internal disagreement, or "close the loop" on outstanding issues.

The decision file should be created and maintained throughout the NEPA process and new information that was not considered during the NEPA process should not be added to the decision file after a FONSI or ROD is signed unless the decision requires additional steps, such as rulemaking, before it can be implemented.

[*For more information, see supplemental guidance: Compiling a Decision File for NEPA Reviews.*]

## 4.10   SUPPLEMENTS TO DRAFT AND FINAL ENVIRONMENTAL IMPACT STATEMENTS

A supplement to a DEIS or FEIS must be prepared if, after circulation of a DEIS or FEIS but prior to an action's implementation, one of the following situations occurs (1502.9(c)):

- substantial changes are made to the proposal that are relevant to environmental concerns;

- significant new circumstances or information arise that are relevant to environmental impacts or that have bearing on the proposal; or

- the NPS determines that preparing a supplemental EIS would further the purposes of NEPA.

Substantial changes to the proposal requiring supplementation may include the addition of an entirely new alternative for detailed analysis or changes in design, location, or timing of an existing alternative that give rise to substantially new impacts not analyzed in the original EIS. Supplementation is generally not necessary in the case of changes to alternatives that do not give rise to new impacts outside the

72

range of impacts analyzed in the original EIS, as long as the analysis in the original EIS is still accurate and up-to-date.

The term "significant new circumstances or information" should be interpreted to mean that the new circumstances or information relate to potentially significant environmental impacts. For example, new circumstances or information requiring supplementation may include the listing of a species under the ESA that was not analyzed in the original EIS but may be significantly impacted by the action, or discovery of a resource present in the analysis area that was not considered in the original EIS but may be significantly impacted by the action.

A supplemental EIS must be circulated in the same manner as a DEIS or FEIS (1502.9(c)(4)). Provided that the original DEIS or FEIS is reasonably available to the public, the supplement may be circulated independently. However, if the supplement is prepared for an EIS that is not reasonably available to the public, the supplement and the EIS itself should be circulated together. Scoping is not required when preparing a supplemental EIS (1502.9(c)(4)).

You should consult with your REC if you have questions about whether a particular case requires supplementation of a DEIS or FEIS, or if you have questions regarding the preparation of a supplemental EIS.

## 4.11   TERMINATING THE NEPA PROCESS PRIOR TO COMPLETION

### A.   Environmental Assessments

If, after announcing and conducting scoping or issuing an EA document for public review and comment, you decide not to take any further action on the proposal, you should formally terminate the EA process. Terminating an EA process can be done through an announcement circulated by the same means that you used to announce scoping and availability of the document. Once the announcement has been issued, the EA process is formally concluded.

### B.   Environmental Impact Statements

Termination of an EIS occurs when preparation of a DEIS or FEIS for which a NOI has been published in the Federal Register stops. Termination may result from a decision to prepare an EA in lieu of the already initiated EIS or from abandonment of the proposal. If a DEIS has already been released, termination would typically only result from abandonment of the proposal.

If an EIS is terminated, it is standard NPS practice to publish a notice in the Federal Register announcing the termination. The notice should include a brief description of the proposal, a reference to the previously published NOI, a discussion of the NEPA process completed to date, and the reason for termination. If the reason for termination is the abandonment of the proposal, the notice should indicate that the NEPA process will be re-initiated if the proposal is revived at a future date. The appearance of the termination notice in the Federal Register formally concludes the EIS process.

If an EIS is terminated for a proposal that normally requires preparation of an EIS and an EA and FONSI are prepared instead, there is a required 30-day waiting period between public notice of the signed FONSI and implementation of the selected action. [*See Section 4.7: Concluding the NEPA Process and Documenting a Decision, and Section 1.5 D: Environmental Impact Statement.*]

## 4.12   USING CONTRACTORS

An EA or EIS may be prepared by a contractor for proposals that are generated either internally or by an applicant, provided that no conflict of interest exists between the particular contractor and the particular project. If a contractor is to prepare a NEPA document, the contractor must sign a disclosure statement prepared by the NPS stating that the contractor has "no financial or other interest in the outcome of the project" (1506.5(c)). When a contractor prepares a NEPA document, the NPS remains responsible for its accuracy and adequacy (1506.5; 46.105).

## 4.13   WORKING WITH OTHER AGENCIES AND ENTITIES

The CEQ and DOI regulations emphasize the importance of consulting, coordinating, and cooperating with other agencies during the NEPA process (1501.6; 46.155). The NPS must consult, coordinate, and cooperate with other federal, state, local, and tribal governments and other bureaus and federal agencies whenever possible concerning actions and environmental impacts within the jurisdictions of, or of interest to those entities (46.155). Furthermore, the CEQ regulations encourage cooperation with non-federal agencies that have requirements similar to NEPA to combine efforts with a goal toward reducing duplication (1506.2). Consultation and coordination must begin as early as feasible during the NEPA process (46.200).

Note that in addition to the responsibility to coordinate with other agencies and entities under NEPA, there are a variety of other environmental review and consultation requirements that may also require consulting and coordinating with other federal, state, local, and tribal governments and other bureaus and federal agencies. [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements.*]

### A.   Lead Agencies

In cases where more than one federal agency is involved in the same proposal, a single NEPA document should be prepared and one of the agencies should be designated as the lead agency. Although federal agencies may act as joint leads, this arrangement should be used sparingly[5] . In most cases a single agency should be designated as the lead agency with any other involved agencies designated as cooperating agencies (1501.5; 46.220(a); 516 DM 1.9 D). Generally, the lead agency should be the one with the greatest level of involvement with the proposal (1501.5(c)). For NPS actions, the NPS is the lead agency for the NEPA review, except for rare instances when there is a compelling reason for another agency to be a joint

---

[5] One exception is that in general, pursuant to an agreement with the Federal Highway Administration (FHWA), the NPS is to be a joint lead with FHWA for EISs prepared for Federal Lands Highway Program for Park Roads and Parkways projects.

lead. If a joint lead agency relationship is established for preparation of an EIS, one agency must be identified as the agency responsible for filing the EIS with the EPA (46.220(c)).

In cases where a non-federal agency has an action to approve that is connected to the NPS proposal, and the non-federal agency must comply with state or local requirements that are comparable to NEPA, the NPS and non-federal agency may act as joint lead agencies (46.220(b)).

## B.    Cooperating Agencies

### When the NPS is the Lead Agency

The role of the cooperating agency is to collaborate, under the coordination of the lead agency, throughout the NEPA process, on issues relating to the cooperating agency's jurisdiction or special expertise. Specific elements of the NEPA process to which the cooperating agency may contribute include, but are not limited to identification of environmental issues, alternatives development, compilation and analysis of data, and impact analysis (46.230).

