Kate Barnekow, State Bar No. 336792
kbarnekow@law.harvard.edu
Harvard Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: (617) 496-4863
Cell: (512) 868-7800

Katherine A. Meyer
(appearance *pro hac vice*)
kmeyer@law.harvard.edu
Director, Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: (617) 496-4863
Cell: (202) 257-5145

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JACK GESCHEIDT, et al., | Case No. 21-4734-HSG |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DEB HAALAND, Secretary of Interior, et al., | |
| Defendants. | |

1

## TABLE OF CONTENTS

2

TABLE OF AUTHORITIES ............................................................................................... ii

3

INTRODUCTION ............................................................................................................1

FACTUAL AND LEGAL BACKGROUND .........................................................................2

4

   A.   Relevant Statutory and Regulatory Scheme..........................................................2

5

      1.   The Park Service Organic Act ...................................................................2

6

      2.   The Point Reyes National Seashore Act .....................................................2

7

      3.   Preservation of the Tule Elk ......................................................................4

8

      4.   The 1980 General Management Plan ..........................................................6

9

      5.   The 1998 Tule Elk Management Plan ........................................................7

10

   B.   Despite Repeated Warnings That the Elk Will Suffer Dire Consequences if Not
       Properly Managed, the Park Service Has Failed to Revise the 1980 General

11

       Management Plan for Tomales Point. ...................................................................9

12

ARGUMENT .................................................................................................................17

13

I.     THE NATIONAL PARK SERVICE HAS VIOLATED ITS STATUTORY DUTY
      TO REVISE THE GENERAL MANAGEMENT PLAN FOR TOMALES POINT
      IN A "TIMELY MANNER." ...................................................................................17

14

   A.   The Park Service's Obligation to Revise the GMP in a "Timely Manner" is a

15

       Mandatory Duty that Must be Compelled by this Court.......................................17

16

   B.   NPS's Failure to Revise the GMP with Regard to Tomales Point is "Unreasonable"
       Within the Meaning of the TRAC Factors. ..........................................................18

17

      1.   A 41-Year Delay in Carrying Out a Mandatory Statutory Duty is Patently

18

         Unreasonable. .......................................................................................19

19

      2.   NPS's Delay is Causing the Death and Suffering of Wildlife that the Agency is
         Required to Protect and Conserve. ...........................................................20

20

      3.   Conserving the Tule Elk and Preventing Massive Die-Offs from Starvation and/or

21

         Dehydration Should be the Park Service's Highest Priority. ........................22

22

      4.   As a Result of the NPS's Egregious Delay, the Tule Elk are Suffering and Dying
         from a Lack of Forage and Water, and the Genetic Viability of this Wildlife

23

         Population is in Serious Jeopardy. ............................................................22

24

II.    PLAINTIFFS HAVE ARTICLE III STANDING. ....................................................23

   A.   Injury ...............................................................................................................23

25

   B.   Causation .........................................................................................................24

26

   C.   Redressability ...................................................................................................24

27

CONCLUSION ..............................................................................................................25

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                    **PAGE(S)**

*Animal Legal Def. Fund, Inc. v. Glickman,*
    154 F.3d 426 (D.C. Cir. 1998) ............................................................................................24

*Biodiversity Legal Found. v. Badgley,*
    309 F.3d 1166 (9th Cir. 2002) ............................................................................................18

*Daniels-Hall v. Nat'l Educ. Ass'n.,*
    629 F.3d 992 (9th Cir. 2010) ..............................................................................................2

*Defs. of Wildlife v. Browner,*
    909 F. Supp. 1342 (D. Ariz. 1995) .....................................................................................19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ...........................................................................................................24

*Hells Canyon Pres. Council v. Richmond,*
    841 F. Supp. 1039 (D. Or. 1993) ........................................................................................19

*Houseton v. Nimmo,*
    670 F.2d 1375 (9th Cir. 1982) ............................................................................................18

*In re A Cmty. Voice,*
    878 F.3d 779 (9th Cir. 2017) .........................................................................................18–9

*In re Bluewater Network,*
    234 F.3d 1305 (D.C. Cir. 2000) .........................................................................................19

*In re Pesticide Action Network N. Am.,*
    798 F.3d 809 (9th Cir. 2015) .........................................................................................18–9

*In re United Mine Workers of Am. Intl. Union,*
    190 F.3d 545 (D.C. Cir. 1999) ...........................................................................................19

*Kirola v. City & Cty. of San Francisco,*
    860 F.3d 1164 (9th Cir. 2017) ......................................................................................23, 25

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ......................................................................................................23–4

*Nat'l Wildlife Fed'n v. Cosgriffe,*
    21 F. Supp. 2d 1211 (D. Or. 1998) .....................................................................................19

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) .............................................................................................................17

*Res. Renewal Inst. v. Nat'l Park Serv.,*
    No. 4:16-cv-00688-SBA, 2016 WL 11673179 (N.D. Cal. July 15, 2016) ................1, 11, 17–8

*Sierra Club v. Babbitt,*
    69 F. Supp. 2d 1202 (E.D. Cal. 1999) ................................................................................19

- ii -

**CASES CONT.**                                                              **PAGE(S)**

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ....................................................................................24

*Telecomms. Rsch. & Action Ctr. v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ...................................................18, 20, 22

*United States v. Monsanto,*
    491 U.S. 600 (1989) .................................................................................18

*United States v. Wilson,*
    631 F.2d 118 (9th Cir. 1980) ..................................................................12

**STATUTES**

5 U.S.C. § 706(1) .........................................................................1, 2, 17, 19

16 U.S.C. § 459c *et seq.* .................................................................2–3, 20

16 U.S.C. §§ 673e, g ...........................................................................5, 22

54 U.S.C. § 100101(a) ...............................................................2, 19–20, 22

54 U.S.C. § 100502 ...........................................................1, 6, 17, 19, 23

**OTHER AUTHORITIES**

37 Fed. Reg. 23,366 (Oct. 20, 1972) ...............................................................3

## **INTRODUCTION**

Plaintiffs—three individuals and an animal protection organization—challenge the failure of the National Park Service ("NPS" or "Park Service") to revise the 1980 General Management Plan ("GMP") for the Tomales Point portion of the Point Reyes National Seashore, where approximately 293 Tule elk are confined behind an eight-foot-high wire fence. The fence was erected by the Park Service more than four decades ago to prevent the elk from competing for forage and water with cattle owned by farmers located south of the fence who are permitted to graze their livestock on this public land.

The Park Service's organic statute provides that it "shall" revise the GMP for each unit of the National Park System—including the Point Reyes Seashore—in a "timely manner." 54 U.S.C. § 100502. Judge Armstrong of this Court has already ruled that this obligation is a mandatory duty that, if not met, gives rise to an unreasonable delay claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1). *Res. Renewal Inst. v. Nat'l Park Serv.*, No. 4:16-cv-00688-SBA, 2016 WL 11673179 (N.D. Cal. July 15, 2016), ECF No. 49 at 8. Yet the Park Service has not revised the GMP for Tomales Point since the relevant GMP was originally issued in 1980.

