1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2  MICHELLE LO (NYRN 4325163)
   Chief, Civil Division
3  DAVID M. DEVITO (CABN 243695)
   Assistant United States Attorney
4  450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102-3495
5  Telephone: (415) 436-7332
   FAX: (415) 436-6748
6  david.devito@usdoj.gov

7  TODD KIM
   Assistant Attorney General
8  Environmental and Natural Resources Division
   United States Department of Justice
9
   MATTHEW P. RAND (NYBN 4937157)
10 Trial Attorney
   Natural Resources Section
11 Environmental and Natural Resources Division
   United States Department of Justice
12 150 M St. NE, Room 3.128
   Washington, D.C. 20002
13 Telephone: (202) 305-0874
   FAX: (202) 305-0506
14 matthew.rand@usdoj.gov

15 Attorneys for Defendants

16              UNITED STATES DISTRICT COURT

17            NORTHERN DISTRICT OF CALIFORNIA

18                   OAKLAND DIVISION

19
   JACK GESCHEIDT, et al.,              )  Case No. 4:21-cv-4734-HSG
20                                       )
                                         )  **DEFENDANTS' CROSS-MOTION FOR**
21          Plaintiffs,                  )  **SUMMARY JUDGMENT AND OPPOSITION**
                                         )  **TO PLAINTIFFS' MOTION FOR SUMMARY**
22     v.                                )  **JUDGMENT**
                                         )
   DEB HAALAND, Secretary of the Interior, )  Date: February 24, 2022
23 et al.,                               )  Time: 2:00 p.m.
                                         )  Place:  Courtroom 2, 4th Floor
24          Defendants.                  )
                                         )  Hon. Haywood S. Gilliam, Jr.
25                                       )
                                         )
26 ─────────────────────────────────────)

27

28
   DEFS.' OPP. TO MSJ & CROSS-MSJ
   4:21-CV-4734 HSG

1

**TABLE OF CONTENTS**

2    TABLE OF AUTHORITIES ...................................................................................................... iii

3    NOTICE OF MOTION AND MOTION .................................................................................... 1

4    RELIEF SOUGHT BY DEFENDANTS ................................................................................... 1

5    ISSUES TO BE DETERMINED ............................................................................................... 1

6    MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

7    I.        INTRODUCTION ........................................................................................................... 1

8    II.       BACKGROUND ............................................................................................................. 4

9              A.      History of Point Reyes National Seashore ......................................................... 4

10             B.      The Park's General Management Plan ................................................................ 5

11             C.      Reintroduction of the Tule Elk at Point Reyes .................................................. 6

12             D.      Elk Management and the 1998 Elk Plan ............................................................ 6

13             E.      Procedural History .............................................................................................. 8

14   III.      LEGAL STANDARD ..................................................................................................... 9

15   IV.       ARGUMENT .................................................................................................................. 9

16             A.      Plaintiffs Lack Standing ..................................................................................... 9

17                     1.      Plaintiffs' Alleged Injury Fails to Establish Injury-in-Fact .................. 10

18                     2.      Plaintiffs Fail to Show that Their Alleged Injury Is Caused by NPS's
                               Alleged Failure to Revise the Park's GMP as It Relates to Tomales
19                             Point ....................................................................................................... 11

20                     3.      Plaintiffs Cannot Show that Their Alleged Injury Could Be Redressed
                               by an Order Compelling NPS to Revise the GMP for Tomales Point ... 11
21
               B.      Plaintiffs' Claim Seeking to Compel NPS to Revise the GMP Fails Because
22                     54 U.S.C. § 100502 Does Not Establish a Discrete, Non-Discretionary Action
                       Enforceable under the APA ................................................................................ 12
23
               C.      NPS Has Not Unreasonably Delayed Revising the Park's GMP ....................... 15
24
               D.      Even if the Court Were to Find that NPS Unreasonably Delayed in Revising
25                     the GMP as it Relates to Tomales Point, Plaintiffs' Remedy is Limited to an
                       Order Directing the Park to Update the GMP, a Process NPS Has Started ....... 20
26
                       1.      Plaintiffs Are Not Entitled to an Order Directing NPS to Provide
27                             Supplemental Food and Water ............................................................... 21

28                     2.      NPS Has Committed to Revising the GMP for Tomales Point ............. 23

3. Because NPS Has Publicly Committed to Provide the Only Relief Plaintiffs Could Obtain in this Action, No Further Relief is Necessary ................24

V. CONCLUSION.........................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*ASARCO Inc. v. Kadish*,
490 U.S. 605 (1989) ............................................................................................ 11-12

*Audubon Soc'y of Portland v. Jewell*,
104 F. Supp. 3d 1099 (D. Or. 2015) ............................................................................ 25

*Backcountry Against Dumps v. Chu*,
215 F. Supp. 3d 966 (S.D. Cal. 2015) ...................................................................... 9-10

*Biodiversity Legal Found. v. Badgley*,
309 F.3d 1166 (9th Cir. 2002) ...................................................................................... 17

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) ................................................................................ 21-22

*Camreta v. Greene*,
563 U.S. 692 (2011) ...................................................................................................... 13

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
341 F.3d 961 (9th Cir. 2003) ........................................................................................ 10

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ...................................................................................................... 24

*City of Sausalito v. O'Neill*,
386 F.3d 1186 (9th Cir. 2004) ...................................................................................... 10

*City of West Sacramento, Cal. v. R & L Bus. Mgmt.*,
No. 2:18-CV-00900 WBS EFB, 2020 WL 7360583 (E.D. Cal. Dec. 15, 2020) .............................. 21

*Confed. Tribes of Umatilla Indian Rsrv. v. Bonneville Power Admin.*,
342 F.3d 924 (9th Cir. 2003) ........................................................................................ 13

*Conservation Nw. v. Kempthorne*,
No. C04-1331-JCC, 2007 WL 1847143 (W.D. Wash. June 25, 2007) ............................................ 13

*Ctr. for Biological Diversity v. Brennan*,
571 F. Supp. 2d 1105 (N.D. Cal. 2007) ................................................................... 10, 11

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
35 F. Supp. 3d 1137 (N.D. Cal. 2014) .......................................................................... 18

*Ctr. for Food Safety v. Hamburg*,
954 F. Supp. 2d 965 (N.D. Cal. 2013) .......................................................................... 23

*Ctr. for Food Safety v. Jewell*,
83 F. Supp. 3d 126 (D.D.C. 2015) ................................................................................ 22

*Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987) ...................................................................................... 18

*Defs. of Wildlife v. Browner*,
   909 F. Supp. 1342 (D. Ariz. 1995) ................................................................. 17

*Ecological Rts. Found. v. Pac. Lumber Co.*,
   230 F.3d 1141 (9th Cir. 2000) .......................................................................... 11

*Fernandez v. Brock*,
   840 F.2d 622 (9th Cir. 1988) ............................................................................ 12

*Gardner v. Bureau of Land Mgmt.*,
   638 F.3d 1217 (9th Cir. 2011) ......................................................................... 13

*Hall v. Norton*,
   266 F.3d 969 (9th Cir. 2001) ............................................................................ 11

*Hells Canyon Pres. Council v. Richmond*,
   841 F. Supp. 1039 (D. Or. 1993) ..................................................................... 17

*Idaho Rivers United v. U.S. Forest Serv.*,
   857 F. Supp. 2d 1020 (D. Idaho 2012) ........................................................... 13

*In re A Community Voice*,
   878 F.3d 779 (9th Cir. 2017) .......................................................... 17, 18, 19, 20

*In re Bluewater Network*,
   234 F.3d 1305 (D.C. Cir. 2000) ....................................................................... 17

*In re Pesticide Action Network N. Am.*,
   798 F.3d 809 (9th Cir. 2015) ............................................................................ 17

*In re United Mine Workers Am. Int'l Union*,
   190 F.3d 545 (D.C. Cir. 1999) ......................................................................... 17

*Indep. Mining Co. v. Babbitt*,
   105 F.3d 502 (9th Cir. 1997) ................................................................ 15, 16, 18

*Jackson Hole Conservation All. v. Babbitt*,
   96 F. Supp. 2d 1288 (D. Wyo. 2000) ............................................................. 10

*Resource Renewal Institute v. National Park Service*,
   No. C 16-0688 SBA, 2016 WL 11673179 (N.D. Cal. July 15, 2016) ......... 13, 14

*Kifafi v. Hilton Hotels Ret. Plan*,
   701 F.3d 718 (D.C. Cir. 2012) ......................................................................... 22

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
   941 F.2d 970 (9th Cir. 1991) ............................................................................ 21

*Luciano Farms, LLC v. United States*,
   No. 2:13-02116-KJM-AC, 2014 WL 1912356 (E.D. Cal. May 13, 2014) ....... 13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................... 9, 10, 12

*Mashpee v. Wampanoag Tribal Council, Inc. v. Norton*,
   336 F.3d 1094 (D.C. Cir. 2003) .................................................................................. 15, 18, 20

*Meinhold v. U.S. Dep't of Def.*,
   34 F.3d 1469 (9th Cir. 1994) ...................................................................................................... 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...................................................................................................................... 9

*N.L.R.B. v. Express Pub. Co.*,
   312 U.S. 426 (1941) .................................................................................................................... 21

*Nat'l Wildlife Fed'n v. Cosgriffe*,
   21 F. Supp. 2d 1211 (D. Or. 1998) ............................................................................................ 17

*Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
   435 F.3d 326 (D.C. Cir. 2006) ................................................................................................... 21

*Norton v. Southern Utah Wilderness Alliance*
   542 U.S. 55 (2004) ............................................................................................................. *passim*

*Occidental Eng'g Co. v. Immigr. & Naturalization Serv.*,
   753 F.2d 766 (9th Cir. 1985) ....................................................................................................... 9

*ONRC Action v. Bureau of Land Mgmt.*,
   150 F.3d 1132 (9th Cir. 1998) .................................................................................................... 13

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010) .................................................................................................... 11

*Salmon Spawning & Recovery All. v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) .................................................................................................... 12

*San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*,
   819 F. Supp. 2d 1077 (E.D. Cal. 2011) ...................................................................................... 9

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ..................................................................................................... 25

*Sierra Club v. Babbitt*,
   69 F. Supp. 2d 1202 (E.D. Cal. 1999) ...................................................................................... 17

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................................................................... 11

*Utah v. Babbitt*,
   137 F.3d 1193 (10th Cir. 1998) ................................................................................................. 10

*Vietnam Veterans of Am. v. Cent. Intel. Agency*,
   811 F.3d 1068 (9th Cir. 2016) .................................................................................................... 12

*WildEarth Guardians v. Chao*,
   454 F. Supp. 3d 944 (D. Mont. 2020) .................................................................................. 14, 22

1  **Statutes**

2  5 U.S.C. § 555 ................................................................................................ 14

3  5 U.S.C. § 706 ........................................................................................... *passim*

4  16 U.S.C. § 673g ............................................................................................. 8

5  16 U.S.C. § 1131 ............................................................................................. 4

6  42 U.S.C § 4332 ............................................................................................ 23

7  54 U.S.C. § 100101 ...................................................................................... 4, 8

8  54 U.S.C. § 100502 ................................................................................... *passim*

9  54 U.S.C. § 306101-306108 ........................................................................ 4-5

10  **Regulations**

11  40 C.F.R. § 1501.10 ...................................................................................... 25

12  40 C.F.R. § 1508.1 .................................................................................. 23, 24

13  40 C.F.R. § 1502.9 ........................................................................................ 24

14  40 C.F.R. § 1503.4 ........................................................................................ 24

15  **Rules**

16  Federal Rule of Civil Procedure 56 ............................................................. 1, 9

17  **Other Authorities**

18  Act of Sept. 13, 1962, Pub. L. 87-657, 76 Stat. 538 ...................................... 4

19  Act of Oct. 18, 1976, Pub. L. No. 94-544, 90 Stat. 2515. ............................. 4

20  Act of Nov. 10, 1978, Pub. L. No. 95-625, Title VI, § 604(3), 92 Stat. 3467 .......................... 5

21  Joint Resolution of Aug. 14, 1976, Pub. L. No. 94-389, 90 Stat 1189 .................................... 6

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

2 PLEASE TAKE NOTICE that on February 24, 2022 at 2:00 p.m. before the Honorable

3 Haywood S. Gilliam, Jr., Judge of the United States District Court for the Northern District of

4 California, Defendants will move the Court, pursuant to Federal Rule of Civil Procedure 56, to enter

5 summary judgment in their favor because (a) Plaintiffs fail to demonstrate standing; (b) the statutory

6 requirement to revise general management plans "in a timely manner" is not a specific, unequivocal

7 command enforceable through the Administrative Procedure Act ("APA"); and (c) the National Park

8 Service ("NPS")[1] did not unreasonably delay revising the General Management Plan for Point Reyes

9 National Seashore ("Point Reyes" or the "Park") as it relates to the Tomales Point reserve ("Tomales

10 Point" or the "Reserve"). This motion is supported by the following Memorandum of Points and

11 Authorities, the Certified Administrative Record, the attached Declaration of Craig Kenkel, and such

12 other argument or evidence as may be presented to this Court at a hearing on this motion.

13

## RELIEF SOUGHT BY DEFENDANTS

14 Defendants move for an order granting summary judgment their favor and denying Plaintiffs'

15 motion for summary judgment.

16

## ISSUES TO BE DETERMINED

17 1.   Whether Plaintiffs have met their burden of establishing Article III standing?

18 2.   Whether 54 U.S.C. § 100502 creates the type of discrete and legally mandatory duty that

19 may be compelled under the APA?

20 3.   Whether NPS has acted arbitrarily and capriciously by not revising the General

21 Management Plan for Point Reyes as it relates to Tomales Point?

22

## MEMORANDUM OF POINTS AND AUTHORITIES

23 **I.    INTRODUCTION**

24 As they have stressed throughout these proceedings, Plaintiffs commenced this action, and

25

26 [1] Plaintiffs' amended complaint names as defendants Deb Haaland, Secretary of the Interior, Shawn Benge, Acting Director of NPS, and Craig Kenkel, Superintendent of Point Reyes, each in their official capacities (collectively referred to herein as "Defendants" or "NPS").

27

28

continue to pursue it, because they are concerned about the welfare of the tule elk population at Tomales Point, and they disagree with, and thus seek to alter, NPS's elk management practices. All of Plaintiffs' claimed injuries flow from those concerns. Critically, the legal theory by which Plaintiffs seek to remedy these alleged injuries rests entirely on their claim that NPS has unreasonably delayed in revising the 1980 General Management Plan (the "GMP") for Point Reyes as it relates to Tomales Point, in violation of 54 U.S.C. § 100502, which revision Plaintiffs seek to compel under section 706(1) of the APA. As was apparent when Plaintiffs unsuccessfully sought a preliminary injunction demanding that NPS provide supplemental food and water to the elk and remove the decades-old Tomales Point fence, however, an incurable disconnect exists between Plaintiffs' alleged injuries and the relief they contend will remedy those injuries, on the one hand, and their sole cause of action, on the other.

The Park's GMP, though admittedly now a forty-one-year-old document, is a programmatic plan that provides a broad, long-term management direction for the Park, including Tomales Point. It does not address implementation-level elk management issues at Tomales Point. Those are addressed instead (as required by the statute directing NPS to develop it) in the Park's 1998 Elk Plan. And while Plaintiffs' original complaint included a claim seeking to compel NPS to update the 1998 Elk Plan, Plaintiffs dropped that claim through their amended complaint, perhaps in recognition that the Court was correct in noting "any direct challenge to the construction of the fence or to the 1998 Tule Elk Management Plan's decision to maintain the fence is likely time-barred." ECF No. 26 ("PI Order") at 14 n.10.

Plaintiffs' efforts to shoehorn their factual complaints about NPS's elk management into a legal claim seeking revision of a general management plan that does not address implementation-level elk management decisions must fail. Because Plaintiffs' alleged injuries are not caused by NPS's alleged failure to revise the GMP, and would not be redressed by an order compelling such a revision, Plaintiffs lack Article III standing to maintain this suit. Moreover, under the Supreme Court's decision in *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55 (2004), the plan revision Plaintiffs seek to compel is not the sort of ministerial, non-discretionary command enforceable under the APA.

In any event, notwithstanding the amount of time that has elapsed since the adoption of the GMP in 1980, NPS has not unreasonably delayed in revising the GMP as it relates to Tomales Point. In that

portion of the Park, the topics that must be addressed at the general management planning level are limited, constrained by the Congressional wilderness designation that applies to nearly all of Tomales Point. Under the circumstances, not revising the GMP for Tomales Point was reasonable.

Nonetheless, due to the severity of the current drought, NPS is now embarking upon a process to develop a new plan for Tomales Point to address wilderness and elk management issues, which would replace the 1998 Elk Plan for Tomales Point, and revise, as appropriate, the GMP as it relates to Tomales Point. Though just beginning, that process represents everything (indeed, significantly more than) Plaintiffs could hope to obtain through their sole cause of action, because even if a GMP revision qualifies as an action the Court may order under the APA, the Court has already recognized that it "has no power to specify what the action must be." PI Order at 11 (quoting *SUWA*, 542 U.S. at 65).

Plaintiffs nevertheless persist in demanding specifics the Court cannot order. In their amended complaint, Plaintiffs request an injunction ordering NPS to: (1) "take immediate measures to comply with their statutory duties to revise the 1980 General Management Plan with respect to the Tomales Point portion of the Point Reyes National Seashore and the Tule elk who live there;" and (2) "enjoin [NPS] from continuing to deprive the Tule elk at Tomales Point of adequate food and water." ECF No. 33 ("FAC") at 17. Likewise, in the proposed order submitted with the motion, Plaintiffs ask the Court to dictate that a revised GMP "includ[e] measures to ensure the humane treatment and management of the Tule Elk who live there," and, potentially require "interim relief . . . to ensure that the elk do not continue to die of starvation and/or dehydration before the General Management Plan is properly revised." ECF No. 56-8. Failing to acknowledge the maximum relief their legal claim might conceivably afford them (i.e., an order directing a GMP revision), Plaintiffs seek to relitigate their failed preliminary injunction request under the guise of summary judgment. But just as before, "Plaintiffs do not cite, and the Court is not aware of, any authorities which would allow Plaintiffs (or the Court) to dictate how the Park Service should revise its general management plan, or even what competing interests it should elevate over others in doing so." PI Order 12. As the Court previously noted, "nothing in the[] statutes [relied on by Plaintiffs] dictates how the Park Service should ensure the protection and conservation of the National Seashore generally or the tule elk more specifically." *Id.* at 14. That statement remains as

1   true now, at summary judgment, as at the time of the Court's preliminary injunction ruling. Accordingly,

2   and as explained in further detail below, Plaintiffs' motion for summary judgment should be denied,

3   Defendants' cross-motion granted, and the case should be dismissed.

4   **II.     BACKGROUND**

5       **A.     History of Point Reyes National Seashore**

6          Point Reyes is a unit of the National Park System, administered by NPS. Congress established

7   the Park on September 13, 1962, for the purpose of preserving "a portion of the diminishing seashore of

8   the United States that remains undeveloped." Pub. L. 87-657, 76 Stat. 538 (codified, as amended, at 16

9   U.S.C. §§ 459c through 459c-7). In 1976, Congress directed NPS to administer Point Reyes "without

10  impairment of its natural values, in a manner which provides for such recreational, educational, historic

11  preservation, interpretation, and scientific research opportunities as are consistent with, and based upon,

12  and supportive of the maximum protection, restoration, and preservation of the natural environment

13  within the area." Act of Oct. 18, 1976, Pub. L. No. 94-544, § 6(a), 90 Stat. 2515. All national park units,

14  including Point Reyes, are now managed to the standards of the NPS Organic Act, 54 U.S.C.

15  § 100101(a), "except as directly and specifically provided by Congress" such as in a unit's enabling

16  legislation, 54 U.S.C. § 100101(b)(2). Today, Point Reyes encompasses more than 71,000 acres,

17  including the almost 33,000-acre Phillip Burton Wilderness Area (Public Laws 94-544 and 94-567).

18         In 1976, Congress designated most of the land that now makes up the Reserve as wilderness

19  pursuant to the Wilderness Act, 16 U.S.C. § 1131 *et seq.* As required by the Wilderness Act, as well as

20  NPS policies, NPS manages this part of the Reserve to protect the area as wilderness and preserve its

21  wilderness character. *See* 16 U.S.C. § 1131(a); 2006 NPS Management Policies, Chapter 6, AR009542-

22  009553. The Wilderness Act prohibits commercial development, structures, roads, and the use of

23  motorized vehicles in wilderness areas. 16 U.S.C. § 1131(b) & (c). The historic Pierce Point Ranch is

24  also located within the Reserve. AR000310, 000323. The ranch is listed on the National Register of

25  Historic Places (since 1985) and is a documented cultural landscape that is of high interpretive value.

26  AR007632. Under federal law and NPS policies, NPS is required to ensure appropriate treatment of the

27  historic ranch and the protection and preservation of its contributing structures and features. 54 U.S.C.

28

1  § 306101-306108; 2006 NPS Management Policies, Chapter 4, AR009524-009540.

2  **B.**    **The Park's General Management Plan**

3  In 1978, Congress passed the National Parks and Recreation Act, which included a provision

4  requiring the preparation of general management plans ("GMPs") for units of the National Park System.

5  Pub. L. No. 95-625, Title VI, § 604(3), 92 Stat. 3467, 3518 (now codified at 54 U.S.C. § 100502).

6  Section 100502 states that GMPs "for the preservation and use of each System unit . . . shall be prepared

7  and revised in a timely manner by the Director." *Id.*

8  In response to that enactment, Point Reyes, together with the geographically proximate Golden

9  Gate National Recreation Area, undertook a joint GMP/National Environmental Policy Act ("NEPA")

10  planning process. As a result of that process, in 1980, NPS approved the GMP. The GMP set forth

11  programmatic management objectives and strategies for the natural and cultural resources in the Park, as

12  well as for visitor use and Park operations in order to administer the Park according to the requirements

13  of the Park's Enabling Law, the NPS Organic Act, and other relevant federal laws, such as the

14  Wilderness Act. As it relates to Tomales Point, the GMP identified most of the lands within the Reserve

15  as "Environmental Protection Subzone-Wilderness" or "Historic Zone." AR000309-000311 (map on

16  000310). The GMP also stated that the "[r]estoration of historic natural conditions (such as

17  reestablishment of Tule elk) will continue to be implemented when such actions will not seriously

18  diminish scenic and recreational values." AR000313. The GMP acknowledged that management of

19  wilderness, including the wilderness within Tomales Point, would be "managed in accordance with the

20  mandates of the Wilderness Act (78 Stat. 890)." AR000309. The GMP further stated that one of the

21  NPS's management objectives was "[t]o preserve and protect all structures in or nominated to the

22  National Register of Historic Places," which included the Pierce Point Ranch that is located in the

23  Historic Zone within Tomales Point. AR000302, 000309-000311, 000314, 000316.

24  Pursuant to previous and current NPS policies, the GMP is complemented by "implementation

25  plans" that "focus on how to implement an activity or project needed to achieve a long-term goal,

26  address a management issue, or achieve a desired condition or goal." DO2 at 5, AR009763) (previous

27  2006 NPS policy at pp. 22-23 (section 2.2) AR008487-008488; p. 27 (section 2.3.4) AR009492). For

28

Tomales Point, one relevant implementation plan is the 1998 Elk Plan. AR003628-003730.

### C.   Reintroduction of the Tule Elk at Point Reyes

Tule elk (*Cervus elaphus nannodes*) are a distinct subspecies of elk endemic to California. AR003637, 003640. Once present in abundance, by the mid-1800s tule elk had been eliminated from the Point Reyes area. AR003640, 003644. In all of California, by 1870, only five to ten individuals remained on a single ranch. *Id.* After numerous attempts to establish new herds, two herds eventually thrived and, by the 1940s, the population had increased to several hundred animals. AR003642. In the 1970s, the State of California started a conservation program with the goal of relocating and establishing new elk herds around the state. *Id.* An interagency task force was created to aid this effort, of which NPS was a member. AR003899. In its 1971 report, the task force identified Point Reyes as a suitable site for reintroduction of the tule elk, provided that five stipulations were met, including a "mandatory" fence to keep elk out of private lands and grazing areas. AR003903.

In 1976, Congress directed the Secretary of the Interior, in coordination with relevant federal, state, and local officials, to "develop a plan for Tule elk restoration and conservation, including habitat management." Pub. L. No. 94-389, 90 Stat 1189 (Aug. 14, 1976). Tomales Point was eventually selected as the location for reintroduction. AR0033914-003918. In accordance with the requirements of the State, a fence was erected to keep the reintroduced elk off of private property, and to avoid conflicts with agriculture. AR003644, 003903. The tule elk were reintroduced in the Park in 1978, with the transfer of 10 individuals into the newly created Reserve. AR003644. This initial herd struggled to take hold. AR004671. However, the herd eventually stabilized and, by the late 1980s, NPS grew concerned about overpopulation and damage to sensitive resources. AR003644-003645.

### D.   Elk Management and the 1998 Elk Plan

NPS began a planning effort in 1992 aimed at controlling the growth of the elk herd. AR003645. This effort resulted in a recommendation that excess elk be removed on a yearly basis via lethal removal (culling), though a draft environmental assessment was eventually withdrawn due to public opposition to culling. *Id.* NPS convened a scientific panel in 1993 to provide alternative recommendations for managing the elk herd. AR003646. That panel's guidance was eventually incorporated into another elk

planning effort, which led, in 1998, to the issuance of the Tule Elk Plan and Environmental Assessment (the "1998 EA"). AR003632-003730. The 1998 EA analyzed four different approaches to elk management. AR003678. NPS selected the preferred alternative, "Alternative A," as the management approach for tule elk in a Finding of No Significant Impact, dated July 17, 1998 ("FONSI"). AR003628-003631. (Alternative A, set forth on pages 43 to 50 of the EA (AR003678-003686) and as adopted in the FONSI, collectively, is hereinafter referred to as the "1998 Elk Plan.")

The 1998 Elk Plan continues to guide elk management at Tomales Point up to the present day. Its three mission statements are to: (1) "Adaptively manage elk as a natural component of the dynamic ecosystem of Point Reyes;" (2) "Assist in the preservation of the tule elk as a subspecies and the genetic diversity it contains;" and (3) "Manage tule elk consistent with other management objectives, including agriculture, public visitation, and the protection of natural, cultural, and recreational resources." AR003673-003674. The 1998 Elk Plan expresses several goals, including to "[m]aintain viable populations of tule elk at Point Reyes," "[m]anage tule elk using minimal intrusion to regulate population size, where possible, as part of natural ecosystem processes," and "research and monitor the habitat and elk population over time." AR003675-003677.

Key management actions adopted in the 1998 Elk Plan include: "[m]aintain the elk fence on Tomales Point;" "continue monitoring tule elk and their environment to analyze trends and better understand tule elk population dynamics and ecology at Point Reyes;" and set an interim population range for the "Point Reyes tule elk population at 600-800 animals, with Tomales Point set at 350-450 and Limantour set at 250-350." AR003679-003681.

The 1998 Elk Plan specifically states that NPS "will maintain the elk fence on Tomales Point and continue to separate tule elk from cattle." AR003680. It also reiterates that NPS's approach "intends to manage the tule elk population over time with as little population manipulation as possible." *Id*. The 1998 Elk Plan discusses and rejects the concept of supplemental forage for the elk, specifying that "[n]o effort will be made to cultivate food crops specifically to improve the range's ability to support elk. Such strategies are known to be self-defeating as artificially provided food leads to ever-increasing herd sizes that overwhelm the ability of the range to support them." *Id*. The plan noted the "history of failed

1   elk management approaches . . . seen at Yellowstone National Park, where elk were fed supplementary

2   winter food that resulted in chronic overpopulation problems," and that supplemental feeding "run[s]

3   counter to ecosystem management objectives for managing diverse and natural systems." *Id.*

4       **E.    Procedural History**

5       Plaintiffs filed the complaint commencing this action on June 22, 2021. ECF No. 1. Plaintiffs'

6   original complaint asserted three claims for relief under the APA. The first—which remains at issue –

7   asserted that under 54 U.S.C. § 100502, NPS is obligated to revise the Park's GMP specifically "with

8   respect to Tomales Point and the Tule elk who live there in a timely manner," and that NPS has

9   unreasonably delayed in doing so in violation of 5 U.S.C. § 706(1). *Id.* ¶ 88. The original complaint also

10  asserted two additional claims: a second claim, alleging that NPS failed to fulfill its duty to '"develop a

11  plan for Tule elk restoration and conservation'" under 16 U.S.C. § 673g by "failing to update" the 1998

12  Elk Plan, and that this failure constituted agency action unreasonably delayed, also in violation of

13  § 706(1); and a third claim, asserting that NPS's "decisions not to undertake measures to ensure that the

14  elk at Tomales Point have access to adequate water and forage and water" contravened its general

15  conservation and non-impairment obligations under 54 U.S.C. § 100101(a) and constituted final agency

16  action that was arbitrary and capricious, in violation of 5 U.S.C. § 706(2). *Id.* ¶¶ 93 & 96.

17      On June 24, 2021, Plaintiffs filed a motion for preliminary injunction, ECF No. 8, in which they

18  sought an order requiring NPS to "take immediate measures to ensure that the Tule elk who live on

19  Tomales Point in Point Reyes National Seashore are provided access to sufficient food and water to

20  ensure that these animals do not continue to die of starvation and/or dehydration." ECF No. 8-13.

21  Defendants opposed, and the Court held a telephonic hearing on July 30, 2021. On August 2, 2021, the

22  Court denied Plaintiffs' motion. ECF No. 26.

23      On August 13, 2021, Plaintiffs filed the FAC. ECF No. 33. With the amendment, Plaintiffs

24  dropped the second and third claims from their original complaint. Thus, Plaintiffs narrowed the case to

25  a single cause of action accusing NPS of unreasonable delay in failing to revise the Park's GMP as it

26  relates to Tomales Point. *Id.* ¶¶ 87-91. Defendants answered the amended complaint on September 21,

27  2021. ECF No. 38. On October 12, 2021, Defendants filed the Certified Administrative Record ("AR"),

28

1   ECF Nos. 39-47. On November 24, 2021, Plaintiffs filed their motion for summary judgment ("Mot.").

2   ECF No. 56. Defendants now oppose Plaintiffs' motion and cross-move for summary judgment.

3   **III.    LEGAL STANDARD**

4          The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably

5   delayed," and to "hold unlawful and set aside agency action, findings and conclusions found to be . . .

6   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

7   § 706(1), (2). Agency action is unlawfully withheld if the agency fails to take a "discrete agency action

8   that it is required to take," i.e., action "demanded by law." *SUWA*, 542 U.S. at 64-65. Agency action is

9   arbitrary and capricious if the administrative record shows that the "agency has relied on factors which

10  Congress has not intended it to consider, entirely failed to consider an important aspect of the problem,

11  [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor*

12  *Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

13         In an APA case, "the function of the district court is to determine whether or not as a matter of

14  law the evidence in the administrative record permitted the agency to make the decision it did."

15  *Occidental Eng'g Co. v. Immigr. & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985). Thus, the

16  usual standard set forth in Rule 56(c) does not apply. *See San Joaquin River Grp. Auth. v. Nat'l Marine*

17  *Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011) (citation omitted). Nevertheless,

18  "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency

19  could reasonably have found the facts as it did." *Occidental*, 753 F.2d at 770.

20  **IV.    ARGUMENT**

21         **A.    Plaintiffs Lack Standing**

22         To establish Article III standing, Plaintiffs must show (1) the existence of an injury-in-fact that is

23  concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged

24  conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defs. of*

25  *Wildlife*, 504 U.S. 555, 560-61 (1992). Standing "is not a pleading requirement 'but rather an

26  indispensable part of the plaintiff's case' and must be supported 'with the manner and degree of

27  evidence required at the successive stages of the litigation.'" *Backcountry Against Dumps v. Chu*, 215 F.

28

Supp. 3d 966, 975 (S.D. Cal. 2015) (quoting *Lujan*, 504 U.S. at 561). This requires a plaintiff to produce "specific facts" at the summary judgment phase showing a nexus between the challenged government action (or inaction) and an injury to its concrete and particular interest. *Lujan*, 504 U.S. at 561 (citations omitted). To do this, a plaintiff asserting a procedural injury must identify specific facts showing "it is reasonably probable that the challenged action [or inaction] will threaten [its] concrete interests." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969-70 (9th Cir. 2003).

### 1.    Plaintiffs' Alleged Injury Fails to Establish Injury-in-Fact

Plaintiffs claim they have standing because "they all derive significant aesthetic pleasure from visiting, photographing, and studying the Tule elk at Tomales Point." Mot. 23. A plaintiff can demonstrate injury-in-fact "when a procedural requirement has not been met, so long as the plaintiff also asserts a 'concrete interest' that is threatened by the failure to comply with that requirement." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (quoting *Citizens for Better Forestry*, 341 F.3d at 969-70). Plaintiffs' alleged aesthetic injury on its own does not suffice; to have standing, they must be connect that "concrete interest" to the agency's violation of some procedural rules that protect those interests. *Id.* Here, Plaintiffs attempt to do so by alleging an injury stemming from NPS's alleged delay in revising the GMP. FAC ¶¶ 7, 9, 11-12, 15, 18. But "a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest and the reasonable probability of the challenged action's threat to his or her concrete interest." *Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1114 (N.D. Cal. 2007). Because 54 U.S.C. § 100502 does not provide for public participation, the statute does not afford a procedural right protective of Plaintiffs' concrete interests. *See Jackson Hole Conservation All. v. Babbitt*, 96 F. Supp. 2d 1288, 1295 (D. Wyo. 2000); *see also Utah v. Babbitt*, 137 F.3d 1193, 1205 (10th Cir. 1998) ("[T]he mere allegation that [a federal agency is] acting without authority or in violation of the law is insufficient to establish standing."). Moreover, any attempt by Plaintiffs to show that NPS's internal management policies (which suggest GMP reviews occur at ten to fifteen-year intervals) establish such a right would fail, because "[a] court will not review allegations of noncompliance with an agency statement that is not binding on an agency; a court will review only those pronouncements that actually have the force

and effect of law." *Brennan*, 571 F. Supp. 2d at 1119; *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071-73 (9th Cir. 2010) (finding that NPS's management policies did not have the force and effect of law because they "do not purport to prescribe substantive rules" and "are intended only to provide guidance within the Park Service, not to establish rights in the public generally"). Accordingly, Plaintiffs cannot establish an injury-in-fact sufficient to give them Article III standing.

### 2. Plaintiffs Fail to Show that Their Alleged Injury Is Caused by NPS's Alleged Failure to Revise the Park's GMP as It Relates to Tomales Point

To establish causation, Plaintiffs must show that their injury is "fairly traceable to the challenged action of the defendant." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). While Plaintiffs need not "establish causation with the degree of certainty that would be required . . . to succeed on the merits, say, of a tort claim," they must establish the "reasonable probability" that the challenged action threatens their concrete interests. *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001). Causation cannot rest on an overly "attenuated chain of conjecture" or "be too speculative, or rely on conjecture about the behavior of other parties." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000). "The issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court." *Id.*

Here, Plaintiffs' causation theory rests on the unfounded speculation that their alleged aesthetic injury—viewing elk that are dead or sick as a result of insufficient access to food or water—is caused by the GMP. This is incorrect. The GMP does not address elk management at the implementation level; it does not dictate the specific manner in which the elk are to be maintained within the Reserve. Indeed, what Plaintiffs actually claim is causing their injuries is not the GMP at all, but the 1998 Elk Plan—which they concede they have no legal right to challenge. Because Plaintiffs cannot trace their alleged injuries to NPS's alleged delay in revising the GMP, they cannot meet the causation element of standing.

### 3. Plaintiffs Cannot Show that Their Alleged Injury Could Be Redressed by an Order Compelling NPS to Revise the GMP for Tomales Point

Plaintiffs have also failed to show that an order directing NPS to prepare a revised GMP would redress their alleged injuries. To satisfy the redressability requirement, Plaintiffs must show that their claimed injury is likely to be redressed by a favorable court decision. *ASARCO Inc. v. Kadish*, 490 U.S.

605, 614-15 (1989). The relaxed standard for causation and redressability that might apply to procedural injury, *see Lujan*, 504 U.S. at 572 n.7, does not apply here because (as explained above) section 100502 affords no procedural rights.

Here, there is no basis to conclude that adoption of a revised GMP will likely address Plaintiffs' claimed injuries, because even if the Court were to mandate a GMP revision under section 100502, it cannot mandate any particular outcome, such as the removal of the Tomales Point fence. *SUWA*, 542 U.S. at 65. Moreover, a revised GMP would not address the elk-specific issues Plaintiffs complain about. Thus, Plaintiffs have not shown their claimed injuries are likely to be redressed by a favorable court action. *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1228-29 (9th Cir. 2008); *Fernandez v. Brock*, 840 F.2d 622, 628 (9th Cir. 1988) (finding no redressability where relief requested—compelling the issuance of regulations—might benefit plaintiffs depending on content of regulations and behavior of regulated third parties).

**B.    Plaintiffs' Claim Seeking to Compel NPS to Revise the GMP Fails Because 54 U.S.C. § 100502 Does Not Establish a Discrete, Non-Discretionary Action Enforceable under the APA**

Plaintiffs' case is premised on their contention that the language in 54 U.S.C. § 100502 instructing NPS to revise general management plans for park units "in a timely manner" creates a legal obligation that may be compelled under section 706(1) of the APA. This premise is faulty, as 54 U.S.C. § 100502 does not impose on NPS a discrete, mandatory duty to take the action Plaintiffs demand.

In *SUWA*, the Supreme Court held that the only agency action a court may compel under APA section 706(1) is "a ministerial or non-discretionary act." 542 U.S. at 64. Plaintiffs thus must show that the action they seek to compel is both "*discrete*" and one NPS is legally "*required to take*." *Id.* These judicial limitations are based upon mandamus principles "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 66-67; *see also Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1075-76 (9th Cir. 2016) (courts may only compel action "pursuant to a legal obligation so clearly set forth that it could traditionally have been enforced through a writ of mandamus" (quotations and citation omitted)). Further, a "writ of

1    mandamus is justified only in exceptional circumstances," is "even more rare" "in connection with

2    agency matters," and "[t]he circumstances that will justify [a court's] interference with nonfinal agency

3    action must be truly extraordinary." *Confed. Tribes of Umatilla Indian Rsrv. v. Bonneville Power*

4    *Admin.*, 342 F.3d 924, 930 (9th Cir. 2003).

5          Here, section 100502 does not impose a ministerial, non-discretionary command to revise GMPs

6    on any particular time schedule or under any particular circumstances. The statute uses the discretion-

7    conferring phrase "in a timely manner," and thus does not describe a "discrete action" NPS is "required

8    to take" at a specific time; at most, the statute is "mandatory as to the object to be achieved," but leaves

9    "a great deal of discretion in deciding how to achieve it." *SUWA*, 542 U.S. at 66. By employing this

10   discretionary language, Congress declined to impose a strict schedule for management plan revisions, or

11   to define "timely," thereby leaving that determination to NPS's expertise. Absent a "clear duty of when

12   to revise [a] plan[]," there is no discrete action for this Court to compel. *ONRC Action v. Bureau of Land*

13   *Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998). Courts have routinely dismissed failure-to-act claims

14   similar to this one. *See id.* (affirming dismissal where statute required land use plans be revised "when

15   appropriate"); *see also Gardner v. Bureau of Land Mgmt.*, 638 F.3d 1217, 1221 (9th Cir. 2011)

16   (affirming agency did not fail to take a required, discrete action where regulation did not specify timing

17   or process for making the requested determination); *Luciano Farms, LLC v. United States*, No. 2:13-

18   02116-KJM-AC, 2014 WL 1912356, at *4 (E.D. Cal. May 13, 2014) (dismissing claim where action

19   was required "as soon as practicable"); *Idaho Rivers United v. U.S. Forest Serv.*, 857 F. Supp. 2d 1020,

20   1032 (D. Idaho 2012) (dismissing claim where statute did not "impose any time limit or otherwise fetter

21   the Secretary's discretion"); *Conservation Nw. v. Kempthorne*, No. C04-1331-JCC, 2007 WL 1847143,

22   at *2-3 (W.D. Wash. June 25, 2007) ("[E]ven if the Secretary has a duty to implement all terms of a

23   recovery plan in a timely manner, this duty is a discretionary one and is unreviewable by this Court.").

24         In arguing that section 100502 imposes a discrete and mandatory action requirement, Plaintiffs

25   rely entirely on the decision of Judge Armstrong in *Resource Renewal Institute v. National Park Service*,

26   No. C 16-0688 SBA, 2016 WL 11673179 (N.D. Cal. July 15, 2016). That decision, however, is not

27   binding here, *see Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011), and, NPS respectfully submits, is

28

not persuasive on this point. Most fundamentally, the Court's opinion did not address how the discretion-conferring phrase "in a timely manner" could create a mandatory duty in light of the Supreme Court's holding in *SUWA* that section 706(1) of the APA may only be used to compel "a ministerial or non-discretionary act." 542 U.S. at 64. Rather, the Court simply concluded that "[t]he imposition of a 'timely manner' requirement, as opposed to a specific statutory deadline, does not affect the justiciability of a claim for unreasonable delay under the APA." *Res. Renewal*, 2016 WL 11673179, at *4 (citing *Houseton v. Nimmo*, 670 F.2d 1375, 1377 (9th Cir. 1982)). The case the Court relied upon for this proposition, *Houseton*, was premised on 5 U.S.C. § 555(b), which is inapplicable here. That section of the APA directs "each agency to conclude *a matter presented to it*" "within a reasonable time." 5 U.S.C. § 555(b) (emphasis added). The provision applies to instances where a "person [] appear[s] before an agency . . . for the presentation, adjustment, or determination of an issue, request or controversy in a proceeding . . . or in connection with an agency function." 5 U.S.C. § 555. It does not stand for the proposition that a court may review any agency action to see if it occurred "within a reasonable time." Here, unlike in *Houseton*—which involved a reconsideration request presented by the Veterans Administration in a proceeding before the EEOC—Plaintiffs have not petitioned NPS to do anything. Accordingly, 5 U.S.C. § 555(b) and the cases based on it are not applicable here.

Additionally, in *Resource Renewal*, Judge Armstrong broadly distinguished the cases cited by NPS, including *ONRC*, *Gardner*, and *Luciano Farms*, *supra*, on the grounds that they "involved statutes that expressly conferred upon the subject agency the discretion to decide whether it is 'appropriate' to act." *Res. Renewal*, 2016 WL 11673179, at *5. *SUWA*, however, drew no distinction between laws giving agencies discretion *whether* to act, and those conferring discretion only as to timing. Where an agency enjoys discretion along either dimension, action cannot be compelled under section 706(1) of the APA. *See WildEarth Guardians v. Chao*, 454 F. Supp. 3d 944, 955 (D. Mont. 2020) ("The cases where courts have entered an injunction remedying an agency's failure to act explain the narrow scope of § 706(1) and generally present challenges to an agency's failure to comply with an absolute, non-discretionary duty that involves a time limit . . . ."). In other words, the law may be "mandatory as to the object to be achieved," as in *SUWA*, and as it is here, but if it "leaves [the agency] a great deal of

discretion in deciding how to achieve it," the action cannot be judicially compelled. 542 U.S. at 66. That

is so because "the prospect of pervasive oversight by federal courts over the manner *and pace* of agency

compliance with such congressional directives is not contemplated by the APA." *Id.* at 67 (emphasis

added).

As the Supreme Court explained in *SUWA*, "[f]ailures to act are sometimes remediable under the

APA, but not always." 542 U.S. at 61. "[W]hen an agency is compelled by law to act within a *certain*

time period, but the manner of its action is left to the agency's discretion, a court can compel the agency

to act, but has no power to specify what the action must be." *Id.* (emphasis added). In contrast, where a

law imposes a mandatory duty on an agency, but leaves the timing of action *uncertain*—i.e., where the

law is "mandatory as to the object to be achieved, but it leaves [the agency] a great deal of discretion in

how to achieve it"—it lacks "the clarity necessary to support judicial action under § 706(1)." *Id.* at 66.

Because 54 U.S.C. § 100502 does not compel NPS to act within a certain time period, it does not create

an obligation that is enforceable under section 706(1) of the APA.

## C.      NPS Has Not Unreasonably Delayed Revising the Park's GMP

Although forty-one years have passed since the Park issued its GMP, and that may seem like a

long time without context, under the circumstances, NPS has not unreasonably delayed in revising that

document as it relates to Tomales Point. "Resolution of a claim of unreasonable delay is ordinarily a

complicated and nuanced task requiring consideration of the particular facts and circumstances before

the court." *Mashpee v. Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir.

2003). The Ninth Circuit applies the so-called "*TRAC*" factors[2] to assess whether an agency's delay in

---

[2] "*TRAC*" factors include: (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 510 (9th Cir. 1997).

taking a required action is reasonable. *Indep. Mining Co.*, 105 F.3d at 507 (adopting factors from *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)).

As their name suggests, GMPs are "general," programmatic documents that provide "broad direction for park management."[3] AR009761. The GMP established this broad direction for the entire Park, including Tomales Point.[4] As relevant to Tomales Point, the GMP sets out desired conditions and general objectives for, among other things, the Congressionally designated wilderness, the historic ranch house and landscape, and management of the elk herd.

Because Congress did not specify what NPS must do to "revise" a GMP, or when it must do so, NPS has the discretion to determine how and when GMPs should be revised, including whether to revise some parts before others. NPS's prior policies on park planning illustrate the agency's approach to this task, providing: "As necessary, general management plans will be reviewed and amended or revised, or a new plan will be prepared, to keep them current. GMP reviews may be needed every ten to fifteen years, but may be needed sooner if conditions change significantly. If conditions remain substantially unchanged, a longer period between reviews would be acceptable."[5] AR009491. The flexibility embodied in these policies reflects the extraordinary variety contained in the 400-plus units of the National Park System.

Despite the passage of forty-one years, the general conditions in Tomales Point have not changed substantially since the GMP. The area has not been developed, and the same land management regimes apply. The Congressionally designated wilderness is still managed under the Wilderness Act and NPS's policies regarding wilderness management; the historic Pierce Point Ranch (which is listed on the National Register of Historic Places) is still managed as set forth in the GMP, and the "restoration of

[3] Previous NPS policy similarly described general management plans as "a broad umbrella document that sets the long-term goals for the park based on the foundation statement." AR009487.

[4] Although Plaintiffs purport to focus exclusively on the GMP "as it relates to Tomales Point and the elk that live there," this unsupported restriction inappropriately limits the inquiry by ignoring the other, non-elk resources and park operations at Tomales Point and throughout the Park as a whole.

[5] This policy was supplanted in 2021 by Director's Order #2, but the new policy similarly does not mandate a revised GMP for Tomales Point. AR009763.

historic natural conditions (such as reestablishment of Tule elk)" remains a relevant general

management direction. Plaintiffs have not shown that the environmental stresses relating to recent

droughts require fundamental changes to the Park's general management direction. In fact, Plaintiffs do

not identify any aspects of the GMP relating to Tomales Point that they would have NPS revise.

Indeed, as explained above, despite their ostensible desire for a revised GMP, Plaintiffs'

grievances focus exclusively on how NPS manages the elk. Distilled to its essence, Plaintiffs' complaint

does not dispute the validity of the general goals and direction set forth in the GMP. Plaintiffs offer no

explanation as to how a revision to the GMP specific to Tomales Point would address the elk

management issues on which they focus, much less how any revision at the GMP level, as opposed to an

implementation level, could remedy the alleged injuries of which they complain.

The cases Plaintiffs cite where courts have found agency delays unreasonable are inapposite. In

those decisions, the courts analyzed unreasonable delay in light of either concrete deadlines,[6] prior

mandamus proceedings where human health was at stake,[7] or, in one case, a specific mandate by the

Ninth Circuit.[8] By contrast, 54 U.S.C. § 100502 gives NPS the discretion to weigh competing priorities

and immediate and long-term planning needs and decide, under the circumstances, whether and when to

revise a GMP. Forty-one years is a long time, and may be too long in some circumstances. For the

resources in many national parks, and in particular those present at Tomales Point, however, the mere

passage of time does not necessarily mean that a GMP needs revision. How best to achieve the

objectives of a plan through implementation measures might change, while the general management

direction and goals remain the same. That is the case here. Thus, under the *TRAC* factors, NPS has not

---

[6] *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1178 (9th Cir. 2002); *In re Bluewater Network*, 234 F.3d 1305, 1315–16 (D.C. Cir. 2000); *In re United Mine Workers Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999); *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202 (E.D. Cal. 1999); *Nat'l Wildlife Fed'n v. Cosgriffe,* 21 F. Supp. 2d 1211, 1217–19 (D. Or. 1998); *Defs. of Wildlife v. Browner*, 909 F. Supp. 1342, 1345–50 (D. Ariz. 1995).

[7] *In re A Community Voice*, 878 F.3d 779 (9th Cir. 2017); *In re Pesticide Action Network N. Am.*, 798 F.3d 809 (9th Cir. 2015).

[8] *Hells Canyon Pres. Council v. Richmond*, 841 F. Supp. 1039 (D. Or. 1993).

unreasonably delayed in revising the GMP as it relates to Tomales Point. *Indep. Mining Co.*, 105 F.3d at

507; *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 35 F. Supp. 3d 1137, 1154-55 (N.D. Cal.

2014) (proposed date to complete a plan in five years reasonable in light of competing priorities);

*Mashpee*, 336 F.3d at 1101 (reversing district court for "disregarding the importance of there being

'competing priorities' for limited resources"); *Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987) ("An

agency has broad discretion to set its agenda and to first apply its limited resources to the regulatory

tasks it deems most pressing.").[9]

Plaintiffs' assertions that NPS has been "warned" about the need to revise the GMP as it relates

to Tomales Point do not withstand scrutiny. None of the alleged "warnings" identify problems with

overall management that suggest a revision to the GMP might be needed. For example, Plaintiffs make

much of the 1993 Scientific Advisory Panel's statement about a hands-off approach to elk management,

which noted that "[w]e can reliably predict that if such a strategy is employed the tule elk will

seasonally be malnourished and appear less 'healthy,' and that dead and dying animals will become

more evident." Mot. 10, 20 (quoting AR004010). Plaintiffs ignore, however, that after making that

statement the same panel proceeded to examine methods of population control (contraception and

culling) to prevent this from happening, ultimately making six recommendations to NPS, all of which

were incorporated within Alternative A of the EA, and thus into the 1998 Elk Plan. Notably, the panel's

recommendations did not include removing the Tomales Point fence or feeding or watering the elk if the

fence remained in place. Thus, contrary to Plaintiffs' characterization, the panel's report fails to evince

any "warning" on which NPS failed to act, let alone one that might have called for a new GMP.

Plaintiffs' assertion that McCrea Cobb's 2010 dissertation "warned" NPS of "dire consequences"

for the Tomales Point elk population, Mot. 9-11, is equally erroneous. Plaintiffs cherry-pick two

---

[9] This analysis focuses principally on the first *TRAC* factor, which is the "most important," *Cmty. Voice*, 878 F.3d at 786, particularly here. To the extent relevant, though, the other factors also weigh in Defendants' favor. The statutory scheme provides no guidance regarding timing. Human health and welfare are not at stake (and to the extent Plaintiffs suggest otherwise, they offer no authority for the notion that use and enjoyment of a National Park implicates human welfare for purposes of the *TRAC* factors). The agency has discretion to establish planning and management priorities, which should be respected. Finally, Plaintiffs' interests are not being prejudiced because the lack of a revision to the GMP is not the cause of their alleged injuries and, in any event, NPS has begun that revision process.

sentences from the dissertation discussing how "predicted future abundances of elk and close proximity to ranches" could lead to potential "conflicts . . . within the next 10 years at Point Reyes," which Cobb "encouraged [NPS] to develop a proactive plan to address." *Id.* at 10 (citing S 000221). Examination of the immediate context reveals that this recommendation was not about Tomales Point, but specifically concerned the free-ranging elk herds elsewhere in the Park. The full paragraph states:

> The D Ranch and Limantour herds were predicted by matrix models to show an irruptive pattern of growth commonly observed in ungulate populations that experience little predation pressure and are at low densities. A similar pattern of irruptive growth was exhibited by the Tomales herds for 20 years after their reintroduction. The Tomales herds showed little evidence of density dependence during this period, so I believe that my density-independent predictions are valid for the D Ranch and Limantour herds. Unlike elk in the Tomales herds, elk in the D Ranch and Limantour herds are not constrained by fences, and thus have much more available high quality habitat surrounding their current ranges. According to resource selection function analyses, elk at Pt. Reyes prefer flat grasslands and ranchland. Given the predicted future abundances of elk and the close proximity of current elk range with ranches, conflicts between elk and local ranchers are likely to occur within the next ten years at Pt. Reyes as the growing elk population expands onto preferred habitat. Abundant elk on agricultural lands can cause economic losses, which lead to tension between ranchers and managing government agencies. NPS managers at Pt. Reyes are strongly encouraged to develop a proactive plan to address this issue.

S 000220-000221 (citations omitted). Thus, on its face, the document "recommended" a "proactive *elk management plan*," to address conflicts specific to the free-ranging elk herds. S 000222 (emphasis added). The recommendation was not about revising the GMP, or even about Tomales Point, and thus is irrelevant to Plaintiffs' claim.

Likewise, Plaintiffs' assertion that NPS has not "implemented the [1998 Elk] Plan's various recommendations for managing the Tule elk population or its genetic viability," Mot. 9, is demonstrably incorrect. Contrary to Plaintiffs' claim that "the Park Service has never introduced additional female elk to maintain the genetic diversity of the Tule elk who are confined at Tomales Point," *id.*, n.3, in July 2001, three tule elk cows were captured at Concord Naval Weapons Station and transported to Tomales Point. AR006024-006029, 006535-006537. All three were dead by November 2001, however, and subsequent efforts to bring elk into Tomales Point were foreclosed by a 2002 NPS Director's Order preventing the transportation of ungulates between NPS units due to concerns regarding Chronic Wasting Disease. AR003745-003760, 006538-6577. Plaintiffs' statement that NPS has not "relocated

any elk south of the fence," Mot. 9, n.3, is also false, as NPS moved forty-five elk from Tomales Point to Limantour in 1998. AR004615-4661, 004709-4716, 006030-006111. Plaintiffs also wrongly contend that NPS ignored recommendations to "install[] elk gates to allow elk access to land south of the fence where water and forage are more readily available, remove[] the fence or relocate[] it farther south, or cease[] ranching operations at the Seashore," Mot. 9, n.3, as those options were discussed in Alternative B of the 1998 EA, which was not selected. FONSI, AR003628-003631; 1998 EA, AR003632-003730. Plaintiffs' suggestion that NPS has shirked a directive to "employ[] immunocontraception to control the elk population," Mot. 9, n.3, similarly misstates the record. The relevant action item in the 1998 EA was to "continue PZP contraceptive tests on elk," and NPS in fact conducted that study from 1997 to 2002, and ultimately decided that immunocontraception was not a feasible method to control the elk population at Tomales Point. AR004709-004716, 006157-006160, 006505-006519.

Plaintiffs also claim NPS was "warned" by a letter Plaintiffs' counsel wrote on behalf of an organization that is not a party to this case, dated August 31, 2020, Mot. 13 (citing S 000001), but that letter did not suggest that the GMP needed revision. Instead, focusing entirely on conditions affecting the elk, the letter alleged that NPS needed to take immediate action with respect to day-to-day elk management. *Id.* Even if the Court construed that letter as containing a "warning" of something it did not say (that the GMP needed to be revised), Plaintiffs' citation to it here only highlights the flaws in their theory of unreasonable delay. The letter was sent less than a year before Plaintiffs filed this lawsuit, so if it was supposed to trigger a GMP revision (which NPS is now undertaking), NPS has not unreasonably delayed in responding. The letter's timing also underscores how Plaintiffs' simplistic emphasis on the "41 years" since the GMP's issuance fails to measure agency "delay" in any relevant way. Rather than engaging in the "nuanced task" of "consideration of the particular facts and circumstances," *Mashpee*, 336 F.3d at 1100, Plaintiffs would have the Court declare a time lapse of forty-one years to be unreasonable *per se*. Plaintiffs offer no support for that bright-line proposition.

**D. Even if the Court Were to Find that NPS Unreasonably Delayed in Revising the GMP as it Relates to Tomales Point, Plaintiffs' Remedy is Limited to an Order Directing the Park to Update the GMP, a Process NPS Has Started**

### 1. Plaintiffs Are Not Entitled to an Order Directing NPS to Provide Supplemental Food and Water

Plaintiffs seek an injunction ordering NPS to: (1) "take immediate measures to comply with their statutory duties to revise the 1980 General Management Plan with respect to the Tomales Point portion of the Point Reyes National Seashore and the Tule elk who live there;" and (2) "enjoin [NPS] from continuing to deprive the Tule elk at Tomales Point of adequate food and water." FAC 17. This relief is not available to Plaintiffs, even if they were to prevail on the merits. At most, NPS could be ordered to revise the GMP. It could not be ordered to provide supplemental food or water.

"An injunction 'should be no more burdensome to the defendant that necessary to provide complete relief to the plaintiffs.'" *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 436 (1941) ("This Court will strike from an injunction decree restraints upon the commission of unlawful acts which are thus dissociated from those which a defendant has committed." (citations omitted)). "Because injunctive relief 'must be narrowly tailored to remedy the specific harm shown,' the precise nature and extent of injunctive relief to which plaintiffs are entitled will depend on which, if any, of those claims are successful." *City of West Sacramento, Cal. v. R & L Bus. Mgmt.*, No. 2:18-CV-00900 WBS EFB, 2020 WL 7360583 (E.D. Cal. Dec. 15, 2020) (quoting *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (footnote omitted)). As such, "[i]njunctive relief[] must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (citing *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)). It cannot be used to remedy claims not in the complaint. *See Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (holding that the "district court abused its discretion" in enjoining agency action that the plaintiff "did not challenge").

Plaintiffs are not entitled to an injunction ordering NPS to provide the elk with supplemental food and water. Their sole cause of action challenges NPS's failure to revise the GMP, the remedy for which is an order compelling the agency to do so. Ordering NPS to take any further actions to remedy this harm would be improper as it would be broader than necessary to provide complete relief. *See Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987) (district court abused its discretion when it

1  ordered the Secretary of Labor to take "specific actions that may not be necessary to enforce the Act . . .

2  , and therefore requires more than is necessary to give complete relief to the plaintiffs"). Moreover,

3  Plaintiffs assert no claim for which the appropriate remedy would be ordering supplemental food and

4  water, nor do they identify any basis for this relief in their Motion. Indeed, Plaintiffs removed the only

5  claim, which, if valid, could have supported such an injunction. *Compare* Compl. ¶¶ 95-97 with FAC ¶¶

6  87-91 (omitting this claim). The omitted claim, even if it had merit, cannot supply a basis for awarding

7  Plaintiffs their requested relief. *See Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 733 (D.C. Cir. 2012)

8  (holding that after plaintiff amended his complaint, "the district court could quite reasonably restrict

9  [injunctive] relief to those parameters" set forth in the amended complaint).

10      Plaintiffs' request for an injunction ordering NPS to provide supplement food and water fails

11  for an additional reason: it is outside the scope of relief available in a § 706(1) action. Because

12  § 706(1) has a "narrow scope," any injunction must be limited to rectifying the "agency's failure to

13  comply with an absolute, non-discretionary duty that involves a time limit." *WildEarth Guardians*,

14  454 F. Supp. 3d at 955. It does not empower a court to dictate management decisions otherwise within

15  an agency's discretion because "[w]hether and how" an agency "compl[ies] with its statutory duties

16  does not present a question appropriate for resolution under" § 706(1). *Id*. at 956 (granting defendants'

17  cross motion for summary judgment on a § 706(1) claim where the agency "has promulgated

18  regulations that at least attempt to comply with its statutory duties"). This is so "even if the TRAC

19  factors indicate[ ] that the" agency unreasonably delayed in taking action. *Ctr. for Food Safety v.*

20  *Jewell*, 83 F. Supp. 3d 126, 144 (D.D.C. 2015). Plaintiffs may not use "a claim of unreasonable delay

21  to require the agency to take actions not directly linked to the delayed action or to otherwise punish the

22  agency for the delay." *Id.* at 145. Yet, that is precisely what Plaintiffs seek, an order directing NPS to

23  make changes that are committed to the agency's discretion—providing supplemental food and

24  water—even though these actions are "not directly linked" to the alleged failure to update the GMP.

25  Plaintiffs are simply not entitled to this relief. *See WildEarth Guardians*, 454 F. Supp. 3d at 956

26  (holding that in issuing an injunction in a § 706(1) action, "a court 'has no power to specify what the

27

28

1    action must be' nor 'set forth the content of regulations'" (quoting *SUWA*, 542 U.S. at 65) (alteration

2    omitted)).

3          Thus, the sole remedy to which Plaintiffs are entitled is an order directing NPS to amend the

4    GMP in a reasonable timeframe. *See Ctr. for Food Safety v. Hamburg*, 954 F. Supp. 2d 965, 968 (N.D.

5    Cal. 2013) ("The sole remedy available under § 706(1) is for the court to 'compel agency action,' such

6    as by issuing an order requiring the agency to act, without directing the substantive content of the

7    decision.").

8                        **2.      NPS Has Committed to Revising the GMP for Tomales Point**

9          On December 14, 2021, NPS publicly announced that it will develop a new management plan for

10   Tomales Point that will revise, as appropriate, the GMP. Kenkel Decl. ¶¶ 2, 4 & Att. 1. The revision will

11   address the four factors set forth in 54 U.S.C. § 100502, (1) "measures for the preservation of the area's

12   resources," (2) "indications of types and general intensities of development . . . associated with public

13   enjoyment and use of the area, including general locations, timing of implementation, and anticipated

14   costs," (3) "identification of and implementation commitments for visitor carrying capacities for all

15   areas of" Tomales Point, and (4) "indications of potential modifications to the external boundaries of

16   [Tomales Point], and the reasons for the modifications." *Id.* ¶ 3. Because the planning process must

17   comply with NEPA, *see* 42 U.S.C § 4332; 40 C.F.R. § 1508.1, NPS anticipates completing an

18   environmental impact statement ("EIS"), with the new management plan being adopted in a record of

19   decision ("ROD"). Kenkel Decl. ¶¶ 2, 4.

20         In addition, NPS intends as part of its new plan to develop a set of actions that address the

21   management of the tule elk herds and wilderness to be implemented once the plan is approved. The plan,

22   therefore, will update and replace the 1998 Elk Plan for Tomales Point. *Id.* ¶ 2.

23         NPS has also stated its anticipated schedule for the planning process. *Id.* ¶¶ 4-5. In March 2022,

24   NPS will begin "pre-NEPA scoping," by requesting public comment on the scope of the plan and

25   potentially on a preliminary range of alternatives. *Id.* Following this first public comment period, over

26   the course of the subsequent year, NPS will develop the purpose and need for the plan, a detailed set of

27   alternatives, and descriptions of existing conditions and potential impacts by reviewing data and

28

appropriate studies, as well as input from subject matter experts and consulting public agencies. *Id.* These pre-NEPA activities will culminate with publication in March 2023 of the notice of intent ("NOI") in the Federal Register, which will initiate the formal EIS process. *Id.* NPS will then develop a draft EIS (informed by the public comments, experts and agency consultations), which NPS anticipates will be released for comment within a year of the NOI. *Id.* NPS will get further public and agency comment on the draft EIS and plans to issue the final EIS, including responses to comments, in time to finalize the ROD by March 2025, when it will adopt the new management plan for Tomales Point. *Id.*

### 3.   Because NPS Has Publicly Committed to Provide the Only Relief Plaintiffs Could Obtain in this Action, No Further Relief is Necessary

Plaintiffs have not made any argument that NPS needs to amend the GMP on any particular timeframe, and the schedule outlined by NPS is appropriate and consistent with the APA. NPS is entitled to the presumption that it will act expeditiously and in good faith to continue complying with the relevant statutes. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (federal agencies are entitled to a "presumption of regularity"). In addition, the imposition of judicial deadlines for compliance with NEPA would impose practical hardship on the agency because the timing of completion of NEPA is not fully within its control. Under NEPA, for example, the length of time needed for analysis is determined not only by the scientific complexity of the issues before the agency, but also by the volume and substance of the public comment to which the agency must respond. *See, e.g.*, 40 C.F.R. § 1503.4 (noting agency may need to "supplement, improve or modify its analyses" in response to public comment); *id.* § 1502.9(c)(1) (noting duty to circulate for additional public comment a supplemental EIS if substantial changes are made). Moreover, NEPA imposes an obligation on agencies to address significant new information that arises at any point during the NEPA process. *Id.* § 1502.9(c)(1)(ii). As a result, such information that comes to light at the end of the NEPA process could require the agency to develop a supplemental analysis and seek additional public comment, delaying a final decision.

Finally, the interests of the public and of the environment are better served by allowing NPS to take the time needed for the new plan, rather than creating a situation where the need to conduct a

1    thorough analysis is overshadowed by the specter of failing to meet a judicially imposed deadline. *See*

2    *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 605-06 (9th Cir. 2014) (observing that

3    "[d]eadlines become a substantive constraint on what an agency can reasonably do" and that the district

4    court's imposition of a tight deadline resulted in the agency's work product being "a jumble of

5    disjointed facts and analyses").

6          However, should the Court decide to impose a timeframe, it should adopt the timeframe set forth

7    by NPS. The "standard" for "determining the appropriate timeline for agency action" is

8    "reasonableness." *Audubon Soc'y of Portland v. Jewell*, 104 F. Supp. 3d 1099, 1102 (D. Or. 2015).

9    NPS's timeline meets this standard. The pre-NEPA scoping period allows NPS to get early feedback

10   from the public on its proposed plan and to properly gather data and review appropriate information

11   before issuing a NOI to start the formal NEPA process. This early feedback and review are necessary to

12   ensure that the EIS is complete within the two-year time limit set by the Council on Environmental

13   Quality. *See* 40 C.F.R. § 1501.10(b)(2); Kenkel Decl. ¶¶ 4-5. The two-year period between filing the

14   NOI and issuing the ROD is set by regulation. The approximately three-and-a-half-year timeline for the

15   planning process is also necessary to provide the agency with sufficient time to consult with the

16   Federated Indians of Graton Rancheria, and other federal, state, and local agencies. Kenkel Decl. ¶ 4.

17   **V.     CONCLUSION**

18         For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and

19   Defendants' cross-motion granted because Plaintiffs fail to meet their burden of establishing standing.

20   Alternatively, the action should be dismissed because a plan revision under 54 U.S.C. § 100502 cannot

21   be compelled under section 706(1) of the APA. If the Court reaches the merits, summary judgment

22   should be granted in Defendants' favor because NPS has not unreasonably delayed in revising the Park's

23   general management plan. Moreover, Defendants have already begun the process of amending the

24   general management plan as it relates to Tomales Point. If the Court were to find any relief appropriate,

25   the only available remedy would be to order Defendants to complete the ongoing revision process by a

26   reasonable deadline.

27

28

1    DATED: December 15, 2021                    Respectfully submitted,

2                                                STEPHANIE M. HINDS
                                                 Acting United States Attorney
3

4                                                 /s/ *David M. DeVito*
                                                 DAVID M. DEVITO
5                                                Assistant United States Attorney

6                                                TODD KIM
                                                 Assistant Attorney General
7                                                Environment & Natural Resources Division

8                                                 /s/ *Matthew P. Rand*
                                                 Matthew P. Rand
9                                                Trial Attorney

10                                               Attorneys for Defendants

11
                         **ATTESTATION PURSUANT TO LOCAL CIVIL RULE 5-1(i)(3)**
12

13          I, David M. DeVito, attest that any signatories indicated by a conformed signature (/s/) within

14   this e-filed document have approved, and concur in, this filing.  I declare under penalty of perjury under

15   the laws of the United States of America that the foregoing is true and correct.

16                                                /s/ *David M. DeVito*
                                                 DAVID M. DEVITO
17

18

19

20

21

22

23

24

25

26

27

28