Kate Barnekow, State Bar No. 336792
kbarnekow@law.harvard.edu
Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: (617) 496-4863
Cell: (512) 868-7800

Katherine A. Meyer
(appearance *pro hac vice*)
kmeyer@law.harvard.edu
Director, Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
Office: (617) 998-2450
Facsimile: (617) 496-4863
Cell: (202) 257-5145

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

JACK GESCHEIDT, et al.,

               Plaintiffs,

     v.

DEB HAALAND,
Secretary of Interior, et al.,

             Defendants.

Case No. 21-4734-HSG

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Date: February 24, 2022
Time: 2:00 p.m.

Hon. Haywood S. Gilliam, Jr.

1

2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 3

   I.   THERE IS NO MERIT TO DEFENDANTS' ASSERTION THAT PLAINTIFFS LACK
      STANDING. .................................................................................................. 3

     A.   Plaintiffs Have Amply Demonstrated Sufficient Injuries. ................................. 3

     B.   Plaintiffs Have Also Demonstrated Sufficient Causation and Redressability. ................ 7

   II.   THE PARK SERVICE HAS VIOLATED ITS MANDATORY DUTY TO REVISE THE
      GMP FOR TOMALES POINT. ....................................................................... 11

     A.   The Park Service Has a Mandatory Duty to Revise the GMP. ...................... 11

     B.   The NPS Has Unreasonably Delayed Revising the GMP for Tomales Point. ............... 14

   III.   BECAUSE THIS CASE IS NOT MOOT, THE PARK SERVICE IS NOT ENTITLED TO
       JUDGMENT BASED ON ITS BELATED DECISION TO REVISE THE GMP FOR
       TOMALES POINT. ....................................................................................... 17

   IV.   THE PARK SERVICE SHOULD BE ORDERED TO COMPLETE ITS REVISION OF
       THE GMP FOR TOMALES POINT WITHIN ONE YEAR. .................................. 21

   V.   PLAINTIFFS SHOULD BE GIVEN THE OPPORTUNITY TO DEMONSTRATE THE
      NEED FOR ADDITIONAL REMEDIAL MEASURES. ........................................ 23

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                                                              **PAGE(S)**

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ...................................................................................................19

*Asmai v. Johnson*,
    182 F. Supp. 3d 1086 (E.D. Cal. 2016) ...................................................................................12

*Cantrell v. City of Long Beach*,
    241 F.3d 674 (9th Cir. 2001) ...............................................................................................8–9

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
    35 F. Supp. 3d 1137 (N.D. Cal. 2014) ....................................................................................21

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ...............................................................................................................22

*Club v. McCarthy*,
    No. 15-cv-01165-HSG, 2016 WL 1055120 (N.D. Cal. Mar. 15, 2016) ................................21

*Conservation Nw. v. Kempthorne*,
    No. C04-1331-JCC, 2007 WL 1847143 (W.D. Wash. June 25, 2007) .............................13–14

*Cnty. of Los Angeles v. Davis*,
    440 U.S. 625 (1979) .........................................................................................................18, 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ...........................................................................................................20

*Douglas Cnty. v. Babbitt*,
    48 F.3d 1495 (9th Cir. 1995) ....................................................................................................9

*Fernandez v. Brock*,
    840 F.2d 622 (9th Cir. 1988) .............................................................................................10–11

*Forest Guardians v. Johanns*,
    450 F.3d 455 (9th Cir. 2006) ...................................................................................................19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...........................................................................................................18–19

*Gardner v. Bureau of Land Mgmt.*,
    638 F.3d 1217 (9th Cir. 2011) .................................................................................................13

*High Sierra Hikers Ass'n v. Moore*,
    561 F. Supp. 2d 1107 (N.D. Cal. 2008) ...................................................................................25

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*,
    230 F. Supp. 3d 1106 (N.D. Cal. 2017) ...................................................................................25

*Idaho Rivers United v. U.S. Forest Serv.*,
    857 F. Supp. 2d 1020 (D. Idaho 2012) ...................................................................................13

- ii -

**CASES CONT.**                                                                      **PAGE(S)**

*In re A Cmty. Voice,*
    878 F.3d 779 (9th Cir. 2017) ............................................................12, 21

*In re Int'l Chem. Workers Union,*
    958 F.2d 1144 (D.C. Cir. 1992) .................................................................21

*In re Nat. Res. Def. Council,*
    956 F.3d 1134 (9th Cir. 2020) .............................................................12, 21

*In re Pesticide Action Network N. Am.,*
    798 F.3d 809 (9th Cir. 2015) .......................................................10, 12, 21

*In re Pub. Emps. for Envtl. Responsibility,*
    957 F.3d 267 (D.C. Cir. 2020) ..................................................................12

*Klamath Siskiyou Wetlands Ctr. v. Boody,*
    468 F.3d 549 (9th Cir. 2006) ....................................................................25

*Knox v. Serv. Emps. Int'l. Union 1000,*
    567 U.S. 298 (2012) ...........................................................................18–19

*Luciano Farms, LLC v. United States,*
    No. 2:13-cv-02116-KJM-AC, 2014 WL 1912356 (E.D. Cal. May 13, 2014) ........................13

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .....................................................4, 6–7, 8–9, 11

*Me. Cmty. Health Options v. United States,*
    140 S. Ct. 1308 (2020) .............................................................................14

*Mont. Wilderness Ass'n v. Fry,*
    408 F. Supp. 2d 1032 (D. Mont. 2006) .....................................................25

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................................20

*Nat. Res. Def. Council v. Sw. Marine, Inc.,*
    236 F.3d 985 (9th Cir. 2000) ....................................................................21

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
    137 F.3d 1372 (9th Cir. 1998) ..................................................................25

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) .............................................................................12, 14

*Nw. Envtl. Def. Ctr. v. Gordon,*
    849 F.2d 1241 (9th Cir. 1988) ...........................................................20–21, 24

*Or. Nat. Desert Ass'n v. Dombeck,*
    172 F.3d 1092 (9th Cir. 1998) .....................................................................9

*ONRC Action v. Bureau of Land Mgmt.,*
    150 F.3d 1132 (9th Cir. 1998) ..................................................................13

**CASES CONT.** PAGE(S)

*Portland Audubon Soc'y v. Babbitt,*
   998 F.2d 705 (9th Cir.1993) .................................................................................................25

*Pub. Citizen Health Rsch. Grp. v. Auchter,*
   702 F.2d 1150 (D.C. Cir. 1983) ...........................................................................................21

*Res. Renewal Inst. v. Nat'l Park Serv.,*
   No. 4:16-cv-00688-SBA, 2016 WL 11673179 (N.D. Cal. July 15, 2016) ........................11, 13

*Rucho v. Common Cause,*
   139 S. Ct. 2484 (2019) ........................................................................................................16

*Salmon Spawning & Recovery All. v. Gutierrez,*
   545 F.3d 1220 (9th Cir. 2008) .........................................................................................9–10

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
   747 F.3d 581 (9th Cir. 2014) ...........................................................................................22–23

*Seattle Audubon Soc'y v. Espy,*
   998 F.2d 699 (9th Cir. 1993) .................................................................................................9

*Sierra Forest Legacy v. Sherman,*
   646 F.3d 1161 (9th Cir. 2011) .........................................................................................24–25

*Telecomms. Rsch. & Action Ctr. v. FCC,*
   750 F.2d 70 (D.C. Cir. 1984) ........................................................................................7, 12–13

*Univ. of Tex. v. Caminesh,*
   451 U.S. 393 (1981) ...........................................................................................................23

*Utah v. Babbitt,*
   137 F.3d 1193 (10th Cir. 1998) ............................................................................................4

**STATUTES**

5 U.S.C. § 706(1) ...................................................................................................1, 7, 10, 12

5 U.S.C. § 706(2) ...............................................................................................................10

16 U.S.C. § 1533 ...........................................................................................................13–14

54 U.S.C. § 100101(a) ..........................................................................................................4

54 U.S.C. § 100502 ................................................................................................8, 10, 13, 14, 16

**REGULATIONS**

40 C.F.R. § 1501.10(b)(2) ....................................................................................................22

40 C.F.R. § 1506.6 ................................................................................................................7

PLAINTIFFS' OPP. TO DEFENDANTS' MSJ & REPLY IN SUPPORT OF PLAINTIFFS' MSJ

1

**OTHER AUTHORITIES**

2

Oxford English Dictionary (3d ed.) ................................................................................13

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPP. TO DEFENDANTS' MSJ & REPLY IN SUPPORT OF PLAINTIFFS' MSJ

**<u>INTRODUCTION</u>**

In their opening brief, Plaintiffs demonstrated that the National Park Service ("NPS" or "Park Service") has a mandatory statutory duty to revise the General Management Plan ("GMP") for Tomales Point "in a timely manner" and that the agency's more than forty-one-year delay in doing so is "unreasonable" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1). Plaintiffs showed that the agency's failure to revise the GMP has resulted in an untenable situation with respect to the Tule elk who live at Tomales Point and who, as a result of the Park Service's failure to revise its management of this wildlife and its habitat, are dying horrific deaths by starvation and dehydration because they cannot get access to food and water south of the three-mile-long fence that the Park Service erected in 1980 on the southern border of Tomales Point.

In response, the Park Service insists that Plaintiffs lack standing to maintain this case and that the agency is not actually required to revise the GMP. Nevertheless, the day before its brief was due—and clearly in response to this lawsuit—the Park Service announced that it now intends to revise the GMP for Tomales Point—but only as an exercise of purely *discretionary* authority—and on this basis contends that it is entitled to final judgment in this case. While Plaintiffs are encouraged that the Park Service has finally acknowledged that it must undertake a revision to the GMP for this portion of Point Reyes National Seashore ("PRNS"), they have two major concerns.

First, the schedule for the GMP revision outlined by the Park Service is far too long in duration. Under that schedule, the NPS would not issue a final Environmental Impact Statement ("EIS") and Record of Decision for the revised GMP until March 31, 2025, at the earliest. Declaration of Craig Kenkel, ECF No. 57-1 ¶¶ 4–5; *id.* ¶ 6 (stressing that even this schedule "is contingent on ongoing funding"). This schedule is far too drawn out, especially given that we now know—as revealed in an attachment to the Declaration accompanying the Park Service's opposition brief, but glaringly omitted from the brief itself—that ***another seventy-two elk, more than 25% of the remaining herd, died last year as a result of the drought conditions at Tomales Point***. This is *in addition to the 152 elk who died in the year prior and the 257 elk who died during the previous drought of 2013-2015*. NPS Website, Plaintiffs' Exhibit ("Pl. Ex.") A, ECF

- 1 -

No. 56-2 (*Point Reyes National Seashore Releases 2020 Population Numbers of Tule Elk across the Park*); *id.* (*Tule Elk at Tomales Point FAQ*). In fact, **more than half of the total population—224 elk of a population of 445—has died during the last two years.**

Not only is this wildlife suffering horrific pain and distress from this situation—which clearly could be alleviated by a change in their management, including, for example, removal or relocation of the fence that confines them—but there can be no question that the sheer volume of deaths is seriously depleting any genetic viability of the remaining population. Accordingly, a delay of more than three additional years (if not longer) before the GMP is actually revised poses a serious risk to the preservation of this wildlife. Therefore, any schedule for the revision of the GMP must proceed more rapidly, especially because the Park Service continues to refuse to provide any forage for these animals in the meantime, despite insisting that the lack of *forage* is what has caused this massive number of deaths during drought conditions.[1]

Even more concerning is the fact that the NPS, which, for over forty years, has failed to revise the GMP for this section of the Seashore, and is now apparently doing so only in response to federal litigation, insists that the Court should not *require* it to conduct this much needed process pursuant to a court-imposed schedule, but should instead simply *trust* that the agency will revise the Plan. In light of the extreme recalcitrance exhibited by the agency to revise the GMP for Tomales Point, its continued insistence that it has no *mandatory* duty to do so, and that, absent a court order, the NPS's voluntary decision to revise the GMP is not binding on either it or any future Administration, there simply is no valid reason why the Court should accept the agency's belated announcement that it has now decided to act. Rather, as the law that applies to an agency's voluntary cessation of unlawful conduct makes absolutely clear, in light of all of these circumstances, the Court should enter judgment for the Plaintiffs and order the Park Service to

---

[1] *See, e.g.*, NPS Website, Pl. Ex. A, ECF No. 56-2 (*Tule Elk at Tomales Point FAQ*) ("Investigations of dead elk, observations of living elk, and range assessments . . . suggest *poor forage quality is the underlying cause of these population changes*") (emphasis added); *id.* (NPS stating it has no intention of providing supplemental forage to prevent further elk population declines).

1  comply with its mandatory duty to revise the GMP for Tomales Point pursuant to as expedited a

2  schedule as possible.

3      Moreover, if the Court rules in Plaintiffs' favor—i.e., it finds that the Park Service has

4  violated its mandatory duty to revise the GMP—it should also allow Plaintiffs to brief whether

5  additional injunctive relief may be appropriate—i.e., whether the Park Service should be required

6  to provide supplemental water and forage to the elk during the time it takes the agency to

7  complete the process for revising the GMP, specifically during the summer and fall months when

8  the drought conditions are so dire. Absent the opportunity to seek such relief, the Tule elk will

9  continue to suffer and die horrific deaths at alarming rates, and the genetic viability of the entire

10  herd will continue to be jeopardized—meaning that by the end of the GMP revision process, there

11  may be no elk population left to protect.

12      For all of these reasons, and because Plaintiffs have demonstrated sufficient Article III

13  standing, the government's motion for summary judgment should be denied, and judgment should

14  be entered for Plaintiffs.

## ARGUMENT

### I.   THERE IS NO MERIT TO DEFENDANTS' ASSERTION THAT PLAINTIFFS LACK STANDING.

#### A.   Plaintiffs Have Amply Demonstrated Sufficient Injuries.

18      Incredibly, the government argues that the three individual Plaintiffs and the

19  organizational Plaintiff lack Article III standing to maintain this action. Defendants' Cross-

20  Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment

21  ("Def. Opp."), ECF No. 57 at 9-12. In making this argument, the NPS appears to be under the

22  serious misapprehension that the only basis for injury-in-fact for plaintiffs challenging an

23  agency's failure to comply with a statutorily prescribed procedure—such as revising a GMP—is a

24  statutory provision that "provide[s] for public participation" in that process. *Id.* at 10. Thus,

25  apparently the Park Service would have this Court believe that standing law requires a violation

26  of a right to notice and comment to challenge an agency's failure to comply with a statutory

27  command. *Id.* However, that formulation of standing law is incorrect.

28

1    The Supreme Court has made clear that individuals challenging the government's failure

2    to comply with a procedure required by law have standing if that procedure is designed to

3    "protect [their] concrete interests." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.7 (1992).

4    In *Defenders of Wildlife*, the example of the quintessential procedural right that would provide the

5    necessary injury-in-fact for standing was an agency's failure to prepare an EIS with respect to the

6    construction of a federally licensed dam. *Id.* The Court did not suggest that the injury would flow

7    from whether the plaintiffs were provided notice and comment on the construction of the dam, or

8    even with respect to the EIS that was required. Rather, the Court explained that "one living

9    adjacent to the site for proposed construction . . . has standing to challenge the licensing *agency's*

10    *failure to prepare an environmental impact statement, even though he cannot establish with any*

11    *certainty that the statement will cause the license to be withheld or altered, and even though the*

12    *dam will not be completed for many years*." *Id.* (emphasis added).

13    Here, Plaintiffs are the proverbial people living adjacent to the proposed dam in *Defenders*

14    *of Wildlife*; i.e., the individual Plaintiffs and the members of organizational Plaintiff Animal

15    Legal Defense Fund ("ALDF") all live near and routinely recreate in Tomales Point. The

16    procedure at issue here—revision of the GMP for Tomales Point—is designed specifically to

17    protect the public's interest in ensuring that the Park Service administer this land in a way that

18    "provide[s] for the enjoyment of the scenery, natural and historic objects, *and the wild life* in such

19    manner and by such means as will leave them unimpaired for the enjoyment of future

20    generations." 54 U.S.C. § 100101(a) (emphasis added). Thus, because Plaintiffs all live near and

21    frequently visit Tomales Point to enjoy its natural wonders and wildlife, such as the Tule elk who

22    live there, this procedure is designed to protect their "concrete interests." 504 U.S. at 573 n.7.

23    Thus, Defendants' reliance on a single Wyoming district court decision, Def. Opp., ECF

24    No. 57 at 10, is unfounded. And the other case cited by Defendants, *Utah v. Babbitt, id.*, does not

25    even address an unreasonable delay claim. 137 F.3d 1193, 1200 (10th Cir. 1998). Rather, the

26    claim at issue there was that plaintiffs were denied public participation at a certain stage of a

27    government process, not that the government failed to undertake a required process at all—the

28    issue presented here. Plaintiffs brought this case not because the Park Service failed to provide

- 4 -

them with an opportunity to comment on or participate in a revision to the GMP, but because, for over forty-one years, the Park Service has *failed entirely to revise that Plan*, which, in turn, greatly adversely affects the Tule elk confined behind the fence and Plaintiffs' ability to enjoy this wildlife and the National Seashore where it lives and is required to be protected.

**Plaintiff Jack Gescheidt**

Plaintiff Jack Gescheidt explains in a sworn Declaration that he has lived in California since 1996 and has "been visiting Tomales Point in the Point Reyes National Seashore on a regular basis—on average six times per year—for at least twenty-four years." Declaration of Jack Gescheidt, Pl. Ex. C, ECF No. 56-4 ¶ 1. He further states that he goes to Tomales Point "for aesthetic enjoyment, recreation, and spiritual renewal" and that he "enjoy[s] photographing the wild lands and wildlife at Tomales Point, including the magnificent Tule elk herd." *Id.* ¶ 2.

However, Mr. Gescheidt recounts that in the summer of 2020, "while enjoying the plants, biodiversity, and wildlife at Tomales Point, [he] saw an elk who was extremely emaciated" and that since then, when he visits Tomales Point, he worries "that [he] will see more elk in the same or worse state, or even find a corpse of an elk who has died from starvation or dehydration because of their inability to access proper water and forage." *Id.* ¶ 4.

**Plaintiff Laura Chariton**

Plaintiff Laura Chariton similarly explains in her sworn Declaration that she lives in Marin County within an hour's proximity to the National Seashore; that, for forty-seven years, she has used Tomales Point "for myriad activities that bring [her] aesthetic, recreational, and spiritual enjoyment"; and that she "enjoy[s] observing wildlife throughout the park, but most of all the tule elk at Tomales Point." Declaration of Laura Chariton, Pl. Ex. D, ECF No. 56-5 ¶ 1. Ms. Chariton further states that Tomales Point "is a very special place to [her]" and that she has "often marked important events in [her] life with a visit to the area to commune with the elk there." *Id.* ¶ 2. Ms. Chariton also states that she has seen firsthand "the suffering of the tule elk at Tomales Point," including seeing "elk who were emaciated, dehydrated, and lacking access to appropriate water sources on a number of occasions between 2015 and the present," and that witnessing such sights "has been horrifically distressing for [her]." *Id.* ¶ 6. She states that the

- 5 -

1    suffering of the elk "completely impairs [her] ability to enjoy Tomales Point and the Seashore"

2    and that "[d]ue to the actions of the National Park Service in failing to manage this wildlife in a

3    way that would ensure it has adequate access to food and water, [she] can no longer truly enjoy

4    visiting [her] favorite place in the world." *Id.* ¶¶ 7–8.

5              **Plaintiff Skyler Thomas**

6              Plaintiff Skyler Thomas explains in his sworn Declaration that he is a "wildlife

7    photographer and videographer," that he has visited Tomales Point "many times as an oasis and

8    wildlife hotspot," and that he utilizes this area "for recreational enjoyment" and to further his

9    photography and videography work. Declaration of Skyler Thomas, Pl. Ex. E, ECF No. 56-6 ¶ 1.

10   Mr. Thomas further explains that he "love[s]" Tomales Point and that this "special" place is a

11   "retreat" for him—"aesthetically, emotionally, and spiritually." *Id.* ¶ 2. He further recounts that

12   since the summer of 2020, he has personally observed "the carcasses of at least fifteen Tule elk"

13   who have died from a lack of water and/or forage and that "[t]hese experiences of seeing dead elk

14   at Tomales Point have had a serious and lasting emotional impact on [him] and have greatly

15   impaired [his] aesthetic enjoyment of Tomales Point." *Id.* ¶¶ 4–5. He explains that he is now

16   "faced with the decision to either forego visiting a place that [he] ha[s] come to love and that so

17   enriches [his] life or to go there anyway and risk seeing the horrific sight of dead or dying elk"

18   and that, consequently, "[t]he aesthetic, recreational, and spiritual enjoyment [he] once derived

19   from Tomales Point is severely impaired." *Id.* ¶ 8.

20             **Plaintiff Animal Legal Defense Fund**

21             ALDF's representative, Mark Walden, also explains in his sworn Declaration that ALDF's

22   members similarly live near and enjoy Tomales Point and the elk who live there and that their

23   aesthetic and recreational interests are seriously impaired because the elk have been so poorly

24   managed by the Park Service. Declaration of Mark Walden, Pl. Ex. F, ECF No. 56-7 ¶¶ 7–10.

25             All of these injuries recounted by Plaintiffs amply satisfy the injury-in-fact test for

26   standing. *See* Plaintiffs' Memorandum in Support of their Motion for Summary Judgment ("Pl. SJ

27   Mem."), ECF No. 56-1 at 23–25. Thus, because Plaintiffs are quintessential individuals who use

28   and enjoy the national park land at issue in this case, and whose enjoyment of that land is

extremely impaired by the Park Service's failure to revise the GMP for Tomales Point, they have demonstrated sufficient procedural injury in this case, regardless of whether they are complaining about a lack of notice and comment. *See Defenders of Wildlife*, 504 U.S. at 573 n.7. Moreover, as the NPS itself acknowledges, when the agency *does* revise the GMP for Tomales Point, it will be required to prepare an EIS, Kenkel Decl., ECF No. 57-1 ¶ 2, which will provide Plaintiffs with a right to comment, 40 C.F.R. § 1506.6—none of which has occurred to date because the NPS has failed to carry out this mandatory statutory duty.[2]

### B.   Plaintiffs Have Also Demonstrated Sufficient Causation and Redressability.

There also is no merit to the NPS's assertion that Plaintiffs have failed to show the necessary causation for standing. Def. Opp., ECF No. 57 at 11. Oddly, the Park Service states that Plaintiffs assert that their aesthetic injuries are "caused by the GMP." *Id.* But the current GMP is not what is causing Plaintiffs' injuries, and Plaintiffs have never asserted that it is. Rather, it is the NPS's *failure to revise* that GMP that is causing Plaintiffs' injuries—i.e., the elk are continuing to die of starvation and dehydration due to a lack of humane management because of the agency's failure, after so many years, to revisit and amend their management. The current GMP for Tomales Point, issued in 1980, states that "[r]estoration of historic natural conditions *(such as reestablishment of Tule elk)* will continue to be implemented when such actions will not seriously diminish scenic and recreational values." AR 000313 (emphasis added). Therefore, a revision of that Plan would necessarily include measures that ensure that this protected wildlife does not continue to die of starvation and dehydration.

Indeed, it is odd that the Park Service insists that a revised GMP would "not address elk management at the implementation level," Def. Opp., ECF No. 57 at 11, when (a) the original GMP expressly states that restoration of natural conditions "will continue to be implemented,"

---

[2] The NPS's reliance on cases that stand for the proposition that its own Policies are not binding, Def. Opp., ECF No. 57 at 10–11, is perplexing. Plaintiffs have not asserted any claim that relies on the NPS's Policies—rather, they simply referred to those Policies as further evidence that a forty-one-year delay is "unreasonable" within the meaning of 5 U.S.C. § 706(1) and *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*"). Pl. SJ Mem., ECF No. 56-1 at 20; *see also* NPS Policies, Pl. Ex. B, ECF No. 56-3 at § 2.3.1.12 (stating that "GMP reviews may be needed *every 10 to 15 years, but may be needed sooner if conditions change significantly*") (emphasis added).

1   AR 000313; (b) the relevant statute provides that GMPs "shall include . . . measures for the

2   preservation of the area's resources," 54 U.S.C. § 100502, which include the Tule elk; and (c) the

3   NPS now tells the Court that it in fact *will incorporate specific elk management measures and*

4   *objectives in the revised GMP that it will voluntarily prepare*, Def. Opp., ECF No. 57 at 23;

5   Kenkel Decl., ECF No. 57-1 ¶ 2 ("The plan will include resource-specific and site-specific

6   analyses to address wilderness and *elk herd management and decisions that can be implemented*

7   *when the plan is final*.") (emphasis added). Accordingly, there is no valid basis for ruling that the

8   Plaintiffs have failed to show the requisite causation here.

9           Nor is there any merit to the Park Service's argument that Plaintiffs lack redressability.

10   Def. Opp., ECF No. 57 at 11–12. That matter is also succinctly addressed by the Supreme Court

11   in footnote seven of *Defenders of Wildlife*, where the Court explained that those who are directly

12   affected by government inaction have standing to complain that the government has failed to

13   carry out a procedural duty and that, in such circumstances, those individuals have standing "even

14   though [they] cannot establish with any certainty" that once the government complies with that

15   duty it will necessarily choose a course of action that will cure the plaintiffs' injuries. 504 U.S. at

16   573 n.7. Thus, again, the Court emphasized that "[t]he person who has been accorded a

17   procedural right to protect their concrete interests can assert that right *without meeting all the*

18   *normal standards for redressability and immediacy*." *Id.* (emphasis added).

19           Indeed, there is no shortage of case law from this Circuit that reiterates this well-

20   established standing doctrine. For example, in *Cantrell v. City of Long Beach*, 241 F.3d 674 (9th

21   Cir. 2001), the Court of Appeals held that birdwatchers had standing to challenge the

22   development of a terminal that would destroy habitat for various bird species because, before

23   disposing of any surplus real property—a prerequisite to constructing the terminal—the Navy was

24   required to comply with the National Environmental Policy Act ("NEPA"). In finding that the

25   plaintiffs had demonstrated sufficient redressability, the court explained that:

26           to establish standing, the birdwatchers need not show that the revised EIS
             would result in the abandonment of the plans to build the marine container
27           terminal. Relying on the discussion of procedural standing in footnote seven
             of *Defenders of Wildlife,* we have held that *to establish redressability, plaintiffs*
28           *asserting procedural standing need not demonstrate that the ultimate outcome*

- 8 -

1    *following proper procedures will benefit them*.

2    *Id.* at 682 (citations omitted) (emphasis added). Rather, the court explained, "[t]he birdwatchers

3    stand in a similar position to the hypothetical plaintiff in *Defenders of Wildlife* who lives adjacent

4    to the construction site of a federally licensed dam; because they are seeking to enforce a

5    procedural right under NEPA to protect their concrete interests, they have standing to challenge

6    the adequacy of the Navy's [Final] EIS *even though they cannot establish that a revised EIS*

7    *would result in a different reuse plan* for the Naval Station." *Id.* (emphasis added); *see also*

8    *Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995) (finding that the uncertainty as to

9    whether the findings of an EIS would affect the agency's determination is "not important" under

10   *Defenders of Wildlife*); *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 703 (9th Cir. 1993) (the fact

11   that redrafting the EIS might not change the agency's decision is "not relevant" to standing). This

12   procedural injury redressability rule is not limited to NEPA. *See, e.g.*, *Or. Nat. Desert Ass'n v.*

13   *Dombeck*, 172 F.3d 1092, 1094 (9th Cir. 1998) (plaintiffs challenging the Forest Service's grant

14   of a grazing permit without obtaining requisite certification from the state that the activity would

15   not violate water quality standards need not prove that the state would have denied such

16   certification to satisfy the redressability requirement).

17         The cases cited by Defendants, Def. Opp., ECF No. 57 at 12, do not help their cause. In

18   *Salmon Spawning & Recovery All. v. Gutierrez*, the court held that the plaintiffs lacked

19   redressability because their requested relief—a court order requiring the government to

20   renegotiate the terms of a treaty concerning the number of salmon that could be taken each year—

21   simply could not be obtained. 545 F.3d 1220, 1228 (9th Cir. 2008) ("[t]he court cannot order

22   renegotiation of the Treaty, and discretionary efforts by the agencies are too uncertain to establish

23   redressability"). However, in the same opinion, the Court of Appeals also held that the plaintiffs

24   *did* have standing to challenge the State Department's failure to re-initiate consultation under

25   Section 7 of the Endangered Species Act ("ESA") to ensure that continued implementation of the

26   Treaty was not likely to jeopardize the existence of the species. In so ruling, the court stressed:

27         the key difference between asserting substantive and procedural violations of the ESA:

28

1    a plaintiff alleging procedural violations of the ESA must show only that the procedural
2    right *could* protect their interest, whereas a plaintiff alleging a substantive violation
     must demonstrate that its injury *would likely be redressed* by a favorable court decision.
3    *Id. (*emphasis added).

4          Thus, this decision actually supports *Plaintiffs'* argument. Like the plaintiffs in *Salmon*
5    *Spawning*, Plaintiffs here are complaining about a *procedural* violation of the relevant statute—
6    i.e., the NPS's failure to revise the GMP for Tomales Point as required by 54 U.S.C. § 100502.
7    They are not, at this juncture, asking the Court to rule as to *how* the agency must ultimately
8    decide to revise that management plan; they are simply asking the Court to compel the agency to
9    actually revise this seriously outdated document, pursuant to Section 706(1) of the APA, which
10   authorizes the Court to compel agency action "unlawfully withheld or unreasonably delayed." 5
11   U.S.C. § 706(1). Once the agency does so, if Plaintiffs or anyone else challenge that ultimate
12   decision as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,
13   they may bring that substantive challenge under Section 706(2) of the APA and will necessarily
14   have to demonstrate the requisite standing to do so.[3]

15         Nor is *Fernandez v. Brock* helpful to Defendants. Def. Opp., ECF No. 57 at 12. There, the
16   court held that the plaintiff migrant farmworkers failed to show redressability when they
17   requested an order compelling the Secretary of Treasury to issue particular regulations that would
18   provide them with pension benefits, but only because it was entirely speculative as to whether
19   third parties subject to the regulations would even participate in pension plans under such new
20   regulations. 840 F.2d 622, 628 (9th Cir. 1988) (noting that "[i]f the farmworkers prevail, the
21   Secretary will issue regulations governing ERISA plans for seasonal workers. But the
22   farmworkers do not know what the regulations will say and cannot predict whether their
23   employer will continue to offer a pension plan at all"). However, again in a ruling that actually

24   _____

25   [3] In their "Issues to be Determined" Statement at the beginning of their brief, Defendants
     assert that this Court must decide "[w]hether NPS acted arbitrarily and capriciously by not
26   revising the General Management Plan for Point Reyes as it relates to Tomales Point." Def. Opp.,
     ECF No. 57 at 1. However, while that standard would of course govern judicial review of any
27   final decision regarding revision of the GMP, *see* 5 U.S.C. § 706(2), it is *not* the standard that
     governs the claim at issue here. Rather, Plaintiffs ask the Court to determine whether, under 5
28   U.S.C. § 706(1), the Park Service's failure to revise the GMP is "unreasonable." *See In re*
     *Pesticide Action Network N. Am.*, 798 F.3d 809, 813–14 (9th Cir. 2015).

1   supports *Plaintiffs'* position, the court held that the plaintiffs *did* have standing to challenge the

2   agency's failure to issue any regulations at all, in violation of the relevant statute, again

3   recognizing that *"[t]he causation and redressability requirements are satisfied because an order*

4   *requiring the Secretary to promulgate some regulations would redress the farmworkers'*

5   *procedural injury*." *Id.* at 631 (emphasis added).[4]

6          Thus, because Plaintiffs here seek to protect their concrete aesthetic, recreational, and

7   other interests in protecting the Tule elk from continuing to die from starvation and dehydration,

8   they need not prove that the revised GMP that is required for this portion of the Seashore would

9   in fact accomplish this objective in order to establish the requisite redressability. Because

10  Plaintiffs are complaining that the Park Service has violated its *procedural* obligation to revise

11  the GMP, under *Defenders of Wildlife* and its progeny, it is enough that the revision to the GMP

12  *may* provide relief.

13  **II.     THE PARK SERVICE HAS VIOLATED ITS MANDATORY DUTY TO REVISE
            THE GMP FOR TOMALES POINT.**

14          **A.      The Park Service Has a Mandatory Duty to Revise the GMP.**

15          There is no merit to the government's assertion that it does not have a mandatory duty to

16  revise the GMP for Tomales Point. Def. Opp., ECF No. 57 at 12–15. As Plaintiffs demonstrated

17  in their opening brief, *see* Pl. SJ Mem., ECF No. 56-1 at 17–18, and as Judge Armstrong has

18  already held, the fact that the governing statute states that the Park Service "shall . . . revise[]" the

19  GMP for each unit of the Park System "in a timely manner" imposes a non-discretionary duty on

20  the agency to revise the GMP. *Res. Renewal Inst. v. Nat'l Park Serv.*, No. 4:16-cv-00688-SBA,

21  2016 WL 11673179 (N.D. Cal. July 15, 2016), ECF No. 49 at 9 (explaining that "[a]lthough the

22  NPS has leeway in deciding *when* to revise a GMP, it *remains statutorily obligated to do so in a*

23  *'timely manner'*") (emphasis added).

24          Defendants' response—that there can be no mandatory duty because there is no statutory

25  deadline imposed on the agency for revising GMPs, Def. Opp., ECF No. 57 at 13—makes no

26

27  ———————————————
            [4] Moreover, in sharp contrast to that case, whatever new measures the Park Service

28  devises for managing the elk will most likely be implemented by the agency itself and not depend
    on unfettered choices of third parties not before the Court.

1    sense. Contrary to what Defendants would have this Court believe, although the Supreme Court

2    in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*") used a statutory command

3    accompanied by a particular deadline as an *example* of a mandatory duty that may be compelled

4    under 5 U.S.C. § 706(1), the Court certainly did not rule that this was the *only* kind of mandatory

5    duty that would suffice for that purpose. 542 U.S. 55 (2004). Indeed, there are many cases in this

6    Circuit decided post-*SUWA* where courts have held that agencies unreasonably delayed carrying

7    out mandatory duties where there was no specific timetable for the required action. *See, e.g.*, *In re*

8    *Nat. Res. Def. Council*, 956 F.3d 1134, 1140–41 (9th Cir. 2020) (despite no statutory timetable,

9    the EPA's ten-year-plus delay in responding to a petition asking the agency to end the use of a

10   dangerous pesticide was unreasonable); *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017)

11   (finding an eight-year delay in updating lead-dust and lead-paint standards unreasonable despite

12   no statutory deadline); *In re Pesticide Action Network N. Am.*, 798 F.3d at 814 (where there is no

13   congressionally mandated timetable and agency's proposed timetable representations are a

14   "roadmap for further delay[,]" plaintiff has a viable unreasonable delay claim where agency

15   delayed more than eight years); *Asmai v. Johnson*, 182 F. Supp. 3d 1086, 1095–97 (E.D. Cal.

16   2016) (finding a delay of fifteen years presumptively unreasonable although there was no

17   statutory deadline); *see also In re Pub. Emps. for Envtl. Responsibility*, 957 F.3d 267, 274 (D.C.

18   Cir. 2020) ("[E]ven the lack of a hard deadline does not give government officials carte blanche

19   to ignore their legal obligations"); *id.* (finding an unreasonable delay of nineteen years).

20           Thus, Defendants conveniently misinterpret the Supreme Court's reasoning in *SUWA* by

21   asserting that a statute that compels an agency to take a specific, non-discretionary action, but

22   does not impose any particular deadline for *when* the agency must act, is the same as a statute that

23   gives an agency discretionary authority *whether* to act at all. This simply is not correct. Rather, if

24   Congress *has* imposed a strict timetable for completion of a mandatory duty, that fact informs the

25   analysis of whether an agency delay is "unreasonable" within the meaning of Section 706(1) of

26   the APA, *see* Pl. SJ Mem., ECF No. 56-1 at 18–20, not the analysis of whether the agency has

27   any such duty at all. 750 F.2d at 80. In *TRAC*, the D.C. Circuit explained that in an unreasonable

28   delay case, "the time agencies take to make decisions must be governed by a rule of reason." *Id.*

- 12 -

1 The Court enumerated several factors that inform that determination, observing that "where

2 Congress has provided a timetable *or other indication of the speed with which it expects the*

3 *agency to proceed* in the enabling statute, that statutory scheme *may supply content for this rule*

4 *of reason.*" *Id.* (emphasis added).

5   Here, of course, the "other indication of the speed with which" Congress expected the

6 Park Service to comply with its statutory duty to revise GMPs, *id.,* is the inclusion of the phrase

7 "in a *timely* manner," 54 U.S.C. § 100502 (emphasis added)—meaning "quickly, rapidly; without

8 delay, promptly," Oxford English Dictionary (3d ed.) (definition of "timely"), and certainly well

9 before a lapse of forty-one years. Indeed, Plaintiffs were unable to find a single case—and

10 Defendants certainly have not cited any—where a court held that a delay of *over forty years* in

11 carrying out any statutory duty was found to be "reasonable."

12   The cases relied on by Defendants are easily distinguished, as Judge Armstrong observed.

13 *Res. Renewal Inst.*, 2016 WL 11673179, ECF No. 49 at 8–10. The statute at issue in *ONRC*

14 *Action v. Bureau of Land Mgmt.* merely required that land use plans be revised when

15 "appropriate," leaving the decision of *whether* to amend such plans to the discretion of the

16 agency. 150 F.3d 1132, 1139 (9th Cir. 1998). The same statutory language was at issue in

17 *Gardner v. Bureau of Land Mgmt.,* 638 F.3d 1217, 1220 (9th Cir. 2011), and similar language—

18 "as appropriate"—was at issue in *Luciano Farms, LLC v. United States,* No. 2:13-cv-02116-

19 KJM-AC, 2014 WL 1912356, at *3 (E.D. Cal. May 13, 2014), upon which Defendants also rely.

20 In *Idaho Rivers United v. U.S. Forest Serv.*, the court held that the statutory language of the Wild

21 and Scenic Rivers Act, which requires the Forest Service to take "such action . . . *as may be*

22 *necessary*" to protect such rivers, did not impose a discrete agency action that could be enforced

23 by the court because the language "as may be necessary" left the agency with a great deal of

24 discretion to decide whether such action was necessary at all. 857 F. Supp. 2d 1020, 1029 (D.

25 Idaho 2012) (emphasis added). And, contrary to what Defendants would have the Court believe,

26 the statute at issue in *Conservation Nw. v. Kempthorne*, No. C04-1331-JCC, 2007 WL 1847143

27 (W.D. Wash. June 25, 2007)—the Endangered Species Act—does not direct the Fish and Wildlife

28 Service to implement recovery measures "in a timely manner." Def. Opp., ECF No. 57 at 13. On

1  the contrary, the ESA does not say anything at all about the speed with which a Recovery Plan

2  must be implemented. 16 U.S.C. § 1533.

3      Understandably, Defendants want this Court to focus exclusively on the "in a timely

4  manner" language of the relevant statute, and they complain that Judge Armstrong "did not

5  address how the discretion-conferring phrase 'in a timely manner' could create a mandatory

6  duty . . ." Def. Opp., ECF No. 57 at 14. But it is not the "in a timely manner" phrase in the statute

7  alone that imposes the duty on the NPS to revise the GMP. Rather, it is Congress' use of the

8  critical word "shall"—an unequivocal word of *command*, *Me. Cmty. Health Options v. United*

9  *States,* 140 S. Ct. 1308, 1320 (2020) (the word "shall" connotes a "command")—along with the

10  direction that a "discrete action," *SUWA*, 542 U.S. at 63, be taken "in a timely manner," 54

11  U.S.C. § 100502, that imposes that duty.

12      Defendants again either misunderstand or misstate the reasoning behind *SUWA* when they

13  attempt to equate a statutory directive requiring an agency to take specific, concrete action—in

14  this case, requiring that the NPS "shall . . . revise[]" management plans, *id.*—to the type of

15  inexact, overarching "object to be achieved" addressed in *SUWA*, 542 U.S. at 66. Def. Opp., ECF

16  No. 57 at 15. There, the Congressional directive to "continue to manage such lands . . . in a

17  manner so as to not impair the suitability of such areas for preservation as wilderness" was not

18  deemed a sufficient mandatory duty for the Court to compel action, not because it did not include

19  a specific timetable in which the agency must "continue" to do something, but because it did not

20  include the requisite "clarity necessary to support judicial action," 542 U.S. at 66, i.e. a command

21  to perform a "discrete action," *id.* at 63—such as the revision of a GMP.

22      **B.      The NPS Has Unreasonably Delayed Revising the GMP for Tomales Point.**

23      In their opening brief, Plaintiffs demonstrated that the agency's over forty-one-year delay

24  in revising the GMP for Tomales Point is clearly "unreasonable," not only because of the time

25  that has passed since the original GMP was issued in 1980, but also because of the dire

26  consequences this delay in managing the elk has caused—i.e., suffering and death by starvation

27  and dehydration of wildlife that is required to be protected and preserved. Pl. SJ Mem., ECF No.

28  56-1 at 18–23. In response, Defendants make several assertions, none of which has any merit.

- 14 -

First, Defendants bizarrely contend that the forty-one-year delay is not "unreasonable" because "the conditions in Tomales Point have not changed substantially since the GMP" was issued in 1980. Def. Opp., ECF No. 57 at 16. However, in light of the fact that since 2013, *hundreds of Tule elk have now died from a lack of sufficient water and forage because they cannot get past the NPS's three-mile-long fence*, this statement is demonstrably incorrect.

Second, to support its position that it has not "unreasonably delayed" revising the GMP for Tomales Point, the Park Service relies on several cases where courts have found an agency's delay of five to six years in carrying out a mandatory duty not unreasonable because of the agency's "limited resources." *Id.* at 18. Of course, a delay of forty-one years is significantly longer than one of five or six. Regardless, in stark contrast to those cases, where agencies submitted evidence of competing priorities and a lack of resources, the NPS has not provided any evidence indicating that it has lacked the resources to revise the GMP over the last four decades.[5]

Third, in response to Plaintiffs recounting the numerous times since the mid-1980s that experts and others warned the Park Service that a failure to adequately manage the Tule elk confined behind a fence could lead to die-offs and suffering by starvation, Pl. SJ Mem., ECF No. 56-1 at 9–13, the agency complains about Plaintiffs' use of the word "warned." Def. Opp., ECF No. 57 at 18–20. But regardless of the word used—"warned," "cautioned," "instructed," or even simply "informed"—the point is that the Park Service has *known for decades* that keeping this population of wildlife confined behind a three-mile-long fence that prevents it from gaining access to water and forage would eventually result in the elk dying of starvation unless the population was somehow otherwise controlled or the fence was removed. Pl. SJ Mem., ECF No. 56-1 at 9–13; *see also* AR 003725 (NPS's experts advising it in 1993 that "[t]he long-range goal of elk management at PRNS should be the establishment of free-ranging elk throughout the

---

[5] Nor could the NPS make such a showing in light of the number of discretionary resources it has available to it. *See, e.g.*, Congressional Research Service, *National Park Service: FY2021 Appropriations* (last updated Oct. 12, 2021), https://crsreports.congress.gov/product/pdf/IF/IF11661 (Congress appropriated $3.123 billion in discretionary funding for the NPS for fiscal year 2021). Nor does the NPS argue that these resources are required to address more important competing priorities or projects, or even detail what those might be.

1    seashore" and that "[t]his would involve . . . *removal of the fence across Tomales Point*.")

2    (emphasis added). Yet, instead of acting on this information by revising the GMP to address this

3    problem, the Park Service has allowed the population to be "controlled" de facto by allowing this

4    protected wildlife to die horrific deaths by starvation and dehydration. This ad hoc, inhumane

5    management approach is "unreasonable" by any measure.[6]

6        Finally, throughout the background section to its brief—but not in the actual argument as

7    to why its delay is not unreasonable—the Park Service appears to imply that it has not acted

8    unreasonably in failing to revise the GMP because "[t]he Tule Elk Plan continues to guide elk

9    management at Tomales Point up to the present day." Def. Opp., ECF No. 57 at 7. But this

10   document, also produced decades ago, has no bearing on the agency's statutory obligation to

11   revise the GMP for this portion of the Seashore. On the contrary, this duty to revise applies to

12   "each" unit of the National Park System, 54 U.S.C. § 100502, which necessarily includes the

13   *entirety* of Point Reyes National Seashore, including Tomales Point. *See, e.g.*, *Rucho v. Common*

14   *Cause*, 139 S. Ct. 2484, 2508 (2019) (noting that proposed legislation requiring "each state" to act

15   "would require *every* state" to act) (emphasis added); *see also* Pl. SJ Mem., ECF No. 56-1 at 16

16   (the Park Service expressly excluded Tomales Point from the scope of the "planning area" for its

17   recent GMP revision for other portions of the Seashore).

18       Furthermore, as Plaintiffs pointed out in their opening brief, the Park Service has failed to

19   implement many of the goals and specific measures outlined in the 1998 Elk Plan. Pl. SJ Mem.,

20   ECF No. 56-1 at 9. Most glaringly, in that Plan the Park Service emphasized the need to maintain

21   "viable populations of tule elk." AR 003675. And, in the words of the Park Service itself, a

22   healthy, viable population of tule elk "is one that *does not suffer disease or mortality due to*

23   *artificially induced or human caused impacts*," such as "*the fencing of elk on the peninsula of*

24   *Tomales Point*." *Id.* (emphasis added). The NPS further observed that these concerns require "that

25   _____

26       [6] Defendants' contention that because these experts and others did not specifically advise
     the Park Service that to fix the problem it must *revise the GMP*, these warnings are irrelevant,
27   Def. Opp., ECF No. 57 at 18–20, is absurd. As the expert agency responsible for both protecting
     this wildlife and revising GMPs under the governing statutes, the Park Service should not have to
28   be told by others the precise management procedures it must undertake to accomplish its
     objectives.

1   management strategies *account for the effect of human altered environments influencing the*

2   *survival of elk on Tomales Point*." *Id.* (emphasis added). And yet, as Plaintiffs have amply shown,

3   the elk are, in fact, suffering *massive* mortality—***losing over half of their population in only two***

4   ***years***—due precisely to the very "human caused impacts" noted by the 1998 Plan that the Park

5   Service has failed for decades to "account for" in its management of the elk.[7] The Plan goes on to

6   specifically warn that "large numbers of starving elk"—the very situation that the Park Service

7   has been faced with since 2013 and was warned of for decades prior—would be an "unacceptable

8   situation[] that would require the Seashore to intervene." AR 003682.

9        Nevertheless, by its own terms, that Plan *expired in 2008 at the latest*. AR 003637 (the

10  1998 Plan would guide management of the elk "for the next five to ten years"). And even if the

11  Plan *were* still in effect, not only is it completely outdated, but it simply does not relieve the Park

12  Service of its separate statutory duty to revise the relevant GMP. Indeed, the Park Service clearly

13  recognizes this fact because it explains that its newly contemplated revision of the GMP "*will*

14  *update and replace the 1998 Elk Plan*." Def. Opp., ECF No. 57 at 23 (emphasis added).

**III.  BECAUSE THIS CASE IS NOT MOOT, THE PARK SERVICE IS NOT
     ENTITLED TO JUDGMENT BASED ON ITS BELATED DECISION TO REVISE
     THE GMP FOR TOMALES POINT.**

17       The Park Service ends its brief with the audacious assertion that because it has

18  belatedly—and clearly in response to this lawsuit—decided to begin the process to revise the

19  GMP for Tomales Point, "no further relief is necessary" and the agency is somehow entitled to

20  summary judgment. *Id.* at 24–25. Plaintiffs have no idea what this free-floating argument,

21  untethered to any legal context, is intended to be, nor have Defendants cited any cases where a

22  court has awarded judgment to an agency based on any similar argument.

23

24  ──────────────────

25       [7] The two actions that the NPS cites as evidence of its implementation of the 1998 Elk
    Plan and other recommendations made by its own experts—the introduction of three female elk to
    Tomales Point in 2001 and the relocation of some elk outside of Tomales Point in 1998, Def.

26  Opp., ECF No. 57 at 19–20—were not only taken *over twenty years ago,* but were not
    implemented as ongoing strategies, as intended, AR 003675 ("the addition of 2-3 female elk

27  *every elk generation*") (emphasis added); AR 003682 (providing that "additional animals . . . be
    moved if the trial is . . . successful"), but were instead discontinued after only one occurrence,

28  long before they could have any meaningful impact on the health or genetic diversity of the herd.

- 17 -

1        The only possible ground upon which this Court could enter judgment for the agency on

2   this basis would be if the Court were to conclude that, based on the Park Service's new voluntary

3   undertaking to revise the GMP, Plaintiffs' unreasonable delay claim is now moot. But the Court

4   cannot possibly find this case moot for two reasons. First, Plaintiffs' claim is not moot because

5   the NPS has not yet actually revised the GMP for Tomales Point. *Knox v. Serv. Emps. Int'l.*

6   *Union 1000*, 567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for the

7   court to grant any effectual relief whatever to the prevailing party") (internal citations omitted).

8   Here, because the agency has not yet revised the GMP for Tomales Point—the very relief

9   requested in Plaintiffs' Complaint, Amended Complaint, ECF No. 33 at 17 (requesting the Court

10   order Defendants "to take immediate measures to . . . revise the 1980 General Management Plan

11   with respect to the Tomales Point portion of the Point Reyes National Seashore")—the case is not

12   moot.

13        Second, to the extent the Park Service is arguing that the case is moot because the only

14   relief Plaintiffs will obtain from this Court is a schedule for completion of a revised GMP, Def.

15   Opp., ECF No. 57 at 24, the case is also not moot because it falls within the well-established

16   exception to mootness for the voluntary cessation of unlawful conduct. *See, e.g.*, *Friends of the*

17   *Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 189–94 (2000). In fact, "[i]t is well

18   settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal

19   court of its power to determine the legality of the practice," for if it did, "the courts would be

20   compelled to leave [t]he defendant . . . free to return to his old ways." *Id.* at 189 (internal citations

21   omitted). Therefore, in accordance with this doctrine, voluntary cessation of the challenged

22   conduct will only moot a case if "there is no reasonable expectation . . . that the alleged violation

23   will recur" and "interim relief or events have completely and irrevocably eradicated the effects of

24   the alleged violation." *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). Further, the

25   burden of demonstrating that such conditions exist, which falls on the party asserting so, "is a

26   heavy one." *Id.* (citations omitted).

27        Here, the Park Service cannot possibly meet its "heavy burden" of demonstrating that

28   "'subsequent events [make] it *absolutely clear that the allegedly wrongful behavior could not*

- 18 -

*reasonably be expected to recur.*'" *Laidlaw*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)) (emphasis added). This is true not only because the agency has already delayed revising the GMP for over forty years, but especially because the agency continues to insist that it does not have a *mandatory duty* to revise the GMP, but rather is only doing so now as an exercise of *discretion.* Def. Opp., ECF No. 57 at 12–15; *id.* at 23–24. In *Knox*, the Supreme Court held that the defendant union had failed to meet its burden that it would not again attempt to collect allegedly unlawful fees from nonunion state employees precisely because, although the union ceased doing so after certiorari was granted, it "continue[d] to defend the legality" of the fees in question. 567 U.S. at 307 (2012). Hence, the Court concluded, "it is not clear why the union would necessarily refrain from collecting similar fees in the future." *Id.*; *see also Forest Guardians v. Johanns*, 450 F.3d 455, 462 (9th Cir. 2006) (finding the case not moot because "[n]otably, the Forest Service *has argued throughout this litigation that it is not required to meet the monitoring requirements* . . . Declaratory judgment in favor of Forest Guardians would thus ensure that the Forest Service does not continue to fail to meet its monitoring responsibilities in the future . . .") (emphasis added).

Here, similarly, given the Park Service's staunch insistence throughout this litigation that it has no statutory obligation to revise the GMP for Tomales Point, it simply cannot meet its "heavy burden" to demonstrate that it is "*absolutely clear*" that it will not simply decide somewhere down the road—as a matter of what it claims is its complete discretion—to abandon the GMP revision process, or delay it indefinitely. *Laidlaw*, 528 U.S. at 189 (emphasis added); s*ee also Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016) (Bureau of Prisons failed to meet its burden that challenge to confinement practices was moot after prisoners had been removed from those units, when the agency continued to assert that its practices were lawful and therefore prisoners were faced with the possibility of being subjected to the same confinement in the future). Thus, absent a court order directing the Park Service to complete the GMP revision process, not only is there no way to ensure that the agency actually goes through with that revision and does not "return to [its] old ways," 528 U.S. at 189, but there is also no way to ensure that any *future* Administration will comply with the agency's (allegedly discretionary)

- 19 -

1   decision. Indeed, although in 1998 the Park Service enumerated several goals and measures it

2   would take to ensure the continued genetic viability of the elk herd at Tomales Point, as Plaintiffs

3   have demonstrated, it has failed to implement those measures or achieve those goals. *See* Pl. SJ

4   Mem., ECF No. 56-1 at 9; *supra* at 16–17. Furthermore, there is no guarantee that the current

5   NPS officials will remain in power, and it is absolutely clear that one agency's regulatory

6   decisions do not bind those of future Administrations. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S.*

7   *v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("an agency changing its course" need

8   only provide a "reasoned analysis for the change"); *Dep't of Homeland Sec. v. Regents of the*

9   *Univ. of Cal.*, 140 S. Ct. 1891, 1903 (2020) (recounting the change in immigration policy from

10  one Administration to the next).

11         The Park Service also cannot meet its equally "heavy burden" of demonstrating that

12  "interim relief or events have completely and irrevocably eradicated the effects of the alleged

13  violation." *Davis*, 440 U.S. at 631. As Plaintiffs have explained, the effect of the alleged violation

14  here is that, because the Park Service has failed to revise the GMP for Tomales Point—which

15  would include developing a new management approach for the Tule elk so they did not continue

16  to die in large numbers of starvation and dehydration—the elk are continuing to suffer and die,

17  and the genetic viability of the entire population is now severely compromised. The mere fact that

18  the agency has now belatedly embarked on a voluntary GMP revision process does not

19  "completely and irrevocably eradicate[]" those effects. *Id.* Moreover, even despite this

20  announcement, the "effects of the alleged violation" are not only continuing, *but worsening*. In

21  fact, as the Park Service's most recent population data reveal, the elk are continuing to die by the

22  dozens at Tomales Point, and—absent some drastic action from the Park Service—they will

23  continue to do so during the time it takes the agency to devise a more humane management

24  approach. Thus, for this reason also, this case is not moot. *See, e.g.*, *Nw. Envtl. Def. Ctr. v.*

25  *Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988) (finding that the close of the 1986 coho salmon

26  fishing season did not render moot environmental organization's challenge to federal agencies'

27  management of the salmon because "[t]he 1986 fishery management *measures have continuing*

28

- 20 -

*effects on the population* of Oregon coho salmon, *and in particular on the number of coho that will be returning to Oregon waters to spawn . . . and on their progeny*") (emphasis added).

## IV.    THE PARK SERVICE SHOULD BE ORDERED TO COMPLETE ITS REVISION OF THE GMP FOR TOMALES POINT WITHIN ONE YEAR.

The Park Service cannot have it both ways. It cannot on one hand contend that it has no mandatory duty to revise the GMP at issue, but, on the other hand, insist that it is entitled to final judgment in this case on the ground that it has now announced it will begin the process to revise the GMP. Rather, in light of the agency's insistence that it is not statutorily required to revise this GMP, the only way to ensure that it actually does so is for the Court to order it to do so, pursuant to a court-ordered schedule. *See, e.g.*, *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 999–1000 (9th Cir. 2000) (courts generally have broad equitable discretion to fix an appropriate deadline for agencies to meet); *In re Nat. Res. Def. Council*, 956 F.3d at 1143 (ordering EPA to issue a full and final response within ninety days of the court's final opinion); *In re A Cmty. Voice*, 878 F.3d at 788 (ordering EPA to issue a proposed rule within ninety days and a final rule within one year); *In re Pesticide Action Network N. Am.*, 798 F.3d at 815 (ordering EPA to issue either a proposed or final revocation rule or a full and final response within ninety days); *Club v. McCarthy*, No. 15-cv-01165-HSG, 2016 WL 1055120, at *7 (N.D. Cal. Mar. 15, 2016) (issuing a court-ordered timeline for EPA to fulfill certain mandatory rulemaking duties under the Clean Air Act); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 35 F. Supp. 3d 1137, 1155 (N.D. Cal. 2014), *aff'd*, 833 F.3d 1136 (9th Cir. 2016) (ordering FWS to complete a recovery plan for an endangered California plant species by a specific date); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (ordering OSHA to submit a final rule in under six months); *Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1159 (D.C. Cir. 1983) (ordering OSHA to issue a notice of proposed rulemaking within thirty days and to expedite the final rule on a priority basis, significantly in advance of the agency's estimate of eighteen months).

The schedule outlined by the Park Service—under which it does not complete the GMP revision *until March 31, 2025*, if at all—is completely untenable, particularly in light of the agency's continued refusal to provide any supplemental food for the elk in the meantime, even

- 21 -

1   though it contends that a lack of forage is what has caused these massive die-offs.[8] Rather, should

2   the Court rule in Plaintiffs' favor on the unreasonable delay claim, the Court should order the

3   Park Service to complete the GMP revision process for Tomales Point pursuant to a much shorter

4   timetable—i.e., within a year from the Court's order. *See, e.g.*, *supra* at 21 (cases where courts

5   have ordered agencies to complete mandatory duties in less than a year).

6          The Park Service seems to think that it should not be subject to a court order to revise the

7   GMP as it pertains to Tomales Point for three reasons. First, it argues that this Court should not

8   order it to comply with its mandatory duty to act because it is "entitled to the presumption that it

9   will act expeditiously and in good faith *to continue complying with the relevant statutes*." Def.

10  Opp., ECF No. 57 at 24 (emphasis added). This assertion strains credulity. To begin with, such an

11  order would only be issued if this Court had *already found that the agency was not, in fact,*

12  *"complying with the relevant statute*[]." *Id.* Moreover, the sentence that Defendants cite for this

13  premise is followed *immediately* by the highly relevant caveat that any such "presumption is not

14  to shield [an agency] action from a thorough, probing, in-depth review." *Citizens to Pres. Overton*

15  *Park, Inc. v. Volpe* 401 U.S. 402, 415 (1971).

16         Next, the Park Service argues that NEPA requirements would prevent it from complying

17  with any expedited timeline ordered by this Court. Def. Opp., ECF No. 57 at 24. While current

18  NEPA regulations require agencies to issue a final EIS and Record of Decision for actions

19  requiring an EIS "within 2 years . . . from the date of the issuance of the notice of intent," 40

20  C.F.R. § 1501.10(b)(2), the NPS has built into its timeline *an additional fifteen months from now*

21  before it even issues that notice of intent for this GMP revision process, Kenkel Decl., ECF No.

22  57-1 ¶ 5. There is no justifiable reason why the agency should take so long to issue such notice.

23         Finally, the Park Service attempts to rely on *San Luis & Delta-Mendota Water Auth. v.*

24  *Jewell*, 747 F.3d 581 (9th Cir. 2014), to suggest that a court-imposed timeline would in fact harm

25  "the interests of the public and the environment." Def. Opp., ECF No. 57 at 24–25. This idea is

26  completely misplaced. That case—in which the Court of Appeals attributed the sloppiness of a

27  _____

28         [8] *See supra*, note 1; Kenkel Decl., ECF No. 57-1 ¶¶ 4-5 (describing the agency's
    schedule); *id.* ¶ 6 (stressing that even this schedule "is contingent on ongoing funding").

PLAINTIFFS' OPP. TO DEFENDANTS' MSJ & REPLY IN SUPPORT OF PLAINTIFFS' MSJ

1    Biological Opinion concerning the impact of "the two largest and most important water projects

2    in the United States" on an endangered species to the one year the district court gave the Fish and

3    Wildlife Service to prepare that document, 747 F.3d at 592—is far different from this one. In

4    contrast to the 2,600 acres at issue here, AR 003651, that case involved "an extremely

5    complicated and technical subject matter covering multiple federal and state agencies and

6    *affecting millions of acres of land and tens of millions of people*." *Id.* at 605 (emphasis added).

7    Moreover, although the court did complain that the final Biological Opinion was poorly written, it

8    nevertheless *upheld* the Opinion on the ground it was "adequately supported by the record and not

9    arbitrary and capricious." *Id.* at 606. Accordingly, that case demonstrates that agencies may be

10   required by courts to move incredibly quickly to remedy procedural injuries when serious, lasting

11   impacts on protected species of wildlife are at stake. And it certainly does not stand for the

12   proposition that a court should not impose *any* timeline for completion of a statutorily mandated

13   duty that has already been delayed for over four decades.

14   **V.    PLAINTIFFS SHOULD BE GIVEN THE OPPORTUNITY TO DEMONSTRATE
           THE NEED FOR ADDITIONAL REMEDIAL MEASURES.**

15          Finally, if the Court issues a favorable ruling for Plaintiffs on the merits, in addition to

16   ordering the Park Service to revise the GMP for Tomales Point pursuant to a significantly

17   expedited schedule, the Court should allow Plaintiffs to seek additional injunctive relief to ensure

18   that the Tule elk at Tomales Point do not continue to die in large numbers from starvation and/or

19   dehydration during the time it takes the NPS to complete the GMP. Although the Court ruled that

20   it lacked authority to grant such measures at the preliminary injunction stage, ECF No. 26 at 13,

21   courts are not bound by the relief granted or denied at that stage of the litigation when it decides

22   the final merits of a claim. *See, e.g.*, *Univ. of Tex. v. Caminesh*, 451 U.S. 393, 395 (1981) ("the

23   findings of fact and conclusions of law made by a court granting a preliminary injunction are not

24   binding at a trial on the merits").

25          Plaintiffs continue to be concerned that, absent a new management approach for the Tule

26   elk, which will be embodied in the new GMP, Def. Opp., ECF No. 57 at 23 (explaining that the

27   new GMP "will update and replace the 1998 Elk Plan for Tomales Point"), the elk will continue

28

- 23 -

1    to die in large numbers as drought conditions worsen in the summer and fall months, affecting not

2    only the individual elk, but also the genetic viability of the entire herd. *See* Pl. SJ Mem., ECF No.

3    56-1 at 21–23. Therefore, because it will take the NPS some time to finalize the new GMP,

4    Plaintiffs may need to seek additional relief from this Court to ensure that the elk are provided

5    adequate food and water, if necessary, during any ensuing drought conditions. *See, e.g.*, *Gordon*,

6    849 F.2d at 1244 ("[w]e have pointed out that 'courts of equity have broad discretion in shaping

7    remedies.'").

8            Plaintiffs' concern is heightened by the fact that the Park Service recently acknowledged

9    that an additional seventy-two elk died last year, despite insisting to this Court that it was "closely

10   track[ing] conditions and st[ood] ready act if needed to safeguard the viability of the Tomales

11   Point elk population." ECF No. 15 at 1. This most recent die-off is in addition to the 152 elk that

12   died the previous year, which means that ***more than half the population has died in the last two***

13   ***years alone*** (224/445). Given the fact that the Park Service was already concerned about the

14   genetic viability of this herd in 1998 when the population numbered 465, AR 003644, and the

15   population is now down to only 221 animals, Attachment 1 to Kenkel Decl., ECF No. 57-2, the

16   smallest it has been—according to the Park Service's own graph—since 1993, Tomales Point

17   Tule Elk Population Graph, Pl. Ex. G; Defendants' Exhibit 8, ECF No. 16-8 (same), allowing this

18   wildlife to continue to die in such significant numbers while the Park Service revises the GMP

19   could very well mean that by the end of the process it will be entirely too late to do anything to

20   save this population. *See* AR 003675 (explaining that "[t]o ensure long-term success of the herd

21   requires a population size, health, and genetic fitness to maintain a viable population"; that "[t]he

22   Point Reyes elk herd relies on its genetic makeup and diversity to cope with the challenges of its

23   environment"; and that "[t]he population of tule elk at Point Reyes has been estimated *to contain*

24   *the lowest level of genetic variation . . . of all the herds of the state*") (emphasis added).The mere

25   fact that the statutory requirement at issue here is only procedural in nature—i.e., the Court can

26   order the Park Service to revise the GMP, but cannot dictate how the agency chooses to do so—

27   does not strip the Court of the equitable authority to issue such additional injunctive relief. *See,*

28   *e.g.*, *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011) (explaining that the

- 24 -

1   lower court's conclusion that it lacked jurisdiction to grant plaintiffs injunctive relief while the

2   Forest Service prepared a supplemental EIS on the legal premise that the court was "limited to

3   providing procedural relief" was "plainly erroneous.") In fact, courts often grant additional

4   injunctive relief after they compel an agency to comply with a procedural requirement. *See, e.g.*,

5   *id.* (explaining that "[w]e have directed or upheld setting aside agency action pending NEPA

6   compliance on numerous occasions"); *Klamath Siskiyou Wetlands Ctr. v. Boody*, 468 F.3d 549,

7   562 (9th Cir. 2006) (enjoining timber sales premised on a policy change that violated NEPA);

8   *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1382 (9th Cir. 1998)

9   (enjoining future logging in the Cuddy Mountain area of Payette National Forest until USFS

10  completes studies in compliance with the NFMA, NEPA, and the Payette LRMP); *Portland

11  Audubon Soc'y v. Babbitt,* 998 F.2d 705, 709 (9th Cir. 1993) (upholding injunction against BLM

12  timber sales pending completion of supplemental EIS); *Hoopa Valley Tribe v. Nat'l Marine

13  Fisheries Serv.*, 230 F. Supp. 3d 1106, 1146 (N.D. Cal. 2017) (requiring NMFS and Bureau of

14  Reclamation put protective water flows in place to reduce disease rates among salmon while

15  agencies completed formal consultation process); *High Sierra Hikers Ass'n v. Moore*, 561 F.

16  Supp. 2d 1107, 1112–13 (N.D. Cal. 2008) (ordering injunctive relief after ruling that that the

17  Forest Service violated NEPA and the Wilderness Act because of the "strong public interest in

18  maintaining pristine wild areas unimpaired by man for future use and enjoyment"); *Mont.

19  Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1039–40 (D. Mont. 2006) (suspending gas leases

20  pending full compliance with NEPA, ESA, and the National Historic Preservation Act).

21        Thus, while there is no need for the Court to rule on this matter now, Plaintiffs wish to

22  reserve the opportunity to request additional equitable relief should it become necessary during

23  the inevitable drought conditions that will occur during the time it takes the NPS to revise the

24  GMP for Tomales Point.

25                          **<u>CONCLUSION</u>**

26        For all of the foregoing reasons, as well as those set forth in Plaintiffs' opening brief, the

27  Court should grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motion

28  for summary judgment.

1    DATED: January 5, 2022                  Respectfully submitted,

2

3

4

5
                                            _____
6                                           Kate Barnekow, State Bar No. 336792
                                            kbarnekow@law.harvard.edu
7                                           Animal Law & Policy Clinic
                                            Harvard Law School
8                                           1585 Massachusetts Ave.
                                            Cambridge, MA 02138
9                                           Office: (617) 998-2450
                                            Facsimile: (617) 496-4863
10                                          Cell: (512) 868-7800

11

12

13

14
                                            _____
15                                          Katherine A. Meyer
                                            (appearance *pro hac vice*)
16                                          kmeyer@law.harvard.edu
                                            Director, Animal Law & Policy Clinic
17                                          Harvard Law School
                                            1585 Massachusetts Ave.
18                                          Cambridge, MA 02138
                                            Office: (617) 998-2450
19                                          Facsimile: (617) 496-4863
                                            Cell: (202) 257-5145
20

21

22                                          Attorneys for Plaintiffs

23

24

25

26

27

28

                                     - 26 -