UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACK GESCHEIDT, et al., | Case No. 21-cv-04734-HSG |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DEB HAALAND, et al., | |
| Defendants. | Re: Dkt. Nos. 56, 57 |

Pending before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 56, 57. The Court held a hearing on the motions. For the reasons detailed below, the Court **GRANTS** Defendants' motion for summary judgment and **DENIES** Plaintiffs' motion for summary judgment.

## I.  BACKGROUND

The parties are familiar with the facts of this case, and they are largely undisputed. The Court therefore only briefly summarizes the facts as relevant to the cross-motions for summary judgment.

Plaintiffs filed this action against the National Park Service ("Park Service" or "NPS")[1] in 2021 to protect the tule elk population that lives in the Tomales Point area of Point Reyes National Seashore. *See* FAC. Plaintiffs contend that drought conditions in the area have become "extremely dire," and the tule elk are dying from lack of adequate forage and water. *See, e.g.*, *id.* at ¶¶ 1–4, 61–62, 64–68, 72–76. NPS has reported, for example, that the Tomales Point elk

---

[1] Plaintiffs sue Deb Haaland, the Secretary of the Interior, Shawn Benge, the Deputy Director of the National Park Service, and Craig Kenkel, Superintendent of Point Reyes National Seashore, in their official capacities. *See* Dkt. No. 33 ("FAC") at ¶¶ 19–21.

population declined from 445 to 293 in 2020.  *See* Dkt. No. 56-1, Ex. A at 3, 9.  152 elk therefore died in 2020.  *See id.*  In December 2021, NPS reported that the elk population further declined to 221, meaning an additional 72 elk died.  *See* Dkt. No. 57-2, Ex. 1.  Plaintiffs suggest that these deaths were preventable, and that tule elk will continue to die unnecessarily because of the Park Service's failure to timely revise its management plan for the National Seashore.  *See* FAC at ¶¶ 1–4, 61–62, 64–68, 72–76.  Plaintiffs contend that the Park Service's failure to timely revise its management plan violates the Administrative Procedure Act ("APA").  *See id.* at ¶¶ 87–91.

### A.    The National Park Service's Management of the Tule Elk

In 1978, Congress enacted the National Park and Recreation Act, which required the Park Service to prepare and revise general management plans for each unit of the National Park System. *See* Act of Nov. 10, Pub. L. 95-625, § 604(3), 92 Stat 3467.  The current statute reads in relevant part:

> General management plans for the preservation and use of each System unit . . . *shall be prepared and revised in a timely manner* by the Director.  On January 1 of each year, the Secretary shall submit to Congress a list indicating the current status of completion or revision of general management plans for each System unit.

54 U.S.C. § 100502 (emphasis added).  Such plans shall include (1) "measures for the preservation of the area's resources"; (2) "indications of types and general intensities of development . . . associated with public enjoyment and use of the area"; (3) "identification of and implementation commitments for visitor carrying capacities for all areas of the System unit"; and (4) "indications of potential modifications to the external boundaries of the System unit, and the reasons for the modifications."  *Id.*

The General Management Plan for the National Seashore was adopted in 1980 (the "1980 General Management Plan" or "1980 GMP").  *See* Dkt. Nos. 39–47, 55 ("Administrative Record" or "AR") 293–347.  Under the plan, the Park Service's management objectives included "identify[ing], protect[ing], and perpetuat[ing] the diversity of existing ecosystems which are found at Point Reyes National Seashore and are representative of the California seacoast," as well as "protect[ing] marine mammals, threatened and endangered species, and other sensitive natural

2

resources found within the seashore." *Id.* at 301. The 1980 GMP also stated that "[r]estoration of historic natural conditions (such as reestablishment of Tule elk) will continue to be implemented when such actions will not seriously diminish scenic and recreational values." *See id.* at 313.

Other management objectives included "monitor[ing] grazing and improv[ing] range management practices in the pastoral zone in cooperation with ranchers" and "preserv[ing] and protect[ing] all structures in or nominated to the National Register of Historic Places," such as the Pierce Point Ranch. *Id.* at 302, 309–12, 314, 316. The plan also indicated that "it is probable that this [ranching] use will continue indefinitely." *Id.* at 312. A fence was accordingly erected to separate the tule elk from the adjacent public lands leased to ranchers. *Id.* at 3644.

In 1998, the Park Service issued the Tule Elk Management Plan to "guide the management, monitoring, and research of tule elk . . . at Point Reyes National Seashore for the next five to ten years." *Id.* at 3637. The Park Service explained that the Plan was needed "to provide for the protection of the elk that is consistent with scientifically sound principles, takes into account the interests of the public, and meets the objectives for which the Seashore was established." *Id.* The Park Service noted concerns about the elk "overpopulating a limited, enclosed range and the potential consequences to other protected species and ecosystems." *Id.*

The 1998 Plan thus identified three "missions" related to the elk:

- Adaptively manage elk as a natural component of the dynamic ecosystem of Point Reyes.

- Assist in the preservation of tule elk as a subspecies and the genetic diversity it contains.

- Manage tule elk consistent with other management objectives, including agriculture, public visitation, and the protection of natural, cultural, and recreational resources.

*Id.* at 3673–74.

As relevant to this case, the 1998 Plan also adopted specific management actions, including that the Park Service would "[m]aintain the elk fence on Tomales Point and continue to separate tule elk from cattle"; "continue monitoring tule elk and their environment to analyze trends and better understand tule elk population dynamics and ecology at Point Reyes"; and set an

3

interim population range for the elk at Tomales Point at 350–450.  *See id.* at 3628–31, 3679–81,

3685–86.  The plan stated that "[r]emoving the fence at Tomales Point will be considered if and

when ranching ceases on the adjacent lands."  *Id.* at 3685.  Plaintiffs allege that this fence prevents

the tule elk from finding adequate water and forage, particularly during times of drought.  *See,*

*e.g.*, FAC at ¶¶ 61, 80–81.

### B.    Procedural Background

On June 24, 2021, Plaintiffs filed a motion for preliminary injunction, in which they sought

an order requiring NPS to "take immediate measures to ensure that the Tule elk who live on

Tomales Point in Point Reyes National Seashore are provided access to sufficient food and water

to ensure that these animals do not continue to die of starvation and/or dehydration."  Dkt. No. 8 at

13.  On August 2, 2021, the Court denied Plaintiffs' motion.  Dkt. No. 26.

Plaintiffs subsequently amended their complaint.  In the FAC, Plaintiffs make clear that

now they are only challenging the Park Service's failure to revise the 1980 General Management

Plan as it pertains to Tomales Point,[2] and not the 1998 Tule Elk Management Plan.  *See, e.g.*, FAC

at ¶¶ 2–3, 88–90.  In short, Plaintiffs contend that under 54 U.S.C. § 100502, the Park Service is

required to update its general management plan "in a timely manner," and that by failing to do so

for over forty years, the Park Service has unreasonably delayed agency action, in violation of 5

U.S.C. § 706(1).  *Id.* at ¶¶ 88–90.  The parties have filed cross-motions for summary judgment.

Dkt. Nos. 56, 57.

//

---

[2] In 2021 the Park Service began the process of amending the 1980 GMP to "update management
guidance for approximately 28,000 of the more than 86,000 acres of national park system lands
managed by Point Reyes, including all lands currently leased for beef and dairy ranching."  *See*
AR 350, 354.  But Plaintiffs urge that this amendment only covers a *portion* of the National
Seashore, and does not update the management guidance as to Tomales Point or the tule elk there.
*See* Dkt. No. 57-1 at 11, 16.  Although the amendment does discuss elk management as to two
free-ranging herds found elsewhere in the National Seashore, the Park Service clarified in
response to public comment on the amendment that "[t]he fenced elk population on Tomales Point
is outside the planning area."  *See* AR 383–86, 1341.  It is unclear whether a "timely" amendment
under 54 U.S.C. § 100502 would require specific consideration of Tomales Point and the tule elk
there as Plaintiffs suggest.  *See* Dkt. No. 57-1 at 19 ("[F]ailing to revise the 1980 GMP *for
Tomales Point* is indisputably unreasonable." (emphasis added)).  But because the Court does not
reach the question of whether the Park Service unreasonably delayed in revising the 1980 GMP,
the Court need not address this issue.

United States District Court
Northern District of California

## II.   LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

## III.   DISCUSSION

Under § 706(1), a court may "compel agency action unlawfully withheld or unreasonably delayed." *See* 5 U.S.C. § 706(1). As explained above, Plaintiffs contend that under 54 U.S.C. § 100502, the Park Service must "prepare[] and revise[]" its general management plan "in a timely manner." *See* 54 U.S.C. § 100502. Forty years, they posit, is untimely under any definition, and has led to inadequate care of the tule elk at Tomales Point. *See* FAC at ¶¶ 88–90.

### A.   Standing

As an initial matter, the Park Service argues that Plaintiffs lack standing to bring their APA claim. *See* Dkt. No. 57 at 9–12. A plaintiff seeking relief in federal court bears the burden of establishing "the irreducible constitutional minimum" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). *First*, the plaintiff must have "suffered an injury in fact." *Id.* This requires "an invasion of a legally protected interest" that is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical. *Lujan*, 504 U.S. at 560 (quotation omitted). *Second*, the plaintiff's injury must be "fairly traceable to the challenged conduct of the defendant." *Spokeo*, 136 S. Ct. at 1547. *Third*,

United States District Court
Northern District of California

1    the injury must be "likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504

2    U.S. at 560–61).  The Park Service urges that Plaintiffs cannot meet any of these three standing

3    requirements.

4          **i.    Injury in Fact**

5          Injury in fact may be alleged as either a "procedural" or a "substantive" injury.  *See City of*

6    *Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).  Procedural injury results from violating

7    a statute or regulation that guarantees *a particular procedure*.  *See id.* ("[A] cognizable procedural

8    injury exists for Article III purposes . . . because of a failure to honor a statutorily required

9    procedure . . . .") (citing *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969–70

10   (9th Cir. 2003)).  Substantive injury, on the other hand, results from violating a statute or

11   regulation that guarantees *a particular result*.  *See West v. Sec'y of Dep't of Transp.*, 206 F.3d 920,

12   930, n.14 (9th Cir. 2000).  Here, because Plaintiffs contend that the Park Service failed to timely

13   update the 1980 GMP as required under § 100502, they assert a procedural injury.  *See* Dkt. No.

14   58 at 10 ("Plaintiffs here are complaining about a *procedural* violation of the relevant

15   statute . . . .") (emphasis in original).

16         As the Supreme Court has explained, however, "an asserted right to have the Government

17   act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal

18   court." *See Allen v. Wright*, 468 U.S. 737, 754 (1984), *abrogated on other grounds by Lexmark*

19   *Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).  Thus, Plaintiffs may not

20   simply allege that the Park Service failed to comply with § 100502.  Rather, Plaintiffs must "also

21   assert[] a 'concrete interest' that is threatened by the failure to comply with that [procedural]

22   requirement." *City of Sausalito*, 386 F.3d at 1197.  Here, Plaintiffs contend that their aesthetic

23   interests in visiting, photographing, and studying the wildlife at the Seashore—including the tule

24   elk at Tomales Point—are threatened by the Park Service's failure to revise the general

25   management plan under § 100502.  *See* Dkt. No. 56 at 23–24; Dkt. No. 58 at 3–7.

26         In response, the Park Service suggests that Plaintiffs cannot state a procedural injury under

27   § 100502 because the statute's procedural requirements do not protect Plaintiffs' interests.  *See*

28   Dkt. No. 57 at 10–11.  Specifically, the Park Service argues that because § 100502 "does not

1    provide for public participation, the statute does not afford a procedural right protective of

2    Plaintiffs' concrete interests." *See* Dkt. No. 57 at 10.  In other words, the Park Service suggests

3    that § 100502 must afford Plaintiffs specific procedural rights—such as notice and comment—in

4    order for them to establish procedural injury.  *See id.*; *see also* Dkt. No. 59 at 2–3.

5          In its briefing, the Park Service relies heavily on a District of Wyoming case in support of

6    this limitation on procedural injury.  *See id.* at 10–11.  In *Jackson Hole v. Babbitt*, the plaintiffs

7    sued the National Park Service over its decision to construct a new entrance station to the Grand

8    Teton National Park.  *See Jackson Hole Conservation All. v. Babbitt*, 96 F. Supp. 2d 1288, 1290–

9    92 (D. Wyo. 2000).  The plaintiffs urged that the Park Service's decision was based on a deficient

10   environmental assessment, prepared under the National Environmental Policy Act ("NEPA").  *Id.*

11   They also argued that the Park Service failed to prepare a GMP for the park, in violation of 16

12   U.S.C. § 1a-7 (the predecessor to § 100502, the statute at issue in this case).  *Id.* at 1292.

13   Although the court found that the plaintiffs had standing to sue under NEPA, it concluded that

14   they did not have standing to sue under § 1a-7.  *See id.* at 1292–95.  The court explained that the

15   plaintiffs "have standing to challenge NPS's compliance with 16 U.S.C. § 1a–7 *only if that statute*

16   *provides them with a procedural right* whose transgression constitutes an Article III injury in

17   fact."  *Id.* at 1295 (emphasis added).  But "in contrast to NEPA, § 1a–7 does not provide any

18   opportunity for public participation or comment in the general management plan planning

19   process."  *Id.*  The court concluded that the plaintiffs did not have a procedural right conferred by

20   § 1a-7, such that they were just arguing that the Park Service "failed to obey the law," which is not

21   sufficient to establish standing.  *Id.* (citing *Allen*, 468 U.S. at 754).

22         Here, the Park Service argues that the Court should adopt the reasoning in *Jackson Hole*

23   and find that (1) a right to public participation through notice and comment is required for a

24   plaintiff to establish a procedural injury; and (2) because § 100502 (like § 1a-7 before it) does not

25   provide for public participation, Plaintiffs cannot establish standing in this case.  *See* Dkt. No. 57

26   at 10–11; Dkt. No. 59 at 2–3.  But the Court would not lightly rely so heavily on a single out-of-

27   district case on this foundational issue of law.  The court's analysis about standing in *Jackson*

28   *Hole* is brief, and in the two decades since it was decided, only one other case appears to have

United States District Court
Northern District of California

1    relied on its reasoning.  *See Feldman v. Mainella*, No. CV 05-4900 DT (CWX), 2006 WL

2    8448114, at *10 (C.D. Cal. Mar. 27, 2006) (concluding in a single sentence that § 1a-7 "does not

3    provide a private right of action," and therefore the plaintiffs lacked standing).  The court in

4    *Jackson Hole* also based its own analysis on a single Tenth Circuit case, *State of Utah v. Babbitt*,

5    137 F.3d 1193, 1197–99 (10th Cir. 1998), to support its conclusion that the plaintiffs cannot assert

6    standing to sue based on procedural injuries under § 1a-7.

7         In *State of Utah v. Babbitt*, the plaintiffs filed suit to enjoin the Bureau of Land

8    Management ("BLM") from preparing an inventory of public lands in Utah.  137 F.3d at 1197–99.

9    Under the Federal Land Policy and Management Act ("FLPMA"), the BLM is required to conduct

10   periodic inventories of federal lands to determine whether any areas are suitable for preservation

11   as wilderness.  *Id.*  In 1980, BLM conducted this inventory and recommended millions of acres in

12   the state be designated as wilderness.  *Id.*  But Congress never passed any legislation actually

13   designating these federal lands as wilderness.  *Id.*  In 1996, the Secretary of the Interior therefore

14   said that "a small team of career professionals" would reassess the federal lands in Utah and report

15   their findings to address this stalemate.  *Id.*  The plaintiffs challenged this process, arguing, *inter*

16   *alia*, that the defendants had no authority to conduct this re-inventory, and that it violated the

17   FLPMA because the new inventory plan did not provide for public participation.  *Id.* at 1200.

18        The Tenth Circuit held that the plaintiffs did not have standing to sue.  *Id.* at 1206–16.  The

19   court reasoned that the plaintiffs lacked standing because they did not actually have a statutory

20   right to participate in the inventory process.  *Id.* at  1206–09.  The plaintiffs therefore could not

21   claim that they were injured because of the denial of this right.  *Id.*  The Tenth Circuit further

22   noted that "[a]ny future injury Plaintiffs may suffer from the submission of the inventory report

23   directly to Congress," such as from actual changes in the management or designation of the land,

24   "is speculative at best."  *Id.* at 1210, n.25.  The report would "not contain any recommendations

25   concerning the suitability or unsuitability of the land for management as wilderness," and would

26   not "affect the management of the public lands."  *Id.* at 1199.  It was also not clear what, if

27   anything, Congress would even do with the report, so the plaintiffs could not rely on the

28   possibility of congressional action to establish injury in fact.  *Id.* at 1210, n.25.

United States District Court
Northern District of California

8

1    Critically, however, the court did not suggest that a right to public participation is *always*

2  required to establish standing for procedural injuries.  Nor did the court determine that the

3  FLPMA had to provide the plaintiffs with any other procedural rights for them to assert standing

4  based on procedural injury.  Because the plaintiffs in *State of Utah* had argued that they had

5  standing based on a right to public participation, the court addressed that specific alleged injury.

6  This Court thus does not read the reasoning of *State of Utah* to speak directly to the issue

7  addressed in *Jackson Hole*.

8    Unfortunately, the parties do not cite—and the Court has been unable to find—any Ninth

9  Circuit cases addressing whether public participation rights are required for plaintiffs to establish

10  procedural injury generally or under § 100502 more specifically.  Rather, the parties' proffered

11  cases simply discuss at a high level what is required to assert procedural injury.  In one

12  formulation, the Ninth Circuit explains:

13

14       [T]o show a cognizable injury in fact, [plaintiffs] must allege (and on
         summary judgment adduce sufficient facts to show) that (1) the
15       [agency] violated certain procedural rules; (2) these rules protect [the
         plaintiffs'] concrete interests; and (3) it is reasonably probable that
16       the challenged action will threaten their concrete interests.

17  *See Citizens for Better Forestry*, 341 F.3d at 969–70.  In a more recent case, the Ninth Circuit

18  provided a slightly different formulation:

19       To establish an injury-in-fact, a plaintiff challenging the violation of
         a procedural right must demonstrate (1) *that he has a procedural right*
20       *that, if exercised, could have protected his concrete interests*, (2) that
         the procedures in question are designed to protect those concrete
21       interests, and (3) that the challenged action's threat to the plaintiff's
         concrete interests is reasonably probable.
22

23  *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018) (citing *Citizens for Better Forestry*, 341 F.3d

24  at 969–70) (emphasis added).  The Park Service relies on the highlighted language in *Azar* to

25  suggest that Plaintiffs must establish that § 100502 provides them with specific procedural rights

26  to assert procedural injury.  *See* Dkt. No. 59 at 2–3.  There is some logical appeal to this

27  suggestion.  But the Ninth Circuit did not address the source of the procedural rights asserted

28  there.

United States District Court
Northern District of California

1     As the Park Service acknowledges in its reply, these "procedural rights" cases generally

2   arise in the context of NEPA, "which confers procedural rights upon interested members of the

3   public." *See* Dkt. No. 59 at 2.  The Park Service suggests that this is because such statutory rights

4   to public participation are required to assert procedural injury.  *Id.*  Yet the Ninth Circuit never

5   says as much in these cases.  To the contrary, the Ninth Circuit has previously stated that "[i]t is

6   unclear whether th[e] 'procedural right' must be conferred by a statute, or whether the right arises

7   because a concrete interest is threatened."  *See Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1501, n.4

8   (9th Cir. 1995).  To the Court's knowledge, the Ninth Circuit has not explicitly resolved this

9   ambiguity.

10     During the hearing on the motions for summary judgment, the Park Service cited to a

11   passage in *Fernandez v. Brock*, in which the Ninth Circuit stated:

> A plaintiff who merely claims that a defendant violated a statutory
> duty does not necessarily satisfy the requirement of injury in fact in
> article III.  Instead, we hold that the crucial inquiry in such a situation
> is whether a statute that imposes statutory duties *creates correlative*
> *procedural rights in a given plaintiff*, the invasion of which is
> sufficient to satisfy the requirement of injury in fact in article III.

17   840 F.2d 622, 630 (9th Cir. 1988) (emphasis added).  The Park Service again argues that this

18   language supports its contention that Plaintiffs cannot establish an injury in fact based on a

19   violation of § 100502, which does not provide for public participation in the GMP process.  But

20   the Court finds that the Park Service reads this language in *Fernandez* too broadly.

21     In *Fernandez*, the plaintiffs were migrant farmworkers seeking a court order to force the

22   Secretary of Labor to establish regulations under the Employment Retirement Income Security Act

23   ("ERISA") to govern the participation, accrual, and vesting threshold for pension benefits for

24   seasonal workers.  *Id.* at 624–25.  As relevant here, the farmworkers argued that for purposes of

25   standing, their injury was the violation of their statutory rights under ERISA.  *Id.* at 628.  They

26   cited various provisions that require the Secretary to promulgate regulations for the seasonal

27   industry.  *Id.* at 628.  They urged "that when Congress enacts a statute imposing a statutory duty,

28   the violation of this duty is sufficient to satisfy the injury-in-fact prong of standing, even though

no injury would exist without the statute." *Id.* In short, the plaintiffs suggested that the Secretary's failure to comply with the statute conferred standing. As noted above, the Supreme Court has already rejected this theory. *See Allen*, 468 U.S. at 754.

The Ninth Circuit thus explained that instead it had to evaluate "the statutory language, the statutory purpose, and the legislative history" of ERISA to determine whether it was intended to protect the plaintiffs' interests. *Id.* at 629–31. Much like in *Citizens for Better Forestry* or *Azar*, the Ninth Circuit considered whether "the procedures in question [were] designed to protect some threatened concrete interest of [the plaintiffs] . . . ." *See Citizens for Better Forestry*, 341 F.3d at 969 (quotation omitted). Having done so, the Court ultimately found that Congress had recognized the needs of seasonal workers, and the plaintiffs therefore had established injury in fact. *Id.*

Consistent with *Fernandez*, the Ninth Circuit seems to routinely find procedural injury without any consideration of the public's right to participate in the agency's decision-making process.

In *National Family Farm Coalition v. EPA*, for example, the plaintiffs challenged the EPA's decision to register a pesticide to kill weeds on corn, soybean, and cotton fields under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). *See Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 904–07 (9th Cir. 2020). The plaintiffs argued that the EPA misapplied FIFRA's procedural requirements, and failed to consider whether farmers' use of the pesticide on milkweed in their fields would unreasonably adversely impact the monarch butterfly population. *Id.* The EPA argued that the plaintiffs lacked standing. *Id.* at 908–10. The Ninth Circuit explained that the plaintiffs were asserting procedural injuries. *Id.* at 909. However, in determining whether the plaintiffs had standing based on these injuries, the Court did not consider whether registering a chemical under FIFRA required notice and comment. Whether or not the statute actually requires such public participation, the Court did not identify or discuss any such right when determining whether the plaintiffs had established an injury in fact. *Id.* at 909–10.

Rather, the Ninth Circuit broadly explained that "the registration provisions at issue [in FIFRA] are designed to protect the environment." *Id.* at 909. The Court then focused on the

United States District Court
Northern District of California

plaintiffs' asserted interest in the environment—specifically, their aesthetic interest in the monarch butterflies.  The Court found that the plaintiffs had sufficiently established injury in fact based on their declarations that they "enjoy watching the monarch butterfly migration where they live, that [the new pesticide] is approved for use in their states, and that they are concerned they will no longer be able to enjoy observing monarch butterflies because of [the pesticide's] effects on milkweed."  *Id.*  The Court explained that even for procedural injuries, "a concrete interest can be an aesthetic or recreational interest in a particular place, or animal, or plant species" provided "there is a geographic nexus between the individual[s] asserting the claim and the location suffering [the] environmental impact."  *Id.* (quotations omitted) (alterations in original).

In short, the Court recognized plaintiffs' aesthetic interest in the monarch butterflies as a concrete interest protected by FIFRA's registration process.  *Id.*; *accord Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 809–17, & n.5 (9th Cir. 2017) (recognizing procedural injury based on the Department of Defense's alleged failure to take into account a new military base's impact on recognized cultural heritage properties as required under the National  Historic Preservation Act); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176 (9th Cir. 2000) ("The recreational or aesthetic enjoyment of federal lands is a legally protected interest whose impairment constitutes an actual, particularized harm sufficient to create an injury in fact for purposes of standing."); *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975) ("The procedural injury implicit in agency failure to prepare an [Environmental Impact Statement under NEPA]—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have.").

These cases are also consistent with the Supreme Court's suggestion that plaintiffs may "seek[] to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs."  *See Lujan v. Defs. of Wildlife*, 504 U.S. at 572, & n.7 (emphasis added).  "[O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact

statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Id.* at 572, n.7.  In this hypothetical, the Supreme Court did not condition standing on whether the person living adjacent to the proposed dam could provide input during the preparation of the environmental impact statement.

The Ninth Circuit's reasoning in *National Family Farm Coalition* and the Supreme Court's hypothetical in *Lujan* therefore seem to apply with equal force here.  Under § 100502, the preparation and revision of the GMPs are intended "for the preservation and use" of the national parks, and "shall include . . . measures for the preservation of the area's resources."  54 U.S.C. § 100502(1).  They are therefore intended, at least in part, to protect "resources" like the wildlife within the national parks—just as FIFRA is intended to protect the environment.  And here, Plaintiffs contend that they have an aesthetic interest in the resources within the national parks— particularly the tule elk at Tomales Point.  Plaintiffs contend that the failure to revise the GMP in over forty years has threatened these interests.[3]  *See* Dkt. No. 58 at 4.

In support of their motion for summary judgment, Plaintiffs have also provided declarations in which they explain that they visit Tomales Point regularly and have aesthetic and recreational interests in the wildlife there.  *See, e.g.*, Dkt. No. 56, Exs. C–F.  Plaintiff Jack Gescheidt, for example, states that he has "been visiting Tomales Point in the Point Reyes National Seashore on a regular basis—on average six times per year—for at least twenty-four years."  *See* Dkt. No. 56-4, Ex. C at ¶ 1.  He "come[s] to the Tomales Point park for aesthetic enjoyment, recreation, and spiritual renewal," and enjoys photographing the area, "including the magnificent Tule elk herd."  *Id.* at ¶ 2.  He also explains how the well-being (or lack thereof) of

---

[3] The Animal Legal Defense Fund asserts standing to bring suit on behalf of its members, whose aesthetic and recreational interests are germane to the organization's purposes, and are negatively impacted by the Park Service's alleged inaction.  *See* Dkt. No. 58 at 6–7; FAC at ¶¶ 16–18.  The Park Service does not appear to raise distinct organizational standing arguments as to this Plaintiff. *Cf. Friends of the Earth v. Laidlaw Envtl. Services*, 528 U.S. 167, 180 (2000) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

the elk has affected his enjoyment of Tomales Point during his visits. *See id.* at ¶¶ 3–8. He

worries for the safety of the remaining elk, and has avoided returning to the park rather than risk

seeing dead or emaciated elk given current circumstances. *Id.* The Park Service does not question

the veracity of Plaintiffs' asserted aesthetic interests in this case, and the Supreme Court has

confirmed that "[o]f course, the desire to use or observe an animal species, even for purely esthetic

purposes, is undeniably a cognizable interest for purposes of standing." *See Lujan*, 504 U.S. at

562–563.

In the absence of clearer authority, the Court thus declines the Park Service's invitation to

limit the procedural injury doctrine to statutes providing the public with the right to notice and

comment. Accordingly, the Court finds that Plaintiffs have adduced sufficient evidence to support

their contention that they have suffered injury in fact based on the threat to their concrete aesthetic

and recreational interests.

### ii.   Causation & Redressability

The Park Service next contends that even if Plaintiffs have identified an injury in fact, they

cannot establish causation and redressability. *See* Dkt. No. 57 at 11–12. The Park Service argues

that Plaintiffs' suggestion that revising the 1980 GMP would change the way elk management is

conducted in Tomales Point is simply too speculative and attenuated. *Id.* They note that the 1980

GMP does not address elk management with any specificity—rather, that level of detail is

contained in the 1998 Elk Management Plan. *Id.*; *see also* Dkt. No. 59 at 4 ("GMPs are

programmatic documents providing 'broad direction for park management.'"). The Park Service

further notes that the Court cannot dictate the substance of *how* the GMP is revised. Dkt. No. 57

at 12. Therefore, even if the Park Service revised the GMP, the Park Service suggests that the

plan could remain largely unchanged and the elk in Tomales Point would continue to be managed

as they are now. *Id.*

The Ninth Circuit has explained that "[a] showing of procedural injury lessens a plaintiff's

burden on the last two prongs of the Article III standing inquiry, causation and redressability."

*Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008).

"Plaintiffs alleging procedural injury can often establish redressibility with little difficulty,

14

1    because they need to show only that the relief requested—that the agency follow the correct

2    procedures—*may* influence the agency's ultimate decision . . . ."  *Id.* at 1226–27; *see also Citizens*

3    *for Better Forestry*, 341 F.3d at 976 ("A petitioner who asserts inadequacy of a government

4    agency's environmental studies . . . need not show that further analysis by the government would

5    result in a different conclusion.  It suffices that . . . the [agency's] decision *could be influenced* by

6    the environmental considerations that [the relevant statute] requires an agency to study.")

7    (alterations and emphasis in original).  The Ninth Circuit has said "[t]his is not a high bar to

8    meet."  *Salmon Spawning*, 545 F.3d at 1227.

9         To the extent the Park Service argues that the relaxed standard for causation and

10   redressability does not apply here, Dkt. No. 57 at 12, the Court disagrees.  As explained in Section

11   III.A.i above, the Court has found that Plaintiffs have adduced evidence of a procedural injury.

12   The Park Service's remaining arguments are inconsistent with the relaxed standard for procedural

13   injuries.

14        The Park Service points out that specific tule elk management decisions—such as whether

15   to maintain a fence separating the herds from public grazing land and whether to provide

16   additional forage—are currently addressed in the 1998 Tule Elk Management Plan.  *Id.* at 11–12;

17   Dkt. No. 59 at 3–7.  NPS therefore urges that Plaintiffs cannot establish that prevailing on their

18   APA claim to revise the GMP would have any effect on the management or health of the tule elk

19   at all.  *Id.*  But the Park Service's argument relies on the assumption that because the current GMP

20   does not provide any specific guidance on elk management, a revised GMP would not either.

21        Plaintiffs contend that the current GMP is deficient because it does not contain adequate

22   measures ensuring the protection of wildlife at the Seashore and does not account for the state's

23   severe and ongoing drought conditions.  *See* Dkt. No. 58 at 7–8.  Plaintiffs further argue that a

24   revised GMP could—and should—address such things.  *Id.*  As it stands now, the 1980 GMP

25   identifies the Park Service's management objectives, including "protect[ing] marine mammals,

26   threatened and endangered species, and other sensitive natural resources found within the

27   seashore."  AR 301.  It also states that "[r]estoration of historic natural conditions (such as

28   reestablishment of Tule elk) will continue to be implemented when such actions will not seriously

United States District Court
Northern District of California

15

diminish scenic and recreational values." *See id.* at 313. The GMP does, therefore, consider wildlife such as the tule elk to at least some degree. NPS does not identify any statutory basis under § 100502 or elsewhere that would preclude a revised GMP from providing for more explicit consideration of the health and ongoing welfare of wildlife at the Seashore. Plaintiffs do not need to show that a revised GMP would actually result in a different management plan or that it would weigh considerations affecting tule elk management differently. It is enough that the Park Service's revision "could be influenced" by the considerations for elk health and safety that Plaintiffs identify. *See Citizens for Better Forestry*, 341 F.3d at 976 (emphasis omitted).

The Park Service's reliance on *Salmon Spawning* is similarly misplaced. *See* Dkt. No. 59 at 6–7. In *Salmon Spawning*, the Ninth Circuit explained that although the redressability requirement for procedural injuries "is not a high bar," it is also "not toothless." 545 F.3d at 1226–27. In that case, the State Department had entered into a treaty on behalf of the United States with Canada regarding fisheries in the Pacific Northwest. *See id.* at 1223–24. The plaintiffs argued that before the State Department could enter this treaty, the Endangered Species Act required it to request advice from the National Marine Fisheries Service ("NMFS") or the Fish and Wildlife Service about the treaty's effect on endangered species such as the salmon in this area. *Id.* NMFS evaluated the treaty and issued a "biological opinion" that it was not likely to jeopardize the endangered salmon. *Id.* The plaintiffs challenged the NMFS biological opinion as arbitrary and capricious, and the implementation of the treaty was thus unlawful. *Id.* at 1224.

In evaluating the plaintiffs' standing, the Ninth Circuit reasoned that it could theoretically set aside the biological opinion. *Id.* at 1226. Critically, however, the Court concluded that it "could not set aside the next, and more significant, link in the chain—the United States' entrance into the Treaty" because "that is a decision committed to the Executive Branch." *Id.* at 1226–27. The Park Service has not identified any similar limitation or break in the causal chain here.

The Park Service also cites *Fernandez v. Brock* in arguing that Plaintiffs cannot establish redressability here. *See* Dkt. No. 57 at 12. As discussed in Section III.A.i above, the plaintiffs in *Fernandez* were migrant farmworkers seeking access to pension benefits under ERISA. *See Fernandez*, 840 F.2d at 625–28. The Ninth Circuit held that it was too speculative to conclude

16

1   that they would receive pension benefits if the Secretary of Labor promulgated new regulations for

2   seasonal workers.  *Id.*  The Court questioned the chain of causation, explaining that "the

3   farmworkers do not know what the regulations will say and cannot predict whether their employer

4   will continue to offer a pension plan at all."  *Id.* at 628.  The Court pointed out that the new

5   regulations may not "differ meaningfully" from those already in place.  *Id.*  But critically,

6   *Fernandez* predates the Supreme Court's opinion in *Lujan*, and did not apply the relaxed standard

7   for procedural injuries.  *See id.* at 625–28.  As the Ninth Circuit later recognized, plaintiffs

8   asserting procedural injuries do not need to establish with certainty that their injury will be

9   addressed if the agency follows the correct procedures.  "[T]hey need to show only that the relief

10  requested—that the agency follow the correct procedures—*may* influence the agency's ultimate

11  decision . . . ."  *Salmon Spawning*, 545 F.3d at 1226–27.

12      Assuming  NPS failed to comply with its obligations under § 100502, "the court can

13  remedy the defect by ordering the Government to comply with its statutory obligations."  *See*

14  *Mattis*, 868 F.3d at 819.  It is thus enough for Plaintiffs to show that the Park Service's procedural

15  compliance with § 100502 may affect their aesthetic interests by changing the way wildlife such

16  as the tule elk are managed at Tomales Point.

17                               *        *        *

18      The Court finds that Plaintiffs have established standing to pursue their APA claim.

19      **B.      Enforceability under the APA**

20      The Park Service next argues that even if Plaintiffs have standing, they still cannot bring a

21  claim under § 706(1) of the APA based on § 100502 because the statute does not involve "a

22  ministerial or non-discretionary act."  *See* Dkt. No. 57 at 12–15 (citing *Norton v. S. Utah*

23  *Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004)).

24      Under the APA, the Court can "compel agency action unlawfully withheld or unreasonably

25  delayed."  5 U.S.C. § 706(1).  The Supreme Court has interpreted this language to mean that "the

26  only agency action that can be compelled under the APA is action legally *required*."  *SUWA*, 542

27  U.S. at 63, & n.1 (emphasis in original).  Accordingly, a case under § 706(1) "can proceed only

28  where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to*

*take*." *Id.* at 64 (emphasis in original).  Section 706(1) is not intended to permit "broad programmatic attack(s)" on agency action, which are better addressed "in the offices of the [agency] or the halls of Congress . . . ." *Id.* (quotation omitted).  The Court explained that such limitations are intended "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 66.

To prevail under § 706(1), Plaintiffs must therefore demonstrate that the Park Service had a nondiscretionary duty to act under § 100502.  *Id.* at 63–64.  As with all questions of statutory interpretation, the starting point for determining whether such a duty exists is the language of the statute itself.  *See United States v. Lillard*, 935 F.3d 827, 833 (9th Cir. 2019) ("The interpretation of a statutory provision must begin with the plain meaning of its language." (quotation omitted)).  As relevant here, § 100502 states:

> General management plans for the preservation and use of each System unit . . . *shall be prepared and revised in a timely manner* by the Director.

54 U.S.C. § 100502 (emphasis added).  Plaintiffs contend that the word "shall" is "an unequivocal word of command," which when paired with the words "be revised" indicates that the Park Service has a non-discretionary duty to revise the GMP.  *See* Dkt. No. 58 at 11–14; Dkt. No. 56 at 17–18.  The Park Service, in turn, responds that because the statute does not prescribe *when* it must revise a GMP or *how* it should do so, the statute inherently implicates the agency's discretion and does not impose any non-discretionary duty for purposes of § 706(1).  *See* Dkt. No. 57 at 12–15.  The Court agrees with the Park Service that when read in context and against the backdrop of binding authority, § 100502 does not require the kind of mandatory, non-discretionary act necessary for claims under § 706(1).

The Park Service urges that a statute cannot compel any "discrete" act without an attendant statutory timeframe.  *Id.*  In *SUWA*, for example, the Supreme Court indicated that "the failure to promulgate a rule or take some decision *by a statutory deadline*" may be a discrete act.  *See SUWA*, 542 U.S. at 63 (emphasis added).  As an example, the Court explained that under 47

18

1   U.S.C. § 251, the Federal Communications Commission is required "'to establish regulations to

2   implement' interconnection requirements '[w]ithin 6 months' of the date of enactment of the

3   Telecommunications Act of 1996." *Id.* at 65 (quoting 47 U.S.C. § 251(d)(1)).  This statutory

4   mandate, the Court explained, "would have supported a judicial decree under the APA requiring

5   the prompt issuance of regulations, but not a judicial decree setting forth the content of those

6   regulations." *Id.*  Because § 100502 does not contain a specific timeframe to revise GMPs,

7   however, the Park Service suggests that Plaintiffs cannot bring their unreasonable delay claim.

8       Plaintiffs respond that although the Supreme Court in *SUWA* referenced a statute that

9   contained a deadline as an example of a mandatory duty, "the Court certainly did not rule that this

10  was the only kind of mandatory duty that would suffice" under § 706(1).  *See* Dkt. No. 58 at 11–

11  12.  Plaintiffs then list several cases they say support their position that no specific timeline is

12  required to find mandatory duties for purposes of § 706(1).  *See* Dkt. No. 58 at 12.  However, the

13  majority of these cases involve 5 U.S.C. § 555(b), and thus do not address § 706(1) or *SUWA* at

14  all.  *Id.*

15      For example, in *In re Natural Resources Defense Council, Inc.*, 956 F.3d 1134, 1136 (9th

16  Cir. 2020), the Ninth Circuit considered the EPA's failure to respond to an administrative petition

17  that the Natural Resources Defense Council ("NRDC") had filed requesting that a specific

18  pesticide no longer be allowed in household pet products.  *See id.* at 1136–37.  The EPA did not

19  respond to the petition for approximately five years.  *Id.* at 1137.  The EPA sought remand for

20  further consideration of the risks associated with the pesticide, and said it would issue a revised

21  response to the NRDC's petition.  *Id.*  But several years later, the EPA had still not done so, and

22  the NRDC filed another case seeking a writ of mandamus to compel the EPA to issue a final

23  response to the petition under 5 U.S.C. § 555(b).  *Id.* at 1138.

24      Section 555(b) applies when a "person [] appear[s] before an agency . . . for the

25  presentation, adjustment, or determination of an issue, request or controversy in a proceeding . . .

26  or in connection with an agency function."  5 U.S.C. § 555(b).  The statute directs "each agency to

27  conclude a matter presented to it" "within a reasonable time."  *Id.*  Such cases, therefore, are not

28  subject to the same limitations as those brought under § 706(1).  The parties did not have to

United States District Court
Northern District of California

19

1    identify any discrete or non-discretionary act, and the Court did not address that question.  *Accord*

2    *In re A Cmty. Voice*, 878 F.3d 779, 784–86 (9th Cir. 2017) ("[A]n agency has a duty to fully

3    respond to matters that are presented to it under its internal processes."); *In re Pesticide Action*

4    *Network N. Am., Nat. Res. Def. Council, Inc.*, 798 F.3d 809, 811–13 (9th Cir. 2015); *Asmai v.*

5    *Johnson*, 182 F. Supp. 3d 1086, 1089, 1092–93 (E.D. Cal. 2016).  Because Plaintiffs have not

6    petitioned the Park Service to do anything, these cases are readily distinguishable.

7         Even in the cases that do not explicitly rely on § 555(b), they still involve an agency's

8    response time to petitions or applications.  In *In re Public Employees for Environmental*

9    *Responsibility*, 957 F.3d 267, 274 (D.C. Cir. 2020), for example, the plaintiffs filed a mandamus

10    petition to compel the Park Service and the Federal Aviation Authority to issue rules governing

11    commercial sightseeing flights over national parks.  957 F.3d at 269.  The relevant applications

12    had been pending "for nearly two decades."  *Id.*  Under the relevant statute, however, the agency

13    "shall make every effort to act on [an] application . . . and issue a decision on the application *not*

14    *later than 24 months after it is received or amended*."  49 U.S.C. § 40128(a)(2)(E) (emphasis

15    added).  The district court reasoned that the plaintiffs were only seeking "to compel the [agencies]

16    to make decisions within the statutory time frames."  *Id.* at 273 (quotation omitted) (alteration in

17    original).  And "[a]lthough the Act does not impose a rigid schedule, it provides a ruler against

18    which the agencies' progress must be measured."  *Id.* at 274.  Even if the Court found this

19    reasoning persuasive, the statute at issue here does not provide this kind of timeline or "ruler."  *Cf.*

20    *WildEarth Guardians v. Chao*, 454 F. Supp. 3d 944, 955 (D. Mont. 2020) ("The cases where

21    courts have entered an injunction remedying an agency's failure to act explain the narrow scope of

22    § 706(1) and generally present challenges to an agency's failure to comply with an absolute, non-

23    discretionary duty that involves a time limit.") (collecting cases).

24         Nevertheless, the Ninth Circuit has suggested at least in passing that a statutory deadline

25    may not be required for purposes of § 706(1).  In *Hells Canyon Pres. Council v. U.S. Forest Serv.*,

26    593 F.3d 923, 932–34 (9th Cir. 2010), for example, the plaintiffs argued that the Forest Service

27    failed to comply with its mandatory duty to prevent motor vehicles in a certain part of the Hells

28    Canyon Wilderness.  *See id.*  The relevant statute states that "there shall be no . . . use of motor

United States District Court
Northern District of California

20

vehicles within any such [wilderness] area." The Court explained the limitations under § 706(1) that the Supreme Court identified in *SUWA*. *See id.* at 932–33 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.") (quotation and emphasis omitted). And the Ninth Circuit did not question that the statute—which does not contain any deadline—imposed a nondiscretionary duty. *Id.* Rather, the Court rejected the plaintiffs' claim by holding that the Forest Service had already complied with its duty. *Id.* at 932 ("[T]he Forest Service has been carrying out this statutory responsibility since at least 1981."). In concurrence, Judge Graber further emphasized that "[i]t cannot seriously be disputed that the Forest Service must prohibit the use of motor vehicles within the Wilderness area." *Id.* at 934 (Graber, J., concurring in part and dissenting in part); *see also Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1078–79 (9th Cir. 2016) (finding regulation providing ongoing duty to warn of health effects still satisfied § 706(1)). Accordingly, the lack of a clear statutory deadline does not appear dispositive. *Cf. Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999) ("[I]f an agency has no concrete deadline establishing a date by which it must act . . . a court must compel only action that is delayed unreasonably.").

But unlike the statute in *Hells Canyon*, § 100502 provides additional guidance regarding the agency action. It says that "[g]eneral management plans . . . shall be prepared and revised *in a timely manner*." 54 U.S.C. § 100502. In determining whether this imposes a nondiscretionary duty, Plaintiffs do not grapple with the meaning of "in a timely manner" in the context of the statute as a whole. *See* Dkt. No. 58 at 13–14. Rather, they repeatedly point out that the use of the word "shall" is "critical" because it is "an unequivocal word of command." *Id.* at 14 (emphasis omitted). When asked about the "timely manner" language during the hearing on the motions, Plaintiffs further clarified that in their view it is irrelevant to the initial question of whether § 100502 imposes a non-discretionary duty. They urge that the Court should only consider this language once it turns to the merits question of whether the Park Service in fact unreasonably delayed in revising the 1980 GMP.

Yet despite Plaintiffs' urging, the word "shall" is not talismanic. Plaintiffs' own authority only states that "the word 'shall' *usually* connotes a requirement." *See Maine Cmty. Health*

United States District Court
Northern District of California

*Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (emphasis added).  The Court must still

interpret the statute as a whole and in context to understand whether it imposes a nondiscretionary

duty.  The Court therefore cannot elevate the word "shall" and ignore the "in a timely manner"

language entirely.  As the Ninth Circuit has instructed, "[w]e start with the plain statutory text and,

when deciding whether the language is plain, we must read the words in their context and with a

view to their place in the overall statutory scheme."  *See Altera Corp. & Subsidiaries v. Comm'r*

*of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019) (quotations omitted).

Plaintiffs assert that "timely," if considered at all, simply means "quickly, rapidly; without

delay, promptly."  Dkt. No. 58 at 13.  But this generic definition makes little sense in the context

of general management plans, which address long-term planning needs for all "area[s] of land and

water administered by the Secretary [of the Interior], acting through the Director [of the National

Park Service], for park, monument, historic, parkway, recreational, or other purposes."  *See* 54

U.S.C. § 100501; *see also* 54 U.S.C. § 100102(1), (3).  Section 100502 itself also lists broad

categories of information that general management plans "shall include":

> 1) measures for the preservation of the area's resources;
> 2) indications of types and general intensities of development (including visitor circulation and transportation patterns, systems, and modes) associated with public enjoyment and use of the area;
> 3) identification of and implementation commitments for visitor carrying capacities for all areas of the System unit; and
> 4) indications of potential modifications to the external boundaries of the System unit, and the reasons for the modifications.

54 U.S.C. § 100502.  Any one of these categories would require significant time and resources to

analyze and develop for each specific System unit.  It defies common sense to believe Congress

intended the Park Service to prepare and revise such complex documents "quickly" or "rapidly."

Moreover, under Plaintiffs' interpretation, the Park Service would have to revise a GMP "quickly"

or "rapidly," even if the Park Service had just prepared it.

The Oxford English Dictionary—on which Plaintiffs rely—offers several other more apt

definitions.  These include "[s]ufficiently early, in good time"; "[a]t a fitting, suitable, or

1    favourable time; in a well-timed manner; opportunely" and "[a]t the proper or natural time; not

2    prematurely."[4]  These definitions all highlight the inherently subjective nature of the phrase "in a

3    timely manner."  The phrase, on its own, does not clarify when the Park Service must act.

4    Whether a revision is made at a "favorable" or "proper" time will require consideration of the

5    surrounding circumstances, including the scope of the general management plans and the need for

6    revision.  The Court therefore agrees with the Park Service that "in a timely manner" confers "a

7    great deal of discretion [on the agency] in deciding how to achieve" the statute's object.  *SUWA*,

8    542 U.S. at 66.

9         In *SUWA*, the plaintiffs alleged that the BLM failed to comply with its statutory and

10   regulatory mandates by allowing recreational use of off-road vehicles on federal land.  *See SUWA*,

11   542 U.S. at 59–60.  The relevant statutes instructed BLM  to "continue to manage [lands] . . . in a

12   manner so as not to impair the suitability of such areas for preservation as wilderness" and to

13   "manage the public lands under principles of multiple use and sustained yield, in accordance with

14   the land use plans."  *Id.* at 59–60, 66–67.  The Supreme Court found that although these statues

15   were "mandatory as to the object to be achieved," they still left "BLM a great deal of discretion in

16   deciding how to achieve it."  *Id.* at 66.

17        The Court declined the plaintiffs' invitation to "enter a general order compelling

18   compliance with the mandate, without suggesting any particular manner of compliance."  *Id.*

19   Doing so, the Court cautioned, "would mean that it would ultimately become the task of the

20   supervising court, rather than the agency, to work out compliance with the broad statutory

21   mandate, injecting the judge into day-to-day agency management."  *Id.* at 66–67.  But "[t]he

22   prospect of pervasive oversight by federal courts *over the manner and pace of agency compliance*

23   with such [broad] congressional directives is not contemplated by the APA."  *Id.* at 67 (emphasis

24   added); *see also id.* at 63 (indicating § 706(1), like traditional mandamus, is limited to "the

25

26   _____

27   [4] *See Timely*, *Oxford English Dictionary*,
     https://www.oed.com/view/Entry/202121?rskey=QHf6SQ&result=2&isAdvanced=false#eid (last
     visited Feb. 24, 2023); *see also Opportune*, *Merriam-Webster Dictionary*, https://www.merriam-

28   webster.com/dictionary/opportunely (last visited Feb. 24, 2023) ("[O]ccurring at an appropriate
     time.").

1    ordering of a precise, definite act about which [an official] ha[s] no discretion whatever.")

2    (quotations omitted) (alterations in original).  Here too, an order directing the Park Service to

3    prepare a revised general management plan under § 100502 would substitute the Court's judgment

4    for the agency's in determining when such a plan required revision.

5           Similarly, in *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1134–35 (9th Cir.

6    1998), the plaintiff sued BLM under § 706(1), claiming that it had violated NEPA and the FLPMA

7    by failing to stop logging and road construction, land exchanges, and juniper eradication in the

8    Cascade Mountains.  The plaintiffs pointed to § 1712 of the FLPMA, which states that "[t]he

9    Secretary shall . . . maintain, and, when appropriate, revise land use plans."  43 U.S.C. § 1712.

10   Although the statute uses the word "shall," the Ninth Circuit nevertheless held that the statute did

11   not impose a nondiscretionary duty that was enforceable under § 706(1).  *ONRC*, 150 F.3d at

12   1139.  The Court reasoned that "[t]he language in Section 1712 does not [] establish a clear duty

13   of when to revise the plans . . . ."  *Id.*; *accord Luciano Farms, LLC v. United States*, No. 2:13-CV-

14   02116-KJM-AC, 2014 WL 1912356, at *3 (E.D. Cal. May 13, 2014) (finding statutory language

15   requiring agency to revise land resource management plans for national forests "as appropriate"

16   "do[es] not command anyone to do anything or to refrain from doing anything . . . .").  There is no

17   meaningful distinction between the statutory language in *ONRC*, which required the BLM to

18   revise land management plans "when appropriate," and the "in a timely manner" language at issue

19   here.  Just as § 1712 does not impose a nondiscretionary duty, neither does § 100502.

20          Plaintiffs rely heavily on the district court's order in *Resource Renewal Inst. v. Nat'l Park

21   Services*, No. C 16-0688 SBA, 2016 WL 11673179, at *4–5 (N.D. Cal. July 15, 2016).  *See* Dkt.

22   No. 56 at 17–18; Dkt. No. 58 at 11.  There, the court analyzed § 100502 and reasoned that a

23   specific statutory deadline was not necessary to establish a non-discretionary duty under § 706(1).

24   *Res. Renewal*, 2016 WL 1167319, at *4–5.  The court explained that "the statute commands that

25   the NPS 'shall' revise a GMP in a 'timely manner,'" and "[a]lthough the NPS has leeway in

26   deciding when to revise a GMP, it remains statutorily obligated to do so in a 'timely manner.'"  *Id.*

27   at *4.  The Court respectfully disagrees with the reasoning of this case, as reflected in the analysis

28   above.  The court in *Resource Renewal* did not examine the meaning of the phrase "in a timely

United States District Court
Northern District of California

United States District Court
Northern District of California

1    manner," or consider the effect that this phrase had on the meaning of the statute overall, instead

2    focusing on the use of the word "shall."  It also relied on cases involving § 555(b), which as

3    discussed above, does not contain the same limitations as claims brought under § 706(1).

4         The Court finds that § 100502 does not create a nondiscretionary duty to act.  The Court

5    therefore cannot compel agency action as being unlawfully withheld under § 706(1).  The Court

6    understands Plaintiffs' concerns that the tule elk population at Tomales Point has decreased

7    significantly over the last few years.  *See* Dkt. No. 56-1, Ex. A at 3, 9 (reporting decline in 2020

8    from 445 to 293 elk in 2020); Dkt. No. 57-2, Ex. 1 (reporting decline in 2021 from 293 to 221

9    elk).  But the Court must faithfully adhere to the limits of the APA.  As the Ninth Circuit has

10   cautioned, "[e]ven if a court believes that the agency is withholding or delaying an action the court

11   believes it should take, the ability to compel agency action is carefully circumscribed to situations

12   where an agency has ignored a specific legislative command."  *See Gardner v. U.S. Bureau of*

13   *Land Mgmt.*, 638 F.3d 1217, 1221–22 (9th Cir. 2011) (quotation omitted).

14                                        *       *       *

15        Because the Court has found that § 100502 is not enforceable under the APA, the Court

16   does not address whether the Park Service has been untimely in revising the 1980 General

17   Management Plan.  As the Court has previously explained, it is not indifferent to the conditions

18   facing the tule elk.  But Plaintiffs have not identified a viable legal basis that would entitle them,

19   or the Court, to intervene in the Park Service's wildlife management decisions.[5]

20   //

21   //

22   //

23   //

24   //

25   //

26

27   _____

28   [5] Notably, the Park Service has publicly announced that it "will develop a new management plan
     for Tomales Point," including revising the 1998 Tule Elk Management Plan and the 1980 General
     Management Plan.  *See* Dkt. No. 57 at 23–24; *see also* Dkt. No. 57-1, Ex. 1 at ¶¶ 2–4.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**IV.    CONCLUSION**

The Court **GRANTS** Defendants' motion for summary judgment and **DENIES** Plaintiffs' motion for summary judgment.  The Clerk is directed to enter judgment in favor of Defendants and to close the case.

**IT IS SO ORDERED.**

Dated:    2/27/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge