**Pages 1 - 25**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

```
JACK GESCHEIDT, ET AL.,        )
                               )
           Plaintiffs,         )
                               )
   VS.                         )     NO. CV 21-04734-HSG
                               )
DEB HAALAND, SECRETARY OF      )
INTERIOR, ET AL.,              )
                               )
           Defendants.         )
_____)
```

Oakland, California
Thursday, February 24, 2022

**TRANSCRIPT OF TELEPHONIC PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    KATHERINE BARNEKOW
                    1622 Massachusetts Avenute,
                    Apartment 6
                    Cambridge, MA 02138
          **BY:  KATHERINE BARNEKOW, ESQUIRE**

                    HARVARD LAW SCHOOL ANIMAL LAW &
                    POLICY CLINIC
                    1585 Massachusetts Avenue
                    Cambridge, MA 02138
          **BY:  KATHERINE MEYER, ESQUIRE**

For Defendants:

                    OFFICE OF THE UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, CA  94102
          **BY:  DAVID DEVITO**
                    **ASSISTANT UNITED STATES ATTORNEY**

Reported By:     Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                 Official Reporter

**APPEARANCES CONTINUED:**

For Defendants:

                        UNITED STATES DEPARTMENT OF JUSTICE
                        Environment and Natural Resources
                        Division
                        150 M Street NE
                        Washington, DC  20002
          **BY:  MATTHEW RAND**
               **ASSISTANT UNITED STATES ATTORNEY**

| | |
|---|---|
| **Thursday - February 24, 2022** | **2:30 p.m.** |

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Calling CV 21-4734, Gescheidt, et al. vs. Haaland, et al.  Parties please state your appearance.

**MS. BARNEKOW:**  This is Kate Barnekow for plaintiffs, and with me on the line is Katherine Meyer.

**MR. DEVITO:**  Good afternoon, Your Honor.  David DeVito from the U.S. Attorney's Office on behalf of the defendants, and also on the line with me is Matthew Rand from the Environmental and Natural Resources Division at DOJ.

**THE COURT:**  Good afternoon to everyone.

So we're here for a hearing on the parties' cross-motions for summary judgment, and we had a detailed discussion at the hearing on the motion for preliminary injunction, and so I'm very steeped in the background of the case, and I've reviewed your papers carefully and the cases that you all have cited.

And so I'd like to focus the discussion on a couple of points because I have a good understanding of the underlying factual contentions that are being made, but I think there are a couple of threshold questions that are where I would like to spend our time today.

And the first is the question of whether there is a ministerial mandatory duty that is imposed by Section 100.502 of U.S. Code Section Title 54, and then really the second is

1   the standing question that the defendants have raised and

2   really with the focus on whether this statute that is the basis

3   for the APA claim here creates a procedural right that gives

4   rise to a cause of action from the standing perspective.

5        And so really the first question I think is for

6   Ms. Barnekow -- is so I'm looking at the statute, and it's

7   actually very brief, and the key language is that "general

8   management plans shall be prepared and revised in a timely

9   manner by the director."  And it's your position that that --

10  the combination of the "shall" and the "timely manner" impose a

11  mandatory and non-discretionary duty under cases like *SUWA*, and

12  I -- really my question is when I look at a case from the Ninth

13  Circuit like the *ONRC* case that involves language that says

14  "when appropriate," how is "timely" any different?  How is

15  "timely" a ministerial duty as opposed to one that vests

16  discretion in the agency?

17       **MS. BARNEKOW:**  Thank you, Your Honor.  This is Kate

18  Barnekow.

19       I would clarify that plaintiffs' contention is that the

20  mandatory duty arises from the combination of the term "shall"

21  which, of course, connotes a command as well as a discrete

22  action that the agency can take, which at issue here would be

23  the term "revised."

24       The phrase "in a timely manner" certainly goes to the

25  speed at which Congress expected the Park Service to act when

1    complying with its duty, but it is not our contention that the

2    phrase "in a timely manner" is what confers or, rather, what

3    creates the mandatory duty for the agency to act at all.

4         **THE COURT:**  All right.  So obviously you could have a

5    section that says the agency shall use its best discretion in

6    addressing issues, and in that instance, the "shall" won't

7    create a mandatory duty, would it?

8         **MS. BARNEKOW:**  That's correct, Your Honor.  So that

9    would be the sort of language that, as you mentioned, *SUWA* or

10   S-U-W-A contemplated where there was not a discrete agency

11   action contemplated by that language.

12       The language at issue in *SUWA* was that the agency was

13   tasked with continuing to do something, so in the same way that

14   "continuing to do something" is not a discrete action such that

15   "using best discretion" is not a discrete action.  Those are

16   the sort of broad, overarching commands that do not give forth

17   a mandatory duty that would be reviewable under the APA.

18       What we have here is something different, is that the

19   agency shall revise the General Management Plan, which, again,

20   is a discrete action that has the clarity necessary

21   contemplated by *SUWA* to create that sort of mandatory duty for

22   the agency to act.

23        **THE COURT:**  I'm not understanding how.  When Congress

24   says "shall do it in a timely manner," what does that mean?

25        **MS. BARNEKOW:**  Your Honor, that means that the -- that

the National Park Service is required to revise the General

Management Plan, just like the statute says.  The phrase "in a

timely manner" goes to, again, the speed at which -- at which

Congress expects the agency to act, which is a factor under

TRAC, which I understand we're not discussing here.

     And so those are the terms that give rise to duty.  The

phrase "in a timely manner" is icing on the top of the cake, if

you will.  The duty would be there regardless of that phrase.

     Does that answer your question?

          **THE COURT:**  I think I understand what you're saying,

but when are you saying that there is a mandatory requirement

of a revision?

          **MS. BARNEKOW:**  So when the mandatory revision arises

would be a question for the TRAC factors, so the statute

provides the demands, in this case, both to issue and revise

the General Management Plan, and when the agency has failed to

do so, as we have here where the agency has failed for over 40

years to issue that revision, then we have to look to the TRAC

factors to determine whether that delay has been unreasonable.

          **THE COURT:**  Although -- but stepping -- and I

understand that that is an issue under TRAC, but that is only

one.  There is a duty.

     What I'm trying to understand -- let me maybe ask in a

hypothetical.

     Is it your position that -- let's say this GNP was created

1    in 1980 and that there was a mandatory duty to revise it in

2    1981, regardless of any other factors.

3        **MS. BARNEKOW:**  I would say that the duty to revise was

4    certainly there, Your Honor.  Whether a claim had merit and

5    whether that delay at that point would have been unreasonable

6    under the TRAC factors is a separate question, regardless of

7    whether the duty was attached.

8        So in short, my answer is yes, but it -- that -- whether

9    that timing would be unreasonable under the Administrative

10   Procedure Act would be a separate question.

11       **THE COURT:**  But I'm not even talking about the APA.

12   I'm talking about what the actual duty is, in your view, and

13   it -- and I'm not sure I'm understanding it, so I appreciate

14   hearing your perspective so I'm sure I understand it.  But at

15   what interval do you say Congress required the agency to make

16   revisions?

17       **MS. BARNEKOW:**  I understand your question, Your Honor,

18   and I'm sorry to keep going back to this point, but I think

19   that question as to when the agency is required to act is a

20   question under the Administrative Procedure Act.  Our claim is

21   inextricably linked to the APA, and whether the agency acted in

22   an appropriate manner at an appropriate time has to go to the

23   TRAC factors.  Whether or not the duty is there, which is -- I

24   understand is what you're asking about, comes purely from the

25   specific language of the statute which, as you noted,

specifically requires that the plans be revised.

I would say that the duty attached from the moment that the -- that Congress passed this statute in 1980, and then the question is when that delay became unreasonable.

I point to the administrative record on a couple of points here, Your Honor, in that the question of when -- when it was unreasonable for the Park Service to not have issued a revision, there are a number of points to which that could have attached.  It could have attached in 1993 when the Park Service's own scientific advisory panel warned them that should they not take further actions, that dead and dying elk were going to become more prevalent.

It could have attached in 1998 when the Elk Management Plan noted specifically that further management actions were needed, specifically at Tomales Point, in order to prevent mortality caused by human impact, such as the fence specifically at Tomales Point.

And it certainly could have attached by 2008 when that Elk Management Plan expired by its own terms.

But regardless of all that, it certainly attached eight years ago which, by the Park Service's own admission in their declaration, which is at ECF No. 57-2, they said, quote, the severity and the frequency of the two historic draughts that have occurred within the last eight years, one of which we are still in, require a new management plan that will include

1    resource and specific analysis to address elk herd management.

2        So there are a number of points here where that duty could

3    have attached, and under any of them, it's still an

4    unreasonable delay.

5        **THE COURT:**  Why don't I hear from Mr. DeVito on this

6    duty question and the *SUWA* analysis.

7        **MR. DEVITO:**  Thank you, Your Honor.  I'll just start

8    with a couple of points.

9        I think that you're correct in viewing this sort of as a

10   threshold question as to whether this is an action that's

11   compellable under the APA pursuant to the Supreme Court's

12   decision in *SUWA*, and we -- I would say that the answer is

13   clearly that it is not, for the reasons that you're touching on

14   here.

15       The question is at what interval, and the statute's

16   direction in that regard is "in a timely manner," which clearly

17   confers the discretion on the agency to determine when it's

18   appropriate to do that.  And that's the sort of thing that

19   takes it outside of the scope of an actionable claim under

20   7061.

21       And I think Your Honor is correct to look at some of the

22   cases that we cited in our briefing, including *ONRC*, because

23   the statutes at issue in those cases are very similar, and they

24   also include the word "shall," so "shall" isn't the thing that

25   says or doesn't say that a statute, you know, creates this

1    compellable duty.  The question is, is it presently compellable

2    now or at any given time, and that's the question that I think

3    Your Honor appropriately touched on when you brought up the

4    question of whether was it compellable in 1981.  The answer I

5    think is clearly no.  And the -- but the point for present

6    purposes is that the statute confers that discretion on the

7    agency.

8         **THE COURT:**  And I know that Judge Armstrong dealt with

9    this exact question some number of years ago, and I know that

10   that is not binding, though it's persuasive authority, and I

11   always view with consideration and respect the views that my

12   colleagues take, but what, in your view, was off about the

13   analysis in that earlier case?

14        **MR. DEVITO:**  Your Honor, I think we explained this in

15   our papers, but I think the main issue, if you are reading

16   Judge Armstrong's decision on this point, is that when she --

17   to the extent that she addressed this question of whether the

18   statute confers discretion on the agency, her -- she cited

19   cases that arose under Section 555(b) of the APA which is not

20   at issue here.  That's a statute that has to do with matters

21   that are what are called "presented to the agency," and so that

22   is sort of an independent source of imposing this question of

23   whether, you know, the agency's action is reasonable.

24        Here under -- under 706.1, we're not talking about a

25   matter that was, quote/unquote, presented to the agency, and so

1    looking, you know, at *SUWA*, the question there has to be, you

2    know, is this -- is this statute by itself, 54 U.S.C. 100.502,

3    something that could be compelled in the mandamus context based

4    on a present duty, and we think that, you know, the "in a

5    timely" manner clearly confers discretion on the agency and,

6    therefore, it's not, and that's the point that, with all due

7    respect, Judge Armstrong's opinion didn't address.

8            **THE COURT:**  All right.

9        The other topic, as I mentioned, that I wanted to talk

10   about was the standing question and really one aspect of it.

11       I take the defendants' point that a number of the cases

12   that the plaintiff is discussing were NEPA cases, and obviously

13   NEPA has its own procedural standing provision, in essence.

14   But I take it that the -- the *Jackson Hole* case from the

15   District of Wyoming is the one that either party was citing

16   that dealt with a statute that is similar to ours and

17   dissimilar to NEPA.  And that court directly held that the

18   petitioners didn't identify and the court couldn't find any

19   procedural rights that were granted to members of the public

20   under the statute that was at issue there, which was 16

21   United States Code Section 1(a) through 7, and the plaintiffs

22   responded to the case by saying it's just one district court

23   case.

24       But setting that aside, why is the reasoning of that case

25   inapposite?  That's a question for the plaintiffs.

1              **MS. BARNEKOW:**  Thank you, Your Honor.

2         I have several answers to your question.  I first want to

3    clarify that NEPA does not always actually provide a right to

4    participate, so the contention that because this is not a NEPA

5    case it somehow does not afford a procedural injury I think is

6    incorrect.

7         But even beyond that, there are a number of Ninth Circuit

8    cases where standing, based on procedural injury, which is what

9    we have here where the Ninth Circuit found that there was

10   standing -- so I'm happy to point you to those cases under the

11   National Historical Preservation Act, for example, as well as

12   under the Endangered Species Act or under a state certification

13   program, none of which -- I'm sorry -- two of which, at

14   least -- two of which did not involve a right to participate

15   and none of which were under NEPA.  So the idea that it's not

16   NEPA means that this sort of injury isn't applicable here I

17   think is incorrect.

18            **THE COURT:**  Let me ask this.  So what are those cases

19   that you think involve analogous statutes, and I will look

20   closely at them.  I'm sure you have cited them in your brief,

21   but what are the two or three, in your view?

22            **MS. BARNEKOW:**  Certainly.  Thank you, Your Honor.

23        So we cited *Oregon National Desert Association vs.*

24   *Dombeck*, which is 172 F.3d 1092, which is Ninth Circuit 1998.

25   In preparation for this hearing, we also found two other cases

1  which I can point you to, the first being *Center for Biological*

2  *Diversity vs. Mattis*, which is 868 F.3d 803, Ninth Circuit

3  2017, and then the second *is Citizens for Better Forestry vs.*

4  *USDA*, 341 F.3d 961, which is Ninth Circuit 2003.

5  **THE COURT:**  And those last two you didn't cite in your

6  brief?

7  **MS. BARNEKOW:**  That's correct, Your Honor.  We only

8  found them after final briefing was complete.

9  **THE COURT:**  All right.

10  So why don't you continue.

11  **MS. BARNEKOW:**  Thank you.

12  I also wanted to add, before continuing on, to the Wyoming

13  case that you brought up, but regardless, under the -- under

14  the requests that we're talking about today that the Park

15  Service comply with their duty to revise a General Management

16  Plan, there is, in fact, a NEPA process which defendants

17  themselves have acknowledged.  So plaintiffs and others will,

18  in fact, have a chance for public participation in this

19  planning process, just as they would under NEPA and some of the

20  other cases.

21  But specifically talking about *Jackson Hole*, respectfully,

22  Your Honor, we think that that case was decided incorrectly.

23  But beyond that, it was based on reasoning that was very

24  specific to the Tenth Circuit.  It relied heavily on *State of*

25  *Utah vs. Babbitt*, which is a Tenth Circuit case from 1998.

1    In that case, the plaintiffs' alleged injury was based on

2    their denial of participation in a process at a stage where

3    there was no statutory rights to participation, and so the

4    Tenth Circuit in that case found that plaintiffs had no

5    standing specifically because there was no right to participate

6    at that stage under the statute -- excuse me -- a notice in

7    common, particularly at that stage.  And that is what *Jackson*

8    *Hole* primarily relies on for the contention that in order for

9    there to be a procedural injury, there must be some public

10   participation and notice in common.

11   But that is not the case in the Ninth Circuit.  Rather, in

12   the Ninth Circuit, to satisfy the injury-in-fact requirement

13   for procedural requirements, "a plaintiff must only show" --

14   and I'm quoting here from *Central vs. City of Long Beach* --

15   "that the procedures in question are designed to protect some

16   threatened concrete interest."

17   In this case, that's exactly what we have.  The statute at

18   issue is clearly designed to protect the concrete interests of

19   our plaintiffs.  The statute specifically requires that the

20   Park Service take measures to, quote, preserve the area's

21   resources, the area's natural resources, which --

22   **THE COURT:**  I mean, you're saying that the generic

23   purposes set out in Sections 1 through 4 are such as to confer

24   a specific -- or directed to a specific benefit for your

25   client?

1      **MS. BARNEKOW:**  I wouldn't say that specific to our

2    clients, but I -- it is a concrete interest under the test

3    established for whether plaintiffs have procedural injury to

4    challenge the Government's failure to undertake a mandatory

5    process which, in this case, is the revision of the GMP.

6      **THE COURT:**  Well, all right.  I understand your

7    position.  You can continue.

8      **MS. BARNEKOW:**  Thank you, Your Honor.

9      Again, continuing in our discussion of *Jackson Hole*, I was

10   going to again point you to two of the cases that I just shared

11   with you, specifically *Center for Biological Diversity vs.*

12   *Mattis*, which is Ninth Circuit 2017, and *Citizens for Better*

13   *Forestry vs. USDA*, which was Ninth Circuit 2003, both of which

14   found that plaintiffs had standing to challenge -- to challenge

15   agency action under a theory of a procedural injury where the

16   statute at issue had no right to public participation or notice

17   and comment at all.

18      So while *Jackson Hole vs. Babbitt* was decided on a very

19   specific understanding of what a procedural injury is, that is

20   not what is binding in this circuit.

21      **THE COURT:**  All right.  Well, the way that the case

22   describes the Tenth Circuit precedent it was considering is

23   that "Petitioners have standing to challenge the agency's

24   compliance with the statute only if that statute provides them

25   with a procedural right whose transgression constitutes an

1  Article III injury in fact."

2      How, if at all, is that different from the Ninth Circuit's

3  law?

4          **MS. BARNEKOW:**  Your Honor, again, this is where I

5  would point you back to the case that *Jackson Hole vs. Babbitt*

6  cites for that assertion which makes it very clear that the

7  court in that case is defining a procedural injury as one where

8  there is a right to public participation.  It does not say it

9  in that particular quote, but that is what they're referring

10  to.

11      And that is why, in fact, defendants have argued

12  plaintiffs do not have -- do not have standing to challenge

13  this because there is no right -- because they have no right to

14  notice and comment in the revision of a General Management

15  Plan.  So that's the distinction --

16          **THE COURT:**  But that wasn't quite my question.  That

17  phrase that I just read, do you think that that is the same or

18  different than the law in the Ninth Circuit?

19          **MS. BARNEKOW:**  I'm sorry, Your Honor.  Could you

20  repeat it just so I'm sure?

21          **THE COURT:**  Sure.  "Petitioners have standing to

22  challenge the agency's compliance with," and then they list the

23  statute, "only if that statute provides them with a procedural

24  right whose transgression constitutes an Article III injury in

25  fact."

1          **MS. BARNEKOW:**  No, Your Honor.  I wouldn't say they

2    have standing only if its transgression creates such an injury.

3    In this case, plaintiffs are injured by the Park Service's

4    failure to revise the General Management Plan, but I do not

5    believe that that is an accurate representation of the law as

6    it stands in the Ninth Circuit.

7          **THE COURT:**  All right.

8        Why don't I ask Mr. DeVito to pick up on this point.

9          **MR. DEVITO:**  Sure, Your Honor.  David DeVito.

10       I think it is an accurate representation of the law in the

11   Ninth Circuit.  I would refer you to the *Fernandez vs. Brock*

12   case that we cited in our papers.  And that case makes it clear

13   that, you know, the crucial injury is not have you -- have you

14   alleged a violation of some statutory obligation.  It's whether

15   that statute imposes some correlative procedural duty and right

16   that is specific to a given plaintiff, the violation of which

17   is sufficient to confer standing.

18       I think the *Jackson Hole* case specifically addresses this

19   and gets it correct, that the statute at issue here, you know

20   54 U.S.C. 100.502, doesn't do that.  There is no evidence in

21   the record or in the legislative history or anywhere that that

22   was the intention of Congress in creating this statute, was to

23   confer rights in these plaintiffs, and so we think that, you

24   know, this is not an issue where oh, the Tenth Circuit law is

25   different.  I think the Tenth Circuit case is consistent with

the Ninth Circuit law which is consistent with the Supreme

Court law on this question, which is that, you know, under --

and I think the Supreme Court case is *Summers vs. Earth Island*

*Institute*.  You can't just identify some law that an agency

isn't following appropriately and -- and confer standing on

yourself.  The question is whether there is procedural rights

in the plaintiff.

I think also, you know, the -- going back to some of the

authorities that the plaintiffs have cited, obviously most of

them are NEPA cases, and that's the distinction that I would

draw, is that NEPA does create those sorts of rights, was

clearly intended to create those sorts of rights and the

statute wasn't, but I think to the extent that there are other

cases like Endangered Species Act cases or Historic

Preservation Act cases, that's sort of the same situation,

which is all distinct from the statute that we have at issue

here, and that's what the Wyoming court in *Jackson Hole* was

addressing, and we think it got that correct.

**THE COURT:**  Just looking at *Fernandez*, where, in your

view, is the clearest statement of the principle that you were

just talking about?

**MR. DEVITO:**  Bear with me, Your Honor, if I can do

this on the fly.  I think it's at page 630.  The Court says,

"The foregoing demonstrates that a plaintiff who merely claims

a defendant violated a statutory duty does not necessarily

1    satisfy the requirement of injury in fact in Article III.

2    Instead, we hold that the crucial inquiry in such a situation

3    is whether a statute that imposes statutory duties creates

4    correlative procedural rights in a given plaintiff, the

5    invasion of which is sufficient to satisfy the requirement of

6    injury in fact in Article III."

7              **THE COURT:**  I see it.

8         Do you have any other take on this standing question

9    that's based on the nature of the statutory and the procedural

10   injury that's alleged?

11             **MR. DEVITO:**  No, Your Honor.

12             **MS. BARNEKOW:**  Your Honor, can I respond to that?

13             **THE COURT:**  Sure.

14             **MS. BARNEKOW:**  Thank you.

15        I would point you as well to Footnote 7 of *Lujan*, in which

16   the Supreme Court made very clear that a person who has been

17   accorded a procedural right can assert that right, and, you

18   know, this goes to other standards without meeting the normal

19   standards of redressability and immediacy.

20        I would say, too, that plaintiffs are not arguing that

21   there is -- there needs to be no other facts on the ground to

22   assert injury other than a violation of law.  Of course that

23   doesn't satisfy Article III.

24        What we have here is a statute that was specifically

25   designed to protect plaintiffs' interests in the natural

1    resources at historic park units.  That is the concrete

2    interests that our plaintiffs have at Tomales Point, which

3    we've demonstrated amply through their standing declaration.

4         They have been injured because the National Park Service

5    has failed to comply with this process.  It's not merely that

6    they have not -- that the Park Service has not complied with

7    their duty to revise the General Management Plan but, rather,

8    the impact that that has had on our plaintiffs.

9         So I would point you there again back to *Center for*

10   *Biological Diversity vs. Mattis*, which this sort of concrete

11   interest they say specifically can reflect a, quote, aesthetic

12   conservational and recreational value, which is exactly what we

13   have here.

14        So I don't think that there can be any real question that

15   the plaintiffs have a concrete interest in the preservation of

16   the area's resources, which is exactly what the statute at hand

17   contemplates and requires.

18        Moreover, whether or not there is a right to notice and

19   comment or public participation, which, again, was the question

20   in the Wyoming case relying on that Tenth Circuit opinion,

21   regardless, defendants themselves have admitted that this

22   process, should they undertake it, which they now say they have

23   committed to beginning the process, will require compliance

24   with NEPA and an environmental impact statement, which will

25   give plaintiffs and others the right to public participation.

1    So even if you accept the reasoning of Wyoming and -- out

2    of the Tenth Circuit, there is still a procedural injury here

3    that plaintiffs have suffered.

4         **THE COURT:**  All right.  I understand your position.

5    Thank you.

6         All right.  Those are the questions that I had.  Obviously

7    there is a lot in terms of the facts, but I think those are the

8    questions I am focused on.

9         And, really, then just one question for Mr. DeVito.  And

10   I -- I saw that the agency is now intending to undertake a plan

11   revision, and it sounds like that will result in potentially

12   visions to the elk plan, but it's a multiyear process that's

13   proposed.

14        And I guess what I'm about to say is stepping away from

15   the doctrine and stepping away from whatever the ruling might

16   be in the case and however it might turn out, I take it that

17   everyone understands that it would not make sense for us to get

18   to 2025 and have that be a moot point because the elk herd is

19   gone.  And that is, you know, whether the doctrinal piece of

20   this fits together exactly with what the plaintiffs are saying

21   or not, that is a concern that they are raising that seems to

22   me to be legitimate, not from the perspective of a -- that may

23   be detached from what the legal structure provides, but it's

24   not an unreasonable thing for them to be concerned about.

25        And so I'm just wondering on behalf of your client how

1   that concern and that public trust is consistent with the time

2   frame that you are proposing?

3        **MR. DEVITO:**  Yes, Your Honor.  David DeVito.

4       I think obviously that's a valid concern that the Park

5   Service shares.  The Park Service certainly is not interested

6   in being in a position where there is no elk herd, and having

7   done all this work while in the interim, the situation on the

8   ground deteriorates to the point where there isn't one.  Of

9   course -- and the Park Service is equally interested and

10  committed to going through this process to revise the elk plan

11  and, as appropriate, the General Management Plan for Tomales

12  Point.

13      And the point of doing all of that is to make sure that

14  the resources at the park, including the elk, are appropriately

15  managed.  And you can rest assured that the Park Service will

16  continue to observe its duty to do that.

17       **THE COURT:**  Is there any thought that has been given

18  in this case to whether some sort of a settlement discussion

19  with a magistrate judge, for example, might help the parties

20  identify some zone of overlapping interest, or is the thought

21  that there's just too much difference in terms of perspective

22  for that to work?

23       **MR. DEVITO:**  Your Honor, this is David DeVito.

24      We have had some discussions, and I think it's probably

25  fair to say that although I think both parties are and were and

1    remain probably interested in settling the case if it were

2    possible, it -- we -- those discussions, I think, led us to

3    believe that we were not going to be able to do that.

4              **THE COURT:**  Is that your take as well, Ms. Barnekow?

5              **MS. BARNEKOW:**  Yes, Your Honor.

6         And if I may, would you want me to respond to the last

7    point made by defendants?

8              **THE COURT:**  Sure.

9              **MS. BARNEKOW:**  Thank you.

10        I would just like to point out -- and we and plaintiffs,

11   I'm sure, appreciate your concern and recognition of the very

12   real threat that by 2025, which as you recognized is the

13   timeline that the Park Service has proposed, at least at this

14   point -- by the time they'll complete this process, that the

15   elk won't exist anymore.

16        I would remind you that when we asked Your Honor for a

17   preliminary injunction and briefed that, the Park Service told

18   you that they, quote, stood ready to act to safeguard the

19   population at Tomales Point.

20        Since that happened, we found out that an additional 72

21   elk have died, and I know Your Honor said you're very familiar

22   with the facts on the ground.  I don't mean to hammer this

23   point home, you know, too much.

24             **THE COURT:**  I understand.  But what I'm getting at is

25   I don't -- I have serious questions as to whether any of that

1   is the driver as to the legal answer, but I also -- and I -- I

2   take Mr. DeVito at his word, and I know that there is a dispute

3   as to what policy ought to be applied here.  But, again, this

4   may be going beyond the scope of what's in front of me, but it

5   just does seem to me that one way or another -- and I don't

6   think the Government would dispute that -- that the

7   preservation of the herd has to be accounted for in some way,

8   and if that -- if that -- and I'm not getting into what the

9   details of that would be because I'm not a wildlife management

10  expert, but I -- what I was asking for is that recognition on

11  the part of the Government and the -- some indication that they

12  are cognizant of the issue.  And I understand that the

13  plaintiffs' view is that they're not responding properly and

14  that there is -- there are a number of things the Court should

15  order that are different than what they're doing, and I get

16  that, so that is not something I need to hear more about.

17      But it just does seem to me to be a case that, setting

18  aside the legal dispute and setting aside the question of what

19  relief is within this Court's prior order and all of those

20  types of things, it seems to me that every one ought to have in

21  mind that the preservation of the herd and making sure that

22  that happens is important.

23      And I don't have reason to doubt that the Government

24  understands the obligation, and I also don't have reason to

25  doubt that there is a good-faith difference of opinion as to

1    what the right policy is and what needs to be done, and I get

2    that.

3         But I just wanted to make clear that -- that I do

4    understand that dimension of this and am hopeful that whatever

5    the outcome of the legal claims here, that's something that is

6    being given due importance and weight by the agency.

7         **MR. DEVITO:**  Your Honor, this is David DeVito.  I

8    might just be repeating myself, but I can assure you that the

9    Park Service understands the importance of that.

10        **THE COURT:**  All right.  So I don't have any other

11   questions.

12        Any closing comments from either of you?

13        **MS. BARNEKOW:**  No, Your Honor.  Thank you.

14        **MR. DEVITO:**  This is David DeVito again.

15   No, thank you, Your Honor.

16        **THE COURT:**  All right.  I will take the motions under

17   submission, and I will aim to issue an order as soon as I can.

18   Thank you both for the argument.

19                  (Proceedings adjourned at 3:11 p.m.)

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4            I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6

7      DATE:    Monday, May 22, 2023

8

9      *Pamela Batalo Hebel*

10     _____
       Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11     U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25