An agency (federal, state, local or tribal government) is eligible to become a cooperating agency during the development of an EA or EIS if it has jurisdiction by law over actions included in an NPS proposal or alternatives under consideration, or special expertise regarding environmental issues related to an NPS proposal or alternatives under consideration (1501.6; 46.225). When the NPS is the lead agency for an EIS, it must invite eligible governmental entities to participate as cooperating agencies. When preparing an EA, the NPS may invite eligible governmental entities to participate as cooperating agencies (46.225). Typically, invitations to other governmental entities to become a cooperating agency are issued by a park unit's superintendent.

*An agency (federal, state, local or tribal government) is eligible to become a cooperating agency during the development of an EA or EIS if it has jurisdiction by law over actions included in an NPS proposal or alternatives under consideration, or special expertise regarding environmental issues related to an NPS proposal or alternatives under consideration (1501.6; 46.225).*

Jurisdiction by law means the ability to "approve, veto, or finance all or part of the proposal" (1508.15). The CEQ regulations state that an agency with jurisdiction by law shall be a cooperating agency (1501.6). Special expertise is defined as "statutory responsibility, agency mission, or related program experience" (1508.26). Any agency with special expertise may become a cooperating agency upon the request of a lead agency. Furthermore, if an agency believes it has either jurisdiction by law or special expertise, the agency itself may make a request to the lead agency to designate it as a cooperating agency (1501.6). The NPS must consider any request by an eligible governmental entity to become a cooperating agency during preparation of an EIS. If the NPS denies a request to become a cooperating agency or determines it is inappropriate to invite an eligible agency to cooperate in preparing an EIS, the NPS must state the reasons for the denial or decision not to extend an invitation in the EIS (46.225(c)).

Cooperating agency relationships, including respective roles and commitments, should be established in writing through a memorandum of understanding (46.225(d)). In the case of a cooperating relationship with a non-federal agency, the DOI NEPA regulations require that a memorandum of understanding be developed and adopted and require that it include a commitment to maintain confidentiality of

75

documents and deliberations prior to the NEPA document's public release (46.225(d)). A cooperating agency is normally expected to use its own funds to carry out its responsibilities (1501.6(b)(5)).

### When Another Agency is the Lead Agency

Whenever another agency proposes to take an action that could affect NPS resources or values, the NPS should consider becoming a cooperating agency for the other agency's NEPA review. It is to the NPS's advantage to participate and comment at the earliest possible time during the process. Input and technical assistance at the scoping stage or earlier will increase the NPS's ability to influence the proposal and enhance the credibility of NPS comments on documents developed later in the process. As a cooperating agency, the NPS typically has a much greater ability to shape the proposal and analysis and provide input in advance of public review and comment periods than it would if it were not a cooperating agency. In many cases, as a cooperating agency, the NPS will be able to offer substantial input on internal draft documents before they are released to the public.

In most cases, the NPS will be invited by the lead agency to participate as a cooperating agency. If the NPS has jurisdiction by law over the proposal, the NPS is required to participate as a cooperating agency. If the NPS has special expertise, it should participate as a cooperating agency for the reasons noted above (1501.6). In the NPS, regional directors accept or reject invitations to become cooperating agencies (DO-12, 5.3). In instances where it is not invited, the NPS may request that a lead agency grant NPS cooperating agency status.

The role of the NPS as a cooperating agency is no different than the role of cooperating agencies when the NPS is the lead: to collaborate, under the coordination of the lead agency, throughout the NEPA process on issues relating to the NPS's jurisdiction and special expertise. Specific elements of the NEPA process to which the NPS may contribute as a cooperating agency include, but are not limited to, identification of environmental issues, alternatives development, compilation and analysis of data, and impact analysis (46.230). Typically, NPS comments on other agency documents should be limited to issues for which the NPS has jurisdiction or special expertise. When the NPS is a cooperating agency, you should comment directly to the lead agency; you are not required to submit your comments as part of the DOI external environmental review process. [*See Section 5.2: DOI and NPS External Environmental Review Process.*]

As is the case when the NPS is the lead agency, the establishment of NPS's role as a cooperating agency should be done in writing, and a memorandum of understanding, including respective roles and commitments, should be developed (46.225(d)). As a cooperating agency, the NPS is normally expected to use its own funds to carry out its responsibilities (1501.6(b)(5)).

## 4.14   INTEGRATING NEPA WITH OTHER ENVIRONMENTAL REVIEW AND CONSULTATION REQUIREMENTS

There are a variety of federal, state, and local environmental review and consultation requirements that can overlap with the NEPA process. The CEQ and DOI

76

regulations direct that NEPA reviews should be integrated with analyses used to meet such other requirements (1502.25(a); 46.430(b)). Often, a single document may be used to satisfy the requirements of multiple authorities. If you are using a NEPA document to meet the other environmental review and consultation requirements, the document must clearly identify and discuss the analysis relied on as part of that review and consultation process. These analyses must be included in the document itself or be otherwise readily accessible by the public (46.430(a)). Any federal permits, licenses, or approvals that must be obtained in order to implement a proposal must be listed in a DEIS (1502.25(b); 46.430(b)). If you are uncertain as to whether or not a permit, license, or other approval is necessary, you must disclose that in a DEIS (1502.25(b)).

Some of the most commonly encountered federal environmental review and consultation requirements are listed and described below. During the scoping process, you should be certain to determine any review and consultation requirements applicable to your proposal. Although such review and consultation requirements should be coordinated and integrated with NEPA to the greatest extent possible, bear in mind that completion of NEPA does not substitute for meeting additional, separate requirements.

You should ensure that all required consultations with other entities are complete prior to signing a decision document (note that for NHPA Section 106 you must complete consultation prior to signing a decision document). If you do not do so, there is a risk that once consultation is complete, you will be unable to implement a selected action and that additional, supplemental NEPA review would be required prior to implementing an action.

### Endangered Species Act

Section 7 of the ESA requires federal agencies to consult with the US Fish and Wildlife Service or the National Marine Fisheries Service when taking an action that may affect federally listed threatened or endangered species or designated critical habitat. An EA or EIS (or selected sections) may provide sufficient information to serve as a biological assessment for ESA Section 7 consultation purposes. If a separate biological assessment is prepared, it should be included or referenced in the NEPA document. Until the Section 7 consultation process is complete, the NPS may not make any irreversible or irretrievable commitment of resources that could foreclose the formulation or implementation of reasonable and prudent alternative measures to address issues arising under the ESA. The standard NPS practice is to complete Section 7 consultation before signing a decision document. If you are unable to do so, you should consult with your REC and the DOI office of the Solicitor.

### National Historic Preservation Act

Section 106 of the NHPA requires federal agencies to consider the effects of their undertakings on historic properties and to provide state historic preservation officers, tribal historic preservation officers, and, as necessary, the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to review and comment on the effects of agency actions. An EA or EIS may be used to serve as documentation of the Section 106 process if appropriate processes are followed. ACHP regulations at 36 CFR 800.8 describe requirements related to the coordination of the Section 106

009739

process with NEPA. You must complete Section 106 consultation before a FONSI or ROD can be signed. [*See CEQ guidance: NEPA and NHPA: A Handbook for Integrating NEPA and Section 106, 2013 (citing 36 CFR Part 800).*]

### Executive Order 11988, Floodplain Management; Executive Order 11990, Wetland Protection

The Floodplain Management and Wetland Protection executive orders direct federal agencies to avoid, to the extent possible, the long- and short-term adverse impacts associated with occupying or modifying floodplains and wetlands. They also require federal agencies to avoid direct or indirect support of floodplain or wetland development whenever there is a practical alternative. Director's Order 77-1: *Wetland Protection* and Director's Order 77-2: *Floodplain Management*, which provide direction on complying with the executive orders, require preparation of a statement of findings (SOF) when a proposal would result in adverse impacts on floodplains or wetlands and detail the requirements and procedural elements associated with SOFs. All SOFs must receive some level of public review and comment.

### Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations

This executive order directs federal agencies to assess whether their actions have disproportionately high and adverse human health or environmental effects on minority and low-income populations. EAs and EISs must specifically discuss and evaluate the impact of the proposal on minority and low-income populations and communities, as well as the equity of the distribution of the benefits and risk of the decision. If the issue is dismissed from detailed analysis, the EA or EIS must specifically indicate this. [*See OEPC's Environmental Compliance Memorandum (ECM) 95-3: NEPA Responsibilities Under the Departmental Environmental Justice Policy.*]

### Consultation with Tribal Governments

If an NPS proposal would have substantial effects on one or more Indian tribes, on the relationship between the federal government and Indian tribes, or the distribution of power and responsibilities between the federal government and Indian tribes, the NPS is required by Executive Order 13175 to initiate government-to-government consultation with affected tribes. In the NPS, government-to-government consultation typically takes place between the park unit's superintendent and tribal leader. Although Executive Order 13175 requires consultation under limited circumstances, the NPS should, in general, consult with potentially affected tribal governments to the greatest extent practicable any time a proposal could affect those tribes.

### Departmental Responsibilities for Indian Trust Resources and Indian Sacred Sites on Federal Lands

Departmental planning must explicitly consider effects of its actions on Indian trust resources (512 DM 2). NPS EAs and EISs must include either an analysis of impacts to Indian sacred sites or a specific dismissal of the issue from detailed analysis (*ECM 97-2: Departmental Responsibilities for Indian Trust Resources and Indian Sacred Sites on Federal Lands, Part 1*).

78

Furthermore, Executive Order 13007 provides that, to the extent practicable, permitted by applicable law, and not clearly inconsistent with essential agency functions, agencies are required to accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and avoid adversely affecting the physical integrity of sites.

2015 NPS NEPA Handbook
009742

# CHAPTER 5: NPS REVIEW OF EXTERNAL ENVIRONMENTAL REVIEW DOCUMENTS

## 5.1   INTRODUCTION

This chapter describes the process by which the NPS participates in environmental reviews of proposals made by non-DOI agencies that affect the interests of the Department. Collectively, these documents are referred to as "external environmental review documents" and may include other agencies' NEPA documents, proposed rules, applications, plans, reports, Section 4(f) documents, and other environmental documents. DOI considers it a priority to provide comments on EISs and other environmental or project review documents prepared by other Federal agencies for their major actions that significantly affect the quality of the human environment (516 DM 4.2). Although this chapter discusses external environmental review generally, the focus is on review of other agencies' NEPA documents.

## 5.2   DOI AND NPS EXTERNAL ENVIRONMENTAL REVIEW PROCESSES

The NPS reviews and comments on external environmental review documents in accordance with the policies and procedures established by DOI OEPC. OEPC determines what types of environmental review documents receive department vs. bureau-level responses, which bureau or office is responsible for consolidating DOI comments when applicable, and deadlines for comments (516 DM 4.3B). The NPS is required to comment (to the extent the NPS has comments to submit) in accordance with the process established by OEPC for each particular review. In addition to the functions listed above, OEPC issues Environmental Review Memoranda (ERM) that contain topic-specific guidance related to external environmental reviews. Two examples of guidance that OEPC has issued are *ERM 13-3: Section 4(f) of the Department of Transportation Act* and *ERM 10-5: Procedures for Reviewing Project and Environmental Reports Prepared by or for Non-Federal Agencies*.

Within the NPS, EQD coordinates review of NEPA and other documents prepared by other agencies (DO-12, 5.2). EQD coordinates the external environmental review process by alerting WASO programs and regional offices to the availability of documents for review and comment. EQD also identifies the individual or office responsible for compiling and preparing NPS comments, and establishes NPS deadlines. Parks, regions, and programs implement their own procedures for internally coordinating external environmental review processes and ensuring comments are submitted within established deadlines.  You are encouraged to contact your REC or external environmental review contact for more information about coordination and approval processes in your region.

It is essential to comment on external environmental review documents through the coordinated process described above to ensure that NPS comments are substantive, internally consistent, of professional tone, and subject to appropriate management review. If you become aware of an external environmental review document on which you wish to comment but have not received a review notification through the

NPS coordinated external environmental review process, contact your REC or other regional external environmental review contact to determine the appropriate course of action.

### 5.3    COMMENTING ON EXTERNAL ENVIRONMENTAL REVIEW DOCUMENTS

#### A.    Scope of Comments

When commenting on external environmental review documents, the NPS should limit its comments to elements of the proposal and analysis over which the NPS has jurisdiction by law or special expertise. "The adequacy of the document in regard to applicable statutes is the responsibility of the agency that prepared the document and any comments on its adequacy shall be limited to the Department's jurisdiction or environmental expertise" (516 DM 4.5).

***Jurisdiction by Law***

Jurisdiction by law means the "authority to approve, veto, or finance all or part of the proposal" (1508.15). For example, if an NPS permit or other authorization is required to implement all or part of a proposal, the NPS has jurisdiction by law.

***Special Expertise***

Special expertise relates to "statutory responsibility, agency mission, or related program experience" (1508.26). For the NPS, this often includes:

- national park system resources and values;

- resources associated with NPS programs, such as National Historic Landmarks and National Natural Landmarks; and

- resources for which the NPS is designated expert by statute; for example, the Federal Power Act requires the Federal Energy Regulatory Commission to consult with the NPS on the potential impacts of hydropower proposals on recreational resources.

#### B.    Substance of Comments

NPS comments should be supported by factual information and offer practical suggestions for changes to the document or proposal. When comments identify inaccuracies or omissions in a document, they should offer specific suggestions for corrections or additions.

NPS comments on external environmental documents should always be substantive. Substantive comments:

- question, with reasonable basis, the accuracy of the information in the document;

- question, with reasonable basis, the adequacy of the environmental analysis;

- present reasonable alternatives other than those presented in the document; or

82

- cause changes or revisions in the proposal.

Examples of substantive comments could include:

- identifying a factual error in the document and offering corrected information;

- identifying a relevant environmental issue not considered in the document and explaining why it should be given detailed analysis;

- identifying inaccuracies or omissions in the document's environmental impact analysis and offering technical information that would enable corrections or additions; and

- offering an alternative not considered in the document or suggesting specific modifications to an alternative.

### C.   Commenting on NEPA Documents as a Reviewing Agency

Through the external environmental review process, NPS provides comments on other agencies' NEPA documents as a reviewing agency. In this role, NPS comments are submitted as part of the public review and comment process associated with a NEPA review (e.g., NOI, DEIS, etc.). As a reviewing agency, the NPS may offer substantive comments on the document to the lead agency, but is generally not involved in the development of the NEPA document. In those instances where the NPS seeks greater involvement in the development of the proposal and analysis than is available to reviewing agencies and has jurisdiction by law or special expertise, the NPS should request to become a cooperating agency. [*See Section 4.13 B: Cooperating Agencies*.] When possible, NPS comments should address ways to avoid or minimize adverse impacts of the proposed action and alternatives on NPS resources and values (516 DM 4.5).

## 5.4   REVIEW OF DRAFT VS. FINAL DOCUMENTS

### *Draft Documents*

When reviewing draft external environmental review documents, the NPS should offer substantive comments on elements of the proposal and analysis over which it has jurisdiction by law or special expertise. In instances where the NPS previously submitted comments or information during scoping or another process stage, the NPS should pay particular attention to determine whether the lead agency has correctly incorporated or addressed those submissions.

Key areas of consideration when reviewing a draft document include:

- Does the document identify all potentially affected NPS units or affiliated sites (National Historic Landmarks, National Natural Landmarks, etc.)?

- Do alternatives include measures to mitigate or avoid impacts to NPS resources or values?

- ▪ Does the document discuss relevant environmental issues related to NPS jurisdiction or special expertise, either as an issue considered but dismissed or as an issue fully analyzed in impact analysis?

- · Does the impact analysis accurately describe and characterize the impacts of the proposal and alternatives on resources related to NPS jurisdiction or special expertise?

### Final Documents

Although there are no public comment periods for final documents, OEPC coordinates departmental review of final documents during their associated waiting period, when applicable. If comments are submitted on final documents, in most cases they should be sent through OEPC. In situations where comments on a final document are sent directly by NPS to an agency, the NPS should coordinate with OEPC prior to sending them and provide OEPC a copy of the NPS comments.

Normally, the NPS does not comment on final documents. However, when the NPS has provided comment on a draft document, it should review the final document, with key areas of consideration including:

- ▪ Does the final document incorporate or respond appropriately to NPS comments on the draft?

- ▪ Is there new information in the final document that relates to areas of NPS jurisdiction or special expertise and that the NPS was therefore precluded from commenting on during review of the draft document?

If the final document does not respond to key comments on the draft or if there is new information relating to NPS jurisdiction or special expertise, it may be appropriate to submit comments on a final document. In those limited instances where the NPS provides comments on a final document, the comments should explain why the NPS is commenting on the final document and make specific references, when applicable, to NPS comments on the draft document. If you are considering submitting comments on a final document, you are encouraged to consult with your REC or regional external environmental review contact to determine if submission of comments is appropriate.

## 5.5   FORMAT OF COMMENTS FOR EXTERNAL ENVIRONMENTAL REVIEWS

Depending on the procedures established by OEPC for review of an external environmental document, NPS comments will take one of the following forms:

- ▪ a comment letter transmitted directly to the lead agency;

- ▪ a comment memorandum submitted to the OEPC-designated lead bureau or office for consolidation into a departmental comment letter; or

- ▪ a departmental comment letter prepared by the NPS as the OEPC-designated lead bureau submitted to OEPC for signature and transmission to the lead agency.

OEPC specifies guidelines for departmental comment letter format in 516 DM 4.5(4). The format described below should be used whenever practicable.

### Control Number

The departmental control number (ER number) assigned for the review should appear in the upper left-hand corner of the letter.

### Introduction

The letter should begin by referencing the title and type of document that is the subject of the comments.

### General Comments

This section of the letter should summarize any key concerns with the document and provide comments of a general nature. This section could also include mention of previous comments or technical assistance provided to the lead agency previously in the process.

### Detailed Comments

This section of the letter contains the specific comments on the text of the external environmental review document. The comments should be presented in a manner that follows the organization of the document, referencing the specific sections or page numbers in the document to which the comments pertain.

### Summary Comments

Comments should avoid expressions of support for or objection to the proposed action in most cases. However, in instances where DOI or a DOI bureau has jurisdiction by law over the action, this may be appropriate. In such instances, comments in support or opposition to the action would appear in this section.

2015 NPS NEPA Handbook
009748

# GLOSSARY

<u>Categorical Exclusion</u> – A category of actions that do not individually or cumulatively have a significant effect on the human environment and have been found to have no such effect in procedures adopted by a federal agency pursuant to NEPA (1508.4).

<u>Cooperating Agency</u> – A federal, state, or local agency or tribal government other than the agency preparing the NEPA review (lead agency), that has jurisdiction by law or special expertise with respect to environmental impacts related to a proposal and that has been deemed a cooperating agency by lead agency (1508.5).

<u>Cumulative Impact</u> – The incremental environmental impact of the an action, when added to the impacts of other past, present, and reasonably foreseeable future actions, regardless of what agency (federal or non-federal) or person undertakes such other actions (1508.7).

<u>Effect (synonymous with impact)</u> – A direct result of an action which occurs at the same time and place; or an indirect result of an action which occurs later in time or in a different place and is reasonably foreseeable (1508.8).

<u>Environmental Assessment</u> – A concise public document, prepared in compliance with NEPA that briefly provides sufficient evidence and analysis of impacts to determine whether to prepare an EIS or FONSI (1508.9).

<u>Environmental Impact Statement</u> – A detailed written statement required by section 102(2)(C) of NEPA (1508.11).

<u>Environmentally Preferable Alternative</u> – The alternative required by 40 CFR 1505.2(b) to be identified in ROD, that causes the least damage to the biological and physical environment and best protects, preserves, and enhances historical, cultural, and natural resources (46.30).

<u>Extraordinary Circumstances</u> – Circumstances that, if exist, mean a CE is may not be used and an EA or an EIS must be prepared (46.205).

<u>Finding of No Significant Impact</u> – A decision document prepared in compliance with NEPA, supported by an EA that presents the reasons why an action will not have significant impacts on the human environment (1508.13).

<u>Human Environment</u> – The natural and physical environment and the relationship of people with that environment (1508.14).

<u>Impact Topics</u>– Headings used in a NEPA document that represent specific resources that would be affected by a proposed action or alternatives under consideration.

<u>Issues</u> – Problems, concerns, conflicts, obstacles, or benefits that may occur if the proposed action or alternatives, including the no-action alternative, are implemented.

<u>Jurisdiction by Law</u> – Agency authority to approve, veto, or finance all or part of a proposal (1508.15).

2015 NPS NEPA Handbook
009749

Lead Agency – The agency or agencies responsible for preparing an EIS (1508.16). This term can apply when an EA is prepared as well.

Major Federal Action – Actions with adverse effects that may be significant and which are potentially subject to federal control and responsibility (1508.18).

Memorandum to File – A memorandum to a decision file that documents a determination that an existing NPS NEPA review provides complete and accurate NEPA documentation sufficient to cover a specific proposal.

Mitigated FONSI – A FONSI that relies on mitigation to avoid or lessen potentially significant environmental effects of proposed actions that would otherwise need to be analyzed in an EIS.

Mitigation – Planning actions taken to avoid an impact altogether to minimize the degree or magnitude of the impact, reduce the impact over time, rectify the impact, or compensate for the impact (1508.20).

NEPA Document – Generally refers to an EA or EIS and can also refer to documentation prepared for a CE that requires documentation.

NEPA Pathway – Level of analysis and documentation for a NEPA review. CEs, EAs, and EISs are all specific NEPA pathways.

NEPA Process – All measures necessary to comply with the procedural requirements of NEPA for a specific action (1508.21).

NEPA Review – Applies broadly to all levels of NEPA documentation, whether it is a CE, EA, or EIS.

No-Action Alternative – Has two interpretations:
>    (1) "no change" from a current management direction or level of management intensity (e.g., if no ground-disturbance is currently underway, no action means no ground-disturbance); or
>    (2) "no project" in cases where a new project is proposed for implementation (46.30).

Notice of Intent – A notice that an EIS will be prepared (1508.22).

Notice of Availability – A notice submitted to the *Federal Register* announcing that a draft EIS, final EIS, and in some cases a ROD, is available to the public.

Preferred Alternative – The alternative identified in draft and final EISs, and most EAs, that the NPS decision maker believes would best accomplish the purpose and need of the proposed action while fulfilling its statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors (46.420).

Proposed Action (synonymous with proposal) – The bureau activity under consideration (46.30).

<u>Reasonably Foreseeable Future Action</u> – Federal and non-federal activities not yet undertaken, but sufficiently likely to occur, that a Responsible Official of ordinary prudence would take such activities into account in reaching a decision. Reasonably foreseeable future actions do not include those actions that are highly speculative or indefinite (46.30).

<u>Record of Decision</u> – The document that is prepared to substantiate a decision based on an EIS (1505.2).

<u>Resource</u> – An element of the human environment.

<u>Scope</u> – The range of actions, alternatives, and impacts to be considered in an EIS (1508.25). This term can also apply to EAs.

<u>Scoping</u> – An early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action (1501.7).

<u>Significant</u> – A subjective interpretation of the level of impact that will result to the human environment if an action is implemented, taking into account the context and intensity of an impact (1508.27).

<u>Special Expertise</u> – Statutory responsibility, agency mission, or related program experience.

<u>Tiering</u> – The coverage of general matters in broader EISs (or EAs) with subsequent narrower statements of environmental analysis, incorporating by reference, the general discussions and concentrating on specific issues (1508.28).

89

90

# APPENDIX A: ENVIRONMENTAL ASSESSMENT REQUIRED CONTENT AND ADDITIONAL CONSIDERATIONS

## I.  REQUIRED CONTENT

At a minimum, an EA must include brief discussions of the following, although you may choose to include additional detail and level of analysis as appropriate (46.310):

- the proposal;

- the need for the proposal;

- the environmental impacts of the proposed action and the alternatives considered, including the following:

  - An EA must discuss the direct, indirect, and cumulative impacts of each alternative and must contain objective analyses that support conclusions concerning environmental impacts.

- a list of agencies and persons consulted;

- either an analysis or specific dismissal of issues related to environmental justice and Indian Trust Resources (ECM 95-3; ECM 97-2).

When the Responsible Official determines that there are no unresolved conflicts about the proposed action with respect to alternative uses of available resources, an EA need only consider the proposed action and does not need to consider additional alternatives, including the no-action alternative.

## II.  ADDITIONAL CONSIDERATIONS

- You may format an EA in any way that is useful to facilitate planning, decision-making, and appropriate public involvement (46.315).

- An EA should include a brief description of the existing conditions and expected future conditions of the area impacted by the project.

- Rather than including a stand-alone no-action alternative, you may document consideration of the no-action alternative by contrasting the impacts of the alternatives with the current condition and expected future condition if the proposal was not implemented.

- Conclusions regarding environmental impacts should be clear and concise.

- The description of environmental impacts should provide enough information to support a determination to either prepare an EIS or FONSI.

- While a longer EA may be appropriate when it involves controversial or complex issues, in many cases there is no need for an EA to be longer than 15 to 50 pages.

- You should consult with your REC to determine whether there are any region-specific requirements or standards, with which you must comply.

2015 NPS NEPA Handbook
009753

92

# APPENDIX B: ENVIRONMENTAL IMPACT STATEMENT REQUIRED CONTENT AND RECOMMENDED FORMAT

The following outline includes the required content and recommended format for an EIS. You may use a different format when there is a compelling reason to do so. If you use a different format, you should be sure to address all of the content included in the outline below.

## A.    COVER SHEET

The cover sheet should not exceed one page and must include (1502.11):

- a list of the responsible agencies including the lead agency and any cooperating agencies;
- the title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the state and county (or other jurisdiction if applicable) where the action is located;
- the name, address, and telephone number of the person at the agency who can supply further information;
- a designation of the statement as a draft, final, or a draft or final supplemental EIS;
- a one paragraph abstract of the statement; and
- for a draft or draft supplemental EIS, the date by which comments must be received.

## B.    SUMMARY

The summary section must adequately summarize the contents of the EIS and should not exceed 15 pages (1502.12). This section should:

- identify significant issues (meaning pivotal issues, or issues of critical importance) related to the proposed action and alternatives;
- discuss the alternatives, including any impacts that are potentially significant; and
- state any major conclusions resulting from the analysis in the EIS.

## C.    TABLE OF CONTENTS

## D.    PURPOSE OF AND NEED FOR ACTION

This chapter must include a brief statement of the purpose and need for action (1502.13; 46.415). It should also include:

- a background section; and
- a brief discussion of issues both carried forward and dismissed from detailed analysis.

## E.    ALTERNATIVES

This chapter should (1502.14; 46.415):

- describe the alternatives carried forward for detailed analysis;

- briefly discuss alternatives considered but dismissed from detailed analysis and include reasons for their dismissal;

- identify a preferred alternative;

- identify mitigation measures that could be applied but are not already integrated into the proposed action or alternatives (this could be included in the environmental consequences section instead (1502.16)); and

- when relevant, a draft EIS must include a list of all federal permits, licenses, or approvals that must be obtained to implement a proposal (1502.25(b); 46.430(b)).

## F.   AFFECTED ENVIRONMENT

This chapter should succinctly describe the current state of the resources that will be affected by the alternatives under consideration (1502.15; 46.415).

## G.   ENVIRONMENTAL CONSEQUENCES

An EIS must present the impacts of the alternatives in comparative form (1502.14). This comparison can be included in the environmental consequences chapter or the alternatives chapter and can be done by narrative, chart, or other format. An EIS must also identify any methodologies used (1502.24). This can be included in the environmental consequences chapter or in an appendix.

This chapter must discuss the environmental impacts of the alternatives based on a scientific and analytical review (1502.16). The discussion must include an evaluation of direct, indirect, and cumulative impacts and identify any impacts that could be significant.

This chapter must include a discussion of the following (46.415):

- any adverse environmental effects which cannot be avoided should the proposal be implemented;

- the relationship between short-term uses of the human environment and the maintenance and enhancement of long-term productivity; and

- any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented.

Unless inapplicable, this chapter must also include a discussion of:

- possible conflicts between the proposed action and the objectives of federal, regional, state, and local (and in the case of a reservation, tribal) land use plans, policies, and controls for the area concerned. (1506.2(d));

- energy requirements and conservation potential of various alternatives and mitigation measures;

- natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures;

- urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures;

If there is incomplete or unavailable information relevant to evaluating reasonably foreseeable significant adverse effects, an EIS must include (1502.22):

- a statement that such information is incomplete or unavailable

- a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment

- a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment

- an evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community

## H.   CONSULTATION AND COORDINATION

This chapter must include:

- a list of preparers that includes the names and qualifications of the people who are primarily responsible for preparing the EIS (1502.17)

- the process used to coordinate with other federal agencies, state, tribal and local governments, and persons or organizations who may be interested or affected, and the results thereof (46.415)

- a list of agencies, organizations, and persons to whom copies of the EIS are sent (1502.10)

If the NPS denies a request to become a cooperating agency or determines it is inappropriate to invite an eligible agency to cooperate in preparing an EIS, the EIS must state the reasons for the denial or decision not to extend an invitation in the EIS (46.225(c)).

## I.   INDEX

## J.   APPENDICES

Appendices should consist of materials prepared in connection with an EIS and can be made readily available upon request rather than circulated along with an EIS (1502.18).

- Comment responses should be included as an appendix to a final EIS.

## K.   ADDITIONAL REQUIRED INFORMATION

An EIS must also include a discussion of:

- the impact of the alternatives on minority and low-income populations and communities, as well as the equity of the distribution of the benefits and risk of the decision (EO 12898); if environmental justice issues are not present or are not likely to be significant, a specific dismissal must be included (ECM 95-3); and

<div align="center">95</div>

- impacts to Indian Trust Resources; if Indian Trust Resources are not present or are not likely to be significantly impacted, a specific dismissal must be included (ECM 97-2).



# United States Department of the Interior

NATIONAL PARK SERVICE
1849 C Street, NW
Washington, DC 20240

**DIRECTOR'S ORDER #2:  PARK PLANNING**

Approved: _____
Counselor to the Secretary
Exercising the Delegated Authority of the Director

Effective Date: _____1-11-21_____

**Duration:**  <u>Until amended or rescinded</u>

This Director's Order supplements NPS *Management Policies* (2006), chapter 2, "Park System Planning," and supersedes sections 2.2 through 2.3.1.2, and sections 2.3.1.7, 2.3.1.12, 2.3.2, and 2.3.4.  The rest of chapter 2 of *Management Policies* remains in effect.

**Contents:**

1. Background and Purpose
2. Authorities
3. Major Elements of the Park Planning Framework
4. Roles and Responsibilities
5. Additional Sources of Guidance

_____

## 1.  Background and Purpose

The National Park Service (NPS) park planning program has transitioned from preparing traditional stand-alone general management plans to a more responsive and flexible planning framework to meet park planning needs and fulfill legal and policy requirements.  This Director's Order (Order) clarifies that a park's planning portfolio—the totality of planning documents in use at a given park—fulfills a park's planning needs, including meeting the requirements for a general management plan (GMP).

This Order:
- defines the NPS planning framework and the park planning portfolio;
- outlines the types of planning documents available to meet park planning needs; and
- provides clarity and guidance about how a park's planning portfolio meets the statutory requirements for GMPs (54 USC 100502).

Additional guidance will be provided through the accompanying Reference Manual (RM-2).

## 2.  Authorities

Authority to issue this Director's Order is contained in the National Park Service Organic Act (54 USC 100101(a) *et seq.*) and other NPS laws, and the delegations of authority contained in Part 245 of the Department of the Interior Manual.

This Director's Order is intended only to improve the internal management of the NPS, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.

This Order lacks the force and effect of law.  Moreover, as it is (1) directed only to the NPS, and (2) not intended to have any effect on any regulated parties, it is not a "guidance document" within the meaning of Executive Order 13891 (2019).  See, section 2(b)(v) of the Executive Order.

## 3.  Major Elements of the Park Planning Framework

The NPS park planning framework is based on the following principles:
- Planning requires collaboration between parks, regional offices, and national planning offices as well as other interdisciplinary programs across the NPS.
- A park's planning portfolio provides a responsive and flexible approach to meet park planning needs and to fulfill legal and policy requirements, including statutory requirements for GMPs.
- Monitoring and data analysis are necessary to ensure that a park's planning portfolio meets park needs.

Central to the planning framework is the park planning portfolio—the assemblage of planning documents that guide park management and decision making and satisfy law and policy.  A park's planning portfolio, which extends from the foundation document to site-specific resource and visitor use management plans, creates a logical, trackable guide for future park management actions.

The park planning portfolio can be visualized as a loose-leaf binder, to which park planning elements, such as a foundation document, stand-alone GMP, strategic plans, and implementation plans, may be added or updated so the portfolio remains current.  By using the totality of documents within a park's planning portfolio, park managers are able to fulfill all relevant legal and policy requirements, including GMP statutory requirements.  Unless otherwise specified, the term "general management plan" refers to (1) a stand-alone GMP, or (2) the planning documents in a park's planning portfolio that collectively meet the statutory requirements for a GMP.  Specific elements that may be included in a planning portfolio are discussed in greater detail below and in RM-2.

### 3.1   Foundation Documents

Every park must have a foundation document—a formal statement of its core mission that provides basic guidance for planning and management decisions.  The foundation document is guided by the enabling legislation for a park, other laws, and NPS policies.  It identifies the park's purpose, significance, interpretive themes, fundamental resources and values, and, if

009760

applicable, other important resources and values, special mandates, and administrative commitments.

The foundation document also includes an assessment of park planning and data needs.  The assessment is a prioritized list of planning projects and data needed to address key park issues.  It is intended to guide future planning activities and associated studies in parks and should be updated as necessary.

### 3.2   Comprehensive Plans

Comprehensive plans provide overall direction and guidance on a variety of issues and topics in one document.  These plans can be undertaken on a park-wide scale or can be focused on a distinct area of a park, such as a sub-unit (in a park with multiple units) or a district.

Congress has mandated several types of comprehensive plans, including:
- GMPs for parks;
- comprehensive management plans for national trails; and
- comprehensive river management plans for national wild and scenic rivers.

The requirements for these plans vary depending on applicable laws and policies. Comprehensive plans for NPS-administered components of the National Trails System must meet the statutory requirements found in 16 USC 1244(e) and (f) and NPS policy in Director's Order #45:  National Trails System.  Comprehensive river management plans for NPS-administered components of the National Wild and Scenic Rivers System must meet the statutory requirements of 16 USC 1274(d)(1) and NPS policy in Director's Order #46:  Wild and Scenic Rivers.  Wilderness stewardship plans are another type of comprehensive plan, which NPS policy (*Management Policies* (2006), chapter 6, and Director's Order #41:  Wilderness Stewardship) mandates be prepared for all wilderness areas.

### 3.2.1   General Management Plan Requirements

A GMP provides broad direction for park management.  At a minimum, each park must have a plan or series of plans that satisfy the four statutory requirements identified in 54 USC 100502, which states that GMPs shall include:
1. measures for the preservation of the area's resources;
2. indications of types and general intensities of development (including visitor circulation and transportation patterns, systems, and modes) associated with public enjoyment and use of the area, including general locations, timing of implementation, and anticipated costs;
3. identification of and implementation commitments for visitor carrying capacities for all areas of the park; and
4. indications of potential modifications to the external boundaries of the park, and the reasons for the modifications.

If a park's planning portfolio contains documents that address these four elements, it will be deemed to meet the requirements for a GMP per 54 USC 100502.  A park's foundation document serves as the basis for general management planning; a foundation document includes an assessment of planning and data needs, which helps park managers identify future planning efforts that address GMP requirements.

3

As stated above, the term "general management plan" refers to (1) a stand-alone GMP, or (2) the planning documents in a park's planning portfolio that collectively meet the statutory requirements for a GMP.  The following subsections (3.2.1.1–3.2.1.4) describe how the four statutory GMP requirements can be met through the planning portfolio.

### 3.2.1.1   Measures for the Preservation of Park Resources

A GMP identifies measures needed to preserve a park's fundamental resources and values and other selected resources.  Direction for the preservation of park resources that assist park managers in meeting this requirement may be found in:

- the assessment of planning and data needs in the park's foundation document;
- a resource stewardship strategy or other planning document that identifies resource goals and management activities; and
- implementation plans or treatment documents for specific resource management topics (for example, a wildlife management plan, vegetation management plan, historic structure report, or cultural landscape report).

### 3.2.1.2   Types and General Intensities of Development

The planning framework gives the NPS flexibility to select the planning tool that best suits a park's needs to meet this requirement.  Some parks may need a stand-alone GMP to take a comprehensive look at development needs.  Other parks may need implementation plans with site-specific development details.  Examples of implementation plans that accomplish this include:

- development concept plans and site plans
- zoning plans
- transportation plans
- visitor use management plans
- trail management plans

Facility-related planning documents should create a realistic vision for the future and set a direction that considers the environmental and financial sustainability of proposed facilities and operational programs.

### 3.2.1.3   Visitor Capacity

Visitor capacity—also known as visitor carrying capacity and user capacity—is a component of visitor use management.  It identifies the maximum levels and types of visitor use that an area can accommodate, while achieving and maintaining the desired resource conditions and visitor experiences that are consistent with park purposes.

Given their general nature, stand-alone GMPs or other comprehensive plans initially address the requirement to identify visitor capacities by assessing current levels of visitor use and baseline conditions for resources and visitor experiences.  They typically include qualitative statements about the types and levels of visitor use that a park could accommodate, while achieving and maintaining desired resource conditions consistent with park purposes.

The identification of and implementation commitments for visitor capacity will be addressed as part of a park's planning portfolio.  For parks that do not identify visitor capacity and implementation commitments in a stand-alone GMP, these requirements will be met through plans that have a significant focus on visitor use (for example, a visitor use management plan,

009762

wilderness stewardship plan, comprehensive site or area plan, or trail management plan).  The more detailed direction on visitor capacity in implementation plans should be consistent with the general guidance for the types and levels of visitor use in the GMP or other completed plans in a park's planning portfolio; or, if necessary, it may update or amend a stand-alone GMP or other plans.

### 3.2.1.4   Boundary Modifications

Park managers must consider the need for potential modifications to a park's external boundaries.  If a boundary change is needed, it should be evaluated in a stand-alone GMP or another planning portfolio document (such as a boundary adjustment study).

### 3.2.1.5   Timely Review of General Management Plans

A GMP will be reviewed every 10 to 15 years, or as necessary, to ensure the four statutory requirements are up to date.  This review will result in written documentation of the existing planning documents that contribute to meeting the four statutory requirements and will identify park planning priorities that further contribute to meeting the requirements.

In addition to the 10- to 15-year review, the NPS should amend a park GMP when:
- significant changes to the conditions discussed in an existing GMP have occurred; or
- substantial new issues related to any of the four statutory requirements have arisen.

If the NPS determines a new planning document related to the GMP statutory requirements should be completed, a strategy to complete the plan should be prepared and the plan should be started as soon as funding becomes available.  The guidance in a park's existing planning portfolio will remain in effect until the new planning document(s) has been completed.

## 3.3   Strategic Plans

In this Order, strategic plans are broadly defined as programmatic level planning documents that identify goals and priorities.  Strategic plans are designed to help NPS managers establish a clear direction for their park or program by helping answer five general questions:  Where are we now?  Where do we want to be?  What are the most important things we need to accomplish to get there?  What are our constraints and opportunities?  How will we review our progress?  Examples of strategic plans include:
- resource stewardship strategies
- strategic facility investment plans
- commercial services strategies
- business plans
- long-range interpretive plans

## 3.4   Implementation Plans

Implementation plans typically tier off comprehensive plans and focus on how to implement an activity or project needed to achieve a long-term goal, address a management issue, or achieve a desired condition or goal.  Implementation plans may direct a specific project or an ongoing activity.  These plans usually require a level of detail and analysis that goes well beyond what is appropriate for a comprehensive or strategic plan.  Examples of implementation plans include:
- visitor use management plans
- development concept plans and site plans

5

- commercial services plans
- resource-specific management plans

### 3.5   Environmental Analysis and Consultation Requirements

Planning documents referenced in this Order will comply with the requirements of the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), other required consultation (for example, tribal consultation), and associated regulations, as appropriate.  (See also Director's Order #12:  Conservation Planning, Environmental Impact Analysis, and Decision-Making, the accompanying NEPA Handbook, and the NPS NHPA Section 106 Nationwide Programmatic Agreement.)

### 3.6   Civic Engagement and Public Involvement

Understanding and considering the public's interest will inform and strengthen the entire planning portfolio.  The planning process referenced in this Order will comply with the requirements and intent of *Management Policies*, sections 2.1.3 and 2.3.1.5; and Director's Order #75A:  Civic Engagement and Public Involvement.  Public involvement strategies, practices, and activities will be developed and conducted within the framework of civic engagement.

### 3.7   Consistency with Other Federal Agencies, and Tribal, State, and Local Governments

Documents within a park's planning portfolio provide consistent guidance that takes into account NPS laws, regulations, and policies, as well as relevant policies, plans, and programs of other Federal agencies, and Tribal, State, or local governments.  When there are inconsistencies between park planning documents and the plans of other Federal agencies or Tribal, State, or local governments, NPS managers should work with the appropriate entities to resolve those inconsistencies to the greatest degree possible consistent with applicable authorities.

## 4.   Roles and Responsibilities

### 4.1   Associate and Assistant Directors

#### 4.1.1   Associate Director, Park Planning, Facilities and Lands

The Associate Director of Park Planning, Facilities and Lands (Associate Director) is delegated the authority to implement and oversee this Order and will:

- establish, in consultation with the Deputy Director, Operations, and regional directors, a process for approving public release of plans funded by the Park Planning and Special Studies Division;
- establish and implement the policies, procedures, and standards specified in this Order;
- issue, review, and revise as appropriate, RM-2 with detailed guidance, general information, recommendations, procedures, and examples for developing foundation documents, comprehensive plans, strategic plans, and implementation plans; and
- provide the necessary guidance, advice, and consultation to ensure the proper and effective implementation of this Order.

The Associate Director may delegate these authorities as deemed appropriate.

009764

### 4.1.2   Other Associate and Assistant Directors

Other associate and assistant directors may have responsibilities for particular plans, such as involvement in planning document input, development, and reviews.

## 4.2   Park Planning and Special Studies Division

The Park Planning and Special Studies Division, Washington Support Office (WASO), will:

- provide overall direction, funding, and policy development for the park planning program;
- conduct WASO-level review of planning documents and review selected plans for national policy consistency; and
- develop training opportunities to improve Service-wide understanding of the planning framework, park planning portfolio, best practices for planning, and support tools for planning.

## 4.3   Planning Leadership Group

The Planning Leadership Group is composed of the chief of the Park Planning and Special Studies Division, regional planning chiefs, the manager of the Environmental Planning and Compliance Branch of the Environmental Quality Division, the chief and branch chiefs of the Denver Service Center Planning Division, and representatives from several NPS programs.  Its function is to:

- provide Service-wide leadership and guidance for the park planning program; and
- help ensure consistency in planning throughout the NPS.

## 4.4   Denver Service Center Planning Division

The Denver Service Center Planning Division will prepare planning products and provide technical support and consulting services on projects for parks, regions, programs, and the Park Planning and Special Studies Division.

## 4.5   WASO Program Managers

WASO program managers will:

- formulate and advise on NPS park planning policies and related guidance;
- manage Service-wide program funds to support the planning and information needs of parks in ways that provide the most benefit for the National Park System; and
- review planning documents as requested by the Park Planning and Special Studies Division.

## 4.6   Regional Directors

Regional directors will:

- review and approve planning documents, as appropriate; and
- establish regional planning priorities based on park and regional planning program recommendations.

009765

### 4.7   Regional Planning Offices

Regional planning offices, including the regional chiefs of planning, regional planning portfolio managers, and other planning staff, will:

- produce and coordinate the development of planning documents;
- collaborate with each park in the region to maintain park planning portfolios;
- review all park planning portfolio documents, particularly those intended to meet GMP statutory requirements, ensuring consistency with this Order and RM-2;
- help park staff identify planning and data needs and submit projects for available fund sources;
- propose regional planning priorities based on the parks' assessments of planning needs;
- coordinate with regional and national compliance programs (NEPA, NHPA, other required consultation), as appropriate;
- ensure that regional associate and assistant directors are consulted in the preparation of park foundation documents, GMPs, and comprehensive, strategic, and implementation plans;
- maintain relationships with park managers and staff; and
- liaise with the Park Planning and Special Studies Division, Denver Service Center Planning Division, and other regional programs.

### 4.8   Park Superintendents

Superintendents will:

- oversee the park planning portfolio and monitor satisfaction of GMP statutory requirements;
- ensure staff commitment to participate in planning activities;
- collaborate with the regional planning offices to identify planning and data needs, prioritize planning work, and secure funding for planning projects;
- encourage partners to support and participate in planning activities where applicable;
- keep apprised of—and work to resolve any inconsistencies with—other Federal, State, local, and tribal government policies, plans, and programs;
- fulfill compliance responsibilities related to NEPA (see Director's Order #12), NHPA, (see the 2008 NPS NHPA Section 106 Nationwide Programmatic Agreement), and other environmental compliance requirements; and
- fulfill responsibilities for civic engagement and public involvement, in accordance with Director's Order #75A.

### 4.9   Project Accountability

Park superintendents, project managers, and regional directors are responsible and accountable for accomplishing planning projects and ensuring projects are consistent with all legal mandates, Executive Orders, regulations, NPS policies, accepted preservation standards and practices, Service-wide orders, directives, initiatives and priorities, and Departmental guidance.

009766

**5.  Additional Sources of Guidance**

Additional sources of guidance are:
1. Section 604 of the National Parks and Recreation Act of 1978 (54 USC 100502; Public Law 95-625)
2. National Trails System Act of 1968, as amended (16 USC 1241—1251)
3. Wild and Scenic Rivers Act of 1968, as amended (16 USC 1271—1287)
4. National Historic Preservation Act of 1966 (NHPA), as amended (54 USC 300101 *et seq.*)
5. NPS NHPA Section 106 Nationwide Programmatic Agreement, 2008, and NHPA Section 106 Toolkit, 2016
6. National Environmental Policy Act of 1969 (42 USC 4321—4370d)
7. Director's Order #12:  Conservation Planning, Environmental Impact Analysis, and Decision-Making and National Park Service NEPA Handbook (2015)
8. Director's Order #41:  Wilderness Stewardship and Reference Manual 41:  Wilderness Stewardship
9. Visitor Capacity on Federally Managed Lands and Waters: A Position Paper to Guide Policy and supporting digital guidance documents (Interagency Visitor Use Management Council, https://visitorusemanagement.nps.gov)
10. Director's Order #45:  National Trails System
11. Director's Order #46:  Wild and Scenic Rivers and Reference Manual 46
12. Director's Order #48A:  Concession Management
13. Director's Order #75A:  Civic Engagement and Public Involvement

*-----End of Director's Order-----*

009767