The Park Service has been repeatedly warned—for decades—that a failure to manage this confined elk population could result in extremely dire circumstances for the elk, including suffering and death from starvation because the elk are unable to reach water and forage on the south side of the artificial barrier. Indeed, for many years now, due to climate change and other factors, the persistent drought conditions in this area have become extremely severe. Consequently, the elk—who, pursuant to a Congressional directive, were re-introduced to this area and are required to be protected—have been unable to access sufficient food and water to survive and are dying by the dozens of starvation and/or dehydration. Last year alone, approximately 152 more elk died—more than a third of the total Tomales Point elk population of 445. *See* NPS Website, Plaintiffs' Exhibit ("Pl. Ex.") A (*Point Reyes National Seashore Releases 2020 Population Numbers of Tule Elk across the Park*). During the previous drought, between 2013–2015, 257 died. *See id.* (*Tule Elk at Tomales Point FAQ*) (explaining that "a similar decline

- 1 -

in the elk herd at Tomales Point happened in the previous 2013–2015 drought when the population decreased from 540 to 283 individuals over a two-year period").[1]

The Park Service's persistent failure to revise this critical management plan—for over 41 years—violates the agency's mandatory duty to do so and constitutes agency action unlawfully withheld and unreasonably delayed under the Administrative Procedure Act, 5 U.S.C. § 706(1).

## FACTUAL AND LEGAL BACKGROUND

### A.     Relevant Statutory and Regulatory Scheme

#### 1.     The Park Service Organic Act

Congress established the National Park Service in 1916 to "promote and regulate the use of the Federal areas known as national parks, monuments, and reservations . . . by such means and measures as conform to the fundamental purpose . . . to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." National Park Service Organic Act, ch. 408, § 1, 39 Stat. 535 (1916) (current version at 54 U.S.C. § 100101(a)). As to its duty to leave wildlife "unimpaired," the Park Service defines "impairment" as an impact that "would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." 2006 NPS Management Policies ("NPS Policies"), Pl. Ex. B at § 1.4.5. Further, when a conflict arises between "conserving resources and values and providing for enjoyment of them, *conservation is to be predominant.*" *Id*. at § 1.4.3 (emphasis added).

#### 2.     The Point Reyes National Seashore Act

In 1962, Congress created the Point Reyes National Seashore as part of the National Park System "to save and preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped." Act of September 13, 1962, Pub. L. No. 87-657, 76 Stat. 538 (1962) (codified at 16 U.S.C. § 459c *et seq.*) (the "Point Reyes Act"). The Point Reyes Act authorized the Secretary of the Interior to acquire the lands,

---

[1] This Court may take judicial notice of statements made by the Park Service on its own website. *Daniels-Hall v. Nat'l Educ. Ass'n.,* 629 F.3d 992, 998 (9th Cir. 2010).

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

waters, and other property within the bounds of Point Reyes Peninsula in Marin County, California. The statute further provided that this public land "shall be administered by the Secretary without impairment of its natural values, in a manner which provides for such recreational, educational, historic preservation, interpretation, and scientific research opportunities as are consistent with, based upon, and supportive of the maximum protection, restoration, and preservation of the natural environment within the area." *Id.*

On October 20, 1972, the Park Service officially established the Point Reyes Seashore. Point Reyes National Seashore, Calif., 37 Fed. Reg. 23,366 (Oct. 20, 1972). This National Seashore is located on a coastal peninsula in Marin County, California, encompassing approximately 71,000 acres and 80 miles of coastline. It is surrounded by the Pacific Ocean on its north, west, and southwest sides and Tomales Bay on a portion of its east side, including Tomales Point. It contains stunning and diverse landscapes, including rolling grasslands, forests, sandy and rocky beaches, and coastal cliffs. Its natural resources are among the most geologically and ecologically diverse in the National Park System.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT



FIGURE 2: TULE ELK RANGE IN POINT REYES

A-2

Final EIS, Appendix A (September 2020) at A-2 (AR 000727).[2]

### 3. Preservation of the Tule Elk

Tule elk are majestic ungulates endemic to California. For centuries, the elk freely roamed the Point Reyes Peninsula until, by the mid-nineteenth century, they were extirpated from the area

_____

[2] Cites to "AR" are to the original Administrative Record filed in this case, *see* ECF No. 39-47; cites to "S" are to the Supplemental AR that has been filed, *see* ECF No. 53-55-1.

by uncontrolled hunting and forced removal from their natural habitat to accommodate private

livestock ranching. *See* 1998 Elk Management Plan ("1998 Plan") at 4 (AR 003640). The elk are

mixed grazers and browsers—i.e., they feed on both ground-level herbs and grasses and on

woody shrubs and trees. *Id*. at 7 (AR 003643). Their life expectancy is approximately 8-12 years,

but they can live up to 21 years, and they give birth to their young between April - June. *Id*.



In 1976, Congress declared that "the protection and maintenance of California's tule elk in

a free and wild state is of educational, scientific, and esthetic value to the people of the United

States" and therefore required the Secretary of the Interior to "develop a plan for the Tule elk

restoration and conservation, including habitat management" and to make land under the

jurisdiction of the Secretary "reasonably available for the preservation and grazing of Tule elk."

16 U.S.C. §§ 673e, g ("The Tule Elk Statute").

In furtherance of these objectives, in 1978, the California Department of Fish and Wildlife

took ten tule elk from an existing herd in the San Luis National Wildlife refuge and placed them

in a small, 2600 acre preserve at the northern end of the Seashore called Tomales Point. *See* 1998

Plan at 8 (AR 003644). Although initially the reintroduced elk failed to thrive, the elk population

increased dramatically once the existing cattle were removed from Tomales Point. *See* NPS

Website, Pl. Ex. A (*Tule Elk*). The comeback of the elk has been heralded by the Park Service as a

stunning wildlife reintroduction success. *Id*. Those elk dispersed, and today there are four sub-

herds of fenced-in Tule elk at Tomales Point (the North herd, Plateau herd, White Gulch herd, and

South herd) and two additional free-roaming herds in the Limantour and Drakes Beach areas at

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

the Seashore, located south of the Tomales Point fence. *See* McCrea Cobb, *Spatial Ecology and Population Dynamics of Tule Elk (Cervus elaphus nannodes) at Point Reyes National Seashore, California* (2010) ("Cobb, *Spatial Ecology and Population Dynamics*") at 23 (S 000094); *see also id*. at 37 (S 000108) (map showing Tomales Point sub-herds and their ranges); *see also* NPS Website, Pl. Ex. A (*Point Reyes National Seashore Releases 2020 Population Numbers of Tule Elk across the Park*). The Seashore attracts millions of visitors each year, including many who come specifically to visit the Tomales Point elk. *See* 1998 Plan at 4 (AR 003640).

### 4. The 1980 General Management Plan

In 1978, Congress also enacted legislation requiring the National Park Service to prepare and revise General Management Plans for the preservation and use of all national parks and other lands within its jurisdiction. National Parks and Recreation Act of 1978, Pub. L. 95-625, § 604(3), 92 Stat. 3518 (current version at 54 U.S.C. § 100502). Congress has since amended the legislation to provide that such "[g]eneral management plans for the preservation and use of each System unit . . . shall be prepared and revised *in a timely manner* by the Director." 54 U.S.C. § 100502 (emphasis added).

A General Management Plan "shall include," *inter alia*, "measures for the preservation of the area's resources," including the wildlife that live in the Park. *Id*. The Park Service's own Management Policies explain that to comply with this directive, "GMP reviews may be needed every 10 to 15 years, *but may be needed sooner if conditions change significantly*." NPS Policies, Pl. Ex. B at § 2.3.1.12 (emphasis added). As the agency's Management Policies further explain:

> If conditions remain substantially unchanged, a longer period between reviews would be acceptable. Even in parks with strong traditions and established patterns of use and development, managers will be responsible for assessing whether resources are threatened with impairment [or] . . . the visitor experience has been degraded . . . . Periodically reassessing the general management plan will give everyone with a major stake in the park an opportunity to revalidate the park's role in the nation and in the region and reevaluate whether the kinds of resource conditions and visitor experiences being pursued are the best possible mix for the future.

*Id*.

In 1980, the Park Service issued a GMP for the Point Reyes National Seashore that established general management objectives and strategies for future management of the Seashore.

The 1980 GMP provided that "[r]estoration of historical natural conditions (*such as reestablishment of Tule elk*) will continue to be implemented when such actions will not seriously diminish scenic and recreational values." 1980 GMP at 13 (AR 000313) (emphasis added).

Also in 1980, the Park Service erected a three-mile-long, eight-foot-high, woven-wire fence along the southern border of Tomales Point to separate the elk from 18,000 acres of Seashore lands south of the fence that the Park Service leased to livestock ranchers to graze their cattle. *See* Map, *supra* at 4. These leases, dating back to the 1960s, granted temporary usage rights to the ranchers until 1990 or "in two cases until 2000." 1980 GMP at 11 (AR 000311).

### 5.    The 1998 Tule Elk Management Plan

In 1982, the Park Service issued an Interim Tule Elk Management Plan, pending completion of the final Management Plan required by the Tule Elk statute. *See* 1998 Plan at 34 (AR 003670). The Interim Plan stated the Park Service planned to "[r]e-establish a healthy, tule elk population on a range which has returned to a natural successional regime as if elk were always present." *See id*. at 35 (AR 003671).

In 1998, the Park Service issued a final Tule Elk Management Plan to "guide the management, monitoring, and research of tule elk." *Id*. at 1 (AR 003637). The Park Service explained the Plan was needed "to provide for the protection of the elk that is consistent with scientifically sound principles, takes into account the interests of the public, and meets the objectives for which the Seashore was established." *Id*. The Park Service further explained that because "Tule elk play an important role in the function of the Seashore ecosystem[,]" the Plan's principal "mission" was to "[a]daptively manage elk as a natural component of the dynamic ecosystem of Point Reyes." *Id*. at 37 (AR 003673). To achieve that goal, a second "mission" of the Service was "[m]aintenance of the remaining genetic diversity . . . as an important objective for elk preservation." *Id*. at 38 (AR 003674). The Service's stated management "goals" therefore included maintaining "viable populations of tule elk at Point Reyes," noting that "[a] healthy herd is one that does *not suffer disease or mortality due to artificially induced or human caused impacts*." *Id*. at 39 (AR 003675) (emphasis added). The Service explained that if the Tule elk at

Tomales Point "are to remain as part of the Seashore's fauna and ecological processes, they should eventually become free-ranging throughout most of the Seashore's natural zones where conditions allow," *id*. at 40-41 (AR 003676-77), and hence another goal of the 1998 Management Plan was to "[p]rovide for a free-ranging elk herd by 2005," *id*. at 40 (AR 003676).

When the Park Service issued the 1998 Plan, there were approximately 465 elk in the Tomales Point population. *Id*. at 8 (AR 003644). Nevertheless, the Park Service was already concerned about the genetic viability of the elk population, explaining that it had the "lowest level of genetic variation" of all the tule elk herds in the state. *Id*. at 39 (AR 003675). The agency acknowledged that if the population were reduced too much this could further impair genetic diversity and lead to inbreeding. *Id*. at 54 (AR 003690). To address this concern, the Park Service recommended adding 2-3 female elk to the population every elk generation to maintain genetic variation within the population and stressed that the first addition of new elk "should be made as soon as possible." *Id*. at 89 (AR 003725). The 1998 Plan further explained that NPS "policy" is to "maintain *wild* populations [of elk] *within natural habitats*" and that "maintaining *captive* herds" was "counter" to this policy. *Id*. at 54 (AR 003690) (emphasis added).

Noting that the total elk population at Point Reyes could increase to 1000 before reaching carrying capacity, *id*. at 16 (AR 003652), the Service proposed an interim population of 350-450 elk at Tomales Point and stated the agency would consider using immunocontraception to control the population should it begin to exceed that number, *id*. at 43 (AR 003679). Indeed, the Park Service explained that the public was opposed to reducing the population by killing the elk via public hunting or agency sharpshooters, *id*. at 18 (AR 003654), and that "[t]he preferred technique to limit growth is immuno-contraception, which allows treated individuals to breed after contraception is stopped," *id*. at 47 (AR 003683).

The Park Service also acknowledged that removing or opening the fence at Tomales Point would allow the existing elk herd to disperse, and that any impairment to the elk habitat from cows could be reduced by installing elk gates or fence openings designed to allow passage of elk, but not cattle. *Id*. at 52 (AR 003688). The Park Service also considered relocating the existing

- 8 -

fence farther south to provide more useable habitat for the elk at Tomales Point, and the agency further acknowledged that it could reduce or eliminate ranching permits under its existing authorities. *Id.*

In the 1998 Elk Management Plan, the Park Service stated it had decided to "maintain the elk fence at Tomales Point and continue to separate tule elk from cattle." *Id.* at 44 (AR 003680). However, the Service further stated it would "continue monitoring tule elk and their environment to analyze trends and better understand tule elk population dynamics and ecology at Point Reyes" and that "[t]he control of the Tomales Point elk population will be attempted through management techniques of contraception and relocation." *Id.*

The 1998 Elk Management Plan was only intended to "guide the management, monitoring, and research of tule elk . . . at Point Reyes National Seashore for the next five to ten years," or until 2008 at the latest. *Id.* at 1 (AR 003637). However, the Park Service has never revised that Plan, nor has it ever implemented the Plan's various recommendations for managing the Tule elk population or its genetic viability.[3]

**B.      Despite Repeated Warnings That the Elk Will Suffer Dire Consequences if Not Properly Managed, the Park Service Has Failed to Revise the 1980 General Management Plan for Tomales Point.**

Since the issuance of the 1980 General Management Plan, the Park Service has been warned many times that its failure to revise its management of the Tule elk on Tomales Point would have dire environmental consequences for this wildlife.

A 1986 dissertation on the Ecology of the Tule Elk Range at Point Reyes National Seashore noted that "[e]lk densities will remain at or close to the herbivore-vegetation equilibrium," and that, as a result, "in periods of drought[,] *die-offs or nutritionally related problems may occur.*" Peter John Patrick Gogan, *Ecology of the Tule Elk Range, Point Reyes*

---

[3] For example, the Park Service has never introduced additional female elk to maintain the genetic diversity of the Tule elk who are confined at Tomales Point, nor has it relocated any elk south of the fence. Nor has the agency installed elk gates to allow elk access to land south of the fence where water and forage are more readily available, removed the fence or relocated it farther south, or ceased ranching operations at the Seashore. Nor, except for a brief trial during the 1990s, has the Park Service employed immunocontraception to control the elk population. Cobb, *Spatial Ecology and Population Dynamics* at 1 (S 000072).

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

*National Seashore* (1986) at 321 (AR 005080) (emphasis added). Thus, the author advised that to avoid this problem, "[s]ystem level management is the recommended option," and that "individuals from other tule elk populations should be introduced to Point Reyes at a minimum of once every four or five years to maintain genetic diversity." *Id*. at 323 (AR 005082).

In 1993, the Park Service's own Scientific Advisory Panel reported that the increasing population of Tule elk at Tomales Point required the Park Service to consider various management actions before the elk began dying of starvation because they could not obtain access to adequate forage. McCullough, et al., "Report of the Scientific Advisory Panel on Control of Tule Elk on Point Reyes National Seashore" (October 18, 1993) at 6, 11 (AR 004010, 004015). The Panel warned that, with respect to the Park Service's continued hands-off approach toward these elk, "[w]e can reliably predict that if such a strategy is employed the tule elk will seasonally be malnourished and appear less 'healthy,' and that *dead and dying animals will become more evident*." *Id*. at 6 (AR 004010) (emphasis added).

In 1998, the Park Service's own Elk Management Plan stressed that further management action was needed "to provide for the protection of the elk that is consistent with scientifically sound principles, takes into account the interests of the public, and meets the objectives for which the Seashore was established," 1998 Plan at 1 (AR 003637), and the Plan contained several recommendations that would have protected the elk population and ensured its genetic viability, *see supra* at 7-9; *see also supra* note 3 (these management actions were not taken). The 1998 Plan further found that the Service's "goal" was to maintain "viable populations of tule elk at Point Reyes," but that *"[a] healthy herd is one that does not suffer disease or mortality due to artificially induced or human caused impacts*." 1998 Plan at 39 (AR 003675) (emphasis added).

In his 2010 dissertation, McCrea Cobb, working in cooperation with the Park Service, explained that "[g]iven the predicted future abundances of elk and close proximity to ranches— *conflicts are likely to occur within the next 10 years at Point Reyes*." Cobb, *Spatial Ecology and Population Dynamics* at 150 (S 000221) (emphasis added). He therefore stressed that "NPS

- 10 -

managers at Pt. Reyes are *strongly encouraged to develop a proactive plan to address this issue*." *Id.* (emphasis added).

Meanwhile, during a drought in 2013–2015, roughly half of the Tomales Point Tule elk population—approximately 257 of the 540 elk—died from a lack of adequate forage and water and the elk's inability to obtain access to the public lands south of the fence. *See* NPS Website, Pl. Ex. A (*Tule Elk at Tomales Point FAQ*) (noting that "a similar decline in the elk herd at Tomales Point happened in the previous 2013–2015 drought when the population decreased from 540 to 283 individuals over a two-year period").

In 2016, a coalition of environmental organizations brought a lawsuit challenging the Park Service's failure to issue a revised General Management Plan for the entire Point Reyes Seashore. *See Res. Renewal Inst.*, 2016 WL 11673179, ECF No. 1. After Judge Armstrong ruled that the NPS had a mandatory statutory duty to revise the GMP in a "timely manner," the parties settled that case with the Park Service agreeing to issue an amendment to the 1980 GMP that addressed the environmental impacts of "the lands currently leased for ranching in Point Reyes." *See* Stipulated Settlement Agreement and Order at 5, *Res. Renewal Inst.*, July, 14, 2017, ECF No. 143. However, the settlement agreement did not mention Tomales Point, nor did it specifically require the Park Service to revise the GMP with respect to that part of the Seashore or with regard to the Tule elk who live there. *Id.*

Nevertheless, not surprisingly, when the Park Service solicited public comment on its Draft Environmental Impact Statement for this partial revision to the GMP, members of the public urged that "the EIS *include more discussion about the impacts of fencing on tule elk herds, particularly during drought years*." Final EIS, Appendix P (September 2020) at P-84 (AR 001341) (emphasis added). However, the Park Service declined to do so, stating that "[t]here are *no fences in the planning area* that limit elk to a geographic location" and stressing that ***"[t]he fenced elk population on Tomales Point is outside the planning area***" for that revised GMP. *Id.* (emphasis added).

- 11 -

In 2018, the California Department of Fish and Wildlife issued its own plan for the management of Tule elk, including the elk confined at Tomales Point. AR 004107-004587. Explaining that its goal "was to maintain, restore and enhance sustainable elk populations into the future," the state agency further explained that "[g]iven future threats such as climate change and ongoing habitat loss – *we must learn how to preserve biodiversity on a scale that protects entire ecosystems as well as the species that live within those systems*." AR 004110 (emphasis added). Noting that "artificial conditions associated with the [elk's] confinement are undesirable in the long term" and that the elk's "*captive-habitat conditions likely preclude reaching or maintaining optimal population levels that promote long-term population viability and genetic diversity without jeopardizing habitat conditions,*" this agency further stated that management goals for the elk should include "reduc[ing] the number of confined herds" and "enhanc[ing] habitat within enclosures." AR 004560-62 (emphasis added).

During the summer of 2020, the public became extremely concerned that drought conditions were once again causing the Tule elk at Tomales Point to die from a lack of forage and water. Visitors to the Seashore, including Plaintiffs, began to see emaciated and dying elk, and they urged the Park Service to take emergency measures to ensure that the elk were provided adequate access to water. *See*, *e.g.*, Declaration of Jack Gescheidt, Pl. Ex. C, ¶ 6; Declaration of Laura Chariton, Pl. Ex. D, ¶ 5.[4] However, the Park Service denied that elk were dying, instead insisting there were adequate sources of water on the north side of the fence. *See* NPS Website, Pl. Ex. A (*Tule Elk at Tomales Point FAQ*) ("there is no evidence the herd decline is due to dehydration and a lack of water"). However, Plaintiffs and others had seen firsthand that the water sources the Tule elk depend on were drastically depleted, and they continued to see dead elk, as well as emaciated animals, struggling to find sufficient access to water. Gescheidt Decl., Pl. Ex. C, ¶ 4; Chariton Decl., Pl. Ex. D, ¶ 6; Declaration of Skyler Thomas, Pl. Ex. E, ¶¶ 4-7.[5]

---

[4] It is well established that the Court may take judicial notice of records filed in its own cases. *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980).

[5] In response to this situation, and because the Park Service had failed to take any ameliorative action, individuals, including Plaintiffs, began a concerted effort to bring water to the elk on their own by carrying troughs and large containers of bottled water to several locations on Tomales Point. Gescheidt Decl., Pl. Ex. C, ¶ 6. The Park Service, however, prohibited the public

On August 31, 2020, the Center for Biological Diversity sent a letter to the Park Service requesting that it "immediately take all necessary actions to carry out [its] legal—and moral— responsibilities to ensure that any elk that are unnaturally confined to the Tomales Point peninsula have access to sufficient water to prevent them from dying." S 000001. The organization further warned the Park Service that "there is evidence that the majority of the limited water sources upon which these fenced elk depend have already become dry or may become dry in the immediate future due to drought" and that "[t]he last time the Tomales Point elk were faced with this kind of dire situation—during the drought of 2012-2014—nearly half (more than 250 of the 540 elk) of the Tomales Point elk population died from a lack of water, and their inability to migrate to find water due to the elk fence which the Park Service maintains." S 000001-02. It explained that the Park Service's refusal to do something about this situation contravenes its statutory duty to "conserve" this legally protected wildlife as required by the NPS Organic Act. S 000002. However, the Park Service never responded to this letter. Rather, the agency continued to deny that there was any problem, or that the Tomales Point elk were suffering from a lack of food or water. *See* NPS Website, Pl. Ex. A (*Tule Elk at Tomales Point FAQ).*

    **C.**    <u>**Proceedings to Date**</u>

In the Spring of 2021, the Park Service finally acknowledged ***that approximately 152 more Tule elk at Tomales Point died during 2020 due to the fact that the elk did not have access to sufficient forage.*** *See* NPS Website, Pl. Ex. A (*Point Reyes National Seashore Releases 2020 Population Numbers of Tule Elk across the Park*).

The only necropsies of elk that the Park Service released to the public demonstrate that the elk died of either starvation or dehydration. *See* Necropsies (S 000005-37); *see also* Declaration of Amy Allen, ECF No. 8-8, ¶¶ 4-6. In fact, necropsies show that the elk were completely emaciated when they died. *Id.*

---

from doing so by confiscating and removing these sources of water. *Id.* Instead, the agency continued to insist to the public and the media that the elk at Tomales Point had adequate access to water. *See* NPS Website, Pl. Ex. A (*Tule Elk at Tomales Point FAQ*).

ECF No. 8-1 at 9.

Following a huge public outcry and extensive media coverage of the elk's plight,[6] on June 11, 2021, the Park Service announced that it was providing some of the elk supplemental water in the southern part of Tomales Point. *See* NPS Website, Pl. Ex. A (*Unprecedented Drought Prompts Point Reyes National Seashore to Provide Supplemental Water for Tule Elk at Tomales*

---

[6] *See, e.g.*, Asher Elbein, *Home on the Range*, BioGraphic (March 23, 2021), https://www.biographic.com/home-on-the-range/; Will Houston, *Point Reyes Elk Dying as Dry Period Persists*, Marin Independent Journal (March 31, 2021), https://www.marinij.com/2021/03/31/point-reyes-elk-dying-as-dry-period-persists/; Andrew Chamings, *Tule Elk in Marin are Dying Off, as the Park Service and Activists Feud over the Reason Why*, SF Gate (April 5, 2021), https://www.sfgate.com/california-parks/article/tule-elk-marin-bay-area-feud-activists-park-fence-16078340.php; Anna Guth, *True to Boom and Bust, Fenced Herd Shrinks in Drought*, Point Reyes Light (April 7, 2021), https://www.ptreyeslight.com/article/true-boom-and-bust-fenced-herd-shrinks-drought; Susan C. Schena, *Rally Against Mass Killing Of Tule Elk 2021: Pt. Reyes*, Patch (April 10, 2021) https://patch.com/california/sanrafael/calendar/event/20210410/1028869/rally-against-mass-killing-of-tule-elk-2021-pt-reyes; Gayle Ong, *Rare Elk Population Declining Due to Drought Conditions*, KRON4 (April 11, 2021), https://www.kron4.com/news/bay-area/rare-elk-population-declining-due-to-drought-conditions/; ABC7 News, *Protesters Demand Removal of Fence after 100+ Tule Elk Die in Point Reyes* (April 11, 2021), https://abc7news.com/tule-elk-deaths-protest-point-reyes-national-seashore/10506617/; Gustaf Kilander, *Dozens of Rare Elk Die in California Due to Climate Crisis*, The Independent (April 12, 2021), https://www.independent.co.uk/climate-change/elk-california-drought-b1830264.html; Jeff Miller, *Center for Biological Diversity Lambasts Rep. Jared Huffman in Scathing Rebuke over Tule Elk Comments in Letter to the Editors*, Enviro News (April 12, 2021), https://www.environews.tv/041221-center-for-biological-diversity-lambasts-rep-jared-huffman-over-tule-elk-comments-in-letter-to-the-editors/; Susanne Rust, *Scores of Rule Elk Died at Point Reyes Seashore in 2020. Are their Days Numbered?*, Los Angeles Times (April 14, 2021), https://www.latimes.com/california/story/2021-04-14/scores-of-tule-elk-died-at-point-reyes-national-seashore; Gabrielle Strum, *California's Native Elk Need Your Help: An Environmentalist's Perspective on the Decimation of Biodiversity in the State*, The Lumberjack (May 9, 2021), https://thelumberjack.org/2021/05/09/californias-native-elk-need-your-help/; George Wuerthner, *Fed Plan to Extend Point Reyes Ranch Leases, Kill Tule Elk, Moves Forward*, Earth Island Journal (May 10, 2021), https://www.earthisland.org/journal/index.php/articles/entry/fed-plan-extend-point-reyes-ranch-leases-kill-tule-elk/.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

*Point*). However, despite the fact that the Park Service itself explained that the reason the elk were dying was a lack of adequate *forage,* the agency made clear that it would not take any measures to provide the elk with any supplemental forage. *Id.* (*Tule Elk at Tomales Point FAQ*) ("Investigations of dead elk, observations of living elk, and range assessments conducted by park staff in coordination and consultation with wildlife managers and veterinarians from the California Department of Fish and Wildlife (CDFW) suggest *poor forage quality is the underlying cause of these population changes*") (emphasis added); *see also id.* (NPS stating that it nevertheless had no intention of providing supplemental forage to prevent elk population declines).[7]

Concerned that the elk were continuing to die horrific deaths from a lack of water and forage, on June 22, 2021, Plaintiffs filed this case and on June 24, 2021, moved for an emergency injunction in an effort to compel the Park Service to provide adequate water and forage to preserve the remaining elk pending the Court's resolution of the merits of Plaintiffs' unreasonable delay claim. ECF No. 8-1. In support of their request, Plaintiffs submitted declarations from a wildlife biologist who served as the Park Ranger-Natural Resource Specialist for Point Reyes National Seashore and a veterinarian, both of whom examined the necropsies for the Tomales Point elk and explained that the elk had died of either starvation or dehydration because of their inability to access food and water south of the fence. Declaration of Judd Howell, ECF No. 8-9, ¶ 5; Allen Decl., ECF No. 8-8, ¶¶ 4-6. Drs. Howell and Allen also explained that allowing wildlife to die this way was extremely "inhumane." Howell Decl., ECF No. 8-9, ¶ 10; Allen Decl., ECF No. 8-8, ¶ 8.

In response, although acknowledging that drought conditions at Tomales Point were "worsening," ECF No. 15 at 22, Defendants insisted that water sources were nevertheless sufficient and assured the Court that the agency would continue to monitor the situation, *id.* at 14, and "stands ready to act if needed to safeguard the viability of the Tomales Point elk population," *id.* at 7.

---

[7] In addition, the supplemental water provided at that time was only available to *one* of the four sub-herds—i.e., the other three herds were not provided any supplemental water. *See* Declaration of James Coda, ECF No. 8-11, ¶ 6.

On August 2, 2021, the Court denied Plaintiffs' Motion for a Preliminary Injunction, finding "that Plaintiffs have not met th[e] extraordinarily high burden to warrant a mandatory preliminary injunction." ECF No. 26 at 16. The Court noted, however, that it "is not indifferent to the conditions facing the tule elk or to the importance of their survival at Tomales Point" and relied on the Park Service's assurance that it would take further action if necessary to preserve the Tule elk. *Id.* On August 18, 2021, the Court also set an expedited summary judgment briefing schedule. ECF No. 36.

Meanwhile, as conditions continued to deteriorate at Tomales Point, and based on the agency's assurance that it would undertake additional measures if necessary to ameliorate those conditions, Plaintiffs continued to submit evidence to the Park Service documenting that conditions were continuing to worsen and requesting that the Park Service take immediate action to provide both supplemental water and forage to the elk. *See, e.g.,* Letter to Defendants' Counsel (S 000049-55). Plaintiffs also provided photos of North Pond 2—the largest accessible water source in Tomales Point, according to the Park Service itself, *see* ECF No. 15 at 13 (Park Service conceding this fact)—demonstrating that the bed of the pond was mostly dried mud with very little usable water for the elk. S 000053-55. Plaintiffs also forwarded to the agency a video and photos showing emaciated animals, as well as an elk struggling to drink water from the muddy North Pond and becoming trapped in mud up to its shoulders. S 000051-52.

In September 2021, pursuant to the settlement reached in *Resource Renewal Institute*, the Park Service issued an Amendment to the 1980 GMP for a *portion* of the Seashore, but again made clear that the fenced elk population on Tomales Point is "*outside the scope of this GMPA/EIS."* AR 000420 (emphasis added); *see also* AR 000393 (same); *see also* AR 000468 (map showing that Tomales Point is outside the planning area).

On September 24, 2021, the Park Service announced that it had installed three additional water troughs at the north end of Tomales Point, and on October 4, 2021, the agency announced that it had installed an additional water trough and a mineral lick in the same general area. S*ee* NPS Website, Pl. Ex. A (*Tule Elk at Tomales Point FAQ*). However, the Park Service has yet to

- 16 -

provide any forage for these animals, despite the fact that, according to the agency, the lack of

adequate *forage* is what is causing the Tule elk to die. *See*, *e.g.*, *id.* ("poor forage quality is the

underlying cause of these population changes").[8]

## **ARGUMENT**

### I. **THE NATIONAL PARK SERVICE HAS VIOLATED ITS STATUTORY DUTY TO REVISE THE GENERAL MANAGEMENT PLAN FOR TOMALES POINT IN A "TIMELY MANNER."**

The Administrative Procedure Act ("APA") provides that a reviewing court "shall . . . compel

agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Supreme

Court has clarified that this provision of the APA applies where an agency "failed to take a

discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55,

64 (2004). As demonstrated below, the NPS has violated its statutory obligation to revise the

GMP for Tomales Point in a "timely manner" as required by its governing statute, 54 U.S.C. §

100502, *by failing to undertake any such revision for 41 years.* As a result, the population of Tule

elk at Tomales Point are being de facto "managed" by the Park Service by allowing them to die

by starvation and dehydration, in complete contravention of the laws designed to protect this

wildlife. Therefore, Plaintiffs are entitled to summary judgment in this case.

### A. **The Park Service's Obligation to Revise the GMP in a "Timely Manner" is a Mandatory Duty that Must be Compelled by this Court.**

As explained, *supra*, the statute governing the Park Service provides that "[g]eneral

management plans for the preservation and use of each System unit . . . *shall* be prepared and

*revised in a timely manner* by the Director." 54 U.S.C. § 100502 (emphasis added). As Judge

Armstrong of this Court has already ruled, this obligation is mandatory, and it therefore easily

satisfies the requirements of *Southern Utah Wilderness Alliance. See Res. Renewal Inst.*, 2016

WL 11673179, ECF No. 49 at 9 (explaining that "the statute commands that the NPS 'shall'

revise a GMP in a 'timely manner,'" and "[a]lthough the NPS has leeway in deciding *when* to

revise a GMP, it *remains statutorily obligated to do so in a 'timely manner*.'") (emphasis added);

---

[8] There also continue to be problems with the Park Service's failure to adequately maintain the supplemental water troughs that have been provided.

1   *id.* (noting that "[w]ere the Court to conclude otherwise, as urged by Defendants, their statutory

2   obligation to revise a GMP would be rendered a nullity"); *see also United States v. Monsanto*,

3   491 U.S. 600, 607 (1989) (finding that the use of the term "shall" denotes a requirement to act);

4   *Houseton v. Nimmo*, 670 F.2d 1375, 1377 (9th Cir. 1982) ("even though agency action may be

5   subject to no explicit time limit, a court may compel an agency to act within a reasonable time.").

6         **B.**     **NPS's Failure to Revise the GMP with Regard to Tomales Point is**
                 **<u>"Unreasonable" Within the Meaning of the *TRAC* Factors.</u>**

7

8          In the Ninth Circuit, the question of whether an agency's delay in taking a required action

9   is "unreasonable" under the APA is governed by the so-called *TRAC* factors, named after the D.C.

10   Circuit's seminal unreasonable delay case, *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70

11   (D.C. Cir. 1984). *See also In re Pesticide Action Network N. Am.*, 798 F.3d 809, 813-14 (9th Cir.

12   2015) (applying the *TRAC* factors); *accord Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166,

13   1177 (9th Cir. 2002).

14          *TRAC* explained that "the time agencies take to make decisions must be governed by a

15   rule of reason," 750 F.2d at 80, and enumerated several factors that a reviewing court must apply

16   to inform this analysis. Those include the following:

17        (1) where Congress has provided a timetable or other indication of the speed with which it
18            expects the agency to proceed in the enabling statute, that statutory scheme may
         supply content for this rule of reason;

19        (2) delays that might be reasonable in the sphere of economic regulation are less tolerable
20            when human health and welfare are at stake;

21        (3) the court should consider the effect of expediting delayed action on agency activities
         of a higher or competing priority; and

22        (4) the court should also take into account the nature and extent of the interests prejudiced
23            by delay.

24   *Id.*; *In re A Cmty. Voice*, 878 F.3d 779, 786 (9th Cir. 2017). *TRAC* further explained that to find

25   an agency's delay "unreasonable," "the court need not find any impropriety lurking behind

26   agency lassitude." 750 F.2d at 80. Here, as demonstrated below, NPS's 41-year delay in revising

27

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

the GMP for the Tomales Point portion of Point Reyes National Seashore amply satisfies the

*TRAC* factors and is therefore "unreasonable" within the meaning of the APA, 5 U.S.C. § 706(1).

### 1. A 41-Year Delay in Carrying Out a Mandatory Statutory Duty is Patently Unreasonable.

Although Congress did not provide a specific timeline for the revision of GMPs, it did

state that such plans "shall" be revised "in a timely manner." 54 U.S.C. § 100502. By any rule of

reason, 41 years—the length of time that has ensued since the Park Service issued the 1980 GMP

that covers Tomales Point—is *beyond* unreasonable. Indeed, courts have consistently ruled that

much shorter delays by agencies are unreasonable under *TRAC*. For example, the Court of

Appeals for this Circuit has twice found that the Environmental Protection Agency's eight-year

delay in responding to an administrative petition was unreasonable, *In re A Cmty. Voice*, 878 F.3d

779 (9th Cir. 2017); *In re Pesticide Action Network N. Am.*, 798 F.3d 809 (9th Cir. 2015), and

many other courts have similarly found that multi-year agency delays in carrying out statutory

mandates are unreasonable, *see, e.g., In re United Mine Workers of Am. Intl. Union*, 190 F.3d 545

(D.C. Cir. 1999) (eight-year delay in promulgating updated air quality standards for hazardous

substances in underground mines was unreasonable); *In re Bluewater Network*, 234 F.3d 1305

(D.C. Cir. 2000) (Coast Guard's nine-year delay in promulgating required regulations was

unreasonable); *Defs. of Wildlife v. Browner*, 909 F. Supp. 1342 (D. Ariz. 1995) (less than two-

year delay in promulgating water quality standards was unreasonable); *Nat'l Wildlife Fed'n v.*

*Cosgriffe*, 21 F. Supp. 2d 1211 (D. Or. 1998) (six-year delay in completing a management plan

was unreasonable); *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202 (E.D. Cal. 1999) (nine-year delay

in the National Park Service's completion of a comprehensive management plan was

unreasonable); *Hells Canyon Pres. Council v. Richmond*, 841 F. Supp. 1039 (D. Or. 1993) (delay

of up to eighteen years was unreasonable).

Therefore, failing to revise the 1980 GMP for Tomales Point is indisputably unreasonable,

especially when the Park Service was tasked by Congress to manage all park units under its

jurisdiction—including the Point Reyes Seashore—in ways that will "conserve the . . . wild life in

the System units and . . . provide for the enjoyment of the [same] in such manner and by such

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

means *as will leave them unimpaired for the enjoyment of future generations*." 54 U.S.C. § 100101(a) (emphasis added); *see also* 16 U.S.C. § 459c (providing that Point Reyes Seashore "shall be administered by the Secretary *without impairment of its natural values*") (emphasis added).

Indeed, the agency's own Management Policies explain that "GMP reviews may be needed every 10 to 15 years, but may be needed sooner *if conditions change significantly*," NPS Policies, Pl. Ex. B at § 2.3.1.12, and that "[i]f conditions remain substantially unchanged, a longer period between reviews would be acceptable," *id*. Here, as the record shows, the agency's own experts and others have warned the Park Service *for decades* that systemic management of this confined elk population was needed to avert a biological catastrophe—i.e., protected elk dying of starvation. *See supra* at 9-13.

Indeed, more than 28 years ago, the Park Service's own Advisory Panel warned the agency that if it continued to employ a hands-off approach to managing the Tule elk at Tomales Point, "[w]e can reliably predict that if such a strategy is employed *the tule elk will seasonally be malnourished and appear less 'healthy,' and that dead and dying animals will become more evident*," AR 004010 (emphasis added)—precisely what has been happening in recent years. Moreover, since then, conditions have changed even *more* significantly—i.e., hundreds of Tule elk have died since 2012 due to unprecedented drought conditions, and the agency itself has recognized that due to climate change and other factors drought conditions are "*worsening*." ECF No. 15 at 22 (emphasis added). Thus, there really can be no legitimate question that the agency's 41-year delay in revising the GMP for this portion of the Seashore is unreasonable in the extreme.

**2.      NPS's Delay is Causing the Death and Suffering of Wildlife that the Agency is Required to Protect and Conserve.**

*TRAC* recognizes that an agency's delay in carrying out a statutory duty is much less tolerable when it affects interests other than those of a solely economic nature. 750 F.2d at 80. Here, again, NPS is required by statute to "*conserve*" this wildlife and to provide for its enjoyment "in such manner and by such means *as will leave [it] unimpaired for the enjoyment of future generations*." 54 U.S.C. § 100101(a) (emphasis added). However, the agency's failure to

1    revise the GMP has created the *opposite* situation—it has resulted in the suffering and death of

2    hundreds of animals who are required to be protected by this agency, and it has meant that

3    members of the public who enjoy using this public land are either exposed to dead, dying, and

4    emaciated elk, or must refrain from using this part of these public lands to *avoid* witnessing such

5    horrific sights. *See*, *e.g.*, Gescheidt Decl., Pl. Ex. C, ¶ 5 ("All of this has drastically changed—

6    even ruined—my enjoyment of the park."); Chariton Decl., Pl. Ex. D, ¶ 8 ("I can no longer truly

7    enjoy visiting my favorite place in the world. I worry about seeing suffering elk again or even

8    finding a dead elk—an experience that would cause me even deeper psychological and lasting

9    pain than I am currently experiencing. I also worry that I will never again be able to see a

10   thriving, healthy, beautiful herd of tule elk and their offspring at Tomales Point."); Thomas Decl.,

11   Pl. Ex. E, ¶ 8 ("Witnessing these scenes of death and unimaginable torturous last hours for the

12   Tule elk have had a profound and sad impact on me. I no longer even like visiting Tomales Point.

13   So now I am faced with the decision to either forego visiting a place that I have come to love and

14   that so enriches my life or to go there anyway and risk seeing the horrific sight of dead or dying

15   elk.").

16        In addition, rather than leave the elk population "unimpaired" for the enjoyment of future

17   generations, the Park Service's failure to manage the elk has resulted in such a decimation of the

18   population in recent years that its genetic viability—already an issue of concern in 1998 when the

19   Elk Management Plan was issued, *see supra*—is seriously compromised. As explained by Dr.

20   Judd Howell:

21        The Tomales Point tule elk population has been hugely diminished on the order of 30 to
         50 percent in a short period of time. These large die-offs result in individuals lost to the
22        herd's gene pool. The National Park Service has not introduced new individuals to the
         population per recommendations. The population decline *will have a negative effect on*
23        *the genetic diversity of this population because there will be a smaller gene pool. This is*
         *a real concern taking into account the massive die-off that already occurred in 2013-*
24        *2015, as well as the number of elk that died last year*.

25   *See* Howell Decl., ECF No. 8-9, ¶ 12 (emphasis added); *see also* Letter from Scientists to Interior

26   Secretary Haaland (June 24, 2001) (S 000038) (explaining that the Park Service's failure to revise

27   the GMP for Tomales Point means that "the adverse consequences that result from confining

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

1  them will continue" and that "this small[,]confined population of wildlife is at risk [of]

2  extirpation").

3        Therefore, should the Tule elk population at Tomales Point continue to decline, further

4  compromising the long-term genetic diversity and viability of the herd, future generations will

5  *never* have the chance to witness, visit, or commune with these magnificent animals.

6        **3.      Conserving the Tule Elk and Preventing Massive Die-Offs from Starvation and/or Dehydration Should be the Park Service's Highest Priority.**

7        There also is no question that revising the GMP for Tomales Point should be a high

8  priority for the NPS. *TRAC*, 750 F.2d at 80. Again, the Park Service's mandate under its organic

9  statute is to "promote and regulate the use of the Federal areas known as national parks,

10  monuments, and reservations . . . by such means and measures as conform to the fundamental

11  purpose . . . to conserve the scenery and the natural and historic objects *and the wild life* therein

12  and to provide for the enjoyment of the same *in such matter such manner and by such means as*

13  *will leave them unimpaired for the enjoyment of future generations*." 54 U.S.C. § 100101(a)

14  (emphasis added).

15        There can be no higher priority for the NPS than to fulfill its Congressional mandate: to

16  preserve this wildlife at Point Reyes National Seashore and to leave it unimpaired for the enjoyment

17  of future generations. The agency's failure to revise the GMP for Tomales Point for over 41 years

18  has created an untenable situation: it has meant that the Tule elk who live there—and which the

19  NPS was specifically instructed to "conserv[e]," 16 U.S.C. §§ 673e—are dying horrific and

20  inhumane deaths in huge numbers from a lack of food and water because they cannot get past the 8-

21  foot-high and 3-mile-long fence that confines them.

22        **4.      As a Result of the NPS's Egregious Delay, the Tule Elk are Suffering and Dying from a Lack of Forage and Water, and the Genetic Viability of this Wildlife Population is in Serious Jeopardy.**

23

24        As to the *TRAC* factor involving the "nature and extent of interests prejudiced" by the

25  agency's delay, 750 F.2d at 80, those interests primarily are those of the elk—which the agency is

26  required by law to protect and preserve—and the interests of the public in being able to enjoy

27  viewing this wildlife and in ensuring that it will be preserved for future generations to enjoy. Yet,

28

- 22 -

because the NPS has neglected its obligation to revise the GMP for this portion of the Seashore, hundreds of animals are continuing to die of starvation and/or dehydration.

Therefore, as demonstrated above, the Park Service has clearly unreasonably delayed its obligation to revise the GMP for Tomales Point within a "timely manner." 54 U.S.C. § 100502. Accordingly, unless and until the Park Service revises the GMP for Tomales Point, it will continue to be operating in dereliction of its mandatory statutory duty. In addition, Plaintiffs, who otherwise enjoy this beautiful place and who take great solace in visiting Tomales Point, have to be confronted with seeing dead, dying, and emaciated elk. And, if the elk population continues to plummet, future generations may *never* have the opportunity to see these magnificent animals. Accordingly, this *TRAC* factor also weighs heavily in support of Plaintiffs' position.

## II.    PLAINTIFFS HAVE ARTICLE III STANDING.

Plaintiffs clearly have sufficient Article III standing to maintain this case. To satisfy Article III, they must show (1) that they are being injured; (2) that this injury is "fairly traceable" to the challenged action of the Defendants; and (3) that this injury will "likely" be redressed to some extent if Plaintiffs prevail on the merits. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1174 (9th Cir. 2017). As demonstrated below, and by the sworn Declarations already filed in this case and resubmitted here, Plaintiffs easily satisfy each of these requirements.

### A.    <u>Injury</u>

Plaintiffs have demonstrated that they all derive significant aesthetic pleasure from visiting, photographing, and studying the Tule elk at Tomales Point. Gescheidt Decl., Pl. Ex. C, ¶ 2; Chariton Decl., Pl. Ex. D, ¶ 1; Thomas Decl., Pl. Ex. E, ¶ 1; Declaration of Mark Walden, Pl. Ex. F, ¶¶ 6-9. As the Supreme Court has explained, such interests in "an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562–63. However, because the Park Service has failed to manage this wildlife as required by its governing statute, Plaintiffs' interests are greatly impaired by seeing dead and dying elk at the Seashore, or having to refrain from visiting this beloved natural area to *avoid* such disturbing

sights. Gescheidt Decl., Pl. Ex. C, ¶ 7; Chariton Decl., Pl. Ex. D, ¶ 8; Thomas Decl., Pl. Ex. E, ¶ 8; Walden Decl., Pl. Ex. F, ¶ 8. These aesthetic injuries are concrete and particularized, and hence sufficient for Article III standing. *See Lujan*, 504 U.S. at 562–63; *see also Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) (*en banc*) (being denied the ability to see animals in humane conditions is an injury in fact for purposes of Article III); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (having to refrain from enjoying a natural resource to avoid aesthetic injury suffices for standing).

### B.   Causation

Plaintiffs' injuries are also "fairly traceable" to the NPS's failure to comply with its mandatory duty to revise the GMP for Tomales Point. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). Indeed, had the agency heeded the many warnings over the years from its own experts and others to do something to manage the Tule elk population to prevent the elk from dying from starvation from a lack of forage, these aesthetic injuries would not be occurring. On the contrary, had the Park Service issued a timely revision of the GMP, the Tule elk population at Tomales Point would be managed in a proper, humane way—not by death by starvation and dehydration. Accordingly, there can be no question that the Park Service's unreasonable delay is a direct cause of Plaintiffs' injuries.

### C.   Redressability

Finally, Plaintiffs' injuries would also be redressed if Defendants were compelled to revise the GMP required by Congress and ensure that this wildlife does not continue to die in large numbers from starvation and dehydration. *See, e.g.*, *Friends of the Earth*, 528 U.S. at 186 (abating and preventing the recurrence of a plaintiff's injury provides redress). Indeed, should Plaintiffs prevail, the Park Service will have to revise the 1980 GMP with respect to Tomales Point and devise a management approach that is *humane* and that ensures the genetic viability of the elk population for future generations—for example, by removing or relocating the fence to provide the elk with access to more food and water or by engaging in other management approaches suggested for many years but never followed by the agency. *See supra* at 7-9. Thus, Plaintiffs

"personally would benefit in a tangible way from the court's intervention." *Kirola*, 860 F.3d at 1175; s*ee also* Gescheidt Decl., Pl. Ex. C, ¶ 8; Chariton Decl., Pl. Ex. D, ¶ 8; Thomas Decl., Pl. Ex. E, ¶ 9; Walden Decl., Pl. Ex. F, ¶ 11 (explaining that granting the requested relief would redress their injuries by assuring the humane management of the elk they so enjoy).

### CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for summary judgment should be granted.

Respectfully submitted,

_____
Kate Barnekow, State Bar No. 336792
kbarnekow@law.harvard.edu
Harvard Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: (617) 496-4863
Cell: (512) 868-7800

_____
Katherine A. Meyer
(appearance *pro hac vice*)
kmeyer@law.harvard.edu
Director, Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: (617) 496-4863
Cell: (202) 257-5145

Attorneys for Plaintiffs

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT